IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY BOIM, Individually and as Administrator of the Estate of David Boim, deceased; and JOYCE BOIM,<br><br>    Plaintiffs,<br><br>v.<br><br>AMERICAN MUSLIMS FOR PALESTINE; AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION; RAFEEQ JABER; ABDELBASSET HAMAYEL; AND OSAMA ABU IRSHAID,<br><br>    Defendants. | Civil No. 17-cv-03591<br><br>**Hon. Sharon Johnson Coleman**<br><br>Hon. Sidney I. Schenkier |

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS**

After eight years of litigation that culminated in an *en banc* decision of the Seventh Circuit, the defendants in *Boim v. Holy Land Foundation, et al.* No. 00-cv-2905, were held to have violated the Anti-Terrorism Act ("ATA") by providing material support to Hamas. The Holy Land Foundation ("HLF"), Islamic Association for Palestine ("IAP"), American Muslim Society ("AMS"), and other defendants (collectively, the "*Boim* Defendants") were held civilly liable for Hamas' murder of American David Boim and were ordered to pay $156 million to the victim's family (the "*Boim* Judgment"). The question presented by this case is whether the *Boim* Defendants, in the guise of new corporate entities, can now avoid paying that judgment to victims of terrorism based on their assertion that the original defendants are out of business and have no assets, while they truly continue their previous operations.

The basis for the Boims' claim is not, as the Defendants assert in the Rule 12(b)(1) motion to dismiss, that corporate "veils" are being "pierced." It is, rather, that the Defendants in this action are the alter egos and successors of the original *Boim* Defendants that were sued by the Boims and found liable by the Seventh Circuit.

This case—and the related enforcement proceedings in *Boim v. Holy Land Foundation*, No. 00-cv-2905, (the "Enforcement Action")—serve two critically important functions: First, they seek compensation for the parents of David Boim, an American teenager murdered by a Hamas gunman in 1996. Second, they seek to ensure the efficacy of the civil remedies provisions of the ATA. In upholding the *Boim* Judgment, the Seventh Circuit, sitting *en banc*, made clear that the conduct of the *Boim* Defendants was nothing less than intentional funding for terrorism: "the American Muslim Society…*did* know (that) in giving money to the (Holy Land) Foundation (it) was deliberately funneling money to Hamas." *Boim v. Holy Land Foundation*, 549 F.3d 685, 701 (7th Cir. 2008). The *Boim* Judgment, awarded pursuant to the ATA, fulfilled

1

an important role in the legislative scheme to protect American nationals from international terrorism. As Judge Posner observed:

> [A] donation to a terrorist group that targets Americans outside the United States may violate section 2333. Which makes good sense as a counterterrorism measure. Damages are a less effective remedy against terrorists and their organizations than against their financial angels. Terrorist organizations have been sued under section 2333…but to collect a damages judgment against such an organization, let alone a judgment against the terrorists themselves (if they can even be identified and thus sued), is…well-nigh impossible. These are foreign organizations and individuals, operating abroad and often covertly, and they are often impecunious as well…[S]uits against financiers of terrorism can cut the terrorists' lifeline.

*Boim*, 549 F.3d at 690-91. Consistent with the purposes of the ATA, the *Boim* Judgment was intended to saddle organizations that had deliberately funded Hamas with significant liability and the ignominy of being responsible for the murder of an American teenager.

Unfortunately, casting off this liability and ignominy has proved all too easy. The *Boim* Defendants simply claimed they had used up their assets and gone out of business. They then continued the same operations down the street under new names: American Muslims for Palestine ("AMP") and Americans for Justice in Palestine Educational Foundation ("AJP"). AMP and AJP have the same mission and purpose, same leaders, same donors and sponsors, and same fundraising and annual conferences as their predecessors. The one big difference is that instead of funding the *Boim* Judgment out of their assets and ongoing fundraising, AMP and AJP want to be free to carry on the work initiated decades ago by the leaders of Hamas under new names and unencumbered by the *Boim* Judgment. As Defendants themselves put it, the new entities continued the "charitable work of [*Boim* Defendants] IAP and AMS without their debts." (Mot. at 13.) Allowing United States-based supporters of terrorism operating under the guise of "charities" to simply regroup and cast away terror-related debts will have one necessary consequence: rendering the Anti-Terrorism Act a nullity. That is what is at stake in this case.

