**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY BOIM, individually and as administrator of the estate of DAVID BOIM, deceased, and JOYCE BOIM, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 17-cv-3591 |
| AMERICAN MUSLIMS FOR PALESTINE, AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION, RAFEEQ JABER, ABDELBASSET HAMAYEL, and OSAMA ABUIRSHAID, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs filed a Complaint seeking monetary, declaratory, and injunctive relief against defendants American Muslims for Palestine ("AMP"), Americans for Justice in Palestine Educational Foundation ("AJP"), Rafeeq Jaber, Abdelbasset Hamayel, and Osama Abuirshaid.[1] Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction [31]. For the reasons stated herein, this Court grants defendants' motion.

**Background**

The following factual background is derived from the Complaint and accepted as true as for purposes of ruling on the instant motion. In 1996, two agents of Hamas killed Stanley and Joyce Boim's son, David Boim.[2] The Boims filed a lawsuit against individuals and organizations here in the United States that were financing Hamas and, thus, the murder of their son. The Boims were

---

[1] The Court has opted to use the defendants' spelling of Osama Abuirshaid.

[2] Hamas was added to the State Department's list of terrorist organizations on October 8, 1997. https://www.state.gov/j/ct/rls/other/des/123085.htm (last visited 8/18/2017).

awarded a judgment of $156 million in 2004. Since the Seventh Circuit Court of Appeals affirmed

that judgment in 2008, *see Boim v. Holy Land Found. for Relief and Dev.,* 549 F.3d 685 (7th Cir. 2008) (*en*

*banc*), the Boims have been trying to collect those funds from the defendants in the original lawsuit:

the Holy Land Foundation for Relief and Development ("HLF"), the American Muslim Society

("AMS"), and AMS's alter ego operating under the name Islamic Association for Palestine ("IAP").

Defendant American Muslims for Palestine ("AMP") was allegedly established in 2005 by

IAP and founded by "activists" from the KindHearts.[3] The Complaint does not identify the

"activists" or individuals affiliated with KindHearts and IAP that opened the national office of the

AMP in 2008. The AMP national office is located down the street from the former offices of AMS

and IAP. The Complaint also alleges that AMP's state mission is identical to the missions of AMS,

IAP, and Holy Land Foundation, to "educate people about Palestine."

Defendant Americans for Justice in Palestine Educational Foundation ("AJP") was

established in 2009 by co-defendant AMP as a tax-exempt 501(c)(3) organization. The Complaint

alleges that it is run by "former leaders of IAP." AMP and AJP's leadership are essentially the same,

according to plaintiffs. Further, the biggest donors to IAP, Holy Land Foundation, and KindHearts

also support AJP.

Defendant Rafeeq Jaber is one of the founders of AJP. He prepares AJP's taxes. His

business, Jaber Financial Services, is in the former offices of AMS and IAP. Jaber is an AMP donor

and representative. Jaber is formerly the president and principal spokesperson for AMS and IAP. He

was also president of IAP and president of the board of directors of Bridgeview Mosque.[4]

---

[3] KindHearts had its assets frozen by the United States Department of the Treasury in February
2006 because it was affiliated with the Holy Land Foundation for Relief and Development, which
had been found to be funding Hamas. KindHearts dissolved in 2011.

[4] Plaintiffs assert that Bridgeview Mosque's charitable arm, The Mosque Foundation, funneled
donations to groups affiliated with Hamas and had in its leadership several individual who have been
found to be providing material support to Hamas.

Defendant Abdelbasset Hamayel is AMP's Executive Director and AJP's registered agent. Hamayel was allegedly "head" of the Mosque Foundation Community Center and Director and Secretary General of IAP. He is also alleged to have been the Wisconsin and Illinois representative for KindHearts.

Defendant Osama Abuirshaid is an AMP board member and National Political Coordinator. The Complaint alleges that Abuirshaid was at some point editor of IAP's newspaper. In that role, AMS paid his salary. Abuirshaid currently publishes a similar newspaper that regularly contains an advertisement for a blog maintained by Shukri Abu Baker, the currently incarcerated former president of the Holy Land Foundation. In August 2015, the United States Customs and Immigration Service decided that Abuirshaid is ineligible for naturalization because he failed to disclose his connections with IAP.

