IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY BOIM, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DAVID BOIM, DECEASED, AND JOYCE BOIM, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN MUSLIMS FOR PALESTINE; AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION; RAFEEQ JABER; ABDELBASSET HAMAYEL; AND OSAMA ABUIRSHAID, <br><br> Defendants. | Civil No. 17-cv-03591 <br><br> **Hon. Sharon Johnson Coleman** <br><br> Hon. Sidney I. Schenkier |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO
COMPEL COMPLETE RESPONSES TO THEIR FIRST SETS OF
JURISDICTION DOCUMENT REQUESTS AND INTERROGATORIES**

Organizations that were held liable under the Anti-Terrorism Act ("ATA") for materially supporting Hamas seek to walk away from a $156 million judgment against them by forming new corporate entities that continue the operations of the judgment debtors. Following a jury trial, the parents of an American teenager murdered by Hamas terrorists in 1996 won a $156 million judgment against The Holy Land Foundation ("HLF"), Islamic Association for Palestine ("IAP"), and American Muslim Society ("AMS"). The judgment debtors then claimed they were defunct and had ceased operations, and the Plaintiffs recovered only a small fraction of their judgment. Recent investigations reveal that these judgment debtors did not really shut down at all.[1] They regrouped as two new entities—defendants American Muslims for Palestine ("AMP") and Americans for Justice

---

[1] For example, Congressional testimony in April and May 2016 by Foundation for Defense of Democracies ("FDD") revealed a "significant overlap" between AMP and judgment debtors HLF (and KindHearts, which the Treasury Department called HLF's "progeny"), IAP and AMS. (*See* Cong. Testimony 4/19/16 (Exhibit 1) (https://docs.house.gov/meetings/FA/FA18/20160419/104817/HHRG-114-FA18-Wstate-SchanzerJ-20160419.pdf), 5/12/16 (Exhibit 2) (https://docs.house.gov/meetings/HM/HM05/20160512/104904/HHRG-114-HM05-Wstate-SchanzerJ-20160512.pdf).)

in Palestine Educational Foundation ("AJP")—which started up just as the old entities purported to close. Organizations that were found, after a full adversary process, to be liable for the murder of an American citizen because they materially supported Hamas should not be relieved of liability when they continue operating in the guise of newly-formed corporate entities. Allowing this easy escape would undermine the civil remedies provisions of the ATA, which are intended to "cut the terrorists' lifeline" by imposing liability for damages against supporters of terror groups. *Boim v. Holy Land Foundation*, 549 F.3d 685, 690-91 (7th Cir. 2008).

AMP and AJP (now a single AJP entity) are, in every material respect, a disguised continuance of the *same organization* as their predecessors. For instance: (i) investigations show that at least 8 leaders in the old organizations have gone on to roles with AMP/AJP (Ex. 1 at 8; Ex. 2 at 5); (ii) AMP/AJP play the same role as their predecessors in a network of pro-Hamas organizations; (iii) just like IAP, they organize annual conferences promoting pro-Hamas ideology; (iv) like IAP, they sponsor fundraisers and assist pro-Hamas organizations with fundraising; (v) they distribute publications espousing the same message as their predecessors; (vi) they plan political actions similar to their predecessors; (vii) their National Policy Director, Abuirshaid, publishes a newspaper, just as he did for IAP; and (viii) they rely on many of the same donors and sponsors as their predecessors.

On January 4, 2018, the Court entered an order authorizing jurisdiction discovery "on the existence of an alter ego relationship." Plaintiffs served interrogatories and document requests[2] two weeks later targeting the alter ego issues alleged in Plaintiffs' Complaint and discussed in the Court's August 18, 2017 jurisdiction opinion (Dkt 41). Plaintiffs have since spent 4 months waiting for responses, conferring with Defendants regarding deficiencies, and exchanging correspondence in an effort to obtain complete responses.

---

[2] Plaintiffs served: (i) Jurisdiction Document Requests ("Document Requests" or "DR" (Exhibit 3)); (ii) Jurisdiction Interrogatories to Defendants AMP and AJP ("Entity Interrogatories" or "EI" (Exhibit 4)); and (iii) Plaintiffs' Jurisdiction Interrogatories to Defendants Rafeeq Jaber; Abdelbasset Hamayel and Osama Abuirshaid (collectively, the "Individual Defendants") ("Individual Interrogatories" or "II" (Exhibit 5)).

