IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY BOIM, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DAVID BOIM, DECEASED, AND JOYCE BOIM,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN MUSLIMS FOR PALESTINE; AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION; RAFEEQ JABER; ABDELBASSET HAMAYEL; AND OSAMA ABUIRSHAID,<br><br>Defendants. | Civil No. 17-cv-03591<br><br>Hon. Sharon Johnson Coleman<br><br>**Hon. Sidney I. Schenkier** |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO
COMPEL COMPLETE RESPONSES TO THEIR FIRST SETS OF
<u>JURISDICTION DOCUMENT REQUESTS AND INTERROGATORIES</u>**

After eight years of hard-fought litigation, plaintiffs won a $156 million judgment against organizations that had financed the terrorist murder of their son. When the time came to collect that judgment, the organizations claimed to be defunct and bankrupt. As discussed in plaintiffs' opening brief, this lawsuit tests whether culpable and civilly liable organizations may jettison their civil liability under the Anti-Terrorism Act ("ATA") by purporting to shut down then re-emerging under different names in the same neighborhood, with the same agenda, same leadership, same operations, same donors and sponsors, same November annual conference, and same message as their predecessors. Plaintiffs ask the Court to declare that these purportedly new entities are liable for the $156 million *Boim* Judgment because they are *alter egos* of the original *Boim* Defendants.

Plaintiffs will demonstrate that the new organizations are the "disguised continuance" of the old organizations, i.e. that they are the *same organizations* and that there was *unlawful or fraudulent intent* in shutting down the old organizations and starting the new organizations in order to shed civil

liability. To support their alter ego claims, plaintiffs need discovery of documents and information relating to (among other things): (a) the overlap in leadership and personnel between the old and new entities; (b) the structure and hierarchy of the purportedly new entities (and their chapters); (c) the formation and early years of the new entities; (d) conferences and events (including speakers, content and sponsors); (e) publications, newsletters and distributed material (English and Arabic); (f) the overlap in donors, sponsors, and fundraising methods and beneficiaries; (g) relationships with partner organizations and key people; (h) the old entities' Arab-language newspaper and the new Arab-language newspaper started by the same publisher (who is also National Policy Director of AMP); and (i) background and employment history of the Individual Defendants.

The reason the parties are now engaged in *jurisdictional* discovery instead of ordinary discovery is that defendants chose to file an unusual Rule 12(b)(1) motion attacking the *merits* of plaintiffs' alter ego claims, and the Court held that "limited jurisdictional discovery on the existence of an alter ego relationship" is appropriate prior to such a motion. (Dkt. 50.) Plaintiffs need this jurisdictional discovery to respond—*with evidence*—to a second Rule 12(b)(1) motion in which defendants will again offer declarations and documents to attack plaintiffs' alter ego allegations.

Plaintiffs' written discovery requests fall squarely within the "limited jurisdictional discovery on the existence of an alter ego relationship" the Court authorized. Plaintiffs' requests are limited to alter ego issues—nearly all of which are the same issues discussed in plaintiffs' complaint and the Court's August 18, 2017 opinion on the first jurisdiction motion. Defendants suggest that because this is "limited" discovery, they should not have to produce anything beyond the 4,500 pages they have already produced. But there is no basis for this arbitrary cut-off, and defendants should not be permitted to choose which documents they want to produce and which they want to withhold. Defendants have chosen to produce AMP/AJP's *publicly available* English-language internet content, secretary of state filings and tax filings, while providing almost no *internal* documents or information.

2

It is the internal material that is most likely to contain evidence that AMP/AJP are in fact "disguised continuances" of the *Boim* Defendants—and that they had the unlawful or fraudulent intent that Judge Coleman found to be "[c]ritical to the alter-ego analysis." (Dkt. 41 at 6.) If defendants can attack plaintiffs' alter ego allegations using their own self-serving declarations and documents, it is only fair that plaintiffs be given discovery of their internal records and information.

Defendants also claim in response to some requests that they have already produced all available documents. That claim is wholly inconsistent with what they have actually produced. For example, defendants' production includes e-mails from only two custodians and very few other internal documents—even though there are three Individual Defendants and AMP/AJP have listed more than a dozen officers, directors and employees. Plaintiffs' opening brief also cites examples of documents that are known to exist but have not been produced, and it is inconceivable that AMP/AJP organized ten years of major annual conferences and numerous national and local events without generating voluminous e-mails and documentation. It is similarly inconceivable that AMP/AJP have no Arabic e-mails or documents and that the Individual Defendants have no e-mails or social media content at all. Defendants must obtain responsive documents and information from *all* potential custodians. To the extent they have not done this, they should be compelled to do so.

