UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY BOIM, Individually and as Administrator of the Estate of David Boim, deceased; and JOYCE BOIM, <br>　　　　　Plaintiffs, <br><br>　　　　v. <br><br> AMERICAN MUSLIMS FOR PALESTINE; AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION; RAFEEQ JABER; ABDELBASSET HAMAYEL; AND OSAMA ABURISHAID, <br><br>　　　　　Defendants. | Civil No. 17-cv-03591 <br><br> Hon. Sharon Johnson Coleman <br><br> Hon. Sidney I. Schenkier |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER ON LIMITED JURISDICTIONAL DISCOVERY**

**I.　BACKGROUND**

Currently pending before this Court are motions by Plaintiffs and Defendants regarding the scope of appropriate limited jurisdictional discovery currently permitted in this matter. By way of brief review, Plaintiffs filed this action in 2017, seeking to hold these five Defendants liable via the alter ego doctrine for a prior judgment obtained by Plaintiffs against different defendants under the Anti-Terrorism Act, in a suit which had been filed in 2000. Dckt. 1. The entities found liable in the 2000 action no longer exist, and became defunct in or about 2004, per Plaintiffs' Complaint in this matter. *Id*. Plaintiffs assert claims of alter ego liability, and specifically claim, in their Response to the Motion to Dismiss, that the current defendants are merely a "disguised continuance" of the earlier and now defunct judgment defendants. Dckt. 1; Dckt. 41. There are no other causes of action asserted in this matter beyond alter ego.

This Court, by way of Judge Sharon Johnson Coleman's Order of August 18, 2017, granted Defendants' Motion to Dismiss under Fed. R. Civ. Proc. 12(b)(1) for lack of subject

matter jurisdiction. Dckt. 41. Upon motion for rehearing, this Court stated that "[w]hile this Court disagrees that it misapplied the law, upon further reflection, this Court placed too much weight to defendants' declarations without providing plaintiffs with the opportunity to conduct limited jurisdictional discovery on the existence of an alter ego relationship." Dckt. 50. The Court permitted this discovery **only** as to "the existence of an alter ego relationship", having previously ruled that "[a]t the outset, this Court finds that plaintiffs have not alleged successor liability … There are no facts supporting any of the situations discussed above. Thus, the Court will consider whether the allegations support an alter-ego theory." Dckt. 50; Dckt. 41 at 8.

In order to demonstrate subject matter jurisdiction relating to alter ego claims, Plaintiffs must "demonstrate the requisite level of unity of interest and control such that AMP and AJP are 'disguised continuances' of the judgment debtors and that the organizations and individual defendants can be held directly liable for the actions of the judgment debtors." Dckt. 41 at 10. This Court has previously noted the relevant standard as follows:

> Courts consider the following factors to determine alter-ego status: "1) the amount of respect given to the separate identity of the corporation by its shareholders; 2) the fraudulent intent of the incorporators; and 3) the degree of injustice visited on the litigants by respecting the corporate entity." *Central States,* 85 F.2d at 1287. Additionally, courts in this circuit consider "the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets." *Int'l Union of Operating Eng'rs, Local 150 AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987). Critical to the alter-ego analysis is the presence of an unlawful motive or intent. *Id*. To establish direct liability under an alter-ego theory, courts also look at the purported alter-ego's control or dominance over the original entity. *Central States,* 85 F.3d 1286.

Dckt. 41 at 6. Accordingly, Plaintiffs have only been authorized to seek limited discovery which speaks to the factors listed above.

Plaintiffs seek far more. In total, Defendants have produced over 4,500 pages of documents in this "limited" jurisdictional discovery phase, and flash drives with full archival data of relevant Facebook, Twitter and website files. Defendants have provided much of what Plaintiffs specifically requested, despite Plaintiffs' assertions now that these documents were

2

always publically available and do not therefore qualify as legitimate discovery responses.[1]

Defendant have already provided the following categories of documents:

