# EXHIBIT 1

# Chi. Reg'l Council of Carpenters Pension Fund v. McGreal Constr., Inc.

United States District Court for the Northern District of Illinois, Eastern Division

November 26, 2012, Decided; November 26, 2012, Filed

No. 12 C 1795

**Reporter**
2012 U.S. Dist. LEXIS 167373 *; 2012 WL 5921140

CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, CHICAGO REGIONAL COUNCIL OF CARPENTERS WELFARE FUND, THE CHICAGO REGIONAL COUNCIL OF CARPENTERS APPRENTICE TRAINING FUND, Plaintiffs, v. McGREAL CONSTRUCTION, INC. and WEST BUILDERS, INC., Defendants.

## Core Terms

single employer, companies, motion to dismiss, allegations, alter ego, Carpenters, defendants', plaintiffs', operations, employees, notice, plausibility, courts, entity

**Counsel: [*1]** For Chicago Regional Council of Carpenters Pension Fund, Chicago Regional Council of Carpenters Welfare Fund, Chicago Regional Council of Carpenters Apprentice Training Fund, Plaintiffs: David Faxon Whitfield, Whitfield, Mcgann & Ketterman, Chicago, IL.

For McGreal Construction, Inc., Defendant: David Joel Bressler, LEAD ATTORNEY, Dykema Gossett Rooks Pitts PLLC, Lisle, IL; Charles Michael Baum, Dykema Gossett PLLC, Chicago, IL.

For West Builders, Inc., Defendant: Steven W Jados, LEAD ATTORNEY, Renee L. Koehler, Koehler & Passarelli LLC, Woodridge, IL; Ronald James Passarelli, Koehler & Passarelli PC, Woodridge, IL.

**Judges:** SIDNEY I. SCHENKIER, United States Magistrate Judge.

**Opinion by:** SIDNEY I. SCHENKIER

## Opinion

**MEMORANDUM OPINION AND ORDER**[1]

Plaintiffs Chicago Regional Council of Carpenters Pension Fund, Chicago Regional Council of Carpenters Welfare Fund, and the Chicago Regional Council of Carpenters Apprentice Training Fund (collectively "the Funds") have filed an amended complaint against McGreal Construction, **[*2]** Inc. ("McGreal") and West Builders, Inc. ("West") for violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132 *et. seq.* ("ERISA"), and the Labor Management Relations Act of 1947, 29 U.S.C. § 185 ("LMRA") (doc. # 27: First Am. Compl.). Specifically, the Funds allege that McGreal and West violated Section 502 of ERISA and Section 301 of the LMRA by failing to allow plaintiffs to complete an audit of West's books and records for the period of January 2010 through June 2011 (doc. # 21: First Am. Compl. at ¶ 11). Plaintiff's seek access to West's records for the period of January 2010 through June 2011, delinquent contributions shown due upon the completion of the audit on West, as well as interest, damages, litigation costs, and other legal and equitable relief the Court deems appropriate (*Id.* at ¶¶ 15-16).

Defendants have moved to dismiss with prejudice plaintiffs' First Amended Complaint (the "Complaint") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) (doc. # 29: West Mot. to Dismiss at 1, doc. # 32: McGreal Mot. to Dismiss at 1). [2] For the reasons set forth below, we grant in part and deny in part defendants' motions to dismiss.

---

[1] On June 27, 2012, by consent of all parties and pursuant to Local Rule 73.1 (b), the Executive Committee reassigned this case to this Court for all proceedings, including entry of final judgment (doc. # 20).

[2] McGreal **[*3]** did not file its own memorandum in support of its motion to dismiss, but instead adopted West's motion to dismiss plaintiff's first amended complaint and supporting memoranda (doc. # 32).

2012 U.S. Dist. LEXIS 167373, *3

## I.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990) (citing *Triad Assocs., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir. 1989)). Rule 12(b)(6) requires dismissal if the allegations in the complaint, taken as true and with all reasonable inferences drawn in favor of the party making the claim, do not state a claim for which legal relief can be granted. Fed. R. Civ. P. 12(b)(6). First, a complaint must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to give the defendant '"fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (abrogated on other grounds)). Second, the factual allegations in the **[*4]** complaint must be sufficient to make the asserted claim "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556); *see also In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 629 (7th Cir. 2010) (noting that "the complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' connotes"). Although the material facts alleged must be taken as true and construed favorably toward the plaintiff, this rule does not apply to legal conclusions, supported only by conclusory statements. *Id.*

## II.

The following facts alleged in the Complaint are those that we consider material to defendants' motion to dismiss and that we take as true for purposes of the present motion. *See, e.g., Twombly,* 550 U.S. at 589 ("at **[*5]** the motion to dismiss stage, a judge assumes that all the allegations in the complaint are true (even if doubtful in fact)") (internal quotations omitted). The Funds are multiemployer benefit plans as defined by ERISA, established and maintained according to their respective Agreements and Declarations of Trust (First Am. Compl. at ¶ 2). Plaintiffs assert that McGreal and West are employers engaged in an industry affecting commerce (*Id.* at ¶ 3, 7).

McGreal and the Chicago Regional Council of Carpenters (the "Union"), a labor organization under the LMRA, are parties to a collective bargaining agreement ("CBA") (*Id.* at ¶ 3). Under the respective Agreements and Declarations of Trust and the CBA, McGreal must make contributions on behalf of its employees to the Funds (*Id.* at ¶ 5). Specifically, McGreal is required to make payments to the Funds for each hour worked by its carpenter employees and for the hours worked by subcontractors that are not signatories to the CBA (*Id.*). In addition, McGreal is required to provide access to the records necessary for the Funds to determine whether McGreal has complied with its contribution obligations (*Id.* at ¶ 6).

Plaintiffs allege that West is "merely **[*6]** the disguised continuance and a single employer with McGreal" (*Id.* at ¶ 8). In support of this contention, plaintiffs allege that the two companies are related in several ways (*Id.*). Plaintiffs contend that McGreal and West's business transactions and operations serve similar purposes and that the two companies share Centex Homes and Pulte Homes as similar customers (*Id.*). The companies also have five common employees and either share or have shared at least four business locations (*Id.*). In addition, plaintiffs allege that David McGreal is the registered agent of McGreal, Christine McGreal was the registered agent of West, and that both individuals own and control McGreal and West (*Id.*). Finally, plaintiffs contend that Christine McGreal is currently an officer of both companies (*Id.*). Plaintiffs assert that either as a single employer or under an alter ego theory, West is required to comply with the provisions of McGreal's CBA and Trust Agreements with the Union, including providing access to its records (*Id.* at 119). According to the Complaint, defendants have failed to allow plaintiffs to complete an audit on West for the period of January 2010 through June 2011, despite repeated **[*7]** requests (*Id.* at ¶ 11). Accordingly, plaintiffs argue that both West and McGreal are in breach of the CBA between McGreal and the Union (*Id.*).

## III.

As West is not a signatory to the CBA, the Funds' theory of liability necessarily depends on them sufficiently alleging (and ultimately proving) that West is bound to

2012 U.S. Dist. LEXIS 167373, *7

the CBA. The Funds assert that West is bound to the CBA under a single employer theory, or as an alter ego of McGreal (*Id.* at ¶¶ 8, 9). Defendants contend that the Complaint alleges insufficient facts to support a single employer or alter ego determination against West (doc. # 30: Mem. at 2-3). More specifically, defendants argue that (1) the Complaint contains only conclusory statements as to West's relationship with McGreal, lacking any factual basis for the alleged single employer relationship (*Id.* at 3-6); and (2) that the Complaint does not plausibly suggest any alleged unlawful misconduct (*Id.* at 6-14).

The single employer doctrine holds '"that when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes.'" *Cent. Illinois Carpenters Health & Welfare Trust Fund v. Olsen,* 467 F. App'x 513, 517 (7th Cir. 2012) (quoting *Moriarty v. Svec,* 164 F.3d 323, 332 (7th Cir. 1998)). **[\*8]** In determining whether two companies constitute a single entity, courts must weigh the totality of the circumstances. *Esmark, Inc. v. N.L.R.B.,* 887 F.2d 739, 753 (7th Cir. 1989). While no single factor is conclusive, *id.,* courts must examine the following criteria: "(1) the interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership," *Olsen,* 467 F. App'x at 517 (citing *S. Prairie Constr. Co. v. International Union Operating Engineers,* 425 U.S. 800, 802 n.3, 96 S. Ct. 1842, 48 L. Ed. 2d 382 (1976)). In general, for alter ego analysis courts consider the same factors, but in addition, a plaintiff must show '"the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement...."' *Trustees of Pension Funds of Local 701 v. Favia Elec. Co.,* 995 F.2d 785, 788-89 (7th Cir. 1993) (quoting *International Union Operating Engineers v. Centor Contractors,* 831 F.2d 1309, 1312 (7th Cir. 1987)). "'[U]nlawful motive or intent are critical inquiries in an alter ego analysis . . . ." *Id.* at 789. However, as with the single employer doctrine, meeting all of the factors is not required to establish **[\*9]** alter ego. *Id.*

**A.**

Under the federal pleading standards, plaintiffs have met their burden for stating a single employer claim. As required by Rule 8(a), plaintiffs' Complaint gives defendants fair notice of the claim against it and the grounds upon which it rests. The Funds allege sufficient facts that, when taken as true, state a single employer claim that is plausible on its face. *Twombly,* 550 U.S. at

570 (plaintiff must allege "enough facts to state a claim to relief that is plausible on its face"); *see also Erickson v. Pardus,* 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ("Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which its rests."). The Funds contend that the common business transactions, officers, management, control, and employees, when taken together, sufficiently allege a plausible claim that West does not have a separate identity from McGreal (*Id.* at ¶ 9).

