```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   STANLEY BOIM, Individually and   )
     on behalf of the Estate of       )
 4   David Boim, et al.,              )
                                      )
 5              Plaintiffs,           )
                                      )
 6              v.                    )  No. 17 CV 03591
                                      )
 7   AMERICAN MUSLIMS FOR PALESTINE,  )
     et al.,                          )
 8                                    )  Chicago, Illinois
                                      )  July 12, 2018
 9              Defendants.           )  1:34 p.m.

10                 TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SIDNEY I. SCHENKIER
11
     APPEARANCES:
12   For the Plaintiffs:       LOCKE LORD, LLP
                               BY:  MR. W. ALLEN WOOLLEY
13                                  MR. STEPHEN J. LANDES
                               111 South Wacker Drive, Suite 4400
14                             Chicago, Illinois 60606
                               (312) 201-2676
15
                               JASZCZUK, P.C.
16                             BY:  MR. DANIEL I. SCHLESSINGER
                               311 South Wacker Drive, Suite 1775
17                             Chicago, Illinois 60606
                               (312) 442-0366
18
     For the Defendants:       MS. CHRISTINA A. JUMP
19                             Constitutional Law Center for
                               Muslims in America
20                             833 East Arapaho Road, Suite 102
                               Richardson, Texas 75081
21                             (972) 914-2507

22   ALSO PRESENT:            MR. ARI HOFFMAN

23   Court Reporter:          Judith A. Walsh, CSR, RDR, CRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Room 1944
                              Chicago, Illinois 60604
25                            (312) 702-8865
                              judith_walsh@ilnd.uscourts.gov
```

1        (Proceedings heard in open court:)

2            THE CLERK:  Case No. 17 CV 3591, Boim versus American

3    Muslims for Palestine.

4            THE COURT:  Good afternoon.

5            MR. WOOLLEY:  Good afternoon, your Honor.  Allen

6    Woolley here for the plaintiff.

7            THE COURT:  Good afternoon.  You have others.

8            MR. WOOLLEY:  I do.  I'm here with my colleagues

9    Steve Landes, Dan Schlessinger, and law student Ari Hoffman.

10           MR. LANDES:  Good afternoon, your Honor.

11           MR. HOFFMAN:  Good afternoon.

12           THE COURT:  Where are you in law school?

13           MR. HOFFMAN:  Washington University in St. Louis.

14           THE COURT:  I'm familiar with that.  I grew up there.

15           MR. HOFFMAN:  Wonderful.

16           THE COURT:  A lot warmer there than here.

17           MR. WOOLLEY:  Maybe not today but --

18           THE COURT:  Most of the time.

19           MS. JUMP:  Your Honor, Christina Jump for the -- with

20   the Constitution Law Center for Muslims in America for all

21   defendants.

22           THE COURT:  Good afternoon.  Ms. Jump has a lot of

23   endurance because I guess she didn't get the memo --

24           MS. JUMP:  I did, just flew in last night --

25           THE COURT:  -- so she had the misfortune to be

1    sitting here all day watching.

2          MS. JUMP:  Not misfortune.  I learned.  I observed.

3          THE COURT:  So we have a number of items here today.

4    I have gone through all of the materials that the parties have

5    filed including the recent filing suite.  In the main, I'm

6    simply prepared to rule, and I'm going to give you my ruling

7    on various matters.

8          There are a few items I have a couple questions on.

9    When I have those questions, I'll let you know, but otherwise,

10   we're really not in discussion mode.  We're in ruling mode.

11   All right.  So if you want to be seated, that's fine, and I

12   can call you up when there's questions, or if you want to

13   stand there, that's fine.  Whatever your pleasure is.

14         So let me begin with some background.  In an earlier

15   lawsuit, plaintiffs obtained a $156 million judgment against

16   Holy Land Foundation for Relief and Development, also known as

17   HLF; American Muslim Society, known as AMS; and Islamic

18   Association for Palestine, known as IAP.  And I'll refer to

19   them collectively at various times as "the original

20   defendants" as a shorthand.

21         According to the plaintiffs, only a small portion of

22   that judgment amount has been collected.  Plaintiffs filed

23   this suit seeking to hold two entity defendants and three

24   individual defendants liable for the uncollected portion of

25   the judgment under theories of successorship and alter ego.

1          In August 2017, the district judge granted a motion

2     to dismiss.  The district judge concluded that plaintiffs had

3     alleged insufficient facts to support a claim for successor

4     liability and, thus, dismissed the complaint insofar as it was

5     based on that theory.

6          With respect to the adequacy of the allegations of

7     alter ego theory of liability, the district judge found the

8     question to be a close one but concluded that plaintiffs fell

9     short of stating a claim.  The district judge thus dismissed

10    the case with prejudice.

11         In January 2018, the district judge vacated the order

12    dismissing the case with prejudice, explaining that she had

13    perhaps relied too much on the declarations offered by

14    defendants in support of the motion -- and I'm quoting from

15    the opinion now -- "without providing plaintiffs with the

16    opportunity to conduct limited jurisdictional discovery on the

17    existence of an alter ego relationship."  The district judge,

18    therefore, permitted plaintiffs to conduct discovery -- and

19    again, I quote -- "solely to address jurisdiction."

20         Plaintiffs thereafter served written discovery on the

21    defendants.  Through extensive meet and confer sessions

22    conducted, it appeared to me, largely if not exclusively by

23    email, defendants provided some 4,500 pages of documents as

24    well as flash drives containing an unspecified amount of

25    social media and written interrogatory responses supplemented

1  by additional information supplied in emails.  The parties

2  remain at issue with respect to certain of the discovery

3  requests, and those disputes are now before me on plaintiffs'

4  motion to compel.

5        In addition to the written discovery that has been

6  served, plaintiffs also have noticed four depositions, all

7  limited to inquiries related to jurisdiction.  The proposed

8  deponents are:  The three individual defendants, Rafeeq Jaber,

9  Abelbasset Hamayel, and Osama Abu Irshaid, each of whom

10  submitted documents labeled as "declarations" in support of

11  the motion to dismiss; and Munjed Ahmad, vice president and

12  treasurer for defendant AMP, Americans Muslims for Palestine,

13  who provided a document labeled as a declaration during the

14  discovery process providing information relevant to the

15  jurisdictional question.

16        And I note that I have referred to the documents as

17  "labeled as declarations" because under 28 U.S.C. Section

18  1746, "declaration" has a defined form and a defined meaning,

19  and none of the declarations comply strictly with the

20  procedural requirements of Section 1746.  And as best I can

21  tell, Mr. Ahmad's declaration doesn't even state that it was

22  offered under penalty of perjury.

23        And I offer that simply as a practice to going

24  forward, that if you're going to use declarations, for them to

25  have the effect of an affidavit or other testimony on oath, it

1    has to comply with the specific formal requirements of Section
2    1746.

3         The scope of plaintiffs' written and oral discovery
4    requests is the subject of another motion before me, and that
5    is defendants' motion to quash and for a protective order.  In
6    that motion, defendants seek three things:  One, to bar the
7    plaintiffs from seeking any additional discovery responses in
8    connection with the written discovery that they have served.
9    So in that respect, the motion that defendants have filed is
10   really a mirror image motion of the plaintiffs' motion to
11   compel.  The second aspect of the motion is -- seeks to quash
12   the four deposition notices, and the third is to bar
13   plaintiffs from seeking any further jurisdictional discovery,
14   at least without leave of Court.

15        So I'm going to address each of those motions in
16   turn, but before doing so, I want to make a few overarching
17   observations that are relevant to all of the motions.

18        First, the parties spar about what the district judge
19   meant by stating that the plaintiffs should have limited
20   jurisdictional discovery.  Now, it's interesting because it's
21   always hard to know what a judge meant.  I always tell my law
22   clerks, don't ever say what somebody meant or felt because you
23   never know what anybody really meant or felt.  We know what
24   they say.  And I certainly don't know what Judge Coleman
25   meant.  I know what she said, and I know the context in which

1    she said it.

2           And in the context of that order and given that the

3    district judge considered the alter ego question to be a close

4    one, I do not read her order permitting discovery into the

5    alter ego issue to mean only partial jurisdictional discovery.

6    I agree that the adequacy of defendants' discovery responses

7    cannot merely be determined by the number of pages that they

8    already have produced.  In one case, 4,500 pages may be too

9    much.  In another case, it may not be enough.  So we can't

10   really just measure it by the pound.

11          That said, the discovery that plaintiffs may pursue,

12   nonetheless, must be both relevant and proportional; and

13   proportional.  And there comes a point when seeking more

14   information adds burden that is not warranted by the

15   reasonably expected benefit.  And I approached the discovery

16   requests with both of those considerations in mind.

17          Second, in their memorandum, plaintiffs occasionally

18   refer to the successor liability theory that they originally

19   pled.  Now, I read the original opinion, and the district

20   judge, I think, pretty unequivocally shot that theory down.  I

21   think I earlier said, pled insufficient facts.  I think she

22   said, pled no facts to support a successor theory of

23   liability.  And in the order permitting jurisdictional

24   discovery, she specifically authorized discovery with respect

25   to alter ego evidence.

