IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY BOIM, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DAVID BOIM, DECEASED, AND JOYCE BOIM, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN MUSLIMS FOR PALESTINE; AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION; RAFEEQ JABER; ABDELBASSET HAMAYEL; AND OSAMA ABUIRSHAID, <br><br> Defendants. | Civil No. 17-cv-03591 <br><br> Hon. Sharon Johnson Coleman <br><br> **Hon. Sidney I. Schenkier** |

### PLAINTIFFS' MOTION FOR LEAVE TO TAKE TWO ADDITIONAL DEPOSITIONS, TO COMPEL ANSWERS TO DEPOSITION QUESTIONS, AND TO COMPEL FURTHER DOCUMENT PRODUCTION

Pursuant to Federal Rule of Civil Procedure 37(a) and the Court's Minute Order of July 12, 2018 (Dkt. 90), plaintiffs Stanley Boim, Individually and as Administrator of the Estate of David Boim, Deceased, and Joyce Boim, hereby move for an order: (i) granting plaintiffs leave to take the depositions of Hatem Bazian and Salah Sarsour limited to issues pertinent to the existence of an alter ego relationship; (ii) compelling deponents Rafeeq Jaber and Osama Abuirshaid to appear (by telephone) to continuations of their depositions to provide answers to certain deposition questions they were improperly instructed not to answer; and (iii) compelling defendants to produce e-mailed AMP/AJP newsletters through 2010 and e-mail lists used to distribute newsletters. In support of this motion, plaintiffs state as follows:

#### Introduction

1. In January of this year, Judge Coleman vacated her prior order dismissing plaintiffs' complaint without prejudice for lack of subject matter jurisdiction and authorized plaintiffs to take

limited jurisdictional discovery on the existence of an alter-ego relationship. (Dkt. 50.) After concluding the depositions of defendants Abdelbasset Hamayel, Osama Abuirshaid and Rafeeq Jaber (together, the "Individual Defendants"), and AMP/AJP director Munjed Ahmad, plaintiffs have now completed what they expect will be the bulk of that preliminary phase of discovery.

2. The depositions revealed, however, that the discovery defendants have provided to date has a critical gap: Plaintiffs still have received very little information about the formation and early stages of AMP in 2005 and 2006. Defendants claim to have virtually no documents left from this time period, and their written interrogatory responses provide minimal information. Defendants submitted a declaration by Munjed Ahmad suggesting Ahmad was knowledgeable about the creation of AMP and had authored the only extant documents from this time period. But Ahmad's November 8, 2018 deposition revealed that Ahmad has extremely limited recollection of 2005-2006 events. He appears to have been primarily involved with a group of high school and college students who at no point played any significant role in AMP. Meanwhile, the adults who *did* go on to lead AMP—Hatem Bazian (AMP's Chairman), Salah Sarsour (an AMP board member), and possibly others—were simultaneously engaged in meaningful formation activities of their own, *without Munjed Ahmad*. Consequently, even for purposes of limited jurisdictional discovery, Ahmad's testimony on the genesis of AMP turned out to be virtually worthless. Although defendants would like to hide behind Ahmad's non-involvement and poor memory, plaintiffs need to depose Bazian and Sarsour to find out what really happened.

3. Two other discovery deficiencies also emerged from the depositions. <u>First</u>, plaintiffs' examinations were hampered by repeated improper instructions not to answer deposition questions in violation of Federal Rule of Civil Procedure 30(c)(2). Plaintiffs request that the Court compel defendants Jaber and Abuirshaid to appear (by telephone) to provide proper, non-evasive answers to certain questions they were instructed not to answer (described below) and reasonable follow-up

2

questions.  Second, defendant Hamayel confirmed during his deposition that AMP sent frequent e-mail newsletters starting around 2009 and continues to maintain an e-mail list and send such newsletters to this day.  Plaintiffs request that the Court compel defendants to produce e-mailed newsletters at least from 2010 and before, as well as any e-mail list identifying the addressees of those newsletters.

## Background

4.  In 2000, plaintiffs filed an action in this Court, *Stanley Boim, et al. v. Quranic Literacy Institute, et al.*, No. 00-cv-2905, seeking to recover damages for the terrorist murder of their son from American persons and organizations that provided material support to Hamas.  This Court entered judgment in favor of Plaintiffs, holding several of those defendants (the "*Boim* Defendants") liable for $156 million.  Plaintiffs have collected only a small percentage of their judgment and instituted this lawsuit seeking to recover the unpaid portion because AMP/AJP are the successors and alter egos of the *Boim* Defendants.

