# EXHIBIT A

```
  1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
  2                    EASTERN DIVISION

  3   STANLEY BOIM, Individually and  )
      on behalf of the Estate of      )
  4   David Boim, et al.,             )
                                      )
  5              Plaintiffs,          )
                                      )
  6              v.                   ) No. 17 CV 03591
                                      )
  7   AMERICAN MUSLIMS FOR PALESTINE, )
      et al.,                         )
  8                                   ) Chicago, Illinois
                                      ) July 12, 2018
  9              Defendants.          ) 1:34 p.m.

 10               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SIDNEY I. SCHENKIER
 11
      APPEARANCES:
 12   For the Plaintiffs:      LOCKE LORD, LLP
                               BY:  MR. W. ALLEN WOOLLEY
 13                                 MR. STEPHEN J. LANDES
                               111 South Wacker Drive, Suite 4400
 14                            Chicago, Illinois 60606
                               (312) 201-2676
 15
                               JASZCZUK, P.C.
 16                            BY:  MR. DANIEL I. SCHLESSINGER
                               311 South Wacker Drive, Suite 1775
 17                            Chicago, Illinois 60606
                               (312) 442-0366
 18
      For the Defendants:      MS. CHRISTINA A. JUMP
 19                            Constitutional Law Center for
                               Muslims in America
 20                            833 East Arapaho Road, Suite 102
                               Richardson, Texas 75081
 21                            (972) 914-2507

 22   ALSO PRESENT:           MR. ARI HOFFMAN

 23   Court Reporter:         Judith A. Walsh, CSR, RDR, CRR
                              Official Court Reporter
 24                           219 S. Dearborn Street, Room 1944
                              Chicago, Illinois 60604
 25                           (312) 702-8865
                              judith_walsh@ilnd.uscourts.gov
```

1        And I understand there can be an overlap between

2   issues of successorship and alter ego, but certainly, I don't

3   believe that the order contemplated that there would be any

4   discovery permitted insofar as it would pertain solely to a

5   successor theory of liability.

6        Third, the plaintiffs attached as Exhibits 1 and 2 to

7   their memorandum in support of their motion Congressional

8   testimony by Jonathan Schanzer of the Foundation for Defense

9   of Democracies dated April 19th and then May 12th, both of

10  2016.  The testimony discusses various defendants in this case

11  and in the original suit.

12       Plaintiffs cite to this testimony, not merely as

13  evidence but really as establishing the fact that the entity

14  defendants are a continuance of the same organizations that

15  were sued in the original action.  And I cite Page 2 of the

16  memorandum where I think that categorical assertion is made.

17       Now, if the testimony really did all that work, you

18  wouldn't be here.  You wouldn't need discovery.  But I don't

19  find that that testimony establishes anything of the sort.

20  The testimony that you cite to provides no detail about

21  Mr. Schanzer or the organization that he represents.  It

22  provides no detail about how he developed the information.

23  May be completely correct, may be completely incorrect, but I

24  think somebody who gives written testimony to a Congressional

25  committee is providing to that committee information.  That

1    does not make it evidence in the way we look at evidence in a

2    legal proceeding, so I place no weight on that testimony.

3         For what it's worth, I do point out that in the May

4    2016 testimony, Exhibit 2 at Page 7, Mr. Schanzer does state

5    that his organization, I quote, "has not seen any evidence

6    that AMP is engaged in any illicit activity."

7         Fourth, I am concerned about the time scope for the

8    requests which all run from 2004 to the present.  Plaintiffs

9    in their memorandum stake out the position that the original

10   defendants "did not really shut down at all."  And I'm quoting

11   here.  "They regrouped as two new entities," AMP and AJP --

12   I'm quoting now -- "which started up just as the old entities

13   purported to close."  That's in the opening memorandum at 2.

14        While the parties debate whether the current entity

15   defendants were created in 2005 and 2008 or 2006 and 2009, in

16   either event, the discovery sought extends far beyond that

17   time period and all the way through 2017.  And I have serious

18   question about the relevance of much of the discovery the

19   farther away we get from the formative period, which I would

20   say is no later than through 2010.

21        But even assuming that there would be some relevance

22   to a period thereafter, I must consider the question of

23   proportionality.  And if getting information for the time

24   period after 2010, you know, imposes no great difficulty, like

25   lists of directors and officers, which has been provided,

1          MR. WOOLLEY:  In the leadership.

2          THE COURT:  Okay.

3          MR. WOOLLEY:  The same people came into the

4    leadership of the new organizations.  The same people had a

5    following or a good will that they had developed --

6          THE COURT:  But --

7          MR. WOOLLEY:  -- with a whole bunch of other people

8    in the --

9          THE COURT:  I understand that, but that's an earlier

10   request:  The creation of the infrastructure, the identity of

11   the officers and directors.  And so that would give you that

12   information to lay side by side with the information of the

13   original defendants, but we're talk -- we're talking now about

14   a different matter.  You're talking about donors and sponsors.

15   And so in order for you to make that "stepping into the shoes"

16   case, you'd have to be able to compare it to something.

17         MR. WOOLLEY:  And so what it --

18         THE COURT:  So here's what I'm not inclined to do.

19   I'm not inclined to give discovery into the organizations

20   that's not sufficiently tethered to the jurisdictional

21   question.  On donors and sponsors and fundraising, in order to

22   do that, you have to show me that you have information from

23   the original defendants that allows you, if you got this

24   information from these defendants to, say, hey, of the 50

25   donors for the originals -- I'm making up numbers -- 49 are

1        THE COURT:  Well, here's what I'll tell you.  If it

2   doesn't, I'll create an eighth category.

3        MR. WOOLLEY:  Okay.

4        THE COURT:  Because the point of this again is not to

5   simply get discovery for other purposes into the

6   organizations.  It is for this particular case.  And one thing

7   the order does provide is that anything that's subject to the

8   confidentiality order is for use only in this case.

9        MR. WOOLLEY:  Okay.

10       THE COURT:  All right.  So anything that is produced,

11  I will allow to be designated as confidential under that

12  protective order -- or confidentiality order, more accurately

13  stated.

14       With respect to the next category, which is

15  relationships, communications, supports, affiliations, shared

16  leadership, or personnel transfer with the network entities or

17  persons, I understand the plaintiffs' theory is that that

18  overlap between the new entities and the old would again

19  advance their claim for alter ego.

20       One objection of the defendant is that -- or

21  defendants is that they dispute the whole concept that there

22  are network persons or network entities.  And that can be a

23  problem in discovery requests when people define a term in a

24  way that the other side is worried that if they answer,

25  they're adopting that term, and so that term is going to be

1    then I spoke with two individuals whose names I'd have to

2    verify who do the publicity and publications and those sorts

3    of statements for the organizations.

4         THE COURT:  All right.  That's a somewhat more robust

5    scope of email search than plaintiffs may have understood,

6    certainly more than they said in the papers.  Mindful that I

7    talked about the lack of utility, in my view, of going later

8    than 2010 in terms of this kind of search, what is it -- what

9    more would you be asking for based on what you've heard

10   Ms. Jump represent concerning which custodians they asked to

11   search?

