**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

STANLEY BOIM, INDIVIDUALLY AND AS )
ADMINISTRATOR OF THE ESTATE OF )
DAVID BOIM, DECEASED, AND JOYCE )
BOIM, )
       )
           Plaintiffs, )
       )
          v. )
       )
AMERICAN MUSLIMS FOR PALESTINE; )
AMERICANS FOR JUSTICE IN PALESTINE )
EDUCATIONAL FOUNDATION; RAFEEQ )
JABER; ABDELBASSET HAMAYEL; AND )
OSAMA ABUIRSHAID, )
       )
          Defendants. )

Civil No. 17-cv-03591

Hon. Sharon Johnson Coleman

**Hon. Sidney I. Schenkier**

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR LEAVE TO TAKE
TWO ADDITIONAL DEPOSITIONS, TO COMPEL ANSWERS TO DEPOSITION
QUESTIONS, AND TO COMPEL FURTHER DOCUMENT PRODUCTION**

Defendants' Response in Opposition ("Opp.," Dkt. 114) to Plaintiffs' Motion for Leave to

Take Two Additional Depositions, to Compel Answers to Deposition Questions, and to Compel

Further Document Production ("Mot.," Dkt. 106) fails to provide any valid reason not to grant the

limited additional discovery plaintiffs seek.  First, as shown in our motion and below, limited

depositions of Hatem Bazian and Salah Sarsour are needed because the witness defendants put

forward on the formation and early phases of AMP, Munjed Ahmad, turned out to have virtually no

knowledge or memory of the events during that critical time period.  We never claimed, as

defendants now baselessly suggest, that we first learned of Bazian and Sarsour during the recent

depositions.  We (appropriately) did not include them in our initial four deposition notices because

this is limited preliminary discovery, and we believed—based on defendants' disclosures—that we

would get sufficient formation and early operation information from Ahmad.  Ahmad's deposition

transcript (Exhibit E to our motion) amply demonstrates Ahmad's lack of memory and knowledge

and provides good cause for the Court to authorize depositions of Bazian and Sarsour.

Second, we should be granted limited additional questioning (by telephone) of Osama Abuirshaid and Rafeeq Jaber because defendants improperly instructed these witnesses not to answer certain questions in violation of Federal Rule of Civil Procedure 30(c)(2). Defendants' response fails to provide any valid justification for these improper instructions, nor does it provide any reason why we are not entitled to the answers defendants refused to give. Although defendants instructed witnesses not to answer on a number of occasions, our request is confined to just two of the four witnesses and five specific sets of instructions not to answer. We should be permitted to ask the unanswered questions and appropriate foundational and follow-up questions.

Third, we (again) request that the Court compel defendants to produce any e-mailed newsletters from 2010 and prior, along with the e-mail list (in whatever form it currently exists) that was used to send them. The depositions confirmed that ██████████████████████████ ████████████████████████████ This material should have been produced.

As indicated in our motion, we believe the additional requested discovery can be completed quickly, allowing plaintiffs to move forward with requesting to file an amended complaint in the first quarter of next year. Plaintiffs' three limited requests in their motion are reasonable, well-founded and will not cause undue delay or burden. The motion should be granted.

## I. PLAINTIFFS NEED TO DEPOSE BAZIAN AND SARSOUR BECAUSE AHMAD KNEW ALMOST NOTHING ABOUT THE FORMATION AND EARLY ACTIVITIES OF AMP.

Contrary to what defendants now suggest, we are *not* seeking to depose Bazian and Sarsour because "new information about Hatem Bazian and Salah Sarour was uncovered during the depositions." (Dkt. 114 at 3.) We are seeking these depositions because Munjed Ahmed, the witness **defendants** put forward on the formation of AMP, had a startling lack of knowledge and memory about this critical time period.

We noticed Ahmad's deposition last Spring because: (i) defendants produced an unsolicited declaration from Ahmad in response to our discovery requests purporting to describe the formation of AMP and stating that Ahmad "was involved in the creation of AMP in 2006" (*see* 4/9/18 Ahmad Decl. ¶¶ 3-7, 12-13 (Exhibit N)); (ii) the only substantive, contemporaneous documents defendants produced purporting to relate to formation of AMP came from Ahmad's files; and (iii) defendants incorporated Ahmad's declaration into their responses to interrogatories seeking identification of persons with knowledge related to defendants' motion to dismiss, identification of witnesses who might provide testimony on a jurisdiction motion, information about the structure and hierarchy of AMP since its inception, and the "creation and formation of [AMP]." (4/10/18 Am. Objections and Resps. to Interrogs. to AMP/AJP Nos. 1, 2, 4, 5 (excerpts attached as Exhibit O).) Based on defendants' disclosures, we reasonably concluded that Ahmad would be defendants' lead witness and would have substantial knowledge about the formation and early operation of AMP.

