```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
      STANLEY BOIM, individually and as    )   No. 17 C 3591
 4    Administrator of the Estate of        )
      David Boim, deceased, and JOYCE       )
 5    BOIM,                                  )
                                            )
 6                  Plaintiffs,             )
                                            )
 7             vs.                          )   Chicago, Illinois
                                            )
 8    AMERICAN MUSLIMS FOR PALESTINE, et    )
      al.,                                   )
 9                                          )   December 18, 2018
                    Defendants.             )   10:04 a.m.
10
                  TRANSCRIPT OF PROCEEDINGS
11    BEFORE THE HON. SIDNEY I. SCHENKIER, MAGISTRATE JUDGE

12    APPEARANCES:

13    For the Plaintiffs:    MR. W. ALLEN WOOLLEY
                             Locke Lord LLP,
14                           111 South Wacker Drive,
                             Chicago, Illinois  60606
15
                             MR. DANIEL I. SCHLESSINGER
16                           Jaszczuk P.C.,
                             311 South Wacker Drive, Suite 3200,
17                           Chicago, Illinois  60606

18
      For the Defendants:    MS. CHRISTINA A. JUMP
19                           Constitutional Law Center for
                             Muslims in America,
20                           833 East Arapaho Road, Suite 102,
                             Richardson, Texas 75081
21

22
                         PATRICK J. MULLEN
23                     Official Court Reporter
                     United States District Court
24          219 South Dearborn Street, Room 1412
                    Chicago, Illinois  60604
25                       (312) 435-5565
```

```
09:46:26
```

1        THE CLERK:  17 C 3591, Boim, et al., versus American
2   Muslims for Palestine.
3        MR. WOOLLEY:  Good morning, Your Honor.  Allen Woolley
4   and Dan Schlessinger here on behalf of the plaintiffs.
5        MR. SCHLESSINGER:  Good morning, Your Honor.
6        MS. JUMP:  Good morning, Your Honor.  Christina Jump
7   on behalf of the defendants.
8        THE COURT:  Good morning.  So we got a bunch of paper.
9   I would say, Mr. Woolley, when you said you want to file a
10  short reply, I'm not sure that 13 pages constitutes "short," at
11  least in my world.
12       MR. WOOLLEY:  I surprised myself on that one, Your
13  Honor.
14       THE COURT:  Yes, me too.
15       You each have various motions to file things under
16  seal.  Does anybody object to any of those motions?
17       MS. JUMP:  No, Your Honor.
18       MR. WOOLLEY:  No, Your Honor.
19       THE COURT:  All right.  Then those will all be
20  granted.
21       Turning to the motions, there's really three
22  categories.  One is whether there should be further
23  depositions, one of Mr. Bazian and one of several Sarsours.
24  I'm blanking on the first name of the --
25       MS. JUMP:  Salah, Your Honor.

1　　　　　THE COURT:  Salah, okay.  Can I ask a question?  With

2　respect to the four depositions that took place, how long were

3　they?

4　　　　　MR. WOOLLEY:  I think between four and seven hours.

5　　　　　MS. JUMP:  I'm not sure that we had one that stopped

6　at four.  But we were watching the time on one of them and came

7　within about 15 minutes of hitting it on time.  Most of them

8　were approximately five hours.

9　　　　　THE COURT:  Okay.  All right.  I'm going to allow the

10　depositions of Mr. Bazian and Mr. Salah Sarsour but limited to

11　three hours each.  Because we're focusing on really something

12　very specific in terms of time frame, I think that that should

13　be ample time to find out if they know anything and what it is

14　that they know.

15　　　　　I've read the positions.  I respect the position of

16　the defense on that.  I think, certainly I think the position

17　that they knew about Mr. Bazian especially early on, I have

18　considered that.  On the other hand, if then in June they had

19　said, well, they want to include Bazian, you couldn't argue

20　that it came too late, and I'm not sure there would have been a

21　good argument why he shouldn't be deposed on this limited

22　issue, and I focus on this limited issue.  So I will grant the

23　motion as to those depositions for a period not to exceed three

24　hours.

