**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY BOIM, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DAVID BOIM, DECEASED, AND JOYCE BOIM, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 17-cv-03591 |
| v. | ) ) | Hon. Sharon Johnson Coleman |
| AMERICAN MUSLIMS FOR PALESTINE; AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION d/b/a AMERICAN MUSLIMS FOR PALESTINE; AND RAFEEQ JABER, | ) ) ) ) ) ) ) | Hon. Sidney I. Schenkier |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND MONETARY JUDGMENT**

Plaintiffs Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim (collectively, "Plaintiffs"), for their first amended complaint against defendants American Muslims for Palestine ("AMP"), Americans for Justice in Palestine Educational Foundation d/b/a American Muslims for Palestine ("AJP") and Rafeeq Jaber, (collectively, "Defendants"), allege and state as follows:

**INTRODUCTION**

1.     In 1996, Stanley and Joyce Boim's son David was murdered in Bet El, Israel, near Jerusalem, by two agents of the international terrorist organization Hamas. Although the murder took place thousands of miles away from the United States, it was directly tied to individuals and organizations in this country that had been providing material support to Hamas.

2.     The Boims initiated a lawsuit in this Court in 2000 (the "*Boim* Action"), under the civil liability provisions of the federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d)(2).

Among the defendants in the *Boim* Action (the "*Boim* Defendants") were the Holy Land Foundation for Relief and Development ("HLF"), the American Muslim Society ("AMS"), and AMS's alter egos operating under the name Islamic Association for Palestine ("IAP", together with AMS, "IAP/AMS"). The *Boim* Action culminated in a $156 million judgment against these individuals and organizations under the ATA for their role in David Boim's murder.

3.     When time came to pay the *Boim* Judgment, IAP/AMS and HLF claimed to be out of business and to have ceased operations. HLF's monetary assets had been seized by the United States, and HLF and several of its leaders were subsequently convicted of terrorist activity. IAP/AMS said that they were ceasing operations and had few assets left as a result of the burden of the *Boim* Judgment and associated litigation costs. Seemingly, the *Boim* Action brought an end to these organizations and their ability to continue raising money. But that was not the case.

4.     At the end of 2005, after a short quiet period, a purportedly new organization emerged under a new name, "American Muslims for Palestine," or "AMP," but with the same fundamental mission and purpose of IAP/AMS. The new name and quiet period were a necessity. Following the *Boim* Judgment, the *Boim* Defendants and their leaders faced intense scrutiny from the enforcement proceedings in the *Boim* Action as well as from criminal prosecutions being pursued by the Department of Justice. Activists who had been involved with IAP/AMS and HLF recognized that these organizations could not continue to pursue their missions with the same names, in the same form, and saddled with the same civil and criminal liability as IAP/AMS. They therefore deliberately concealed their connection to IAP/AMS, emphasizing internally that "we really need to distance ourselves from any well known IAP figures."

2

5.     However, following what the initial founders themselves called a "transition" to the new organization, the AMP organization that ultimately emerged strikingly replicated the IAP/AMS organization that had ostensibly shut down under the burden of the *Boim* Judgment and ongoing criminal prosecutions. AMP/AJP ended up with largely the same core leadership as IAP/AMS; it serves the same function and purpose; it holds nearly identical conventions and events with many of the same roster of speakers; it operates a similar "chapter" structure in similar geographic locations; it continues to espouse Hamas' ideology and political positions; and it continues to facilitate fundraising for groups that funnel money to Hamas.

6.     The purportedly new juridical entities that are defendants in this case—AMP and AJP (the Section 501(c)(3) corporation that is now the operating entity doing business as AMP)—are simply fronts and new names for the same enterprise previously conducted by IAP/AMS. They have inherited and purposefully made use of IAP/AMS's goodwill, knowledge, reputation, networks, donors, fundraising capabilities, and other valuable intangible assets to carry out the same fundamental mission and activities as IAP/AMS. They have also continued IAP/AMS's informal methods of operation, with no accountability to any members; with a small, unelected board of directors that has few formal meetings and virtually no minute books or formal resolutions; and a disdain for basic corporate practices and separateness. In every meaningful respect, AMP/AJP is nothing more than a disguised continuance of IAP/AMS— stripped of the burden of the *Boim* Judgment and the ignominy of having been found liable for aiding and abetting the murder of an American teenager. AMP/AJP are the alter egos and successors of IAP/AMS, and are therefore liable for the unpaid portion of the *Boim* Judgment.

7.     Along with parallel enforcement proceedings in the original *Boim* Action, *Boim v. Holy Land Foundation*, No. 00-cv-2905, this declaratory judgment action seeks to enforce the

3

*Boim* Judgment against AMP and AJP as alter egos and successors of the *Boim* Defendants. These cases will permit the Boims to recover long-overdue compensation from alter-egos that continue to raise money and conduct operations in place of IAP/AMS.

8.     More importantly, enforcing the *Boim* Judgment against these alter egos also will serve the larger purpose of ensuring the efficacy of the civil remedies provisions of the ATA. In upholding the *Boim* Judgment, the U.S. Court of Appeals for the Seventh Circuit, sitting *en banc*, made clear that the conduct of the *Boim* Defendants was nothing less than intentional funding for terrorism: "the American Muslim Society...*did* know (that) in giving money to the (Holy Land) Foundation (it) was deliberately funneling money to Hamas." *Boim v. Holy Land Foundation*, 549 F.3d 685, 701 (7th Cir. 2008) (*en banc*) ("*Boim III*"). The *Boim* Judgment awarded under the ATA fulfilled an important role in the legislative scheme to protect American nationals from terrorism: It saddled organizations that had deliberately funded Hamas with significant liability and disapprobation. Unfortunately, casting off that liability and negative publicity has proved all too easy in this case. The *Boim* Defendants simply claimed they were out of money and had gone out of business, only to reemerge and re-start their fundraising later under new names, free of the burden of the *Boim* Judgment. Permitting United States-based supporters of terrorism to regroup and cast away their liability would effectively render the civil liability provisions of the ATA a nullity. This case seeks to ensure that entities found liable for violations of the ATA cannot escape that liability simply by forming new entities and changing their name.

9.     In addition to enforcing the *Boim* Judgment against AMP/AJP, this action seeks declaratory relief and damages against defendant Rafeeq Jaber, who is himself an alter ego of IAP/AMS. Jaber was a founder of AMS and president of IAP. He participated in the direction and control of those entities in 1996, and was directly involved in the conduct that gave rise to

the *Boim* Judgment. He remained the president and a director of IAP/AMS until the end and directed the purported wind-up of these organizations in 2004 and 2005. As such, he had fiduciary duties to the Boims as judgment creditors of IAP/AMS. He failed to exercise adequate diligence and care in carrying out those duties and concealed the continuation of the *Boim* Defendants to evade collection of the *Boim* Judgment.

10.     This action requests that the Court (i) enter a declaratory judgment determining that AMP and AJP are the alter ego and/or successors of one or more of the *Boim* Defendants (including IAP/AMS); (ii) enter a declaratory judgment determining that Rafeeq Jaber is the alter ego of one or more of the *Boim* Defendants (including IAP/AMS) or is liable under the doctrine of veil piercing; (iii) enter a declaratory judgment determining that each of Defendants is jointly and severally liable for the unsatisfied portion of the *Boim* Judgment; (iv) enter money judgments against each of the Defendants, jointly and severally, for this unpaid liability; and (v) enter a money judgment against Jaber for fraudulently concealing from Plaintiffs material facts regarding the collection of the *Boim* Judgment, including that IAP/AMS was being resurrected in the form of AMP and that IAP/AMS continued to have valuable good will, intangible assets, and a newspaper that were being passed on without any compensation to Plaintiffs.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 18 U.S.C. §§ 2333(a) and 2338 and 28 U.S.C. §§1331 because Plaintiffs seek to impose liability on AMP, AJP and the Rafeeq Jaber arising from the civil liability provisions of the ATA, 18 U.S.C. § 2333(d)(2), as alter egos and/or successors of the *Boim* Defendants. *See, e.g., Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037-1038 (7th Cir. 2000) (alter ego liability was "direct" liability under federal statute and therefore subject to federal

subject matter jurisdiction); *Central States, Se. and Sw. Areas Pension Fund v. Central Transp., Inc.*, 85 F.3d 1282, 1286 (7th Cir. 1996) (recognizing federal subject matter jurisdiction for enforcement action based on alter ego liability); *Trs. of the Chi. Painters & Decorators Pension Fund v. NGM Servs., Inc.*, 2014 U.S. Dist. LEXIS 176004, at \*6-7 (N.D. Ill. Dec. 22, 2014) (federal subject matter jurisdiction for successor claim).

12.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, and to issue preliminary and permanent injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.

13.     In addition, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 in the event that any claims asserted herein are not subject to original jurisdiction, because such claims (if any) are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14.     Venue is proper under 18 U.S.C. §2334(a) because one or more of the Defendants resides, will be served, and/or has an agent in this judicial district. Venue is also proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district and/or, on information and belief, a substantial part of the property that is the subject of this action is situated in this district.

## THE PARTIES

15.     Plaintiffs Stanley Boim and Joyce Boim are United States citizens who reside in Jerusalem, Israel. Stanley Boim is the administrator of the estate of his son, David Boim, deceased. The *Boim* Judgment was entered in favor of Stanley and Joyce Boim.

16.     AMP (American Muslims for Palestine) is a California corporation now listed as suspended on the California Secretary of State website.  The entity's listed mailing address is 10101 South Roberts Rd., Palos Hills, Illinois.

17.     AJP (Americans for Justice in Palestine Educational Foundation, doing business as American Muslims for Palestine) is a 501(c)(3) tax-exempt organization incorporated in California and located at 10063 South 76th Avenue, Bridgeview, Illinois.

18.     Individual Defendant Rafeeq Jaber is a resident of Illinois and this Judicial District.  Individual Defendant Rafeeq Jaber was a founder of AMS and president of IAP.  He was directly involved in the conduct that gave rise to the *Boim* Judgment and was an alter ego of AMS/IAP and/or is subject to liability under the doctrine of veil piercing.

## GENERAL ALLEGATIONS

19.     Stanley and Joyce Boim's seventeen-year old son David was murdered by Hamas terrorists at a bus stop in Israel in 1996.  He was standing with a group of classmates on their way to Jerusalem to attend a review class in preparation for their matriculation exams.  A car drove up opposite the boys and a gunman shot at the group, hitting David in the head.  David died the next day.  The Boims filed suit in 2000 in this Court under the civil remedies provision of the ATA, 18 U.S.C. §2333.  The *Boim* Defendants included individuals and organizations in the United States that provided material support to Hamas in violation of 18 U.S.C. §2339A.  They included, *inter alia*, *Boim* Defendants HLF, IAP/AMS, the American Middle East League for Palestine ("AMELP"), and a purported think tank, the United Association for Studies and Research ("UASR"), which was the political command center of Hamas in the United States.

7

## HAMAS BUILDS A NETWORK—INCLUDING
## IAP AND AMS—TO FUND ITS ACTIVITIES

20.     The Gaza branch of the International Muslim Brotherhood became Hamas in 1987 during the Palestinian uprising against Israel known as the "First Intifada." As IAP board member and AMP leader Osama Abuirshaid has explained, less than a year later: "Hamas issued its charter (or covenant)… The charter is an unapologetically hard-line document that vividly promises destruction to Israel. However, with the passing of time…. the discourse of Hamas has become much softer, though the major beliefs of the movement remain unchanged and it continues to refuse the recognition of the state of Israel." The Hamas charter calls for the annihilation of Israel through "jihad" (i.e. holy war) and seeks to establish an Islamic state in place of Israel, "from the (Jordan) River to the (Mediterranean) Sea." It rejects not just the state of Israel but also secular Palestinian rule, and it advocates the use of violence and terrorist attacks to achieve its ends. The leaders of IAP/AMS, HLF and AMP/AJP, and the organizations themselves, are well-known vocal advocates and proponents of this ideology and political program.

21.     Primarily through the Izz al-Din al-Qassam Brigades (Hamas' military wing), and now as the de facto governing body in Gaza, Hamas has taken credit for numerous acts of terror, including suicide bombings and shootings of civilians and military targets, dating back to its inception. In 1995, the United States designated Hamas as a "Specially Designated Terrorist" in Executive Order 12947 (January 25, 1995), which declared a national emergency with respect to the "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process." This designation was reaffirmed under Executive Order 13224 (October 31, 2001) and remains in effect today.

22.    Hamas garners support and raises funds for its terrorist attacks and jihad against Israel through social welfare, charitable, humanitarian and political activities, carried out directly and through an extensive network of Hamas-affiliated charities, social service organizations and mosques.  These activities enhance Hamas's reputation, allow it to recruit participants for terrorist activities, and allow it to collect funds ostensibly ear-marked for legitimate purposes. Funds channeled to these organizations, even if for legitimate purposes, free up Hamas's resources to be used for terrorist attacks, and funds donated for humanitarian purposes may ultimately be channeled to Hamas's military wing.  In some cases, Hamas-affiliated social institutions have directly engaged in recruiting, propaganda, incitement, and logistical support for terrorist activities.

