**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY BOIM, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DAVID BOIM, DECEASED, AND JOYCE BOIM, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 17-cv-03591 |
| v. | ) ) | **Hon. Sharon Johnson Coleman** |
| AMERICAN MUSLIMS FOR PALESTINE; AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION; RAFEEQ JABER; ABDELBASSET HAMAYEL; AND OSAMA ABUIRSHAID., | ) ) ) ) ) ) | Hon. Sidney I. Schenkier |
| Defendants. | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION**
**FOR LEAVE TO FILE THE FIRST AMENDED COMPLAINT**

We brought this action and the related enforcement proceedings in the original *Boim v. Holy Land Foundation* action (No. 00-cv-2905) for a vitally important reason: to ensure that organizations found civilly liable under the Anti-Terrorism Act ("ATA") for the terrorist murder of David Boim cannot simply re-open under a different name down the street, free of the unpaid judgment this Court awarded to David Boim's parents. Permitting adjudicated supporters of a designated terrorist group responsible for the murder of a young American to reincarnate, jettison their liability, and continue their earlier activities under new names would nullify the civil remedies provisions of the ATA and leave the victims with an uncollectable judgment.

This Court held in August 2017 that, although "[t]he case here is a close one," our initial Complaint did not sufficiently demonstrate for jurisdiction purposes that defendants American Muslims for Palestine ("AMP") and Americans for Justice in Palestine Educational Foundation

("AJP"; together, "AMP/AJP") were a "disguised continuance," such that they would be directly liable for the actions of the judgment debtors. (Dkt. 41 at 8, 10.) The Court concluded its August 2017 ruling by inviting us to "refile a complaint in the event that [we] further develop the allegations establishing an alter ego theory of liability." (*Id.* at 11.) In January 2018, the Court vacated the dismissal and permitted us to take limited jurisdictional discovery to provide further support for our alter-ego allegations. (Dkt. 50.) We have now taken that jurisdictional discovery, done extensive additional investigations, and submitted a proposed First Amended Complaint ("FAC") that adds roughly 40 additional pages of detailed factual allegations. These new allegations respond directly to the issues the Court identified in its August 2017 ruling.

Despite the Court's earlier invitation to refile, defendants demanded an opportunity to oppose the amendment. The Court granted their request, but instructed that the response should not be "a motion to dismiss the amended complaint." (2/6/19 Tr. at 6-7 (Ex. A).) Defendants' opposition (Dkt. 160 ("Opp.")) is exactly what the Court said they should not file. Defendants do not argue anything like "undue delay, bad faith, dilatory motive[,] or undue prejudice." Instead they say the FAC is "futile," urging the Court preemptively to *dismiss* all our claims with prejudice under Rules 12(b)(1) and 12(b)(6). This opposition is an unabashed Rule 12 motion to dismiss—and a transparent effort to take two (or even three) bites at the same apple.

Defendants' opposition forces us to respond substantively to their Rule 12(b)(1) and 12(b)(6) arguments. As we demonstrate below, defendants' premature motion to dismiss fails to articulate grounds to dismiss any of our claims. The FAC's detailed new allegations propel what was a "close" alter-ego case into a compelling alter-ego case, and it pleads viable causes of action for all of our other claims as well. Under Seventh Circuit law, the Court has clear subject matter jurisdiction for our alter-ego claims, and there is supplemental jurisdiction for the

remaining claims.  We request that the Court overrule defendants' Rule 12(b)(1) and 12(b)(6)

arguments and grant leave to amend.  This ruling should be law of the case.  *Garber-Cislo v.*

*State Farm Auto. Ins. Co*., No. 10-cv-13301, 2012 U.S. Dist. LEXIS 199122 (E.D. Mich. April

18, 2012) (Ex. B); *Fresh N. Pure Distrib. v. Foremost Farms USA*, No. 11-cv-470, 2011 U.S.

Dist. LEXIS 136307, at *3 (E.D. Wis. Nov. 28, 2011) (Ex. C) (converting response to motion to

amend into motion to dismiss).  We should not have to brief yet another motion to dismiss.