Plaintiffs brought this action seeking a declaration that AMP, AJP and three individuals (collectively, "Defendants") are liable for the *Boim* Judgment as alter egos and successors of the *Boim* Defendants. Defendants have chosen to respond to Plaintiffs' Complaint by filing a Rule 12(b)(1) motion based almost entirely on a Supreme Court case—*Peacock*—that applies only to vicarious liability veil-piercing claims, and not to the "direct" liability alleged in alter ego and successor claims. *Peacock* does not preclude jurisdiction here.

Furthermore, Defendants deliberately chose to file a Rule 12(b)(1) motion to challenge *jurisdiction*, not a Rule 12(b)(6) motion or motion for summary judgment challenging the viability of Plaintiffs' claims. They cannot attack jurisdiction by arguing (without complying with the procedural requirements of Rules 12(b)(6) and 56) that they should win the ultimate issue on the merits. Furthermore, Plaintiffs' allegations do state viable claims, and none of Defendants' new evidence provides any basis to decide otherwise. For these reasons, as set forth below, the Court should deny Defendants' motion.

## BACKGROUND

In 1996, Plaintiffs' son David was murdered by two agents of the international terrorist organization Hamas. Plaintiffs initiated what is now the Enforcement Action in 2000 under the civil remedies provision of the ATA against various individuals and organizations that provided material support to Hamas in violation of 18 U.S.C. § 2339A. In 2004, this Court entered the *Boim* Judgment in the amount of $156,000,000 against certain of the *Boim* Defendants, including the AMS and IAP and in 2012 against HLF. Plaintiffs had little success collecting on the *Boim* Judgment. AMS and IAP claimed to be out of business with few assets; HLF had ceased operations, and its assets had been seized by the United States. (Compl. ¶ 1.)

Plaintiffs have since learned that these *Boim* Defendants remain in business today through their alter egos and successors, AMP and AJP. (*Id.* ¶ 2.) These two new entities are

3

effectively the *same entities* as AMS and IAP—just operating under different names. (1) AMP was established in 2005 (right after the *Boim* Judgment). (2) The new entities were created and are managed by individuals who previously managed and controlled the *Boim* Defendants. (3) They have the same mission and purpose. (4) They opened on the same street. (5) They run the same annual conference. (6) They share many of the same donors and fundraisers. (7) On information and belief, some of the *Boim* Defendants' assets were transferred to AMP and AJP. (*Id*. ¶¶ 34-36, 47-48, 53.) AMS, IAP and HLF were abandoned and replaced by new entities "in order to permit the same ongoing enterprise—formerly conducted through the *Boim* Defendants—to continue free and clear of the burden of paying the *Boim* Judgment." (*Id*. ¶ 54.)

Plaintiffs have also learned that three of the leaders of the original *Boim* Defendants—Rafeeq Jaber, Abdelbasset Hamayel, and Osama Abu Irshaid (the "Individual Defendants")—subsequently became key leaders of AMP and AJP. Jaber was president and the principal spokesman of both AMS and IAP. (Compl. ¶ 39.) He was deeply involved with the operation and funding of these organizations in the 1990s, including when Hamas murdered David Boim in 1996. Jaber was subsequently an organizer of AJP, a representative of AMP, and President of the Board of Directors of the Bridgeview Mosque, which is a significant supporter of AMP and AJP and has a history of directing money to terrorist organizations, including Hamas and al-Qaeda. (*Id*. ¶¶ 38, 39.) Hamayel and Abu Irshaid were also heavily involved with AMS and IAP, and, along with Jaber, directed and controlled AMS's activities. (*Id.* ¶¶ 40, 41, 55.) Like Jaber, they subsequently controlled AMP and AJP. (*Id*. ¶¶ 40, 41, 55.)

Plaintiffs seek to enforce the *Boim* Judgment against Defendants based on alter ego and successor liability theories. To accomplish this, Plaintiffs have initiated three well-recognized procedural mechanisms for enforcing judgments against alter egos and successors of judgment

4

debtors: (i) they re-initiated enforcement proceedings within the Enforcement Action by serving citations to discover assets pursuant to 735 ILCS 5/2-1402(a) and Ill. S. Ct. R. 277(b); (ii) they filed a Motion for Joinder of Non-Parties Pursuant to Federal Rule of Civil Procedure 25(c) in the Enforcement Action; and (iii) they filed this action seeking a declaration that Defendants are successors and alter egos of the *Boim* Defendants. Because of potential limitations in the scope of post-judgment proceedings, Plaintiffs brought this action to supplement the Enforcement Action, in order to ensure access to the full range of relief available under the law.