In 2000 and 2001, Jaber, Hamayel, and Abuirshaid were the three highest paid employees at AMS. In order to further establish continuity between AMS, IAP, the Holy Land Foundation and defendants AMP and AJP, plaintiffs identify five other individuals who are not named as defendants: Hatem Bazian, AMP and AJP chairman and regular speaker at IAP and Holy Land Foundation conferences; Salah Sarsour, a board member and fundraiser for AMP, and former fundraiser for IAP who was imprisoned in Israel for his ties to Hamas; Husein al-Khatib, an AMP board member and former Holy Land Foundation Regional Director; Kifah Mustapha, a co-Imam at Bridgeview Mosque and associate director of the Mosque Foundation from 2002 to 2014; and Sufian Nabhan, an AMP board member and former IAP representative in Michigan.

Plaintiffs further allege that the Annual IAP conference held each November had speakers known to be closely identified with Hamas. Plaintiffs allege that the IAP Annual Conference simply became the AMP Annual Conference in 2006 when IAP and AMS became defunct following the original *Boim* litigation. The audience, content, management, speakers all remained the same under

3

AMP. At the 2006 inaugural AMP conference, the speakers included Rafeeq Jaber, Kifah Mustapha, Osama Abu Ishraid, and Raed Tayeh (a former member of IAP).

Plaintiffs seek declaratory and injunctive relief to hold the defendants here liable for the $156 million judgment in the earlier *Boim* litigation. Plaintiffs allege that AMP and AJP are alter egos or successor entities of the now defunct *Boim* defendants AMS, IAP, and the Holy Land Foundation.

**Legal Standard**

A Rule 12(b)(1) motion seeks dismissal of an action over which a court allegedly lacks subject-matter jurisdiction.

> While it is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution, we accept as true all of the allegations contained in a complaint…. Likewise, subject-matter jurisdiction must be secure at all times, regardless of whether the parties raise the issue, and no matter how much has been invested in a case.

*Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 853 (7th Cir. 2012) (internal citations omitted). In order to determine whether subject matter jurisdiction in fact exists, this Court may properly look beyond the allegations in the complaint and consider whatever evidence has been submitted on the issue. *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993); *see also Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

**Discussion**

Plaintiffs assert that this Court has original subject matter jurisdiction stemming from the civil liability provision of the Anti-Terrorism Act, 18 U.S.C. 2333(d)(2), because the defendants are alter egos or successors of the defendants in the original *Boim* case, AMS, IAP, and the Holy Land Foundation. Alternatively, plaintiffs argue for ancillary jurisdiction, which is part of a federal court's inherent power to enforce its judgments. *See Peacock v. Thomas,* 516 U.S. 349, 356, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996). However, the Supreme Court has "never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a

4

person not already liable for that judgment." *Id.* at 357. Thus, the Supreme Court has "cautioned against the exercise of jurisdiction over proceedings that are entirely new and original, or where the relief sought is of a different kind or on a different principle than that of the prior decree." *Id.* at 358 (internal citations omitted).

*Peacock* involved an employee who had obtained an ERISA judgment against his former employer and then sought to enforce the judgment against a shareholder of the employer under a corporate veil-piercing theory. The Supreme Court reversed the lower court's finding of subject matter jurisdiction where the subsequent law suit was founded upon different facts and entirely new theories of liability, and did not include a substantive ERISA violation. *Id.* The alleged wrongdoing in *Peacock* occurred after judgment was entered in the original ERISA case, and the plaintiff's claims -- civil conspiracy, fraudulent transfer of assets, and a "veil-piercing" theory -- were "theories of relief that did not exist and could not have existed, at the time the court entered judgment in the ERISA case." *Id.* at 359. In this case plaintiffs are not asserting a "veil-piercing" theory of vicarious liability in order to avoid the issue in *Peacock* that resulted in no jurisdiction.

After *Peacock,* the Seventh Circuit decided *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.,* 85 F.3d 1282 (7th Cir. 1996), and *Board of Trustees, Sheet Metal Workers' National Pension Fund v. Elite Erectors, Inc.,* 212 F.3d 1031 (7th Cir. 2000), limiting the reach of *Peacock.* In *Central States,* the Seventh Circuit distinguished *Peacock* based on the plaintiff fund's allegations that the new corporate defendants so dominated and controlled the previous defendant corporation that the new corporate defendants could be said to have played a role in the original ERISA violation. *Central States,* 85 F.3d at 1286. That case was not an action to enforce a judgment, under this reasoning, but a specific claim under ERISA. *Id.* The Seventh Circuit affirmed the district court's judgment in favor of the defendants based on Central States' failure to prove direct liability under a "true employer" or alter-ego theory. *Id.* at 1288-89.