2

Defendants ultimately produced thousands of pages of documents. But the bulk of these are publicly-available AMP internet content and public filings. *Defendants have not fully searched for and produced critical <u>internal</u> information and records.* For instance, although AMP/AJP identify more than a dozen current board members and employees (a number of which were closely-affiliated with judgment debtors), Defendants have produced e-mails from only *two* custodians, and they refuse to say which other custodians' records (if any) were searched. Except for public internet content, Defendants: (i) have not provided lists of all persons involved in starting up AMP or AMP's early officers and directors; (ii) refuse to provide *any* information or documents regarding donors and sponsors, even though the overlap of funding sources is a central alter ego issue; (iii) refuse to provide annual conference materials, such as agendas, speaker lists, content of speeches, or programs (which are known to exist (*see* Ex. 1 at 10 n.84)), even though the conferences represent an essential function of both AMP/AJP and their predecessors; (iv) have not provided e-mail distributions to "subscribers," even though these are known to have been sent (*see* Ex. 1 at 2 n.6; Ex. 2 at 1 n.4); (v) refuse to identify the organizations they promoted and helped with fundraising; and (vi) refuse to provide information about relationships to networks of people and organizations that have been closely tied to both the judgment debtors, AMP/AJP, and the funding of terrorist groups.

In short, Defendants seek only to produce the public face of AMP/AJP. This is not surprising. Their leaders have long been acutely aware of the repercussions of violating the ATA— to the point of sponsoring a program on "navigat[ing] the fine line between legal activism and material support for terrorism." (Ex. 1 at 8.) But Defendants are entitled to dig deeper. The Court should compel Defendants to search and produce *all* responsive documents and information, not just AMP's cleansed English internet content and public filings.

## Background

In 2000, Plaintiffs filed an action in this Court, *Stanley Boim, et al. v. Quranic Literacy Institute, et*

*al.*, No. 00-cv-2905 (the "*Boim* Action"), seeking to recover damages for the terrorist murder of their son from American persons and organizations that provided material support to Hamas. This Court entered judgment (the "*Boim* Judgment") in favor of Plaintiffs, holding several of the defendants in the *Boim* Action (the "*Boim* Defendants") liable for $156 million. Plaintiffs have collected only a small percentage of the *Boim* Judgment. Plaintiffs instituted this lawsuit seeking to recover the unpaid portion of their judgment because AMP/AJP are the successors and alter egos of the *Boim* Defendants, and the Individual Defendants are now leaders of AMP and AJP and are also alter egos.

On June 12, 2017, Defendants moved to dismiss under Fed. R. Civ. P. 12(b)(1), arguing that the Court lacks subject matter jurisdiction. (Dkt 31.) The Court dismissed the Complaint without prejudice on August 18, 2017 (Dkt 40, 41), concluding that this was a "close" case, but that "[o]n these facts…plaintiffs fail to demonstrate the requisite level of unity of interest and control" to support alter ego claims. (*Id.* at 8, 10.) Plaintiffs moved to reconsider, and the Court granted the motion on January 4, 2017, vacating its previous order. (Dkt 50.) The Court held that it had "placed too much weight to defendants' declarations without providing plaintiffs with the opportunity to conduct limited jurisdictional discovery on the existence of an alter ego relationship." The Court authorized plaintiffs to "conduct discovery solely to address jurisdiction." (*Id.*)[3]

On January 18, 2018, plaintiffs served their (i) Document Requests, (ii) Entity Interrogatories, and (iii) Individual Interrogatories. Each of these was specifically tailored to address

---

[3] The Court's opinion discussed many (but not all) of the issues in the Complaint, including the establishment of AMP and persons involved; the location of AMP's offices; AMP's "mission"; the establishment of AJP; the leadership (and overlap of leadership) of the *Boim* Defendants, AMP and AJP; the donors (and overlap of donors) between the Boim Defendants and AMP/AJP; Jaber's roles (including as tax preparer) with AMP/AJP, the *Boim* Defendants and the Bridgeview Mosque; Hamayel's role with AMP/AJP, IAP, KindHearts and the Mosque Foundation; Abuirshaid's role with AMP, IAP (and their newspapers); the timing and nature of the individual defendants' involvement with the *Boim* Defendants (including the chronology of their coming to the United States); overlapping employees, representatives, and speakers between the *Boim* Defendants and AMP/AJP; the IAP and AMP annual conferences; nefarious intent or unlawful motive; the structure and hierarchy of leadership of the *Boim* Defendants and AMP/AJP; transfer of assets between the *Boim* Defendants and AMP/AJP; the degree of dominance or control over the *Boim* Defendants; and whether AMP/AJP are a disguised continuance of the *Boim* Defendants.