Finally, defendants offer a host of reasons why their responses to the seven categories of deficiencies identified in Sections A through G of plaintiffs' opening memorandum should be deemed sufficient. As shown in plaintiffs' opening memorandum and below, nothing in defendants' response brief excuses their failure to provide the documents and information requested. For these reasons, the Court should grant plaintiffs' motion, order defendants to conduct required searches, and compel production of responsive documents and information.

**Argument**

I. **DEFENDANTS ARE IMPROPERLY SEEKING TO AVOID RESPONDING TO APPROPRIATE WRITTEN DISCOVERY REQUESTS.**

    A. **Defendants' Cannot Use Production of Public Internet Content and Secretary of State Filings to Avoid Producing Internal Documents and Information.**

As discussed in plaintiffs' opening brief, defendants' strategy throughout the jurisdiction discovery process has been to avoid producing *internal* documents and information by pointing to the 4,500 pages of primarily *public* internet content, secretary of state filings and tax documents they previously produced. Defendants' response brief provides a detailed bullet-point summary of their document production, which confirms that the vast bulk of their material is publicly available. (Dkt. 74 at 3.) With the limited exceptions of (i) Executive Committee meeting minutes; (ii) two custodian's e-mails specifically relating to "creation of job descriptions" and "the decision to merge AMP and AJP"; (iii) a "Palestinian Advocacy Day 2016" promotional packet; and (iv) a 2009-2010 annual national plan (referred to as "list of training topics"), the categories listed in defendants' summary are derived from internet content or other public sources.

Defendants suggest that their 4,500-page public production should suffice for purposes of "limited jurisdictional discovery." But the discovery rules do not contain a volume limit, and permitting defendants to avoid production of internal material just because they produced a large volume of public website data would be particularly unfair here. AMP/AJP's leaders (a number of which were involved with IAP/AMS and HLF) are fully aware of the perils of public association with organizations that were found civilly and criminally liable under the ATA. For that reason, the public, English-language face of AMP/IAP is sanitized. Evidence that these new entities are the "disguised continuance" of their predecessors will be found in defendants' internal and Arabic documents, not AMP's English website—as will evidence of the unlawful or fraudulent intent that the Court found "[c]ritical to the alter-ego analysis." (Dkt. 41 at 6.)

4

B.  **To Meet their Discovery Obligations, Defendants Must Obtain and Produce Documents and Information from More than Just Two Custodians.**

Defendants also assert they have already produced all their documents within certain categories. However, they appear only to have produced e-mails and internal documents from *two custodians*: Munjed Ahmed and Kristin Szremski. The production includes no e-mails or other documents from the Individual Defendants, and defendants refuse to say which (if any) additional custodians were searched or asked for information. Numerous additional potential custodians exist within defendants' control. AMP/AJP have identified eleven current directors and four current employees, including several who were formerly involved with IAP/AMS and/or in forming AMP: Hatem Bazian, Salah Sarsour, Sufyan Nabhan, Hussein Al-Khatib, Hamayel and Abuirshaid. None of these custodians appears to have provided documents or information.

In responding to discovery requests, it is not sufficient for an entity to rely on one or two agents; it must collect all responsive information and documents within the entity's possession, custody or control. *See Cent. States, Se. & Sw. Areas Pension Fund v. Carstensen Freight Lines*, No. 96 C 6252, 1998 U.S. Dist. LEXIS 11265, *13 (N.D. Ill. Jul. 17, 1998) (Exhibit A) (corporation must "gather and obtain from books, records, other officers or employees, or other sources, the information necessary to answer the interrogatories"); *Weddington v. Consol. Rail Corp.*, 101 F.R.D. 71, 74 (N.D. Ind. 1984) ("answers to interrogatories addressed to a corporation or other judicial person must speak of the composite knowledge of the party"); *In re ATM Fee Antitrust Litig.*, 233 F.R.D. 542, 544 (N.D. Cal. 2005) (organization cannot rely on personal knowledge of single agent but must provide information from sources "under its control"). To the extent they have not done so, defendants should be compelled to collect and produce documents, emails, computer files and responsive information from all potential custodians under their control, not just Ahmed and Szremski.