- Articles of Incorporation of AMP and AJP, and By-Laws of AJP (no by-laws exist as to AMP, as already plainly stated to Plaintiffs) (bates labels 000001; 000005; 000008 – 000030; 000036; and 000054)
- The entire Twitter feed used to AJP d/b/a AMP (bates labels 000069 – 000276)
- All forms 990 filed on behalf of AJP, which are from 2010-2016 (redacted only as to names and addresses of voluntary donors, for 2015 and 2016) (bates labels 000277 – 000456)
- Blog postings and news articles from the relevant website, ampalestine.org (000457 – 001050; 001151 – 001613; 001668 – 001680; 001905 – 001907)
- The full website archival files, in electronic form for ampalestine.org
- The full Facebook and Twitter archival files, in electronic form
- Archived website pages in PDF form, specifically showing dates of each AMP annual conference, speakers, and agendas for each, to the extent retained in the ordinary course of business (bates labels 004469 – 004530)
- Executive Committee meeting minutes to the extent retained in the normal course of business (bates labels 002658 - 002660; 004410 - 004422; 004455)
- Listings and addresses, where applicable, of all local contacts for the subordinate "chapters" (*see* website archive and correspondence at Ex. A)
- Emails as retained in the normal course of business reflecting the creation of job descriptions (bates labels 004453 – 004454; 004447)
- Emails as retained in the normal course of business reflecting the decision to merge AMP and AJP into one functioning entity (with AJP surviving and AMP as a d/b/a) (bates labels 002604 – 002605; 002622 – 002640)
- Palestine Advocacy Day 2016 full materials (bates labels 004424 – 004435)
- Mission statements and statements of purpose of AMP and AJP, as filed with the relevant Secretaries of State and as sent to donors, as well as from the relevant website pages (bates labels 000001; 000005; 000010; 000036; 000038; 000041;000043; 000047; 000054; 000065; 000458; 001641 – 001642; 001645 – 001646 001647 – 001649)
- Printouts of the topics of YouTube videos posted by AMP, which remain publically available (bates labels 001919 – 001928)
- A list of training topics to be pushed down to local chapter contacts, as created by AMP headquarters (bates labels 004459 – 004468)
- The addresses at which AMP has had its place of business (Interrogatories to AMP and AJP, Response No. 6, dated April 10, 2018)

---

[1] Defendants produced, after a deficiency letter from Plaintiffs specifically requesting them, the 990s filed by AJP (and, to the extent that there are any, on behalf of AMP). Nonetheless, despite repeatedly demanding this production, Plaintiffs now claim the production of the 990s is irrelevant because they were always publically available. This is exactly the sort of request and harassment which supports Defendants' move for a protective order preventing further blanket discovery at this stage, unless and until this Court specifies what, if any, remaining discovery is necessary for jurisdictional purposes.

3

*See* Exhibit A to Defendants' Motion to Quash and for Protective Order ("Defendants' Motion"). These are, of course, in addition to the interrogatory responses and amended interrogatory responses, on behalf of the individual defendants and corporate entity defendants. *See* Exhibit C to Defendants' Motion, with relevant sworn verifications for each. And, to assuage Plaintiffs that the early origin documents they wish existed and/or were retained in the normal course of business simply weren't retained or never existed, Defendants produced a Declaration from Munjed Ahmad, one of the creators of AMP originally, attesting to his search for records relating to the decision to begin AMP and attaching the only ones he located from separate servers, after a diligent search. *See* Exhibit D to Defendants' Motion. This Declaration also states the incorporation and creation date of AMP as 2006, as supported by the documents also produced in this matter. *Id*. Defendants have still not been required to file Answers, and Plaintiffs have not yet been required to provide Initial Disclosures or any other form of discovery response, as neither of those actions is necessary or appropriate at this stage of this case.