As noted above, in determining whether two companies constitute a single entity courts examine the interrelatedness of the companies' operations, whether the companies share common management, have centralized control of their labor relations, and if there **[\*10]** is common ownership between the companies. *Olsen,* 467 F. App'x at 517. A single employer finding does not require every factor to be met. *Esmark,* 887 F.2d at 753. Instead, a court must consider the totality of the circumstances. *Id.; see also R.R. Maint. & Indus. Health & Welfare Fund v. Hacker,* No. 10-3305, 2011 U.S. Dist. LEXIS 121168, 2011 WL 5008311, at \*7 (C.D. Ill. Oct. 20, 2011) (denying defendant's motion to dismiss where plaintiffs did not allege that the defendant companies shared common management, but did allege that the companies were in the same fields, shared a significant number of employees, and shared equipment). Here, the Funds allege that West and McGreal share common business operations and purposes with at least two of the same clients, have five of the same employees with Christine McGreal as an officer of both companies, that the companies operate out of the same business locations, and that Christine and David McGreal own and control both companies (First Am. Compl. at ¶ 8). Thus, the plaintiffs have alleged three of the four single employer factors: interrelation of operations, common management, and common ownership between McGreal and West.

These allegations plainly give notice to defendants **[\*11]** of the basis for the claim, and meet the plausibility test. In *Trustees of Chicago Regional, Council of Carpenters Pension Fund v. Central Rug & Carpet Co.,* the court found that the plaintiffs had met the federal pleading standards where they alleged only that they had conducted an audit of the defendant's books and discovered a possibly related company. 10-CV-1493, 2012 U.S. Dist. LEXIS 16889, 2012 WL 426887, at \*2 (N.D. Ill. Feb. 10, 2012); *see also Chicago Regional Council of Carpenters Pension Fund v. FAC Construction & Design, Inc.,* No. 11-cv-04303, 2011

2012 U.S. Dist. LEXIS 167373, *11

U.S. Dist. LEXIS 145411, 2011 WL 6369792, at *2-3 (N.D. Ill. Dec. 15, 2011) (same). Here, plaintiffs allege considerably more than the lean allegations found sufficient in *Central Rug & Carpet* and *FAC Construction & Design.* Taking into consideration the totality of the circumstances and the relatively straightforward nature of this case, the plaintiffs have pled enough factual information to meet the federal pleading standards for their single employer claim. *See, e.g., McCauley v. City of Chicago,* 671 F.3d 611, 616-17 (7th Cir. 2011) (explaining that "[t]he required level of factual specificity rises with the complexity of the claim").

Defendants complain that the Funds have not fleshed **[*12]** out the details of their allegations: for example, the Funds allege that Ms. McGreal holds offices with both defendants without alleging details about the responsibilities of the offices (doc. # 30: Def.'s Mem. at 10). While it is true that the *Twombly* and *Iqbal* decisions have introduced a requirement of "plausibility." a fact-pleading regime as the type envisioned by West has not replaced "the notice pleading concept embodied in federal practice." *Cent. States, Se. & Sw. Areas Pension Fund v. King Auto Fin., Inc.,* 12 CV 617, 2012 U.S. Dist. LEXIS 140688, 2012 WL 4364310, at *3 (N.D. Ill. Sept. 19, 2012); *see also Bissessur v. Indiana Univ. Bd. of Trustees,* 581 F.3d 599, 603 (7th Cir. 2009) (noting that "[o]ur system operates on a notice pleading standard; *Twombly* and its progeny do not change this fact"). For example, the Federal Rules of Civil Procedure still provide standardized complaint forms that allow plaintiffs to fill in a handful of blank spaces, and thereby fulfill their burden for stating a claim under the federal rules. *See, e.g.,* Fed. R. Civ. P. Form 11. Taking all of the factual allegations in the Complaint to be true and drawing on the Court's "judicial experience and common sense," *Iqbal,* 556 U.S. at 679, **[*13]** the Funds have alleged a claim against McGreal and West that is plausible on its face. Accordingly, the Court denies defendants' motions to dismiss pursuant to Rule 12(b)(6) as they pertain to plaintiffs' single employer claim.

**B.**

We reach a different conclusion with respect to plaintiffs' alter ego claim. As previously discussed, alter ego analysis requires courts to consider the four single employer factors, plus "unlawful motive or intent" to avoid obligations under a CBA. *Favia,* 995 F.2d at 788-89. While plaintiffs have pled enough to state a single employer claim that is plausible on its face, plaintiffs

have not alleged any additional facts to show that — in addition — an alter ego theory is plausible. Instead, plaintiffs merely assert in the most conclusory way that West is "merely the disguised continuance" of McGreal (First. Am. Compl. at ¶ 8(h)). Without any factual allegations regarding defendants' unlawful motive or intent, this allegation is not sufficient to meet the plausibility test. *See, e.g., Twombly,* 550 U.S. at 555 (noting that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions"); *see also Iqbal,* 556 U.S. at 664 **[*14]** ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegation."). Consequently, the Court grants defendants' motions to dismiss insofar as plaintiffs' seek to allege an alter ego claim.

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss (doc. ## 29, 32) are granted in part and denied in part. We grant the motions to the extent that the Complaint seeks to allege an alter ego theory, but deny the motions as to plaintiffs' single employer theory claim.

**ENTER:**

/s/ Sidney I. Schenkier

**SIDNEY I. SCHENKIER**

**United States Magistrate Judge**

**DATE: November 26, 2012**

**End of Document**

# EXHIBIT 2

 Positive
As of: May 23, 2018 5:13 PM Z

# Trs. of the Chi. Reg'l Council of Carpenters Pension Fund v. Conforti Constr. Co.

United States District Court for the Northern District of Illinois, Eastern Division

July 17, 2013, Decided; July 17, 2013, Filed

No. 09 C 322

## Reporter

2013 U.S. Dist. LEXIS 99982 *; 2013 WL 3771415

TRUSTEES OF THE CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, et al., Plaintiffs, vs. CONFORTI CONSTRUCTION COMPANY, INC., Defendant.

## Core Terms

Funds, audit, continuity, successor, notice, predecessor, companies, successor liability, successorship, operations, employees, settlement, discovery

**Counsel: [*1]** For Trustees of the Chicago Regional Council of Carpenters Pension Fund, Chicago Regional Council of Carpenters Welfare Fund, Chicago Regional Council of Carpenters Apprentice & Trainee Program Fund, Plaintiffs: Terrance Bryan McGann, LEAD ATTORNEY, Karen M Rioux, Whitfield McGann & Ketterman, Chicago, IL.

For Conforti Construction Company, Inc., Conforti Construction Services, Inc., Defendants: Todd Abraham Miller, LEAD ATTORNEY, Kathleen Marie Cahill, Allocco, Miller & Cahill, P.C., Chicago, IL.

**Judges:** SIDNEY I. SCHENKIER, United States Magistrate Judge.

**Opinion by:** SIDNEY I. SCHENKIER

## Opinion

### MEMORANDUM OPINION AND ORDER

On January 19, 2009, the plaintiffs, Trustees of the Chicago Regional Council of Carpenters Pension Fund, Chicago Regional Council of Carpenters Welfare Fund, and Chicago Regional Council of Carpenters Apprentice & Trainee Program Fund ("the Funds") sued Conforti Construction Company, Inc. ("CCC") to recover delinquent benefit contributions owed for the period of January 1, 2004 through March 31, 2009 (doc. # 35: Plaintiffs' Rule 25(c) Motion to Substitute a Party Defendant ("Pls.' Mot.") at 1). Pursuant to a settlement reached between the Funds and CCC, the Court entered an Agreed Judgment Order **[*2]** on July 12, 2010, with CCC agreeing to satisfy the judgment of $190,000.00 through nine monthly installments (Pls.' Mot. at Ex. A; doc. # 32).

Thereafter, CCC failed to make any of the payments set forth in the Agreed Judgment Order. As a result, on February 15, 2013, the Funds filed a motion pursuant to Rule 25(c) of the Federal Rules of Civil Procedure, seeking to substitute Conforti Construction Services, Inc. ("CCS") as a party defendant liable for the $190,000.00 judgment (Pls.' Mot. at 1-2). The Funds seek to substitute CCS as the defendant under a theory of successor liability (*Id.* at 4). In the alternative, the Funds request that the Court allow for limited discovery solely on the successorship question (*Id.* at 8-9). For the reasons stated below, we deny the motion in its entirety.

### I.

At the threshold, we consider CCS's argument that the motion should be denied for lack of proper service. Pursuant to Federal Rule of Civil Procedure 25(c), a motion to substitute parties "must be served as provided in Rule 25(a)(3)." In turn, Rule 25(a)(3) provides that a motion "must be served ... on non-parties [such as CCS] as provided in Rule 4," and pursuant to Rule 4(h)(1)(B), a domestic corporation, **[*3]** such as CCS, must be served "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service . . .."