1           And I understand there can be an overlap between

2     issues of successorship and alter ego, but certainly, I don't

3     believe that the order contemplated that there would be any

4     discovery permitted insofar as it would pertain solely to a

5     successor theory of liability.

6           Third, the plaintiffs attached as Exhibits 1 and 2 to

7     their memorandum in support of their motion Congressional

8     testimony by Jonathan Schanzer of the Foundation for Defense

9     of Democracies dated April 19th and then May 12th, both of

10    2016.  The testimony discusses various defendants in this case

11    and in the original suit.

12          Plaintiffs cite to this testimony, not merely as

13    evidence but really as establishing the fact that the entity

14    defendants are a continuance of the same organizations that

15    were sued in the original action.  And I cite Page 2 of the

16    memorandum where I think that categorical assertion is made.

17          Now, if the testimony really did all that work, you

18    wouldn't be here.  You wouldn't need discovery.  But I don't

19    find that that testimony establishes anything of the sort.

20    The testimony that you cite to provides no detail about

21    Mr. Schanzer or the organization that he represents.  It

22    provides no detail about how he developed the information.

23    May be completely correct, may be completely incorrect, but I

24    think somebody who gives written testimony to a Congressional

25    committee is providing to that committee information.  That

1    does not make it evidence in the way we look at evidence in a

2    legal proceeding, so I place no weight on that testimony.

3            For what it's worth, I do point out that in the May

4    2016 testimony, Exhibit 2 at Page 7, Mr. Schanzer does state

5    that his organization, I quote, "has not seen any evidence

6    that AMP is engaged in any illicit activity."

7            Fourth, I am concerned about the time scope for the

8    requests which all run from 2004 to the present.  Plaintiffs

9    in their memorandum stake out the position that the original

10   defendants "did not really shut down at all."  And I'm quoting

11   here.  "They regrouped as two new entities," AMP and AJP --

12   I'm quoting now -- "which started up just as the old entities

13   purported to close."  That's in the opening memorandum at 2.

14           While the parties debate whether the current entity

15   defendants were created in 2005 and 2008 or 2006 and 2009, in

16   either event, the discovery sought extends far beyond that

17   time period and all the way through 2017.  And I have serious

18   question about the relevance of much of the discovery the

19   farther away we get from the formative period, which I would

20   say is no later than through 2010.

21           But even assuming that there would be some relevance

22   to a period thereafter, I must consider the question of

23   proportionality.  And if getting information for the time

24   period after 2010, you know, imposes no great difficulty, like

25   lists of directors and officers, which has been provided,

1    that's one thing, but where going beyond 2010 increases the

2    burden, I'm not persuaded it's a burden worth making the

3    defendants shoulder.

4         If defendants cannot develop evidence sufficient to

5    state an alter ego claim from the discovery obtained for the

6    period through the end of 2010, the likelihood to me is small

7    that they will obtain information obtained from a period more

8    remote from the time than the original defendants ceased --

9    I'm sorry, that the original defendants ceased operations and

10   the current entity defendants were formed.

11        So with those overarching considerations in mind, I'm

12   going to turn to plaintiffs' motion to compel.  The motion

13   addresses a number of document requests and interrogatories to

14   the entity defendants and the individual defendants, but the

15   motion and memoranda really group them in six categories.  So

16   I'm going to address them really in that categorical way

17   rather than on a request-by-request basis.

18        So the first category is discovery relating to the

19   creation of AMP, the structure and hierarchy of the entity

20   defendants, and the identity of directors, officers,

21   employees, and chapters.  Having reviewed the various

22   arguments, I grant the motion insofar as it seeks

23   supplementation of the discovery responses so as to require

24   identification of officers and directors for AMP for the

25   period 2006 to 2008.  To me, any overlap in the persons who

1    served in those positions for AMP and those who may have been

2    affiliated with the original defendants is relevant to the

3    alter ego question.

4          And I'm going to be talking generally throughout here

5    about what is relevant to that question.  And in making those

6    determinations, I am not in any way foreshadowing what I think

7    the outcome is with respect to any amended pleading or any

8    attack on the amended pleading.  The issue before me is what

9    discovery is germane to the issue, not whether any particular

10   discovery will carry the day.

11         Now, it may be that because we're going back so long,

12   there are no documents remaining from that period that would

13   answer the question, but that does not absolve defendants from

14   further investigation to find out from people who may have

15   knowledge because it's often the case that -- I have to tell

16   you, even now with all of our ESI world and everybody emails

17   everything and everybody Tweets everything, I rarely have a

18   case when there isn't some question and there's no piece of

19   paper, ephemeral or hard copy, that exists on it and people

20   have to rely on memory or people who may have knowledge about

21   something.  So the fact that there may not be a document

22   doesn't relieve somebody of the obligation of still trying to

23   ascertain the information.

24         I also grant the motion insofar as it seeks

25   information concerning the decision to form AMP and AJP and

1    the persons involved in the formation, whether that

2    information is contained in documents or has to be supplied

3    through interrogatory answers.  For the reasons I've already

4    stated, that information is relevant to the alter ego

5    question.

6        Now, after a reasonable search, if defendants say

7    there are no documents that bear on that question, then there

8    should be a specific discovery response that states that.  And

9    irrespective of whether there are documents, I will require a

10   narrative response to the entity interrogatory, I believe it's

11   No. 5, on that point.

12       I would point out to the parties that a reference to

13   Rule 33(d) as a substitute for a narrative response to an

14   interrogatory is really an exception and not the norm.  It is

15   supposed to be reserved for situations where a requesting

16   party can derive the information from the documents that are

17   identified just as easily as could the producing party.  And I

18   don't see here that a request to explain the reasons for the

19   formation of the defendant entities and to identify the people

20   involved in that creation is something that falls in that

21   category.  I think that for -- to ask the requesting party to

22   discern that from documents may be asking a bit too much.  I

23   think that is something that is better served by a narrative

24   response.

25       With respect to the information concerning local

1    chapters, I grant the motion but, consistent with my comments,

2    limit the timeframe to the period ending at the end of 2010.

3          I deny the motion insofar as it seeks documents or a

4    further interrogatory response regarding precursors to the

5    entity defendants.  The defendants answered the interrogatory

6    on that by denying on oath that there were any precursors.

7    The fact that the plaintiffs disagree with that response is

8    not a basis to require the defendants to alter the response.

9          When I talk about making searches, by the way, I know

10   that there's an issue about ESI.  I'm going to reserve that

11   for the end, and I'm going to ask some questions about that

12   when we get to the end to talk about what's going to be

13   required in terms of that aspect of the search.

14         The next category is information concerning

15   conferences, events, speakers, publications, and distributed

16   material.  Defendants have produced a certain amount of that

17   type of discovery, but the plaintiffs say that they've

18   produced only what is publicly available and that the

19   defendants are obliged to search for additional information

20   that may exist in internal documents.  Defendants say that

21   they have nothing more, with the possible exception of

22   speeches by dozens of board members, which defendants say

23   would be burdensome to collect and would not establish

24   jurisdiction.

25         As I kind of foreshadowed earlier, for it to be

1   relevant, discovery does not have to establish the ultimate

2   issue.  It merely has to be relevant to the ultimate issue.

3   And I conclude that the plaintiffs are entitled to certain of

4   this information to see if it bolsters or, on the other hand,

5   fails to bolster their theory that the entity defendants

6   stepped into the shoes of the original defendants.  I,

7   therefore, will require the defendants to search internal

8   records for certain of the information that plaintiffs seek

9   but solely for the period ending at the end of 2010.

10          The categories are:  Documents concerning the

11  organization, promotion, and content of AMP events; documents

12  concerning sponsorship of booths for events; documents

13  concerning the content of presentations at annual conferences

14  or other events; and newsletters or other publications

15  distributed by the entity defendants, whether in English or in

16  Arabic.  If defendants have no documents that fall within one

17  or more of those categories, again, they shall so state.

18          I deny the motion insofar as it seeks all

19  communications with speakers, sponsors, partner organizations,

20  attendees, or any financial arrangements with speakers.  A

21  request that seeks all information, and I use the word as it's

22  quoted in there, "all communications" to me is plainly

23  overbroad.

24          The plaintiffs also list under this category all

25  communications with potential donors, which I similarly find

1   to be an overbroad request, so I deny that as well.

2          The next category is discovery regarding donors,

3   sponsors, fundraising, and disposition of funds.  And on this

4   Court, plaintiffs seek information on the theory that an

5   overlap between the entity defendants on these matters and the

6   original defendants would be relevant to show that the entity

7   defendants stepped into the shoes of the original defendants.

8          So here, I do have a question.  With respect to

9   information concerning donors and sponsors and fundraising and

10  disposition of funds, to what extent do the plaintiffs have

11  that kind of information regarding the original defendants?

12         MR. WOOLLEY:  Do you want to address that, Steve?

13         MR. LANDES:  Well, your Honor, we have an

14  understanding that how the original defendants raised funds

15  and for whom they raised funds.  The original defendants were

16  essentially a connected network of organizations.

17         THE COURT:  No, but I think you're going farther than

18  I want because in order to step into the shoes, you'd have to

19  be able to determine an overlap.