5.  On June 12, 2017, defendants moved to dismiss under Fed. R. Civ. P. 12(b)(1), arguing that the Court lacks subject matter jurisdiction.  (Dkt 31.)  The Court dismissed the complaint without prejudice on August 18, 2017 (Dkt 40, 41), concluding that this was a "close" case, but that "[o]n these facts…plaintiffs fail to demonstrate the requisite level of unity of interest and control" to support alter ego claims.  (*Id.* at 8, 10.)  Plaintiffs moved to reconsider, and the Court granted plaintiffs' motion on January 4, 2017, vacating its previous order.  (Dkt 50.)  The Court held that it had should have provided plaintiffs "the opportunity to conduct limited jurisdictional discovery on the existence of an alter ego relationship" and authorized plaintiffs to "conduct discovery solely to address jurisdiction."  (*Id.*)

6.  On January 18, 2018, plaintiffs served document requests and interrogatories.  Following extensive efforts to resolve the deficiencies in defendants' initial responses, plaintiffs

3

moved to compel further responses on May 14, 2018. (*See* Dkt. 54, 56.) Plaintiffs also noticed four depositions of the three individual defendants in this case, along with Munjed Ahmad, an AMP/AJP director who submitted a declaration purporting to address, among other things, the formation and early operation of AMP in 2005 and 2006. Defendants moved to quash those depositions. (Dkt. 65, 67.)

7. This Court ruled on both motions on July 12, 2018. The Court granted in part and denied in part plaintiffs' motion to compel, ordering further responses to certain interrogatories and document requests. (Dkt. 90; Dkt. 94.) Among other things, the Court granted plaintiffs' motion to compel production of documents and information concerning: (i) the decision to form AMP and the identity of all persons involved in the formation (Dkt. 94 at 11-12) and (ii) newsletters or other publications distributed by the Entity Defendants through 2010 (*id.* at 14).

8. The Court denied defendants' motion to quash insofar as it sought to limit further production of information as to written requests that had already been served, but ordered that the parties may not issue additional discovery without agreement or court order. (Dkt. 90.) The Court also denied defendants' motion to quash the deposition notices and denied defendants' oral motion to bar questioning for periods after 2010, although it reminded plaintiffs that information after that period was of marginal relevance and inquiry after that time period should be extremely limited. (Dkt. 90.)

9. Following the Court's ruling, defendants provided supplemental interrogatory responses for the Individual Defendants and for AMP/AJP (8/27/18 Defs.' 2d Am. Objections and Resps. to Jurisdiction Interrogs. to AMP/AJP (excerpts attached as Exhibit A)), a number of additional documents, amended declarations for the Individual Defendants, and an amended declaration for Ahmad (8/25/18 Decl. M. Ahmad (without confidential exhibit, Exhibit B)). As the Court directed, the parties scheduled and proceeded with the depositions of the three Individual

4

Defendants and Ahmad. (*See* Ahmad Tr. (excerpts attached as Exhibit C); Jaber Tr. (excerpts attached as Exhibit D); Abuirshaid Tr. (excerpts attached as Exhibit E); Hamayel Tr. (excerpts attached as Exhibit F).)

10. At the November 16, 2018 status hearing before this Court, plaintiffs reported that they were still awaiting deposition transcripts but expected to seek additional depositions and to compel further compliance with discovery. Plaintiffs' counsel e-mailed defendants' counsel on November 29 (i) requesting agreement to take limited depositions of Bazian and Sarsour, and explaining why these were necessary; (ii) reiterating plaintiffs' position that they were entitled to answers to questions defendants improperly instructed witnesses not to answer; and (iii) identifying two areas where plaintiffs believe defendants failed to comply fully with the document requests. (E-mail chain between Woolley and Jump (Exhibit G).)

11. On December 4, 2018, the parties held a telephone conference regarding the issues plaintiffs identified. Defendants' counsel was unwilling to agree to depositions of Bazian or Sarsour, stood by her objections and instructions not to answer, and refused to produce any further documents. Defendants' counsel confirmed these positions in an e-mail response later on December 4. (*Id.*) Based on defendants' representation that no further documents exist, plaintiffs have dropped their demand for financial and bank records showing donations. This motion requests that the Court authorize and compel the remaining limited discovery described below.