12        MR. WOOLLEY:  We don't -- I appreciate Ms. Jump

13   filling us in on who was searched.  We only got emails from

14   two, Ms. Sremski and Mr. Ahmad.  Neither of those two were

15   people who were around in the IAP days.  I believe Mr. Ahmad

16   was in law school, and Ms. Sremski never had come around.

17        We are most interested in the emails that the people

18   who were actually involved across the board might have.  That

19   would include Hatim Bhasian, who was the person whose name is

20   on the incorporation documents and who, as far as I can tell,

21   has been a, if not the, leader of this new organization

22   throughout the entire time period and still is.

23        There are also the individual defendants.  It's hard

24   for us to believe they don't have anything that's relevant in

25   their emails.  And they haven't provided anything.

1   as being people who were involved in the IAP days, looked like

2   they might have been involved in the transition and who are

3   still involved in -- under control today, and those would be

4   Salah Sarsour.

5           THE COURT:  I'm sorry.  Spell the name.

6           MR. WOOLLEY:  S-a-r-s-o-u-r.

7           Sufian Nabhan, which is N-a-b-h-a-n; and Hussein Al,

8   A-l, dash, K-h-a-t-i-b.

9           THE COURT:  Khatib?

10          MR. WOOLLEY:  Yes.

11          THE COURT:  Okay.

12          MS. JUMP:  You know, I will say that not -- I'd have

13  to double-check the list.  They're certainly not current

14  leaders of the organization and they are -- some of them, I

15  don't believe, are even current board members.  I mean, I can

16  contact them individually and see if they have anything, but I

17  certainly would say that I don't believe that they should be

18  subject to deposition in this matter --

19          THE COURT:  I'm not saying that anybody else gets

20  deposed.

21          MS. JUMP:  I'd be fine checking into them as well.

22  Just to be upfront, I hadn't thus far.

23          THE COURT:  No, I understand.

24          MS. JUMP:  They're not the ones who push -- you know,

25  who are in any control so --

1    It's a very skinny neck on a very large funnel.

2         And so here, I think that given the thoroughness of

3    the original request and the targeted depositions for these

4    particular individual defendants and Mr. Ahmad and given that

5    we are dealing with a very specific issue here, and that is

6    discovery concerning alter ego, I think that the discovery

7    that has been served that now I'm requiring to be supplemented

8    and the depositions that have been noticed are ample to allow

9    the parties to present to Judge Coleman their positions now on

10   the alter ego.

11        So I am going to say that no further discovery may be

12   served absent written agreement of the parties or court order.

13   And the reason that I allow that, I would say, very small

14   safety valve is because, you know, you never can predict what

15   may come up in a deposition.  And in fairness, if something

16   comes up and it seems reasonable that there be something

17   that's specific to the new item that came up, I would hope the

18   parties would be able to work that out; but on the other hand,

19   that's not a lever to come running into court saying, "I want

20   five more depositions" because that would be a very steep run

21   uphill.

22        So I grant that part of the motion.  And again, I

23   want to emphasize, it's not because I think that there's been

24   an abuse in any way, but it's really as part of my authority

25   to exercise control over the discovery process that I do this

1          MR. WOOLLEY:  Well --

2          THE COURT:  Whether they did something in 2013, I'm

3     not sure why that goes to it.

4          MR. WOOLLEY:  Well, there may be, for example,

5     evidence of a connection to -- and I'm making this up.  This

6     is not something I'm reciting something specific on, but for

7     example, if there was an effort to raise funds for an

8     organization that provided funding to Hamas and that happened

9     in 2011, that would seem to me to be a continuation of the old

10    entities' practice that got them in trouble that happened

11    after 2010 that still reflected the fact that the same people

12    were running the organization with the same issues, for the

13    same purpose later on.

14         THE COURT:  Well, I don't know.  I don't know

15    because -- you know, I had a case once where I represented a

16    fellow on appeal in a bank fraud case.  And at trial, the

17    government put into evidence to show federally insured status,

18    an element of bank fraud, a document showing that they were

19    federally insured in 1972.  I'm giving away my age.  Okay.

20    The problem was, the conduct at issue was in 1979.  You know,

21    you can't infer that there was necessarily the case that it

22    was insured in '79 because it was in '72.  Because somebody

23    decided to fundraise or provide funds in 2011 or '12 or '17

24    doesn't mean that they did so in 2005 or '6.  You're getting

25    discovery during that period.  And so I am inclined to limit

# EXHIBIT B

**From:** Christina Jump
**Sent:** Thursday, November 29, 2018 11:40 AM
**To:** Woolley, Allen; Landes, Stephen
**Cc:** Charles Swift; Leila Mustafa
**Subject:** Munjed Ahmad Third Declaration, and Third Amended Interrogatory Objections and Responses of AMP and AJP

Counsel:

Please see the attached updated Declaration of Munjed Ahmad and the updated Interrogatory objections and responses on behalf of AMP and AJP, along with the relevant verifications of Mr. Ahmad.

These updates reflect the information provided by Plaintiffs at the deposition of Mr. Ahmad on November 8, 2018, and as reflected in the transcript of his deposition, which was received one week ago, on November 21, 2018.  The only changes are in regard to the sponsors to and speakers at the 2007 Convention, and are based upon Mr. Ahmad's recollection after being provided the opportunity to review the document produced for the first time during that deposition, which purports to be the program from the 2007 AMP convention (albeit with unidentified handwriting contained within it, as referenced in the deposition transcript, and which was not maintained by AMP, or any other defendant in this matter, in the normal course of business).

There are no other changes to these documents, and they have been updated simply to bring them into accord with recollections after the opportunity to review the document produced by Plaintiffs during the deposition of Mr. Ahmad.

Thank you.

2018.11.29 - Defendants' Third Amended Objections and Rog Responses re AMP and AJP.pdf
2018.11.27 - Third Declaration of Munjed Ahmad with signature page and Confidential Exhibit.pdf

*Christina A. Jump*
Civil Litigation Department Head
Constitutional Law Center for Muslims in America
833 E. Arapaho Rd., Suite 102
Richardson, TX  75081
(972) 914-2507 (main)
(972) 914-2508 (direct)