It is now apparent that Ahmad was a smokescreen intended to conceal AMP's roots in IAP. As shown in our motion (Mot. ¶ 16), Ahmad has virtually no knowledge or memory of the formation and early stages of AMP and was not even involved in early activities by the IAP-connected people who went on to become much of AMP's leadership. We do not dispute that Ahmad ultimately connected with Bazian (at a time and place Ahmad cannot recall) and ultimately went on to play a prominent role with AMP. But even a cursory review of Ahmad's deposition transcript makes strikingly clear that he cannot answer rudimentary questions about the formation and early stages of AMP. For instance, he only vaguely recalls the initial meetings he participated in; he does not independently recall who attended those meetings (except that they were high school- and college-age youth who did not go on to play a significant role in AMP); he does not recall the discussions; he does not recall details of what happened between the April 2006 Muslim American Society ("MAS") convention and the August incorporation of AMP; he does not recall how, where

or when he met Bazian; he does not recall where his discussions with Bazian took place or the specifics of what was discussed; he does not know if Bazian was working with anyone else; he does not know where the idea to have a convention and the convention format came from; and he cannot recall who was on the convention steering committee. (*See* Mot. ¶ 16, Ex. C at 86-154.)

Moreover, Ahmad's testimony made clear that his early activities were with a group of high school- and college-age youth who never went on to play a significant role at AMP. This group (unlike AMP) was focused on educating "youth," and planned "aspirational" activities that never happened. (*Id.* ¶¶ 14-16.) In the meantime, we are informed and believe that by late-2005 Sarsour, Bazian and others were organizing the group that eventually would go on to form the core of AMP—and, in particular, that this group planned organizational activities when they got together at the April 2006 MAS convention in Milwaukee. This belief is bolstered by Abuirshaid's testimony that he was invited to a meeting in 2005 or 2006 attended by Bazian and Sarsour where participants "were discussing the need for an organization that works for Palestine." (Mot. Ex. E at 178-181.) Ahmad was not part of this meeting or Bazian and Sarsour's organizational efforts. Indeed, Ahmad himself believes he had not yet met Bazian and he did not talk to Sarsour about the new organization. (Mot. Ex. C at 98-101, 133.) The *only* meeting Ahmad participated in at the MAS convention was an impromptu get-together in an empty conference room with his separate youth group. (*Id.* at 107-109.)

At the end of the day, *none* of the four deponents provided substantive answers to plaintiffs' many questions about the formation and early stages of AMP. Even Abuirshaid, who apparently attended a key early meeting, was able to provide little information about the meeting or the attendees other than Bazian and Sarsour.[1] We need to ask Bazian and Sarsour about the early stages

---

[1] Abuirshaid failed to recall specifically attending the 2006 MAS convention or whether the meeting took place at this event. A flyer for the event indicates that Bazian and Abuirshaid were featured speakers (MAS 2d Ann. Convention Flyer (Exhibit P)), and we believe the meeting which Abuirshaid referred likely took

of AMP and who else was involved. As Ahmad himself commented when asked if Bazian was working with anyone else during the formation period, "***I wouldn't know. You'd have to ask him***." (Mot. Ex. C at 102 (emphasis added).)

Defendants argue that we should be foreclosed from taking these critical depositions because we knew about Bazian and Sarsour before the litigation and "chose not to name them as Defendants" or include them in our initial deposition notices. The premise of that argument is flawed. We were never required name as defendants or notice depositions of *every* knowledgeable witness—in fact, to do so would have been contrary to the limited and preliminary nature of the jurisdictional discovery. We started with Ahmad because we believed—based on information *defendants* provided—that Ahmad was the witness defendants intended to rely on and would have extensive knowledge of the formation and early operations of AMP. We now know that Ahmad has virtually no knowledge or memory. We recognize that the Court requires us to ask permission to take further depositions in the jurisdiction discovery phase and demonstrate a sufficient reason for doing so. We have done that in this motion. Defendants' notion that we somehow *waived* our right to ask for further depositions by not noticing Bazian and Sarsour at the beginning—before knowing whether Ahmad would be sufficient—has no basis.