25　　　　　Let me pause on that for a moment.  With respect to

1    the scheduling of that, do you expect there to be any

2    complexities to that?

3         MS. JUMP:  Your Honor, Mr. Bazian is in California,

4    and as a professor who has other obligations well outside of

09:51:55    5    AMP, I'm not sure as to his schedule.

6         THE COURT:  Okay.  What about Mr. Sarsour?

7         MS. JUMP:  Mr. Sarsour has limited involvement, so I

8    can speak with him.  I know that he runs a business in

9    Milwaukee and I think that there would be fewer issues, but I

09:52:11    10    have not discussed availability with him.

11         THE COURT:  Well, is there any reason that Mr. Bazian

12    couldn't be done remotely?

13         MR. WOOLLEY:  I think we'd prefer to do it in person,

14    Your Honor.

09:52:28    15         THE COURT:  You want to go out there?

16         MR. WOOLLEY:  If we need to, I think we would do that

17    rather than do it remotely.

18         THE COURT:  Well, why don't you work on arranging

19    these, and I will order that they be done by January 31st.  If

09:52:51    20    you do them earlier that's better, but I understand the next

21    couple of weeks will be challenging for various reasons,

22    especially if someone is in California with schedules to

23    coordinate.  But I think that should give you ample time.  Does

24    anybody disagree?

09:53:28    25         MS. JUMP:  Your Honor, if we can do -- with the

1    possibility of doing Professor Bazian in California, I think

2    that will make the scheduling easier.

3            THE COURT:  Okay, so by January 31st.

4            Then with respect to the next category, which is

09:54:05    5    certain instructions not to answer at the deposition, I've

6    looked at each of those.  With respect to Mr. Jaber, there's

7    two passages that are raised.  One is at pages -- and I'm going

8    to leave out the line numbers -- 208 to 211, and these are

9    instructions not to answer questions about what he allegedly

09:54:52   10    said at a 2011 convention on the grounds that it's outside the

11    2010 time frame.

12            This is with respect to a document, and the testimony

13    as I read it was that he didn't create the document to put onto

14    the website.  That left open a little bit the question of

09:55:18   15    whether he created the document because you could create a

16    document for one purpose and it may be used for another

17    purpose.

18            MS. JUMP:  Well, I'm sorry, Your Honor.  If I may

19    clarify, are we talking about Mr. Jaber or Mr. Abuirshaid?

09:55:44   20            THE COURT:  I think it's Jaber at 208-08 to 211-18.

21            MR. WOOLLEY:  I think the issue with Mr. Jaber, Your

22    Honor, this was a profile that was published by the

23    Anti-Defamation League.

24            THE COURT:  Oh, I'm sorry.  You're right.

09:57:20   25            MR. WOOLLEY:  So it's definitely not Mr. Jaber's

1    publication.

2          THE COURT:  I'm sorry.  Yes, I was thinking -- you're

3    right.  You're right.  So then the question is, I guess,

4    whether even though he didn't create the document, did he

09:57:43    5    endorse the statements in that.  It seems to me that that's

6    close enough to 2010.  I didn't categorically bar everything

7    after that date.  So that should be answered.  If he says no,

8    then that's one thing.  If he says yes, you can argue about

9    what it means, but it also doesn't strike me that we need to

09:58:12    10    have him come back and sit to have further testimony about it.

11          MR. WOOLLEY:  I think --

12          THE COURT:  So --

13          MR. WOOLLEY:  I'm sorry, Your Honor.

14          THE COURT:  So I'm going to grant the motion that he

09:58:33    15    has to answer that, but he can do that in the form of a

16    declaration or affidavit.

17          MR. WOOLLEY:  Well, I think there would be some

18    follow-up questions, and what we proposed was he do it by phone

19    so he didn't have to come back.