23.    Hamas obtains funding from a broad network of sources outside Gaza.  These include U.S.-designated State Sponsors of Terrorism (such as Iran), wealthy individuals, numerous charities that function as Hamas front organizations, and overseas organizations set up in Europe, Asia and the United States to raise funds from international donors.  In the years leading up to the *Boim* Judgment, this worldwide network raised tens of millions of dollars per year to support Hamas.  This network continues to provide extensive financial support to Hamas today.

24.    Hamas's international funding and support network had its origins with the Muslim Brotherhood even before Hamas was founded.  Beginning in the 1950s, the International Muslim Brotherhood, through its "Western Brothers," took root in the United States establishing an intricate network of interconnected organizations and activists to promote and fund its goals. Among those groups and activists in the United States was the "Palestine Committee"

9

established by Brotherhood leaders in Gaza and the United States in the 1980's to publicly support and fund the emerging terror network.

25.     After Hamas was established in 1987, "[t]he International Muslim Brotherhood directed its Palestinian Committees throughout the world, including in the United States, to help Hamas." *See* Order, *United States v. Holy Land Foundation*, No. 04-CR-00240 (N.D. Tex. May 24, 2010) [Dkt. 1447, p. 9].     The Palestine Committee then created a group of organizations, run by a small group of identifiable activists, to fulfill this mandate.     These were not membership organizations.     They were controlled by a small group of self-appointed leaders who paid little if any attention to corporate forms or legal requirements.     The Palestine Committee in the United States established three related entities with distinct roles and tasks to carry out this mission: *Boim* Defendants IAP/AMS, UASR, and the "Occupied Land Fund," which subsequently renamed itself "the Holy Land Foundation."

### THE *BOIM* DEFENDANTS

26.     <u>Holy Land Foundation for Relief and Development (HLF)</u>.     *Boim* Defendant HLF, formerly the Occupied Land Fund, was founded in Indiana in 1988, one year after the founding of Hamas, by Shukri abu Baker with funds supplied by Mousa abu Marzook (a/k/a Abu Omar, Abu Umar, Abu Rizq), who is currently and has for many years been a senior leader of Hamas.     HLF was later incorporated in California by Abu Baker, Ghassan Elashi and Mohammad el-Mezain in 1991, and renamed the Holy Land Foundation for Relief and Development.     HLF moved to Texas in 1992 and was located across the street from Elashi's business, Infocom Corporation.     Infocom and Ghassan Elashi were convicted in 2005 for dealing in the property of a Specially Designated Terrorist and conspiracy to commit money laundering. The violations included sending money to Marzook.

27.     HLF acted as the direct financial conduit to Hamas institutions and was referred to by its leaders as "the Treasury" or "the Fund." HLF claimed to be the largest Islamic charity in North America and publicly declared that it was dedicated to the cause of social welfare in Palestine.

28.     <u>Islamic Association for Palestine (IAP).</u> An entity or group of persons and entities operating under the name "Islamic Association for Palestine" (known collectively as "IAP National") operated continuously in the United States from the time it was established by the Palestine Committee in the early 1980s until it purportedly closed in late-2004 or early-2005. In 1981, Khaled Mishal directed the creation of the Islamic Association for Palestine. Khaled Mishal was then a senior member of the Muslim Brotherhood in Gaza and from 2004 until May 2017 was the leader of Hamas. Khaled Mishal described IAP as one of the "first pillars of Hamas." In 1983, Marzook was tasked to strengthen IAP. Marzook transferred $150,000 to both IAP and HLF. On August 29, 1995, Marzook was designated by the U.S. Department of the Treasury as a Specially Designated Terrorist. He was expelled from the United States in 1997. On August 22, 2003, Khalid Mishal was designated as a Specially Designated Global Terrorist.

29.     IAP National acted as an umbrella organization that encompassed various other informal and legal entities throughout the United States that called themselves "Islamic Association for Palestine." These included: IAP Illinois; the Islamic Association for Palestine formed in California in 1986 by Ghassan Elashi ("IAP California"); AMS (American Muslim Society) formed by Rafeeq Jaber in Illinois in 1993; American Middle East League for Palestine ("AMELP") formed in Texas in 1990 by Yasser K. Saleh Bushnaq and Ismael Selim Elbarasse; and IAP Texas formed by Basman Elashi in 1993. Ghassan Elashi was convicted in the HLF

case in 2004 and sent to prison for violation of the ATA. Elbarasse shared a bank account with Marzook that sent substantial funds to IAP, UASR and HLF. Elbarasse and Marzook funded Boim Defendant Muhammad Salah's trip to Israel, the West Bank and Gaza in 1992 to deliver "emergency" cash to Hamas operatives. Each of these organizations assumed a primary position in the IAP/AMS network depending on the location of the individual who was designated as the leader of the network at that time.

30.　　IAP National functioned as a promoter and fund-raiser for the network of front organizations supporting Hamas, including by promoting HLF and by directing donors to give money to HLF. IAP National also acted as the primary voice and propaganda arm for Hamas in the United States. It published Arabic-language newspapers directed to the Palestinian population in the United States advocating Hamas doctrines, it issued Hamas press releases and communiqués, and published the Hamas charter, which, as noted above, explicitly called for the destruction of Israel and the murder of Jews. In line with Hamas' political program, IAP National (along with the legal entities under its umbrella) never promoted a solution to the Palestinian issue that included the continued existence of the State of Israel.

31.　　IAP National organized annual conventions, conferences and meetings, which included as speakers members of Hamas brought from the Middle East at IAP's expense as well as local pro-Hamas speakers. These conferences and conventions have been a hallmark of entities in the Hamas network, including IAP/AMS. They create a circle of social interaction where leaders and activists know each other. Leading Islamic scholars are able to hand down teachings. Important connections and relationships are formed and sustained in these conferences and decisions are made "on the margins" of these conventions.

32.     American Muslim Society (AMS).  *Boim* Defendant AMS was incorporated in Illinois in 1993.  In 1994, AMS applied for the name of "Islamic Association for Palestine in Chicago."  Prior to its incorporation, AMS's principals acted as the local chapter of IAP National.  The AMS group took over leadership of IAP National in 1996, with Defendant Rafeeq Jaber as its president.  During the *Boim* litigation, AMS was both the Chicago branch and the national office of IAP National, and it was the primary voice for Hamas in the United States.  Although it was formally a separate corporate entity, the Seventh Circuit Court of Appeals ultimately determined that AMS was in reality simply one of the various alter egos of the IAP National umbrella organization and pursued the same objectives and mission.

33.     While IAP characterized itself as a "public-awareness, educational, political, social, and civic" organization, one of the core missions of IAP/AMS was to promote and facilitate funding for Hamas and Hamas ideology and political positions.  As explained by Magistrate Judge Keys in his comprehensive ruling on summary judgment in the *Boim* Action: "IAP and AMS (as well as the various organizations within the national IAP umbrella) contributed money, on a number of occasions, to HLF, and routinely and consistently encouraged people to donate money to HLF, and otherwise assisted in HLF's fundraising endeavors." *Boim v. Quranic Literacy Institute*, 340 F. Supp. 885, 910 (N.D. Ill. 2004) ("*Boim v. QLI*").  "Turning to the question of whether IAP and AMS desired to help Hamas' activities succeed, and, in fact, engaged in some act [to help] those activities succeed, the record contains an abundance of evidence that both of these propositions is, in fact, true." *Id.* at 908.

34.     Notwithstanding its veneer of official neutrality with respect to Hamas' activities, Magistrate Judge Keys found that IAP/AMS promoted these activities, albeit "subtly":

> The record makes clear that, if IAP has never outrightly cheered on
> Hamas' terrorist activities, it has come awfully close.  Certainly,

13

> IAP has never condemned Hamas' tactics. Indeed, Mr. Jaber testified that IAP takes no position on whether suicide bombings, also called "martyrdom operations," are right or wrong, "because we do not judge. I don't believe we are in a position to judge the people what they do and what they do not do. Because the one in the field is different than the one sitting in the chair like me here." Jaber Deposition II, pp. 194–95. The record shows that IAP actually praises Hamas' terrorist activities, though it does so somewhat subtly: Mr. Jaber admitted that IAP National, under his leadership, published articles and editorials characterizing suicide bombers and those who carried out bombing operations against Israeli targets as "martyrs" and as "freedom fighters," though he claimed that IAP took no official position on the validity of those characterizations. Jaber Deposition II, pp. 194–98.

*Boim v. QLI*, 340 F. Supp. 2d. at 912.

35.     IAP/AMS were also closely tied to HLF and shared key personnel. For example, HLF Treasurer Ghassan Elashi formed IAP California; HLF President and CEO Shukri Abu Baker was a member of IAP National's advisory board; Kifah Mustapha, HLF's registered agent in Illinois, organized the programming for IAP National's 1999 Annual Conference; and Ahmad Agha, HLF's treasurer, was a director of AMELP.   The fluidity and interchangeability of activists between IAP's various constituent organizations and HLF was typical and characteristic of Hamas and Palestine Committee organizations.

36.     IAP/AMS and HLF leaders also established close and consistent relations with Hamas leadership in Gaza and the West Bank.  In 1988, Abdullah Azzam, who founded al-Qaeda with Osama bin Laden, was the featured speaker at the annual IAP conference.  Azzam made an impassioned plea at the conference to donate funds to Hamas and referred explicitly to Sheikh Ahmed Yassin, the terror group's spiritual leader in Gaza, as a worthy recipient of donations.  Sheikh Said Mohammed Siyam, one of Hamas' most senior political and military leaders from Gaza and a protégé of Hamas co-founder Sheikh Abdel Aziz al-Rantissi, spoke at the 1989 convention.

14

37.     <u>United Association for Studies and Research (UASR)</u>.  *Boim* Defendant UASR was created by Marzook in Illinois in 1989 as an affiliate of HLF, IAP and AMS.  UASR purported to be a think-tank conducting research on Middle-Eastern and Islamic topics.  It functioned as a political and intellectual command center for Hamas in the United States.

## THE *BOIM* DEFENDANTS CONSPIRE TO CONTINUE SUPPORT FOR HAMAS IN THE WAKE OF THE OSLO ACCORDS AND GROW THEIR NETWORK OF SUPPORT IN THE UNITED STATES

38.     As noted above, it is a cardinal principle of Hamas that no agreement can be reached that will allow for the permanent presence of the State of Israel.  This view took a serious blow when in 1993 the Palestine Liberation Organization, led by Yasser Arafat, entered into an agreement with Yitzhak Rabin, Israel's Prime Minister, to establish a mechanism to lead to peace.  This agreement was known as the "Oslo Accords."  Leaders of HLF, IAP/AMS and UASR organized and attended a summit held in Philadelphia in 1993 that included Hamas leaders from Gaza and the West Bank.  The purpose of the meeting was to design a strategy to oppose the Oslo Accords including by "support[ing] the families of the (Hamas) martyrs" and providing "a political force for our brothers on the inside."  A recommendation was made that "[the] institutions (in the United States) should be at the service of the Movement over there… [and] should include financial, information, political, everything."  The meeting was surveilled by the FBI.  Transcripts of the meeting that were released by the government show that leaders of IAP and HLF including Omar Ahmad, Mohammad al-Hanooti and Ismail Elbarasse of IAP, and Shukri abu Baker and Ghassan Elashi of HLF were active participants.

39.     The Philadelphia meeting was a precursor to the events and the specific strategy that underlies this complaint and explains the subsequent events that are the subject of this lawsuit.  The tapes of the meeting reveal that leaders of IAP/AMS and HLF fully expected that

Hamas would soon be designated by the government as a terrorist organization. This would require Hamas' U.S. affiliates to take a nuanced position in dealing with the American public and policy makers. They understood that dissimulating the Palestine Committee's real aims was a necessary tactic. Shukri Abu Baker was heard saying, "I swear by Allah that war is deception. … Deceive, camouflage, pretend that you're leaving while you're walking that way." Omar Ahmad elaborated on Abu Baker's position by comparing the deception that the group was going to employ with head fakes used by basketball players. "He makes a player believe that he is doing this while he does something else." The participants made it clear that moving forward they had to create two separate public personas: (1) to address the general American public in moderate terms (2) while speaking to their Islamic followers with greater honesty.

40.    By the time that David Boim was murdered in 1996, the IAP/AMS organization and the entities under its umbrella, together with HLF, continued to grow and broaden their capabilities and importance. In 2002, IAP/AMS's website claimed that is was "the largest Muslim, Arab, and Palestinian American grassroots organization dedicated to the cause of Palestine…" The IAP/AMS organization had built a massive network of financial donors, leadership, volunteers, loyal followers, regional groups, speakers, and contacts in Hamas and the Arab world. It had built and expanded a newspaper, public relations expertise, and substantial media, publishing, social media and internet capabilities. It had developed a major annual convention and the capability to stage successful national and local fund-raisers, festivals and other events. It had compiled lists of donors and sponsors and developed the capacity to raise money for its component entities and other groups that supported its cause. It had built good will, constituent loyalty, and prestige, for both the organization and its leaders.