## ARGUMENT

Under Rule 15(a), leave to amend should be freely given when justice requires.  Fed. R.

Civ. P. 15(a).  Denial of motions to amend is disfavored.  *Bausch v. Stryker Corp.*, 630 F.3d 546,

562 (7th Cir. 2010).  Defendants oppose the FAC as "futile" because they say it would be subject

to dismissal under Rule 12(b)(1) or 12(b)(6).  An opposition to a motion to amend based on

futility is essentially a motion to dismiss, *Finnerman v. Daimler Chrysler Corp.*, No. 16-cv-451,

2017 U.S. Dist. LEXIS 175286, *5 (N.D. Ill. Oct. 23, 2017) (Ex. D), and the standards

applicable to motions to dismiss under Rule 12 apply to such motions.  *Runnion v. Girl Scouts of*

*Greater Chicago & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015).  Defendants' futility arguments

fail because the FAC is not subject to dismissal under either Rule 12(b)(1) or Rule 12(b)(6).

## I.  DEFENDANTS' RULE 12(B)(1) FUTILITY ARGUMENTS FAIL BECAUSE THE FAC PROPERLY ALLEGES SUBJECT MATTER JURISDICTION.

### A.  Plaintiffs' Alter Ego Claims against AMP/AJP Provide an Independent Basis for Subject Matter Jurisdiction.

Defendants misleadingly begin their opposition by arguing that our "veil piercing" and

other non-alter-ego claims cannot support subject matter jurisdiction.  These arguments are

irrelevant, as we do not seek to base jurisdiction on those claims.  The basis for federal

jurisdiction in this case is our *alter-ego claims against AMP/AJP*.  The extensive new factual

allegations in the FAC are more than sufficient to establish jurisdiction over these claims.

### 1. Federal Courts Have Subject Matter Jurisdiction over Claims to Enforce ATA Judgments against Alter Egos.

There is no dispute that federal courts have independent subject matter jurisdiction over actions seeking to enforce ATA judgments against alter egos. This Court's August 2017 ruling recognized that our alter-ego allegations against AMP/AJP seek to hold these entities *directly* liable under the ATA because we allege they are a "disguised continuance" of the *same organizations* as the judgment debtors. (Dkt. 41 at 4-6.) Our alter-ego claims are not vicarious "veil-piercing" claims and are therefore not subject to the jurisdictional limitations of *Peacock v. Thomas*, 516 U.S. 349 (1996). *See, e.g., Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037-38 (7th Cir. 2000); *Cent. States, Se. and Sw. Areas Pension Fund v. Central Transp., Inc.*, 85 F.3d 1282, 1286 (7th Cir. 1996).

### 2. Defendants' Timing Arguments Fail because Plaintiffs Do Not Seek to Invoke "Ancillary" Jurisdiction Based on the Original *Boim* Case.

Citing language from *Peacock*, defendants argue that the Court cannot have subject matter jurisdiction over our alter ego claims because those claims entail "new facts and theories 'that did not exist and could not have existed at the time the court entered judgment in the' original case brought by Plaintiffs." (Opp. at 7.) This argument misunderstands our alter ego theory and misapplies *Peacock*. First, we are not suing AMP/AJP for actions that "could only have come after the date of the original judgment." (*See* Opp. at 6.) The actions giving rise to liability are IAP/AMS's and HLF's conduct *in 1996 and prior*. AMP/AJP is liable as the alter ego, or "disguised continuance," of the earlier entities. Second, the "new facts and theories" language defendants rely on comes from a section of *Peacock* addressing *ancillary jurisdiction*. In *Peacock*, unlike here, the plaintiff sought federal jurisdiction over a second enforcement lawsuit because it was "ancillary to the original" lawsuit by virtue of the district court's power to enforce its judgments. *Peacock*, 516 U.S. at 354. The Supreme Court held there was no

4

Ancillary jurisdiction because the new lawsuit was based on theories of relief that did not exist at the time of the original lawsuit that was the basis for jurisdiction. *Id*. at 359. We do not seek to invoke "ancillary" (or supplemental) jurisdiction based on jurisdiction in the 2000 *Boim* case. We claim, based on Seventh Circuit precedent, that the alter-ego claims provide an *independent* basis for jurisdiction. The cited language from *Peacock* does not apply to our case.