This Court has jurisdiction over this action because Plaintiffs seek to impose "direct" liability under the ATA on Defendants as alter egos and successors of the *Boim* Defendants. (Compl. ¶ 5.) As discussed below, there is ample authority establishing that independent federal jurisdiction exists in these circumstances. Defendants have nonetheless chosen to file a Rule 12(b)(1) motion challenging jurisdiction—apparently seeking to force this case into state court while the parallel Enforcement Action proceeds in federal court. They made the strategic choice not to file a Rule 12(b)(6) or summary judgment motion. As demonstrated below, there is no legal or factual basis for the Defendants' jurisdictional challenge.

## ARGUMENT

I. **Plaintiffs Have Pled Alter Ego and Successor Liability Claims that Give Rise to Independent Subject-Matter Jurisdiction.**

Claims under section 2333(a) of the ATA are subject to exclusive federal jurisdiction. 18 U.S.C. § 2338. Plaintiffs allege that Defendants are *directly* liable under section 2333 for the unpaid portion of the *Boim* Judgment. AMP and AJP are directly liable because they *are* the judgment debtors, just under different names. The Individual Defendants are directly liable because they controlled the *Boim* Defendants and/or directly participated in the conduct at issue.

5

Relying on *Peacock v. Thomas*, 516 U.S. 349 (1996), Defendants assert that this is a "veil piercing" case (Mot. at 7-9), and that "*[p]iercing the corporate veil* is not itself an independent… cause of action, 'but rather is a means of imposing liability on an underlying cause of action.'" 516 U.S. at 354. But this is not a "veil piercing" or "vicarious liability" case, and *Peacock* has no application. In *Peacock*, the plaintiff was unable to collect an ERISA judgment against a corporation and brought a second lawsuit seeking to pierce the corporate veil against an officer of that corporation. However, unlike here, that officer had been a defendant in the original lawsuit and the first court had already ruled that the officer was not a fiduciary and therefore *could not be directly liable under ERISA*. *Id*. at 351-52. In the second lawsuit, the plaintiff sought to hold the officer—who could not be directly liable—vicariously liable under a veil-piercing theory. *Id.* at 352. The Supreme Court held that this veil-piercing claim against a non-fiduciary alleged no "underlying" violation of any provision of ERISA. *Id*. at 354. Here, by contrast, the Defendants are *directly* liable. Plaintiffs allege that AMP and AJP are the same entity or a disguised continuance of the judgment debtors who were liable for violations of the ATA, and that the Individual Defendants are liable because they controlled the judgment debtors. These are *direct* liability allegations against defendants who, unlike in *Peacock*, are subject to ATA liability.

The Seventh Circuit has endorsed exactly this distinction, making clear that *Peacock* is limited to *veil-piercing* claims, which are a form of *vicarious* liability, and does not apply to *alter ego or successor liability* claims, which are a form of *direct* liability:

> But there is a deeper problem with defendants' position—they do not appreciate the difference between vicarious and direct liability. Efforts to pierce the corporate veil ask a court to hold A vicariously liable for B's debt. If federal law does not establish vicarious liability, then the request must rest on state law; what other source could it have? ***But a contention that A is B's "alter ego" asserts that A and B are the same***

6

> ***entity; liability then is not vicarious but direct*** … All liability under ERISA is federal; a claim "arises under" federal law when federal law creates the right of action.

*Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037-1038 (7th Cir. 2000) (emphasis added); *see also Central States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 85 F.3d 1282, 1286-1287 (7th Cir. 1996) ("This theory is different from *Peacock*'s, where Thomas pursued Peacock *solely in his capacity as an officer and shareholder of the liable corporation*. Thomas' lawsuit attempted to '*pierce the corporate veil*.'") (emphasis added).