In *Elite Erectors,* the Seventh Circuit again addressed subject matter jurisdiction under an alter-ego theory, holding that the plaintiff's claims against the "secondary" defendants arose independently under ERISA. *Elite Erectors,* 212 F.3d at 1037. The court of appeals described the distinction between alter-ego liability and a corporate veil-piercing claim:

> Efforts to pierce the corporate veil ask a court to hold A vicariously liable for B's debt…. But a contention that A is B's "alter ego" asserts that A and B are the same entity; liability then is not vicarious but direct.

*Id.* at 1038 (citing Central States, 85 F.3d at 1286-87) (emphasis in original). Thus, this Court must consider whether plaintiffs here have adequately alleged for jurisdictional purposes the present defendants are the alter-ego of AMS, IAP, and the Holy Land Foundation.

Courts consider the following factors to determine alter-ego status: "1) the amount of respect given to the separate identity of the corporation by its shareholders; 2) the fraudulent intent of the incorporators; and 3) the degree of injustice visited on the litigants by respecting the corporate entity." *Central States,* 85 F.2d at 1287. Additionally, courts in this circuit consider "the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets." *Int'l Union of Operating Eng'rs, Local 150 AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987). Critical to the alter-ego analysis is the presence of an unlawful motive or intent. *Id.* To establish direct liability under an alter-ego theory, courts also look at the purported alter-ego's control or dominance over the original entity. *Central States,* 85 F.3d 1286.

Illustrative for this Court's purposes, is *Trustees of Sheet Metal Workers Local No. 1 Welfare Trust v. Pekin Climate Control, Ltd.,* 669 F.Supp.2d 924 (C.D. Ill. 2009) (McDade, J.). After initially dismissing a complaint for lack of jurisdiction, the district court granted reconsideration based on the legal framework set out above. *Pekin Climate Control* involved a situation where the plaintiff fund obtained a judgment against Meyer Climate Control, Inc. ("Meyer"), but the plaintiff was unable to

collect the judgment because the judgment debtor, Meyer, had been administratively dissolved. *Id.* at 926. The plaintiff fund then initiated a new action against Pekin Climate Control ("Pekin") and two individual defendants, Kevin Brown and James Brown, who were each 50 percent shareholders of Meyer with complete control over Meyer's operations. *Id.* The court found that the plaintiff fund had adequately alleged an alter ego theory of liability to support subject matter jurisdiction. The plaintiff fund had sufficiently suggested that Pekin was a "disguised continuance" of Meyer based on the Browns' ownership and control of both corporations and an alleged transfer of assets from Meyer to Pekin. The court characterized this transfer of assets as "a sham transaction designed to frustrate the collection of the ERISA judgment against Meyer in the prior suit." *Id.* at 929. Further, the failure of the Browns to properly wind-up Meyer's business affairs upon dissolution indicated a lack of respect for the corporate entity. *Id.*

Also informative for its treatment of alter-ego and successor liability, though in the context of a motion to dismiss for failure to state a claim rather than a jurisdictional quandary, is *Sanchez v. Global Parking Management, Inc.*, No. 14 C 4611, 2015 WL 4429024 (N.D. Ill. Jul. 20, 2015) (Wood, J.). The plaintiffs were former employees of Global Parking Management ("Global"), asserting various wage claims. The parties discussed but did not reach a settlement agreement. A month later, Car Parking Solutions ("Car Parking") was formed. Global's office manager became the registered agent and a managing member of Car Parking. The new entity took over Global's business, including the same employees, same equipment, management and staff. Car Parking simply covered Global's signs with the name Car Parking. The plaintiffs asserted three theories of liability against Car Parking: alter-ego, successor, and single employer. The district court found the plaintiffs had adequately stated a claim against Car Parking based on the following criteria. For alter-ego, the court applied two elements: "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that

adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Id.* (quoting *Wachovia Sec., LLC v. Banco Panamericano, Inc.,* 674 F.3d 743, 751-52 (7th Cir. 2012)). The court also described the situations where a successor entity can be held liable for the actions of their predecessors: "where (1) there is an express or implied assumption of liability; (2) the transaction amounts to a consolidation, merger, or similar restructuring of the two corporations; (3) the purchasing corporation is a mere continuation of the seller; and (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Id.* (quoting *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1325-26 (7th Cir. 1990)).

The Court turns to the case at bar with this guidance in mind. The case here is a close one. Plaintiffs assert that AMP, AJP, and the three individual defendants are the alter-ego or successor entities of AMS, IAP, and the Holy Land Foundation, the judgment debtors. At the outset, this Court finds that plaintiffs have not alleged successor liability. There are no facts supporting any of the situations discussed above. Thus, the Court will consider whether the allegations support an alter-ego theory.