4

plaintiffs' alter ego allegations and the evidence defendants submitted in response.  As discussed herein, nearly all of the requests were based on alter ego issues discussed in the Court's August 18 opinion and Plaintiffs' initial Complaint.  (*See* Dkt 1; Dkt 41 at 2-3, 8-10.)

After requesting an extension of time, Defendants served responses to plaintiffs' discovery on March 5, 2018.  (Resps. to DR (Exhibit 6), EI (Exhibit 7), II (Exhibit 8).)   These consisted primarily of objections and contained little substantive information.  Defendants initially produced just 68 pages of documents, most of which were public secretary of state filings.  Four days later, on March 9, Plaintiffs responded with a 10-page letter detailing deficiencies in Defendants' responses and requesting a LR 37.2 conference early the following week.  (3/9/18 Woolley Ltr. (Exhibit 9).)

Since that time, the parties have had telephone conferences and exchanged numerous letters and e-mails in an effort to resolve the discovery issues.  (*See* 3/9-27/18 Email Chain (Exhibit 10); 4/3/18 Woolley Letter (Exhibit 11); 4/3-4/18 Email Chain (Exhibit 12); 4/9-5/1/18 Email Chain (Exhibit 13); 4/18/18 Jump Email (Exhibit 14); 5/1/18 Jump Email (Exhibit 15).)  Defendants served amended responses to all three sets of written discovery on April 10, 2018 (Am. Resps. to DR (Exhibit 16), EI (Exhibit 17), II (Exhibit 18)), and provided several supplemental document productions, most recently a week ago, on May 7.  Defendants also produced the Declaration of Munjed Ahmad (Exhibit 19) and identified Ahmad as a person who may provide testimony in connection with their next jurisdiction motion.  (Exs. 17,18.)  Ahmad's declaration purports to provide additional *factual evidence* on a number of issues covered by Plaintiffs' discovery requests, further expanding the scope of jurisdiction discovery likely to be necessary.

Since Plaintiffs' March 9 deficiency letter, Defendants have produced several thousand pages of additional documents and provided supplemental substantive information, which consists primarily of downloads from AMP's publicly available website and social media accounts, as well as publicly available secretary of state filings and tax forms.  Defendants have produced e-mails from

only *two* individuals e-mail accounts—even though AMP/AJP have identified more than a dozen current directors and employees. A limited number of non-public documents, apparently from the same two custodians, were produced. Neither of the custodians is an Individual Defendant or formerly affiliated with a judgment debtor. Defendants refuse to disclose which other custodians, if any, have provided documents or information. (*See* Ex. 13 at 2-3.)

Plaintiffs have noticed four depositions (three Individual Defendants and Ahmad) for mid- to late-June, limited to jurisdiction issues. Plaintiffs hope to resolve this motion and complete jurisdiction discovery by mid-summer. Plaintiffs expect to seek leave to file an amended complaint based on jurisdiction discovery and following the roadmap in the Court's August 18, 2018 ruling.

## Argument

Rule 37 permits a party seeking discovery to move to compel answers to interrogatories or production of documents where the responding party has provided evasive or incomplete responses. Fed. R. Civ. P. 37(a)(3). Plaintiffs have made good faith efforts to obtain complete responses, but Defendants' responses remain deficient. This motion groups the deficient responses into seven categories. For the Court's convenience, the text of the particular document requests and interrogatories within each category, along with the text of Defendants' amended responses, is set forth in the chart attached as Appendix A.

**A.  Creation of AMP, Structure and Hierarchy of the Entity Defendants, and the Identities and Roles of Directors, Officers, Employees, Chapters (DR3-5, EI3-5)**

The Court's August 18, 2017 opinion focused extensively on the sufficiency of Plaintiffs' allegations about (i) the creation of AMP/AJP and the people responsible for starting these entities, (ii) the connection between the leaders of AMP/AJP and IAP/AMS, and (iii) "how each organization is structured [and] its hierarchy." (Dkt 41 at 8-10.) Defendants' contention that this Court lacks jurisdiction will rely not just on the Individual Defendants' declarations but also the newly-created Ahmad declaration, which focusses on the creation of AMP.