5

### C. Defendants' Scope Objections are Based on an Arbitrary and Overly-Narrow Interpretation of the Jurisdictional Discovery Judge Coleman Authorized.

Defendants contend that plaintiffs' discovery requests exceed the scope of the limited jurisdictional discovery authorized by Judge Coleman's January 4, 2018 order. But defendants' principal rationale for this position appears to be that production of more than 4,500 pages would go beyond the definition of "limited." Defendants fail to articulate any basis for this arbitrarily narrow interpretation of the scope of jurisdictional discovery.

Judge Coleman's order, on the other hand, does make the scope clear. The Court authorized "limited jurisdictional discovery **on the existence of an alter ego relationship**." (Dkt. 50 (emphasis added).) Plaintiffs' jurisdiction interrogatories and document requests focus strictly on the alter ego issue and are "limited." Plaintiffs have deliberately *not* served comprehensive written discovery extending beyond alter ego issues, and at this time seek only to depose the four witnesses who have submitted declarations that may be used in defendants' next jurisdiction motion.

At the same time, jurisdictional discovery in this case is necessarily broader than jurisdictional discovery would be on a peripheral jurisdictional issue, such as amount in controversy or diversity citizenship. Defendants' jurisdiction motion attacked the *merits* of plaintiffs' alter ego claims head on, arguing that there is no federal jurisdiction in this case because plaintiffs fail adequately to support the alter ego claims that would be the basis for federal jurisdiction.[1] Although plaintiffs contend the existence of an alter ego relationship is an ultimate issue in this case, which should not be decided in the context of a Rule 12(b)(1) jurisdiction motion,[2] the Court's (now-vacated) August 18, 2017 ruling did what defendants asked. Judge Coleman ultimately decided the

---

[1] Plaintiffs allege that this Court has federal subject matter jurisdiction because their alter ego and successor claims seek to hold defendants "directly" liable for violations of the federal Anti-Terrorism Act. *See, e.g., Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037-1038 (7th Cir. 2000) (alter ego liability is "direct," not vicarious, and therefore "arises under" federal law for jurisdiction purposes when federal law creates the original right of action).
[2] *See Mungiovi v. Chicago Housing Auth.*, 901 F. Supp. 261, 263-264 (N.D. Ill. 1995) (dismissal under Rule 12(b)(1) is not appropriate "[i]f the issue of jurisdiction is intertwined with the merits of the case").

6

jurisdiction issue based on the merits of the alter ego claim, putting the burden on *plaintiffs* to demonstrate an alter ego relationship. Judge Coleman recognized that this case "is a close one," but held that "[o]n these facts," plaintiffs "fail to demonstrate the requisite level of unity of interest and control such that AMP and AJP are 'disguised continuances' of the judgment debtors and that the organizations and individual defendants can be held directly liable for the actions of the judgment debtors." (Dkt. 41 at 8, 10.)

In addition, defendants argued that the Court could "look beyond" the jurisdictional allegations in the complaint and "view whatever evidence has been submitted on the issue" to determine whether jurisdiction exists. (Dkt. 31 at 10.) Defendants offered declarations of defendants Abdelbasset Hamayel, Osama Abuirshaid and Rafeeq Jaber (the "Individual Defendants"), as well as several purported evidentiary documents, in an effort to rebut plaintiffs' alter ego allegations. (Dkt. 31 at 10-15.) Plaintiffs argued that a court should not consider evidentiary material on a Rule 12(b)(1) motion where "the facts required to establish jurisdiction are coextensive with those necessary to prevail on the merits," *Villasenor v. Ind. Wire & Cable*, 929 F. Supp. 310, 312, n.3 (N.D. Ill. 1996), but the Court considered defendants' submissions. Although the Court later vacated the August 18, 2017 ruling (and plaintiffs still intend to argue that a jurisdiction motion is not the place to decide the merits), plaintiffs now face the prospect of having to present evidence to support their alter ego claims to get past a second Rule 12(b)(1) motion. Plaintiffs must first be given a fair opportunity to take discovery on their alter ego allegations.