At this point, Plaintiffs' actions far exceed the scope articulated in this Court's order permitting limited discovery for the sole purposes of jurisdiction as to the alter ego claims alone, and are merely harassing and unjustly burdensome. Nonetheless, Plaintiffs filed a Motion asking this Court to "order Defendants to conduct a complete search for documents, e-mails and information in the possession, custody or control of Defendants (and their officers, directors and personnel)" during this time of limited jurisdictional discovery. Dckt. 54 at Para. 3.[2] It is hard

---

[2] As stated in Defendants' Response to Plaintiffs' Motion to Compel (Dckt. 74), Defendants object to the hearsay, unverified document attached to Plaintiffs' Motion to Compel at Exhibit 1. Dckt. 56.2. This document, with a listed author of the Foundation for Defense of Democracies, was not written or approved by any Defendant in this matter, and did not involve consultation with any Defendant in this matter. The veracity of neither the author nor has not been established; it is therefore impermissible hearsay and as such should be disregarded by this Court. *See Block v. Toyota Motor Co.*, 5 F. Supp.3d 1053, 1061 (D. Minn. 2014) (disallowing purported evidence including prior congressional testimony because "Plaintiffs' counsel cannot rely on unrelated

4

to see what, if anything, Plaintiffs <u>aren't</u> seeking now which they believe they would be entitled to later in full discovery in this matter, if this case were to ever proceed that far.

## II. AUTHORITIES AND RELEVANT REQUESTS

A. <u>Legal Standards</u>

Plaintiffs here cannot show the discovery they seek relates to the jurisdiction of this Court as to their claims of alter ego by way of a disguised continuance. "Instead, plaintiffs merely assert in the most conclusory way that [these defendants are] 'merely the disguised continuance' of" the original judgment defendants which no longer exist. *See Chi. Reg'l Council of Carpenters Pension Fund v. McGreal Constr., Inc.*, 2012 U.S. Dist. LEXIS 167373, *13 (N.D. Ill. Nov. 26, 2012) (**attached hereto as Exhibit 1**). Plaintiffs fail to tie their discovery requests to their alter ego allegations, and "have not specified what information they believe that they could obtain from further discovery" that would be relevant to the limited instant issue of alter ego jurisdiction. *See Trs. of the Chi. Reg'l Council of Carpenters Pension Fund v. Conforti Constr. Co*, 2013 U.S. Dist. LEXIS 99982, *15 (N.D. Ill. Jul. 17, 2013) (**attached hereto as Exhibit 2**). Unfortunately, "what was intended to have been limited jurisdictional discovery has become an expansive and expensive foray" into all sorts of tangents, which is not what this Court ordered. *Draper, Inc. v. MechoShade Sys.*, 2012 U.S. Dist. LEXIS 11243, *3 (S.D. Ill. Jan. 30, 2012) (**attached hereto as Exhibit 3**).

Plaintiffs claim they "do not waive their right to seek further orders compelling compliance with their discovery requests if appropriate", supporting the need for the protection Defendants seek from the Court here. Dckt. 54 at fn. 1. Plaintiffs currently complain about not receiving what they deem to be appropriate responses in six main areas: (1) early officers and directors in AMP and AJP; (2) identification of voluntary donors; (3) annual conference

---

investigations, recalls, and press coverage to relieve them of their duty" to prove the allegations specific to the particular case).

5

materials, such as agendas, speaker lists, content of speeches, or programs; (4) e-mail distributions to "subscribers"; (5) identification of organizations "promoted and helped with fundraising";[3] and (6) information about "relationships to networks of people and organizations that have been closely tied to both the judgment debtors, AMP/AJP, and the funding of terrorist groups." Dckt. 56 at 3. As to each of these areas and as set forth in Defendants' Response to Plaintiffs' Motion to Compel (Dckt. 74, "Defendants' Response"), Defendants either have provided the responsive information as it exists and is in good faith required to be preserved, or the requests are simply far too broad, burdensome and objectionable as written, and are not reasonably calculated to lead to the discovery of jurisdiction-related information as to alter ego.

B.  Information Which Has Already Been Produced, Despite Plaintiffs' Move to Compel

    1.  Officers and Boards of Directors Information Has Been Provided

Defendants have identified the officers and members of the Boards of Directors of AMP and AJP, as well as produced all relevant state Articles of Incorporation. Defendants also identified current employees, and locations used by Defendants. And, Defendants set forth by year all members of the Boards of Directors of the relevant organizations, from formation to date, as much as the regularly retained records will show. *See* Exhibit C to Defendants' Response. Defense counsel had also summarized this information via emails, but since counsel for Plaintiffs considered that summary to be unsatisfactory, Defendants specifically set forth the exact same information in the April 10, 2018 amended discovery responses. Exhibit A to Defendants' Response. The only information not provided was a full and exhaustive list of original members of the Board of Directors for AMP from 2006, when it was formed, and 2007 and 2008. As repeatedly stated, there are no records which were maintained in the regular course of business showing this, and Defendants therefore cannot produce any such record from the

---

[3] Discussion as to this purported deficiency was inadvertently omitted from Defendants' Response (Dckt. 74), and is therefore addressed herein at II.C.3, as it relates to both pending motions.