CCS contends that the Funds failed to properly serve their Rule 25(c) motion on CCS because the motion was not served on a CCS officer or on its registered agent (doc. # 42: CCS's Response to Plaintiffs' Rule 25(c) Motion to Substitute a Party Defendant ("CCS Resp."), Conforti Aff. ¶ 31). Rather, the motion was served on the law firm of Allocco, Miller, & Cahill, P.C. ("Allocco"), which was not authorized to accept service of process for CCS and had been retained only to handle the company's audit disputes during October 2009 (CCS Resp. at 8).

There is a strict requirement for valid service. *Mid-Continent Wood Products, Inc. v. Harris*, 936 F.2d 297, 300-03 (7th Cir. 1991); *Indiana Ins. Co. v. Barnes*, No. 98 C 1272, 1998 U.S. Dist. LEXIS 11619, 1998 WL 440896, at *1 (N.D. Ill. July 27, 1998); *Commonwealth Edison Co. v. Diversified Technologies Grp., Inc.*, No. 93 C 4138, 1993 U.S. Dist. LEXIS 16277, 1993 WL 479046, at *3 (N.D. Ill. Nov. 17, 1993). "Without proper service of process, a court cannot exercise personal jurisdiction over a **[*4]** defendant." *Naylor v. Streamwood Behavioral Health Sys.*, No. 11 C 50375, 2012 U.S. Dist. LEXIS 162084, 2012 WL 5499441, at *6 (N.D. Ill. Nov. 13, 2012). "[T]he service requirement is not satisfied merely because the defendant is aware that he has been named in a lawsuit or has received a copy of the summons and the complaint." *United States v Ligas*, 549 F.3d 497, 500 (7th Cir. 2008); *see also Homer v. Jones-Bey*, 415 F.3d 748, 758 (7th Cir. 2005). A signed return of service constitutes *prima facie* evidence of proper service, which can only be overcome by strong and convincing evidence presented by the party opposing service. *Homer*, 415 F.3d at 752.

Here, the Funds have presented no signed return of service. Indeed, the Funds did not respond to this argument at all. Consequently, we accept CCS's uncontradicted assertion that Allocco was not authorized to accept service for CCS. "In order for service on an attorney to constitute proper service on a party, the attorney must be specifically authorized by the defendant to perform that particular task." *Guess?, Inc. v. Chang*, 163 F.R.D. 505, 507-08 (N.D. Ill. 1995); *see also Oncology Therapeutics Network Joint Venture, L.P. v. Olympia Fields Internal Medicine Assocs., S.C.*, No. 01 C 2079, 2003 U.S. Dist. LEXIS 8073, 2003 WL 21183850, at *2 (N.D. Ill. May 15, 2003) **[*5]** (citing *Trotter v. Oppenheimer & Co. Inc.*, No. 96 C 1238, 1997 U.S. Dist. LEXIS 2540, 1997 WL 102531, at *2, n. 4 (N.D. Ill. Mar. 4, 1997) (service on a party's attorney is insufficient unless the party specifically appointed attorney for that purpose)).

We therefore conclude the service of process was improper in this case, and that the motion to substitute could be denied on that basis alone. However, because the Funds could correct this defect by properly serving CCS, we address the substance of the Funds' argument to explain why, on the merits, it fails.

**II.**

Rule 25(c) is a procedural mechanism, which does not determine any substantive issues that may be involved in the action. *ISI Int'l v. Borden Ladner Gervais, LLP*, No. 98 C 7614, 2002 U.S. Dist. LEXIS 2406, 2002 WL 230904, at *1 (N.D. Ill. Feb. 15, 2002), *aff'd*, 316 F.3d 731 (7th Cir. 2003). Substitution of the parties under Rule 25(c) is within the discretion of the court. *Id.* Under ERISA, we analyze successor liability applying federal common law standards. *See Teed v. Thomas & Betts Power Solutions, LLC*, 711 F.3d 763, 764 (7th Cir. 2013); *Upholsters' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327-29 (7th Cir. 1990).

Under these standards, successor **[*6]** liability applies when: (1) there was substantial continuity in the business operations of the predecessor and successor; and (2) the successor employer had prior notice of the claim against the predecessor before the acquisition. *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 674 (7th Cir. 2011); *Chicago Regional Council of Carpenters Pension Fund, et al. v. Estate Installations*, No. 11-cv-2924, 2013 U.S. Dist. LEXIS 17215, 2013 WL 500833, at *2 (N.D. Ill. Feb. 8, 2013); *see also Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.* 59 F.3d 48, 49 (7th Cir. 1995). Although successor liability traditionally applied only when assets were sold, it is an equitable doctrine that has been extended to encompass "any reorganization that results in a substantial continuation of the business by the successor and either obliterates the previous business or leaves it as an 'empty shell'." *Cent. States, Se. & Sw. Areas Pension Fund v. TAS Inv. Co. LLC*, No. 11-cv-2991, 2013 U.S. Dist. LEXIS 41089, 2013 WL 1222042, at *7 (N.D. Ill. Mar. 25, 2013) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Wiseway Motor Freight, Inc.*, No. 99 C 4202, 2000 U.S. Dist. LEXIS 23212, 2000 WL 1409825, at *6 (N.D. Ill. Sept. 25, 2000)).

The parties **[*7]** here dispute both elements of successor liability. We address each element in turn.

2013 U.S. Dist. LEXIS 99982, *7

## A.

The continuity element requires that "the new company has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Chicago Regional Council of Carpenters Pension Fund*, 2013 U.S. Dist. LEXIS 17215, 2013 WL 500833, at *2 (internal quotations omitted); *cf. Canteen Corp. v. NLRB*, 103 F.3d 1355, 1361 (7th Cir. 1997). The determination of whether there is sufficient continuity for one company to be a successor of another company is a factual question to be decided based on the totality of the circumstances *Chicago Regional Council of Carpenters Pension Fund*, 2013 U.S. Dist. LEXIS 17215, 2013 WL 500833, at *2. In making that case-specific assessment, we review such factors as whether:

> the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*Id.* In *Upholsterers' International*, the Seventh Circuit found the following factors evidenced **[*8]** continuity of operations: the successor's employment of "substantially all" of the predecessor's workforce, including supervisors and vice presidents; its use of the predecessor's plant, machinery, and equipment to produce the same products; its completion of the predecessor's unfinished work orders, and its agreement to honor the predecessor's warranties. *Upholsterers' Int'l*, 920 F.2d at 1329. In considering these types of facts, we find that the requisite substantial continuity is not present in this case.

The uncontradicted evidence is that CCS never acquired any assets from CCC (CCS Resp., Aff. at ¶ 13). Likewise, the uncontradicted evidence is that (a) CCS did not take over any CCC construction projects after CCC's operations wound down; and (b) CCC and CCS do not share the same location, machinery, or equipment (*Id.* at ¶¶ 11, 14-15).

Additionally, the two companies had different supervisors (CCS Resp., Aff. at ¶ 17), as well as different owners and officers. Robert Conforti, Sr. ("Conforti, Sr.") is the sole owner and president of CCC, and Robert Conforti, Jr. ("Conforti, Jr.") is the sole owner and president of CCS (*Id.* at ¶¶ 5-6, 8). Conforti, Jr. started CCS with his own personal **[*9]** funds, and Conforti, Sr. never had any ownership interest or involvement in CCS's operations (*Id.* at ¶ 5, 6). Although Conforti, Jr. was previously Vice President and a ten percent shareholder at CCC, he had not held this position or owned shares in CCC for nearly four years when he incorporated CCS in 2008 (*Id.* at ¶¶ 7-8). Conforti, Jr. did continue to work as an estimator for CCC until he incorporated CCS in 2008 (*Id.* at ¶ 7), but the fact that he once worked for CCC is insufficient, standing alone, to establish that CCS is a successor to CCC. *See Chicago Regional Council of Carpenters Pension Fund*, 2013 U.S. Dist. LEXIS 17215, 2013 WL 500833, at *1-3 (finding no sufficient continuity where an employee for a window installation company began his own window installation company with his own funding and without any assets from his former employer).

The Funds' claim that CCS picked up where CCC left off (Pls.' Mot. at 5) relies mainly on the assertion that the two companies shared some clients and employees. However, only two of CCS's twenty-three clients were previously clients of CCC, which had fifty-four clients (CCS Resp., Ex. B at 9-11). Such minimal overlap of clients does not demonstrate sufficient continuity **[*10]** between the companies to weigh in favor of a finding of successorship. *See Chicago Regional Council of Carpenters Pension Fund*, 2013 U.S. Dist. LEXIS 17215, 2013 WL 500833, at *4 (finding that the majority of the alleged successor's contracts coming from clients that never worked with the predecessor supports a lack of continuity).