20         MR. LANDES:  Right.

21         THE COURT:  And in order to determine an overlap, you

22  have to know what the original ones had in terms of donors and

23  sponsors to see if then the new ones picked up the same donors

24  and sponsors.  And so if you have that information concerning

25  the original defendants, that's one thing, but if you don't,

1    then I think this request is problematic.

2           MR. LANDES:  We can come back and develop that list

3    of original donors and sponsors and --

4           THE COURT:  Well, you have the ability to do that?

5           MR. LANDES:  I believe so, your Honor.

6           THE COURT:  Well, then here's what I would suggest on

7    this subject.  You develop that --

8           MR. LANDES:  Right.

9           THE COURT:  -- and you give them that list and that

10   they produce any information concerning any of those entities

11   that are donors and sponsors of the current entity defendants

12   for the period through 2010.

13          MR. WOOLLEY:  I think there are a couple of other

14   things that I would add to Mr. Landes' answer.  As we sit here

15   today, there are -- there are some sponsors and donors that

16   come to mind such as the Mosque Foundation --

17          THE COURT:  Right.

18          MR. WOOLLEY:  -- that are heavily involved.  And one

19   of the -- one of the things that we contend is that the new

20   organization stepped into the shoes by having the same people

21   involved, having the same good will --

22          THE COURT:  I'm sorry.  When you say "the same people

23   involved," you mean the same people involved in running the

24   organization?

25          MR. LANDES:  Yes.

1           MR. WOOLLEY:  In the leadership.

2           THE COURT:  Okay.

3           MR. WOOLLEY:  The same people came into the

4    leadership of the new organizations.  The same people had a

5    following or a good will that they had developed --

6           THE COURT:  But --

7           MR. WOOLLEY:  -- with a whole bunch of other people

8    in the --

9           THE COURT:  I understand that, but that's an earlier

10   request:  The creation of the infrastructure, the identity of

11   the officers and directors.  And so that would give you that

12   information to lay side by side with the information of the

13   original defendants, but we're talk -- we're talking now about

14   a different matter.  You're talking about donors and sponsors.

15   And so in order for you to make that "stepping into the shoes"

16   case, you'd have to be able to compare it to something.

17          MR. WOOLLEY:  And so what it --

18          THE COURT:  So here's what I'm not inclined to do.

19   I'm not inclined to give discovery into the organizations

20   that's not sufficiently tethered to the jurisdictional

21   question.  On donors and sponsors and fundraising, in order to

22   do that, you have to show me that you have information from

23   the original defendants that allows you, if you got this

24   information from these defendants to, say, hey, of the 50

25   donors for the originals -- I'm making up numbers -- 49 are

1    the same.

2                 MR. LANDES:  Or --

3                 THE COURT:  Or two --

4                 MR. LANDES:  Or some significant are the same.

5                 THE COURT:  Right.  You know, or somewhere in

6    between.  But then you have the ability and each side has the

7    ability to use that information as they will on the alter ego

8    question.  But if you only have it for the new entities, it

9    doesn't give you any ability to relate it to the original

10   defendants for the purposes of alter ego.  And to me then,

11   it's just open-ended discovery into the organization, which is

12   not how I read the order.

13                MR. WOOLLEY:  But I guess where I -- where I was

14   trying to go with this, your Honor, is that at some point, we

15   need to be able to sit down at a deposition with some of these

16   witnesses.  And I think we're going to be able to match in

17   some cases old entities and new entities, but I think we want

18   to be able to sit down with them and say, okay, "These were

19   donors to AMP when you came on board.  Are these people that

20   you know, and are they people that were donating prior to AMP

21   coming on board?"  If that's the only way we can get the

22   information, that's how we're going to get it.

23                We think that what we're going to find is that the

24   reason that the donors were available to start funding AMP

25   right off the bat is that they were already tethered to these

1   leaders, these people.  And that's who they went with, and

2   that's why they became the donors to the new organization and

3   why the new organizations were able to get up and running so

4   quickly.

5            THE COURT:  Okay.  Anything further, Ms. Jump?

6            MS. JUMP:  Your Honor, on that, I'd like to hear out

7   the rest of the order and then I might have some

8   clarifications, but --

9            THE COURT:  No, on that particular point because

10  that's what I was asking.

11           MS. JUMP:  I mean, on that point, I don't -- what he

12  just said, I don't think a deposition is required for.  I

13  think if he gives us a list and says, were any of these donors

14  during that timeframe, we can answer that.

15           THE COURT:  Right.  And I understand what counsel is

16  saying.  What he's really saying is he wants to go at it the

17  opposite way.  He wants to have a list of the donors --

18           MS. JUMP:  Right.

19           THE COURT:  -- and then say, you know, you had some

20  relationship, or if you had some relationship to the original

21  entities, the original defendants, were any of these people

22  donors.  He wants to do it that way.  So on reflection, that's

23  not unreasonable.  That's not unreasonable.

24           MS. JUMP:  And I'm sorry.  I just want to make sure

25  that I'm clear on it.  To say that if there is a list of the

1    donors of the original defendants?

2           THE COURT:  Well, no.  Here's what I think they're

3    saying.  They come up with some donors for the original

4    defendants.  They're not sure that they have a complete list.

5    What they want to do is get the list of the donors for the

6    entity defendants back in the origin period and then say,

7    okay, were any of these people donors for the original

8    defendants.

9           MS. JUMP:  Your Honor, the problem that I see with

10   that --

11          THE COURT:  And have I captured your argument?

12          MR. WOOLLEY:  Basically, your Honor.

13          MR. LANDES:  I would say, your Honor --

14          THE COURT:  Close enough.

15          MR. LANDES:  -- that the original case, the question

16   of donors, aside from the relationship with the Holy Land

17   Foundation, really wasn't that significant.  I mean, it was

18   a -- there were donors.  We didn't focus on those donors in

19   the original case so --

20          THE COURT:  I'm not -- I'm not being critical of

21   however the original case was done.

22          MR. LANDES:  Just in terms of --

23          THE COURT:  All I'm saying is that now we're looking

24   at discovery for it to be meaningful in terms of who the

25   donors were for these defendants early on.  For the alter ego

1    analysis, you have to know who the donors were for the

2    original defendants.  And, you know, Mr. Woolley is saying,

3    basically, "I'd like to be able to know who the donors were

4    for these defendants so I can lay that in front of deponents

5    and say, were any of these donors for the original defendants."

6            MS. JUMP:  And your Honor, I guess what I'm saying is

7    to the extent some of our guys are not going to know that -- I

8    don't have a list of the donors to the original defendants.

9    We didn't represent any of the original defendants.  I

10   understand that some of our people were involved --

11           THE COURT:  Right.

12           MS. JUMP:  -- with some -- to certain degrees, but

13   they don't have -- I mean, that would have already come out if

14   we had a list of the donors to the original defendants.  We

15   would have already had to have produced it in response to the

16   discovery.  We've already said we don't.  So I'm not sure that

17   my guys could answer that anyway.

18           MR. WOOLLEY:  It may be the case that we'll sit down

19   with these deponents and put names in front of them and they

20   won't know, but we want to have the opportunity to do that,

21   and that's the only access to that information we may have

22   with respect to some of those donors.

23           THE COURT:  All right.  Let me make a couple comments

24   about this category and then give you my ruling.  Okay.  The

25   defense makes the comment that donors do not create

1    jurisdiction and that voluntary donations are not assets.  And

2    I think that's obviously true.  Voluntary donations, you know,

3    may not be assets, but that's not really the point.  The point

4    is whether there's evidence that the new entity simply picked

5    up everything from the old entities including donors and that

6    that would bear on the alter ego question.  Now, if there's no

7    overlap, you know, that may cut a different way, but that

8    certainly is to me relevant to the alter ego question.

9         And I also am aware of Judge Coleman's statement in

10   the opinion that a shared mission does not suggest a nefarious

11   intent or unlawful motive alone, "alone."  It doesn't mean

12   that in certain circumstances, a shared mission, if

13   accompanied by other things, whether it's nefarious motive,

14   couldn't be relevant to alter ego.  And again, evidence

15   doesn't have to be dispositive on a point to be relevant to

16   the point.

17        So I don't find that argument to be compelling.  In

18   terms of the privacy interests, we do have a protective order,

19   and I think that that's sufficient to cover it.  So I will

20   grant this request, but I'm going to limit it a little more

21   strictly than I limited the rest of it in terms of time

22   period.

23        Remind me, because I got -- I think I got a little

24   bit confused about which entity was in '05 and '06 and which

25   was in '08 or '09.

1      MS. JUMP:  AMP was created in 2006.

2      THE COURT:  Okay.  So without, you know --

3      MS. JUMP:  AMP --

4      THE COURT:  -- without adopting either side's

5  position, AMP was the earlier one --

6      MS. JUMP:  Yes.

7      THE COURT:  -- and AJP --

8      MS. JUMP:  AJP --

9      THE COURT:  -- was the later one.

10      MS. JUMP:  And then AMP became the d/b/a, just to

11  make it confusing, later.

12      THE COURT:  Well, that's later.  I'm not worried

13  about the later part.