12. Plaintiffs believe the remaining discovery requested in this motion can be completed within 30 days, after which plaintiffs will seek leave to file their amended complaint.

## Argument

### A. The Court Should Authorize Depositions of Hatem Bazian and Salah Sarsour Limited To Issues Related to the Existence of an Alter Ego Relationship.

13. Plaintiffs seek leave to take depositions of Bazian and Sarsour limited to issues related to the existence of an alter-ego relationship. The primary reason for this request is that the

discovery and depositions to date have provided very little information about the formation and early operation of AMP, including the people involved in its initial stages and planning its first convention, which took place in November 2006.

14. Plaintiffs initially requested this information through written discovery. However, defendants' written discovery responses on the formation and early operation of AMP have been extremely sparse. Aside from the bald incorporation documents for AMP, the only documents defendants have produced from the formation stage are three pages of handwritten notes and a PowerPoint presentation from Munjed Ahmad's files. These documents contain little substantive information. As discussed below, the notes pertain to meetings with high school- and college-age students who never went on to play any significant role with AMP. Ahmad himself describes the PowerPoint presentation as "proposed" and "aspirational"—the referenced directors, committees and workshops never occurred. (Ex. B ¶ 9.)

15. Plaintiffs also received defendants' narrative response to Interrogatory No. 5 and a corresponding narrative in Ahmad's declaration. (Exs. A, B.) These too contain little substantive information. Ahmad attests that "AMP was envisioned and first discussed in the later part of 2005, beginning in approximately August 2005, and was officially created in August 2006" and states that he "initially discussed the concept of starting an education-based non-profit organization, with the purpose of educating youth in America on Palestine and its history, with Nabila Dache," a friend he grew up with who never became involved in AMP. (Ex. B ¶¶ 5-6.) He indicates that he also had discussions with Bazian, who has continued to be involved with AMP/AJP. (*Id.*) Defendants' narrative response also identifies Bushra Zaibak as someone who assisted in coordinating the bazaar at the initial 2006 AMP conference. (Ex. A.)

16. Plaintiffs noticed and took Ahmad's deposition because defendants put him forward as a knowledgeable witness on the creation of AMP—by producing his (and only his) documents on

6

the issue and submitting his declaration. It quickly became apparent, however, that Ahmad could provide virtually no material information. Ahmad answered overwhelming numbers of questions by saying he did not recall or know the answer,[1] and his answers made clear that: (i) he has an extremely limited memory of any events from 2005 or 2006; (ii) his early-stage meetings involved high school- and college-age people who never went on to play any significant role with AMP; (iii) he had no involvement in contemporaneous efforts by Bazian, Sarsour and potentially others in the formation of what became AMP. For example, Ahmad testified that:

- His initial conversations about starting a new organization took place sometime in 2005 and were with Nabila Dache, a person he knew growing up who never became a board member. (Ex. C at 92-93.)

- Sometime in 2005 and 2006, he attended 2 to 3 meetings about starting a new organization. (*Id.* at 94) He does not independently recall who attended these meetings. (*Id.* at 96) [REDACTED]

  (*Id.* at 116-17, 118, 122.)

- One meeting took place at the Muslim American Society ("MAS") convention in Milwaukee on April 14, 2006. (*Id.* at 94.) This meeting included the same group of youths as the other meetings; Bazian was not there. (*Id.* at 107-108.) This was the only meeting Ahmad participated in at the MAS convention (*id.* at 107), and he does not recall what was discussed at the meeting. (*Id.* at 109.)

- Ahmad did not know Bazian before the April 2006 MAS convention and does not recall how he was introduced to Bazian or where their first discussion took place. (*Id.* at 99-101.) However, he believes his discussions with Bazian all took place *after* the MAS convention. (*Id.* at 101.) He thinks his meetings with Bazian were in person, but does not recall. (*Id.*)

- Ahmad had no discussion of AMP with any of the Sarsour family prior to the MAS convention. (*Id.* at 98.) Although he knew Salah Sarsour, he does not recall meeting with him about the new organization. (*Id.* at 133.)

- He did not hear that Bazian and Sarsour had met with Abuirshaid to urge him to join the new organization and does not even think he knew Abuirshaid at the time. (*Id.* at 109.)

---

[1] Searches of Ahmad's deposition transcript for "don't recall" and "don't remember" yielded a total of 332 hits. A separate search for "don't know" yielded 185 more hits. (*See* Search Screenshots (Exhibit H).)