# EXHIBIT C

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3   STANLEY BOIM, Individually   )
     and as Administrator of the  )
 4   Estate of David Boim,        )
     deceased; and JOYCE BOIM,    )
 5                                )
                  Plaintiffs,     )
 6                                )
 7      vs.                       )  Case No.
                                  )  17-cv-03591
 8   AMERICAN MUSLIMS FOR         )
     PALESTINE; AMERICANS FOR     )
     JUSTICE IN PALESTINE         )
 9   EDUCATIONAL FOUNDATION;      )
     RAFEEQ JABER; ABDELBASSET    )
10   HAMAYEL; AND OSAMA           )
     ABUIRSHAID,                  )
11                                )
                  Defendants.     )
12
13           The deposition of MUNJED AHMAD,
14   called by the Plaintiffs for examination, taken
15   pursuant to the Federal Rules of Civil Procedure
16   of the United States District Courts pertaining
17   to the taking of depositions, taken before
18   Marianne Nee, a Certified Shorthand Reporter of
19   the State of Illinois, CSR License No.
20   084-002341, taken at 111 South Wacker Drive,
21   Suite 4100, Chicago, Illinois, on Thursday,
22   November 8, 2018, commencing at 9:09 a.m.
23
24
```

103

1   on youth specifically or was he focused on

2   education in general?

3       A.   I don't recall.

4       Q.   Did he provide any specifics on what

5   aspects of Palestine he was interested in

6   educating people on?

7       A.   As I said, I don't remember the

8   specificity of these conversations.  I just

9   remember having them.

10      Q.   Okay.  Did Dr. Bazian mention at any

11  time that KindHearts had just been closed down?

12      A.   No, not that I recall.

13      Q.   Did he mention anything about IAP and

14  HLF and AMS being shut down?

15      A.   As I said, I didn't know or hear of

16  these organizations until -- the organizations

17  that you just mentioned until well after the

18  establishment of AMP, so he -- no.

19      Q.   Do you recall how long any of these

20  conversations were?  Were they short, were they

21  long discussions?

22      A.   I mean, I don't know.  I don't recall.

23      Q.   Did you and Dr. Bazian at some point in

24  time agree to move forward on incorporating AMP?

104

1      A.    Yes.

2      Q.    When did that happen?

3      A.    Sometime in 2006.

4      Q.    Do you recall the context of that

5   decision?

6      A.    I honestly don't remember.

7      Q.    Did Dr. Bazian give you any indication

8   as to what he envisioned the new organization

9   actually doing?

10     A.    Just -- you know, it was an educational

11  organization to bring about the Palestinian

12  narrative.

13     Q.    Whose idea was it to have an annual

14  conference?

15     A.    I can't remember.

16     Q.    Was it yours?

17     A.    I don't remember.  It may have been.  I

18  don't remember.

19     Q.    How did the idea as to what the format

20  of the annual conference come to be?

21     A.    Again, you're asking me something that

22  happened, you know, in 2006, so I really -- I

23  can't give you an answer.  I don't remember.

24     Q.    Did you have a discussion as to whether

115

1    up with?

2         A.   I don't recall.

3         Q.   Looking at page 3, going back to those

4    workshops, I believe you indicated in your

5    declaration that these were aspirational and

6    never actually took place?

7         A.   That's correct.

8         Q.   Did you talk to Ziad Hamdan about this

9    organization and participating in any sort of

10   workshops?

11        A.   I don't recall.

12        Q.   Same question for Othman Atta.  Did you

13   talk to him at all?

14        A.   I can't recall if I talked to him or

15   not.

16        Q.   Do you remember if anyone from the ISM

17   provided any input into the creation of this

18   organization?

19        A.   Into the creation, no.

20        Q.   No one did?

21        A.   No one did.

22        Q.   Turning to the next page, there is a

23   list of AMP Milwaukee Directors.  Did you

24   envision at this point in time that -- well,

138

1      Q.   After the MAS convention where you

2  selected the names, what happened next with this

3  organization?

4           MS. JUMP:   Object to the

5       characterization of the previous testimony.

6           You can answer.

7  BY THE WITNESS:

8      A.   Well, sometime in August it was

9  created.  Can I tell you the details of how,

10 where we got from April to August?  I can't.  I

11 don't recall.

12 BY MR. WOOLLEY:

13     Q.   Do you recall participating in any

14 further meetings between April and August?

15     A.   I don't recall if I did or didn't.  I

16 don't remember.

17     Q.   Do you recall participating in any

18 emails or chat sessions or bulletin boards or

19 internet postings?

20     A.   I don't recall.

21     Q.   Do you know if anyone put up an AMP

22 website during that period?

23     A.   I don't remember.

24     Q.   Do you recall as you sit here today

139

1   having any role in moving the organization from

2   its date in April to getting it incorporated in

3   August?

4        A.   I mean, I was involved, yes.

5        Q.   In what ways?

6        A.   With creating eventually what became

7   the mission statement, creating, you know, kind

8   of the idea of what we were going to be doing,

9   just deciding that it would be incorporated,

10  deciding that it would be incorporated in

11  California.  I was involved in all of those.

12  Can I remember the specificity of how that all

13  came about?  No.

14       Q.   Okay.  Any other activities that you

15  can remember happening during that April to

16  August time period?

17       A.   I'm sure there were, but I just can't

18  remember them specifically.

19       Q.   Okay.  So you say creating the mission

20  statement.  Were you involved in drafting that?

21       A.   Yes.

22       Q.   Did you draft it?

23       A.   I don't remember if I drafted it by

24  myself, if somebody else drafted it.  I don't

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
AHMAD                                                      11/8/2018

141

1    discovery process.

2        Q.   Did you look over the material that was

3    turned over?

4        A.   I did.

5        Q.   Did you see anything that you believed

6    to have been a mission statement from that time

7    period?

8        A.   Honestly I don't remember.  I haven't

9    looked at it in preparation for today at all, so

10   I don't remember.

11       Q.   What you came up with during that time

12   period was different than what we saw in the

13   PowerPoint slides though, is that right?

14       A.   I don't remember.  I don't.

15       Q.   Do you know if Hatem Bazian ever saw

16   those PowerPoint slides?

17       A.   I don't know.

18       Q.   The organization was incorporated in

19   California in August, is that right?

20       A.   Correct.

21       Q.   Were there any events or any

22   publications or any mailings or anything like

23   that between April and August?

24       A.   I don't remember.

145

1        Q.    Does Plaintiffs' Exhibit 65 refer to

2    the first 2006 AMP convention?

3        A.    It does.

4        Q.    Which took place on November 23rd and

5    25th, 2006?

6        A.    I believe so.

7        Q.    Do you recall who had the idea to have

8    it over Thanksgiving weekend and why?

9        A.    I don't remember the conversation.  I

10    remember the why though, because there was

11    nothing else going on.

12        Q.    Did you ever hear that IAP had ever --

13    had had its conventions over Thanksgiving

14    weekend?

15        A.    No.

16        Q.    Who chose the Crowne Plaza Hotel?

17        A.    I don't remember.

18        Q.    Were you involved in lining up the

19    space and making the arrangements?

20        A.    I remember going to the Crowne Plaza

21    prior to the event to check it out.

22        Q.    Looking at the bottom there are a

23    couple of 414 telephone numbers.  Is either of

24    those yours?

174

1    example.

2    BY MR. WOOLLEY:

3        Q.    Okay.  Any other steps?

4        A.    Not that I can think of right now.

5        Q.    Do you make any representations to

6    potential donors that their identities will be

7    kept confidential?

8        A.    We don't make any representation about

9    that.

10       Q.    Do you keep any records of donors in a

11   locked file cabinet or under special security

12   because it's donor information?

13           MS. JUMP:  Object as vague as to time

14       frame.

15           Go ahead.

16   BY THE WITNESS:

17       A.    I don't know.  I'm not at the office so

18   I don't know.

19                    (Exhibit 69 was marked for

20                    identification.)

21   BY MR. WOOLLEY:

22       Q.    I am handing you what's been marked

23   plaintiffs' exhibit 69.  Is plaintiffs' exhibit

24   69 a copy of the 2nd Annual convention program?

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD                                                          11/8/2018

175