Finally, defendants argue that the Court should forbid us from deposing Sarsour (not Bazian) because we "provide no proof" that he was a "founder of AMP." (Opp. at 4.) This is a false standard. Providing "proof" is not a prerequisite for requesting discovery—discovery is supposed to lead to the proof, not the other way around. Furthermore, there is ample reason to believe that Sarsour was connected with IAP and AMP all along. Defendants say Salah Sarsour was not listed as an IAP/AMS board member, but they ignore that Jaber, President of IAP/AMS, testified that Salah Sarsour was "active in IAP" (Jaber Dep. at 103 (additional excerpt attached as

place there. Abuirshaid did not recall who besides Bazian and Sarsour were there, did not recall many details about the discussion, and did not know what was decided at the meeting. (Mot. Ex. E at 181-83.)

Exhibit Q)); that Salah's brother, Imad, was a long-time IAP board member going back to 1997 (AMS Board List (Exhibit R)); and that Salah's other brother, Jamil, told the FBI that Salah was involved with Hamas and fundraising activities by the Holy Land Foundation ("HLF"), another *Boim* Defendant that was heavily intertwined with IAP/AMS and liable for the identical judgment. (Mot. Ex. L at 48.)  Likewise, defendants' assertion that Sarsour did not appear as "a member of AMP's board" until 2009 is misleading because 2009 was the first time AMP/AJP list *any* board members.  (*See* Ex. O No. 3 (showing Sarsour on the first list of board members).)  Furthermore, as discussed above, we know that Sarsour was present at the meeting Abuirshaid attended in 2005 or 2006 and expect Sarsour to confirm that he was involved in arranging contacts in 2005-2006 with people in different cities who might help the new organization. ██████████████████████ ████████████████ (Mot. Ex. I), and Sarsour's Milwaukee furniture business advertised in the 2007 AMP convention program and listed Salah Sarsour as the contact.  (2007 AMP Convention Program (excerpts attached as Exhibit S).)

## II.      THE "SUCCESSOR LIABILITY" ISSUE HAS NOTHING TO DO WITH THIS MOTION.

Defendants inexplicably devote a section of their response to an argument that "successor liability is not a live claim in this suit." (Opp. at 5-6.)  This argument quotes a paragraph from the background section of our motion (¶ 4) describing the reasons we initially filed this lawsuit.  Our motion does not seek any discovery based on the successor theory; we seek the additional discovery solely to demonstrate the existence of an alter-ego relationship.

## III.     JABER AND ABUIRSHAID SHOULD PROVIDE ANSWERS TO QUESTIONS THEIR COUNSEL IMPROPERLY INSTRUCTED THEM NOT TO ANSWER.

In defending their instructions not to answer, defendants' response attempts to gloss over three critical points.  First, counsel's instructions were unequivocal violations of Rule 30(c)(2).  (*See* Mot. ¶¶ 19-21.)  Defendants attempt to excuse their violations by asserting that "there are relevant

court orders speaking to what is permissible to answer." There are not. Defendants orally moved for an order barring questioning for periods after 2010, but the Court *denied that motion*. (Dkt. 90.) Moreover, some of defendants' instructions were based on grounds other than post-2010 questioning, and there is not even Court guidance supporting those objections. Because there was no court order barring questions in advance, it was incumbent on defendants to seek a protective order if they believed plaintiffs' questions were improper. The rules do not permit defendants to play judge, decide relevance objections on their own, and shut down questioning unilaterally.[2]

  <u>Second</u>, we are *not* seeking to compel testimony "simply because plaintiffs didn't like the answers the witnesses gave." (Opp. at 6.) Although there were dozens of answers we "didn't like" because they were improperly evasive or coached, these are not the subject of this motion. This motion focuses on five instructions not to answer where we did not get answers *at all* and material lines of questioning were cut off.

  <u>Third</u>, plaintiffs' questions were proper, well within the bounds of discovery, and not asked for any improper purpose. It is readily apparent that defendants' true purpose in blocking answers was to prevent disclosure of damaging—but relevant and discoverable—information. Nothing in defendants' response justifies their violations of Rule 30(c)(2) or depriving plaintiffs of the information these questions sought:

  1.  **Jaber quotation about Zionists working against AMP and closing IAP** (Jaber Dep. at 208:08-211:18 (Mot. Ex. D)). Defendants' instructed Jaber not to answer *any* questions relating to an Anti-Defamation League profile that purports to quote his statements at conferences. (*See* Mot. Ex. K.) Asking Jaber whether he made the quoted statements (and foundation and follow-

---

[2] As discussed in their motion (¶ 21), plaintiffs are mindful of the Court's view that post-2010 conduct is of marginal relevance. For that reason, plaintiffs kept such questions to a minimum and did not cover a number of lines of questioning relating to post-2010 events. Plaintiffs' limited questions regarding post-2010 documents were intended to elicit information about *ongoing* practices, policies, conduct, ideology and associations that plaintiffs believe continued from before 2010.

up questions) is appropriate and highly relevant. (*See* Mot. ¶ 23.a.) Recognizing that their stated objections to the ADL profile do not pass muster, defendants now argue in their response that they properly instructed Jaber not to answer because "statements of others are not 'evidence'." (Opp. at 7.) That argument is nonsensical. Defendants' potential hearsay and foundation objections to the ADL profile are exactly why plaintiffs need Jaber to confirm or deny under oath whether he made the quoted statements.