09:59:04    20          THE COURT:  Yes, I know that.  I know that, but I'm

21    ruling that it's going to be an affidavit that he endorses them

22    or not.  Then, you know, you can again argue, depending on the

23    answer, about what it means.  I say that especially because

24    with the other testimony that you're raising concerning

09:59:50    25    Mr. Jaber -- and that's at 143 to 146 -- I deny the motion, and

1   I deny the motion because you're correct, Mr. Woolley, that

2   relevance is not generally a basis to instruct not to answer

3   but enforcing an order is.  This is one of those intersections,

4   because if the order is that the discovery is limited to alter

5   ego, then an instruction not to answer questions that don't

6   really go to that is enforcing a court order.

7           So if the idea was I can't instruct him not to answer

8   to enforce an order because what I'm asking is not relevant to

9   the designated subject and you can't instruct based on

10  relevance, then it kind of hamstrings a person's ability to try

11  to object and instruct in order to enforce a court order.  So I

12  deny the motion as to the passage at 143 to 146.

13          With respect to Mr. Abuirshaid, with respect to the

14  inquiry at 160 to 164 concerning potential prior imprisonment

15  of Jamil and Salah Sarsour, I will grant that motion for him to

16  answer those questions.

17          With respect to the questions at 264 to 266, 269, and

18  270 to 271, I'm going to deny the motion because as I read this

19  it really was answered.  There were questions about whether

20  Baitulmaal --

21          Is that the pronunciation?

22          MS. JUMP:  Yes, Your Honor.

23          THE COURT:  -- sponsored a particular convention, but

24  I think in the passage at page 270 he did address that.  Let me

25  go back to the transcript.  I'm looking at the deposition which

10:00:16

10:00:42

10:01:28

10:02:10

10:02:41

1  is Exhibit E to the plaintiffs' motion.  He did not answer the

2  question about whether Baitulmaal sponsored a convention.  He

3  did answer questions about whether it was an organization that

4  sent aid and supplies to Gaza.  When you asked about whether in

10:03:47  5  2014 AMP took steps to see what it was doing with money it

6  raised for allowing it to advertise, at 271 to 272 you asked:

7      "At any point in time, did AMP take any steps to

8  better investigate what Baitulmaal was doing with the funds it

9  was raising?"

10:04:23  10      The answer after some colloquy:

11      "It wasn't part of any discussion.

12      "Were you aware of any such discussions?

13      "I don't know.  I don't know if they ever took place.

14  I don't know if they didn't.  I wasn't a part of those

10:04:44  15  discussions."

16      So I think in fairness he did answer that inquiry, so

17  I'm going to deny the motion as to those passages.

18      Then at 286 to 290, this is the document where there

19  was an Arabic language version and a translation.  I guess the

10:05:16  20  question that was really put was did he write the Arabic

21  version of this, not asking him to vouch for the translation or

22  interpretation, whichever you prefer.  His testimony was he

23  would need an hour to go through it to figure it out, right?

24  That's what he testified.

10:05:45  25      MR. WOOLLEY:  The Arabic version.

1    THE COURT:  Yes, the Arabic.

2    MS. JUMP:  Yes.

3    THE COURT:  The Arabic version, yes.  But since you're

4    not asking him to vouch for the translation, in order to

10:06:24    5    determine that he'd have to read the Arabic version.

6    MS. JUMP:  Correct.  Your Honor, just to be clear, the

7    problem with the exhibit as presented is that in Arabic it

8    should be much like cursive, continuous, and it wasn't.  It was

9    like individual letter, individual letter, and what he's saying

10:07:03    10    is:  I can't read it because of that.

11    THE COURT:  Well, he didn't say he couldn't read it.

12    He said it would take him a long time.

13    MS. JUMP:  He did.  I can find the spot if you'd like,

14    Your Honor, but he did say:  It's broken apart.  Whoever wrote

10:07:27    15    this, you know, I can't read it in this way.