16

41.     In short, in the two decades since its inception, the IAP/AMS organization had become a valuable and effective operation, with significant assets, resources and capabilities that enabled it to raise substantial quantities of money and have a powerful voice across a large constituency in the United States.

## THE *BOIM* DEFENDANTS ARE JUDGED LIABLE TO PLAINTIFFS

42.     On November 10, 2004, the United States District Court for the Northern District of Illinois entered summary judgment in favor of the Boims and against *Boim* Defendants IAP, AMS and HLF, reserving the issue of damages for a subsequent jury trial. *Boim v. QLI*, 340 F. Supp. 2d 885. On December 8, 2004, a jury awarded damages of $52 million. Pursuant to the ATA, the judgment was trebled and entered in the amount of $156 million.

43.     Throughout the suit, in both the trial and appellate courts, IAP/AMS repeated their public position that they were nothing more than "charitable and educational" institutions promoting the welfare of Palestinians and educating the American public about the Palestinian cause.

44.     The District Court found that the evidence presented in the parties' summary judgment papers squarely debunked this argument, such that "no reasonable jury" could find in favor of IAP/AMS on the issue of liability. *Boim v. QLI*, 340 F. Supp. 2d at 913. The defense that the individual and organizational defendants were mere advocates and benign donors was rejected.

45.     The *Boim* Defendants also asserted that they should not be liable because they supported Hamas' humanitarian and charitable activities rather than its terrorist activities. The United States Court of Appeals for the Seventh Circuit, sitting *en banc*, rejected that assertion in a landmark ruling governing civil liability under the ATA. The Court held that a defendant that provides material support to a terrorist organization such as Hamas—even to its social or

charitable wing—with knowledge that the organization engages in terrorism is, as a matter of law, a cause of the organization's terrorist activity and liable for damages under 18 U.S.C. § 2333. *Boim III*, 549 F.3d at 698-99 ("Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities").

46.    The Seventh Circuit also rejected the suggestion that indirect support does not constitute a violation of the ATA, holding that donating money to another organization that supports Hamas—directly or through a "chain of intermediate organizations"—can lead to liability so long as the defendant knows (or is reckless in failing to discover) that donations to the other organization end up going to Hamas. *Boim III*, 549 F.3d at 701-702.

47.    IAP/AMS further argued in the District Court that the "IAP" named in the complaint was a different entity than the IAP/AMS entities whose names appeared in the record. The District Court acknowledged that "there were a number of organizations using the IAP name," but held that the evidence made clear that all of those organizations were related, "whether officially or unofficially." *Boim v. QLI*, 340 F. Supp. 2d at 906-907. For instance, the Court noted that Individual Defendant Rafeeq Jaber testified that "IAP National" was an umbrella organization that floats between IAP Texas and AMS, without any separate corporate structure; when IAP National is headquartered in Dallas, IAP Texas serves as the National organization; when IAP National is headquartered in Chicago, AMS serves as the National Organization. *Id.* at 907. Jaber had served as president of IAP National, as well as of AMS and IAP Texas. *Id.* Even when IAP National was based in Chicago, IAP Texas continued to handle certain IAP National projects, and IAP National and AMS "exchange[d] money" with IAP Texas. *Id.* at 907-908. Likewise, Jaber's predecessor as president of IAP National, Omar

Ahmad, testified that another entity, AMELP (American Middle East League for Palestine), had done business for a time as IAP without any sort of corporate formality. *Id.* at 907. AMS and IAP National gave money to AMELP. *Id.* at 908. Jaber also testified that IAP National had "chapters" in various other geographic locations (Detroit, Wisconsin, New Jersey and California), which functioned like "committees" to publicize conferences and help raise money for IAP. *Id.*

48.     Based on this evidence, the District Court concluded that AMS and all the IAP entities essentially functioned as one organization and could not use their purported corporate structure to avoid liability:

> In short, the record shows that at all times relevant to this action, there was a national organization serving as the Islamic Association for Palestine, and that IAP Texas and AMS either formally served as that organization, or were so intertwined and involved with that organization as to make any formal distinction meaningless. The defendants cannot now hide behind their ambiguous and amorphous corporate design. The Court finds that the defendants' "it wasn't us" arguments ring hollow.

*Boim v. QLI*, 340 F Supp. 2d at 908. The Seventh Circuit concurred with this treatment, noting that IAP "appears to be either an alter ego of [AMS] or just an alternative name for it, and need not be discussed separately." *Boim III*, 549 F.3d at 687-688.

49.     The Seventh Circuit affirmed the judgment against IAP/AMS in 2008, holding that IAP/AMS funneled funds to Hamas using HLF as a conduit. *Boim III*, 549 F.3d at 701. As noted by Magistrate Judge Keys, in addition to fund-raising for Hamas, IAP "published and distributed an abundance of pro-Hamas documents," undertook campaigns in support of *Boim* Defendant Mohammed Salah, who had been arrested in Israel, and "published documents designed to garner public support for Abu Marzook, who Mr. Jaber knew at the time to be the head of the political bureau of Hamas." *Boim v. QLI*, 340 F. Supp. 2d at 910-11.

19

50.    The Court of Appeals vacated the judgment against HLF and remanded for further proceedings on an issue that did not affect HLF's ultimate liability. *Boim III*, 549 F.3d at 701. On remand, the District Court found that HLF had funded Hamas and entered judgment against HLF for the same $156 million. 2012 U.S. Dist. LEXIS 126063 (Doc. # 883). That judgment was not appealed and is now final.

51.    On February 25, 2005, a default judgment was entered against UASR and AMELP.

52.    The Boims registered their judgments against these defendants in this Court. Those judgments remain valid and subject to enforcement. The Boims have filed a petition to revive the *Boim* Judgment against IAP/AMS pursuant to 735 ILCS 5/2-1602 and will be doing the same for the *Boim* Judgment against HLF.

## THE *BOIM* DEFENDANTS CLAIM THEY HAVE NO FUNDS TO PAY THE JUDGMENTS

53.    Following the entry of judgments in December 2004 (which were amended in early 2005), Plaintiffs issued a series of citations to discover assets starting in February 2005 and pursued enforcement proceedings against the liable *Boim* Defendants. Despite these efforts, Plaintiffs have had very limited success in collecting on the judgments against IAP/AMS, HLF and the other *Boim* Defendants.

54.    In a March 2005 deposition taken pursuant to a citation to discover assets, Individual Defendant Rafeeq Jaber, then president of IAP National and an officer of AMS, claimed that both of those organizations were essentially "defunct" as a result of the expense of the litigation and judgment in the *Boim* Action.

55.    In 2004 HLF and its principals were indicted. In 2008, five individuals, including three HLF officers (Shukri Abu Baker, Ghassan Elashi and Mohammad El-Mezain), the director

of HLF's New Jersey office (Abdulrahman Odeh), and a speaker and entertainer at HLF's fundraising events (Mufid Abdulqader), as well as HLF as an organization were convicted of violating the anti-terrorism laws for providing assistance or material support to Hamas.

56.     In a comprehensive 96-page opinion, the United States Court of Appeals for the Fifth Circuit upheld the convictions. *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011). By the time of the Fifth Circuit's decision, HLF claimed that it had ceased to function as a distinct organization.

57.     With HLF and the IAP/AMS organization apparently defunct and relying on explicit statements by Rafeeq Jaber that they were no longer operating, Plaintiffs discontinued their collection efforts.  However, Plaintiffs have since learned that the HLF and the IAP/AMS organization *did not* stop operating.  They have continued to operate and raise substantial funds under new names.

## HLF ATTEMPTS TO CONTINUE OPERATIONS DISGUISED AS "KINDHEARTS"

58.     On December 4, 2001, HLF was designated as a terrorist organization and its assets were frozen by the FBI and Treasury.  Treasury officials stated that HLF's primary purpose had been to subsidize Hamas.  In January 2002, while HLF's leaders were being investigated by the government and after HLF's assets had been seized, HLF's leaders helped launch and were active in a purportedly new organization—the Ohio-based KindHearts for Charitable Relief and Development ("KindHearts").

59.     As with its convicted predecessor HLF, KindHearts outwardly espoused strictly charitable and humanitarian objectives.  Beneath the surface, however, KindHearts was nothing more than a new legal entity created to front the same pro-Hamas organization first established by HLF and the Palestine Committee nearly two decades earlier.  KindHearts shared a bank

account and employees with HLF. IAP raised funds for KindHearts. Future AMP President Hatem Bazian spoke at a KindHearts fundraiser in 2004. Former IAP leaders Osama Abuirshaid and Abdelbasset Hamayel became KindHearts fundraisers and organizers after IAP closed down. KindHearts was a continuation of HLF intended to allow HLF to continue to operate despite consequences of the government investigation.

60.     HLF's efforts to continue its operations while hiding under a different name were ultimately unsuccessful. On February 19, 2006, the United States Treasury Department invoked a "Block Pending Investigation" and froze the assets of KindHearts, stating that the organization was the "progeny" of HLF, and that it provided "support for terrorism behind the façade of charitable giving." KindHearts disbanded in 2011 and its funds were purportedly distributed under government supervision.

## AMS/IAP "TRANSITIONS" TO AMP/AJP TO CONTINUE THE WORK OF THE *BOIM* DEFENDANTS

61.     In 2005, shortly after IAP/AMS had shut down, various individuals began discussing the "transition" to a purportedly new entity, which would ultimately become AMP. In 2009, AMP leaders incorporated AJP as a Section 501(c)(3) organization to provide fundraising capabilities. AJP later became the operating entity for the organization and is now doing business as AMP. The AMP entity is currently listed as suspended on the California Secretary of State's website.

62.     The new AMP/AJP entities have continued to occupy the same role in Hamas's international fundraising and propaganda network as the IAP/AMS organization. They continue to maintain the IAP/AMS organization's position as the most prominent Islamic organization in the United States acting on behalf of the "Palestinian Cause" and Hamas. AMP board member and one of its purported founders, Munjed Ahmad, testified that AMP is focused on the

"Palestinian issue," and that he was unaware of any other organization in the United States that had the same focus when AMP was organized in 2006, after IAP/AMS and HLF were out of business. Hatem Bazian, the first chairman of AMP, also testified that at the time—after the purported dissolution of IAP/AMS and HLF—that there was no other organization speaking for Palestine.

63.     That the new organization has come to occupy the same position as IAP/AMS was not accidental. AMP resulted from an effort to re-create an organization that would continue to play IAP/AMS's role after IAP/AMS shut down—and to do so in a manner that would deliberately conceal the close connection between the new AMP organization and its predecessors. As set forth below, the individuals involved in the "transition" initially sought to preserve the appearance that AMP was not tied to IAP/AMS. But the AMP organization that emerged was the same organization in every material respect.

**A.      IAP and AMS Are Shut Down and New Entities Are Created to Carry on their Work While Evading Liability for the *Boim* Judgment.**

64.     At the time Jaber was telling Plaintiffs that IAP and AMS were defunct in 2005, AMP was being formed as a "volunteer organization" by individuals who included IAP/AMS and HLF leadership and activists. As shown in the timeline below, the timing of the formation of—or "transition" to (to use the words of the activists involved)—AMP coincides precisely with the shutdown of its predecessors and a period of intense legal pressure that required careful concealment of the close connection between the new AMP entity and IAP/AMS.



| | |
|---|---|
| 2000 | *Boim* Action filed |
| 2001 | HLF designated, assets frozen |
| 2002 | Kindhearts created |
| 2003 | |
| 2004 | Indictment of HLF |
| | *Boim* Judgment |
| 2005 | IAP closes |
| | *Boim* citations to discover assets |
| | AMP discussions begin |
| | "Transition" bulletin board begins |
| 2006 | Kindhearts assets frozen |
| | MAS convention--AMP "transition" meeting |
| | AMP incorporated |
| | AMP convention in Rosemont--700 attendees |
| 2007 | 2nd AMP convention |
| 2008 | AMP opens first national office down street from IAP |
| | HLF found guilty |
| | 7th Cir. affirms *Boim* judgment |

65.     At the time of the December 2004 *Boim* Judgment, individuals openly affiliated with HLF and IAP/AMS faced considerable legal peril. As predicted at the 1993 Philadelphia meeting, by 2005 elements of the United States Hamas network (most notably HLF and its principals and *Boim* defendant Muhammad Salah) had been indicted by the federal government for their connections with Hamas. Fawaz Mushtaha, who was an IAP board member through 2004, fled the United States; a substantial trove of Hamas data was found buried in the backyard of his former residence. The data was important evidence in the government's criminal case against HLF. Sabri Samirah, another IAP/AMS Board member as of at least 2002, also left the

24

United States and was not permitted to return until approximately 2014. Salah Daoud and Hasan Sabri, two additional IAP/AMS board members, also fled the United States. In order to minimize legal scrutiny, and to evade continued liability for the Boim Judgment, it was necessary to obscure any connection with these organizations and their leaders.

66. In 2005, shortly after IAP/AMS stopped operations, former IAP/AMS board member Osama Abuirshaid started publishing a "new" Arab-language newspaper, *Al-Meezan*. The new newspaper had a format that was nearly identical to the IAP newspaper, *Al-Zaytouna*, which Abuirshaid had edited. The new newspaper covered the same Palestinian topics, relied on a number of the same advertisers, and was distributed to many of the same mosques and readership as the IAP newspaper.