**3. The FAC's Detailed New Allegations Provide Ample Support for Our Alter Ego Claims against AMP and AJP.**

That leaves only the jurisdiction issue the Court identified in August 2017: Do the FAC's 40 pages of additional facts transform the "close" case presented by our original Complaint into a pleading sufficient to establish that AMP/AJP is a "disguised continuance" of the judgment debtors?[1] (Dkt. 41 at 8, 10.) The Court's August 2017 ruling laid out the standards required for such a showing, and defendants do not challenge the Court's legal roadmap—in fact, defendants' opposition identifies the same basic factors the Court identified. Under these factors, the FAC easily pleads an alter-ego claim that supports jurisdiction.

**a. The FAC Alleges a "Unity of Interest and Control" Such that AMP/AJP is the "Disguised Continuance" of its Predecessors.**

Fundamental to the alter-ego analysis is whether there is a "unity of interest and control," such that the new entity is a "disguised continuance" of the preceding entity. (*See* Dkt. 41 at 10; Opp. at 10 (citing *U.S. v. All Meat and Poultry Prod.*, 470 F. Supp. 2d 823, 828 (N.D. Ill. 2007)).) A "disguised continuance" exists where the entities were "in effect a single entity." (Opp. at 9 (citing *Esmark, Inc. v. NLRB*, 887 F.2d 739, 754 (7th Cir. 1989).) *See also DCK/TTEC, LLC v. Postel*, No. 14-1739, 2015 U.S. Dist. LEXIS 63279, at *15 (W.D. Pa. May

---

[1] Although the FAC's allegations easily demonstrate the viability of our alter-ego claim, defendants' attack on the sufficiency of our allegations is improper as a jurisdiction argument. As shown in our earlier briefs (which are hereby incorporated), dismissal under Rule 12(b)(1) is inappropriate if the jurisdiction issue is intertwined with the merits. (Dkt. 37 at 8-9; Dkt. 43 at 4-6; Dkt. 49 at 3-7.)

14, 2015) (Ex. E) (alter ego where "the later-formed entity is a mere continuation of its predecessor"). The FAC alleges facts establishing that AMP/AJP is a disguised continuance:

- The Court focused heavily on our allegations of shared leadership between IAP/AMS and AMP/AJP. (Dkt. 41 at 8-10.) *See also Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 436 (E.D.N.Y. 2013) (reasonable jury could consider "shared leadership" in determining charities were alter egos of Hamas); *Linde v. Arab Bank, PLC*, 97 F.; Supp. 3d 287 (E.D.N.Y. 2015) (same; charities were founded by Hamas leaders or had Hamas operatives on boards). The FAC adds facts showing a striking overlap in the limited group of individuals who formed the leadership of the old and new entities. The FAC identifies each of these individuals by name and includes a diagram showing that the core leadership from IAP/AMS nearly all either left the country or became heavily involved with AMP. AMP/AJP's leadership came almost entirely from IAP/AMS and/or HLF. (FAC ¶¶ 78-84.)

- AMP continued to hold the same annual convention as IAP. Like IAP conventions, the AMP conventions took place in Rosemont, Illinois, during Thanksgiving weekend, and had largely the same audience, content, format, management, and roster of speakers. Because it was a continuation of IAP, AMP was able to stage a major, multi-day convention with 700 attendees and numerous speakers three months after it incorporated. (FAC ¶¶ 72, 90-91.)

- AMP opened its first national office on Roberts Road, Palos Hills, Illinois, a short distance down the same street from the former offices of IAP/AMS. (FAC ¶ 72.)