Courts within the Seventh Circuit have also found independent subject-matter jurisdiction over *successor* liability claims. These claims, like alter ego claims, are based on *direct* liability, in contrast to the veil-piercing claims barred in *Peacock. Trs. of the Chi. Painters & Decorators Pension Fund v. NGM Servs., Inc.*, 2014 U.S. Dist. LEXIS 176004, at *6-7 (N.D. Ill. Dec. 22, 2014); *Trustees of Sheet Metal Workers Local No. 1 Welfare Trust v. Pekin Climate Control, Ltd.*, 669 F. Supp. 2d 924, 928-929 (C.D. Ill. 2009). As the *NGM Services* court held, seeking to hold a successor (that did not co-exist with the predecessor) is not veil piercing but direct liability:

> …the Funds here do not seek to pierce the corporate veil…because there never was any veil between the two companies. [They] coexisted for only 13 days in 2010 and there is no evidence before the court establishing that the two companies operated as one. Instead, the Funds seek to hold NGM liable under theories of successor or alter ego liability, both of which are claims for direct— not vicarious—liability.

2014 U.S. Dist. Lexis 176004, at *6-7. That is what Plaintiffs allege here.

Because there is an independent basis for subject-matter jurisdiction, Plaintiffs are not relying on supplemental (or "ancillary") jurisdiction arising from the original *Boim* Action, as Defendants misleadingly suggest. Nonetheless, because there exists an independent basis for

7

subject-matter jurisdiction, this Court also has supplemental jurisdiction over any related theories of liability against the Defendants that "form part of the same case or controversy," including any veil-piercing and vicarious liability that might otherwise not have an independent jurisdictional basis under *Peacock*. *See* 28 U.S.C. § 1367(a).

## II. Defendants' Challenge to the *Merits* of Plaintiffs' Claims Is Both Improper in a Rule 12(b)(1) Motion and Insufficient to Demonstrate a Lack of Jurisdiction.

Defendants also argue that Plaintiffs' claims have no merit. According to Defendants, Plaintiffs' allegations either fail to state claims in the first place (Mot. at 5-6), or the "facts" presented in the declarations and documents accompanying Defendants' motion rebut those claims. (Mot. at 10-15.) These arguments fail both procedurally and substantively.

### A. Defendants Cannot Challenge the Merits of Plaintiffs' Ultimate Claims through a Rule 12(b)(1) Motion.

Defendants filed a Rule 12(b)(1) motion, limited to the narrow issue of whether this Court has federal subject-matter jurisdiction to hear Plaintiffs' claims. Such motions relate to jurisdictional issues—*e.g.*, amount in controversy or existence of diversity-of-citizenship—not to whether or not the claims have merit. Thus, the Seventh Circuit has noted the distinction between a challenge to the *viability* of a claim and a *jurisdictional* challenge:

> Even if the Funds' complaint was subject to dismissal under Fed. R. Civ. P. 12(b)(6), ***that shortcoming would not have affected the district court's subject-matter jurisdiction***. Skylight and Lowry appear to believe that whenever a claim flops, it also falls out of federal jurisdiction. That's not so; there is a gulf between 'deficient' and 'too feeble to invoke federal jurisdiction.'

*Elite Erectors*, 212 F.3d at 1038 (emphasis added); *see also Pekin*, 669 F. Supp. 2d at 928.[1]

---

[1] Defendants also fail to comply with the procedural safeguards of a Rule 12(b)(6) motion or a motion for summary judgment. If this were a Rule 12(b)(6) motion, Defendants would be required to limit their arguments to "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City*

8

Defendants also cannot properly attach declarations and documents to a Rule 12(b)(1) motion for the purpose of rebutting the merits of Plaintiffs' ultimate claims. Quoting *Evers v. Astrue*, 536 F.3d 651, 656–57 (7th Cir. 2008), Defendants assert that the "'[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" (Mot. at 10.) But their declarations and documents all address the issue of whether they are successors or alter egos (*see* Mot. at 10-15). That is, of course, the ultimate factual issue in this case. This evidentiary material falls under an exception to the *Evers* rule because "the facts required to establish jurisdiction are coextensive with those necessary to prevail on the merits." *Villasenor v. Industrial Wire & Cable*, 929 F. Supp. 310, 312, n.3 (N.D. Ill. 1996); *Lockhart v. United States*, 961 F. Supp. 1260, 1264, n.3 (N.D. Ind. 1997). Defendants' evidentiary material is improper and should be disregarded.