To demonstrate continuity between the entities, plaintiffs point to a shared stated mission – "to educate people about Palestine." This alone does not suggest any nefarious intent or unlawful motive. To find otherwise would create a false inference that no legitimate humanitarian organization could ever be created with that mission. Plaintiffs also allege that AMP was established by individuals, though they do not identify precisely who, affiliated with IAP and KindHearts. AMP's offices are down the street from the former offices of AMS and IAP. Plaintiffs allege that AJP, the fundraising arm of AMP, is run by former leaders of IAP, but does not identify precisely who, and that many of AJP's donors also gave to the judgment debtors.

Among the individual defendants, Rafeeq Jaber appears to have the closest ties to the judgment debtors. Jaber was president of both AMS and IAP in the early 1990s. In 2012, he moved his company Jaber Financial Services' office to space within the same building, though not the same office space, that formerly housed the AMS and IAP offices. Dkt. 31-1, Ex. C., Jaber Decl. at ¶ 13. He is alleged to have organized AJP and signed a petition as a representative of AMP in 2015.

Abdelbasset Hamayel never held any positions with AMS, but worked as an office administrator reporting to the Board of Directors for IAP from September 1997 to 2003, when it ceased operations. Hamayel began volunteering with AMP in December 2008 and is now serving as the interim Executive Director, an unpaid position. According to affidavits submitted by defendants, Hamayel was not involved in the creation of AMP or AJP.

Osama Abuirshaid immigrated to the United States in September 1996. He became outreach coordinator for AMS in 2000 and a member of IAP in 2002. Abuirshaid was also editor of IAP's newspaper whose salary was paid by AMS, though plaintiffs do not provide a timeframe for that role. Abuirshaid has a consulting firm that began working with AMP in 2010. He later joined the board of AJP. Plaintiffs further allege that Jaber, Hamayel, and Abuirshaid were the three highest paid employees at AMS in 2000 and 2001. This is contradicted by Hamayel's averment that he was never employed by AMS. *See* Dkt. 31-1, Ex. A, Hamayel Decl. at ¶6.

Plaintiffs spend a great deal of time discussing organizations (KindHearts and The Mosque Foundation) and five individuals that are not named as defendants in this or the previous suit.[5] It is unclear from the complaint and additional materials how many people are involved in the leadership of AMP and AJP or how many were involved in the leadership of the previous judgment debtors.

---

[5] Although KindHearts had its assets frozen by the Department of the Treasury, it was not a defendant in the previous lawsuit nor do plaintiffs assert that it has ever been adjudicated as violating the Anti-Terrorism Act by funding Hamas. Similarly, the Mosque Foundation has never been found to have violated the Anti-Terrorism Act, though some members of its leadership from various times are alleged to have been involved with funding Hamas. Dkt. 1, Compl. at ¶38.

Likewise there is no indication of how each organization is structured or its hierarchy. It is therefore difficult for the Court to determine that AMP, AJP, and the individual defendants have the requisite degree of control and dominance over the original entities. Nor is there any evidence of a transfer of assets between the judgment debtors and AMP or AJP. Indeed, a transfer of assets appears factually impossible because the judgment debtors were defunct or had had their assets seized by the government prior to the formation of AMP and AJP.

The situation here is not like in *Pekin Climate Control*, where each company was held by the two individual defendants and there was evidence of a fraudulent transfer of assets. Nor is it like *Sanchez*, with the same space, equipment, employees, and management. Instead, it appears that the individual defendants, who were involved with the judgment debtors to varying degrees, are now involved with new organizations seeking to further the mission of educating people about Palestine. In their effort to find a collectible defendant and to prevent their previous victory from being a pyrrhic one, plaintiffs are painting with overly broad strokes here. This Court is wary on the one hand of potentially permitting the funding of a terrorist organization and cutting off a source of recovery of a significant judgment. On the other hand, this Court is equally cautious of branding any organization and its members that support humanitarian interests for the people of Palestine as having an unlawful motive.

On these facts, this Court finds that plaintiffs fail to demonstrate the requisite level of unity of interest and control such that AMP and AJP are "disguised continuances" of the judgment debtors and that the organizations and individual defendants can be held directly liable for the actions of the judgment debtors. The Court must always be cognizant of its jurisdictional limitations and the impropriety of exercising jurisdiction without adequate basis.

Accordingly, defendants' motion to dismiss is granted. The complaint is dismissed without prejudice. Plaintiffs may refile a complaint in the event that they further develop the allegations establishing an alter ego theory of liability.

IT IS SO ORDERED.

ENTERED:

Dated:  August 18, 2017

SHARON JOHNSON COLEMAN
United States District Judge

11