6

Plaintiffs served interrogatories and document requests targeting these issues. As shown under heading A of Appendix A, Defendants have objected and provided incomplete responses:

- Plaintiffs requested a description of the creation and formation of AMP and AJP, including identification of all persons involved in the creation of the entities or any precursor organization (EI5). In addition, Plaintiffs requested all documents relating to any unincorporated or precursor organizations that pre-existed the formation of AMP and AJP (including the "volunteer" organization AMP's website until recently said was founded in 2005) (DR3), and all documents relating to the decision(s) to create or form AMP, AJP or any precursor organization (DR4). Defendants objected and have not provided an interrogatory response listing persons involved in creating AMP.[4] Instead, Defendants point to various documents they produced, which do not answer the question: (i) AMP's certificate of incorporation, which lists only Hatem Bazian, (ii) Ahmad's Declaration, which contains no names of persons involved in creating AMP, and (iii) several pages of Ahmad's cryptic and unsworn handwritten notes, which contain several names but no indication whether (or how) the people were involved or whether other people were involved. Defendants should be compelled to answer EI5 fully and under oath. In addition, to the extent Defendants have not searched the e-mails, computers and documents of AMP/AJP's directors and affiliated persons who may have responsive documents (including the Individual Defendants and directors Hatem Bazian, Salah Sarsour, and Sufyan Nabhan), these should be searched and responsive documents produced.

- Plaintiffs requested that Defendants (i) identify, for each year, all board members, officers, employees, chapters and locations of AMP and AJP (EI3); (ii) describe the "structure and hierarchy" of AMP and AJP, including leadership, reporting structure and responsibilities of officers and employees (EI4); and (iii) produce all documents relating to the structure and hierarchy of AMP and AJP, including organization charts, lists of officers, directors and employees, and documents showing relationships to regional chapters (DR5). Defendants have provided names of certain directors, officers and employees and documents containing descriptions of some officer and staff positions, and they again point to internet content. However, they have not provided—either in interrogatory responses or produced documents—

---

[4] Defendants assert that although "AMP was originally contemplated in late 2005," it was not "formed" and no action occurred until 2006. Defendants accuse Plaintiffs of a "known mischaracterization of these facts," but Plaintiffs' discovery requests come from the statement in AMP's *own website* that AMP was founded in *2005* as a "strictly volunteer organization." AMP claims the website "only briefly" said 2005, and "this error was corrected" by January 2017, before Plaintiffs filed their initial Complaint. But the 2005 date was on the website for years, and the change occurred after FDD's Congressional testimony in April and May 2016 specifically quoting the 2005 date and language from AMP's website. (*See* Ex. 1 at 8; Ex. 2 at 1.)

7

- comprehensive lists of all directors, officers and employees for each year, nor have they provided the information called for in the definition of "identify" (i.e. full name, title/position, address/telephone, employer/affiliation (Exs. 4, 5, Def. P)). Of particular importance, they have not identified AMP's officers, directors and employees *during its initial years (2005-2008)*. Defendants contend they have no documents containing this information. However, they must still answer the interrogatories based on all information available, *including the memories of their personnel*, regardless of whether documents still exist. Moreover, to the extent Defendants have not searched the e-mails, electronic files and paper documents of all persons affiliated with the organizations, these should be searched and responsive documents produced.

- Defendants recently sent an (unsworn) e-mail listing the local chapters of AMP as of 2009 (per an archived page of the AMP website) and the current chapters and their Facebook pages. (Ex. 15 at 1-2.) Although Defendants note that some chapter representatives are also (by coincidence) AMP board members, they have not identified these chapter representatives or described the reporting structure of the chapters. This information should be provided (in sworn supplemental responses, not e-mail form). In addition, to the extent Defendants have not searched e-mails, electronic files and paper documents of the chapters and chapter representatives, these should be searched and responsive documents produced.