Defendants assert that plaintiffs "do not even attempt to tie their discovery request to the allegations made in their Complaint." (Dkt. 74 at 6.) Nothing could be further from the truth. Starting with their very first discovery letter on March 9 (Dkt. 56-4, Ex. 9), and continuing through their motion to compel (Dkt. 56 at 6-14), plaintiffs have explained how their requests are relevant to their alter ego allegations—and in most cases tie directly to alter ego issues discussed in the Court's

7

August 18, 2017 opinion.[3]

Having chosen to attack plaintiffs' alter ego allegations in a jurisdiction motion, defendants should not now be permitted to avoid producing internal documents relating to alter ego issues in jurisdictional discovery. Defendants want to avoid this discovery and make this case go away based on the documents *they want to produce*, along with the self-serving declarations of the Individual Defendants and the recently submitted April 9, 2018 Declaration of Munjed Ahmad (Dkt. 56-5, Ex. 19). While plaintiffs continue to believe a Rule 12(b)(1) motion should not decide the merits of a case, there is a strong likelihood that plaintiffs may be faced with such a motion. As the Court held on January 4, plaintiffs should have an opportunity to take discovery on the existence of an alter ego relationship before having to respond to defendants' attack.

## II. DEFENDANTS SHOULD BE COMPELLED TO PROVIDE RESPONSIVE DOCUMENTS AND INFORMATION WITHIN THE CATEGORIES OUTLINED IN PLAINTIFFS' MOTION.

Sections A through G of plaintiffs' opening brief grouped defendants' deficient discovery responses into seven general categories. For each, plaintiffs described the potential relevance of the requested documents and information to the alter ego issue, referenced the specific document requests and interrogatories, and specified the responsive categories of documents and information that have not been produced. Defendants' response brief provides no basis to excuse production of any of the requested documents and information within the seven categories.

---

[3] The Court discussed a broad range of alter ego issues, including: (a) the establishment of AMP and persons involved; (b) the location of AMP's offices; (c) AMP's "mission"; (d) the establishment of AJP; (e) the leadership (and overlap of leadership) of the *Boim* Defendants, AMP and AJP; (f) the donors (and overlap of donors) between the *Boim* Defendants and AMP/AJP; (g) Jaber's roles (including as tax preparer) with AMP/AJP, the *Boim* Defendants and the Bridgeview Mosque; (h) Hamayel's role with AMP/AJP, IAP, KindHearts and the Mosque Foundation; (i) Abuirshaid's role with AMP, IAP (and their newspapers); (j) the timing and nature of the individual defendants' involvement with the *Boim* Defendants (including the chronology of their coming to the United States); (k) overlapping employees, representatives, and speakers between the *Boim* Defendants and AMP/AJP; (l) the IAP and AMP annual conferences; (m) nefarious intent or unlawful motive; (n) the structure and hierarchy of leadership of the Boim Defendants and AMP/AJP; transfer of assets between the *Boim* Defendants and AMP/AJP; (o) the degree of dominance or control; and (p) whether AMP/AJP are a disguised continuance of the *Boim* Defendants. (*See* Dkt. 41 at 2-3, 8-10.)

A. **Creation of AMP, Structure and Hierarchy of the Entity Defendants, and the Identities and Roles of Directors, Officers, Employees, and Chapters (DR3-5, EI3-5)**

In response to Section A of plaintiffs' brief, defendants argue that they have already identified certain officers and directors of AMP and AJP. (Dkt. 74 at 7.) Plaintiffs previously acknowledged this (Dkt. 56 at 7) and are not seeking to compel defendants to provide the same information again. Rather, plaintiffs seek to compel defendants to produce the categories of documents and information requested in DR3-5 and EI3-5 that defendants have *not* provided—and, for the most part, fail even to address in their response brief. In particular:

- Defendants' response ignores that plaintiffs requested identification not just of directors and officers, but of *all persons involved in the creation of the entities or any precursor organization* (EI5), as well as documents relating to precursor organizations and the decision to form AMP, AJP and any precursor organization (DR3, DR4).

- Defendants concede that they have not identified directors and officers from the most important time period, AMP's 2006 inception through 2008.

- Defendants' response fails to address the lack of documents and information provided about local chapters of AMP, including chapter representatives and the relationship of local chapters to the central organization. Other than material from the central AMP/AJP website and social media accounts, defendants have not produced documents from the local AMP/AJP chapters.