6

fledgling days of a new charity. Defendants therefore provided a Declaration from Munjed Ahmad, who was involved in the creation of the original entity AMP, and his notes which he was able to locate from the time of formation of that entity. Exhibit D to Defendants' Response. As to the relevant jurisdictional issues, the information which Plaintiffs wanted, pertaining to formation of AMP and AJP and the involvement of the individual defendants in those formations, has all been provided. All corporate filings, and an additional Declaration from a founder of AMP which speaks to his intent in creation of AMP and the degree of his related awareness of the prior *Boim* judgment defendant entities, specifically drafted and provided to complete the response where the documents do not, have been provided. Defendants have stated repeatedly there is nothing being withheld which was maintained in the regular course of business. As to the individual defendants in this matter, Plaintiffs have already deposed Defendant Jaber, twice, in connection with the original 2000 litigation and his role pertaining to judgment defendants AMS and IAP and the dissolution of their assets, if any, and have all of his relevant testimony as to where those assets went. Defendants Jaber, Abuirshaid and Hamayel have already submitted sworn testimony in this matter that they were not involved in the creation of Defendant AMP or Defendant AJP, and Munjed Ahmad also voluntarily submitted sworn testimony that these three Defendants had nothing to do with the creation of AMP or AJP. There is simply nothing else to compel in this regard. In the alternative, should the Court deem the accurate answers and documents already provided to be insufficient, Defendants would be amenable to third party interrogatories submitted to Mr. Ahmad via defense counsel, for any further information he may have relevant to AMP's creation, as it pertains to this limited jurisdictional discovery on alter ego. There are no jurisdictionally related questions which can be asked in a deposition which cannot be asked by written question just as well, if not better, so Defendants respectfully submit that if further responses are needed, they should come in the form of written questions to Mr. Ahmad, for his sworn responses.

2. <u>Information as to Annual Conferences and Speakers Has Been Provided</u>

Plaintiffs complain further about what they have already received, regarding information as to AMP and/or AJP annual conventions. Defendants provided this information, the underlying documentation, and a summary broken down by year and topic, as to all ten annual conferences conducted by Defendants to date. *See* Exhibit F to Defendants' Response. This also includes production identifying the speakers and topics for each year's conference, where that information was retained. *Id*. Furthermore, to the extent that Plaintiffs claim any overlap with AMP conferences and IAP operations exists, Defendants have clearly responded: "As to conferences held by IAP or the cessation of IAP conferences, no related documents are in the possession of any Defendants." *See* Exhibit C to Defendants' Response, at April 10, 2018 Response to Request for Production No. 24. There is nothing left to compel here. To the extent Plaintiffs seek a definitive list of all presentations ever given by any of the dozens of Board members identified by Defendants in their interrogatory responses, this is both overly broad and unduly burdensome for Defendants to gather and summarize, and otherwise equally available to Plaintiffs by way of the complete archives, in their native electronic form, already produced by Defendants of the website, Facebook and Twitter pages. Furthermore, speeches given by any Board member at any time do not establish jurisdiction over these five defendants as to the matter presented before this Court (which, in this lawsuit, is solely alter ego liability).