The Funds point out that five persons went to work for CCS immediately after receiving their last paycheck for CCC, and that all but one of CCS's employees came from CCC (Pls.' Mot. at 6). However, the record is devoid of evidence demonstrating that these employees worked in the same conditions or reported to the same supervisor as at CCC. *See Chicago Regional Council of Carpenters Pension Fund*, 2013 U.S. Dist. LEXIS 17215, 2013 WL 500833, at *4 (finding insufficient continuity where the alleged successor hired former employees of the predecessor but the employees were not shown to have worked in the same conditions or reported to the same supervisor). To the contrary, the evidence shows that CCC and CCS did not share supervisors (CCS Resp., Aff. at ¶ 17). Moreover, while both CCC and CCS performed carpentry and related construction work for general contractors in Chicago and its suburbs, CCS also performs work **[*11]** in the medical industrial construction markets, which CCC did

not (*Id.* at ¶ 9). *See Chicago Regional Council of Carpenters Pension Fund*, 2013 U.S. Dist. LEXIS 17215, 2013 WL 500833, at *3 (sufficient continuity not established where two companies performing some similar work while engaging in other different services).

In aid of their successorship claim, the Funds also assert that both companies shared the same Wage and Fringe Benefit Bond with State Farm, as evidenced by a letter from a State Farm underwriter dated January 3, 2009, stating that CCS's bond (93 BH N5702) replaced that of CCC's (Pls.' Mot. at 7 and Ex. G at 2). CCS disputes this assertion, pointing to an email from their State Farm agent dated February 18, 2013 stating that this bond was new, had a different number than the CCC bond, and was not set up as a continuation of the CCC bond (CCS Resp. at 15; Aff. at ¶ 21; Ex. C at 12). In light of this conflicting evidence, the bond does not weigh in favor of successorship, and in any event would not overcome the evidence that shows a lack of continuity.

**B.**

In addition, the evidence offered by the Funds fails to show that CCS had prior notice of CCC's liability to the Funds. The notice requirement for **[*12]** successor liability can be satisfied "not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances." *Upholsterers' Int'l*, 920 F.2d at 1329. The notice requirement is crucial because "it would be inequitable to hold a successor liable when it was unable to take the liability into account in negotiating the acquisition price . . .." *Id.* at 1327. CCS denies that it had notice of CCC's audit liability when Conforti, Jr. created and started operating CCS (CCS Resp., Aff. at ¶ 29). The Funds' arguments to the contrary lack merit.

The Funds contend that CCS had notice because the agreed judgment against CCC resulted from a claim based on an audit for the period of 2004 to 2009, and Conforti, Jr. was an officer of CCC for part of that time. (Pls.' Mot. at 7). That argument is a nonstarter. Although Conforti, Jr. was still an officer and shareholder in CCC at the start of the period covered by the audit, he had resigned as an officer and sold his shares in June 2004, only six months after the start of the audit period (CCS Resp., Aff. at ¶¶ 7-8; Ex. A at 6-8). Further, the audit **[*13]** of CCC did not commence until 2009, well after Conforti, Jr. ceased performing any work for CCC and

well after he had established CCS (CCS Resp., Aff. at ¶ 5, 7).

The Funds also assert that CCS had notice of the liability because Conforti, Sr. spoke with Conforti, Jr. about the audit of CCC and the settlement of the lawsuit (Pls.' Mot. at 7-8). However, the audit in 2009 and the settlement of the lawsuit in 2010 could not have given CCS notice of CCC's liability as of 2008, when CCS was established and began operations.

Finally, the Funds contend that CCS had notice of CCC's liability because the two companies hired the same law firm to represent them during the audits of CCC and CCS that commenced in 2009 (Pls.' Mot. at 7-8). It is true that both CCC and CCS retained Allocco to represent them in the Funds' 2009 audits of their companies (CCS Resp., Ex. E at 15; Pls.' Mot., Ex. A at 2-4). However, this does not automatically mean that CCS had notice of CCC's liability. *See Trustees of Chicago Plastering Institute Pension Trust v. Elite Plastering Co., Inc.*, 603 F. Supp. 2d 1143, 1149-50 (N.D. Ill. 2009) (finding notice could not be imputed to successor based on attorney's knowledge of **[*14]** potential liability of predecessor where the attorney was not involved in any transfer of interest between the two companies). Here, Allocco was retained by CCS solely for the purpose of the audit of CCS. There is no evidence that either Allocco or CCC advised CCS of the results of the CCC audit prior to entry of the agreed judgment. And, again, CCC's retention of counsel in October 2009 provides no evidence that it had knowledge of CCC's possible liability in 2008 when CCS was created and began operations — and well before the audit of CCC even had commenced.

Because the Funds have not satisfied the elements of substantial continuity or notice sufficient for us to impose successor liability upon CCS, we find it unnecessary to address CCS's argument that Rule 25(c) does not apply to transfers that occur prior to the commencement of the litigation.

**III.**

Finally, we deny the Funds' request for limited discovery solely on the issue of CCS's potential liability as a successor to CCC (Pls.' Mot. at 8-9). The Funds have already conducted audits of CCC and CCS (Pls.' Mot. at Ex. H). As discussed above, the evidence from those audits do not support the Funds' contention that CCS

was a mere continuation **[\*15]** of CCC. Further, the Funds have not specified what information they believe that they could obtain from further discovery. For these reasons, the Funds' request for limited discovery is denied.

### CONCLUSION

In closing, we note that some of the evidence on which the Funds' rely for their motion was in their possession prior to the time they filed this action on January 19, 2009 — such as the letter dated January 3, 2009, which they cite for the proposition that CCC and CCS shared the same Wage and Fringe Benefit Bond (Pls.' Mot. At 7 and Ex. G). Moreover, the Funds had the audit results they claim show successorship as of July 2009 (*Id.* at Ex. H), about one year before the Court entered the agreed judgment between the Funds and CCC. In light of CCC's failure to pay the judgment amount and the Funds' difficulty in collecting from CCC, we understand the Funds' motivation for seeking to replace CCC with a pocket that may be more solvent.

What we do not understand is why, in light of the evidence the Funds now say supports a finding of successorship, the Funds failed to seek to substitute or join CCS as a defendant prior to the entry of judgment. Had the Funds been able to successfully bring **[\*16]** CCS into the case while it was being litigated, CCS would have been at the bargaining table and would have had an opportunity to help shape the settlement that resulted in an agreed judgment — or, conversely, would have the option to forego settlement in favor of litigation. Instead, the Funds now seek to bind CCS to a $190,000.00 judgment that was agreed to between a defunct CCC and the Funds, and that CCS (which the Funds now say was at the time already the successor to CCC) had no say in negotiating. Even if the Funds had made out a persuasive case for a finding of successorship (which for the reasons discussed above they have failed to do), the Court would have great pause about whether it should exercise its discretion to bring CCS into the case and tie it to a judgment in these circumstances.

Plaintiffs' motion to substitute a party defendant is denied, as is their request for limited discovery.

**ENTER:**

/s/ Sidney I. Schenkier

**SIDNEY I. SCHENKIER**

**United States Magistrate Judge**

**DATE: July 17, 2013**

***

End of Document

# EXHIBIT 3

 Neutral

As of: May 29, 2018 7:05 PM Z

# Draper, Inc. v. MechoShade Sys.

United States District Court for the Southern District of Indiana, Indianapolis Division

January 30, 2012, Decided; January 30, 2012, Filed

CAUSE NO. 1:10-cv-1443-SEB-DKL

**Reporter**

2012 U.S. Dist. LEXIS 11243 *; 2012 WL 287480

DRAPER, INC., Plaintiff, vs. MECHOSHADE SYSTEMS, INC., Defendant.

**Prior History:** Draper, Inc. v. Mechoshade Sys., 2011 U.S. Dist. LEXIS 35226 (S.D. Ind., Mar. 31, 2011)

## Case Summary

No case summary is available for this document at this time; however, we've provided other information in the document that may be useful to you. To access the full document, please click the document title and sign in to Lexis Advance®.

---

End of Document



LEAGLE™

LAWYER LOGIN

Home / Browse Decisions / DRAPER, INC. v. MECHOSHADE SYSTEMS, INC.

# DRAPER, INC. v. MECHOSHADE SYSTEMS, INC.

Cause No. 1:10-cv-1443-SEB-DKL.                    Email | Print | Comments (0)

**View Case**      Cited Cases

*DRAPER, INC., Plaintiff, v. MECHOSHADE SYSTEMS, INC., Defendant.*

United States District Court, S.D. Indiana, Indianapolis Division.

January 30, 2012.

*Attorney(s) appearing for the Case*

*DRAPER, INC., Plaintiff, represented by* <u>Andrew M. McCoy</u> *, FAEGRE BAKER DANIELS LLP — Indianapolis.*

*DRAPER, INC., Plaintiff, represented by* <u>R. Trevor Carter</u> *, FAEGRE BAKER DANIELS LLP — Indianapolis.*

*MECHOSHADE SYSTEMS, INC., Defendant, represented by* <u>Jonathan G. Polak</u> *, TAFT STETTINIUS & HOLLISTER LLP.*

*MECHOSHADE SYSTEMS, INC., Defendant, represented by* <u>Sid Leach</u> *, SNELL & WILMER, LLP, PRO HAC VICE.*

## ORDER Plaintiff's Motion to Compel [doc. 64]

DENISE K. LARUE, Magistrate Judge.