14      So with respect to AMP, I will require you to search

15  for and produce any of the information, the donor lists, the

16  donor sponsors, fundraising, disposition of funds for the AMP

17  entity for the period '05 to 07; for the AJP entity, '08 to

18  '10.

19      MS. JUMP:  And, your Honor, just to clarify, we can

20  operate under the understanding that that is covered by the

21  confidentiality agreement that's in place?

22      THE COURT:  Yes.  You have no dispute with that, do

23  you, Mr. Woolley?

24      MR. WOOLLEY:  If it fits within the seven categories,

25  which is financial information --

1      THE COURT:  Well, here's what I'll tell you.  If it

2  doesn't, I'll create an eighth category.

3      MR. WOOLLEY:  Okay.

4      THE COURT:  Because the point of this again is not to

5  simply get discovery for other purposes into the

6  organizations.  It is for this particular case.  And one thing

7  the order does provide is that anything that's subject to the

8  confidentiality order is for use only in this case.

9      MR. WOOLLEY:  Okay.

10      THE COURT:  All right.  So anything that is produced,

11  I will allow to be designated as confidential under that

12  protective order -- or confidentiality order, more accurately

13  stated.

14      With respect to the next category, which is

15  relationships, communications, supports, affiliations, shared

16  leadership, or personnel transfer with the network entities or

17  persons, I understand the plaintiffs' theory is that that

18  overlap between the new entities and the old would again

19  advance their claim for alter ego.

20      One objection of the defendant is that -- or

21  defendants is that they dispute the whole concept that there

22  are network persons or network entities.  And that can be a

23  problem in discovery requests when people define a term in a

24  way that the other side is worried that if they answer,

25  they're adopting that term, and so that term is going to be

1    used against them as an admission that there is such a thing.

2         Okay.  So I'm not saying that that was the intent

3    here as opposed to the intent being, since we have, what was

4    it, 30 people and 20 entities, you've got to have a shorthand

5    for it.  So what I will do is, I'm going to require production

6    of some of this, but I will in my order -- and I'm ruling

7    right now that providing a response to those requests is not

8    an admission that there are, in fact, networked entities or

9    networked persons but that the phrase is just used as a

10   convenient shorthand to describe numerous entities and

11   persons.  And, of course, plaintiffs will agree, you're not

12   going to try to use any response as an adoption of your

13   definition.

14           MR. WOOLLEY:  That was never our intent, your Honor.

15           THE COURT:  Okay.  So the answer is "no"?

16           MR. WOOLLEY:  "No."

17           THE COURT:  Another objection is that the defendants

18   here have no knowledge about documents retained by more than

19   20 entities and 30 individuals but again, the request doesn't

20   really ask what do they know, what do they have.  I read it as

21   saying, what do these defendants know or have with respect to

22   those entities.  That's a different matter.  So I reject that

23   objection.

24           So I'm going to, though, limit this in two ways

25   because the request, again, seeks all documents that may bear

1    on the relationship or relationships.  So I'm going to limit

2    this again to the period through 2010.  And I'm going to limit

3    it to information that is sufficient to disclose the existence

4    of any relationships or dealings, not every single document,

5    if there are documents that would show the relationships or

6    dealings because it seems to me the point isn't whether there

7    were five or 50 dealings because the plaintiff will say that

8    there's -- if there's any that shows an overlap.

9         The next category is Al-Meezan and its relationship

10   to the entity defendants.

11        MS. JUMP:  I'm sorry, your Honor.  I do have a

12   question for clarification on the prior point.

13        THE COURT:  Sure.

14        MS. JUMP:  Are we narrowing that list down at all of

15   the 20 and 30?

16        THE COURT:  No.

17        MS. JUMP:  But it is limited just as to what is in

18   the possession of our current --

19        THE COURT:  Yes.

20        MS. JUMP:  -- defendants.

21        THE COURT:  Yes.

22        Plaintiffs assert that Al-Meezan, which is a

23   newspaper published by defendant Abu Irshaid-- am I

24   pronouncing it correctly?

25        MS. JUMP:  Abu Irshaid.  Yes, your Honor.

1        THE COURT:  -- replaced another paper that IAP, one

2  of the original defendants, published with Mr. Abu Irshaid as

3  a paid editor.  Plaintiffs seek documents concerning the

4  decision to cease publication of the paper that was published

5  by IAP and to begin the publication of Al-Meezan as well as

6  copies of Al-Meezan.

7        Now, originally in the response to the motion to

8  compel, there was no response.  And here is where I have kind

9  of a bone to pick with each of you, right.  In the reply

10  memorandum in support of the separate motion to quash, the

11  defendants inserted argument on this point that they say was

12  inadvertently omitted that related to a separate motion.

13        I think that's an unorthodox way to correct an

14  omission.  If there was an attempt somehow to save paper, why

15  start now?  Why start now?  And then the plaintiffs took it

16  upon themselves to file a sur reply, and at least in the way

17  that I practice law, sur replies require leave of Court.  No

18  leave of Court was sought.  It's simply the plaintiffs took

19  this upon themselves and granted themselves the authority to

20  file a sur reply; again, a rather unorthodox way to proceed.

21  And when I use "unorthodox" here, I don't mean "good."

22        So I don't want to see this again.  If somebody

23  thinks they left something out, then raise it the proper way,

24  not in a back door.  And if somebody thinks a sur reply is in

25  order, then ask for a sur reply.

1         So what I will do since you haven't been before me

2  before in this case in anything substantive, I'll consider

3  that a shot across the bow.  So I will consider the argument

4  that's raised.  I'll let you file the sur reply.  I'll allow

5  it to be under seal.  That motion is granted.

6         And so with respect to the objection, one objection

7  is that it's -- the discovery sought with regard to Al-Meezan

8  is not relevant to the alter ego analysis.  Again, I disagree

9  because I think it does go part and parcel with the defense --

10  I'm sorry, the plaintiffs' theory of the "stepping into the

11  shoes."

12         If, in fact, there is evidence to be had that

13  Al-Meezan was really a replacement for the original

14  defendants' paper and they can offer that, again, whether it

15  carries the day by itself in conjunction with other evidence,

16  that will be for the parties to argue about and for Judge

17  Coleman to decide, but for discovery, I reject the proposition

18  that it's not relevant.

19         Defendants argue that it's not relevant because it

20  was created by Mr. Abu Irshaid and not the entity defendants,

21  but again, he is a defendant in this case, so drawing that

22  line is not a line that can be so neatly drawn given the

23  allegations in the case.

24         Defendants acknowledge that Mr. Abu Irshaid, he has

25  some copies of Al-Meezan but that it would be unduly

1    burdensome for him to produce them.  I don't -- I have not

2    seen any evidence to support the burden argument.  It doesn't

3    strike me that producing copies of some newspapers, if they're

4    in the possession of the defendant for a specific period of

5    time, is unduly burdensome, so I reject that argument.  So I

6    will require production of the copies of Al-Meezan that

7    Mr. Abu Irshaid has in his possession.

8         Remind me when it was that Al-Meezan started

9    publication.

10        MS. JUMP:  2005, your Honor, until 2015.

11        THE COURT:  Okay.  I will require that for the period

12   of 2005 to 2007.  And as to documents concerning the decision

13   to stop the publication of the prior newspaper and to start

14   Al-Meezan, I read the defendants to say that they have no such

15   documents.

16        MS. JUMP:  Correct, your Honor.

17        THE COURT:  If they have no such documents, then they

18   have no such documents, so I will not enter an order requiring

19   them to produce what they say they don't have.

20        The next category is documents concerning the

21   individual defendants' background, employment history, and

22   online content.  On this, I rule that the defendant -- the

23   entity defendants, if they have documents disclosing any

24   employment or other relationship between the individual

25   defendants and the entities who are identified in request for

1   production 30 and 31, then they should produce them.  The

2   individual defendants say they don't have any.  It wasn't

3   clear to me that the entity defendants say they don't have

4   any.  And if they have any, then they are required to produce

5   them, and they're certainly required to look.

6          The individual defendants, I'm going to require that

7   they produce documents that would show travel to any

8   conference or meeting relating to any Islamic or Palestinian

9   organization but only for the period through 2010.

10         And with regard to the internet content, I know that

11  the defendants say they posted -- or they produced certain

12  Facebook and other types of social media.  What is it that the

13  plaintiffs are looking for in terms of internet content beyond

14  what has been produced?

15         MR. WOOLLEY:  We got the AMP website, and we got

16  AMP's Twitter feed, You Tubes, and Facebook accounts.  We

17  believe that the individual defendants themselves also have

18  social media and blogs and some pages, maybe web pages, and we

19  want those identified pursuant to the interrogatory so we can

20  look into that.

21         THE COURT:  Do you know whether they had those kinds

22  of accounts during the period through 2010, the individual

23  defendants?

24         MS. JUMP:  Up to 2010, and if we're going to personal

25  ones as opposed to for an alternative business such as

1    Mr. Jaber's tax business --

2            THE COURT:  Personal.  Yes, personal.

3            MS. JUMP:  I believe at least one of them had a

4    Facebook page, but I don't believe that they had independent

5    websites, but I would need to verify that to be certain.