- ██████████████████████████████████████████████████
  ██████████████████████████████ (Exhibit I)), Ahmad never heard of Nabhan in connection with the startup of AMP (Ex. C at 134), ████████████████████
  ████████████████ (*id.* at 136), and does not recall if Nabhan was involved in planning the 2006 and 2007 conventions. (*Id.* at 136-37.)

- He cannot recall details of what occurred between the April MAS meeting and the August 2006 incorporation of AMP, and he does not recall if he participated in any further meetings or in communicating via e-mails or electronic bulletin boards. (*Id.* at 138.) He had no role in filing the AMP incorporation documents in California. (*Id.* at 109-110.)

- He does not recall how many discussions with Bazian occurred (*id.* at 101), does not remember what Bazian specifically told him about the need for a new organization (*id.* at 102), does not remember the specifics of the conversations, does not recall the length of the conversations, does not recall if Bazian was focused on youth or education in general, does not recall what aspects of Palestine were of interest to Bazian (*id.* at 103), does not recall the context of the discussion about moving forward to incorporate AMP (*id.* at 104), and does not recall if anyone else was involved in any of the discussions (*id.* at 140).

- Ahmad does not know if Bazian was working with anyone else to start AMP and stated that if we wanted to know if Bazian was working with anyone else on the concept, "[we]'d **have to ask him**." (*Id.* at 102 (emphasis added).)

- Ahmad does not recall whose idea it was to have an annual conference or who came up with the format. (*Id.* at 104.) He has no recollection of discussing whether there should be youth events as well as adult events and does not recall whether Bazian talked to him about doing some of the events in Arabic. (*Id.* at 105.) He does not recall when AMP decided to have a convention (which took place three months after it was incorporated) (*id.* at 143-144), who was on the steering committee (*id.* at 144, 148), or who decided to hold it over Thanksgiving weekend of 2006. (*Id.* at 145.)

17. Meanwhile, plaintiffs have learned from other sources that Bazian and Sarsour (and likely others) began working on their own, without the involvement of Ahmad or his group of high school- and college-age students. For instance, AMP/AJP's National Policy Director (and former IAP board member and leading staff member) Osama Abuirshaid testified that he was invited to a meeting with Bazian and Sarsour in 2005 or 2006 in which they discussed "the need for an organization that works for Palestine." (Ex. E at 178-181.) Abuirshaid (like Ahmad) did not recall

8

Case: 1:17-cv-03591 Document #: 106 Filed: 12/07/18 Page 9 of 15 PageID #:1551

Ahmad being at the meeting and did not think he knew Ahmad at the time. (*Id.* at 182.)

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬ (Ex. I.) These two adult early donors were associated with IAP, part of the early AMP/AJP leadership and remain on the board to this day.

18. In short, Ahmad had virtually no value as a witness on the creation and early days of AMP—notwithstanding that defendants had *him* submit declarations on this topic in support of their discovery responses. Plaintiffs need to depose witnesses who were actually involved in the *real* formation of AMP, not a high school- and college-age group that was merely "aspirational" and never went on to have any meaningful role in the actual organization.

    **B.**    **The Court Should Compel Witnesses to Answer Deposition Questions They Were Improperly Instructed Not to Answer.**

19. Federal Rule of Civil Procedure 30(c)(2) specifies that there are only three circumstances in which counsel can properly instruct a witness not to answer a deposition question:

> A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3) [to terminate or limit the deposition on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party].

Fed. R. Civ. P. 30(c)(2). During a deposition, "[c]ounsel for the witness may halt the deposition and apply for a protective order, see Rule 30(d)(4), but must not instruct the witness to remain silent." *Redwood v. Dobson*, 476 F.3d 462, 467-68 (7th Cir. 2007); *see also BP Amoco v. Flint Hills Res.*, No. 05-CV-5661, 2009 U.S. Dist. LEXIS 131, at *11 (N.D. Ill. Feb. 11, 2009) (Exhibit J) (instructions not to answer the questions regarding the Texas City incident based on relevancy were not sanctioned by the Federal Rules and were clearly improper); *Eggleston v. Chicago Journeyman Plumbers' Local Union No. 130*, 657 F.2d 890, 903 (7th Cir. 1981) (deponents must continue to answer after counsel registers an

9

objection); *Specht v. Google, Inc.*, 268 F.R.D. 596, 598 (N.D. Ill. 2010) (witness must answer question after an objection; "[t]he only exceptions are those stated in the last sentence of Rule 30(c)(2)").