```
 1      it you will, from the second annual AMP
 2      convention in 2007?
 3          A.    Yes.
 4          Q.    Was this handed out to all the
 5      attendees of the convention?
 6          A.    I believe so.
 7          Q.    This was something that was in paper
 8      form?
 9          A.    Yes.
10              MS. JUMP:   Take your time and look
11          through it.
12      BY MR. WOOLLEY:
13          Q.    On the fourth page there is a letter
14      from the convention chairman and it purports to
15      be from you.  Do you see that?
16          A.    Yes.
17          Q.    Were you the convention chairman of the
18      second convention?
19          A.    I believe so.
20          Q.    And that letter was ████ ██ ████
21          ██ ████ ██ ██ ████ ██ ██ ████ ██ ██ ██
22      ████████
23          ██   ██ ██ ████████
24          ██ █ ████████ █ ████ ████ █████ ████
```

176

1     Q.   If you take a look at the second page

2  of Exhibit 69, there is a mission statement at

3  the top.  Do you see that?

4     A.   Yes, I see it.

5     Q.   It says:

6          "American Muslims for Palestine (AMP)

7     is a not for profit membership based

8     community association."

9          Do you have any knowledge as to what

10 was meant by "membership based"?

11    A.   Yeah, I do.

12    Q.   What was that?

13    A.   Membership, as I may have said earlier,

14 was not in the sense that you pay a membership

15 fee to join the organization.  It was kind of a

16 loose terminology basically meaning that, you

17 know, membership like if you -- you know, people

18 who join us are kind of like members.

19          There is no membership list.  There is

20 no membership fee or anything like that.  It's

21 just kind of like a community organization that

22 people can join or people can be a part of I

23 guess.

24    Q.   What was the reason for using the word





STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD 11/8/2018

179

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD                                                    11/8/2018

180

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD                                                                11/8/2018

181

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD                                                                    11/8/2018

182

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD                                                                11/8/2018

183

1          A.      Yes.

2          Q.      What was the reason for prohibiting

3   photography, audio and/or visual recordings?

4          A.      One is that the speakers hadn't given

5   permission for their lectures to be recorded and

6   we didn't want people to post it and get a free

7   lecture without having attended our event.

8          Q.      Were there any other reasons discussed?

9          A.      I'm sure there were, but I can't recall

10  the discussions.

11         Q.      Was there ever any discussion of audio

12  or visual recordings having been used in legal

13  cases with other organizations?

14         A.      Not that I recall.

15         Q.      Prosecutions?

16         A.      Not that I remember.

17         Q.      Do you recall having any discussion

18  with anyone about this regulation at the time

19  you put it into the convention brochure?

20              MS. JUMP:  Objection; asked and

21         answered.

22  BY THE WITNESS:

23         A.      Like I said, I don't recall the

24  discussions in specificity.

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
AHMAD                                                    11/8/2018

184

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD                                                                    11/8/2018

185

1     A.   █ don't █recall.  █ █to █recall █that █ █ █am

█ █ █the █one █that █created █this █bullet █point █and █just

█ █ █to █use █as █much █legalese █as █ █could █just █to █give

█ █ █the █insulation.  █ █mean, █as █an █attorney █you

█ █ █understand █what █that █is.

█ █ █     Q.   █Could █you █turn █to █the █speaker █bios

█ █ █which █are —

█ █ █     A.   █ █have █it.

█ █ █     Q.   █Got █it?  █Did █you █know █Sheikh █Kifah

█ █ █Mustafa?

█ █ █          (MS. █HUMP:  █Objection; █asked █and

█ █ █     answered.)

█ █ █BY █THE █WITNESS:

█ █ █     A.   █ █knew █who █he █was, █yes.

█ █ █BY █MR. █WOOLLEY:

█ █ █     Q.   █Did █you █know █him █as █the █iman █and

█ █ █associate █director █of █the █mosque █foundation?

█ █ █          (MS. █HUMP:  █Objection; █asked █and

█ █ █     answered.)

█ █ █BY █THE █WITNESS:

█ █ █     A.   █At █that █time.  █At █that █time.

█ █ █BY █MR. █WOOLLEY:

█ █ █     Q.   █Do █you █know █how █he █became █a █speaker █for

█ █ █the █2007 █convention?

186

1        A.    I don't recall the discussion.

2        Q.    Were you involved in the discussions of

3   the speakers for the 2007 convention?

4        A.    I believe so, but I don't recall.

5        Q.    Do you know whether he was paid to

6   appear?

7        A.    I don't recall.

8        Q.    The second person is Osama Abuirshaid

9   we've talked about before.

10       A.    Hm-hmm.

11       Q.    Were you involved in discussions of

12  whether he should be included in this

13  convention?

14       A.    I don't recall.

15       Q.    Do you recall that he was a speaker at

16  the 2007 convention?

17       A.    No, I don't recall.

18       Q.    Sheikh Mohammad Al Hanooti, was that

19  someone that you knew as of 2007?

20       A.    As I indicated before, he was the imam

21  at the mosque that I attended in Virginia.

22       Q.    Right.  Were you involved in bringing

23  him to this convention?

24       A.    Possibly.  I don't recall.

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD                                                                    11/8/2018

187

1

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
AHMAD                                                    11/8/2018

188

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD                                                              11/8/2018

189

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD                                                    11/8/2018

190

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

AHMAD

11/8/2018

191

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
AHMAD                                                    11/8/2018

192

1

10      Q.    Referring back to Plaintiffs' Exhibit

11   61, which is the Second Set of Interrogatory

12   Responses, I'm going to refer to the response to

13   No. 3 again.

14      A.    Okay.

15      Q.    There is a list that says, "The below

16   are past and present employees of AMP/AJP," and

17   then it lists a number of people.

18            Are those the people that have been

19   employed by AMP or AJP throughout the years?