Defendants also assert that Jaber has testified that the statements contained within the ADL article are not true. (*Id.*) That is wrong. Jaber denied making a statement attributed to him in a 2010 ADL publication quoting his alleged remarks at a December 2009 MAS/ICNA convention. (Mot. Ex. D at 212-214.) However, defendants instructed Jaber not to answer any questions regarding the 2013 profile, and he has never testified whether he made the quoted statement that "The Zionist organizations are the true terrorist organizations … they will be working against AMP and they closed IAP." We are entitled to his answer.

    2.    **2010 AMP tax returns** (Jaber Dep. at 143:09-146:24). Despite defendants' efforts to distance Jaber (IAP's President) from AMP, we have learned that Jaber was a regular speaker at AMP conferences from the beginning and prepared AJP's tax returns. ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ Plaintiffs sought to depose Jaber about the 2010 return, which was within the time-period the Court set for most of the preliminary discovery. Defendants nonetheless cut off questioning based on their unilateral decision that the questioning was not relevant. Defendants' justification for this clear violation of Rule 30(c)(2) is that plaintiffs' counsel allegedly "failed to provide a proper explanation as to how Defendant Jaber interpreted tax forms to be relevant" to the alter-ego issue. (Opp. at 8.) However, as the Court

knows, "relevance" is not the standard for discoverability; defendants are not the arbiters of relevance; and a lawyer taking a deposition is not required to provide an explanation (and roadmap to the witness) up front as a prerequisite to asking deposition questions.

3. **Imprisonment of Salah and Jamil Sarsour for supporting Hamas** (Abuirshaid Dep. at 160:19-164:08 (Ex. E)).  Defendants argue that their instruction not to answer questions about the imprisonment of Salah and Jamil Sarsour was justified because *Jamil* was not involved with IAP/AMS or AMP.  (Opp. at 9.)  This ignores that Abuirshaid was asked not just about Jamil, but about Jamil and Salah together.  As discussed above, Salah was "active in IAP," was implicated by Jamil in an FBI interview for funding Hamas and HLF,[3] and is a long-time board member of AMP. Abuirshaid's knowledge about his background is a fully appropriate topic for questions.

Defendants also argue that plaintiffs misinterpret the double negative in part of their objection—they were *not* claiming that IAP was *not* relevant. However, even with that clarification, the end result was still that defendants instructed Abuirshaid not to answer based on an objection that the imprisonment was related to time periods before 2005 and, according to counsel, "the whole reason for this deposition is to focus on the creation and establishment of AMP and AJP from 2005 to 2010." (Mot. Ex. E at 163.)  This instruction violated Rule 30(c)(2), and plaintiffs are entitled to find out what Abuirshaid knows about the Sarsour brothers' background.

4. **AMP advertisements seeking donations for charities that send aid to Gaza** (Abuirshaid Dep. at 264:03-266:06; 269:13-21; 270:18-271:19).  Plaintiffs contend and evidence developed in discovery demonstrates that, just like IAP, AMP promotes fundraising efforts by

---

[3] Defendants object to the FBI memorandum because it relates to HLF and, according to defendants, examining HLF actions should have been addressed in the prior litigation.  (Opp. at 10.)  This objection makes little sense.  Plaintiffs included an excerpt from the FBI memorandum to demonstrate that they have a reasonable basis to pursue questioning about Salah Sarsour's background and imprisonment in Israel—and the memorandum clearly states that Salah's own brother implicated him in involvement with Hamas and funding HLF.  (Mot. Ex. L at 48.)  Supporting funding for HLF (which is one of the liable *Boim* Defendants) and Hamas was exactly what led to IAP's liability in the 2000 case.  Sarsour's direct involvement with this is highly relevant.

charities and individuals that send money and aid to Gaza—and in some cases directly to the Hamas government. Plaintiffs believe AMP has done this nearly since its inception and continues to promote some of the same organizations today. To obtain testimony on this practice, plaintiffs showed AMP/AJP's National Policy Director, Abuirshaid, a 2014 convention program containing full-page color advertisements from some of these charities depicting aid to Gaza and urging convention attendees to "donate now."