16    That's just as to that, what was presented and the way

17    the version was presented to him.

18    MR. WOOLLEY:  Your Honor, I think our translators

19    could read it.

10:07:49    20    MS. JUMP:  Your Honor, if you look at page 287, he

21    says:

22    "I can't read it in Arabic.  This is not -- it's not

23    connected.  The words are not connected."

24    THE COURT:  Right, I understand.  I read that.

10:08:30    25    MS. JUMP:  Okay.

1    THE COURT:  But at 288, line 3:

2    "Are you able to recognize this as something that

3  relates to what you wrote, or is it completely unintelligible?

4    "Answer:  I'd have to spend maybe an hour to read to

10:08:58   5  try to figure out what it is."

6    MS. JUMP:  Right.

7    THE COURT:  So he'll spend the hour.

8    MS. JUMP:  Okay.  Then, Your Honor, just to clarify as

9  to Mr. Abuirshaid, for the portion from 160 to 164 and as well

10:09:32  10  to that exhibit, is that something that also could be done by

11  declaration?

12    THE COURT:  With respect to these two topics, those I

13  will allow them to follow up by phone on limited to these two

14  topics.  Especially with respect to, you know, Exhibit 40, the

10:09:50  15  document that's discussed at pages 286 to 290, if his answer is

16  "yes, I wrote that," there are reasonable follow-up questions

17  that would flow from that that it's harder to do, you know, in

18  a declaration because the answer isn't simply freestanding

19  significant without further discussion.  So that I will allow

10:10:23  20  him to be re-presented for deposition by telephone.

21    Since we have a deadline to finish the other two by

22  January 31st, obviously it doesn't pay to wait till the last

23  minute, but we'll set that deadline for the completion of

24  Mr. Abuirshaid's deposition as well.  Okay?

10:10:52  25    MR. WOOLLEY:  Okay.

1    THE COURT:  Then with respect to the newsletter and
2    distribution lists, so as I understand it on the website there
3    is kind of a catalog of newsletters.
4    MS. JUMP:  There are documents, and they put it under
5    publications.
6    THE COURT:  Okay.
7    MS. JUMP:  So it's not necessarily, you know, this
8    newsletter with this date.
9    THE COURT:  But on the website you would be able to
10   find various newsletters under publications.
11   MS. JUMP:  And I'm just hesitating, Your Honor,
12   because they don't frame it as that this is, you know, a
13   newsletter of AMP.  If they would have sent out an e-mail with
14   a document, the document but not necessarily a transmittal
15   e-mail will be on the website.
16   THE COURT:  Well, put it this -- I'm sorry.  Say that
17   again?
18   MS. JUMP:  If they would have sent out -- what the
19   witness testified is that if they would have sent out a
20   document by e-mail, then the attached document will be on the
21   website --
22   THE COURT:  That's what I --
23   MS. JUMP:  -- maybe not a transmittal e-mail.
24   THE COURT:  I'm not talking about transmittal letters.
25   I'm not talking about distribution lists.  I'm talking about

1    the e-mail.  All right?

2              So I can go onto certain organizations' websites.

3    They send out newsletters.  I can go and I can find newsletters

4    that were sent out.  So if they sent out newsletters, there are

10:13:37    5    some of those at least that are on the website that somebody

6    could look at.

7              MS. JUMP:  To the extent -- and I'm not trying to

8    argue.  I just don't want to misrepresent anything.  There

9    isn't anything from the time frame that we're talking about.

10:14:00    10             THE COURT:  I didn't even ask anything about the time

11   frame.

12             MS. JUMP:  Okay.

13             THE COURT:  I'm just asking a general question.

14             MS. JUMP:  Yes, it's not as titled a newsletter.

10:14:27    15             THE COURT:  Right.

16             MS. JUMP:  But, yes, anything that would have

17   previously been sent out is on the website.