67. By late-2005 (or before), various individuals had begun organizing the group that would eventually become AMP. The organizers referred to this initial phase of AMP on a Yahoo bulletin board as the "transition." Among the initial organizers of the "transition" group were Hatem Bazian and Magdi Odeh. Each had previously had a role with IAP/AMS or HLF. Magdi Odeh organized IAP's first annual "Jerusalem Festival for English Speakers" held in Chicago in 1999. Hatem Bazian spoke at numerous IAP and KindHearts events and had a close personal relationship with IAP/AMS leader Rafeeq Jaber.

68. In a January 18, 2006 message, Bazian suggested that an upcoming April 16, 2006 convention of the Muslim American Society ("MAS") in Milwaukee be the location "to meet for AMP business." MAS is closely affiliated with the Muslim Brotherhood. A primary organizer of MAS in 1992 was Mohammed Mahdi Akef who went on to become the *murshid* or spiritual leader of the Muslim Brotherhood in Egypt from 2004-2010.

25

69.    In preparation for the meeting, specific care was taken to avoid any public connection with IAP/AMS.  For example, Magdi Odeh told the group that Sufian Nabhan, who was an IAP board member and its Michigan representative, should be left out "when we meet in Milwaukee since he is well associated with IAP…. [W]e really need to distance ourselves from any well known IAP figures…. [s]ince this is the *transition period*…." (emphasis supplied). Nevertheless, Sufian Nabhan ███████████████████████ was involved with the organization early-on, and has served as a core AMP board member for approximately 10 years.

70.    The MAS convention where the "transition" meeting took place was effectively an IAP reunion.  The MAS convention was organized by IAP and HLF activist Salah Sarsour, who was also a member of the 2001 IAP Convention Committee.  The convention was a precursor of AMP leadership.  It included a panel discussion by future AMP director and leader Osama Abuirshaid and future AMP President Hatem Bazian and was moderated by AMS president Rafeeq Jaber.  Abuirshaid also testified that around this time he was approached by Bazian and Sarsour and attended a meeting about the need for a new organization to address Palestinian issues.

71.    Other speakers at the MAS convention included (a) Mohammed Al-Hanooti, IAP President from 1984-86 and an attendee at the 1993 Philadelphia meeting; (b) Jamal Said, Imam of the Bridgeview Mosque, who, as explained below, was the senior religious authority for IAP/AMS, a frequent speaker at IAP events and a major benefactor of HLF and other terrorist groups and supporters; (c) Raeed Tayeh, who was an IAP employee working for Abuirshaid and a Research Fellow at UASR; and (d) Kifah Mustapha, an employee of IAP from 1996-2000 who was instrumental in staging its events, a fundraiser for HLF.  These people would all become repeat speakers at future AMP events.

72.     In August 2006, AMP filed formal articles of incorporation. A few months later, in November 2006, as detailed below, AMP held its first National Convention in Rosemont, Illinois—the same place where IAP had held its annual conventions—and registered its current internet domain address, AMPalestine.org. ███████████████████████████████ ██████ who were both closely tied to IAP/AMS. Individuals affiliated with IAP opened the national office for AMP in 2008 at 10101 South Roberts Road, Palos Hills, Illinois, just down the street from the former offices of AMS/IAP and former IAP president Individual Defendant Rafeeq Jaber.

73.     In 2008, AMP's leadership formed AJP as a Section 501(c)(3) tax-exempt organization to create a legal entity to do fund-raising for AMP. ████████████████ ████████████████████████████████ As explained above, AJP subsequently became the single operating entity for the AMP organization, doing business as AMP. The AMP entity was suspended. The leadership of AMP and AJP were essentially identical. There were no formal elections of officers for either entity, and the self-appointed board members were typically unclear about which entity they served.

74.     The timing of AMP and AJP's formation as the continuation of the Palestine Committee's core project to direct Hamas' activities in the United States was deliberate and consistent with the strategy adopted at the 1993 Philadelphia meeting. On information and belief, the leaders of the IAP/AMS organization claimed IAP and AMS had closed down and ceased operations for the purpose of deflecting Plaintiffs' enforcement efforts and evading further liability. At the same time, as detailed herein, the IAP/AMS organization retained its critical assets—its leadership, its donors, its network of supporters, its reputation and "good

will," its public relations capabilities, its ability to publish a widely-circulated Arab-language newspaper, its slate of events and conventions, and its highly-effective fundraising apparatus.

75.      Utilizing and attaching this former IAP/AMS leadership was critical to AMP moving forward and achieving success.  According to AMP President Hatem Bazian, Osama Abuirshaid's "involvement....(was) a necessity...."  Former IAP/AMS board member and manager Abdelbasset Hamayel testified that that he was brought into AMP to "help the organization start functioning," exactly as he had done for IAP/AMS.

76.      In the course of seemingly abandoning the IAP/AMS entities and creating new legal entities, the IAP/AMS organization's leaders deliberately and successfully evaded Plaintiffs' enforcement efforts by means of false claims that the IAP/AMS organization had been shut down and ceased to operate.  They obscured the identity of the IAP/AMS organization as the predecessor of AMP and the source of its critical assets, leadership and mission. To obstruct and prevent enforcement of the *Boim* Judgment and thereby work a clear injustice on Plaintiffs, they continued to raise substantial funds to maintain its ongoing operations and fund new programs at substantial cost while failing to pay the outstanding *Boim* Judgment.  The same individuals who controlled IAP and AMS at the time they allegedly ceased operations now control and operate AMP/AJP.

**B.      Following the "Transition," AMP Emerges as the Same Organization as IAP/AMS with Largely the Same Core Leadership.**

77.      The core leadership and management of the AMP organization that emerged after the "transition" is strikingly similar to the core leadership and management of IAP/AMS in the years leading up to the *Boim* Judgment.

78.      As detailed in the chart below, the leadership of both IAP/AMS and AMP consisted of a limited number of individuals, which substantially overlapped:

28



79. The column on the left begins with the thirteen persons who were listed as members of the IAP/AMS boards of directors in 2002 (AMS) and 2004 (IAP). The column on the right identifies nine people who have been identified as core leadership of AMP. While several additional people have been listed on AMP/AJP's website over the years, these appear to have been a mixture of employees and people with short-term or limited involvement. Board meeting minutes, e-mail chains on board-level issues, and witness testimony indicate that the long-term core leadership of AMP/AJP has consistently been vested in just a few people.

80. The continuity in leadership between IAP/AMS and AMP is obvious and striking. Three of the first four listed IAP/AMS board members, Hamayel, Abuirshaid and Nabhan, all

undertook significant roles and board positions at AMP: Abuirshaid became chief spokesman, fundraiser and board member; Hamayel became the functional executive director; and Nabhan was ███████████ organized a significant fundraiser in Michigan in May 2007, and became an original board member. Consistent with AMP's effort to conceal its IAP roots, Jaber, the past IAP/AMS president, has held no official officer or board position at AMP. However, he has nonetheless played a major role in the AMP organization since its inception. Jaber has been a featured speaker at AMP conventions and events since the very first convention in 2006, lending his personal prestige to these events and establishing for attendees the continuity between IAP and AMP. Jaber has also acted as AMP's tax preparer and financial advisor. When AMP/AJP faced difficult tax and legal issues, Jaber was at board meetings and on e-mail chains along with the core AMP/AJP leadership.

81.    Imad Sarsour was an AMS board member. He was the business partner of his brother Salah Sarsour, who was also active in IAP. Imad, Salah and a third brother, Jamil, were also major funders of and fundraisers for HLF. Salah Sarsour took the Sarsour family board spot and leading role at AMP. Kifah Mustapha, an AMS board member, did not officially join the AMP board but has been actively involved in AMP since its inception, including as a frequent speaker and in filming promotional videos.

82.    Four other IAP/AMS board members, Salah Daoud, Sabri Samirah, Fawaz Mushtaha and Hasan Sabri, also did not take roles at AMP because they left or were forced out of the United States at the time IAP was shutting down and HLF was being criminally prosecuted. However, Salah Daoud's sister-in-law, Sanaa Daoud, took an AMP board seat. Salah and Sanaa Daoud were both affiliated with Middle East Financial Services, a money forwarding service based in Bridgeview, Illinois. In 2005, Salah Daoud testified, in exchange for

immunity, that Middle East Financial Services sent funds to Palestinian Islamic Jihad, a designated terrorist organization. When Sabri Samirah was permitted to return (briefly) to the United States, he was a featured speaker at the 2014 AMP convention.

83.    Three of the former IAP/AMS board members who are not currently known to have left the United States took no significant role at AMP: Mahmoud Shafeeq, Mohammad El-Natour and Muhamad Abdel'al. None of these three had significant roles at IAP/AMS. Indeed, Jaber, Abuirshaid and Hamayel could not even remember Mahmoud Shafeeq.

84.    Hussein al-Khatib, Hatem Bazian, and Yousef Shahin were not IAP/AMS board members (or closely related to IAP/AMS board members) as of 2002-2004. However, they were actively involved with IAP/AMS. Hussein al-Khatib had a significant role at IAP's affiliate, HLF, and was well-known and closely aligned with IAP and its leadership. Hatem Bazian was closely aligned with IAP and its leadership and regularly spoke at IAP events. Yousef Shahin was an active IAP member who was on the AMS board in 1999, had been president of IAP's New Jersey chapter, and had organized IAP activities in New Jersey. Munjed Ahmad, had no prior role with IAP/AMS. However, he was still in law school at the time IAP/AMS was active.

C.    **AMP/AJP Continue the Same Activities as the IAP/AMS Organization and Use the Same Critical Assets.**

85.    IAP and AMS were not for-profit companies seeking to earn financial benefit for their owners or shareholders. They did not have large bank accounts, own factories, or possess other significant tangible capital assets. IAP/AMS reflected the goals, ideology, outlooks and perseverance of a discrete group of individuals. IAP and AMS did not have dues-paying members. The board of directors of IAP/AMS was self-perpetuating with infrequent meetings. They did not adopt formal resolutions, and did not keep a minute book. They were not-for-profit

31

political and charitable entities, created to fund and carry out the mission of the pro-Hamas founders and leaders who ran them.

86.     Courts considering alter ego and successor liability in this context have repeatedly recognized that the traditional tests for alter ego and successor status in the for-profit corporate context do not apply to non-profits. *See, e.g., Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 435 n.14 (E.D.N.Y. 2013) (examining charities "operating as Hamas front groups," the court questioned "whether legitimate corporations are sufficiently analogous to terrorist groups such that every corporate veil piercing factor applies here"); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 334 (E.D.N.Y. 2015) (noting "skepticism" as to whether "legitimate corporations are sufficiently analogous to terrorist groups such that every corporate veil piercing factor applies" to charities allegedly controlled by Hamas); *Macaluso v. Jenkins*, 95 Ill. App. 3d 461, 465 (2d Dist. 1981) (organization's "status as a not for profit corporation in and of itself should not bar a court from applying the equitable remedy of piercing the corporate veil ... equitable remedy looks to the substance rather than to form"); *Hankinson v. King*, 117 F. Supp. 3d 1068, 1074 (D. Minn. 2015) (*de facto* merger doctrine of successor liability applied to non-profit without shareholders where there was a continuity of management and personnel); *Ring v. The Elizabeth Found. for the Arts*, No. 113849/2011, 2014 WL 5908429, at *5 (N.Y. Sup. Nov. 12, 2014) (another "court recognized that, because both entities were not-for-profits, they had no owners or shareholders.  Therefore, it looked to other indicia of control instead of considering ownership, per se").

87.     As a political and purported charitable not-for-profit, the IAP/AMS organization's most valuable and critical assets were the intangible assets that enabled it to raise money, propagate its message, build its network and power, and achieve its political objectives.  The

constant hard work of the organization and its leaders over two decades had made the organization, in IAP National's words, "the largest Muslim, Arab, and Palestinian American grassroots organization dedicated to the cause of Palestine." In building this organization, IAP and AMS accumulated substantial intangible assets including: (a) a broad and loyal constituency; (b) an ability to send its message efficiently to a discrete public; (c) a nationwide network of volunteers who for many years consistently assisted on a variety of projects (Kifah Mustapha); (d) the know-how to arrange major conventions, fundraisers and festivals (Abdelbasset Hamayel); (e) a roster of speakers for these events (Hatem Bazian, Jamal Said, numerous others); (f) public relations experts who understood the mission and the audience; (g) a widely-circulated, Arab-language newspaper with an experienced and capable editor (Abuirshaid and *Al-Zaytounah*); (h) an experienced executive director and manager (Abdelbasset Hamayel); (i) a tax preparer who was also a well-known spokesman and well-respected community leader with access to funds and the media (Jaber); (j) a network of international partners and contacts in the Middle East and elsewhere; (k) a highly-effective fundraising apparatus; (l) substantial good will and prestige, both for the organization and its leaders, based on past charitable and political work; and (m) the trust of a broad network of supporters of terrorist organizations, especially Hamas, who required the confidence that their evasion of American and international law would be protected by experienced money launderers and forwarders of funds capable of surreptitiously reaching the terrorist recipients of their contributions.