- The IAP director who became AMP/AJP's National Policy Director, Osama Abuirshaid, continued to publish an Arab-language newspaper with the same format, a nearly identical web page, similar content, overlapping advertisers, and similar circulation, as the newspaper he previously published for IAP. (FAC ¶¶ 66, 93.)

6

- AMP/AJP relies on a "chapter" system to organize events and expand its geographic reach throughout the country. AMP quickly developed chapters in many of the same locations where IAP/AMS previously had chapters. (FAC ¶ 94.)

- AMP/AJP inherited substantial goodwill and intangible assets from IAP/AMS, which allowed it to hit the ground running, with the ability to raise money, propagate its message, build its network, and achieve its political objectives. (FAC ¶¶ 87-89.)

- AMP/AJP filled the gap left by the shut-down of IAP and continued as the most prominent Islamic organization acting on behalf of the Palestinian cause and Hamas. (FAC ¶ 62.) It assumed the same role as IAP/AMS within the same interconnected network of organizations. (FAC ¶¶ 109-144.) *See Strauss*, 925 F. Supp. 2d at 436 (jury could find charities were alter egos where they were interwoven with Hamas and crucial to its success).

- AMP/AJP outwardly claims, as did IAP/AMS, that its mission is to "educate" about Palestine. But, like IAP/AMS, AMP/AJP continues to promote Hamas and its ideology, including in political action and by facilitating fundraising on behalf of organizations that send money to Hamas in Gaza. This is the same sort of activity Judge Keys found gave rise to IAP/AMS's ATA liability in the *Boim* Case. (FAC ¶¶ 95-108.) *See also Strauss*, 925 F. Supp. 2d at 436 (reasonable jury could consider "active support of Hamas' ideology and goals" in finding charity an alter ego of Hamas); *Linde*, 97 F. Supp. 3d at 334 (same).

These allegations paint a compelling picture, making clear that AMP/AJP is in every material respect the judgment debtors with new names and "front" entities. Defendants do not address the bulk of our new allegations, and the few arguments they offer are at best peripheral. Defendants argue that we "misconstrue what 'assets' may form the basis of a transfer under alter ego theory." (Opp. at 11.) But the premise of their argument is misplaced. This is an alter ego

claim, not a "fraudulent transfer" claim. A "sham transfer of assets" might prove a disguised continuance (*see* Dkt. 41 at 6), but defendants cite no authority that an alter ego relationship requires a transfer of assets. *See Stodd v. Goldberger*, 73 Cal. App. 3d 827, 833 (Cal. Dis. Ct. App. 1977) (transfer of assets not necessary to invoke alter ego doctrine). Furthermore, we *do* allege that AMP inherited substantial good will and intangible assets from IAP/AMS and that these inherited assets enabled AMP quickly to raise money, spread the organization's message, and put on a convention with 700 attendees just three months after AMP was incorporated. (FAC ¶¶ 87-91.) The good will, reputation and intangible assets here are no less valuable than the restaurant name and reputation in *Lincoln Nat'l Life Ins. Co. v. Nicklau, Inc.*, No. 98 C 2453, 2000 U.S. Dist. LEXIS 6936 (N.D. Ill. May 17, 2000) (Ex. F).

Defendants also assert that there was a "gap of several years" between the shutdown of IAP and the beginning of AMP. (*See* Opp. at 11.) We allege a "gap" of only a few months, not "several years." Defendant Rafeeq Jaber reported in early-2005 that IAP/AMS had become defunct following the December 2004 *Boim* Judgments. (FAC ¶¶ 53-54, 64.) By mid- to late-2005, discussions were under way to transition a new entity, and by the end of 2005, the Yahoo "AMP_Transition" bulletin board was up and running. (FAC ¶¶ 64, 66-68.) The close temporal connection between the shutdown of IAP and transition to AMP bolsters, rather than precludes, our alter-ego claims. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 45 (1987) (7-month hiatus between predecessor's demise and successor's startup not determinative).