### B. Plaintiffs' Allegations State Cognizable Claims for Alter Ego and Successor Liability.

Defendants urge that the Court has no jurisdiction because the allegations in the Complaint are insufficient to state claims for alter ego or successor liability. (Mot. at 4-6.) Defendants have failed, however, to show any legal deficiency in Plaintiffs' allegations. Contrary to what Defendants suggest, federal courts have broadly applied alter ego liability to individuals and organizations that engage in or support terrorism. Recognizing that terrorist organizations differ from owned, for-profit entities, these courts have eschewed typical "factors"

---

*of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (citations omitted). They have not done so. Nor do they comply with the evidentiary and procedural rules for presenting evidence in support of summary judgment, including the separate statement of facts required under the local rules and the "reasonable opportunity" to provide pertinent materials under Fed. R. Civ. P. 12(d), which includes being allowed to conduct meaningful discovery. *See Herzog v. St. Peter Lutheran Church*, 884 F. Supp. 2d 668, 671 (N.D. Ill. 2012).

9

applied to alter ego claims in the for-profit context in favor of "the broader equitable principle" under which "the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice" or when it is "interposed to defeat legislative policies." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629-630 (1983) ("*BPECEC*"). This analysis looks at dominion and control and whether an entity's independence is in form only. *See, e.g.*, *Id.*; *In re 650 Fifth Ave. & Related Props.*, 881 F. Supp. 2d 533, 548-552 (S.D.N.Y. 2012); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 435 n.14 (E.D.N.Y. 2013); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 432 (E.D.N.Y. 2009).

Courts have also extended the alter ego analysis to *non-contemporaneous* entities when they are managed or controlled by the same people and are in reality a "disguised continuance" of one enterprise. *See Sanchez v. Global Parking Management, Inc.*, No. 14–cv–04611, 2015 WL 4429024, at *1, *3 (N.D. Ill. July 20, 2015) (common management "relevant to determine whether two seemingly independent businesses are really one enterprise"); *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987) (alter ego focuses on the "existence of a disguised continuance" of former business entity or attempt to avoid obligations of collective bargaining agreement); *Pekin*, 669 F. Supp. 2d at 926, 929 (finding alter ego liability based on "disguised continuance" where new entity was alleged to "conduct[s] substantially the same business, using substantially the same assets, at the same physical facility, with the same management, and same employees" and owners failed to properly wind up predecessor's affairs and pay judgment); *Laborers' Pension Fund v. Green Demolition Contractors, Inc.*, 2016 WL 74682, at *2 (N.D. Ill. Jan. 7, 2016). In addition, as Defendants note (Mot. at 5 n.8), a new entity may be liable under *successor liability* theories

10

where it is a "mere continuation" of a predecessor or where the new entity has the "fraudulent purpose" of escaping a predecessor's liabilities. As the Seventh Circuit has stated, "If a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability." *Brandon v. Anesthesia & Pain Mgmt. Assoc., Ltd.*, 419 F.3d 594, 599 (7th Cir. 2005). As with alter ego liability, courts have adapted the successor liability paradigm to not-for-profit entities, even where requirements usually applied in the for-profit, corporate context do not fit the circumstances of non-profits. *See, e.g., Chao v. Int'l Bhd. of Indus. Workers Health & Welfare Fund*, 97 F. Supp. 3d 268, 274 (E.D.N.Y. 2015); *Hankinson v. King*, 117 F. Supp. 3d 1068, 1074 (D. Minn. 2015); *Ring v. The Elizabeth Found. for the Arts*, No. 113849/2011, 2014 WL 5908429, at *5 (N.Y. Sup. Nov. 12, 2014).

Plaintiffs allege that AMP and AJP—purportedly new entities—are actually *the same* organizations as AMS and IAP. They are a "disguised continuance" designed to "permit the same ongoing enterprise—formerly conducted through the *Boim* Defendants—to continue free and clear of the burden of paying the *Boim* Judgment." (Compl. ¶ 54.) They have the same leaders; they have the same mission and purpose; they hold the same annual conferences; they operate in the same geographic location; and they have many of the same donors and fundraisers. Indeed, the new entities continue to generate funds using the same conferences, donors and fundraising mechanisms. Instead of using the ongoing funding to pay the *Boim* Judgment, they escape liability by putting a new name on the door. Permitting this strategy to succeed would "defeat [the] legislative policies," *BPECEC*, 462 U.S. at 629-630, embodied in the civil remedies provisions of the ATA.

Likewise, Plaintiffs allege that the Individual Defendants controlled IAP, AMS and HLF, used them as a front to advance their personal objectives, and directly participated in the conduct

11

giving rise to the *Boim* Judgment. (Compl. ¶ 55.) The Individual Defendants also control AMP and AJP, and use them as a disguised continuance of the *Boim* Defendants to continue advancing the same objectives. (*Id*.) These allegations are sufficient for alter ego liability.