**B.     Conferences, Events, Speakers, Publications, and Distributed Material (DR13-15, DR24, DR26, EI11, II8)**

In the original *Boim* case, Judge Keys found that although AMS/IAP claimed to be educational organizations and denied donating money to Hamas or HLF, they nonetheless provided material support to Hamas by (among other things): (i) soliciting donations to HLF from others "to support the needy people in Palestine"; (ii) allowing HLF to set up a booth at the annual convention; (iii) publishing pro-Hamas documents (e.g. advocating martyrdom); (iv) sponsoring events to support the release of Hamas-affiliated persons arrested in Israel; (v) inviting pro-Hamas speakers (e.g. speakers calling for Jihad) to conventions and paying travel expenses; and (vi) praising Hamas's terrorist activities, albeit "somewhat subtly." *Boim v. QLI*, 340 F. Supp. 2d at 910-913.

Plaintiffs allege that AMP/AJP have stepped into IAP/AMP's shoes. Like IAP/AMP, AMP/AJP claim to be "educational" organizations and deny supporting Hamas or any affiliate organization. But also just like IAP/AMS, AMP/AJP sponsor events featuring pro-Hamas speakers,

8

promote and facilitate fundraising by organizations that funnel funds to Hamas, and generate publications with pro-Hamas ideology. AMP/AJP's audience, content, management, speakers and message have remained essentially the same as their predecessors'. (Dkt 1 ¶¶ 47-49; Dkt 41 at 3-4.)

Plaintiffs' discovery requests target these issues. Defendants have provided AMP's *public* internet content, but they object and have not provided *internal* documents and information:

- Plaintiffs asked Defendants to identify all speakers, presenters and moderators at AMP/AJP conferences and events (EI11) and to produce communications with and documents relating to payments to or from speakers, sponsors, partners, and attendees at conferences, meetings or fundraisers (DR15). Defendants have asserted overbreadth and scope objections and have provided a list of AMP's annual conferences (from their website). (Ex. 15 at 1.) They also refer to their production of internet and social media material, which includes some information about conferences and speakers. Defendants have not provided a comprehensive list of events or speakers, presenters and moderators (and the related information requested in the definition of "identify"). Nor have they produced communications with speakers, sponsors, partners, or attendees, or any information regarding payments to speakers or arrangements with sponsors. AMP's annual conferences are major events with more than 1,000 attendees and numerous speakers and programs. It is inconceivable that Defendants have no responsive information beyond their public internet content.

- Plaintiffs requested documents relating to AMP's annual conferences, including documents relating to speakers, agendas, publicity, participants, sponsors, organizations with booths, partners, attendees, and the cessation of IAP conferences and start of AMP conferences (DR24), as well as any recording or other document reflecting the content of any AMP/AJP meeting, speech, conference, presentation or fundraiser (DR14). Again, Defendants have asserted overbreadth and scope objections and attempted to deflect the request by pointing to AMP's public internet content. Other than limited information on AMP's internet pages, Defendants have not produced documents relating to planning, executing and paying for conferences (at least one of which occurred after this lawsuit was filed). There are virtually no promotional materials, advertising, agendas, programs, documentation about attendees or sponsors, information about booths, or documents reflecting the content of speeches and presentations. Programs for conferences are known to exist (Ex. 1 at 10 n.84), and, again, it is inconceivable that these major AMP conferences did not produce voluminous documentation.

- Plaintiffs requested AMP/AJP publications, communications with potential donors or sponsors,

advertisements, newsletters, conference materials, children's publications, re-prints and translations (DR13). Defendants again assert overbreadth and scope objections and refer to AMP's publicly available internet material. Plaintiffs are entitled to *all* publications and materials in these categories (in English and Arabic), not just AMP's public English website and social media pages. Again, e-mails to "Subscribers" are known to exist (Ex. 1 at 2 n.6; Ex. 2 at 1 n.4), and AMP/AJP published and disseminated a wide range of material.

- Plaintiffs requested documents relating to any AMP/AJP representative appearing as a speaker, presenter or panelist at any event sponsored by persons or entities other than AMP/AJP (DR26), as well as certain information regarding Abuirshaid's attendance at conferences for PalesAbroad events in Istanbul and Amman, Jordan (II8). (Plaintiffs offered to narrow DR26 to pertinent subject matters so that, for example, it would not encompass Jaber's participation in a financial planning conference, but Defendants continue to assert overbreadth and scope objections. (*See* Ex. 15 at 1.)) These objections should be overruled. Plaintiffs are entitled to discovery regarding the content of speeches and the nature of AMP/AJP's representatives' involvement with outside organizations. This information may reveal connections with these organizations AMP/AJP now deny; it may show continued connections to Hamas-affiliated organizations (as in the case of the PalesAbroad events, which Plaintiffs are informed were promoted by the military wing of Hamas and headed by a trustee of Interpal, a Hamas-affiliated group designated a "terrorist entity" in the United States); it may reveal AMP/AJP positions that are not posted on publicly-available websites, and it may demonstrate that AMP/AJP have continued relationships with domestic and overseas organizations in IAP/AMS's network.