Defendants suggest that this information is not available from records. However, defendants refuse to say whose records have been searched and have only produced limited internal records from 2 custodians. To the extent they have not done so, defendants should be compelled to search the computers, e-mail accounts, electronic storage and files belonging to all three Individual Defendants as well as all custodians currently affiliated with AMP/AJP who may have responsive documents or information, particularly Hatem Bazian, Salah Sarsour, and Sufyan Nabhan. In addition, defendants need to obtain any responsive information these custodians may remember and incorporate this information into proper, sworn interrogatory responses.

Finally, defendants should be compelled to obtain any responsive documents or information

9

that may be in the possession of local AMP/AJP chapters. Such information and documents are within AMP/AJP's control and should be produced. *See In re ATM Fee Antitrust Litig.*, 233 F.R.D. 542, 544 (N.D. Cal. 2005) (organization must provide information from sources "under its control" including subsidiaries); *Brunswick Corp. v. Suzuki Motor Co.*, 96 F.R.D. 684, 686 (E.D. Wisc. 1983).

      **B.    Conferences, Events, Speakers, Publications, and Distributed Material (DR13-15, DR24, DR26, EI11, II8)**

Defendants attempt to deflect attention from the deficiencies highlighted in Section B of plaintiffs' opening brief (Dkt. 56 at 9-10) by pointing to public information they previously provided regarding AMP's annual conferences (Dkt. 74 at 9-10). Again, plaintiffs are not seeking to compel information defendants have already produced, but the *internal* documents and information requested by DR13-15, DR24, DR26, EI11 and II8 that do not appear on AMP's website or social media accounts. This includes without limitation: (i) documents relating to the organization, promotion and content of AMP's annual conventions and other events; (ii) e-mails or communications with speakers, sponsors, partner organizations or attendees; (iii) documentation regarding sponsorship or arrangements for booths; (iv) promotional materials, advertising (other than the internet content), agendas or programs; (v) travel arrangements, agreements or financial arrangements with speakers; (vi) notes, transcripts or records reflecting the content of speeches or presentations; (vii) English and Arabic publications; (viii) communications with potential donors or sponsors; (ix) advertisements; (x) newsletters and distributions to subscribers; and (xi) re-prints and translations. (*See* Dkt. 56 at 9-10; Dkt. 56-1, App. A § B.)

As shown in plaintiffs' opening brief, some of this information is known to exist, and it is inconceivable that AMP/AJP sponsored large annual conventions (some very recent) and numerous national and local events and fundraisers without generating e-mails, records, financial records, conference materials, and other documents falling into the requested categories. (Dkt. 56 at 9-10.) Defendants should be compelled to search the files, e-mail accounts, computers and other

10

documents in possession of potential custodians and produce responsive documents.

Defendants object to providing documents and information regarding e-mail distributions to "subscribers"—which are known to exist (Dkt. 56-2, Ex. 1 at 2 n.6; Ex. 2 at 1 n.4)—on the ground that they believe e-mail subscriber identities would compromise subscribers' "privacy rights." There are several problems with this objection. First, there is a protective order in this case to protect confidential information; if subscriber identities are protectable, they can be designated confidential. Second, the objection does not cover the *content* of the distributed e-mails, which could be produced without disclosing the recipients. Third, defendants have provided no evidence to substantiate any expectation of privacy by subscribers or any efforts to maintain their confidentiality. Fourth, this information is important to plaintiffs' claim that AMP largely inherited its donors, sponsors, and conference attendees from its predecessors. Plaintiffs need to examine the overlap between AMP subscribers and the constituents who received materials from the *Boim* Defendants—and whether the subscriber list itself came from the *Boim* Defendants. Plaintiffs' interest in receiving documents relating to e-mail distributions to subscribers outweighs any privacy right, particularly when the identity of subscribers can be protected (if appropriate) under the confidentiality order.