C. <u>Information for Which Defendants Seek Protection</u>

1. <u>Identities of Voluntary Donors for 2015 and 2016 Will Not Show Jurisdiction</u>

Defendants are not willing to invade the privacy of third party donors, and seek this Court's protection as to the identity and amounts of the voluntary donors to AJP d/b/a AMP, which were redacted in production as to the 2015 and 2016 Form 990s. Plaintiffs attempt to argue, as they tried and failed in response to the Motion to Dismiss already, that voluntary donations, made to a new charitable organization at a later date after the judgment at issue and

8

with no prior obligation that these donations be made, somehow constitute "assets" of the original *Boim* 2000 judgment defendants. They do not. Voluntary donors of a charity are not transferable property. *See Christiansen v. Mech. Contractors Bid Dep.*, 404 F.2d 324, 325 (10th Cir. 1968) ("[t]he court can find no equitable or moral reason … why the new corporation could not be organized to conduct a modified and extended business or even a business similar to that conducted by the old corporation so long as no property of the old corporation was diverted to the new corporation"); *see also* Dckt, 41 at 10 ("this Court is equally cautious of branding any organization and its members that support humanitarian interests for the people of Palestine as having an unlawful motive"). Defendants revealed the dates and amounts of donations made which were large enough to itemize on the 990 Forms produced, but redacted the names and addresses of those donors based on the privacy rights of those who are not parties to this lawsuit. *See* Exhibits A, C to Defendants' Response. Furthermore, the redacted information is as to the 2015 and 2016 990s only (bates labels 000407-000412 and 000440-000447); this information as to individuals making voluntary donations <u>more than a decade</u> after the dissolution of the relevant judgment debtors cannot help establish alter ego jurisdiction. This Court rightly noted that "a shared stated mission – 'to educate people about Palestine[]' … alone does not suggest any nefarious intent or unlawful motive. To find otherwise would create a false inference that no legitimate humanitarian organization could ever be created with that mission." Dckt. 41 at 8. Defendants therefore seek this Court's protection as to the identity of voluntary donors to AJP d/b/a AMP, as redacted from the 2015 and 2016 Form 990 filings.

      2.    <u>Email Distribution Lists Are Not Relevant to Control for Alter Ego Jurisdiction</u>

Plaintiffs next complain about not receiving email distribution lists and other data for any and all materials sent out by these Defendants, at <u>any</u> time, and any and all items distributed. These requests are objectionable, burdensome, and not likely to reveal any jurisdictionally relevant information as to alter ego. As with donor identities, the identities of email subscribers

9

(as opposed to Directors of the current Defendant entities, who can exercise control over the organizations) are not made public, and there is no justifiable interest outweighing the privacy rights of those involved which in any way connects subscribers to a new entity, created after the dissolution of all 2000 judgment defendants, to alter ego jurisdiction in this action. To the extent Plaintiffs seek any materials which may be discoverable, all materials retained in the regular course of business are reflected in the website, Facebook and Twitter archival data which has already been produced in full electronic form in this matter by Defendants.

      3.      <u>Entities "Promoted and Helped with Fundraising" Are Publically Available, Or In the Data Already Produced, to the Extent Relevant..</u>

Falling back on their Anti-Terrorism Act claims asserted and litigated in the 2000 action against those judgment defendants, Plaintiffs recite the way in which Judge Keys found connections between the original judgment debtors IAP, AMS and HLF with money and support provided to Hamas. Dckt. 26 at 8. But there are no claims in this suit against these Defendants under the Anti-Terrorism Act, despite Plaintiffs' lengthy pontifications to the contrary. The only cause of action at issue in this matter is whether AMP, AJP, and/or these three individual Defendants can properly be considered alter egos of the prior judgment defendants IAP, AMS and/or HLF. For the limited discovery currently authorized by this Court at this 12(b)(1) stage, all that matters is whether Plaintiffs can sufficiently show, for jurisdictional purposes, "the purported alter-ego's control or dominance over the original entity. *Central States,* 85 F.3d 1286." Dckt. 41 at 6. Therefore, only discovery requests which would show any continuation and control over the original judgment defendant entities (IAP, AMS and HLF) by the new entities and/or individuals (Defendants AMP, AJP, Jaber, Abuirshaid and Hamayel), along with the required showing of a "sham transfer of assets" and "an unlawful motive or intent", are relevant to the limited scope permitted here. Dckt. 41 at 6, citing *Int'l Union of Operating Eng'rs, Local 150 AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987).