In response to Defendant MechoShade Systems, Inc.'s motion to dismiss this suit for lack of personal jurisdiction, Plaintiff Draper, Inc. moved for a stay of the motion and leave to conduct jurisdictional discovery. The parties briefed the standards for general and specific jurisdiction and the propriety of the discovery that Draper proposed to serve on MechoShade. The Court overruled MechoShade's objections, granted Draper's motion for limited jurisdictional discovery, and stayed MechoShade's motion to dismiss pending the discovery. [Doc. 51.] The discovery served by Draper on MechoShade consisted of 5 interrogatories, 15 requests for production, 1 Rule 30(b)(6) deposition, and 2 additional depositions. [1] Dissatisfied with MechoShade's production, Draper filed the present motion to compel. The parties' dispute concerns the sufficiency of MechoShade's responses to Draper's requests for production and Rule 30(b)(6) deposition.

Draper contends that discovery obtained from third parties and other discovery reveal that MechoShade is in possession of additional responsive documents and information. MechoShade responds that (1) Draper's discovery requests are overly broad, reaching far beyond the limited jurisdictional discovery authorized by the Court; (2) producing the additional material would be unduly burdensome and costly, and not likely to lead to relevant information; and (3) Draper's jurisdictional arguments underlying the discovery it seeks to compel are collaterally estopped by a decision of the United States District Court for the District of Colorado in a parallel case filed by Draper. Draper also contends that MechoShade's designated Rule 30(b)(6) representative was unable to adequately testify regarding several of its noticed subjects and it wants a supplemental deposition with a different representative.

The Court first dispenses with MechoShade's collateral-estoppel argument. Although the present parties were also parties in the Colorado suits, the issues decided by the district court in Colorado pertained to whether *that* court had personal jurisdiction over MechoShade based on its contacts with *Colorado.* Because the issue of *this* Court's jurisdiction over MechoShade based on its contacts with and activities *in Indiana* were not before the Colorado court, its decision does not preclude any arguments by Draper here. Furthermore, to the extent that MechoShade argues that the Colorado District Court's interpretations and applications of the governing law binds this Court's analysis, MechoShade is reminded that a district judge's decision, especially one from another district, has no precedential authority for any judge or court here. See, *e.g., Gould v. Bowyer,* <u>11 F.3d 82</u>, 84 (7th Cir. 1993) ("A district court decision binds no judge in any other case, save to the extent that doctrines of preclusion (not *stare decisis*) apply.").

<mark>The Court agrees with MechoShade that what was intended to have been limited jurisdictional discovery has become an expansive and expensive foray through its files. Thousands of documents have been produced and likely thousands more are sought by way of the current motion.</mark> Courts have discretionary power under the Federal Rules and inherent power to limit and control jurisdictional discovery, and they should exercise that authority to ensure that jurisdictional discovery does not conflict with the purposes and protections of personal jurisdiction. Fed. R. Civ. P. 26(b)(2)(C). See *York v. Tropic Air, Ltd.,* Civ. A. No. V-10-55, *Memorandum Opinion and Order,* 2011 WL 5827299, *1 (S.D. Tex., Nov. 17, 2011); *Nu Image, Inc. v. Does 1-23,322,* 799 F.Supp.2d 34, 36-37 (D. D.C. 2011); *Insubuy, Inc. v. Community Insurance Agency,* No. 10 C 3925, 2010 WL 4659483 (N.D. Ill., Nov. 9, 2010) ("As with all discovery matters, district courts have broad discretion in determining when additional jurisdictional discovery is appropriate.") (citing *GCIU-Employer Retirement Fund v. Goldfarb Corp.,* <u>565 F.3d 1018</u>, 1023, 1026 (7th Cir. 2009)); *Himoinsa Power Systems, Inc. v. Power Link Machine Co., Ltd.,* No. 08-2601-MLB, *Memorandum and Order,* 2010 WL 2265160 (D. Kan., June 2, 2010).

> It is well established that a federal district court has the power to require a defendant to respond to discovery requests relevant to his or her motion to dismiss for lack of personal jurisdiction. That much is evident in Insurance Corp. of Ireland, and the circuit courts have frequently made the point. E.g., Renner v. Lanard Toys Ltd., 33 F.3d 277, 283 (3d Cir. 1994) (where facts relevant to jurisdiction were ambiguous, district court erred in denying discovery); Edmond v. United States Postal Service General Counsel, 949 F.2d 415, 425 (D.C. Cir. 1991) (district court erred in limiting jurisdictional discovery where plaintiffs made specific allegations of conspiracy to support personal jurisdiction); Theunissen v. Matthews, 935 F.2d 1454, 1465 (6th Cir. 1991) (court may permit discovery in aid of deciding Rule 12(b)(2) motion, and scope of such discovery is committed to district court's sound discretion); Butcher's Union Local No. 498 v. SDC Investment, Inc., 788 F.2d 535, 540 (9th Cir.1986) (discovery should ordinarily be granted where pertinent jurisdictional facts are disputed, but district court has discretion to control scope of discovery); Wyatt v. Kaplan, 686 F.2d 276, 283 (5th Cir. 1982); Fraley v. Chesapeake & Ohio Ry. Co., 397 F.2d 1, 3-4 (3d Cir. 1968) (district court erred by refusing to require defendant to answer interrogatories to explain ambiguous assertions in its affidavits about scope of business activities within jurisdiction); Surpitski v. Hughes-Keenan Corp., 362 F.2d 254, 255-56 (1st Cir. 1966) (where plaintiff was total stranger to defendant, district court erred in dismissing for lack of personal jurisdiction without giving plaintiff opportunity for discovery).

> However, a plaintiff is not always entitled to discovery to respond to a motion to dismiss for lack of personal jurisdiction. Using their power to control discovery, courts should take care to ensure that litigation of the jurisdictional issue does not undermine the purposes of personal jurisdiction law in the first place.

*Ellis v. Fortune Seas, Ltd.,* 175 F.R.D. 308 (S.D. Ind. 1997) (emphases added). <mark>It is time that control is exercised over jurisdictional discovery in this case and move this preliminary phase of the litigation to completion.</mark>

The Court will separately address each category of documents that Draper seeks from MechoShade.

1. Commission Reports and Bookings Reports. [2] Draper contends that, in its financial-related productions, MechoShade focused only on direct sales to Indiana, but that direct sales do not capture all of MechoShade's "business" in Indiana. MechoShade's Commission Reports and Bookings Reports are

the only documents produced so far that capture all of its business activity in the state, according to Draper. Commissions are paid to MechoShade's representatives for (1) sales of products to customers in Indiana, (2) sales of products to customers outside of Indiana when the products will be installed in projects located in Indiana, and (3) products that are specified [3] in Indiana regardless of the location of the project in which the products will be installed. "Thus," Draper contends, "each time a MechoShade representative receives a commission, MechoShade has some form of a business contact with the state of Indiana. Accordingly, these Commission Reports are highly relevant to the jurisdictional analysis." (*Brief in Support* at 13).

Bookings Reports also capture commissions, but also "new bookings (*i.e.,* potential projects) and budgets. . . ." (*Id.* at 14). They are a "much higher level of a summary or review of MechoShade's business activity in Indiana, but nonetheless are clearly relevant to MechoShade's business contacts in Indiana." (*Id.*).

MechoShade produced Commission Reports and Bookings Reports only for its Indiana representative, Interspec, Inc., for the period 2006-2010. It produced no Reports for any other representative or MechoShade employee who was responsible for MechoShade's business in Indiana. Draper contends that these reports will show the volume of MechoShade's business activity in and contacts with Indiana, beyond just sales to customers located in Indiana because the Reports will show the commissions paid for products that were not sold to customers in Indiana but which represent business activity in or contacts with Indiana. As an example, Draper asserts that the Commission Reports for Interspec "show approximately $1,000,000 in sales related to Indiana since 2006 that MechoShade did not identify in the other financial documents it produced." (*Id.* at 13-14).

Draper does not indicate which of its requests for production cover the reports but contends that MechoShade "apparently does not dispute" that the reports are covered because MechoShade produced the reports for Interspec from 2006-2010. (Draper's *Brief in Support* [doc. 66-1] at 12). It asserts only that the reports "relate to the first general category of information relevant to the general jurisdictional analysis: the volume of MechoShade's business in Indiana." (*Id.* at 12).

In its response, MechoShade directly addressed only the Bookings Reports, and only as an example of its general objection that Draper has not shown a need for the additional documents: it argues that the Bookings Reports "do not provide any additional information concerning MechoShade's in Indiana [*sic*] that Draper does not already have. Nor has Draper met its burden of showing what *additional* information the Bookings Reports will reveal beyond what Draper already has that would establish general jurisdiction." (*Defendants' Brief in Opposition* [doc. 74] at 10.) Draper does not address this objection in its reply. MechoShade also generally argues (with regard to all of the categories of documents sought by Draper) that Draper's discovery has already become excessive, Draper has not shown that the additional materials that it seeks are necessary for it to respond to the pending motion to dismiss, and that production of the requested additional documents will be overly burdensome.