6            THE COURT:  Okay.  So I will require that material

7    again ending at the end of 2010.

8            MS. JUMP:  And, your Honor, just to clarify, is that

9    to be -- our period is beginning 2006?

10           THE COURT:  Well, with --

11           MS. JUMP:  Just going back --

12           THE COURT:  2005.

13           MS. JUMP:  Okay.

14           THE COURT:  That's the earliest point that they

15   say --

16           MS. JUMP:  That's fine.

17           THE COURT:  Okay.

18           MR. WOOLLEY:  And Mr. Landes reminds me that we would

19   like the Arabic material as well if that wasn't clear.

20           THE COURT:  Well, I assume when he said "online

21   internet content," it would be in whatever language it's in.

22           MR. WOOLLEY:  Right.

23           MS. JUMP:  It is what it is.

24           THE COURT:  Right.  Okay.  Always one of my favorite

25   phrases.  It's kind of like the old Wisconsin phrase:  No

1    matter where you go, there you are.

2          All right.  I have some questions about the email

3    production.  One of the complaints by the plaintiffs in the

4    motion is that they say that there's been a search and

5    production for only two custodians, and there's a lot more

6    people than that.  So let me ask a couple questions about

7    that.

8          In terms of custodians for email accounts, how many

9    different custodians were -- had their email accounts searched?

10         MS. JUMP:  Just -- and I'm not trying to be tricky

11   but just to make sure that I'm being clear and

12   straightforward, anybody who would have had access to the

13   relevant and responsive scope for the entities, that would be

14   five who were asked to search, five individuals.

15         THE COURT:  Can you tell me who?

16         MS. JUMP:  Mostly.

17         THE COURT:  Okay.  It's not a memory test.

18         MS. JUMP:  Mostly.  It would be Munjed Ahmad --

19         THE COURT:  Right.

20         MS. JUMP:  -- who is the individual --

21         THE COURT:  Our fourth declarant.

22         MS. JUMP:  Correct.  All of the individual defendants

23   to the extent they would have anything on behalf of the

24   entities as well.

25         THE COURT:  I'm sorry.  Can I stop you there?

```
 1                    MS. JUMP:  Sure.
 2                    THE COURT:  In terms of the individual defendants,
 3      are you talking about their personal email accounts as well
 4      as --
 5                    MS. JUMP:  Both.
 6                    THE COURT:  -- the entity?
 7                    MS. JUMP:  Yes.
 8                    THE COURT:  Okay.  So you say those were searched?
 9                    MS. JUMP:  Yes.
10                    THE COURT:  Okay.
11                    MS. JUMP:  And then a former employee who -- quite
12      frankly so that I don't butcher her name, I'll just refer to
13      as Kristen but who is identified --
14                    THE COURT:  I think I've seen that.
15                    MS. JUMP:  -- in the production.
16                    MR. WOOLLEY:  Sremski, Judge.
17                    THE COURT:  Okay.
18                    MS. JUMP:  It's -- that may be.
19                    THE COURT:  All right.
20                    MS. JUMP:  And she had previously, the role that she
21      had previously held with AMP, so I spoke with her to see what
22      she had.
23                    THE COURT:  Okay.
24                    MS. JUMP:  She was able to find some that she had on
25      her personal devices that just happened to be overlap.  And
```

1    then I spoke with two individuals whose names I'd have to

2    verify who do the publicity and publications and those sorts

3    of statements for the organizations.

4           THE COURT:  All right.  That's a somewhat more robust

5    scope of email search than plaintiffs may have understood,

6    certainly more than they said in the papers.  Mindful that I

7    talked about the lack of utility, in my view, of going later

8    than 2010 in terms of this kind of search, what is it -- what

9    more would you be asking for based on what you've heard

10    Ms. Jump represent concerning which custodians they asked to

11    search?

12           MR. WOOLLEY:  We don't -- I appreciate Ms. Jump

13    filling us in on who was searched.  We only got emails from

14    two, Ms. Sremski and Mr. Ahmad.  Neither of those two were

15    people who were around in the IAP days.  I believe Mr. Ahmad

16    was in law school, and Ms. Sremski never had come around.

17           We are most interested in the emails that the people

18    who were actually involved across the board might have.  That

19    would include Hatim Bhasian, who was the person whose name is

20    on the incorporation documents and who, as far as I can tell,

21    has been a, if not the, leader of this new organization

22    throughout the entire time period and still is.

23           There are also the individual defendants.  It's hard

24    for us to believe they don't have anything that's relevant in

25    their emails.  And they haven't provided anything.

1        THE COURT:  Well, again, I don't know --

2        MR. WOOLLEY:  Right.

3        THE COURT:  -- because especially if we're going back

4   to the prior decade --

5        MR. WOOLLEY:  Right.

6        THE COURT:  -- it would not --

7        MR. WOOLLEY:  There --

8        THE COURT:  -- be unusual --

9        MS. JUMP:  That's right.

10       THE COURT:  -- if there wasn't email from that

11   period, depending on how the systems work, you know, what gets

12   overridden or what gets automatically deleted and such because

13   certainly, I don't know that these entity defendants, there

14   would be any argument that somehow they should have been

15   preserving something in '08.

16       MR. WOOLLEY:  And if it doesn't exist, it doesn't

17   exist.

18       THE COURT:  And what I've heard is that they did the

19   search for the individual defendants and that, as Ms. Jump

20   said, it is what it is.  So on that point, I'm kind of

21   foreshadowing the ruling I'm going to give you.  You are going

22   to get to talk to these defendants.

23       MR. WOOLLEY:  Okay.

24       THE COURT:  So you can ask them about it.

25       MR. WOOLLEY:  There are three others that stuck out

1  as being people who were involved in the IAP days, looked like

2  they might have been involved in the transition and who are

3  still involved in -- under control today, and those would be

4  Salah Sarsour.

5          THE COURT:  I'm sorry.  Spell the name.

6          MR. WOOLLEY:  S-a-r-s-o-u-r.

7          Sufian Nabhan, which is N-a-b-h-a-n; and Hussein Al,

8  A-l, dash, K-h-a-t-i-b.

9          THE COURT:  Khatib?

10         MR. WOOLLEY:  Yes.

11         THE COURT:  Okay.

12         MS. JUMP:  You know, I will say that not -- I'd have

13 to double-check the list.  They're certainly not current

14 leaders of the organization and they are -- some of them, I

15 don't believe, are even current board members.  I mean, I can

16 contact them individually and see if they have anything, but I

17 certainly would say that I don't believe that they should be

18 subject to deposition in this matter --

19         THE COURT:  I'm not saying that anybody else gets

20 deposed.

21         MS. JUMP:  I'd be fine checking into them as well.

22 Just to be upfront, I hadn't thus far.

23         THE COURT:  No, I understand.

24         MS. JUMP:  They're not the ones who push -- you know,

25 who are in any control so --

1          MR. WOOLLEY:  I guess our position is if they are

2     current board members, they would be in the control of this

3     organization.  I don't know whether they are or not.  I know

4     they were recently, but it was our impression.  We'll have to

5     confirm.

6          MS. JUMP:  I will have to check with them.

7          THE COURT:  Why don't we do this.  Why don't you

8     reach out to them and see if they can take a look at their

9     email and see if there's anything from that vintage that would

10    pertain to these subjects.  Okay?

11         MS. JUMP:  And so that's 2005 to 2010?

12         MR. WOOLLEY:  Right.

13         THE COURT:  Correct.  Okay.  I'm not going to --

14    well, let me say this.  If somebody is a board member now, I

15    would expect that there would be the ability, you know, to get

16    that.

17         MS. JUMP:  I would expect that if they're a board

18    member now -- I mean, I can contact them certainly but --

19         THE COURT:  What I'm saying is, get that search done.

20         MS. JUMP:  Oh, yes.  I got it.

21         THE COURT:  In other words, if the person won't

22    simply say --

23         MS. JUMP:  "I don't want to deal with it."

24         THE COURT:  -- "I don't have that."  All right.  If

25    they're not, then I don't know that they have the ability to

1    force them to do it.

2         MR. WOOLLEY:  Right.

3         THE COURT:  And based on the time issues, you know,

4    going back that far, I'm not going to authorize subpoenas for

5    this because you're going to make a good faith effort --

6         MS. JUMP:  Absolutely.

7         THE COURT:  -- to determine this.

8         MS. JUMP:  Yes, your Honor.

9         THE COURT:  Form of production, so what was produced

10   by the defendants, was it collected from various systems and

11   produced in, I'll use a very technical term, a lump?

12        MS. JUMP:  Yes, your Honor.

13        THE COURT:  Okay.  All right.  And is that lump

14   searchable?

15        MS. JUMP:  What is searchable has been produced

16   electronically.

17        THE COURT:  I'm not -- what I'm saying is, now you

18   have -- what you did is from various sources, you collected

19   material responsive to their discovery request.  You collected

20   it.  You loaded it all into a PDF.  You produced it.

21        MS. JUMP:  Correct.

22        THE COURT:  In the form that you produced it to them

23   in the PDF, can someone do a word search?