20. Despite the clear rules in this jurisdiction, defendants' counsel repeatedly disrupted the depositions with improper instructions not to answer. In a number of cases, counsel instructed witnesses not to answer based on objections with no relation to any Court order or comment, such as "IAP is not relevant," the exhibit "speaks for itself as to what it says," ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and a 2010 AMP tax return ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*See, e.g.*, Ex. E at 163, 269; Ex. D at 146, 214.)

21. In other cases, defendants' counsel attempted to enforce a zero-tolerance policy (at least for sensitive areas of inquiry) for questions arguably based on any document or event after 2010. Plaintiffs are mindful of the Court's admonition to limit post-2010 questioning in the jurisdictional discovery phase, and for that reason avoided extensive questioning about post-2010 events. However, the Court expressly declined to bar *all* such questioning, and plaintiffs believe that certain limited questions about post-2010 documents and events could provide information about *ongoing* practices, policies, conduct, ideology and associations *that continued from before 2010*. This is particularly true here, because defendants claim that they did not retain documents from before 2010, and certain post-2010 documents and events may be the best—or only—means plaintiffs may have of refreshing recollection and establishing pre-2010 facts.

22. If defendants believed plaintiffs were spending too much time on post-2010 conduct or conducting the examinations in bad faith (neither of which was the case), it was incumbent on them to seek a protective order under Rule 30(d)(3). None of the three permissible Rule 30(c)(2) exceptions permitted defendants to instruct these witnesses not to answer based on time periods, "asked and answered," "document speaks for itself," or other objections. Defendants' violations of Rule 30(c)(2) repeatedly and improperly disrupted plaintiffs' examinations, resulted in unnecessary

10

colloquy, prevented plaintiffs from obtaining information they sought, and foreclosed follow-up questioning.

23. Plaintiffs are entitled to proper responses to their unanswered questions and to ask appropriate follow-up questions. For purposes of this motion, plaintiffs are limiting their request for further testimony to 5 particular sections of the Jaber and Abuirshaid transcripts:

    a. <u>Jaber Dep. at 208:08-211:18 (Ex. D)</u>. Jaber was shown a "Profile" of AMP published by the Anti-Defamation League purporting to quote statements he made at 2009 and 2011 conferences, including anti-Israel statements and a remark suggesting an equivalence between AMP and IAP: "The Zionist organizations are the true terrorist organizations … they will be working against AMP and they closed IAP." (Jaber Dep. Ex. 56 at 4, 7 (<u>Exhibit K</u>).) Before any questions were asked, defendants' counsel instructed Jaber "not to answer any questions relating to this document" on the grounds that the document was "not created by any of the defendants in this lawsuit or produced by the defendants in this lawsuit" and was "also dated 2013 which is outside the scope of our relevant time frame." (Ex. D at 209.) This instruction violated Rule 30(c)(2), and defendants' objections are meritless. Indeed, these statements are heavily probative of the connection between IAP and AMP, as well as ongoing views and ideology of AMP and one of its most frequent speakers going clear back to 2006 (who also happened to be the President of IAP).

    b. <u>Jaber 143:09-146:24</u>. 

    c. <u>Abuirshaid 160:19-164:08 (Ex. E)</u>. Abuirshaid was asked to provide details regarding what he had heard about Salah Sarsour and his brother Jamil being imprisoned overseas. Plaintiffs are informed and believe that both Salah and Jamil were imprisoned in Israel for supporting Hamas. According to a 2001 FBI memorandum, Jamil was arrested in late-1998 for providing financial assistance to Hamas and described in an FBI interview the involvement of his brothers Salah and Imad (a former IAP board member) with Hamas fundraising activities through *Boim* Defendant the Holy Land Foundation ("HLF"). (11/5/2001 FBI Memo at 48 (<u>Exhibit L</u>).) Counsel instructed

11

        Abuirshaid not to answer and cut off this line of questioning based on objections that (i) the testimony related to time periods before 2005, (ii) "IAP is not relevant as to whether there's alter-ego," and (iii) "IAP is not represented at this deposition." None of these objections has merit—AMP is IAP's alleged alter-ego, and pre-2005 facts about IAP are front and center in this case. Obviously, defendants would prefer to prevent inquiry into a key AMP founder and director's past connections with Hamas and HLF (as well as AMP/AJP's National Policy Director's awareness of those connections), but this evidence is very relevant to this case.