20      A.    I believe so, yes.

21      Q.    Do you know of any people that are not

22   on that list?

23      A.    I think this is accurate.

24      Q.    Were those people paid by AMP or AJP?

193

1      A.   Yes, I assume they were.  I don't

2  recall with regards to Julia and Awad if they

3  were or weren't, but I'm pretty sure they were.

4      Q.   Does AMP or AJP retain any payroll

5  records or tax records in connection with

6  employees?

7           MS. JUMP:  Objection; vague as to time

8      period.

9  BY MR. WOOLLEY:

10     Q.   For any time period.

11     A.   I'm sure we do, but I don't have access

12  to those.  They're in the office.

13     Q.   Do you know how far back they go?

14     A.   I don't.

15     Q.   And by "the office," do you mean

16  Illinois?

17     A.   Correct.

18     Q.   Were you involved in hiring any of

19  these people?

20     A.   Not always.  Some maybe but not all.

21     Q.   Were you involved in hiring Kristin

22  Szremski?

23     A.   I remember sitting in on an interview

24  with Kristin, yes.

256

1   document, please, this mission statement that's

2   listed here that we discussed a bit earlier, I

3   think we skipped the part that lists that:

4            "AMP was founded in North America

5       working to provide non-partisan and

6       non-sectarian educational, social and

7       cultural programming for the purpose of

8       raising the American public's awareness of

9       Palestine's rich heritage and diverse

10      people."

11           Do you see where that is?

12  A.   Yes, I do.

13  Q.   Okay.  And is that in your opinion

14  accurate as to the purpose of AMP being

15  non-political and non-sectarian?

16  A.   Yes.  As I indicated earlier, the point

17  of this was education.  This has nothing to do

18  with politics.

19  Q.   And if I could get you to look at

20  what's already been marked as Exhibit 67,

21  please.

22           MS. JUMP:  I promise we'll put this all

23      back in order, Ms. Court Reporter, before we

24      leave today.

257

1    BY THE WITNESS:

2        A.    Okay.

3    BY MS. JUMP:

4        Q.    And this is an article discussing the

5    2006 first convention; is that correct --

6        A.    Yes.

7        Q.    -- of AMP?

8              If you'll look with me at the bottom of

9    the second page and then going onto the top of

10   the third page there, which is on the pages

11   which have been produced in this matter as

12   Defendants' Production 005444 and 005445, there

13   is a quote that's attributed to you at the

14   bottom of the page; is that correct?

15       A.    It is.

16       Q.    And that states that:

17             "Board member Munjed Ahmad pointed out

18        that AMP does not endorse violence, nor is

19        it an organization with a political agenda."

20             Is that accurate?

21       A.    It is.

22       Q.    Okay.  And then at the top of the third

23   page which is Bates labeled 005445, there is a

24   quote attributed to you that:

258

1          "'We are an educational organization

2      with the idea to cause change through

3      education and information.  Any acts of

4      injustice should be condemned by all people,

5      especially when it is state sponsored,' he

6      added.  'Palestine is a just cause for

7      all.'"

8          Is that an accurate quote by you?

9      A.   It is.

10     Q.   Okay.  And this article also refers to

11 some of the speakers who appeared at this first

12 conference.  One of the ones that was not

13 discussed earlier today but is mentioned in this

14 article, if you'll look with me on the first

15 page of this document, refers to Norman

16 Finkelstein, DePaul University professor.

17         Do you see that?

18     A.   Yes.

19     Q.   And do you recall him being invited and

20 appearing to speak at the -- at AMP's first

21 convention in 2006?

22     A.   Yes.  He was there.

23     Q.   Okay.  And why was he there?  Or why

24 did AMP invite him, to the best of your

259

1    recollection?

2        A.    I don't have specific recollection, but

3    because he was a person who had -- he was of

4    Jewish background, he was the son of a Holocaust

5    survivor as I remember it, and he had a sense of

6    justice as it related to -- you know, he was

7    about justice.  That was kind of the reason that

8    he was brought, as I recall.

9        Q.    Okay.  And then if you'll look with me

10   at what's been marked as Exhibit 68 to your

11   deposition which is the Exhibit 1 to your second

12   declaration in this matter --

13       A.    Hm-hmm.

14       Q.    -- if you look on the first page under

15   the category that states "Donors to AMP from

16   2006 to 2007."  Do you see where that is?

17       A.    Yes.

18       Q.    If you go to the bottom bullet point

19   there, can you please read to me the quote

20   that's listed there?

21       A.    Sure.  It's the same quote as we talked

22   earlier because this is what we are about.  It

23   says:

24            "AMP is a not for profit membership

270

1      A.   On a day-to-day basis?

2      Q.   Hm-hmm.

3      A.   No, he didn't.

4      Q.   Or on any ongoing basis.

5      A.   He didn't.

6      Q.   If you'll turn with me to Exhibit 64,

7  please.

8      A.   Go ahead.  I'm sorry.

9      Q.   I believe we referred earlier to

10  Exhibit 64 being your handwritten notes

11  regarding the initial discussions in 2005 and

12  2006 for the creation of what became later AMP;

13  is that correct?

14     A.   Yes.

15     Q.   Okay.  If you'll look with me on the

16  first page of Exhibit 64, there is some writing

17  that is off to the bottom left.

18          Do you see that?

19     A.   Yes.

20     Q.   Near the bottom.  Can you read that,

21  please?

22     A.   "No hate talk."

23     Q.   What did you mean by that?

24     A.   Well, clearly our -- the vision for the

271

1   organization was to educate others about issues

2   relating to Palestine and Palestinians and, as

3   we said, the heritage and the culture of the

4   Palestinians.

5          This was not an organization envisioned

6   to hate or to spew violence or to degrade

7   others.  That wasn't the point of this

8   organization.  This organization had no interest

9   in doing any kind of -- anything like that.  We

10  don't hate anyone.  That's not the point.  The

11  point is to educate others.

12         MS. JUMP:  Okay.  Thank you.  I have no

13      further questions at this time.  Pass the

14      witness.

15         MR. WOOLLEY:  Okay.  Just a few

16      follow-ups.

17                    EXAMINATION

18  BY MR. WOOLLEY:

19      Q.   Turning back to the Viva Palestina

20  entry in the response to Interrogatory No. 8 in

21  PX 61.

22      A.   What number?

23      Q.   It's Interrogatory No. 8.

24  Unfortunately, these don't have page numbers.

# EXHIBIT D

1