Defendants attempt to defend their instructions not to answer by arguing that AMP's fundraising after 2010 does not mean AMP did so earlier. (Opp. at 7.) But it appears that AMP was promoting some of these same charities from the beginning. Ironically, defendants acknowledge as much, and now urge that their improper instruction was justified (apparently in retrospect) because we had a 2007 program in our possession containing advertisements for two of the same charities and therefore did not need to use the 2014 program. (Opp. at 7-8; Ex. S (advertisements for Baitulmaal, Islamic Relief).) This argument ignores that Abuirshaid was a hostile witness who claimed not to be connected to AMP in 2007. We sought to use the 2014 program because he was a leader of AMP/AJP at that time, and the ads in 2014 program graphically show a clear connection between aid to Gaza and a request in an AMP program for donations.

5. **Identification of purported Abuirshaid article** (Abuirshaid Dep. at 286:14-290:15). Defendants argue that "there is nothing more to compel" regarding the Arabic Abuirshaid article published on the internet by "palinfo.com" with Abuirshaid's picture (Mot. Ex. M) because Abuirshaid testified that the Arabic version of the article was illegible and he had never written anything for the publisher. (Opp. at 10.) This is nothing more than an evasion designed to avoid answering the simple question of whether Abuirshaid was the author of this article, regardless of whether he wrote it for palinfo.com. There was an English translation attached to the exhibit, and it strains credibility to claim Abuirshaid could not tell whether he wrote it. (We expressly did not ask

10

him to vouch for the accuracy of the translation.) He should be required to provide a non-evasive answer regarding his authorship and appropriate foundation and follow-up questions.

## IV. DEFENDANTS SHOULD BE COMPELLED TO PROVIDE E-MAIL NEWSLETTERS AND E-MAIL LISTS.

Defendants' response evades both of the two requests in our motion for documents relating to newsletters. First, Hamayel testified that ███████████████████████████ ███████████████ (Mot. Ex. F at 141-146.) ██████████████████████ Defendants' response does not address the continued existence or non-existence of the newsletters themselves, discussing only the "email lists." If there are still newsletters in existence, they must be produced.

Second, defendants' refrain that we keep asking for documents we "wish" existed but do not is disingenuous. Defendants know we are asking for the current e-mail list ██████████████ ████████████████████████ If the current list is the only form in which the 2010 list still exists, the fact that AMP/AJP have added to it since 2010 does not make it more burdensome to produce and should not prevent its production.

THEREFORE, for the reasons set forth herein and in Plaintiffs' Motion for Leave to Take Two Additional Depositions, to Compel Answers to Deposition Questions, and to Compel further Document Production, plaintiffs request that the Court enter an order granting the motion and (i) granting plaintiffs leave to take the depositions of Hatem Bazian and Salah Sarsour limited to issues pertinent to the existence of an alter ego relationship; (ii) compelling deponents Rafeeq Jaber and Osama Abuirshaid to appear (by telephone) to continuations of their depositions to provide answers to certain deposition questions they were improperly instructed not to answer; (iii) compelling defendants to produce any e-mailed AMP/AJP newsletters through 2010 and e-mail lists used to distribute newsletters; and (iv) granting plaintiffs' costs and fees for the continued depositions and such other relief as the Court deems just and proper.

11

Dated: December 17, 2018                    Respectfully submitted,


                                           _/s/ W. Allen Woolley_____
                                           Stephen J. Landes
                                           W. Allen Woolley
                                           Michael B. Kind
                                           LOCKE LORD LLP
                                           111 South Wacker Drive
                                           Chicago, IL 60606
                                           (312) 201-2772
                                           *Attorneys for Stanley Boim, Individually and as the*
                                           *Administrator of the Estate of David Boim, Deceased,*
                                           *and Joyce Boim*



Of Counsel
Nathan Lewin (*pro hac vice*)
Alyza D. Lewin (*pro hac vice*)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, DC 20006
(202) 828-1000

Daniel I. Schlessinger
Seth H. Corthell
JASZCZUK P.C.
311 South Wacker Drive, Suite 3200
Chicago, Illinois 60606
(312) 442-0509

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that on December 17, 2018 he caused the foregoing

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO TAKE TWO

ADDITIONAL DEPOSITIONS, TO COMPEL ANSWERS TO DEPOSITION QUESTIONS,

AND TO COMPEL FURTHER DOCUMENT PRODUCTION to be served by electronically

filing with the Clerk of the Court for the Northern District of Illinois using the CM/ECF system,

and thereby serving by e-mail notification upon counsel for all parties of record.


        */s/ W. Allen Woolley*