18             THE COURT:  So lurking there on the website --

19             MS. JUMP:  Yes.

10:14:55    20             THE COURT:  -- under some field you can find certain

21   things that they sent out as newsletters at various times.

22             MS. JUMP:  Correct, if it was sent out.

23             THE COURT:  Okay.  Now what you have, I think, said is

24   that you have produced all of those that are newsletters.

10:15:39    25             MS. JUMP:  We have produced -- we can't -- there

1   aren't records of what was sent out going back.  So I

2   understand Your Honor, but I just want to clarify.  So I have

3   asked for and identified everything that existed at the time

4   and that does exist.

10:16:31   5          THE COURT:  Again, you know, you're kind of --

6          MS. JUMP:  And we have produced everything we have.

7          THE COURT:  I'd like you to indulge me --

8          MS. JUMP:  Yes.

9          THE COURT:  -- and just answer my specific questions.

10:17:06   10          MS. JUMP:  Yes, Your Honor.

11          THE COURT:  Okay?

12          MS. JUMP:  Uh-huh.

13          THE COURT:  Whatever is on the website that would

14   constitute a newsletter you have produced.

10:17:23   15          MS. JUMP:  Yes, Your Honor.

16          THE COURT:  Okay.  So you're saying that there are not

17   newsletters that are on the website that go back beyond a

18   certain time.

19          MS. JUMP:  Correct, Your Honor.

10:17:36   20          THE COURT:  So my question is:  Is there any other

21   source that any of the defendants have for newsletters that are

22   in particular the '06 to '10 time frame --

23          MS. JUMP:  No.  Sorry.

24          THE COURT:  -- that's not on the website?

10:17:58   25          MS. JUMP:  No, Your Honor.

14

1      THE COURT:  So no separate database.

2      MS. JUMP:  Correct.

3      THE COURT:  No hard-copy file.

4      MS. JUMP:  Correct.

10:18:08   5      THE COURT:  Did each of the defendants do a reasonable

6  search of their files to see if:  Oh, yeah, I do have this

7  file.  I kept these old newsletters, but I'm just a pack rat.

8  I didn't know anybody would ever want them.

9      MS. JUMP:  Yes, Your Honor.

10:18:36  10      THE COURT:  Have they looked for that?

11      MS. JUMP:  Yes.

12      THE COURT:  Okay.  In the depositions of the

13  individuals, the individual defendants and Mr. Ahmad, did you

14  ask them about newsletters?

10:19:07  15      MR. WOOLLEY:  What we asked Mr. Hamayel was, one, were

16  newsletters sent out, and he answered that they were starting

17  around the time that he started in around 2009.

18      THE COURT:  Okay.

19      MR. WOOLLEY:  And he said several a month.  He did not

10:19:28  20  testify as to whether he had any or whether they existed.  We

21  just know they once existed.

22      THE COURT:  Did you ask?  Did you ask him?

23      MR. WOOLLEY:  I can't remember.

24      MR. SCHLESSINGER:  I did take the deposition, Your

10:20:01  25  Honor, and I don't remember whether I asked that question.

1    THE COURT:  Okay.  I mean, I guess --

2    MS. JUMP:  Your Honor, I can say I asked him in the

3    deposition --

4    THE COURT:  Okay.

10:20:32    5    MS. JUMP:  -- and he said he does not have a way.

6    THE COURT:  Okay.  You know, if you have testimony

7    that newsletters started going out only at about the time he

8    was involved at least in the capacity he testified to in '09,

9    and there's no evidence to contradict what I'm hearing from the

10:20:59    10    defense that what's on the website is what's on the website and

11    is what they have and that the individual defendants don't have

12    any squirreled away and the organizational defendants don't

13    have any squirreled away in a separate database or in a

14    hard-copy file, it's hard for me to order production of

10:21:27    15    something that I don't have a basis to say it should exist, or

16    maybe I should say it does exist, right?