88.     The IAP/AMS organization's substantial standing in the Palestinian community was untarnished by the fact that it and its partner, HLF, and certain of its leaders had been found liable for violation of the ATA. The leaders of IAP/AMS were well-connected with Hamas

33

leadership in Gaza, which vivified the organization, provided it with legitimacy in its community and afforded direction on what political line to adopt.

89.     The IAP/AMS organization's valuable intangible assets simply "transitioned" to AMP and later AJP, which have continued to use these assets to raise money, spread the organization's message, advance the organization's pro-Hamas/anti-Israel political objectives, provide a fundraising platform for pro-Hamas intermediary organizations, and (as discussed below) provide indirect support for Hamas itself.

90.     For example, among the most significant activities of IAP and AMS was an annual conference generally held in November.  IAP invested significant time, effort and funds in preparing and conducting these conferences.  The conferences were an important fundraising platform, both for the IAP/AMS organization itself, as well as for other political and charitable organizations pursuing similar objectives.

91.     After IAP/AMS purportedly went out of business, the conferences continued under AMP's auspices.  Remarkably, in 2006 AMP, within just three months after it was purportedly formed as a "new" organization, was able to organize a convention attended by over 700 people in an upscale hotel that was in every way a duplication of the earlier IAP/AMS gatherings.  The audience, content, format, management, speakers, and their message, remained the same under the AMP imprimatur as it had been under IAP/AMS.  Magdi Odeh was listed as "point of contact" for the convention; he was an organizer of events for IAP and, as noted above, part of the "AMP Transition."   Speakers at the inaugural 2006 AMP Annual Conference included Rafeeq Jaber, Kifah Mustapha and Osama Abuirshaid, as well as Raeed Tayeh, a former employee of IAP/AMS.    Additional speakers included Nihad Awad, the head of CAIR which was formed by leaders of IAP/AMS where Awad had been employed, and Sheikh Jamal

Said, the ultimate religious authority for IAP/AMS. The mere presence of these prominent IAP personalities at the inaugural AMP convention validated the purpose and authenticity of the "new" organization. It sent a clear signal to the pro-Hamas public that IAP/AMS was still here; and that AMP was the authentic and validated continuation of the most significant Islamic organization on behalf of Palestine in the United States.

92. The 2007 AMP Conference was more of the same. A noted speaker was Sheikh Mohammad Al Hanooti, a member of the Palestine Committee, a former President of IAP and an organizer of the 1993 Philadelphia meeting. Other speakers included Sheikh Ziad Hamdan, the Imam of the Islamic Society of Milwaukee, identified by the government as an active fundraiser for HLF and a speaker at the 2001 IAP convention. The speakers again included well-known IAP personalities such as Sheikh Jamal Said, Nihad Awad, Sufian Nabhan, Rafeeq Jaber, Osama Abuirshaid, Kipha Mustafa, and numerous others who had appeared at previous IAP conventions and events. AMP and AJP also sponsor other conferences, fundraisers and events, just as IAP/AMS did. The success of these events results from the same network, capability and reputation possessed by the IAP/AMS organization. Like the IAP/AMS events, these events continued to support the same mission and objectives, have similar speakers, and raise funds for the same or similar purposes.

93. AMP/AJP is closely allied with the Arab-language newspaper, *Al-Meezan*, which Abuirshaid started publishing in 2005, just as IAP/AMS were allegedly shutting down. Abuirshaid was previously employed by IAP as the editor of IAP's similar newspaper, *Al-Zaytounah*. The two newspapers are strikingly similar in format, had nearly identical web pages, targeted the same audience, carried similar content, relied on overlapping advertisers, and, on information and belief, had very similar circulation. Like *Al-Zaytouna* for IAP, *Al-Meezan*

carried content consistent with AMP's mission and was an important means to communicate with the public that supported AMP.

94.    Like its predecessors, AMP/AJP relies on a "chapter" system to organize events and expand its geographic reach throughout the country.    From the very beginning, the "transition" group sought to build AMP's presence in other cities.    AMP soon developed chapters in locations that largely overlapped the locations where IAP/AMS had previously maintained chapters.    These included chapters in the Chicago area, Detroit area, New Jersey, District of Columbia/Virginia, and Milwaukee.

**D.    AMP is Still Promoting Hamas Ideology and Fundraising for Hamas.**

95.    AMP claims on its website—just as IAP/AMS did—that it is "all about educating people about Palestine" and nothing more.  However, it is in fact continuing the full program and mission of AMS/IAP and HLF:  to act as the major supporter of Hamas and its ideology and political agenda in the United States.  This includes, *inter alia*, running national and local conventions and conferences directed to the identical audiences of the events run by the IAP/AMS organization, with the largely the same organizers, speakers and agenda; publishing Hamas propaganda on social media; organizing and promoting fund raising for political activists and "charities" that direct money to Hamas-supervised and controlled entities in Gaza; and, maintaining close relationships with Hamas leadership in the Middle East.

96.    The circumstances in Gaza have changed since the AMS/IAP organization began operating under the AMP/AJP names.  Under the leadership of Ismail Haniyeh, Hamas forcibly took control of Gaza on June 14, 2007, and thereby became responsible for Gaza's social welfare and economic needs.  However, this did not fundamentally change the unlawful consequenc of supporting Hamas.  As the Seventh Circuit recognized in its 2008 opinion, meeting humanitarian needs in a quasi-governmental role enhances Hamas's reputation and power.  By publicly

36

addressing humanitarian needs—including providing food, housing, infrastructure and education—Hamas solidifies its ability to retain the allegiance of the population and to continue its assault on Israel.

97. After taking over Gaza in June, 2007, Hamas's leadership continued its military activities, diverting substantial funds to weapons production and the construction of underground tunnels reaching into Israel for the purpose of infiltration by terrorists. Armed conflict between Hamas and Israel in 2008-2009 and 2014 caused great damage to the civilian population and infrastructure placing greater pressure on the ability to Hamas to govern. AMP continues materially to support the same basic Hamas efforts and ideology, as did HLF and IAP/AMS.

98. Mindful of the past experiences of their predecessor entities (and concerned over government scrutiny and legal risk), AMP outwardly claims not to send or receive money to or from overseas. This contention is consistent with AMP's careful approach to avoiding legal liability while attempting to continue the same activities as HLF and IAP/AMS. AMP, for example, invited participants at its 2014 conference to "come and navigate the fine line between legal activism and material support for terrorism."[1]

99. While AMP and AMS appear to avoid any *direct* support for Hamas, they have continued to provide *indirect* support through intermediary organizations. This is exactly the activity that Magistrate Judge Keys found as a basis for IAP/AMS's liability under the ATA. *Boim v. QLF*, 340 F. Supp. 2d at 910. The Seventh Circuit held that such indirect support was nonetheless material support for Hamas that could give rise to liability under the ATA:

> Nor should donors to terrorism be able to escape liability because terrorist and their supporter launder donations through a chain of intermediate organizations.

---

[1] Shane Harris, *Pro-Palestinian Group Lectured On Skirting Terror Laws*, THE DAILY BEAST (Dec. 05, 2014), https://www.thedailybeast.com/pro-palestinian-group-lectured-on-skirting-terror-laws.

Donor *A* gives to innocent-appearing organization *B* which gives to innocent-appearing organization *C* which gives to Hamas. As long as *A* either knows or is reckless in failing to discover that donations to *B* end up with Hamas, *A* is liable.

*Boim III*, 549 F.3d at 701-02.

100. For example, AMP indirectly provided material support to Hamas by arranging to have payments sent to purported charitable organizations, which act as intermediaries, rather than funneling them through HLF, as had been done previously. At its annual conventions, AMP sets aside space for a variety of vendors and organizations that are also event sponsors—just as IAP did at its annual conventions. Prominent among these sponsors are charities devoted to the Palestinian cause, including (among others) Baitulmaal, Zakat Foundation, Islamic Relief and United Muslim Relief. These organizations raise funds at the AMP conventions to send overseas for the ostensible purpose of ameliorating the suffering in Gaza. Each of these organizations has close connections with Hamas and disburses funds through Hamas operatives.

101. For instance, Baitulmaal, Inc., is one of three United States charities on the "approved list" of the Union of Good, the charity sponsored by Sheikh Yusuf Qaradawi, which was designated in 2008 by the United States Department of the Treasury as a Specially Designated Global Terrorist group. Gaza-based Unlimited Friends Association for Social Development ("UFA") is closely aligned with senior Hamas leaders and openly states that it provides support to the children of "martyrs," a code-word for deceased Hamas terrorists. UFA openly states that it channels funds from Baitulmaal to the "families of martyrs of the Palestinian people." Baitulmaal has also openly distributed meat to Hamas functionaries and government workers on Muslim holy days claiming that "it is a matter of principle for the charity to help [Hamas] officials who can't afford to buy meat." UFA and Baitumaal share staff.

102.     Baitulmaal is a consistent supporter of AMP.  It has sponsored numerous AMP events including its conventions from at least 2007 until the most recent in November 2018.

103.     UFA receives direct support from additional AMP event sponsors including, Helping Hands for Relief and Development, the Zakat Foundation of America, and United Muslims Relief.  These funds are raised at AMP conventions.  In August 2015 AMP, under the supervision of Abuirshaid, organized an event in Detroit, Michigan on behalf of United Muslim Relief that raised approximately $200,000.  In 2016, a poster on the AMP's Facebook page called upon the public to donate money through the "Al Meshkah Charitable Society."  Al Meshkah is a conduit to Hamas and was so designated by the Government of Israel in February 2008.

104.     ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

105.     AMP has also continued to provide material support to Hamas through its open fundraising support for a pro-Hamas organization called Viva Palestina.  This intermediary organization is the creation of George Galloway, a former member of the British Parliament.  It claims to provide "humanitarian aid" to the Palestinian people.  This aid consists of money and assistance provided directly to Hamas and Hamas entities. In March 2009, the Viva Palestina activists arrived in Gaza with funds and equipment.  The "activists" were received, and Galloway was personally thanked by Ahmed Al-Kurd, Hamas' Minister of Social Welfare.  (The U.S. Department of the Treasury had, on August 7, 2007, previously designated Al-Kurd and the Al-Salah Society, a charity that Al-Kurd operates in Gaza, as a "front for Hamas.")  Galloway

handed substantial sums of money and equipment directly to Hamas leader Ismail Haniyeh, stating, "But I, now here, on behalf of myself...are giving three cars and £25,000 in cash to Prime Minister Ismail Haniyeh. Here is the money. This is not charity. This is politics." This "gift" was a small portion of the funds and equipment that was given to Hamas by Viva Palestina. The beneficiaries included the same organizations in Gaza that had been funded by HLF.

106. A draft 2009 AMP press release emphasizes AMP's significant direct role in facilitating fundraising efforts by Viva Palestina:

> Most recently AMP has endorsed and hosted several events for British MP George Galloway, who was in the United States raising funds for Viva Palestine and his second aid convoy to Gaza. AMP-sponsored fundraisers took place in Dallas, Texas; Kansas City, Milwaukee, Minneapolis and in New Jersey, where in one night Galloway raised more than $300,000.

> "AMP has the perspective to go out and do things," Galloway told the open house guests (in an event held near Chicago on April 15, 2009). "I would not have had the success I have had here if it weren't for AMP."

107. Galloway has paid tribute to AMP "who of all the organizations with which I've worked here in the United States are far and away producing the biggest meetings and the biggest fundraising, and I want to congratulate them on that. In New Jersey, they organized a fundraising dinner to which I spoke. We raised $360,000 in two hours." AMP hosted numerous fundraising events for Galloway and Viva Palestina, including on January 30, 2010 in Secaucus, New Jersey where Galloway asked the audience "to give me something to go back to Gaza with..." Other fundraisers for Viva Palestina included (a) in Minneapolis in June 2009 hosted by AMP board member Hussein al-Khatib, (b) in Brooklyn, New York on May 21, 2010, and (c) in Chicago, Illinois on May 23, 2010. Abuirshaid was a frequent speaker at these events in support of Galloway and Viva Palestina.

108.    By organizing and supporting fundraisers for Viva Palestina with knowledge that the funds were being sent directly to Hamas and Hamas-supported organizations, AMP continues an IAP/AMS core mission of raising funds for Hamas-related groups.  In knowingly raising funds for Hamas, AMP is providing material support to Hamas, just as its predecessors did.

**E.    AMP/AJP Operates within the Same Interconnected Network as Its Alter Egos and Predecessors.**

109.    The current active AMP/AJP has also inherited the network of supporters, management, and donors that previously served IAP/AMS and HLF.  For example:

110.    <u>The Mosque Foundation</u>.  The Mosque Foundation in Bridgeview, Illinois, is the charitable arm of the Bridgeview Mosque.  Together with its individual leaders, the Mosque Foundation is a significant supporter and funder of AMP/AJP, just as it was a constant supporter and funder of IAP/AMS and HLF.  The consistent and generous support of the Mosque Foundation and its affiliates and leaders was an essential asset of IAP/AMS.  In many cases, the Mosque Foundation participated directly in the IAP/AMS organization's activities, often with blurred (or non-existent) boundaries between the Foundation and IAP/AMS.