Finally, defendants attempt to downplay AMP/AJP's ongoing support for Hamas and Hamas ideology, asserting that our purported "inflammatory rhetoric" about the Hamas connection is "conclusory" and legally irrelevant. (Opp. at 14.) Much as defendants would like

to sweep these allegations under the rug,[2] they are both well-supported and highly relevant.

AMP/AJP leadership has frequently written and spoken favorably of Hamas; the AMP/AJP

organization promotes Hamas ideology in its conventions and on social media; AMP/AJP

engages pro-Hamas speakers; and AMP/AJP actively facilitates fundraising by groups that

channel money to Hamas in Gaza.  (FAC ¶¶ 95-99.)  For example, AMP organized fundraisers

across the country for Viva Palestina, which raised hundreds of thousands of dollars and openly

presented money and equipment directly to Hamas leader Ismail Haniyeh.  (FAC ¶¶ 105-108.)

We do not need to prove new violations of the ATA to show that AMP/AJP are alter egos.  But

the striking similarity to the conduct of IAP/AMS that led Judge Keys to conclude they violated

the ATA strongly supports the alter-ego relationship.[3]  (FAC ¶¶ 46-49, 157-158.)

> **b.    The FAC Pleads Facts Demonstrating "Motive and Intent."**

This Court and defendants also identify "motive and intent" to avoid liability as a factor

in the alter ego analysis.  (Dkt. 41 at 6 (citing *Int'l Union of Operating Eng'rs, Local 150 AFL-*

*CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987); *Cent. States*, 85 F.3d at

1287); Opp. at 9.)  The FAC includes compelling motive and intent allegations.  In early-2005,

IAP/AMS were held liable and were subject to enforcement proceedings on the $156 million

---

[2] Defendants have sought to avoid producing and then to suppress public disclosure of information tying them to IAP, HLF and Hamas—most recently by designating as confidential non-protectable evidence relating to the Yahoo bulletin board and the imprisonment in Israel of one of their directors for funneling money to Hamas.  Judge Schenkier struck these improper designations.  (*See* Dkt. 156, 170.)

[3] Judge Keys considered, for example:  holding meetings condemning the Oslo accords; discussing ways to support the "movement" (carefully not referring to Hamas by name); sponsoring a speaker who advocated Jihad; distributing pro-Hamas documents; assisting fundraising and encouraging donations to groups that supported Hamas; allowing such groups to set up booths at conventions; publishing documents designed to garner support for individuals affiliated with Hamas; and inviting pro-Hamas speakers to attend conferences.  (FAC ¶ 157.)  AMP/AJP does the same things.  Moreover, as AMP/AJP does here, IAP/AMS repeatedly argued they were nothing more than "charitable and educational" institutions supporting Hamas's humanitarian and charitable activities rather than its terrorist activities.  Judge Keys and the Seventh Circuit rejected these arguments.  Supporting Hamas's charitable wing could be a basis for ATA liability and even "indirect" support was sufficient.  (FAC ¶¶ 43-46.)

9

*Boim* Judgment for aiding and abetting the murder of an American teenager. (FAC ¶¶ 42, 53.) IAP/AMS claimed to be "defunct" to evade enforcement efforts and further liability. (FAC ¶ 74.) Re-starting the enterprise under "AMP" permitted it to shed the burden of the *Boim* Judgment and proceed with its work—with the same leadership, network of supporters, reputation, good will, slate of events, speakers, and fundraising apparatus. (FAC ¶¶ 74-76.)

The FAC also offers new "smoking gun" evidence that AMP deliberately sought to conceal its connection to IAP. In December 2005, some of AMP's early planners began communicating on a Yahoo bulletin board entitled "AMP_Transition." In discussing an upcoming meeting at the MAS convention in Milwaukee, they agreed that former IAP board member and Michigan representative Sufian Nabhan should not be included in AMP's transition meeting in Milwaukee (even though Nabhan had been involved in early AMP planning) because "we really need to distance ourselves from any well known IAP figures." (FAC ¶ 69.) Nabhan and most of the other "well known" IAP leaders ultimately went on to lead AMP (FAC ¶ 78), but the group expressly sought to hide its IAP connection during the *Boim* enforcement proceedings.