### C. Defendants' Purported Factual Arguments Do Not Preclude Jurisdiction.

Defendants devote the final 5 pages of their brief to *factual* arguments supported by perfunctory declarations and a few additional documents having no evidentiary foundation. (Mot. at 10-15.) Defendants' purported evidence does not support any jurisdictional or other deficiency in Plaintiffs' claims.

**1. AMP and AJP.** According to Defendants, a Settlement Agreement reached between KindHearts and the Treasury Department in 2011 precludes the "supposed fraudulent transfer of any assets" from HLF or KindHearts to AMP or AJP. (Mot. at 13-14, Ex. F.) This Settlement Agreement, supported by no declaration or other evidentiary foundation, does not prove that there were never transfers of funds or assets between the *Boim* Defendants and AMP and AJP. It indicates only that KindHearts (not a *Boim* Defendant but a "progeny" of HLF and former employer of Hamayel (Compl. ¶¶33, 40)) agreed that its remaining funds as of 2011 would be used for outstanding financial obligations and as grants for charitable purposes. (Mot., Ex. E ¶ 1.) There is no evidence regarding disposition of KindHearts' assets prior to 2011 and no evidence concerning transfers that may have occurred between the judgment debtors and AMP and AJP. This is a disputed issue of fact that cannot be resolved prior to discovery.

Furthermore, Plaintiffs have not asserted a fraudulent transfer theory, and whether transfers occurred is not dispositive. Although Plaintiffs believe that discovery will show transfers, the core issue is whether AMP and AJP are the same entities, or "disguised continuances," of one or more of the *Boim* Defendants. Evidence that the new and old entities share the same purpose, mission, leadership, donors, fund raising capability, conferences, and

12

physical location will suffice to support the alter ego and successor allegations.

Nor have the Plaintiffs alleged that legal entities named AMP and AJP existed in 1996. Defendants' assertion that the 1996 actions were "in actuality performed by entities which did not exist until nine (AMP) and thirteen (AJP) years later" (Mot. at 14.) is irrelevant. Plaintiffs allege that the new formal entities were created to avoid the *Boim* Judgment, and that they are actually the *same organizations* as their predecessors. In that sense AMP and AJP were the "true actors" that violated the ATA and were held liable in the *Boim* Judgment. In both *Central States* and *Elite Erectors* the Seventh Circuit found comparable allegations to support "direct" liability giving rise to subject-matter jurisdiction.

        **2.**    **Rafeeq Jaber.** Defendants attempt to minimize Jaber's involvement with AMS and IAP by attaching testimony that he had another job with Met Life at the time and was unpaid by AMS. (Mot. at 12.) At best, such evidence creates disputed issues of fact with respect to the degree of Jaber's involvement. Regardless of how he was paid, Jaber held high-level positions with the *Boim* Defendants: He was the former president and principal spokesman for AMS and IAP in Chicago and President of IAP National. (Compl. ¶ 39.) Defendants themselves *admit* Jaber served as President of AMS and IAP in the early 1990s. (Mot. 12.)

Jaber's effort to distance himself from a long history of activism and leadership with IAP/AMS is not new. During his first deposition in the *Boim* case, Jaber claimed that he was not involved with IAP National before 1996. He swore that "for IAP nationally prior to 1996, I was not involved. So I don't know what took place before that." (4/9/03 Jaber Dep. 225:18-20 (Landes Decl. (attached as Exhibit 1), Ex. A).) When confronted at his second deposition with a 1991 document from his own Mosque Foundation listing him as the president of IAP National's Chicago chapter, Jaber recanted and admitted he was a member of IAP National committees as

13

of *1991*. (7/28/03 Jaber Dep. 72:21-74:20 & Ex. 29 (Landes Decl., Ex. B).)