C. **Donors, Sponsors, Fundraising, and Disposition of Funds (DR16, DR17, DR21, DR22, DR25, EI9, EI10)**

Another critical component of Plaintiffs' alter ego allegations is the overlap between IAP/AMS's and AMP/AJP's donors, sponsors, fundraising activities, and the beneficiaries of Defendants' fundraising efforts. (Dkt 1 ¶¶ 36-38, 50, 52; *see* Dkt 41 at 8.) This includes not just AMP/AJP's own fundraising, but also fundraising they facilitated on behalf of other entities who channeled funds to Hamas (including Hamas's social programs[5])—just as IAP/AMS previously did. *See Boim v. QLI*, 340 F. Supp. 2d at 910-912 (IAP denied direct funding to HLF, but nonetheless

---

[5] Although the *Boim* Defendants purported to "direct their support exclusively to" Hamas's "health, educational, and other social welfare services," the Seventh Circuit held they were nonetheless liable for violating the ATA because money is fungible and the social welfare activities reinforce the terrorist activities. *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 698 (7th Cir. 2008).

supported Hamas by promoting and soliciting donations to HLF, advertising for HLF, and allowing HLF to set up a booth at annual conventions). Several of Plaintiffs' jurisdiction discovery requests directly target these alter ego allegations. Defendants' responses are evasive and incomplete:

- Plaintiffs requested documents relating to AMP/AJP's fundraising and other income generating activities, including fundraising for the benefit of other organizations (DR16, DR17). Defendants asserted overbreadth and scope objections and referred to their production of publicly available AMP internet content. Beyond the internet content (and a few documents from the two custodians), they have declined to produce communications with donors or sponsors, documents relating to fundraisers, and documents relating to promoting or assisting other organizations with fundraising. Defendants argue that AMP/AJP are not fundraising organizations because they never "handled" the funds raised for other organizations, even though they "*sponsored events*" at which money was raised by and for other entities. (Ex. 13 at 8 (emphasis added).) As discussed above, this was exactly the situation with IAP; Plaintiffs are entitled to discovery regardless of whether funds actually passed through AMP/AJP's accounts.

- Plaintiffs requested that Defendants identify AMP/AJP's donors, sponsors and funders (EI10). Defendants again asserted scope and overbreadth objections, and stated that "this interrogatory seeks to invade the privacy rights of individuals who are not parties to this litigation, and seeks information which is confidential and proprietary." Plaintiffs responded that Defendants should address any legitimate privacy or confidentiality concerns through a confidentiality order and agreed to entry of such an order in the form of Form LR 26.2. Defendants nevertheless refuse to identify any donor, sponsor or funder and have redacted this information from documents produced in response to other requests.

- Plaintiffs requested that Defendants produce documents regarding the use, recipients and disposition of funds (including funds raised for other organizations) (DR21), and identify persons and organizations to which they provided funding or support for fundraising (including direct funding, promotion at conferences, booths, advertisements and solicitations) (EI9). Defendants assert scope, overbreadth and confidentiality objections. These objections should be overruled, as the requested information is highly relevant, directly targeted at Plaintiffs' alter ego claims, and can be protected with a confidentiality order if appropriate. Defendants also point to their production of publicly available internet content, but this material provides little of the requested information. Plaintiffs are entitled to *all* documents and full information regarding the recipients and disposition of funds—not just the information Defendants have chosen to post on AMP's public website and social media pages.

11

- Plaintiffs requested documents relating to any transfers of funds between AJP and AMP (DR22). As discussed above, this information may be required to demonstrate that—like AMS/IAP—AMP/AJP were alter egos of *each other*, exchanging money freely and failing to follow corporate formalities. In addition, these documents will likely show that AMP and AJP replicated the same sort of 2-entity structure used by AMS/IAP and HLF—with a 501(c)(3) "fundraising" arm and a separate "education" arm that did not have to disclose its operations on public Form 990s. (*See* Ex. 1 at 2 (describing use of AJP, a 501c3, as "fiscal sponsor" for AMP, which filed no 990s).)