### C. Donors, Sponsors, Fundraising, and Disposition of Funds (DR16, DR17, DR21, DR22, DR25, EI9, EI10)

As shown in plaintiffs' initial brief, the overlap between the *Boim* Defendants' and AMP/AJP's donors, sponsors, fundraising activities, and beneficiaries of fundraising efforts is a central allegation in plaintiffs' claim that AMP/AJP is a "disguised continuance" of its predecessors. (*See* Dkt. 56 at 10-11.) Plaintiffs contend that AMP/AJP inherited many of the same key donors and sponsors that previously supported IAP/AMS. In addition, AMP/AJP continued to use the same types of fundraising methods and—just like IAP/AMS—continued to assist other organizations in raising funds by providing booths at conventions, organizing fundraising events, and promoting and advertising those organizations. (*See id.*)

Except to the limited extent already available through public sources, defendants nonetheless refuse to: (i) provide any internal documents or information regarding AMP/AJP's fundraising activities, including fundraising for other organizations (DR16, DR17); (ii) identify donors, sponsors and funders (EI10); (iii) provide documents regarding the use, recipients and disposition of funds, including funds raised for other organizations (DR21); or (iv) identify persons and organizations to which they provide funding or support for fundraising (e.g. direct funding, promotion at conferences, booths, advertisements and solicitations) (E19).

Defendants object that donors are irrelevant because "voluntary donations" made to a "new charitable organization" do not constitute "assets" of the original *Boim* Defendants. (Dkt. 74 at 8-9.) But that has never been plaintiffs' argument. This is an alter ego case, not a fraudulent transfer case. The overlap of sponsors, donors, and beneficiaries of fundraising is relevant to show that AMP/AJP are disguised continuances and alter egos of the *Boim* Defendants—not that the *Boim* Defendants somehow fraudulently transferred donations to their successors.

Defendants also suggest that donors have a privacy right that outweighs plaintiffs' need for the identities of donors. As with subscribers, defendants' "privacy" argument fails for several reasons. First, there is a protective order in this case to protect confidential information; if donor identities are genuinely private, they can be designated confidential. Second, defendants' privacy objection only relates to donor identities and provides no basis to withhold documents and information relating to any other aspect of AMP/AJP's fundraising or solicitation activities. Third, defendants have offered no evidence to substantiate that donors have an expectation of privacy or that AMP/AJP will assert a privacy right on their behalf. Fourth, plaintiffs' interest in receiving the documents and information it seeks to compel in Section C outweighs any privacy interest, particularly when there is a confidentiality order in place.

**D.     Relationships, Communications, Support, Affiliation, Shared Leadership or Personnel, and Transfer of Funds with "Network Entities" and "Network Persons" (DR20, EI8, II6, II7)**

Defendants object that DR20, EI8, II6 and II7 "cannot be answered by Defendants due to the inappropriate and prejudicial nature of the definitions" of "Network Entities" and "Network Persons."  (Dkt. 74 at 11.)  Defendants' disagreement with the purported "clumping of unrelated entities and organizations" is a semantic dispute, not a basis to avoid answering these discovery requests.  Having put their objection to plaintiffs' terminology on record, defendants are fully capable of responding to these discovery requests with respect to each of the specific persons and entities listed in the definitions.  They should be compelled to do so.

Defendants object that the persons and entities listed in the definitions "have no connection to AMP and/or AJP."  This is an ironic objection.  If there actually were no connections, then providing documents and information regarding relationships, communications, support, affiliation, shared leadership, and transfer of funds would be an easy matter—there would not be any.  The real reason defendants seek to avoid answering is that they have extensive connections with the "Network Entities" and "Network Persons," for example:  (i) the tight relationships AMP/AJP continue to have with groups such as the Mosque Foundation, which provided extensive financial support and shared leadership with IAP/AMS and now does the same for AMP/AJP; (ii) AMP/AJP's continued relationship with many of the same speakers, donors, sponsors, partner organizations, and influential figures as IAP/AMS; and (iii) the ongoing relationships AMP/AJP and its leadership continue to have with people and organizations connected to Hamas and Hamas-affiliated groups in the Middle East and elsewhere.  These relationships are an important part of plaintiffs' alter ego case, demonstrating that AMP/AJP occupy the same place in a network of people and organizations that IAP/AMS and HLF occupied—and that AMP/AJP promote groups that channel money to Hamas-affiliated organizations, just as the *Boim* Defendants did.