Plaintiffs' extended explanations of the wrong-doings attributed to IAP, AMS and HLF have no bearing on the relevant issues in this matter unless Plaintiffs can show the correlations and control, along with the fraudulent transfer of assets and ill intent described above, by these five Defendants regarding any assets of IAP, AMS and HLF to which Plaintiffs' previous judgment renders them entitled. Plaintiffs' blanket conclusory assertion that "AMP/AJP have stepped into IAP/AMP's [sic] shoes" does not do this, and their requests for documents which they believe will show **independent** purported liability of AMP, AJP and these individual Defendants under the Anti-Terrorism Act are off point: there are no pending allegations against AMP, AJP and these individual Defendants under the Anti-Terrorism Act.[4] Dckt. 56 at 8, 9. The only relevant issue is the degree of continuation, control and deception these Defendants may have over the former assets of the judgment defendants, which Plaintiffs seek. Therefore, Plaintiffs' requests regarding funds raised "by" AMP or AJP, their own interactions with each other, and their interactions with their own subscribers do not speak to any alter ego relationship over IAP, AMS or HLF. The same is true for travel and attendance at outside conferences by Defendant Abuirshaid in 2017, a fundraiser which purportedly took place in 2015, outside employment undertaken by any of the individual Defendants, and any travel abroad by the individual Defendants. Dckt. 56 at 13-15. Plaintiffs cannot seek evidence purporting to support claims which they did not and cannot bring. To the extent any relevant responsive data does exist, it is contained within the full electronic archival data, already produced, of the relevant website, Twitter, and Facebook pages of these Defendant entities.[5] Plaintiffs need only read

---

[4] To the extent this even needs to be said, all five Defendants in this matter deny any wrongdoing or potential liability under the Anti-Terrorism Act, despite no such claims being brought against them. As repeatedly shown in the provided materials, AJP and AMP are non-partisan and educational in nature, and fully domestically based and operated.

[5] Plaintiffs claim this extensive information is merely useless "publically available" data for which Defendants should get no credit for producing, despite Plaintiffs specifically insisting on receiving the archival data available only to Defendants for these social media pages. Nonetheless, Defendants had the archival data harvested, and produced it to Plaintiffs in the same electronic

what they have already received to find that available data.

4. <u>The Only "Network" Sought Exists Solely in the Minds of Plaintiffs</u>

In a similar vein, Plaintiffs seek information and responses relating to what they label as "Network Entities" and "Network Defendants." However, the definitions of these newly created terms involve a clumping of unrelated entities and organizations, having little to nothing to do with the alter ego claims in this matter, and which cannot be answered by Defendants due to the inappropriate and prejudicial nature of the definitions used.[6] The entities and individuals identified have no connection to AMP and/or AJP, and far exceed the entities found liable to Plaintiffs in the 2000 litigation as judgment entities (IAP, AMS, and Holy Land Foundation ("HLF"), as referenced in this Court's Order at Docket 41, p. 2). Just as this Court previously noted that "Plaintiffs spend a great deal of time discussing organizations (KindHearts and The Mosque Foundation) and … individuals that are not named as defendants in this or the previous suit" (Dckt. 41 at 9), Plaintiffs veer equally unjustifiably here, in this "limited" discovery.

---

format in which it is available to Defendants as the owners of these relevant social media pages.

[6] Plaintiffs' discovery defines "Network Entity" as including all of the following entities: "American Middle East League for Palestine; Anera; Baitulmaal, Inc.; Benevolence International Foundation; Global Relief Foundation; Helping Hands for Relief and Development; Hamas; ICNA Relief; IHH Humanitarian Relief Foundation; Islamic Relief Foundation; Interpal; KindHearts; Life for Relief and Development; Middle East Financial Services; The Mosque Foundation (or Bridgeview Mosque); Muslim American Society; the Muslim Brotherhood; Palestinian Children's Relief Fund; any branch of the Palestine Committee; Union of Good; United Muslim Relief; Unlimited Friends Association for Social Development; Viva Palestina; Zakat Foundation of America" and "any charitable, humanitarian, political or educational organization in Gaza or the West Bank; and any branch of the acting governmental authorities in Gaza or the West Bank."