Production of the Commission Reports and Bookings Reports are not warranted by Draper's requests for production. [4] Requests 1 and 2 ask for "All Documents Relating to MechoShade's sales of the `428 Products [and the "Trade Dress Products"] in Indiana." Draper argues that the Commission Reports and Bookings Reports will capture all of MechoShade's *business* and *contacts* in Indiana. They might, but these Requests are limited to documents relating to *sales* of *specific products* in Indiana — they do not encompass all of MechoShade's contacts or other business activity relating to Indiana or all of its products. Draper complains that the Reports produced for Interspec show approximately $1,000,000 of "sales related to Indiana" that were not reflected in MechoShade's other financial production, but Draper has mistaken the relationship required in Requests 1 and 2: both request documents *relating to sales in Indiana,* not documents *relating to sales relating to Indiana.* While the Commission Reports record commissions paid for products not *sold* in Indiana but *installed* or *specified* in Indiana, and therefore can be argued to provide evidence of *business activity affecting, and contacts in,* Indiana, that information is beyond the scope of Requests 1 and 2.

The Commission Reports also include commissions paid for sales in Indiana. While an analysis of these sales commissions might tend to show the amount of MechoShade's Indiana sales for the identified products (depending on whether the commissions are calculated in direct proportion to sales) and, thus, it can be argued that the Reports fall within the literal scope of Requests 1 and 2, Draper has not shown good cause to believe that the voluminous documents MechoShade has already produced do not sufficiently show its sales in Indiana. MechoShade asserts that it has already produced better and more direct evidence of its Indiana sales for the two categories of products and Draper did not controvert the assertion. Thus, it appears, without more, that Draper's requests are duplicative.

Draper did not show how the additional information on "new bookings (*i.e.,* potential projects), and budgets" contained in the Bookings Reports is related to MechoShade's sales of the `428 or trade-dress products in Indiana, and a relationship is not obvious.

Draper's motion to compel MechoShade to produce its Commission Reports and Bookings Reports for other representatives and employees is denied under Requests 1 and 2 because the documents are beyond the scope of the Requests and Draper has not made a good-cause showing of need for them.

Request 3 asks for documents showing the number and gross revenue of any product sold or offered for sale by MechoShade in the United States. Again, Draper does not assert that MechoShade has failed to adequately responded with documents showing the numbers of its products sold in the United States or the gross revenue generated thereby.

Request 4 (marketing materials for products sold or offered for sale in Indiana), Requests 5 and 6 (communications between MechoShade and third parties and between MechoShade and Draper relating to Draper, the MechoShade patents, MechoShade's alleged trade dress, and the accused products), Requests 7 and 8 (license agreements), Request 11 (assignments of the `428 patent), Requests 12 and 14 [5] (documents used or referenced in declarations), and Request 15 (MechoShade's bid protests) do not cover the Commission Reports and Bookings Reports.

The scope of Request 9's request for "All Documents Relating to Any contacts You have had with Any Person in Indiana in the last five (5) years" is too broad for the limited purpose of jurisdictional discovery and will not be enforced as is. Draper did not fully describe the nature of the Commission Reports or Bookings Reports, but they appear to be internal records of MechoShade and not themselves communications or contacts made with persons in Indiana. But they relate to contacts with persons in Indiana — specifically, the payment of commissions to them — and, thus, could indicate business activity by MechoShade in Indiana. Draper has not asserted that MechoShade has failed to produce sufficient documents showing its sales in Indiana, so it has not shown a need for documents relating to commissions in order to verify or discover the amounts of MechoShade's annual Indiana sales. However, Draper has shown that commissions can be paid to persons in Indiana for non-sales activity, namely, the specification in Indiana of MechoShade products for projects not located in Indiana.

Therefore, MechoShade shall produce summaries for each year, beginning 2007 until the date of suit, showing the total annual number and total annual amount of commissions paid to representatives in Indiana on account of (1) sales of MechoShade products to customers in Indiana and (2) specifications in Indiana of MechoShade's products regardless of where the projects for which the specifications were made are located. MechoShade need not produce

the Commission Reports or Bookings Reports or identify the representatives to whom the commissions were paid, the amount of each commission, or the projects for which the commissions were paid. The accuracy of the summaries shall be verified by affidavit or declaration.

Request 10 asks for all documents relating to any of MechoShade's distributors, dealers, retailers, and/or agents doing business in Indiana. This Request is overly broad for the limited purpose of jurisdictional discovery if interpreted to include the subject reports and will not be enforced as is. Draper has shown that commissions paid to specifiers in Indiana of products not sold in Indiana are direct evidence of business activity in Indiana (payments of commissions, promotions of sales) that is not captured by in-state sales data and are, therefore, relevant to the jurisdictional analysis. Production of this information is ordered above. Draper has also shown that commissions paid to representatives outside of Indiana on account of products that are sold to customers outside of Indiana but which are installed in Indiana are indirect evidence of business activity (installations of products) in Indiana not captured by in-state sales data. Draper has not shown how any other content of the Commission Reports and Bookings Reports are likely to be relevant to the general-jurisdiction analysis. [6]

Rather than order production of the Commission Reports as only indirect evidence of in-state installations, and in the interest of controlling and streamlining this stage of *limited* jurisdictional discovery, the Court prefers to order MechoShade to produce direct information of in-state installations of products sold out-of-state. Production is ordered below of information showing installations performed by MechoShade in Indiana of `428 and trade-dress products. In response to Request 10, MechoShade shall also produce annual summaries of installations in Indiana performed by others of the same products that were sold outside of Indiana, as shown by the Commission Reports and Bookings Reports. The summaries shall cover the period of 2007 until the date of suit, and shall show the number of installations and the dollar value of the products installed, to the extent that this information is shown by the Commission Reports and the Bookings Reports. [7] The accuracy of the summaries shall be verified by affidavit or declaration.

Time Period. Draper sought production of documents "since at least 2000" (and presumably to the date of its filing suit). The reports that MechoShade produced apparently dated "from 2006 to 2010." Preliminary jurisdictional discovery should not be allowed to take on a life of its own, overwhelming defendants with burdens that are inconsistent with a limited appearance for the purpose of challenging jurisdiction. Courts should also carefully monitor and control discovery of commercially sensitive information to ensure that it is narrowly tailored and likely to lead to information relevant to the jurisdictional issues at hand. For the purpose of establishing general personal jurisdiction on the date of filing, discovery relating to the period of 2007 to the filing of suit — three years and eleven months of data — should be sufficient to show MechoShade's relevant business activity in Indiana. In all of the productions ordered herein, MechoShade is not required to produce responsive documents pertaining to any period prior to 2007 or after the filing of this suit.

2. Communications with dealers, architects, and other specifiers, and end users. Draper wants the Court to compel MechoShade to produce all documents relating to its business contacts with dealers, specifiers, [8] and end users in Indiana. According to Draper, MechoShade focuses a substantial part of its business establishing relationships with specifiers and dealers as a way to increase sales of its products. It wants the Court to order MechoShade to produce "all documents relating to contacts it has had with any dealer or specifier in Indiana." (*Brief in Support* at 16).

Draper asserts that "most of what it has learned about MechoShade's business model and its contacts with dealers and specifiers came from Interspec, which produced *ten times* more e-mail correspondence than MechoShade." (*Brief in Support* at 16). Draper contends that the documents it seeks are covered by its Requests 1, 2, 3, 9, and 10.

Requests 1 and 2 ask for documents relating to *sales* of specified MechoShade products, not all communications or contacts with dealers, specifiers, or end users. As noted above, Draper has not shown that it does not already have sufficient information showing MechoShade's sales in Indiana. Thus, Draper has not shown that it needs documents showing all contacts with dealers, specifiers, and end users for the purpose of determining MechoShade's Indiana sales. But Draper wants documents showing these contacts in order to show MechoShade's in-state activities directed to building relationships with dealers, specifiers, and end users for the ultimate objective of soliciting or promoting future in-state sales. [9] While sales-solicitation and sales-promotion activities do constitute business activity, they are not fairly within Requests 1's and 2's scope of documents "relating to . . . sales of the `428 Products [and "Trade Dress Products"] in Indiana." These requests are properly construed as seeking documents showing or providing evidence of the amount of MechoShades sales in Indiana, not documents having any tangential relation to the subject of sales, whether marketing, advertising, customer development, or post-sale repairs, payment disputes, bill collection, *etc.*

Draper's assertion that Request 3 asks for "documents relating to sales and offers to sell MechoShade's products" is simply incorrect. The language of this Request asks for "All Documents showing the *number* of products and *gross revenue* of Any product sold or offered for sale by MechoShade in the United States." [10] (Emphasis added.) All of MechoShade's communications with dealers and specifiers is not reasonably likely to show those facts — neither are MechoShade's contacts with specifiers and dealers for the purpose of soliciting or promoting sales. Draper did not assert that it does not already have sufficient production which shows the number of products sold by MechoShade in the United States or the gross revenue generated thereby.

Request 9 asks for all documents relating to any contacts Mechoshade has had with any person in Indiana for the last five years. Request 10 is not restricted to contacts but seeks documents relating in any way to MechoShade's distributors, dealers, retailers and/or agents doing business in Indiana. As such, both requests are too broad for the limited purposes of jurisdictional discovery. Because they are not narrowly tailored to obtain specific information likely to be relevant to the existence of general jurisdiction over MechoShade, these Requests will not be enforced as written. However, MechoShade's in-state sales-solicitation and sales-promotion contacts with Indiana dealers and specifiers are relevant to the issue of general jurisdiction over MechoShade.