24        MS. JUMP:  I believe that it is.  I'll go back and

25   double-check as to the one that -- the way in which we

1   produced the copy.  I will clarify that.  And since we

2   de-designated some documents that -- de-designated Bates

3   labels are not going to be included in what we've already

4   produced --

5           THE COURT:  Right.

6           MS. JUMP:  -- that might be searchable.

7           THE COURT:  Okay.

8           MS. JUMP:  But as to whether the compilation itself

9   is searchable, I don't know.  I'll have to double-check.  I

10  think so, but I don't know.

11          THE COURT:  Okay.  Because that's their

12  fundamental --

13          MR. WOOLLEY:  Yes, I can -- I'm sorry, your Honor.  I

14  didn't mean to --

15          THE COURT:  Their fundamental criticism of the form

16  of production, they say that what they have, they can't

17  search, that they can't do a word search, they can't

18  correlate, you know, different emails.  And if, as they

19  resided on the various systems from which you collected it,

20  it's searchable, you know, that -- that's probably not the

21  best way to produce it.

22          But Mr. Woolley, why don't you tell me what you

23  wanted to say.

24          MR. WOOLLEY:  Oh, I was just going to elucidate

25  what's going on because I did have to spend some time on

1    dealing with the documents.  What I believe happened is they

2    got both paper documents and printouts of some emails from

3    Ms. Sremski and Mr. Ahmad.  They redacted information with

4    email addresses and some other things from the emails and some

5    of the other documents, and then we put them all in a scanner

6    and scanned them all.  So we got a single PDF document from

7    each of the two people.  They are not searchable.  And they

8    are not unitized in a way so that if you did the search, all

9    you'd get would be one hit, and it would be the PDF document.

10   So what we're looking for --

11        THE COURT:  When you say "unitized," you're basically

12   saying that all the documents wound up getting combined so

13   there's no discrete documents on there, it's all one lump.

14        MS. JUMP:  I can make the whole thing -- if it's a

15   whole PDF, I can make the whole PDF word searchable.  That's

16   fine.

17        THE COURT:  Okay.

18        MS. JUMP:  My understanding is that what is being

19   searched for, what is any metadata that is within the original

20   document, and that's where we're having our bigger objection.

21        THE COURT:  So let's do one thing at a time.  So if

22   you can produce it to Mr. Woolley in a form that he could word

23   search it and it identifies discrete documents so it's not

24   all --

25        MS. JUMP:  I believe -- I believe I can do that.

1        THE COURT:  All right.

2        MS. JUMP:  I will double check.  And also just to

3    clarify, we don't -- because we're a nonprofit, we don't

4    print, scan, and recreate.  We drag and drop.  So nothing was

5    printed and rescanned.

6        MR. WOOLLEY:  Okay.

7        THE COURT:  In other words, she wasn't trying to make

8    it hard.

9        MR. WOOLLEY:  Nor am I accusing her of doing that.

10   That's not the point.  We --

11       THE COURT:  I didn't want it to be left out there as

12   any kind of soft suggestion.

13       MS. JUMP:  I appreciate that.

14       MR. WOOLLEY:  What we're really interested in, what

15   was produced so far is not all that much email.  It's

16   manageable.  What we're concerned with is going forward, if

17   there's a lot more email produced, we'd like it in native

18   format or some sort of electronic format.

19       THE COURT:  Something that is searchable.

20       MS. JUMP:  As long as we're clear that it's word

21   searchable.

22       THE COURT:  Let's talk about metadata.  At this

23   stage, I'm not going to order production of metadata.  I don't

24   think that, at least in the cases that I have, it's not

25   routine.  Certainly, in the Seventh Circuit pilot project

1    about metadata, you don't produce all fields of metadata

2    automatically.  So I think that right now from what I'm seeing

3    the issues are, it's not so much, I need to know which draft

4    of something came first or was there a conversation before

5    there was that draft.  You're looking at an overlap that's

6    entity to entity.  And at this point, as I say, I have not

7    seen the case made that metadata is required for that, so I'm

8    going to deny that request.

9         So that really addresses the plaintiffs' motion.  In

10   terms of the additional production that is required, I'll talk

11   at the end about that because I want to talk about that

12   production and a few other things.  Okay.

13        With respect to the defendants' motion, three parts.

14   One is to bar them -- to bar the plaintiffs from obtaining any

15   further discovery based on their current written requests.  I

16   guess you could figure out that based on my ruling on their

17   motion, I deny that.

18        MS. JUMP:  I -- understood.

19        THE COURT:  You figured that out.

20        MS. JUMP:  Yes.

21        THE COURT:  Second, in terms of quashing the current

22   deposition notices, the original motion asks to defer the

23   depositions until I clarify -- or actually Judge Coleman

24   because at the time you didn't know that you got stuck with

25   me, clarify the order permitting the jurisdictional discovery,

1    but then in the objection to the sur reply that you filed

2    because you're probably upset that they filed a sur reply and

3    so forth, you said, "Now I want to simply close all discovery."

4         So neither is happening.  So I will allow these

5    individuals to be deposed.

6         MS. JUMP:  That would be the three --

7         THE COURT:  The four people, the three individual

8    defendants and Mr. Ahmad.

9         Now, the third issue is the request that I call a

10   halt to any further discovery without Court approval.  The

11   plaintiffs say that's not necessary.  They have not threatened

12   to serve additional discovery, and any additional discovery

13   they might choose to serve would be properly limited.  And I

14   want you to know, I've gone through these requests.  I

15   disagreed with the breadth of some of them.  I don't think any

16   of them are in bad faith.  I understand everybody's position

17   on that.  They're respectable positions.

18        So I don't think that this is a situation where, oh,

19   my gosh, you know, one party is trying to simply for the sport

20   of it overwhelm the other party and so a protective order is

21   appropriate for that reason.

22        So I don't find that the requests are abusive, but at

23   the same time, the written discovery that has been served is,

24   without question, thorough.  And that's actually a compliment.

25   It's not a criticism.  And the depositions that the plaintiffs

1    seek to take are certainly designed to allow them to test the

2    assertions in the various declarations that the individual

3    defendants made on the earlier motion practice and in the

4    course of discovery now by Mr. Ahmad.  And I recognize this is

5    an important matter to everybody.  I also see the docket

6    number on this case, but I know that the real docket number is

7    '96, right?

8              MR. WOOLLEY:  2000.

9              MS. JUMP:  2000.

10             THE COURT:  No, the docket number, the original case.

11   When was it filed?

12             MR. WOOLLEY:  2000.

13             MS. JUMP:  2000.

14             THE COURT:  2000.  Okay.  So that's an old case.  So

15   I'm not put off by old dates.  You probably don't know this

16   history in Chicago.  I'm the *Shakman* judge, so I oversee

17   consent decrees governing about 14 governmental entities where

18   the case was filed in 1969.

19             So with that said, I think that this is a case that

20   cries out for resolution for everybody, for everybody.  So,

21   you know, there's a balance to be struck and that when people

22   are seeking information at some level, you know, it's never

23   enough.  On the other hand, for all the documents that wind up

24   getting produced, how many of them get actually listed on a

25   pretrial order and how many of them ever get used at trial.

1  It's a very skinny neck on a very large funnel.

2          And so here, I think that given the thoroughness of

3  the original request and the targeted depositions for these

4  particular individual defendants and Mr. Ahmad and given that

5  we are dealing with a very specific issue here, and that is

6  discovery concerning alter ego, I think that the discovery

7  that has been served that now I'm requiring to be supplemented

8  and the depositions that have been noticed are ample to allow

9  the parties to present to Judge Coleman their positions now on

10  the alter ego.

11          So I am going to say that no further discovery may be

12  served absent written agreement of the parties or court order.

13  And the reason that I allow that, I would say, very small

14  safety valve is because, you know, you never can predict what

15  may come up in a deposition.  And in fairness, if something

16  comes up and it seems reasonable that there be something

17  that's specific to the new item that came up, I would hope the

18  parties would be able to work that out; but on the other hand,

19  that's not a lever to come running into court saying, "I want

20  five more depositions" because that would be a very steep run

21  uphill.

22          So I grant that part of the motion.  And again, I

23  want to emphasize, it's not because I think that there's been

24  an abuse in any way, but it's really as part of my authority

25  to exercise control over the discovery process that I do this

1    and to get people at issue so that they can get this resolved.

2            So with all of that in mind, I guess what I would

3    like to do is, rather than, you know, simply throw a dart for

4    a date, you know, of production, I'd like to give Ms. Jump a

5    little time to go back and kind of sort through what I've

6    ordered and then talk across the table with plaintiffs'

7    counsel about, here is when I think would be reasonable to get

8    this done.  And it may be that some of it can be done

9    incrementally on a rolling basis but then to come up with, if

10   you can by agreement, a date by which it will be complete.

11           Okay.  So if I gave the parties 10 days to do that,

12   would that be enough time, to have those conversations?

13           MS. JUMP:  Oh, conversations.

14           THE COURT:  Not to produce everything.

15           MS. JUMP:  Yes, we can have the conversations.

16           MR. WOOLLEY:  Absolutely, your Honor.

17           THE COURT:  You were saying, "Wow, the guy sounds

18   reasonable until he got to the end."