    d.    <u>Abuirshaid 264:03-266:06; 269:13-21; 270:18-271:19</u>.



    e.    <u>Abuirshaid 286:14-290:15</u>. Abuirshaid was shown an article posted in Arabic on the internet, along with an English translation. (Abuirshaid Dep. Ex. 40 (<u>Exhibit M</u>).) He was asked (without vouching for the accuracy of the translation) simply to identify the article as something he wrote. After a series of obstructionist objections and evasive answers, defendants' counsel ultimately instructed Abuirshaid not to answer because the article was dated 2014. If this radically pro-Hamas article was indeed written by AMP/AJP's National Policy Director (who was also on the IAP board), it reflects a continuity of ideology stretching back to IAP. Plaintiffs' questions attempting to identify this article should be answered.

24.    Plaintiffs request that the Court order the depositions of Abuirshaid and Jaber to be continued for the purpose of answering these five sets of questions and any reasonable follow-up questions. Plaintiffs do not object to conducting these continued examinations by telephone to avoid requiring the witnesses to travel (but request that the court reporter be present in Chicago).

12

### C. The Court Should Compel Defendants to Produce Newsletters and Newsletter Recipients.

25. ███████████████████████████████████████████████████████

████████████████████████████ (Ex. F at 141-146.) ████████████████████

████████████████████████████████████████████████████████████

████ *Id.* at 146.)  None of the newsletters or recipient lists has been produced.

26. Defendants' position on the newsletters is that "to the extent anything was sent out, it is contained currently on the website, which has been produced to you in its full archival nature." (Ex. G, 12/4/18 Email from Jump to Woolley.)  Defendants' attempt to fall back, once again, on the production of publicly available internet material is unsatisfactory and contrary to the Court's July 12, 2018 ruling that defendants must produce "newsletters or other publications distributed by the entity defendants, whether in English or in Arabic" through 2010.  (Dkt. 94 at 14.)

27. With respect to the e-mail list used for the distributions, defendants assert that no "snapshot" has been maintained for the 2005-2010 timeframe, and the current lists "at most, are inextricably intertwined with any prior known emails and therefore not separable." (Ex. G, 12/4/18 Email from Jump to Woolley.)  Again, this argument is without merit.  If the current version of the list is the *only* version available (because there has been continuous updating), the fact that it may be over-inclusive should not prevent production.  Although not raised during the recent discovery conference, defendants have also previously expressed concerns about email recipients' purported "privacy rights."  Plaintiffs addressed that issue fully in their reply in support of their first motion to compel (*see* Dkt. 76 at 11) and will not repeat those arguments here, except to say defendants can alleviate any privacy concerns by designating the e-mail list information "confidential" under the confidentiality order.

### LR 37.2 Certification

28. Pursuant to Fed. R. Civ. P. 37(a)(1) and Local Rule 37.2, plaintiffs' counsel certify

13

that they have in good faith conferred with defendants' counsel in an effort to obtain compliance with defendants' discovery obligations and to obtain agreement to the two additional requested depositions without court action. Counsel's efforts included a telephone conference on December 4, 2018 at approximately 4:00 p.m., as well as a substantive e-mail on November 29, 2018. Counsel for Plaintiffs (W. Allen Woolley and Seth H. Corthell) and for Defendants (Christina Jump) participated in the telephone conference.

NOW THEREFORE, for the foregoing reasons, plaintiffs request that the Court grant this motion and enter an order:

Dated: December 7, 2018                              Respectfully submitted,

                                                     ___/s/ W. Allen Woolley_____
                                                     Stephen J. Landes
                                                     W. Allen Woolley
                                                     Michael B. Kind
                                                     LOCKE LORD LLP
                                                     111 South Wacker Drive
                                                     Chicago, IL 60606
                                                     (312) 201-2772
                                                     *Attorneys for Stanley Boim, Individually and as the Administrator of the Estate of David Boim, Deceased, and Joyce Boim*

Of Counsel
Nathan Lewin (*pro hac vice*)
Alyza D. Lewin (*pro hac vice*)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, DC 20006
(202) 828-1000

Daniel I. Schlessinger
Seth H. Corthell
JASZCZUK P.C.
311 South Wacker Drive, Suite 3200
Chicago, Illinois 60606
(312) 442-0509