```
  1
                IN THE UNITED STATES DISTRICT COURT
  2                NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION
  3
     STANLEY BOIM, Individually    )
  4  and as Administrator of the   )
     Estate of David Boim,         )
  5  deceased; and JOYCE BOIM,     )
                                   )
  6              Plaintiffs,       )
                                   )
  7       vs.                      )   Case No.
                                   )   17-cv-03591
  8  AMERICAN MUSLIMS FOR          )
     PALESTINE; AMERICANS FOR      )
  9  JUSTICE IN PALESTINE          )
     EDUCATIONAL FOUNDATION;       )
 10  RAFEEQ JABER; ABDELBASSET     )
     HAMAYEL; AND OSAMA            )
 11  ABUIRSHAID,                   )
                                   )
 12              Defendants.       )
 13
 14          The deposition of RAFEEQ JABER,
 15  called by the Plaintiffs for examination, taken
 16  pursuant to the Federal Rules of Civil Procedure
 17  of the United States District Courts pertaining
 18  to the taking of depositions, taken before
 19  Marianne Nee, a Certified Shorthand Reporter of
 20  the State of Illinois, CSR License No.
 21  084-002341, taken at 111 South Wacker Drive,
 22  Suite 4100, Chicago, Illinois, on Wednesday,
 23  November 7, 2018, commencing at 9:10 a.m.
 24
```

115

1                    (Recess had from 11:15 to

2                    11:27 a.m.)

3          █████████████████████████████████████

██        █████████████████████████████████████████

██        █████████████████████████████

██        █████████████████████

██        ███████████████████

██        ██████████████████████████████████████

██        █████████████████████████████████

███        ████████████████

███        ████████████████████████████████

███        ██████

███        █████████████████████████████

███        ███████

███        ███████████████████████████████████

███        ███████████████████████████████████████████

███        █████████████████████████████████████

███        █████████████████████████████████████████████

███        ████████████████████████████

███        █████████████████

███        ████████████████████

███        ██████████████████████████████████████

23         ████████████████████████████████████████

███        ███████████████████████████████████████

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                    11/7/2018

116



STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                    11/7/2018

118

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                           11/7/2018

119

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                    11/7/2018

120

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                    11/7/2018

121

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                              11/7/2018

123

312.781.9111                                                    630.983.0030

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                    11/7/2018

124

[Lines of deposition transcript redacted]

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                    11/7/2018

125

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                    11/7/2018

126

1           they say, this is all the money we got

2    all year and this is how we spent it.

3                 But each event doesn't mean that brings

4    money.  Some of them they lose money.

5           Q.   Take a look at, by way of comparison,

6    the 2011 return.  Do you see that?

7           A.   Yeah.

8           Q.   Go to the second page.  You see item

9    4a, right?

10          A.   Okay.

11          Q.   It says, "Annual Conference on

12   Palestine and the Middle East," right?

13          A.   Hm-hmm.

14          Q.   It says expenses $2,792?

15          A.   Yes.

16          Q.   And then if you go across the line, it

17   has a revenue number?

18          A.   Yes.  When they gave me the revenues, I

19   put --

20          Q.   But you didn't ask them for the revenue

21   number when you did the 2010 return.

22               MS. JUMP:  Objection.  Objection.

23          mischaracterizes the previous testimony and

24          asked and answered.

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                          11/7/2018

127

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                    11/7/2018

128

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                    11/7/2018

129

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                          11/7/2018

130

1        A.    No, I don't have it.  I don't have this
2    even.
3        Q.    But I assume that if you checked yes,
4    it was because it met whatever threshold the
5    instructions required for there to be a Schedule
6    B?
7              MS. JUMP:  I am going to object to the
8        extent it calls for speculation.
9              Go ahead.
10   BY THE WITNESS:
11       A.    Repeat the question.  What do you mean
12   with that?
13   BY MR. LANDES:
14       Q.    You saw that -- let me ask you this
15   question.  Go to Part IV here, Roman numeral IV.
16             MS. JUMP:  Page 3.
17   BY MR. LANDES:
18       Q.    And there is all these yeses and nos,
19   right?
20       A.    Right.
21       Q.    Who filled that out?  Did you fill that
22   out or did the client fill that out?
23       A.    No.  I filled it out based on the
24   information they gave me.

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                              11/7/2018

131

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                              11/7/2018

132

1

///

24

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                                11/7/2018

133

1

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                              11/7/2018

134

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                                11/7/2018

135

24        ///

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                            11/7/2018

136

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                    11/7/2018

137

1

24        ///

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                        11/7/2018

138

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                                11/7/2018

139

1

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                        11/7/2018

140



STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                                 11/7/2018

141

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER                                                    11/7/2018

142

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                          11/7/2018

143

1        A.    No.   Well, it's been a long time.

2        Q.    Yeah, okay.   Let's take a look at 12a.

3              "Does the organization have a written

4    conflict of interest policy?"

5              It says yes.

6        A.    I asked them, they said yes.

7        Q.    Did you ever see it?

8        A.    No.

9        Q.    It says,

10             "Are officers, directors or trustees,

11   and key employees required to disclose

12   annually interests that could give rise to

13   conflicts?"

14             And you checked yes; is that correct?

15       A.    Which one?

16       Q.    12b.

17       A.    12b, okay.   Yes.

18       Q.    And did you see any written policy to

19   that effect?

20       A.    No.

21       Q.    And the same is true with 12c?

22       MS. JUMP:   I'm going to stop for a

23   moment here and object.

24             The purpose of this deposition is

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE

JABER

11/7/2018

144

///

24

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                    11/7/2018

145

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
JABER                                                    11/7/2018

147

1

2

3

4

5

6

7

8

9

10

11

12    _____

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT E

1

1

2             IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION
3

STANLEY BOIM, Individually     )
4   and as Administrator of the    )
Estate of David Boim,          )
5   deceased; and JOYCE BOIM,      )
                                   )
6               Plaintiffs,        )