17    MR. WOOLLEY:  We understand that.

18    THE COURT:  So I deny the motion as to the production

19    of newsletters.  Now the distribution lists become an

10:21:49    20    interesting question because as I understand what is being said

21    it's that if we take '09 as when the newsletters were first

22    going out, there is no distribution list, a historical snapshot

23    of the lists as they existed and who was on them in '09 or '10.

24    Fair?

10:22:22    25    MR. WOOLLEY:  That's our understanding, Your Honor.

1          THE COURT:  And that's correct?

2          MS. JUMP:  Correct, Your Honor.

3          THE COURT:  At some later point -- well, let me put it

4    a different way.  Today newsletters go out, right?

10:22:58    5          MS. JUMP:  Correct.

6          THE COURT:  And there is a list of distribution of the

7    newsletters.

8          MS. JUMP:  Correct.

9          THE COURT:  Okay.  And that list may include people

10:23:12   10    who got it in '09 and '10.

11          MS. JUMP:  Maybe, uh-huh.

12          THE COURT:  But it would include people who didn't get

13    it until maybe even this past year, right?  Do you agree,

14    Mr. Woolley?

10:23:33   15          MR. WOOLLEY:  Yeah, our understanding is it was this

16    same list but that it was built up.

17          MS. JUMP:  That's correct, Your Honor.

18          THE COURT:  Pardon me?

19          MS. JUMP:  That's correct, Your Honor, and it's not --

10:24:41   20          THE COURT:  What I guess I'm saying is it's the same

21    list but built up, but the problem is that after eight years of

22    build-up, what you want to know -- I mean, you probably want to

23    know more than I'm letting you know, but that's a different

24    matter.  Is there a way to take the list that exists now and

10:25:12   25    determine who was on the list as of '09 or '10?

1         MS. JUMP:  No, Your Honor, there is not.

2         MR. WOOLLEY:  We don't know, Your Honor.  All we can

3   say is this seems to be the best evidence we have to determine

4   who might be on it.

5         THE COURT:  Well, but I guess we don't know, though,

6   because what will you derive from it if you're unable to say

7   whether somebody was on the list in '09 or '10 versus that they

8   got on the list in '15 or '16?

9         MR. WOOLLEY:  I think our view of this matter, Your

10  Honor, is that the '09-10 time cutoff was set because of burden

11  issues --

12        THE COURT:  No.

13        MR. WOOLLEY:  -- in the preliminary phase.

14        THE COURT:  No, no, no, no, it wasn't set.  I

15  apologize for stepping on your remarks here, but since it was

16  my ruling I figure I should set the record straight.  It wasn't

17  a burden strictly.  It was a diminishing significance vis-a-vis

18  burden.  All right?  Your argument is that when there was the

19  establishment of entities in the '06 time frame, you know,

20  that's the alter ego.

21        Now, as they may have evolved since then who are on

22  distribution lists, you know, is somebody who decides they want

23  to get newsletters from the organization in '16 evidence of

24  whether there was an alter ego in '06?  In my view, there's a

25  point at which the relevance diminishes to zero.  There's a

10:25:36

10:26:34

10:27:07

10:27:41

10:28:10

1   point at which it's more highly relevant.  There's a point at

2   which there's a balance.  I struck '10 as a balance, but it

3   wasn't simply on, gee, it's too much burden.  It was my

4   assessment of diminishing value.

10:28:39

5        So my concern here is that a list today doesn't really

6   give you a window into who was on the list at a time when it is

7   significant, and I haven't heard of a way to identify it.  You

8   know, when you say it's the best evidence, the problem is that

9   it's not evidence of who was on the list then unless there's a

10:29:07

10  way of identifying that, and I haven't heard it.

11       MS. JUMP:  And, Your Honor, I can state that I

12  questioned Mr. Hamayel during the deposition on the record and

13  then I also checked previously with anyone else who might know

14  the answer to that, and there is not a way to parse it out.