111.    The Mosque Foundation has a history of donating and directing money to terrorist organizations.  It previously donated and solicited significant funds to HLF and KindHearts as well as to Benevolence International Foundation and Global Relief Foundation, both of which were designated as financiers of terrorist organizations by the United States Treasury Department in 2002.  The Mosque Foundation directly subsidizes and supports AMP by paying the salary of AMP's "voluntary executive director," Abdelbasset Hamayel, who had previously been a central leader of IAP/AMS and an employee of KindHearts.

112.    <u>Sheikh Jamal Said</u>.  The Mosque Foundation's Imam, Sheikh Jamal Said, was the ultimate religious authority for IAP/AMS and, in the words Defendant Rafeeq Jaber, Sheikh Said

is the "religious leader of the community." Sheikh Said was identified by the government as a member of the Palestine Committee. He was also identified in 1993 as Treasurer and a member of the Board of Trustees of the Al-Aqsa Educational Fund, Inc., a funder of Hamas based in Oxford, Mississippi. In 1993, the Al-Aqsa Educational Fund, Inc., described by the government as a "financier of terror disguised as a charitable organization…," was designated by the U.S. Department of the Treasury as a Specially Designated Global Terrorist Entity Muhammad Salah, a *Boim* Defendant, stated that Jamal Said was instrumental in recruiting him into Hamas. (Salah, in a separate case, *United States v. Muhammad Hamid Khalil Salah*, 03-cr-978-2 (N.D. IL), was convicted, and imprisoned for obstruction of justice in the *Boim* Action.)

113. There has been, and continues to be, substantial intertwining of the leadership and supporters of the Mosque Foundation and what was the IAP/AMS organization and what is now AMP. Jamal Said, for instance, regularly spoke at IAP events and is a frequent speaker at AMP conventions and fundraisers. As demonstrated below, leaders of AMP/AJP, including Defendant Rafeeq Jaber and Abdelbasset Hamayel have been prominent leaders of the Mosque Foundation and its affiliates for decades.

114. <u>Rafeeq Jaber</u>. Jaber served as president, principal spokesman and recognized leader of AMS from its inception in 1993 and later became the head of the IAP National organization. Jaber remained the leader of IAP/AMS until it allegedly dissolved in 2004 or 2005. Jaber admits that he personally was an active fundraiser for HLF, and that AMS had a fundraising contract with HLF.

115. Jaber has also long been the *eminence grise* of Chicago-area organizations that support Hamas terrorism. Jaber has had a long-term relationship and leadership role with the Mosque Foundation and has served as President of the Board of Directors of the Bridgeview

Mosque. In 2006, Jaber was the initial registered agent for U.S. Palestinian Community Network ("USPCN"), a purported community group which, on information and belief, is an affiliate of the Popular Front for the Liberation of Palestine, a designated terror organization based in Gaza.

116.     Jaber has played a significant role with AMP/AJP since their inception. He was a prominent speaker at the very first AMP convention in 2006 and has been a frequent and honored speaker at AMP events since that time. He has also publicly declared his close relationships to a number of AMP leadership figures. For example, he has stated that he loves Hatem Bazian and Abuirshaid more than brothers. Salah Sarsour calls Jaber his "brother."

117.     Jaber's business, Jaber Financial Services, which is located in the former office building of AMS and IAP, is a regular donor to AMP. In 2015, Jaber signed a petition designating himself as a representative of AMP. Jaber has been a central participant in board-level business decisions for AMP and was integral in decisions concerning the corporate forms of the AMP entities. Jaber prepares and files AMP/AJP's federal and state tax returns ███████

███████████████████████████████████████████████████

███████████████████████████████

118.     In public statements, Jaber has drawn an equivalence between IAP and AMP. For example, he stated in 2011 that "the Zionist organizations will be working against AMP and they closed IAP."

119.     Jaber also personally oversaw the windup of IAP/AMP and handled the monetization of its assets and payment of creditors. The Boims received a total of $14,386 from IAP and AMS plus some trinkets from its "store." Jaber made no effort at all to pay any more of the Boim Judgment. He testified that IAP/AMS never declared bankruptcy and that there was no formal windup. He is unaware if the IAP/AMS board members knew about the judgment or any

obligation to pay. He didn't tell them. He never discussed the Boim Judgment at any board meetings. He claims that he never understood that as the President of the judgment debtor he had a fiduciary duty to see that the creditors were paid. He rejected the offer from Abuirshaid to purchase the *Al-Zaytounah* newspaper, which would have generated money to pay creditors. He explained the reason for not selling simply by stating, "[b]ecause it is a not for profit community organization. We close we close."

120.    <u>Abdelbasset Hamayel</u>.  Hamayel began working for IAP in 1997, assisting IAP leader Sabri Samirah. He became the AMS/IAP office administrator in 1997 and became the Director and Secretary General of IAP from 2002 until its purported closing. At the time Hamayel assumed the position of Director and Secretary General of IAP, AMS was "IAP National," which made the two organizations functionally identical. In a 2003 deposition, Rafeeq Jaber, then President of IAP, testified that Hamayel was responsible for producing AMS and IAP's "action letters...newsletters...(and) bulletins...," which were essential elements of the pro-Hamas propaganda offensive in the United States. Jaber described Hamayel as "[t]he employee that works for us, the executive director, the secretary. He is everything." Abuirshaid, another IAP/AMS leader, described Hamayel as playing an "important role" in "managing the internal affairs" of IAP/AMS.

121.    After IAP/AMS closed down, Hamayel moved to HLF's successor KindHearts as its Wisconsin and Illinois representative. After KindHearts' funds were frozen by the government in 2006, Hamayel was hired in 2007 by Sheikh Jamal Said, to work at the Bridgeview Mosque Foundation, where he became head of the Mosque Foundation Community Center. Hamayel began doing work for AMP in 2008 and became AMP's "voluntary" and "temporary" Executive Director in January 2009. His salary is paid by the Mosque Foundation

Community Center. Munjed Ahmad, a member of AMP's board of directors, characterizes Hamayel's role as AMP/AJP's "director of operations." Hamayel acknowledges that he undertook a critical responsibility when he came on board at AMP, stating that his role was to "help the organization start functioning."

122. Although Hamayel outwardly claims that his only contact with people in Palestine is with his family, Hamayel maintains close personal relationships with Hamas leaders in the West Bank. One such relationship is with Sheikh Bassam Jarrar. Sheikh Jarrar, who lives in Ramallah, is considered a member of the Hamas "aristocracy" because he was one of a group of Hamas activists who were deported to Lebanon by Israel in 1992. At that time, then Israel Defense Minister Yitzhak Rabin described Sheikh Jarrar as one of the Hamas leaders in the Ramallah area. Consistent with Hamas' ideology, Sheikh Jarrar has frequently stated that the elimination of the State of Israel is a theological imperative. On information and belief, Hamayel also has a relationship with Khalil al-Hayya, a senior Hamas political leader who is the spokesman for Yahya Sinwar, the current Hamas leader in Gaza. Hamayel often expresses his support and affiliation with the Islamic bloc at Bir Zeit University in Ramallah, which is a known affiliate of Hamas.

123. <u>Osama Abuirshaid</u>. Abuirshaid is an AMP/AJP board member and National Policy Director. Abuirshaid was on the board of IAP/AMS through 2004 and was the editor of IAP's newspaper, *Al-Zaytounah*. According to Jaber, Abuirshaid was "from IAP National which is…Chicago [and] in charge of everything from A to Z in the paper, what comes on the paper and what goes into the paper." Abuirshaid's salary was paid by AMS. According to a document filed by AMS with the Illinois Attorney General, Abuirshaid was one of the three highest paid persons at AMS in 2000 and 2001, along with Jaber and Hamayel.

124.    When IAP/AMS purportedly went out of business, Abuirshaid offered to purchase *Al-Zaytounah* from IAP/AMS, but Jaber declined to allow IAP/AMS to sell it.    Instead, Abuirshaid set up a replacement newspaper, which he published under the name *Al-Meezan,* from a location in Virginia.    *Al-Meezan* was an important vehicle to communicate with AMP supporters and publicize AMP's agenda and political positions, just as *Al-Zaytounah* was the primary communication for IAP/AMS.    In this newspaper and his other writings and pronouncements, Abuirshaid continued the publication and advocacy of pro-Hamas positions. The content, target audience, website and many of the advertisers of *Al-Meezan* were essentially identical to those of *Al-Zaytounah.*

125.    Abuirshaid attended the 2006 MAS convention.    He and Hatem Bazian were featured on a panel moderated by Rafeeq Jaber.    On information and belief, Bazian and Salah Sarsour approached Abuirshaid at that convention, to work with them to form the "new" organization that became AMP.    Abuirshaid claims to have declined at that time because he "didn't want to be a target" of the investigations and indictments then pending against HLF and its leaders.    However, he immediately became a regular speaker at AMP events, and acknowledges he was "very involved" as the speaker at "AMP's conferences and events (and) did a lot of their fundraisings…working on setting the tone of AMP and trying to articulate (its) positions…."    By 2010, Abuirshaid had become a board member and employed as a paid consultant acting as National Policy Director.    Bazian has testified that bringing Abuirshaid into AMP had become a "necessity."

126.    Abuirshaid plays a major role in maintaining close ties with Hamas leadership. For instance, on February 25-26, 2017, Abuirshaid appeared in Istanbul, Turkey as a headline speaker at the "Conference for Palestinians Abroad" ("PalesAbroad") organized and attended by

prominent Hamas leaders. The event was promoted by the Qassam Brigades (the military wing of Hamas) and headed by Dr. Essam Yusuf, a/k/a Essam Mustafa, trustee of Interpal, a Hamas-affiliated "charity" designated by the United States in 2003 as a "terrorist entity." The Istanbul conference received direct praise from Yahya Sinwar, the current leader of Hamas in Gaza who was designated by the United States Department of State in September 2015 as a Specially Designated Global Terrorist, and Khaled Mishaal, the leader of Hamas based in Qatar, who was similarly designated by the United States in August 2003. At the same time the organization was discredited by the Palestinian Authority as a "front for Hamas." More recently, in October 2017, Abuirshaid spoke at another PalesAbroad meeting in Amman, Jordan.

127. Abuirshaid has travelled multiple times to Qatar, including in the past year, where he has met with Ayan Jarwan. Jarwan served time in federal prison for conspiring to violate the International Emergency Economic Powers Act for sending funds to charities that were designated by the United States as funders of Al Qaeda.

128. As AMP/AJP's National Policy Director, Abuirshaid also acts as a major and prolific exponent of the Hamas political line in the United States. Although Abuirshaid ostensibly disclaims any connection with Hamas, his public positions and pronouncements praise Hamas and advocate Hamas' position on eliminating the State of Israel, including through armed "resistance." For example, in a July 12, 2014 Facebook posting, he wrote that in the context of war between Israel and Hamas the believers have only two "good" options, "victory or self-sacrifice in the path of Allah." This is a slogan frequently used by Hamas.

129. <u>Hatem Bazian</u>. Bazian is the Chairman of AMP/AJP and was involved in the "transition" to AMP in 2005-2006. Bazian is a well-known and controversial academic and

political figure, who has been a vocal critic of the existence of the State of Israel and openly expresses views aligned with Hamas.

130. Bazian has known Rafeeq Jaber, president of IAP/AMS, since the mid-1990s and was a regular participant in IAP/AMS events, including as a speaker for at least five separate IAP conferences and events. In 2004 he was a featured speaker at a fundraiser for KindHearts together with Mohammed el-Mezain, a leader of HLF who is now in prison for providing money to Hamas. He also appeared along with Abuirshaid on a panel moderated by Jaber at the 2006 MAS convention.

131. As with Abuirshaid and Hamayel, Bazian maintains ties with foreign organizations tied to Hamas. For example, in 2014, Bazian spoke at a fundraiser in the United Kingdom for Interpal, an organization that was designated by the United States Treasury in 2003 as a Specially Designated Global Terrorist because of its affiliation with Hamas.

132. <u>Salah Sarsour</u>. Salah Sarsour is the CEO of Prime Furniture in Milwaukee, Wisconsin. He owns and operates the business together with his two brothers, Emad (Imad) and Jamil. Emad was for many years a member of the IAP/AMS board of directors. Prime Furniture was a donor and bundler of donations to HLF and a consistent and generous financier of IAP events. Rafeeq Jaber identified Salah Sarsour as "active in IAP," and Salah Sarsour was a member of the planning committee for the 2001 IAP convention.

133. ███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

[REDACTED]

134.    Salah Sarsour was the chairman of the 2006 MAS convention where AMP was formed and was also Chairman of the MAS Milwaukee chapter.   Salah Sarsour testified that he was consulted by Hatem Bazian on organizing AMP.   This is confirmed by internet bulletin board posts referring to Salah Sarsour recruiting "people from in Detroit and Texas" who were "ready to start working" on AMP in early 2006.   On information and belief, Sarsour helped plan the initial AMP conventions in 2006 and 2007.   He testified that he joined the AMP board in 2009 or 2010, at or about the time he gave up the chairmanship of the MAS Milwaukee chapter, and has served on the board to date.   Salah Sarsour is AMP's "chapter coordinator" and an important fundraiser. [REDACTED] His business, Prime Furniture, sponsored AMP conventions and events, including the very first convention in 2006.  He was also chairman of the 2014 and 2015 AMP conference committees.