### c. The FAC Demonstrates that Neither IAP/AMS Nor AMP/AJP Respected Corporate Separateness.

Defendants and the Court also identify as an important factor "the amount of respect given to the separate identity of the corporation," including whether leaders of the old organization "failed to properly wind-up" its business affairs. (*See* Dkt. 41 at 6, 7 (citing *Cent. States*, 85 F.2d at 1287; *Trs. of Sheet Metal Workers Local No. 1 Welfare Trust v. Pekin Climate Control, Ltd.*, 669 F. Supp. 2d 924, 929 (C.D. Ill. 2009)); Opp. at 10.) *See also DCK/TTEC*, 2015 U.S. Dist. LEXIS 63279, at *15 (later-formed entity may be alter ego if "independence of the separate corporate entities was disregarded"). The FAC demonstrates that none of the current or former entities observed corporate formalities or paid heed to the separateness of the

10

corporate entities. Judge Keys and the Seventh Circuit found that IAP, AMS and all the entities operating under the "IAP National" umbrella were intertwined and were alter egos of each other. (FAC ¶¶ 150-151.) The U.S. Treasury Department froze KindHearts' assets, finding it was the "progeny" of HLF. (FAC ¶ 60.) IAP/AMP did not conduct a formal or proper wind-up (FAC ¶ 119), and AMP/AJP did not comply with corporate formalities or operate as distinct entities. They operated with the same board of directors. There are no records of separate officers, board meetings, minutes or resolutions. Directors were not elected and were unaware of which entity they served. Meetings were often informal, impromptu and without notice. (FAC ¶¶ 152-153.)

Defendants acknowledge that AMP/AJP were "less than ideal record-keepers" but urge that this shows only that the contemporaneous entities are alter egos with *each other* and does not demonstrate that the "old and new corporations" are alter egos. (Opp. at 10-11.) This is a baseless and overly-narrow distinction. Organizations cannot disregard corporate formalities for decades and then seek to rely on the fiction of separate juridical "front" entities to shield their ongoing enterprise from liability. Here, the old and the new organizations have not operated as separate juridical entities, but as a single, loose, unstructured enterprise driven by the same core group of individuals, with no regard for corporate formalities. (FAC ¶¶ 154, 155.) AMP/AJP has no more ground than the alter egos of IAP to invoke corporate separateness as a shield.

### d. Permitting AMP/AJP to Avoid Liability Would Promote Injustice and Inequity.

Finally, courts consider whether there are circumstances "such that adherence to the fiction of separate corporate existence would sanction fraud or promote injustice." (*See* Dkt. 41 at 6-8 (citing *Sanchez v. Global Parking Mgmt., Inc.*, No. 14 C 4611, 2015 WL 4429024 (N.D. Ill. Jul. 20, 2015) (Ex. G); *Cent. States*, 85 F.2d at 1287); Opp. at 10.) In the terrorism context, courts have held that "'equitable principles[s]' allow a court to disregard the corporate form

'where it is interposed to defeat legislative purposes' or would 'work fraud or injustice.'" *In re 650 Fifth Ave. & Related Props.*, 881 F. Supp. 2d 533, 548 (S.D.N.Y. 2012) (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627 (1983)).

There are ample equitable reasons here to disregard the invented corporate forms. AMP/AJP are a disguised continuance of the judgment debtors, and the leaders of these entities have consistently failed to adhere to corporate formalities. Permitting AMP/AJP to invoke their separate corporate entities to continue operating free of the *Boim* Judgment would be manifestly unjust to the Boims. It would permit IAP/AMS to avoid full payment of the judgment, while transmitting goodwill, reputation, fundraising capability and intangible assets to AMP/AJP. Permitting adjudicated supporters of a designated terrorist organization to reopen for continuing business (literally) down the street under a new name, free of liability, would also defeat the legislative purposes of civil enforcement mechanisms of the ATA. (*See* FAC ¶¶ 8, 164-165.)