Moreover, evidence directly links Jaber to the funding of Hamas terrorism proved in the *Boim* case. When Jaber was President of AMS, the organization was itself a donor to HLF, writing at least one check just two months before David Boim's murder. (AMS Check No. 211 (*Id.*, Ex. C).) Jaber testified that AMS would also directly send donors' funds to HLF. (*Id.*, Ex. A 73:5-23; 73:24-74:1-17.) Jaber also worked with the head of IAP National to celebrate the Fifth Anniversary of the Intifada in the Chicago area, and the proceeds of the event went to HLF. (*Id.*, Ex. B 70-78.) IAP and AMS had a contract agreeing to raise funds for HLF. (*Id.*, Ex. A 201-03.) Jaber vouched for HLF, identifying as "trustworthy people" Shukri Abu Baker, Ibrahim [El-Mezain], and Basman Elashi (*Id.*, Ex. A 203:13-18), each of whom was subsequently convicted and sent to prison for financial dealings with Hamas. *See United States v. El-Mezain*, 664 F.3d. 467 (5th Cir. 2011) (Abu Baker and El-Mezain); (U.S. Department of Justice Press Release, October 13, 2006 (Basman Elashi) (*Id.*, Ex. D).)

      **3.** **Abdelbasset Hamayel and Osama Abu Irshaid.** Hamayel's and Abu Irshaid's declarations also relate to contested issues of fact. Hamayel asserts that he began working for IAP "as Chicago office administrator in or around September 1997." (Mot. Ex. 1 ¶ 3.) However, Kifah Mustapha, a former employee of HLF and a regular entertainer at IAP "festivals" and conventions, testified that Hamayel was the master of ceremonies at IAP festival events beginning in 1996. (3/2/04 Mustapha Dep. 72:16-24; 73:1 (Landes Decl., Ex. E).) Hamayel declares that he "did not hold any positions with the American Muslim Society," but he was an employee of its alter ego, IAP. *See Boim v. Quranic Literacy Institute*, 340 F. Supp. 885, 908 (N.D. Ill. 2004). Although he claims to be "a volunteer Executive Director for AMP, in an unpaid position," he was listed as part of the "Full-Time Staff" of the Mosque Foundation since

14

2007. (2010 Mosque Found. Ann. Report, 2010 at 14 (*Id*., Ex. F).) The Mosque Foundation is a major financial sponsor of AMP and AJP. (Compl. ¶38.)

Abu Irshaid fails to mention in his declaration that he was editor of IAP's main publication, *Al-Zaytouna*, a copy of which was on "each chair in the [IAP/AMS] conferences." (Landes Decl., Ex. E 72:3-10.) In addition, although Abu Irshaid explains that he has filed suit to obtain naturalization, he omits that the reason USCIS denied his original application was because he failed to disclose his connections with IAP. Abu Irshaid's recent complaint, although cited in his affidavit, was filed under seal and is not available. *Irshaid v. United States Citizenship and Immigration Services*, No. 1:17-cv-00402 (E.D. Va. Filed 03/31/2017).

Defendants' factual arguments are premature and should be subject to discovery. Moreover, whether or not Hamayel and Abu Irshaid were "true actors" in 1996, they were alter egos of the *Boim* Defendants and AMP and AJP after that date. They were involved in the ongoing disguised continuance of the *Boim* Defendants for the purpose of avoiding payment of the *Boim* Judgment. *See Pekin*, 669 F. Supp. 2d at 6229 (finding alter ego liability where alter ego failed to properly wind up business affairs and effected sham transaction to frustrate collection of judgment). Plaintiffs' claims based on post-1996 conduct are inextricably intertwined with the successor claims against AMP and AJP and "form part of the same case or controversy." *See* 28 U.S.C. § 1367. Plaintiffs have, therefore, alleged supplemental jurisdiction over any claims not subject to original jurisdiction. (Compl. ¶ 6.)

## CONCLUSION

For the foregoing reasons, this Court should deny the Defendants' motion and grant such further relief as the Court deems just and appropriate.

15

Dated: July 11, 2017 Respectfully submitted,

 *Stephen J. Landes*
Stephen J. Landes
W. Allen Woolley
Michael B. Kind
Joshua Fliegel
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700

*Attorneys for Stanley Boim, Individually and as the Administrator of the Estate of David Boim, Deceased, and Joyce Boim*

Of Counsel
Nathan Lewin (*pro hac vice*)
Alyza D. Lewin (*pro hac vice*)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, DC 20006
(202) 828-1000

Daniel I. Schlessinger
JASZCZUK P.C.
311 South Wacker Drive
Suite 1775
Chicago, Illinois 60606
(312) 442-0509

16

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on July 11, 2017 he caused the foregoing PLAINTIFFS' RESPONSE TO MOTION TO DISMISS to be served by electronically filing with the Clerk of the Court for the Northern District of Illinois using the CM/ECF system, and thereby serving by e-mail notification upon counsel for all parties of record.

*Michael B. Kind*