- Plaintiffs requested documents relating to 2015 Detroit event sponsored by AMP, which reportedly raised $200,000 for charitable purposes in Gaza (DR25). Defendants claim AMP merely "served in an educational role" at this event. Plaintiffs are entitled to discovery regarding AMP's participation in the Detroit event regardless of how Defendants characterize its role.

**D. Relationships, Communications, Support, Affiliation, Shared Leadership or Personnel, and Transfer of Funds with "Network Entities" and "Network Persons" (DR20, EI8, II6, II7)**

A central theme in Plaintiffs' alter ego case will be that AMP/AJP occupy the same place in a network of people and organizations that IAP/AMS and HLF previously occupied. This network includes leaders and workers with the successive entities, sponsors, donors, speakers at events, partner organizations, and organizations the successive entities have promoted or assisted with fundraising. (*See* Dkt 1 ¶¶ 34-52.) Plaintiffs listed key persons and entities comprising the network in their definitions of "Network Entity" and "Network Person" (Ex. 3, Def. K, L; Ex. 4, Def. I, J; Ex. 5, Def. J, K) and asked Defendants to identify and produce documents relating to relationships, dealings, contracts, communications, sponsorship, support, affiliation, sharing of leadership or personnel, employment or volunteer roles, officer or director positions, or transfers of funds between any Defendant and any "Network Entity" or "Network Person" (DR20, EI8, II6, II7).

Defendants refuse to answer because these terms (i) "imply[] relationships and/or organizational overlap which does not exist" and (ii) seek information that "invades the privacy of individuals and/or entities who are not parties to this lawsuit or the '*Boim* Action'." (*E.g.* Ex. 16, DR20 & Gen. Obj. 3.) Neither of these objections has merit. First, the existence of "relationships

12

and organizational overlap" is a highly-contested alter ego issue to be litigated; Plaintiffs should not simply have to accept Defendants' say-so. Second, any legitimate "privacy" concern should be addressed through a confidentiality order, not denial of discovery.

E.     *Al-Meezan* **and its Relationship to AMP/AJP (DR 23)**

Defendant Abuirshaid was the editor of IAP's newspaper, *Al-Zaytounah*, and was paid a salary by AMS. (Dkt 1 ¶ 41; *see* Dkt 41 at 3.) In 2005, just as IAP and AMS were shutting down and AMP was starting up, Abuirshaid began publishing a new Arab-language newspaper, *Al-Meezan*, which Plaintiffs contend effectively replaced *Al-Zaytounah*. Abuirshaid is the National Policy Director of AMP and has a long association with AMP/AJP. (Dkt 1 ¶ 41.)

Plaintiffs have requested copies of the newspapers, as well as documents relating to the creation and promulgation of the two papers, including the decision to stop publishing *Al-Zaytounah* and the decision to begin publishing *Al-Meezan* (DR23). Defendants refuse to produce responsive documents. According to Defendants, Abuirshaid turned over all copies of *Al-Zaytounah* to the government in 2015, but Defendants acknowledge that he retained copies of *Al-Meezan*. Defendants refuse to turn these over because they claim the paper was not published by AMP/AJP and would be overly burdensome to produce. (*See* Ex. 13 at 8, 11, 14.) But the content of *Al-Meezan* is highly relevant, and the importance of these papers outweighs any burden of producing documents that Abuirshaid admittedly possesses. Defendants have offered no legitimate objection to producing documents *relating* to the startup of *Al-Meezan* or any connection between *Al-Meezan* and AMP/AJP.

F.     **The Individual Defendants' Background, Employment History, and Online Content (DR30, DR31, DR33, DR34, II4)**

In support of their initial jurisdiction motion, the Individual Defendants submitted declarations seeking to distance themselves from the *Boim* Defendants and AMP/AJP. (Dkt 31-1, Exs. A, B, C.) Despite raising these issues, Defendants now object and refuse to provide documents and information in response to discovery requests seeking background and employment information

13

on the Individual Defendants (except to the extent it appears in their declarations, secretary of state filings, or AMP's publicly available website and social media content):

- Plaintiffs requested documents relating to any employment, volunteer, leadership, consulting, professional services, officer or director position any of the Individual Defendants held with any *Boim* Defendant, AMP, AJP, the Mosque Foundation or KindHearts (DR30, DR31). Defendants assert that there are no such records *in the possession of Individual Defendants.* AMP/AJP should produce any such records they possess. The Individual Defendants have held employment, service professional, officer and/or director positions with AMP/AJP. AMP/AJP must have, and should produce, employment records, pay records, e-mails, correspondence, contracts, or other documents relating to the Individual Defendants' affiliation with AMP/AJP.