13

Defendants' remaining objections make even less sense. Defendants say they cannot "answer anything as to the knowledge or documents retained" by the Network Entities and Network Persons. But plaintiffs have never requested anything beyond documents and information in *defendants'* possession, custody or control; there is no request for non-parties' knowledge or documents. Finally, defendants assert that they possess no assets of IAP, AMS or HLF and re-print their statements to that effect in response to several discovery requests that are not even at issue in this motion to compel. (Dkt. 74 at 12-13.) These responses are beside the point. As discussed above, this is an alter ego case, not a fraudulent transfer case. Plaintiffs do contend that AMP/AJP have inherited substantial intangible assets and good will from their predecessors.[4] But whether assets were transferred from the *Boim* Defendants to AMP/AJP has nothing to do with the propriety of plaintiffs' "Network Entities" and "Network Persons" discovery requests.

### E.     *Al-Meezan* and its Relationship to AMP/AJP (DR23)

Defendants did not respond to Section E of plaintiffs' motion to compel. The Court should overrule defendants' objections and compel a complete and proper response to DR23.

### F.     The Individual Defendants' Background, Employment History, and Online Content (DR30, DR31, DR33, DR34, II4)

Defendants did not respond to Section F of plaintiffs' motion to compel. The Court should overrule defendants' objections and compel a complete and proper response to to DR30, DR31, DR33, DR34 and II4.

---

[4] For example, IAP and AMS's intangible assets included: (a) a broad and loyal constituency; (b) extensive mailing and contact lists; (c) a nationwide network of members and volunteers who for many years assisted on a variety of projects; (d) the know-how to arrange major conventions, fundraisers and festivals; (e) a roster of speakers for these events; (f) generous repeating sponsors and donors; (f) public relations experts who understood the mission and the audience; (g) a widely-circulated, Arab-language newspaper with an experienced and capable editor (Abuirshaid); (h) an experienced executive director and manager (Hamayel); (i) a tax expert who was also a well-known spokesman and well-respected community leader with access to funds and the media (Jaber); (j) a network of international partners and contacts in the middle east and elsewhere; (k) a highly-effective fundraising apparatus; and (l) substantial good will and prestige, both for the organization and its leaders, based on past charitable and political work. AMP/AJP inherited much of this, enabling it quickly to step into IAP/AMS's shoes.

14

### G. Responsive Emails in a Usable Format with Metadata and any Attachments

Defendants do not dispute that they have only produced limited e-mails from two custodians (Kristin Szremski and Munjed Ahmed) and that those e-mails were produced as single, bulk PDF files with no metadata or attachments. Instead, defendants say plaintiffs have failed to identify what "jurisdictionally related information" their bulk PDF files omit, suggesting that the Court should simply defer the format issue to the regular discovery period. (Dkt. 74 at 13.)

The point of Section G of plaintiffs' motion is to compel defendants to produce responsive e-mails from the three Individual Defendants and the remainder of the custodians associated with AMP/AJP. Presumably, these will be more voluminous than the few e-mails produced to date. The rules require e-mails to be produced in the form in which they are ordinarily maintained or in a reasonably usable form, Fed. R. Civ. P. 34(b)(2)(e), and plaintiffs have requested that e-mails be produced in native format or at least in an electronic form compatible with document management systems. The Court should compel production of the additional e-mails in a compliant format.

### Conclusion

For the reasons set forth herein and in Plaintiffs' motion and memorandum, Plaintiffs request that the Court grant Plaintiffs' motion and compel the discovery requested in that motion.

Dated: June 5, 2018                Respectfully submitted,

                                                                    /s/ *W. Allen Woolley*
Stephen J. Landes
W. Allen Woolley
Michael B. Kind
Joshua Fliegel
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 201-2772
*Attorneys for Stanley Boim, Individually and as the Administrator of the Estate of David Boim, Deceased, and Joyce Boim*

15

<u>Of Counsel</u>
Nathan Lewin (*pro hac vice*)
Alyza D. Lewin (*pro hac vice*)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, DC 20006
(202) 828-1000

Daniel I. Schlessinger
JASZCZUK P.C.
311 South Wacker Drive, Suite 1775
Chicago, Illinois 60606
(312) 442-0509

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on June 5, 2018 he caused the foregoing PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL COMPLETE RESPONSES TO THEIR FIRST SETS OF JURISDICTION DOCUMENT REQUESTS AND INTERROGATORIES to be served by electronically filing with the Clerk of the Court for the Northern District of Illinois using the CM/ECF system, and thereby serving by e-mail notification upon counsel for all parties of record.

*/s/ W. Allen Woolley*