Plaintiffs' discovery defines "Network Person" as including "Khaled Abughazaleh; Omar Ahmad; Nihad Awad; Shukri Abu Baker; Muhammad Alkik; Hatem Bazian; Khalil Demir (also known Halil Demir); Sana'a Abed Daoud; Salah Daoud; Ghassan Elashi; George Galloway; Sheikh Mohammad Al Hanooti; Oussama Jamal; Sheikh Bassam Jarrar; Ayman Jarwan; Hussein al-Khatib; Khalil al-Khaya; Mousa Abu Marzook; Mohammad El-Mezain; Kifah Mustapha; Sufian Nabhan; Ashraf Nubani; Magdi Odeh; Yusuf Qaradawi; Mohamed Qatanani; Nabil Sadoun; Sheikh Jamal Said, Ra' ed Sal ah; Sabri Samirah; Salah Sarsour; Yousef Shahin; Khaled Smaili" and "any representative or affiliate of a Network Entity"."

Defendants cannot answer as to the knowledge of or documents retained by the more than <u>twenty entities</u> or the more than <u>thirty individuals</u> named, none of whom are defendants in this or the *Boim* 2000 lawsuit. What Defendants can do, and did, is speak to whether they possess any assets of IAP, AMS and/or HLF. They do not. Defendants have answered this unambiguously:

> 7. Identify all Assets that were at any time owned or possessed by any *Boim* Defendant and were later received (directly or indirectly) or came to be possessed or owned by Respondent.
>
> **Response**: None as to AMP and AJP. As to any payments made to the Individual Defendants, see Objections and Responses to Interrogatories to Individual Defendants as well as their individual Declarations previously provided.[7]
>
> 8. All documents in Respondent's possession, custody or control relating to the *Boim* Judgment, enforcement efforts in connection with the *Boim* Judgment, or any actual or potential criminal investigation or prosecution of any *Boim* Defendant.
>
> **Response**: None, other than the transcripts of the depositions of Rafeeq Jaber, which are already in the possession of Plaintiffs; limited correspondence retained by Mr. Jaber has already been produced.
>
> 9. All documents relating to the cessation of the operations, wind-up, or dissolution of any *Boim* Defendant or affiliate, including documents relating to the decision to stop operating.
>
> **Response**: None.
>
> 10. All documents relating to any Assets that at one time were owned or possessed by any *Boim* Defendant and that, at any time, were received (directly or indirectly) or came to be possessed or owned by Respondent.
>
> **Response**: None. As to payments received by any Individual Defendant for agreed paid services as referenced in the previously produced Declarations of the Individual Defendants, please see those Declarations as well as responses provided by Individual Defendants to Interrogatories in this matter.
>
> 27. All documents that Respondent obtained directly or indirectly from any *Boim* Defendant. This request includes any copies of paper documents, electronic transmissions or electronically stored information now in Respondent's possession, custody or control that were at any time in the possession, custody or control of a *Boim* Defendant.
>
> **Response**: None.
>
> 28. All documents relating to the preventing or avoiding liability for the *Boim* Judgment or civil or criminal liability under the federal Anti-Terrorism Act of any other anti-terrorism statute.

---

[7] Ex. C to Defendants' Response, Objections and Responses to Interrogatories to AMP and AJP, Response No. 7.

**Response**: None exist. [8]

3. Identify all Assets that were at any time owned or possessed by any *Boim* Defendant and were later received (directly or indirectly) or came to be possessed or owned by Respondent.

**Response**:
No assets owned or possessed by any *Boim* 2000 judgment defendant have ever been received, possessed or owned by the Individual Defendants in this matter, other than as payment for work performed for paid services during the existence of IAP and/or AMS (prior to 2004) as referenced in the Declarations of the Individual Defendants. Regarding Defendant Jaber, please also see transcripts of depositions of Rafeeq Jaber for detailed inquiry and answers already obtained by Plaintiffs regarding the distribution of the assets of IAP and AMS, if any, and the dissolution of IAP and AMS. Those deposition transcripts are already in Plaintiffs' possession.[9]

Therefore, Defendants have answered, clearly and unequivocally, as to the relevant assets of the prior *Boim* 2000 judgment defendants. Plaintiffs may not like the answers, but they are accurate.