Taking Requests 9 and 10 in combination, and giving them a proper scope, the Court finds that Draper is entitled to production of documents showing or evidencing sales-solicitation or sales-promotion contacts it has had in Indiana with any dealer or specifier located in Indiana. In addition, consistent with the time frame set forth above, MechoShade is entitled to such documents showing or evidencing such contacts that occurred during the period of 2007 to the date of filing of this suit.

3. Marketing and advertisements that reached Indiana. Request 4 asks for "All Documents Relating to Any marketing materials, advertisements, brochures, catalogs, flyers, or commercials Related to Any product sold or offered for sale by MechoShade in Indiana." Draper asserts that, while MechoShade produced responsive documents, Draper has discovered, from Interspec's production, several e-mails sent to Interspec from MechoShade's marketing department. In the one e-mail that Draper submitted, a MechoShade marketing intern forwards a potential-customer lead to Interspec, specifically a person who viewed MechoShade postings on a third-party website and took an online test. The e-mail asks the Interspec addressee to "contact the individual as you would any lead that we may refer to you." This e-mail is clearly not an advertisement, brochure, catalog,

flyer, or commercial; if it is included within Request 4, it can only be as "marketing material." In the context of the other requests, it is reasonable to construe "marketing material" as meaning pre-prepared materials targeted at potential customers, not individually-generated, incidental communications like periodic lead-referral e-mails. [11] However, because MechoShade did not contest the applicability of Request 4 to lead-referral e-mails, the Court will assume its applicability in this instance. Draper asks the Court to order MechoShade to produce "all marketing materials (including at least any e-mails and e-mail attachments sent from MechoShade's marketing e-mail addresses to Interspec and any other person or company in Indiana) and documents relating to advertisements in any publication or periodical that reaches Indiana." (*Brief in Support* at 17). [12]

Granting that the lead-referral e-mail submitted by Draper qualifies as "marketing material," they tend to show MechoShade's sales-solicitation or business activity in Indiana and are, thus, relevant to the jurisdictional analysis. However, neither the precise dates of the leads, the addressees, the source of the lead, nor the identifications of the leads is relevant. MechoShade must produce either (1) all lead-referral communications sent to a MechoShade representative or dealer in Indiana for the time period 2007 to the date of suit, (2) redacted lead-referral communications for the same time period with the irrelevant information removed, or (3) a summary showing, for each year 2007 to the date of suit, the number of leads referred by MechoShade to an Indiana representative (verified by affidavit or declaration). MechoShade is not ordered to produce all e-mails sent from its marketing addresses to any person or company in Indiana. Draper did not show that it is likely that MechoShade failed to produce any responsive documents other than e-mails or other documents containing lead-referral communications. MechoShade is reminded, however, that any marketing materials, advertisements, brochures, catalogs, flyers, or commercial advertisements in the form of, or attached to, an e-mail should be produced in response to Request 4.

Draper also points to MechoShade's Vice President's testimony that "MechoShade publishes ads in national publications that reach Indiana," (*Brief in Support* at 17), and asserts that such materials are relevant to the jurisdictional analysis, (*id.*). It then asks the Court to order MechoShade to produce "documents relating to advertisements in any publication or periodical that reaches Indiana." (*Id.*). However, Draper does not assert or show grounds to believe that responsive documents exist that MechoShade has not produced. Moreover, a request for *all* documents *relating to* all advertisements in any publication or periodical that reaches Indiana — including, *e.g.,* communications with ad developers, billing correspondence, and internal planning documents — is far too broad for the limited purposes of jurisdictional discovery. Therefore, there is no basis for ordering MechoShade to produce additional documents in response to this part of Request 4.

4. Project files, field reports, and related documentation. MechoShade maintains "project files" consisting of records regarding construction projects in which its products are installed. These files contain purchase orders, installation orders, work orders, field reports, warranty/repair orders, call logs, and other communications relating to each project. Draper complains that MechoShade has not produced a single project file for any project in Indiana. It argues that the project files are covered by its Requests for Production 1, 2, and 9.

As noted above, Requests 1 and 2 ask for documents relating to sales of MechoShade's `428 Patent and trade-dress products in Indiana. Draper has not shown how the project files will give a more accurate account of MechoShade's sales in Indiana than do the productions that it has already received. Draper has also failed to show that the files are likely to provide evidence of any business-solicitation activity by MechoShade in Indiana. See *Eli Lilly and Co. v. Mayne Pharma (USA) Inc.,* 504 F.Supp.2d 387, 394-95 (S.D. Ind. 2007); *Fanimation Design & Manufacturing, Inc. v. NICOR, Inc.,* No. IP 02-576-C-M/S, *Order on Defendant's Motion to Dismiss,* 2003 WL 21766572 (S.D. Ind., July 17, 2003). Also as previously explained, Request 9's scope is too broad to enforce as is for the purposes of limited jurisdictional discovery.

However, the Court agrees with Draper that construction projects in Indiana for which MechoShade performed the installation of its product [13] or any later warranty/repair work constitute relevant business activity for the purpose of the general-jurisdictional analysis. Without stretching the legitimate scopes of Requests 1, 2, and 9 too far, and in the absence of specific contrary argument by MechoShade, the Court concludes that Draper is entitled to information showing installations of `428 and trade-dress products performed by MechoShade on projects in Indiana for the year 2007 to the date of suit. Similarly, Draper is entitled to information showing warranty/repair work performed by MechoShade in Indiana on the same products during the same time period. However, in exercise of its discretion and for the purpose of controlling what was intended to be limited jurisdictional discovery, the Court does not compel MechoShade to produce its project files but requires it to compile and produce annual summaries of the relevant information showing the specified installations and warranty/repair work. The summary shall include, for each Indiana project and for each work visit, all of the dates on which the work was performed, whether the work was installation or warranty-repair work, and, if the work generated additional revenue to MechoShade not already disclosed in its prior productions, the amount of that additional revenue. The accuracy of the summaries shall be verified by affidavit or declaration.

5. Communications with Technical Support and the Estimating Department. For the same reasons as explained above for MechoShade's installation and warranty/repair work in Indiana, MechoShade shall produce annual summaries identifying technical assistance and proposals that it provided during the period 2007 until the date of suit to its representatives, dealers, specifiers, and end users located (1) in Indiana, regardless of the location of the projects for which the assistance was given, and (2) outside of Indiana for projects located in Indiana. The summaries shall provide, for each year, (a) the number of occasions that technical assistance was provided, (b) a breakout showing the number of in-state and out-of-state projects for which the assistance was provided, (c) the number of proposals that were provided, and (d) a breakout of the number of in-state and out-of-state recipients of the proposals. The accuracy of the summaries shall be verified by affidavit or declaration.

6. MechoWeb. Draper's request for access to MechoShade's intranet system *MechoWeb* is denied. MechoShade is reminded that, if it has not done so already, it is obligated to search all of its records, including those existing on *MechoWeb,* for responsive documents.

7. Business reports. Draper asserts that MechoShade "tracks" its top dealers, specifiers, projects, and end users "in an effort to increase its presence in Indiana." (*Brief in Support* at 21). It also requires its representatives to produce and/or update "business reports" which are weekly and monthly reports that "track[] various construction projects in each representative's territory." These reports include Project in Planning reports, Open Proposal reports, and Sales Objective reports. At least one of these business reports "also tracks the most recent presentation MechoShade and/or its representatives gave to a particular dealer or specifier." (*Id.*) Draper contends that, because these reports "are directly related to MechoShade's activities in soliciting new business in Indiana," they are relevant to jurisdiction and should be produced. Draper argues that the documents are covered by its Requests 1-3, 9, and 10.

In support of its request, Draper submitted examples of e-mails that MechoShade sent to Interspec (and produced as part of Interspec's production). These e-mails show that show that the "tracking" that Draper describes is MechoShade's request that each of its representatives send to MechoShade weekly or monthly reports of the top dealers, specifiers, architects, interior designers, projects, *etc.* in the representative's territory. In addition,

MechoShade asks its representatives to send a "Sales Objective & Activities Report" on which they record certain information for each "Firm" in their territories. This information includes "Presentation Date," "Presentation Type," and "Presenter."

Because the representatives' reports of their "top lists" to MechoShade are not evidence of sales-solicitation or other business activity by MechoShade in Indiana, they are irrelevant to the question of general jurisdiction. But presentations made by MechoShade or its representatives to potential customers in Indiana — *e.g.,* architects, specifiers, decorators, dealers — clearly constitute sales-solicitation activity in Indiana and are relevant to jurisdiction. However, because the rest of the information contained on the representatives' Sales Objectives and Activities Reports is irrelevant to the inquiry, MechoShade is not ordered to produce these Reports. Instead, MechoShade shall compile and produce summaries of the relevant information contained in these reports. Specifically, MechoShade shall disclose, for each year from and including 2007 until the date of suit, (1) the number of presentations MechoShade or its representatives gave to potential customers in Indiana regarding MechoShade's products, and (2) if available from the Sales Objectives and Activities Reports, the total number of customer attendees. Neither the dates of the presentations, the identities of the presenters, nor the identities of the attendees need be produced. The accuracy of the summaries shall be verified by affidavit or declaration.