19           MS. JUMP:  Exactly.

20           THE COURT:  I hear you.  It took a hard one.

21           MS. JUMP:  It took a turn.

22           THE COURT:  So today is the 12th, so we'll say by the

23   23rd, which is a week from Monday.  Okay.  What I'd like to do

24   is submit to me, you know, a proposed order with a deadline

25   for that.  And in those discussions, I would then like you to

1    also talk about dates for the deposition.

2         Once the production is completed, what would be the

3    plaintiffs' sense of how much time you would need to be ready

4    to take the depositions?

5         MR. WOOLLEY:  Yes.  I think we probably could be

6    ready to take the depositions in 30 days, and we could take

7    them relatively quickly after that.

8         THE COURT:  Okay.  So I think that that's a

9    reasonable timeframe, so why don't you figure that after the

10   production is complete that the depositions will commence

11   beginning no earlier than 30 days out but then be completed no

12   later than 30 days thereafter.

13        MS. JUMP:  Got it.  So a 30-day window.

14        THE COURT:  Right.  You produce the documents and

15   other material, 30 days for them to absorb it, get ready, and

16   then 30 days thereafter to complete the depositions.  If you

17   can do it sooner, that's fine, but, you know, I'm trying to be

18   sensitive to schedules and so forth.  I know that you're

19   elsewhere.

20        MS. JUMP:  Yes, your Honor.

21        THE COURT:  Okay.  Does that make sense to everybody?

22        MR. WOOLLEY:  Yes, your Honor.

23        MS. JUMP:  And, your Honor, you may be about to get

24   to this, but I do have some questions about the scope of the

25   depositions.

1          THE COURT:  Yes.  Okay.

2          MS. JUMP:  I understand we have it just as to the

3     four people, but would it be fair to say that the questions

4     and everything would be limited to the same general timeframe

5     that we've been working with, of the 2005 to 2010 timeframe

6     regarding alter ego and that sort of thing, not their entire

7     lives and backgrounds?

8          MR. WOOLLEY:  Given that these are depositions, so

9     they're going to either have the memories or not and there's

10    not going to be any additional burden on them to answer, that

11    seems like it would be a constraint that would be difficult to

12    live with in a deposition.  And I don't know exactly where we

13    would have the problems, but I don't see how it would create

14    an additional burden to allow the depositions to cover a

15    greater timeframe if it makes sense at that time.

16         THE COURT:  Why would it make sense?

17         MR. WOOLLEY:  Well, we may -- we may want to find

18    out, for example, whether a practice has continued past 2010,

19    and that may be something that the witness could tell us off

20    the top of his or her head.

21         THE COURT:  And why would you care in terms of

22    whether, as you put it into -- in your memorandum, these

23    individuals and entities stepped right into the shoes, there

24    was never really an end to the original entities, they simply

25    reformulated as the new entities?

1          MR. WOOLLEY:  Well --

2          THE COURT:  Whether they did something in 2013, I'm

3    not sure why that goes to it.

4          MR. WOOLLEY:  Well, there may be, for example,

5    evidence of a connection to -- and I'm making this up.  This

6    is not something I'm reciting something specific on, but for

7    example, if there was an effort to raise funds for an

8    organization that provided funding to Hamas and that happened

9    in 2011, that would seem to me to be a continuation of the old

10   entities' practice that got them in trouble that happened

11   after 2010 that still reflected the fact that the same people

12   were running the organization with the same issues, for the

13   same purpose later on.

14         THE COURT:  Well, I don't know.  I don't know

15   because -- you know, I had a case once where I represented a

16   fellow on appeal in a bank fraud case.  And at trial, the

17   government put into evidence to show federally insured status,

18   an element of bank fraud, a document showing that they were

19   federally insured in 1972.  I'm giving away my age.  Okay.

20   The problem was, the conduct at issue was in 1979.  You know,

21   you can't infer that there was necessarily the case that it

22   was insured in '79 because it was in '72.  Because somebody

23   decided to fundraise or provide funds in 2011 or '12 or '17

24   doesn't mean that they did so in 2005 or '6.  You're getting

25   discovery during that period.  And so I am inclined to limit

1   it to that period.

2          Now, you know, there's a rule of reason.  If there's

3   a particular item that goes a little farther, you know, I

4   don't think it makes sense to try to cut it off.

5          MS. JUMP:  Understood.

6          THE COURT:  But, I mean, you know, we can do it

7   another way, Mr. Woolley, is I can limit the time of the

8   deposition and then you have to make choices about what's --

9   what's your real mission.

10         MR. LANDES:  Your Honor?

11         MS. JUMP:  And --

12         THE COURT:  I don't like to do that, but I think if

13  you're going -- if it's your real desire to have the latitude

14  to go farther, then maybe the tradeoff is, I'm going to give

15  you less time and you've got to make some choices.

16         MS. JUMP:  And your Honor, if I may.

17         THE COURT:  I'm sorry.  I think Mr. Landes --

18         MR. LANDES:  I think, your Honor, we may have

19  evidence --

20         THE COURT:  I know they're double teaming you.

21         MS. JUMP:  I can take them.

22         MR. LANDES:  We may have evidence of, for example,

23  certain fundraising that took place outside of the 2010 cutoff

24  and ask, well, we learned about this, when did it start.  In

25  other words, there may be evidence according to things that we

1  will learn and then we want to go back.  "Did you do this --

2  we know that you did this in 2011 and 2012.  What was the

3  history?"

4         THE COURT:  When you say you know that, you would say

5  essentially you know that?

6         MR. LANDES:  Well, we have some reason to believe it.

7  We just want to go back and see --

8         MR. WOOLLEY:  And --

9         THE COURT:  Can I ask the question, you know, why do

10  you need then to go to '12 as opposed to a freestanding

11  question?

12         MS. JUMP:  I agree.

13         MR. WOOLLEY:  I think there are some events -- for

14  example, I think there was a Detroit event in 2015 that

15  involved the same people who were involved back in 2002 with

16  these old organizations of the same kind of thing.  And we

17  think that the fact that this was still going on could be

18  argued to be relevant --

19         THE COURT:  When you say "still going on," I don't

20  know, still going on.  That's the point.  And again, if -- you

21  know, if somebody started up an organization in 2006 and maybe

22  they just picked up everything from the old and there was a

23  continuation but, if so, the discovery through 2010 should

24  show that.

25         On the other hand, maybe they didn't pick it up, and

 1   maybe then because there was a void, others -- or they jumped

 2   into a void later.  Those are both -- well, you know,

 3   Mr. Landes, if you wish to laugh --

 4            MR. LANDES:  No, I'm not.

 5            THE COURT:  -- or smile --

 6            MR. LANDES:  Sorry.

 7            THE COURT:  -- then feel free to do that, but I don't

 8   think that that's really necessary.

 9            MR. LANDES:  That wasn't my intention, your Honor.

10            THE COURT:  Okay.

11            MR. LANDES:  I was just --

12            THE COURT:  All I'm doing is, I'm hypothesizing about

13   the different variables of why I'm focusing on this earlier

14   period.

15            So I have given you my thoughts on this.  I'm

16   reluctant to enter a specific order saying there cannot be any

17   question that goes after December 31, 2010.  There's a

18   difference between spending 20 minutes on an event that's in

19   '15 as opposed to asking one or two questions as a foundation

20   to go over.

21            MS. JUMP:  And I understand that, and --

22            THE COURT:  Okay.

23            MS. JUMP:  -- I do have an agreement with exactly

24   what you said earlier, if you are going to say, did this

25   happen later, did it happen during 2008, '9, '10, you don't

1    need --

2           THE COURT:  I know, but sometimes it's just a

3    question that simply orients somebody.  Again, I'm not going

4    to -- I don't want to issue a bright line because of that, but

5    I've given you my thoughts on that, so I will trust you to

6    take heed of those thoughts and not go beyond where I have

7    suggested to you it's appropriate.

8           MS. JUMP:  With that in mind, your Honor, we would

9    ask for a limit on the time for each deposition.

10          THE COURT:  Okay.  You asked for a limit.  What's

11   your proposal?

12          MR. WOOLLEY:  We think --

13          THE COURT:  I know.  Let's see what Ms. Jump says.

14          MS. JUMP:  I was --

15          THE COURT:  Or actually, maybe what I can do, you can

16   each give me a piece of paper and tell me what the limit is

17   you propose.  I can guess what theirs would be.

18          MR. WOOLLEY:  We won't even say it then, your Honor.

19          THE COURT:  I could be wrong.

20          MS. JUMP:  I'm going to guess that theirs would be

21   seven hours on the record which is, you know, generally what

22   the federal rules allow for a deposition.

23          THE COURT:  Is that right, Mr. Woolley?

24          MR. WOOLLEY:  That's correct.

25          MS. JUMP:  And that's what we don't think is

1      appropriate here.

2                 THE COURT:  What do you think?

3                 MS. JUMP:  I think three hours on the record.

4                 THE COURT:  Okay.  All right.  Well, I'm not going to

5      put a time limit on it.  And the reason that I'm not going to

6      put a time limit on it is because I do not conclude that the

7      deposition is limited simply to the statements in the

8      declarations.  If it was limited to the statements in the

9      declarations, that would be fine, but I think that the

10     plaintiffs are entitled to depose the individuals not only on

11     what they said in the declaration but on things they developed

12     in written discovery or other questions that they have that

13     are in the focus on the relevant time period to determine the

14     knowledge of the individuals.