                                   )
7        vs.                       )    Case No.
                                   )    17-cv-03591
8   AMERICAN MUSLIMS FOR            )
PALESTINE; AMERICANS FOR       )
9   JUSTICE IN PALESTINE           )
EDUCATIONAL FOUNDATION;        )
10  RAFEEQ JABER; ABDELBASSET      )
HAMAYEL; AND OSAMA             )
11  ABUIRSHAID,                    )
                                   )
12              Defendants.        )

13

14              The deposition of OSAMA ABUIRSHAID,
15  called by the Plaintiffs for examination, taken
16  pursuant to the Federal Rules of Civil Procedure
17  of the United States District Courts pertaining
18  to the taking of depositions, taken before
19  Marianne Nee, a Certified Shorthand Reporter of
20  the State of Illinois, CSR License No.
21  084-002341, taken at 111 South Wacker Drive,
22  Suite 4100, Chicago, Illinois, on Thursday,
23  October 18, 2018, commencing at 9:11 a.m.
24

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
ABUIRSHAID                                          10/18/2018

113

1      ████ ██ ███ ██████ ████████ ██████ ██████
       ██ ██████ ████ ███ █████████

       ████ ██ █████ █████ ██ ███ █ █████ ████

       ████ █████ ███████ ██ ██████ ████ ████ █ █████

       ███ ████ ████████████ ██ ████ ███ ████ ███

       █████ ███ █ ████ ████ █ █████ █ █████ ███ ███

       █ █████ █████████ ███ ██ █ ████ █ ███ ███ ████

       ██ ██ ██ ███ ████████████

9      Q.   Is Baitulmaal an organization that

10     advertised through Al-Meezan?

11     A.   They did, yes.

12     Q.   Did Baitulmaal ever advertise through

13     Al-Zaytouna?

14          MS. JUMP:   Objection as asked and

15          answered.

16     BY THE WITNESS:

17     A.   I don't know.

18     BY MR. WOOLLEY:

19     Q.   Do you know when Baitulmaal came into

20     existence?

21     A.   I don't know.

22     Q.   Do you know any of the leadership at

23     Baitulmaal?

24     A.   I knew some.

178

1   BY THE WITNESS:

2       A.   It's as I told you, the first time I

3   met him it was sometime in 2005 or 2006.

4   BY MR. WOOLLEY:

5       Q.   Okay.  Where did you meet him?

6       A.   I don't remember exactly, but I have

7   seen Hatem around that time.

8       Q.   What was the context in which you met

9   him for the first time?

10      A.   I think it's going to come up later on,

11  so I attended -- I was invited for a meeting,

12  but I think it would come on later on, so I

13  don't know if I want to talk about it now.

14          MS. JUMP:  You can go ahead and answer.

15  BY THE WITNESS:

16      A.   Okay.  So I invited for a meeting in

17  2005 or 2006, sometime around that time, when

18  they were discussing the need for an

19  organization that works for Palestine and I

20  refused to be part of it.  That's when I first

21  met Hatem.

22  BY MR. WOOLLEY:

23      Q.   Who invited you to that meeting?

24      A.   I don't remember exactly who.

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
ABUIRSHAID                                                  10/18/2018

179

1      Q.   Was it Hatem Bazian?

2      A.   I didn't know Hatem prior so I don't

3    know if it's him who reached out.  I don't know

4    who exactly reached out to me.

5      Q.   Was this invitation something that came

6    by email, mail or in person?

7      A.   I really don't remember.

8      Q.   Where was that meeting to take place?

9      A.   I don't remember.  It was maybe in

10   Chicago.  I don't know exactly where.  I can't

11   remember exactly.

12     Q.   When in 2005?

13     A.   I don't know.  It's 2005 or 2006.  I'm

14   not sure.

15     Q.   Is it possible that that meeting was to

16   take place at the MAS convention in Milwaukee?

17     A.   I don't know.  I don't know.

18     Q.   You attended the M-A-S convention in

19   Milwaukee in 2006?

20     A.   What is M-A-S?

21     Q.   MAS.  Muslim Association of --

22     A.   Did they have a convention at that

23   time?  I don't know.  If they had and if I was

24   invited to it, maybe, but I can't -- I'm not

180

1    certain.  I don't know.

2        Q.   Do you recall being a speaker at the

3    MAS convention in 2006?

4        A.   I didn't speak -- no.  2006, no.  I

5    don't know.  I don't know if there was a

6    convention in Milwaukee in 2006.  I don't know.

7    So I don't know.

8        Q.   Your testimony is you were not a

9    speaker at a convention in Milwaukee in 2006?

10       A.   No, no.  That's --

11           MS. JUMP:  Object; mischaracterizes the

12       previous testimony.

13           MR. WOOLLEY:  I'm just trying to get it

14       straight.

15   BY THE WITNESS:

16       A.   I don't know if there was a convention

17   in 2006 in Milwaukee.  I don't know.  If there

18   was and I was invited, then I was invited, but I

19   don't know.

20   BY MR. WOOLLEY:

21       Q.   Who did you tell you didn't want to be

22   involved in this meeting that you were invited

23   to?

24       A.   Hatem was there and Salah was there.

181

1      Q.   Salah Sarsour?

2      A.   Sarsour, yes.

3      Q.   Did you tell them that in person?

4      A.   It was in the meeting.  I wasn't -- I

5  didn't want to be part of any organizations.

6      Q.   So you went to the meeting and you told

7  them --

8      A.   I don't know how I was invited.  Maybe

9  for a conference or maybe I was there for an

10  event.  Maybe I was there for something.  I

11  don't know how this happened, when exactly it

12  happened.  I remember this issue being brought

13  up, and I said I didn't want to be part of any

14  organizations.

15     Q.   Was there anyone else there besides

16  Hatem Bazian and Salah Sarsour?

17     A.   I don't remember who was there, but I

18  remember Salah and Hatem.

19     Q.   Where did the meeting take place?

20     A.   Again, it's either Chicago or -- I

21  don't know.  Maybe Chicago.  If you're saying

22  there was a conference in Milwaukee, if there

23  was a conference, maybe Milwaukee would be

24  another possibility.  Now, I don't know this.

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
ABUIRSHAID                                          10/18/2018

                                                            286

1      A.   I have to read it.

2           MS. JUMP:  His question to you is

3      without commenting on the accuracy of it,

4      whether that is the translation.

5  BY THE WITNESS:

6      A.   Yes.

7  BY MR. WOOLLEY:

8      Q.   That translation is a translation of

9  what you've done?

10     A.   Yes.

11     Q.   Okay.

12                    (Exhibit 40 was marked for

13                         identification.)

14  BY MR. WOOLLEY:

15     Q.   I'm now handing you Exhibit 40.

16  Looking up at the top of Exhibit 40 there is a

17  website www.palinfo.com.  Is that a website

18  you're familiar with?

19     A.   I don't write this for them.

20     Q.   Okay.  Do you know what the website is?

21     A.   I know what it is.  I didn't write it

22  for them.  I know what the website is.  I don't

23  usually visit it.  I didn't write this article

24  for them.

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
ABUIRSHAID                                              10/18/2018

287

1      Q.   Can you tell me what the website is?

2      A.   It's just a website that reports about

3   Palestine.

4      Q.   Do you know who runs it?

5      A.   No.

6      Q.   Who did you -- did you write the

7   article that's shown?

8      A.   I can't read it in Arabic.  This is not

9   -- it's not connected.  The words are not

10  connected here.  So whoever translated this, if

11  he read or she read this and came up with this

12  translation, that is not an accurate

13  translation.  Not to say that they may not have

14  another copy that we could have used for

15  translation, but for anyone to come and say that

16  they can read this in Arabic, no.

17     Q.   To say they can't read it or can read

18  it?

19     A.   Can't.  It's not connected.  The words

20  are not connected.

21     Q.   Are you able to recognize this as

22  something that --

23     A.   I can't read it.

24          MS. JUMP:  Hang on.  Let him finish his

288

1       question.

2   BY MR. WOOLLEY:

3       Q.   Are you able to recognize this as

4   something that relates to what you wrote or is