10:30:16

15       MR. WOOLLEY:  I think our position on this, Your

16  Honor, would be that there is going to be a lot of names, some

17  of which may have been added later, that aren't going to be

18  that important on the list.  They're protected by the

19  confidentiality orders, so they're not going anywhere.

10:30:39

20       What we want to look at is to see a couple of things

21  on the list, one, whether certain names are on there that would

22  indicate to us that these folks have been involved and were

23  getting these newsletters so that we can follow up and, two --

24       THE COURT:  I'm sorry.  What is the follow-up?

10:31:09

25       MR. WOOLLEY:  Well, if these names match things in our

1   investigations that show that these people had earlier

2   involvement, that would be it.  That would be a data point.

3       The other would be that I think we're interested

4   generally in understanding the kind of categories of people and

10:31:41   5   organizations that were getting these e-mails.  Maybe some of

6   them started getting them later, but we believe that some of

7   these connections in this network have existed from clear back

8   in the IAP days, and the fact that categories of organizations

9   or people that go back that far are on this list may be

10:32:29   10   significant.

11       Now, the other side can argue maybe they didn't come

12   on the list till later or that they aren't significant, but

13   that is evidence that I think is significant, and the burden of

14   producing this list I don't think is all that great.  It's one

10:32:54   15   list, and it would be covered by the confidentiality order.

16       THE COURT:  All right.  Is there anything further?

17       MS. JUMP:  No, Your Honor.  We can't break it down.

18       THE COURT:  Okay.  I take it he's correct that there's

19   not really any burden associated with producing the list.

10:33:20   20       MS. JUMP:  Not much.

21       THE COURT:  Okay.  Produce the list subject to the

22   confidentiality order.

23       Do you have an attorney's eyes only provision?

24       MS. JUMP:  I don't believe we do.

10:33:41   25       MR. WOOLLEY:  There is not, Your Honor.  It's a

1 standard order from the Northern District.

2 THE COURT: All right. Well, I will for this

3 particular list impose as a condition that it will be

4 attorneys' eyes only.

10:35:25 5 Because, Mr. Woolley, if your position is I have other

6 documents that may allow you to make connections, those are

7 connections that your internal assessment of the evidence will

8 allow you to make and it's not going to require you to go

9 outside.

10:35:40 10 MR. WOOLLEY: Okay.

11 THE COURT: All right? How long will it take you to

12 produce that?

13 MS. JUMP: I don't know. I can try to do it by

14 January 31st and just inform the parties and the Court if for

10:38:18 15 any reason it would take longer.

16 THE COURT: All right. It shouldn't take longer.

17 MS. JUMP: I don't -- I can't imagine that it will.

18 THE COURT: Because you don't need a -- I mean, how

19 would you propose to have it produced, a printout?

10:38:53 20 MR. WOOLLEY: I'm happy to discuss what the most

21 efficacious way to do that is.

22 THE COURT: Okay. All right. Well, let's do this.

23 I'd like to have this tied off a little bit faster. Let's say

24 a month from now. Okay?

10:39:27 25 MS. JUMP: Okay.

1        THE COURT:  So we'll put it at January 18th.

2        MS. JUMP:  I don't anticipate a problem with that,

3   Your Honor.

4        THE COURT:  Okay.  Great.  Now, so the motion is

10:39:53   5   granted in part and denied in part.  I understand the reason

6   you sought the additional discovery you seek, but I am telling

7   you right now this is it.

8        MR. WOOLLEY:  Okay.  Thank you, Your Honor.

9        THE COURT:  I think that, you know, the time has come

10:40:35   10  to assess what information has been provided.  I saw in one of

11  the deposition transcripts Mr. Landes said that, you know, the

12  amended complaint was ready and raring to go.  Maybe that was

13  aspirational, I don't know, you know, but he said it's ready.