135.    <u>Hussein al-Khatib</u>.   Al-Khatib was a Regional Director for HLF based in Minneapolis after holding an important position as Director General for HLF in the West Bank.

In that capacity he was directly responsible for sending funds to Hamas organizations and was a signatory on HLF's bank account.

136. Al Khatib also maintained close ties with Hamas-affiliated people in the Middle East. He was identified by the government as part of the Hamas social infrastructure in Israel and the Palestinian Territories and made known his close relationship with Hamas spiritual leader Bassam Jarrar. He also prominently publicized the views of Khalil al-Hayya, a senior Hamas political leader who is the spokesman for Yahya Sinwar, the current Hamas leader in Gaza, and he repeatedly praised the views of Mousa abu Marzook, a prominent Hamas leader who was instrumental in organizing the Palestine Committee in the United States. Al-Khatib widely praised Hamas terrorists and terror attacks. For example, in November 2014 he paid tribute to a Hamas terrorist who killed a baby in Jerusalem.

137. Al-Khatib became one of the original AMP board members. He was the sponsor of a fundraising event for George Galloway in Minneapolis in June 2009 and was a close friend of Salah Sarsour. The 2009 phone number of the AMP Minneapolis chapter belonged to al-Khahtib.

138. <u>Kifah Mustapha</u>. Until 2015, Mustapha was the co-Imam of the Bridgeview Mosque, and from 2002 to 2014, he was the associate director of the Mosque Foundation. Mustapha is currently the Imam and Director of the Prayer Center of Orland Park, Illinois, and representative for Dar El Fatwa of Lebanon in the United States. Dar El Fatwa is an affiliate of the Muslim Brotherhood. Its leader is considered the most significant Muslim Brotherhood leader in Lebanon. He supports jihad against Israel including attacks from Gaza.

139. Mustapha was the Illinois representative of HLF and was its registered agent in this State. As its registered agent, Mustapha described his role as "soliciting money for the

50

various programs HLF" held in Illinois and elsewhere, including internationally. Mustapha was also closely connected to IAP. He spoke at IAP events, including the 2001 IAP convention, and now regularly speaks at AMP conferences and fundraisers including the initial AMP convention in 2006 and the following convention in 2007. He has filmed promotional videos for AMP.

140. Mustapha was identified by the government as a member of the Palestine Committee or one of its related organizations. In 2010, Mustapha filed suit against the Illinois State Police claiming wrongful discharge after he was terminated as its first Muslim chaplain. *Mustapha v. Monken*, 1:10-cv-05473 (N.D. Ill.). Judge Guzman granted summary judgment to defendants, finding that the discharge was lawful in view of Mustapha's close connection to HLF, a designated terrorist organization. *Mustapha v. Monken*, No. 10-cv-05473, 2013 WL 3224440, *10 (N.D. Ill. June 25, 2013).

141. <u>Sufian Nabhan</u>. Nabhan was an IAP director and chapter leader based in the Detroit area. An early "transition" chat reported that he was identified by Salah Sarsour as "ready to start working" on forming AMP. Magdi Odeh later stated, however, that they "would leave brother Sufian out...since he is well associated with IAP." That "leaving out" was short-lived (if it ever existed). Nabhan ██████████████████████ joined the initial AMP board in 2009. Nabhan was the IAP chapter leader in Detroit. The 2009 list of AMP chapters shows Nabhan's phone number for the AMP Detroit chapter.

142. <u>Yousef Shahin</u>. Yousef Shahin was identified by Rafeeq Jaber as an active member of IAP in New Jersey where he organized events. He was also on the board of IAP/AMS as of 1999. He became a board member of AMP in 2009. He organized a fund raiser for AMP on behalf of George Galloway and Viva Palestina that took place in New Jersey on June 21, 2009.

51

143.  _Raeed Tahye_.  Raeed Tahye was active in IAP and a Research Fellow at *Boim* Defendant UASR.  He was an employee of IAP working closely and under the direction of Osama Abuirshaid.  Tahye was a speaker at the 2006 MAS convention and at the inaugural 2006 AMP convention.

144.  _Magdi Odeh_. Magdi Odeh organized IAP's first annual "Jerusalem Festival for English Speakers" held in Chicago in 1999.  He was instrumental in organizing the "transition" from IAP/AMS in 2005-2006 together with Hatem Bazian.  He became an officer of AMP in 2007.

**F.      Neither IAP/AMS and HLF nor AMP/AJP Have Operated with Regard for Corporate Formalities.**

145.  Corporations are a legal fiction created to allow individuals to conduct business through a separate entity and insulate themselves from potential ramifications such as liability and tax consequences.  In order to avail themselves of the protections that corporate existence affords, the corporation must comply with all of the statutory and regulatory requirements imposed by the state of incorporation.

146.  Not-for-profit corporations are a specialized form of corporation that can be organized in order to carry out a charitable or civic purpose.  Not-for-profit corporations are subject to additional legal requirements beyond those imposed on corporations organized for profit in order to ensure that they are true to their corporate purpose and not unfairly taking advantage of the legal fiction that allows them to exist.

147.  HLF, IAP and AMS, the corporate defendants in the *Boim* Action, and AMP and AJP, the corporate defendants in this suit, were all organized as not-for-profit corporations pursuant to the California Nonprofit Corporation Law ("the CNCL").

148.    The CNCL imposes requirements typical of state not-for-profit statutes.  Among the obligations that the CNCL enumerates in return for recognition of its fictional existence as a legal entity are electing directors, choosing and disclosing officers, holding regular meetings at least annually, keeping appropriate minutes of meetings, and acting consistently with an approved corporate purpose.

149.    IAP was incorporated pursuant to the CNCL on November 5, 1986 by Ghassan Elashi.  According to Abdelbaset Hamayel, who was a board member and office administrator of IAP and the Secretary of AMS, corporate formalities were not observed for IAP and AMS.  Rather, AMS served as the legal entity and did business under the name of IAP.

150.    In fact, as set forth herein, the leadership of IAP/AMS had little regard for the distinctions between the various legal entities that comprised what came to be known as "IAP National."  IAP National was not a legal entity, but an umbrella organization that encompassed various other informal and legal entities, including IAP Illinois; IAP California; AMS; AMELP; and IAP Texas.  Those entities loosely operated as a single enterprise, with the entity occupying the primary position in the network shifting, depending on the location of the individual who was designated as the leader of the network at the time.  The fluidity of IAP National's various constituent organizations and HLF was typical and characteristic of Muslim Brotherhood and Palestine Committee organizations. *See Boim v. QLI,* 340 F. Supp. 2d at 906-907.

151.    The IAP National organizations observed few corporate formalities and did not differentiate or maintain separate corporate structures.  As the District Court observed in the *Boim* Action when refusing to treat the various IAP entities as separate, the entities "were so intertwined and involved with that organization as to make any formal distinction meaningless.  The defendants cannot now hide behind their ambiguous and amorphous corporate design."

*Boim v. QLI*, 340 F Supp. 2d at 908. The Seventh Circuit agreed, holding that IAP "appears to be either an alter ego of [AMS] or just an alternative name for it, and need not be discussed separately." *Boim III*, 549 F.3d at 687-688.

152.    If anything, AMP and AJP have been operated with even less regard for corporate structure and formalities. AMP was incorporated under the CNCL on July 28, 2006; AJP was incorporated as a 501(c)(3) corporation approximately three years later. However, AMP and AJP were never treated as distinct entities. They operated with common leadership and had no separate purpose (other than to use the AJP entity to avoid disclosing AMP's activities on publicly-filed tax forms). They appear to have operated with the same board of directors; and they have no records of separate officers, board meetings, corporate minutes, resolutions, or other formalities. Ultimately, the AMP entity was suspended by the California Secretary of State (without any formal windup), and AJP became the *de facto* operating entity. AJP now operates under the name "American Muslims for Palestine" (AMP) and has essentially the same board of directors and managers as had previously operated the pair of entities.

153.    Neither AMP nor AJP has ever consistently complied with the CNCL's requirements for operating as not-for profit, public benefit corporations. The single board of directors that apparently served both entities was unelected, and there is virtually no documentation regarding the selection of board members or officers. In fact, AMP does not appear to have had a board at all until approximately 2009. Once there was a board, the board members and officers appear to have been generally unaware of which entity they served. Meetings of directors were typically informal and, according to deposition testimony, often impromptu and without notice. Meeting minutes exist for only a few board meetings, with no

minutes documenting meetings during a number of years. There is virtually no documentation of formal corporate resolutions or acts.

154. For all intents and purposes, "American Muslims for Palestine" has not operated as a corporate entity (or pair of corporate entities) at all. Rather, it has operated as a loose, unstructured enterprise driven by a core group of like-minded individuals, with little to no regard for corporate structure or formalities. This core group of individuals is largely the same group that ran IAP/AMS and seeks to continue the same enterprise.

155. The leaders of IAP/AMS, HLF and AMP/AJP have all failed to comply with the CNCL's requirements for operating as not-for profit, public benefit corporations. They cannot now seek to invoke the corporate existence of these entities to shield their ongoing enterprise from liability for the *Boim* Judgment. Rather it is fair and legally appropriate to regard them as alter egos of each other, all essentially filling the same purpose with the same mission, goals, leadership, donors, and methods of operation.

## THIS LAWSUIT DOES NOT SEEK TO SUPPRESS SPEECH BUT TO DEMONSTRATE DEFENDANTS ARE ALTER EGOS AND SUCCESSORS

156. This lawsuit is not directed at AMP/AJP's ideology, the content of its message, what is said on its websites, or at the expressed views of individuals who attend its conferences. Plaintiffs' allegations regarding AMP/AJP's ideology and message, and the manner in which that message is delivered, are offered solely to demonstrate that the ideology and message of AMP/AJP is virtually identical to HLF, IAP and AMS. This is evidence that AMP and AJP are the alter egos and successors to the legal entities that were the material supporters of terrorism against whom the Boims have a valid outstanding judgment.

157. The ideology and message of HLF, IAP and AMS were central to Judge Keys' determination that these entities were liable in the original *Boim* Action. For instance, in

granting the Boims' motion for summary judgment on liability in that case, Judge Keys determined that IAP and AMS "desired to help Hamas' activities succeed" and engaged in acts of "helping those activities succeed" based on evidence that IAP/AMS (among other things): (a) held a meeting where attendees condemned the 1993 Oslo Accords and vowed to ensure its failure; (b) sponsored a speaker who urged "supporting Jihad"; (c) discussed ways to support "the Movement" (being careful not to use the name "Hamas"); (d) published and distributed pro-Hamas documents; (e) published an editorial advocating martyrdom; (f) assisted fundraising and encouraged donations to groups found to have supported Hamas; (g) allowed such groups to set up booths at conventions; (h) published documents designed to garner support for individuals affiliated with Hamas; (i) invited pro-Hamas speakers to attend conferences and conventions; and (j) "subtly" praised terrorist activities by using terms such as "martyrs" and "freedom fighters." *Boim v. QLI*, 340 F. Supp. 2d at 908-912. These, of course, are the exact same types of conduct that AMP/AJP continues to engage in to this day.

158. Judge Keys noted in reaching this finding that, while some of the *Boim* Defendants' ideology and messaging may not in themselves violate the law, these were evidence of key elements of the Boim's section 2333 claim:

> Of course, publishing documents in support of members of Hamas or in support of organizations or people known to support Hamas is not against the law. But all of this does tend to evidence a desire on the part of IAP to help Hamas succeed.

*Boim v. QLI*, 340 F. Supp. 2d at 911. The Seventh Circuit confirmed that subjecting organizations that *provide material support* for organizations (including Hamas) known to engage in terrorism to liability "would not violate the First Amendment." *Boim v. HLF*, 549 F.3d at 700.

159.     Nor do Plaintiffs allege that Defendants are liable for espousing any ideology, promulgating any speech, or associating with any person or organization.  *Plaintiffs do not request that this Court suppress or limit any speech or association.  This lawsuit seeks only to enforce an existing judgment.*  As alleged herein, AMP's ideology, messages and associations continue of the same ideology, messages and associations previously endorsed by IAP, AMS and HLF.  Use of this evidence as part of Plaintiffs' proof that AMP is a mere continuation of its predecessors—and is therefore an alter ego and successor—does not implicate the First Amendment here any more than it did in the *Boim* Action.

### DEFENDANTS ARE LIABLE FOR THE *BOIM* JUDGMENT

160.     From their creation, HLF, IAP and AMS worked in tandem to support Hamas. *See Boim v. QLI*, 340 F. Supp. 2d at 909.  The interrelationship between the organizers and donors of *Boim* Defendants IAP/AMS and HLF, and the current beneficiaries of their largess and efforts—AMP/AJP—is no coincidence.  It is the continued implementation of a plan initiated over thirty-five years ago by Khalid Mishal and Mousa abu Marzook to support Hamas in the United States by whatever available means can be devised and with any individuals who are available to assume necessary roles to skirt the laws of the United Sates and law enforcement. The conviction of HLF and its leaders and the economic losses suffered by IAP/AMS as a result of the *Boim* Judgment were not terminal events.  They were simply temporary setbacks.