**B.    Plaintiffs' Can Maintain the Remainder of their Claims in this Court Based on Supplemental Jurisdiction.**

District courts have "supplemental jurisdiction" over any claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A "loose factual connection between the claims is generally sufficient." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014); *Emanuel v. Rolling in the Dough, Inc.*, 10-cv-2270, 2010 U.S. Dist. LEXIS 117864 (N.D. Ill. Nov. 2, 2010) (J. Coleman) (Ex. H). Defendants argue there is no independent basis for jurisdiction over our (i) veil piercing claim against Jaber (Opp. at 4-5); (ii) fraudulent concealment claim against Jaber (*id*. at 5-6); and (iii) successor claims against AMP/AJP (*id*. at 7-9). These arguments are irrelevant. The Court has supplemental jurisdiction over the non-alter-ego claims because they are based on the same facts as the alter ego claims, including (i) the close overlap between the

12

old and new entities, (ii) the efforts to conceal that IAP/AMS had not really shut down but had transitioned to AMP, and (iii) Jaber's extensive involvement in both the old and new entities.[4]

## II. DEFENDANTS' RULE 12(B)(6) FUTILITY ARGUMENTS FAIL.

Defendants also argue that the FAC is "futile" because it would be dismissed under Rule 12(b)(6) for failure to state a claim. None of their arguments supports a Rule 12(b)(6) dismissal. First, for the reasons discussed above, we have properly alleged our alter ego claims against AMP/AJP. Defendants' Rule 12(b)(1) arguments were essentially Rule 12(b)(6) arguments, none of which had merit. The Rule 12(b)(6) section of defendants' current motion argues that this case differs from *Sanchez* because (i) Munjed Ahmed had no prior role with IAP/AMS; and (ii) we "do not point to 'the same space, equipment, employees, and management.'" (Opp. at 13.) These are fact issues not suitable for dismissal under Rule 12(b)(6), and defendants' effort to find non-overlapping aspects of the old and new entities only serves to highlight how extensive the overlap really was. Out of the 9 people who became the core leadership of AMP/AJP, *only* Ahmad had no previous known connection to the judgment debtors. (FAC ¶ 78.) With respect to space, equipment, employees and management, these entities were not-for-profits with minimal "equipment" and "employees"; they cannot be compared with the parking lot management business in *Sanchez*. The FAC amply alleges, with supporting detail, the extensive overlap of the core aspects of the old and new entities' operations.

Second, defendants attack our successor liability claim because we purportedly "present no new bases for jurisdiction other than those already defeated in the first round of pleadings."

---

[4] Successor liability claims, like alter-ego claims, are based on direct liability and may also be subject to independent subject matter jurisdiction. (*See* Dkt. 37 at 7 (citing *Trs. of the Chicago Painters & Decorators Pension Fund v. NGM Servs., Inc.*, No. 14 C 5701, 2014 U.S. Dist LEXIS 176004, at *6-7 (N.D. Ill. Dec. 22, 2014) (Ex. I)). Likewise, our alter ego claim against Jaber, based on Jaber's direct involvement in IAP/AMS prior to 1996, is subject to independent and supplemental jurisdiction.

(Opp. at 7.)  But defendants overstate the reach of the Court's August 2017 opinion.  That ruling (which was vacated) held only that the *initial Complaint* did not allege facts to support (for jurisdiction purposes) any of the four exceptions to the general successor liability rule.  (Dkt. 41 at 8.)  The FAC adds facts sufficient to plead successor liability (i) as a "mere continuation" (or de facto merger) or (ii) based on a fraudulent assets transfer to avoid liability.  (*See* Dkt. 41 at 8.)