- Plaintiffs asked for documents relating to any travel to the Middle East by the Individual Defendants for meetings or conferences relating to any Islamic or Palestinian organization (DR33), including Abuirshaid's attendance at "PalesAbroad" events in Istanbul and Amman, Jordan (DR34). These documents are relevant to show Defendants' on-going support for pro-Hamas organizations overseas and rebut AMP/AJP's contention that their sole mission is education within the United States. If there are any legitimate "privacy" concerns that properly warrant protection, these can be addressed through the confidentiality order.

- Plaintiffs asked for identification of any website, blog, social media account or internet domain name owned, controlled, created or maintained by any of the Individual Defendants that has contained content relating to any *Boim* Defendant or AMP/AJP (II4). Defendants asserted overbreadth and "privacy rights" objections and declined to provide any information other than to reference AMP's internet content. If the Individual Defendants have posted content on the internet relating to any *Boim* Defendant or AMP/AJP, they should answer this interrogatory.

**G.     Responsive Emails in a Usable Format with Metadata and any Attachments**

As discussed above, Defendants have produced e-mails from just two custodians: Munjed Ahmad and Kristin Szremski. Yet Defendants themselves identify at least 11 current directors and 4 current employees, including several who were previously involved with IAP/AMS and/or in forming AMP: Hatem Bazian, Salah Sarsour, Sufyan Nabhan, Hussein Al-Khatib, Hamayel and Abuirshaid. Defendants should disclose which custodians were asked for e-mails or other documents. To the extent e-mails (and other documents) from these custodians have not been

14

searched and collected, they should be.

In addition Ahmad's and Szremski's e-mails were produced as images in single, bulk ".pdf" files, with no metadata and nearly all e-mail address information redacted. These files cannot be used with a document management system, cannot be sorted or searched, present potential authentication difficulties, and cannot be traced to other e-mail addresses because of the redactions. In addition, a few of the e-mails to attachments, which (if they exist) are not included. Plaintiffs have requested that e-mails be produced in native format, but at the very least in a usable (searchable and sortable) electronic form with metadata and any attachments. (Ex. 13 at 10.)

Under Fed. R. Civ. P. 34(b)(2)(e), unless otherwise specified, responding parties must produce electronically stored information (such as e-mails) in the form in which it is ordinarily maintained or in a reasonably usable form. In addition, Plaintiffs specified in their definition of "Document" that documents include all attachments and all metadata associated with documents. (Ex. 3, Def. C.) Defendants should be compelled to produce all responsive e-mails, and the production should be in a usable electronic form, including metadata and any attachments.

## Conclusion

For the reasons set forth herein and in Plaintiffs' motion, Plaintiffs request that the Court grant Plaintiffs' motion and issue an order awarding the relief requested in that motion.

Dated: May 14, 2018 Respectfully submitted,

  /s/ *W. Allen Woolley*
Stephen J. Landes
W. Allen Woolley
Michael B. Kind
Joshua Fliegel
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 201-2772
*Attorneys for Stanley Boim, Individually and as the Administrator of the Estate of David Boim, Deceased, and Joyce Boim*

Of Counsel
Nathan Lewin (*pro hac vice*)
Alyza D. Lewin (*pro hac vice*)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, DC 20006
(202) 828-1000

Daniel I. Schlessinger
JASZCZUK P.C.
311 South Wacker Drive, Suite 1775
Chicago, Illinois 60606
(312) 442-0509

16

**CERTIFICATE OF SERVICE**

      The undersigned attorney certifies that on May 14, 2018 he caused the foregoing MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL COMPLETE RESPONSES TO THEIR FIRST SETS OF JURISDICTION DOCUMENT REQUESTS AND INTERROGATORIES to be served by electronically filing with the Clerk of the Court for the Northern District of Illinois using the CM/ECF system, and thereby serving by e-mail notification upon counsel for all parties of record.

                                                                                                           /s/ W. Allen Woolley