5. <u>Defendant Abuirshaid's Former Publications, Unrelated to the 2000 Judgment Defendants, Do Not Pertain to Jurisdiction on Alter Ego</u>

Plaintiffs seek copies of a publication started and previously run by Defendant Abuirshaid from 2005 to 2015, the magazine *Al Meezan*. Dckt. 56 at 13. While recognizing, albeit reluctantly, that Defendants responded that the requested materials regarding IAP's prior publication *Al-Zaytounah* are not in the possession of any Defendant, Plaintiffs believe they are entitled to the hard copies of *Al Meezan* which were retained (solely in hard copy format) by Defendant Abuirshaid after he sold it in 2015, simply because Plaintiffs think "the content of *Al-Meezan* is highly relevant." Dckt. 56 at 13. However, Defendants have responded that *Al Meezan* was not an AMP or AJP publication, was the creation of Defendant Abuirshaid on his own, was sold by him in 2015 (well before any document retention trigger relating to this matter), and that the only documents relating to *Al Meezan* which remain in the possession of <u>any</u> current Defendant are the hard copies possessed by Defendant Abuirshaid. Production of these hard copies would be unduly burdensome, and will not speak to any alter ego connection to the 2000 judgment defendants.

---

[8] Ex. C, Objections and Responses to Requests for Documents, Nos. 8-10, 27-28.
[9] Ex. C, Objections and Responses to Interrogatories to Individual Defendants, No. 3.

<u>There are no</u> other "documents *relating* to the startup of *Al-Meezan* or any connection between *Al-Meezan* and AMP/AJP" which any Defendant in this matter can produce, as already repeatedly communicated to Plaintiffs. Dckt. 56 at 13; *see also* Exhibit C to Defendants' Response.

      6.      <u>The Form of Responses Provided Will Not Change Jurisdictional Status</u>

Plaintiffs complain about the format of the information received, with particular attention to wanting emails from AMP and/or AJP servers, among others, in native form.[10] Dckt. 56 at 14-15. However, Plaintiffs fail to identify what, if any, jurisdictionally related information pertaining to their alter ego claims they believe they are missing out on by getting the answers which have been provided in the form in which they are readily available to these Defendants and have been provided. While extensive email production may ultimately be a topic for full discovery at a later date, at which point Plaintiffs' dismissively broad statement that "[d]ocument productions are frequently orders of magnitude higher" than the thousands of pages already produced here in this limited authorized discovery, no connection exists between the alter ego jurisdictional inquiry permitted here, and the <u>form</u> in which Plaintiffs would rather receive information.[11] Dckt. 73 at 2.

For the reasons set forth above, Defendants respectfully request this Court grant their Motion to Quash and for Protective Order, and rule that the limited jurisdictional discovery permitted in this matter is now complete for purposes of allowing Plaintiffs to more fully respond to Defendants' upcoming re-asserted Motion to Dismiss under Fed. Rule Civ. P. 12(b)(1), and for any such other relief to which Defendants may show themselves justly entitled.

---

[10] Defendants have provided some emails, as found on outside servers by some individuals associated with AMP and/or AJP, but do not have access to the "native" files of those emails. In addition, as also already communicated, Defendants are not withholding any emails retained in the normal course of business regarding the topics on which Defendants have responded to discovery.
[11] Plaintiffs refer to emails and other data in the custody and control of individuals who are not parties to this lawsuit nor within the control of these Defendants. Dckt. 56 at 14-15. For reasons already set forth in this briefing and in accordance with the Federal Rules of Civil Procedure, Defendants are not required to make such production, even in the scope of full discovery.

\

                                        Respectfully submitted,

                                        */s/ Christina A. Jump*

                                        Charles D. Swift,
Texas Bar No. 24091964
Christina A. Jump
Texas Bar No. 00795828
Constitutional Law Center for
Muslims in America
833 E. Arapaho Rd, Suite 102
Richardson, TX 75081
Phone: (972) 914-2507
Fax: (972) 692-7454
*Attorneys for Defendants*

Thomas Anthony Durkin
ID No. 0697966
2446 N. Clark Street
Chicago, IL 60614
Tel: 312-981-0123
Fax: 312-913-9235
tdurkin@durkinroberts.com
*Local Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFIY that on this 5th day of June 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

                                        */s/ Christina A. Jump*
                                        Christina A. Jump
                                        *Attorney for Defendants*