8. Lead generations / lead lists. For the same reasons explained above regarding the third category of requests covering e-mailed lead referrals, MechoShade shall also produce complete or redacted copies of any non-email lead-referral documents or summaries thereof showing the same information required for the e-mailed referrals and for the time period.

9. Continuing education presentations in Indiana. For the same reasons explained above in regard to MechoShade's "business reports," continuing-education presentations on MechoShade's products given by MechoShade or its representatives in Indiana to former, current, or potential customers, dealers, architects, decorators, specifiers, *etc.* constitute relevant sales-solicitation activity in Indiana covered by a properly limited construction of Requests 1, 2, 4, and 9. MechoShade shall compile and produce a summary showing all such presentations, identifying for each year from and including 2007 to the date of suit, the number of presentations and the number of attendees. Neither the dates, locations, nor the attendees' or presenters' identities need be provided. The accuracy of the summaries shall be verified by affidavit or declaration.

10. Home Systems. MechoShade did not dispute Draper's assertion that Home Systems is a division of MechoShade, and MechoShade did identify Home Systems' sales in Indiana in response to Draper's requests. Draper asserts that its discovery requests should apply equally to Home Systems and asks for production of all responsive documents regarding Home Systems. But Draper does not assert or provide any basis for finding or assuming that MechoShade has not already produced conforming responsive documents. MechoShade is reminded that, if Home Systems is a division through or by which it conducts business activity in Indiana, then it must comply with Draper's requests and this Order with respect to Home Systems' documents to the same extent as its own documents.

11. Custodians search, disclosure of searches, supplementation of responses. Draper wants the Court to compel MechoShade to "adequately search the records of specified custodians," but it provides no basis for finding that it has not done so. We assume that MechoShade is aware of and is committed to complying with its discovery obligations and that, if it has discovered or has had pointed out to it any reason why a more intensive search for responsive documents is necessary, it will undertake one.

Although MechoShade has stated that it has performed reasonable searches for responsive documents and information, Draper wants the Court to compel it to identify the searches that it has performed; otherwise, "it is unclear just how `reasonable' MechoShade's searches were." (*Brief in Support* at 24). Because Draper has shown no basis for finding that MechoShade's searches were unreasonable or incomplete, its request is denied. Finally, Draper wants the Court to compel MechoShade to supplement its previous discovery responses with any necessary changes or additions revealed by additional discovery ordered herein. Again, the Court assumes that MechoShade is aware of its continuing duty to supplement and correct it discovery responses.

12. Supplemental Rule 30(b)(6) deposition of Norman Rathfelder. Draper has sufficiently shown that MechoShade's designated Rule 30(b)(6) representative, Jan Berman, was unprepared to adequately testify on the subjects that Draper noticed for the deposition. Mr. Berman also identified Norman Rathfelder as the MechoShade employee who is most knowledgeable about the subjects on which Mr. Berman could not testify. Draper requests only a four-hour deposition of Mr. Rathfelder. (*Reply* at 9). Because MechoShade did not designate a representative who was knowledgeable about several noticed subject areas, and its designated representative identified Mr. Rathfelder as the proper representative, the Court grants Draper's request and orders MechoShade to make Mr. Rathfelder available for a supplemental Rule 30(b)(6) deposition not to exceed four hours.

Specific jurisdiction. Draper contends that sufficient forum contacts exist for both specific and general jurisdiction over MechoShade. Because the contacts required for specific jurisdiction are substantially less than for general jurisdiction, the parties are encouraged to focus their discovery efforts on facts and circumstances that are relevant to specific jurisdiction and to come to an agreement thereon if possible. [14] However, after examining the parties' assertions and preliminary arguments regarding specific jurisdiction, the Court concludes that a stay of general-jurisdiction discovery and addressing the existence of specific jurisdiction is not warranted.

Draper asserts that, in addition to MechoShade's cease-and-desist communications sent to Draper in Indiana, MechoShade also (1) informed some of Draper's customers that Draper was infringing MechoShade's patent and trade dress and that the customers might be caught up in a lawsuit, and (2) initiated two bid protests against bids that included specifications for the allegedly infringing Draper products. These actions were intended to stop or disrupt some of Draper's business activity involving the accused infringing products. MechoShade and Draper also executed a "Rule 408 Settlement Negotiation Agreement" [doc. 22-4] and engaged in settlement negotiations, [15] however briefly, before this suit was filed. Cease-and-desist contacts alone are insufficient for specific jurisdiction; there must be additional extra-judicial enforcement activity. *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.,* 148 F.3d 1355, 1360 (Fed. Cir. 1998). While contacts with an alleged infringer's customers for the purpose of informing and/or threatening them regarding the alleged infringement, and bid protests against an infringer's products for the purpose of hindering the infringer's bid both qualify as extra-judicial enforcement activity supporting special jurisdiction, *Campbell Pet Co. v. Miale,* 542 F.3d 879, 885-86, 997 (Fed. Cir. 2008) governing law from the Court of Appeals for the Federal Circuit holds that all such extra-judicial activities must occur in the forum state, not just have an effect on the alleged infringer's business activity in the forum state, *Radio Systems Corp. v. Accession, Inc.,* 638 F.3d 785, 791-92 (Fed. Cir. 2011). The policy of encouraging settlements also argues against using negotiations, even when combined with license discussions, as extra-judicial enforcement activities establishing special jurisdiction. See *Autogenomics, Inc. v. Oxford Gene Technology Ltd.,* 566 F.3d 1012, 1019 (Fed. Cir. 2009); *Red Wing Shoe,* 148 F.3d at 1361. It appears that none of the customer-contacts or bid protests described so far occurred in Indiana. However, if the parties are aware of or become aware of additional qualifying extra-judicial activity, they are encouraged to focus their presentations to the Court on the present motion accordingly.

## Conclusion

Draper's *Motion to Compel* is GRANTED IN PART and DENIED IN PART as set forth above. It is time to determine whether the Court has personal jurisdiction over MechoShade. MechoShade shall complete the productions ordered herein no later than February 24, 2012. It shall make rolling productions as documents and summaries become ready to produce. Draper shall file its response to MechoShade's Motion to Dismiss no later than March 14, 2012. MechoShade may file a reply no later than March 24, 2012. The parties should not expect to receive extensions of these deadlines.

SO ORDERED.

## FootNotes

1. Draper also undertook some third-party discovery, particularly of Interspec, MechoShade's Indiana representative.

2. In this Order, the Court uses the shorthands and descriptors that are used by the parties in their briefing.

3. Specification refers to the process of composing the detailed lists of materials, products, dimensions, *etc.* of the components of a construction project that will comprise the requirements for a solicitation of bids. Project specifications can be written, at least in part, by architects, decorators, and dealers.

4. *MechoShade's Responses to Draper's First Set of Requests for Production,* attached as Exhibit 1 to the *Declaration of Andrew M. McCoy* [*etc.*] in support of *Draper, Inc.'s Motion to Compel* [*etc.*] [doc. 65-1].

5. There is no Request 13.

6. The only content other than commissions that was described was that the Bookings Reports contain information on "new bookings (*i.e.,* potential projects), and budgets." (*Brief in Support* at 14). On its face, this content does not appear likely to show business activity in Indiana and Draper offered no explanation. Any relationship of information on potential future projects and budgets to actual business activity conducted in Indiana appears too attenuated to warrant production of the Bookings Reports.

7. Presumably, the commissions paid to out-of-state representatives are based on the value of the products sold. Depending on the formula for calculating the commissions, MechoShade will be able to give more or less accurate values for the value of the in-state installed products.

8. Construction projects use specifications of project components that assist dealers in bidding on the projects. MechoShade works with persons or entities that write these specificactions (*e.g.,* architects, interior designers, and dealers) in order to encourage them to specify MechoShade products.

9. Thus, Draper's request for documents relating to *all* contacts with dealers, specifiers, and end users in Indiana is far too broad and not narrowly tailored to the limited jurisdictional issues.

10. It is unclear what Draper means by documents relating to the number of products and gross revenue of any such products offered for sale but not sold.

11. "Marketing material" might differ from the other terms of the Request — "advertisement, brochure, catalog, flyer, or commercial" — by encompassing, for example, mass-distributed e-mails, expositions displays, individual DVDs.

12. Draper thus narrows the scope of Request 4. The Request does not ask for marketing material, advertisements, *etc.* that are targeted at Indiana, or even that appear "in any publication or periodical that reaches Indiana." Rather, the Request broadly seeks all marketing material, advertisements, *etc.* for *products* that are sold or offered for sale by MechoShade in Indiana, regardless of whether the marketing material or advertisements are specifically directed to Indiana or even reach Indiana, or whether a lead-referral e-mail has an Indiana addressee or any relation to an Indiana lead.

13. It was not clear from the cited evidence whether these installations generated separate, additional revenue to MechoShade or were already incorporated into the contract sales price for the project.

14. Obviously, if the parties can yet come to an agreement on whether general jurisdiction exists, much of the production ordered herein (and resulting costs) would also be avoided.

15. The content of the negotiations was not described. Certainly, they were geared toward settlement of MechoShade's infringement assertions and threats of litigation, but it is unknown whether they also included licensing negotiations.

## Comment

Your Name

Your Email