15                So I can't -- I can't meaningfully say that, you

16     know, five hours is right or five and a half hours or six

17     hours and 12 minutes, you know, is correct.  So I'm going to

18     stay with the presumptive limit under Rule 30.

19                MR. WOOLLEY:  Okay.

20                MS. JUMP:  Your Honor --

21                THE COURT:  But don't ask for more.

22                MS. JUMP:  Your Honor, I also have concerns regarding

23     Rafeeq Jaber with him particularly.  He's already been deposed

24     twice by them as to where the money went, where the assets

25     went of the judgment defendants.  So with him, I certainly

1  would -- I would request -- first of all, I don't have

2  possession of the transcripts of the two prior depositions,

3  and if that's something that I know is in their possession, we

4  haven't done any discovery requests from our side, I would ask

5  that those be produced to us in advance of his deposition.

6          THE COURT:  Any objection?

7          MR. LANDES:  No.

8          MR. WOOLLEY:  No.

9          MS. JUMP:  And also that the same topics not be

10  covered, the same questions, repetitive questions not take

11  place.  He shouldn't have to go through the same questions a

12  third time.

13          MR. WOOLLEY:  We will produce the transcripts, and we

14  will not do repetitive questioning --

15          THE COURT:  Okay.

16          MR. WOOLLEY:  -- if we've already covered it.

17          THE COURT:  All right.  And, of course, I think that

18  everybody understands that his prior testimony, to the extent

19  relevant to the alter ego question in this case, can be used

20  in this case as if given in this case.

21          MS. JUMP:  I don't have a -- I'm not challenging

22  that.

23          THE COURT:  Okay.

24          MS. JUMP:  I just want to see it.

25          THE COURT:  Well, that's fair.  Okay.  Anything else?

1    MS. JUMP:  I would, if we can, like to go back just a

2    couple more questions on the production --

3    THE COURT:  Sure.

4    MS. JUMP:  -- of the copies on the Al-Meezan, the

5    newspaper, newsletter.

6    THE COURT:  Yes.

7    MS. JUMP:  Mr. Abu Irshaid has those copies only in

8    hard copy format.  We can -- we can take pictures.  We can get

9    them in producible form, but I just want to be upfront that it

10   quite likely won't be readable because it isn't something that

11   I can take from the original form and produce well.  And I

12   don't know that it will read well, you know, when copied or

13   reformatted.

14         So I can't make the same assurances on that that I

15   can with the stuff that I've already produced that I know

16   that -- or that I believe we can make word searchable.

17   THE COURT:  Can you give me an idea of the volume?

18   You're talking about a three-year period.

19   MS. JUMP:  Uh-huh.  So for the --

20   THE COURT:  For Al-Meezan.

21   MS. JUMP:  -- 2005 to 2008.

22   THE COURT:  Yes.  '7.

23   MS. JUMP:  '7.  Sorry.  2005 to 2007.  I believe, and

24   I will verify, but I believe that it was monthly.  So we'd be

25   looking at --

```
 1            THE COURT:  36.

 2            MS. JUMP:  -- 36 issues.

 3            I don't know how long they are.  I don't know how

 4   many pages for each.  And again, I don't know if we're

 5   talking, you know, irregular, large sheets or if we're talking

 6   easily scannable sheets.  I just -- I don't know.

 7            THE COURT:  Okay.

 8            MS. JUMP:  I know that for the whole, what he has to

 9   go through, 2015, you know, all copies that he has of it,

10   that's a room.  I know that.  But that --

11            THE COURT:  That's --

12            MS. JUMP:  -- is --

13            THE COURT:  So I don't think on this issue, we have

14   the same issue about searchability and so forth because it's a

15   hard copy form.  Why don't you -- maybe do you do, ever use a

16   copy service?

17            MS. JUMP:  We can.  We don't have one that we use

18   regularly -- sorry.  But we certainly could find one.

19            THE COURT:  Okay.  Maybe a copy service could do it

20   better; not a criticism of, you know, your photocopy skills.

21            MS. JUMP:  I don't strive to be the best at that.  I

22   don't see that being rewarded.

23            THE COURT:  Well, it's useful to be able to do it.

24   I've had late nights where I've had -- end of a settlement

25   conference, I've had to make sure something has been copied.
```

1          But I think in order to make it readable, what I

2  would suggest is maybe you take one and figure out with a copy

3  service the best way to get it done in a readable fashion and

4  then share it with the plaintiffs' side so everybody agrees

5  that this is the best we can do.

6          MS. JUMP:  I can do that, your Honor.  My concern

7  then would be cost.

8          THE COURT:  Right.

9          MS. JUMP:  We are a nonprofit.  We're not, you know,

10  operating off a whole bunch of fees or anything.  So depending

11  on how -- I don't know the answer, but I have concerns as to

12  seeing that cost escalate.

13          THE COURT:  Well, let's see what the cost is.  You

14  know, and that's something, you know, that you should talk

15  with the plaintiffs about, too, right.  And maybe the idea

16  would be, do one of them, see, you know, what the best way is

17  that you can get it readable, what the cost is, and provide

18  that to them and then they can look at that, they can see, if

19  it turns out the cost is not that great, then it's not that

20  great.  If it turns out to be a big cost, then you have a

21  discussion, you say, "Yes, I want all of these, I don't want

22  all of these.  We can do something on the cost."  You know,

23  whatever the conversations are that people usually have or

24  should have.  Okay?

25          MS. JUMP:  Yes.  We will do that, your Honor.

1          MR. WOOLLEY:  Yes.

2          THE COURT:  All right.  Anything else?

3          Okay.  I think we've dealt with -- oh, there's the

4   one other motion, the motion --

5          MR. WOOLLEY:  Confidentiality motion.

6          THE COURT:  -- concerning the request to remove

7   confidentiality designations.  Ms. Jump, you asked to be able

8   to respond to that in writing.

9          MS. JUMP:  Yes, your Honor.

10          THE COURT:  That's fine.  How long would you like to

11   do that?

12          MS. JUMP:  Normally, I would say seven days, your

13   Honor, but I have a Third Circuit brief due pretty soon --

14          THE COURT:  Well, I think the priority given to

15   working on -- I don't want to get you in trouble with the

16   Third Circuit.  Do that.  And get these documents -- you know,

17   get an agreement on when they're going to be produced.  Get

18   all of that under way, you know, because I don't think that

19   there's an urgency on the confidentiality designation issue.

20          So what would be a reasonable time for you?

21          MS. JUMP:  If I could have 30 days, your Honor.

22          THE COURT:  Any objection?

23          MR. WOOLLEY:  No.

24          THE COURT:  Okay.  So that would take us to August

25   10th, right?

1          THE CLERK:  August 3rd.

2          Yes, August 10th.

3          THE COURT:  Okay -- no.  August 11th because today is

4   the 12th.

5          THE CLERK:  Well, the 11th is a Saturday.

6          THE COURT:  Right.  So we'll give you until Monday

7   the 13th.

8          MS. JUMP:  I appreciate that, your Honor.

9          THE COURT:  And if you'd like a reply, I'll let you

10  have a reply.

11         MR. WOOLLEY:  Two weeks.

12         THE COURT:  27th.  All right.  So I think that that

13  takes care of all of the motions, right.  The plaintiffs'

14  motion to compel is granted in part, denied in part.

15         The defendants' motion to quash and for protective

16  order is granted in part, denied in part.  The motion to file

17  a sur reply under seal is granted.  And the motion to strike

18  the designations of confidentiality, we set the briefing

19  schedule:  Response, August 13th; reply, August 27th.

20         MR. WOOLLEY:  And the motion to file that under seal

21  is granted as well.

22         THE COURT:  Yes.  Okay.

23         MS. JUMP:  I think that does it.

24         THE COURT:  Okay.  I've got to get out of here before

25  I come up with something else.

1          You know, I'm not trying to gin up business for the

2    fine court reporter here, but I would urge you to get a

3    transcript of this proceeding.  I'm going to summarize my

4    ruling, but I think it will help you to have the backdrop to

5    it.

6          MS. JUMP:  Yes, your Honor.

7          THE COURT:  All right.  Very good.  Thanks a lot.

8          MS. JUMP:  Thank you.

9          MR. WOOLLEY:  Thank you, your Honor.

10          THE CLERK:  All rise.  Court stands in recess.

11      (Proceedings adjourned at 3:00 p.m.)

12                    * * * * * * *

13              C E R T I F I C A T E

14          I, Judith A. Walsh, do hereby certify that the

15    foregoing is a complete, true, and accurate transcript of the

16    proceedings had in the above-entitled case before the

17    Honorable SIDNEY I. SCHENKIER, one of the judges of said

18    Court, at Chicago, Illinois, on July 12, 2018.

19

20    /s/ Judith A. Walsh, CSR, RDR, F/CRR_____  July 25, 2018

21    Official Court Reporter

22    United States District Court

23    Northern District of Illinois

24    Eastern Division

25