5   it completely unintelligible?

6       A.   I have to spend maybe an hour to read,

7   to try to figure out what is this.

8       Q.   Okay.  Looking at the translation and

9   recognizing that it may or may not be that

10  accurate, a fully accurate translation, are you

11  able to recognize this as referring to something

12  that you wrote in Arabic?

13      A.   You're asking me about the whole

14  translation here?

15      Q.   Yeah.  I'm not asking you to vouch for

16  whether the translation is correct at this

17  point.  I'm asking if you can recognize it as

18  something that was an attempt to translate what

19  you wrote in Arabic.

20      A.   Okay.  So you need to give me time to

21  read it.  It's a long translation and I have to

22  see the Arabic text before I say yes.

23      Q.   You can't tell me by reading it in

24  English whether it relates to something that you

289

1  wrote?

2          MS. JUMP:  I'm going to object as asked

3      and answered.  He already testified that he

4      did not write an article as represented here

5      and --

6          MR. WOOLLEY:  I don't think that was

7      the testimony.  I think the testimony is he

8      -- the non-connectedness of the script makes

9      it unintelligible.

10         MS. JUMP:  That's a separate thing.

11     That's a separate thing.  So we can have the

12     court reporter read it back, but the first

13     thing he said when he saw this is, "I don't

14     write this, I didn't write this."

15         THE WITNESS:  To this website.

16  BY MR. WOOLLEY:

17     Q.   Let me clarify.  It's my understanding

18  what you said was that you didn't write this

19  article to this website?

20     A.   Because I never wrote articles for

21  them.

22     Q.   Okay.  So and then with respect to the

23  text below it, your testimony is it's

24  unintelligible script?

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
ABUIRSHAID                                          10/18/2018

290

1       A.   Yes.

2       Q.   Okay.  Then with respect to the

3   purported translation my question is, without

4   vouching for whether it's completely accurate,

5   can you recognize it as an attempt to translate

6   something that you authored?

7            MS. JUMP:  And on that question,

8       because of the foundation, the lack of

9       foundation, I'm going to instruct him not to

10      answer that.  This is also outside of the

11      time frame of the jurisdiction.

12           MR. WOOLLEY:  Please mark that one.

13           MS. JUMP:  Because it's dated 2014.

14           You don't have to answer.  I'm

15      instructing you not to answer.

16                         (Exhibit 41 was marked for

17                          identification.)

18   BY MR. WOOLLEY:

19      Q.   I'm handing you what's been marked as

20   Exhibit 41 and this is a bad screenshot of a

21   Facebook text that cuts off half the text, but

22   what I wanted to ask you is who the picture is

23   of.

24      A.   Can you first give me the full text?  I

# EXHIBIT F

1

                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
                              EASTERN DIVISION

STANLEY BOIM, Individually      )
and as Administrator of the     )
Estate of David Boim,           )
deceased; and JOYCE BOIM,       )
                                )
              Plaintiffs,        )
                                )
     vs.                        )    Case No.
                                )    17-cv-03591
AMERICAN MUSLIMS FOR            )
PALESTINE; AMERICANS FOR        )
JUSTICE IN PALESTINE            )
EDUCATIONAL FOUNDATION;         )
RAFEEQ JABER; ABDELBASSET       )
HAMAYEL; AND OSAMA              )
ABUIRSHAID,                     )
                                )
              Defendants.        )

          The deposition of ABDELBASET
HAMAYEL, called by the Plaintiffs for
examination, taken pursuant to the Federal Rules
of Civil Procedure of the United States District
Courts pertaining to the taking of depositions,
taken before Marianne Nee, a Certified Shorthand
Reporter of the State of Illinois, CSR License
No. 084-002341, taken at 111 South Wacker Drive,
Suite 4100, Chicago, Illinois, on Wednesday,
October 17, 2018, commencing at 9:00 a.m.

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
HAMAYEL                                               10/17/2018

238

1          (list Excel sheets.

           Q.   There was a reference earlier to AMP
email addresses and some discussion in that
regard.   To the best of your knowledge, when did
AMP first begin using AMP domain email
addresses?

           A.   I would say sometime in 2009 when I
started, that time frame.

           Q.   And just to clarify, do you have an AMP
email address?

           A.   AMP has email, email address, yes, not
me.

           Q.   Not you?

           A.   Yeah.

           Q.   No AMP email address specifically for
you?

           A.   No.

           Q.   Okay.   You also referenced that there
were email lists that AMP would have had
regarding sending out the digital newsletter.
Do you recall that?

           A.   Yes.   I did, yes.

           Q.   For the time period of 2005 through
2010, would those email lists still be retained

STANLEY BOIM v. AMERICAN MUSLIMS FOR PALESTINE
HAMAYEL                                           10/17/2018

239

1    and available?

2         A.   First of all, I started 2009 so I doubt

3    they have any email service before I came in.

4    And when I started, it was just maybe a few

5    hundred people or a few hundred names on the

6    list.

7         Q.   Okay.

8         A.   So we started building up the list and

9    we have like big number now.  We keep updating

10   the list.

11        Q.   Okay.  So is there anyplace where you

12   would be able to look to find an accurate email

13   list that was used by AMP in 2010?

14        A.   That I have to go back to the experts.

15        Q.   And who would the experts be on that

16   topic?

17        A.   Before it was Kristin.  Now I have to

18   ask Leena.

19        Q.   Thank you.  And when did --

20        A.   I'm not so aware of the technical

21   issues here.

22        Q.   Okay.  And when did Leena begin working

23   for AMP, to the best of your knowledge?

24        A.   Maybe last year, early last year or

240

1   mid-year last year sometime.

2        Q.    So for the time period of 2005 through

3   2010, who would be the person who would know

4   regarding what I believe you just referred to as

5   the technical aspects?

6        A.    Again, I joined 2009.  2009 and up it

7   was Kristin.



16                    (Proceedings adjourned at

17                    3:24 p.m.)

18             FURTHER DEPONENT SAITH NOT.

19

20

21

22

23

24

## AMS BORD OF DIRECTORS 2002

RAFEEQ JABER
OSAMA ABU-IRSHAID
SABRI SAMIRAH
ABDEL BASET HAMAYEL
SALAH DAOUD
MOHAMED EL-NATOUR
MUHAMAD ABDELAL
FAWAZ MUSHTAHA
IMAD SARSOUR
SUFIAN NABHAN
MAHMOUD SHAFEEQ

## AMS BORD OF DIRECTORS 2001

RAFEEQ JABER
KIFAH MUSTAFA
ABDEL BASET HAMAYEL
SALAH DAOUD
MOHAMED EL-NATOUR
MUHAMAD ABDELAL
FAWAZ MUSHTAHA
IMAD SARSOUR
SUFIAN NABHAN
SABRI SAMIRAH
GHASAN DAHDULI
HASAN SABRI

## AMS BORD OF DIRECTORS 2000

RAFEEQ JABER
KIFAH MUSTAFA
ABDEL BASET HAMAYEL
SALAH DAOUD
MOHAMED EL-NATOUR
MUHAMAD ABDELAL
FAWAZ MUSHTAHA
IMAD SARSOUR
SUFIAN NABHAN
SABRI SAMIRAH
HASAN SABRI
GHASAN DAHDULI



IAP 00077

## AMS BORD OF DIRECTORS 1999

RAFEEQ JABER
FAWAZ MUSHTAHA
IMAD SARSOUR
SUFIAN NABHAN
SABRI SAMIRAH
GHASSAN DAHDOULI
YOUSIF SHAHIN
TAWFEEQ AL-DEEK
HASAN SABRI
RIAD MUSTAPHA

## AMS BORD OF DIRECTORS 1998

AMER ALSHAWA
RAFEEQ JABER
FAWAZ MUSHTAHA
IMAD SARSOUR
SUFIAN NABHAN
SABRI SAMIRAH
GHASSAN DAHDOULI
YOUSIF SHAHIN
TAWFEEQ AL-DEEK
WALID ABU SHARKH
HASAN SABRI
RIAD MUSTAPHA

## AMS BORD OF DIRECTORS 1997

RAFEEQ JABER
FAWAZ MUSHTAHA
IMAD SARSOUR
SUFIAN NABHAN
SABRI SAMIRAH
GHASSAN DAHDOULI
FU'AD ALBAHRI
YOUSIF SHAHIN
TAWFEEQ AL-DEEK
ABDEL-MUHAIMEN AL-SEBAI
WALID ABU SHARKH
HASAN SABRI
RIAD MUSTAPHA

IAP 00078

## AMS BORD OF DIRECTORS 1996

RAFEEQ JABER
FAWAZ MUSHTAHA
SABRI SAMIRAH
GHASSAN DAHDOULI
FU'AD ALBAHRI
TAWFEEQ AL-DEEK
ABDEL-MUHAIMEN AL-SEBAI
HASAN SABRI

## AMS BORD OF DIRECTORS 1995

RAFEEQ JABER
SABRI SAMIRAH
HALI SULIMAN

## AMS BORD OF DIRECTORS 1994

RAFEEQ JABER
SABRI SAMIRAH
HALI SULIMAN

## AMS BORD OF DIRECTORS 1993

RAFEEQ JABER
SABRI SAMIRAH
HALI SULIMAN

IAP 00079