14  But you've had, I think, a fair amount of discovery.  You've

10:40:58   15  had the key people testify and two others you've identified

16  you're going to have, and I think the time then has come to go

17  to Judge Coleman and present your amended complaint and then

18  see where it sits.  Okay?

19        MS. JUMP:  Your Honor, may I ask a clarifying question

10:41:25   20  as to the deposition of Salah Sarsour?

21        THE COURT:  Yes.

22        MS. JUMP:  Are we going to use the same -- I would

23  anticipate based on the prior questions in the other

24  depositions and what's before the Court today that there may be

10:41:51   25  questioning regarding, you know, the 1990s, and I would just

1    like some guidance from the Court or clarification as to the

2    parameters in addition to the time, the length of the

3    deposition, of the subject matter for the deposition.

4                 THE COURT:  Well, what do you want to go into?

10:42:16    5    MR. WOOLLEY:  I think our primary focus is, as we

6    explained, the transition period.  We would probably also ask

7    some questions about his connections to IAP and the other

8    issues that are relevant to the transition from IAP and the

9    alter ego issues.  I don't anticipate we're going to go into

10:42:48   10    the current AMP operations even though he's on the board.

11                 THE COURT:  All right.

12                 MS. JUMP:  And, Your Honor, my concern would be as to

13    much like the questions that were asked of Mr. Abuirshaid

14    regarding imprisonment in the 1990s of Salah Sarsour, whether

10:43:35   15    there was imprisonment in the 1990s of Salah Sarsour and his

16    brother Jamil Sarsour in Israel.  I just don't see how that

17    pertains to either IAP or any later organizations regarding

18    alter ego.

19                 MR. WOOLLEY:  Your Honor, I think that's a very

10:44:16   20    central issue.  Salah Sarsour --

21                 THE COURT:  You always say every issue is central.

22                 MR. WOOLLEY:  Well, Salah Sarsour was involved with

23    the HLF, Holy Land Foundation.  He was fundraising.

24                 THE COURT:  Well, given the theory of alter ego and

10:45:31   25    the theory of the involvement, you know, of Mr. Sarsour prior

10:46:29

1 to that, that whole theory certainly dovetails into a certain
2 political philosophy, and I think that some inquiry into that
3 to set a backdrop, you know, is appropriate.  They have a
4 certain limited amount of time.  It would not behoove them to
5 unduly spend time on things that are going to take them too far
6 afield.  All right?

7        MS. JUMP:  Understood, Your Honor.

8        THE COURT:  Okay.

9        MR. WOOLLEY:  Thank you, Your Honor.

10:46:54

10        THE COURT:  Thanks very much.  A status, we should
11 probably set another status so that we don't lose track.

12        MR. WOOLLEY:  Early February?

13        THE COURT:  Well, why don't we do this.  Maybe I'll
14 set it at the latter part of January.

10:47:29

15        MR. WOOLLEY:  Okay.

16        THE COURT:  See, my hope is that you don't wait until
17 January 31st to actually do everything.  All right?  So how
18 about if I see you on January 30th at 9:00 o'clock?  If it
19 turns out that the deposition of Mr. Bazian is on January 30th

10:48:11

20 in sunny California, then we'll kick the date.

21        MR. WOOLLEY:  Okay.  Thank you, Your Honor.

22        THE COURT:  All right.  Thank you very much.

23        MS. JUMP:  Thank you, Your Honor.

24        MR. SCHLESSINGER:  Thanks, Your Honor.

10:48:19

25    (Proceedings concluded.)

1   C E R T I F I C A T E

2        I, Patrick J. Mullen, do hereby certify the foregoing

3   is an accurate transcript produced from an audio recording of

4   the proceedings had in the above-entitled case before the

5   Honorable SIDNEY I. SCHENKIER, one of the magistrate judges of

6   said court, at Chicago, Illinois, on December 18, 2018.

7

8                        _/s/ Patrick J. Mullen_
                         Official Court Reporter
9                        United States District Court
                         Northern District of Illinois
10                       Eastern Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25