161.     Defendants AMP and AJP are the alter egos and successors of *Boim* Defendants IAP/AMS and HLF.  Defendants are controlled and operated by the former leaders of these *Boim* Defendants.  AMP was headquartered on the same street as AMS and IAP and established by leaders and activists of IAP/AMS and HLF.  AMP/AJP continues the same enterprise, mission and activities as the *Boim* Defendants.  As alleged herein, the good will and many intangible

assets of the *Boim* Defendants were transferred to AMP and AJP and continue to be used by them today.

162.     IAP/AMS and HLF were abandoned and replaced by AMP/AJP in order to permit the same ongoing enterprise—formerly conducted through the *Boim* Defendants—to continue free and clear of the burden of paying the *Boim* Judgment. AMP was established in 2005 shortly after summary judgment was entered in favor of the Boims in late 2004. AMP/AJP *is* IAP/AMS and HLF, but just has a different name. These *Boim* Defendants were dissolved following the judgments obtained in this case and were reestablished with the same officers and leaders and the same stated goals under new names. As such, they are a disguised continuance of their predecessors. They have such a "unity of interest" and leadership with the *Boim* Defendants that their independence and separate existence is a legal fiction that should not be upheld by a court. The continuity of the enterprise, management and control in the new entities make them legal successors and alter egos of *Boim* Defendants IAP, AMS and HLF.

163.     Defendant Rafeeq Jaber is also an alter ego of IAP/AMS and/or subject to liability under the doctrine of veil piercing. Jaber controlled these entities and used them as a front to advance his personal objectives. In the guise of acting on behalf of the entities, Jaber directly participated in the conduct giving rise to the *Boim* Judgment. In addition, IAP/AMS—as the District Court and Court of Appeals in the *Boim* Action observed—followed few corporate formalities and were all alter-egos of each other. The legal fiction of their separateness from Jaber is equally tenuous and should not be upheld. Finally, as the IAP/AMS president and board member responsible for the windup of IAP/AMS, Jaber owed fiduciary duties to creditors, principally the Boims. Jaber breached those duties by failing to monetize the assets of IAP/AMS, including the *Al-Zaytouna* newspaper, and concealing from the Boims that the

operations of IAP/AMS were going to be resurrected, using IAP/AMS's good will and intangible assets to begin raising funds that could be used, in part, to pay a portion of the *Boim* Judgment.

164. Allowing Defendants to escape liability based on the fiction of their separate legal existence would enable *Boim* Defendants IAP, AMS, HLF, and Jaber to shield and transfer the significant good will and intangible assets amassed by IAP/AMS over the years, and continue with their same enterprise and mission, after the *Boim* Defendants were held to be material supporters of international terrorism. The *Boim* Defendants should not be allowed to escape liability simply by creating two new legal entities that, apart from their names, are in all material respects identical to IAP/AMS and HLF and thereby shift the decades-long ongoing mission, operations, activities and assets to those purported new entities.

165. The ATA provides a comprehensive scheme of criminal and civil liability aimed at eradicating support for international terrorism. The material support provisions of the ATA have been described by the Supreme Court as a "preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010). Allowing the *Boim* Defendants—each of which has been found liable as a "material supporter[] of international terrorism"—and their leaders to re-open down the street and continue to operate without paying their victims would send a message that this important statute, implicating a uniquely federal interest, can be ignored. The effective criminal and civil enforcement mechanisms of the ATA will be thwarted if "fronts" for people and enterprises that support terrorism can avoid liability merely by morphing into new entities not subject to prior ATA judgments.

166. As alter egos and/or successors of *Boim* Defendants IAP/AMS and HLF, AMP/AJP and Jaber are effectively the same entity or person as these *Boim* Defendants and are

liable to Plaintiffs under 18 U.S.C. § 2333(a) for the unpaid portion of the *Boim* Judgment. This Court should direct AMP, AJP and Jaber to satisfy the *Boim* Judgments and thereby achieve the objectives and purposes of the ATA.

**COUNT I**
**DECLARATORY JUDGMENT AGAINST DEFENDANTS**
**AMERICAN MUSLIMS FOR PALESTINE (AMP) AND AMERICANS**
**FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION (AJP)**

167.    Plaintiffs repeat and reallege paragraphs 1-166 above as if fully set forth herein.

168.    Defendants AMP and AJP purport to be  organizations apart and distinct from *Boim* Defendants Holy Land Foundation for Relief and Development (HLF), the Islamic Association for Palestine (IAP), and the American Muslim Society (AMS).  AMP and AJP deny that they are alter egos or successors of any *Boim* Defendant and contend that they are not liable for any portion of the *Boim* Judgment.

169.    AMP and AJP are in fact and as a matter of law the alter egos and/or successors in interest of the aforementioned purportedly defunct organizations.

170.    There is a substantial and continuing controversy between Plaintiffs and AMP and AJP.  A declaration of rights is both necessary and appropriate to establish that AMP and AJP are the alter egos and successor of HLF, IAP and AMS, and that AMP and AJP are therefore liable to Plaintiffs for the unpaid amount of the *Boim* Judgment.

WHEREFORE Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim respectfully request the Court to enter judgment in favor of Plaintiffs and against Defendants American Muslims for Palestine and Americans for Justice in Palestine on Count I herein as follows:

A.    Declare that the *Boim* Judgment against Islamic Association for Palestine and American Muslim Society entered in 2004 and affirmed in 2008 is currently valid and enforceable;

B.    Declare that the *Boim* Judgment against the Holy Land Foundation for Relief and Development entered in 2012 is currently valid and enforceable;

C.    Declare that American Muslims for Palestine and American for Justice in Palestine are the alter egos and successor of the Islamic Association for Palestine, American Muslim Society, and the Holy Land Foundation for Relief and Development;

D.    Declare that American Muslims for Palestine and Americans for Justice in Palestine are fully and jointly and severally liable for any unpaid amount of the *Boim* Judgment; and

E.    Award Plaintiffs such other relief as the Court deems just and proper under the circumstances.

## COUNT II
## DECLARATORY RELIEF AGAINST DEFENDANT RAFEEQ JABER

171.    Plaintiffs repeat and reallege paragraphs 1-166 as if fully set forth herein.

172.    Defendant Rafeeq Jaber, purports to be an individual person apart and distinct from *Boim* Defendants the Islamic Association for Palestine (IAP), and the American Muslim Society (AMS). Jaber denies that he is the alter ego of any *Boim* Defendant and/or is subject to liability under the doctrine of veil piercing, and contends that he is not liable for any portion of the *Boim* Judgment.

173.    Defendant Jaber is in fact and as a matter of law the alter ego of the aforementioned purportedly defunct organizations and/or is subject to liability for the *Boim*

Judgment under the doctrine of veil piercing. As alleged herein, Individual Defendant Jaber participated directly in the conduct giving rise to the *Boim* Judgment and was also directly involved in deflecting Plaintiffs' enforcement efforts by the concealed and fraudulent continuation of IAP/AMS through new entities with different names, continues to control the successors—AMP and AJP—as a front to continue the same types of personal goals he previously sought to achieve through IAP/AMS.

174.    In addition, as alleged herein, the *Boim* Defendants failed to comply with requirements for maintaining their corporate existence, and the fiction of their corporate separateness should not be observed. The Court should pierce the corporate veil and hold Jaber liable for the *Boim* Judgment.

175.    There is a substantial and continuing controversy between Plaintiffs and Jaber. A declaration of rights is both necessary and appropriate to establish that Jaber is the alter ego of IAP/AMS and/or is subject to liability under the doctrine of veil piercing, and is therefore liable to Plaintiffs for the unpaid amount of the *Boim* Judgment.

WHEREFORE Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim respectfully request the Court to enter judgment in favor of Plaintiffs and against Defendant Rafeeq Jaber on Count II herein as follows:

A.      Declare that the *Boim* Judgment against Islamic Association for Palestine and American Muslim Society entered in 2004 and affirmed in 2008 is currently valid and enforceable;

B.      Declare that Defendant Rafeeq Jaber, is the alter ego of the Islamic Association for Palestine, American Muslim Society and/or is subject to liability under the doctrine of veil piercing;

62

C.      Declare that Defendant Rafeeq Jaber is fully liable for any unpaid amount of the *Boim* Judgment; and

D.      Award Plaintiffs such other relief as the Court deems just and proper under the circumstances.

**COUNT III**
**ENTRY OF MONEY JUDGMENT**

176.    Plaintiffs repeat and reallege paragraphs 1-166 as if fully set forth herein.

177.    The *Boim* Judgment is a final, non-appealable and currently fully enforceable judgment against Holy Land Foundation for Relief and Development (HLF), the Islamic Association for Palestine (IAP), and the American Muslim Society (AMS). To date, the *Boim* Judgment remains only partially satisfied.

178.    As alter egos and/or successors of *Boim* Defendants HLF and IAP/AMS, as alleged herein, each of the Defendants is jointly and severally liable for the full amount of the unsatisfied portion of the *Boim* Judgment. Jaber is also liable for the full amount of the unsatisfied portion of the *Boim* Judgment under the doctrine of veil piercing.

WHEREFORE Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim respectfully request the Court to enter judgment in favor of Plaintiffs and against each of the Defendants on Count III herein as follows:

A.      Enter Judgment in the full amount of the *Boim* Judgment, to the extent not yet paid, against each of the Defendants, jointly and severally; and

B.      Award Plaintiffs such other relief as the Court deems just and proper under the circumstances.

**COUNT IV**
**FRAUDULENT CONCEALMENT AGAINST RAFEEQ JABER**

179.    Plaintiffs repeat and reallege paragraphs 1-166 as if fully set forth herein.

180.    Defendant Rafeeq Jaber served as an officer and director of IAP/AMS during and following the *Boim* Action. In this capacity, Jaber oversaw the windup of IAP/AMS's affairs and the application of IAP/AMS's assets to pay its creditors, including Plaintiffs. IAP/AMS's assets were insufficient to pay its debt to Plaintiffs, who were its principal (if not only) creditor.

181.    Jaber owed fiduciary duties to Plaintiffs, as judgment creditors, including an affirmative duty to disclose material facts bearing on Plaintiffs' ability to recover on the *Boim* Judgment.

182.    Jaber was aware of and failed to disclose material facts that he had a duty to disclose, including that (i) IAP/AMS was resuming operations and fundraising under the new name AMP; (ii) IAP/AMS's intangible assets and goodwill were being utilized and exploited to permit AMP to stage successful and lucrative events and engage in fundraising; and (iii) IAP/AMS retained a valuable newspaper, *Al-Zaytouna*, which it had not monetized, despite Abuirshaid's offer to purchase it.

183.    In addition, as detailed above, Jaber made affirmative representations and took actions that were misleading with respect to these material facts. These include (i) his statements at his deposition in 2005 and elsewhere to the effect that IAP/AMS had ceased operations and had exhausted their ability to pay; (ii) his subsequent conduct in turning over assets to the Boims without disclosing the concealed facts in the preceding paragraph; (iii) speaking at AMP events and participating in AMP activities without disclosing that AMP was a continuation of IAP/AMS and was utilizing IAP/AMS's good will and intangible assets for fundraising and to continue its operations.

184.     Plaintiffs reasonably and justifiably relied on Jaber's deposition testimony and continued concealment of material facts in discontinuing their efforts to pursue further collection of the *Boim* Judgment.

185.     As a result of Jaber's continued concealment and Plaintiffs' justified reliance, Plaintiffs were prevented from enforcing the Boim judgment while AMP continued to operate and raise substantial funds for more than a decade.  Had Plaintiffs been alerted to the concealed material facts, they could have sought through enforcement proceedings or otherwise to recover funds from AMP.  Plaintiffs have suffered damages as a result.

WHEREFORE Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim respectfully request the Court to enter judgment in favor of Plaintiffs and against each of the Defendants on Count IV herein as follows:

A. Award compensatory damages caused by Jaber's misconduct, as alleged in this Count, in an amount to be determined at trial;

B. Award punitive damages; and

C. Award Plaintiffs such other relief as the Court deems just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.


Dated: _____, 2019        Respectfully submitted,


       _____

       Stephen J. Landes
       W. Allen Woolley
       Michael B. Kind
       LOCKE LORD LLP
       111 South Wacker Drive
       Chicago, IL 60606
       (312) 201-2772

       *Attorneys for Stanley Boim, Individually and as the*
       *Administrator of the Estate of David Boim,*
       *Deceased, and Joyce Boim*


Of Counsel
Nathan Lewin
Alyza D. Lewin
LEWIN & LEWIN LLP
888 17th Street NW
4th Floor
Washington, DC 20006
(202) 828-1000

Daniel I. Schlessinger
Seth Corthell
JASZCZUK P.C.
311 South Wacker Drive
Suite 1775
Chicago, Illinois 60606
(312) 442-0509