The principle behind these exceptions is that an obligor cannot avoid its obligations by continuing its operations under a different corporate name.  *Kaeser & Blair, Inc. v. Willens*, 845 F. Supp. 1228, 1233 (N.D. Ill. 1993) (citing *Terminal Freezers, Inc. v. Roberts Frozen Foods, Inc.*, 41 Ill. App. 3d 981 (Ill. Ct. App. 1976)); *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594, 598-599 (7th Cir. 2005) (corporation that goes through change in form without change of substance should not escape liability).  Courts consider factors such as (1) timing between the dissolution of the former entity and incorporation of the latter; (2) overlap of ownership interest; and (3) overlap of management.  *Kaeser*, 845 F. Supp. at 1233.  While continuity of ownership is ordinarily required for the "mere continuation" exception, courts have recognized that this factor is not applicable to not-for-profit entities that have no owners.  *See, e.g., Hankinson v. King*, 117 F. Supp. 3d 1068, 1074 (D. Minn. 2015); *Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 324 (D.D.C. 2012); *Chao v. Int'l Bhd. of Indus. Workers Health & Welfare Fund*, 97 F. Supp. 3d 268, 274 (E.D.N.Y. 2015).

The FAC alleges that (a) the same core group of leaders controlled IAP/AMS and AMP/AJP; (b) AMP was started shortly after IAP was shut down for the purpose of avoiding liability; (c) IAP/AMS's good will and intangible assets were transferred to AMP; (d) Jaber engaged in fraudulent concealment in shutting down IAP; and (e) AMP continued the same enterprise.  Despite these compelling successorship allegations, defendants urge that the "gap"

14

between the shutdown of IAP and startup of AMP defeats successor liability. (Opp. at 8-9.) The Supreme Court rejected this argument in *Fall River*, 482 U.S. at 45, holding that a "hiatus" may be a factor in assessing continuity but is not determinative. We allege that the pressure and scrutiny arising from the *Boim* Judgment forced IAP/AMS to lay low and regroup. (FAC ¶¶ 4, 64-65.) The "gap" was necessary for this purpose and fully consistent with our successor theory.

  <u>Third</u>, although they incorporate their Rule 12(b)(1) arguments regarding the remaining claims as Rule 12(b)(6) arguments, the only arguments defendants raise against the "veil piercing" and "fraudulent concealment" claims against Jaber is that there is no basis for subject matter jurisdiction. (Opp. at 4-6.) They do not argue that these counts fail to state claims.

## III. DEFENDANTS' REQUEST TO DISMISS ABUIRSHAID AND HAMAYEL WITH PREJUDICE IS PROCEDURALLY IMPROPER.

  Defendants demand that the Court dismiss individual defendants Abdelbaset Hamayel and Osama Abuirshaid with prejudice. This is not a procedurally proper request at this stage. Our FAC has the effect of dropping the claims against these two defendants (without prejudice). *See Taylor v. Brown*, 787 F.3d 851, 858 (7th Cir. 2015) (proper vehicle for voluntary dismissal of claim against a party is Rule 15(a) amendment). The sole ground asserted by defendants for their dismissal is our decision not to include claims against them in the FAC. That decision does not justify dismissal with prejudice. The Court should permit us to file the FAC and thereby drop these defendants from this litigation. If it does not, the existing Complaint, including the claims against Abuirshaid and Hamayal, will remain in effect unless and until the Court grants a proper motion to dismiss them.

## CONCLUSION

  For the foregoing reasons, and the reasons set forth in plaintiffs' motion, plaintiffs' motion for Leave to File the First Amended Complaint should be granted.

May 17, 2019

Respectfully submitted,

*/s/ W. Allen Woolley*

Stephen J. Landes
W. Allen Woolley
Michael B. Kind
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 442-0509
*Attorneys for Stanley Boim, Individually and*
*as the Administrator of the Estate of David*
*Boim, Deceased, and Joyce Boim.*

Of Counsel
Nathan Lewin (*pro hac vice*)
Alyza D. Lewin (*pro hac vice*)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, D.C. 20006
(202 828-1000

Daniel I. Schlessinger
Seth H. Corthell
JASZCZUK P.C.
311 South Wacker Drive, Suite 3200
Chicago, IL 60606
(312) 442-0509

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed electronically using the Court's CM/ECF system and has been served to all parties via email through CM/ECF on this 17th day of May 2019.


*/s/ W Allen Woolley*