**UNPUBLISHED OPINIONS MENTIONED IN MOTION**

**(ARRANGED IN ORDER OF APPEARANCE)**

# Smith v. Campagna

United States District Court for the Northern District of Illinois, Eastern Division

June 25, 1996, Decided ; June 26, 1996, DOCKETED

No. 94 C 7628

**Reporter**
1996 U.S. Dist. LEXIS 9055 *; 1996 WL 364770

Joseph O. Smith, Plaintiff, v. Angelo Campagna, et al., Defendants.

**Disposition:** **[*1]** Plaintiff's motion is denied.

**Counsel:** JOSEPH O SMITH, plaintiff, [PRO SE], Elgin Mental Health Center, Elgin, IL.

For ANGELO CAMPAGNA, Director Elgin Mental Health Center, DR MANGAHAS, Medical Officer Elgin Mental Health Center, defendants: Cynthia J. Wood, Illinois Attorney General's Office, Chicago, IL.

**Judges:** David H. Coar, Judge, United States District Court

**Opinion by:** David H. Coar

# Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff seeks a substitution of judge because he disagrees with rulings this court has made in this action. However, neither a court's judicial rulings nor judicial knowledge serve as a proper basis for a recusal. *See Liteky v. United States,* 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994); *In the Matter of Huntington Commons*

*Associates,* 21 F.3d 157 (7th Cir. 1994); *Emmel v. Coca-Cola Bottling Co. of Chicago, Inc.,* 904 F. Supp. 723, 746 (N.D.Ill. 1995). Plaintiff's motion is therefore denied.

Plaintiff has filed a motion to compel Rule 37. Plaintiff's motion to compel is denied for failure to "include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure **[*2]** without court action" as required under Fed.R.Civ.P. 37(a)(2)(A) and a recitation of the nature of the efforts made as required by General Rule 12(k) of the Court.

Moreover, plaintiff appears to be under the impression that he is entitled to take the depositions of the defendants. Pro se litigants may use any of the discovery methods prescribed in the Federal Rules of Civil Procedure. However, this court has no authority to finance or pay for a party's discovery expenses even though the party has been granted leave to proceed in forma pauperis under 28 U.S.C. § 1915(a). *Badman v. Stark,* 139 F.R.D. 601, 605 (M.D. Pa. 1991) (§ 1915 does not require the government to advance funds for deposition expenses); *Doe v. United States,* 112 F.R.D. 183, 184-85 (S.D.N.Y. 1986) (in forma pauperis statute does not require government to advance funds for deposition expenses); *Toliver v. Community Action Com'n to Help the Econ.,* 613 F. Supp. 1070, 1072 (S.D.N.Y. 1985) (no clear statutory authority for the repayment of discovery costs for pro se in forma pauperis plaintiff), *Ronson V. Commissioner of Correction for State of N.Y.,* 106 F.R.D. 253, 254 (S.D.N.Y. 1985) (indigent prisoner's **[*3]** motion to depose physician at corrections facility denied); *Sturdevant v. Deer,* 69 F.R.D. 17, 19 (E.D. Wis. 1975) (28 U.S.C. § 1915 "does not extend to the cost of taking and transcribing a deposition."); *Ebenhart v. Power,* 309 F. Supp. 660, 661 (D.D.N.Y. 1969) ("Grave doubts exist as to whether Section 1915 authorizes this court to order the appropriation of Government funds in civil suits to aid private litigants in conducting pre-trial discovery.").

The taking of depositions would entail stenographic or court reporter expenses which this court is not authorized to pay, and plaintiff has made no showing that he is able to pay the expenses for the taking of the depositions. Instead, plaintiff may conduct his discovery by means of written interrogatories.

Plaintiff claims that his hearing loss makes a telephonic deposition extremely difficult. Defendants are therefore given until July 12, 1996, to respond as to why plaintiff's deposition cannot be taken at the Elgin Mental Health Center, rather than over the telephone. It also appears that his motion of evidence relates to his objection to having his deposition taken over the telephone. Defendants should address this in **[*4]** their response too.

Plaintiff's motion to amend complaint and join additional party defendants is held in abeyance. Plaintiff is given until July 26, 1996, to submit his amended complaint. The amended complaint must be on the forms required under General Rule 47 of this Court. Plaintiff must write both the case number and the judge's name on the complaint and return the originally filled out and signed form and a copy for the judge and a copy for each defendant he names to the Prisoner Correspondent. Plaintiff is advised to keep a copy for his files. The copies of his complaint may either be exact duplicates of the original (that is, Photocopied from the original) or conformed copies of the original (that is, typed or hand written word for word from the original) If plaintiff chooses to make conformed copies then he may request more copies of the amended complaint form from the Prisoner Correspondent.

The amended complaint replaces or supersedes the original complaint. In other words, after plaintiff files an amended complaint, the court no longer considers the original complaint. Thus, allegations or claims contained in the original complaint will not be considered if they are not **[*5]** included in the amended complaint. Similarly, if a defendant in the original complaint is not named as defendant on the cover of the amended complaint, the court will treat that defendant as dropped from the suit. Therefore, if plaintiff wants to amend, **he must make sure to list all his defendants in the caption on the first page of the complaint. He must also include in his amended complaint all allegations he wants the court to consider.** Plaintiff must also serve a copy of the amended complaint on Assistant Attorney General Cynthia J. Wood and provide the Clerk with an extra copy for each new defendant he names so that summons can issue to the

U.S. Marshal for service on the newly joined parties.

The Clerk is directed to send plaintiff one copy of the civil rights complaint form and instructions for filing along with a copy of this order.

Plaintiff seeks a restraining order and order upon defendants to comply with medical orders. It appears, however, that the parties he wishes to have this court restrain are not currently defendants in this action but may be defendants he wishes to add in his amended complaint. This court therefore lacks personal jurisdiction to enter the **[*6]** order he seeks. His motion is therefore denied.

ENTER:

David H. Coar, Judge

United States District Court

DATED: JUN 25 1996

# Carol Diane Gray & Strategic Research Consulting, Inc. v. United States

United States District Court for the Northern District of Illinois, Eastern Division

September 4, 2012, Decided; September 4, 2012, Filed

No. 11 cv 3269

**Reporter**
2012 U.S. Dist. LEXIS 125076 *; 2012-2 U.S. Tax Cas. (CCH) P50,548; 110 A.F.T.R.2d (RIA) 2012-5804; 2012 WL 3835261

CAROL DIANE GRAY and STRATEGIC RESEARCH CONSULTING, INC., Plaintiffs, v. UNITED STATES OF AMERICA, Defendants.

**Subsequent History:** Affirmed by Gray v. United States, 723 F.3d 795, 2013 U.S. App. LEXIS 14873 (7th Cir. Ill., July 23, 2013)

**Prior History:** Gray v. United States, 2011 U.S. Dist. LEXIS 144731 (N.D. Ill., 2011)

**Counsel:** **[*1]** Carol Diane Gray, Plaintiff, Pro se, Fox Lake, IL.

For Carol Diane Gray, Strategic Research Consulting, Inc., Plaintiffs: David M Adler, LEAD ATTORNEY, Leavens, Strand, Glover & Adler, LLC, Chicago, IL.

For United States of America, Defendant: Christina Medzius Bixby, LEAD ATTORNEY, United States Department of Justice, Tax Division, Washington, DC; AUSA, United States Attorney's Office (NDIL), Chicago, IL.

**Judges:** Judge Sharon Johnson Coleman.

**Opinion by:** Sharon Johnson Coleman

# Opinion

**Memorandum Opinion and Order**

Plaintiffs Carol Gray and Strategic Research Consulting, Inc. (collectively "Gray") filed a four count Second Amended Complaint on January 16, 2012, alleging violations of the Internal Revenue Code, 26 U.S.C. §§ 7422, 7432, 7433. The government moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) on the basis that this Court lacks subject matter jurisdiction since the United States has not waived sovereign immunity and Gray has failed to state a claim upon which relief can be granted. For the reasons stated herein, the Court grants the motion.

**Background**

The relevant factual background is reproduced here from this Court's December 16, 2011 Order dismissing **[*2]** the First Amended Complaint. During Gray's divorce proceedings in the 1990s, it came to light that her ex-husband allegedly failed to file and pay federal income tax for several years including 1992 through 1995, some of the years at issue in the present litigation. Gray alleges that she paid installments on her tax bill for the years 1992 to 1995 until receiving a letter from the IRS on October 8, 1997, in response to her request for an installment plan. The letter stated that the IRS "can't consider an installment agreement for you because our records show you don't owe anything on this account." The letter further states that, due to her ex-husband Steven Gray's bankruptcy proceedings, "[a]ll collection activities are currently suspended." Gray believes the letter indicated that her tax arrearages had been dismissed. Gray alleges that she showed the October 8, 1997, letter to IRS agents and that they ignored the letter and thus the process was unfair and lacked impartiality. Gray alleges that she was

2012 U.S. Dist. LEXIS 125076, *2

threatened with perjury for asking to amend her 1992 through 1995 tax returns. Gray alleges that Appeals Officer Zimmerman told her in June 2000, that Gray would receive relief from **[*3]** penalties for 1992 through 1995, but in the Appeals Officer's final decision she was denied relief.

Gray claims that she significantly overpaid her taxes for the years 1996 through 1999 and the IRS owes her a refund. She further explains that she did not file timely returns for 2001, 2002, 2003, and 2004 because she had to pay her son's college tuition and incurred significant failure to file penalties for those years.

Gray alleges that in 2007 Revenue Officer Holcomb promised her that no further lien would be placed on her properties as long as Gray complied with the payment schedule, but a month later five additional liens were placed on Gray's business property. Gray claims that the tax liens have ruined her credit and she has lost, among other things, money, equity in her home, and business opportunities.

In 2009, Gray underwent an audit for the years 1992 through 1995. Gray alleges that significant changes were made to her tax returns for those years, resulting in an increase in liability. On November 16, 2011, Gray filed an administrative claim for the determination of her tax liabilities for the years at issue in the Second Amended Complaint. (2d Amend. Compl. at ¶ 140).

## Legal **[*4]** Standard

Rule 12(b)(1) requires dismissal of claims over which the federal court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Jurisdiction is the "power to decide" and must be conferred upon the federal court. *In re Chicago, Rock Island & Pacific R.R. Co.*, 794 F.2d 1182, 1188 (7th Cir. 1986). In reviewing a Rule 12(b)(1) motion, the Court may consider additional materials beyond the complaint to determine whether subject matter jurisdiction exists. *See United Phosphorus Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc). A plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met. *See Western Transp. Co. v. Couzens Warehouse & Distributors, Inc.*, 695 F.2d 1033, 1038 (7th Cir. 1982).

A motion to dismiss tests the legal sufficiency of the complaint. See Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) (quoting *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892

F.2d 583, 586 (7th Cir.1989)). In the context of a motion to dismiss, the Court accepts all well pleaded allegations as true, views them in the light most favorable to the plaintiff, and **[*5]** draws all reasonable inferences in favor of the plaintiff. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010). Although the bar to survive a motion to dismiss is not high, the complaint must allege sufficient factual matter, accepted as true to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

## Discussion

The government moves to dismiss Gray's claims for negligence on the part of IRS officers in the collection of her taxes assessed for tax years 1992 through 1995 (Count I), the placement of a lien on her property relating to tax years 2001, 2003, and 2004 (Count II), refund stemming from an alleged overpayment for tax years 1996 through 1999 (Count III), and the 2009 audit of Gray's tax returns from 1992 through 1995 (Count VI). The government argues that it has not waived sovereign immunity and that Gray fails to state a claim upon which relief can be granted.

Generally, the United States maintains sovereign immunity against civil suits unless Congress expressly waives it. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992). **[*6]** Under 28 U.S.C. § 1346(a)(1), a district court has original jurisdiction in "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." Where a statute provides for a specific consent to suit, "the limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lane v. Pena*, 518 U.S. 187, 192, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996) (quoting *Lehman v. Nakshian*, 453 U.S. 156, 161, 101 S. Ct. 2698, 69 L. Ed. 2d 548 (1981)). The burden is on the plaintiff to establish that the government consents to be sued in this case. *See Whittle v. United States*, 7 F.3d 1259, 1261 (6th Cir. 1993). Here, Gray is seeking to sue the government pursuant to sections 7433, 7432, 7422 of the Internal

2012 U.S. Dist. LEXIS 125076, *6

Revenue Code therefore this Court will examine Gray's Second Amended Complaint to determine whether all of the conditions and limitations on which the government consents to be sued in those provisions have been met.

### 1. Count [*7] I and Count IV (Section 7433)

Gray brings both Count I and Count IV of the Second Amended Complaint pursuant to 26 U.S.C. § 7433. In Count I, Gray alleges that various IRS officers acted negligently and recklessly in seeking collection of an assessment for tax years 1992 through 1995. In Count IV, Gray alleges that in May and June of 2009 the IRS conducted an illegal audit of her tax returns from tax years 1992 through 1995, which she became aware of on May 15, 2009.

Section 7433(a) authorizes suits against the government in connection with collection of federal income tax. Section 7433(d) provides for three limitations on such suits, including exhaustion of administrative remedies and that suits may be "brought only within 2 years after the date the right of action accrues." 26 U.S.C. § 7433(d)(1),(3). The government argues that Counts I and IV meet neither of these limitations.

In order to exhaust administrative remedies the taxpayer must file an administrative claim and may not file a civil action in the district court before the earlier of the following dates: the date the decision is rendered on an administrative claim or the date six months after the date an administrative claim [*8] is filed unless the administrative claim is filed within the last six months before the expiration of the two year statute of limitations in which case a civil action may be filed at any time. 26 C.F.R. §301.7433-1(d).

Here, Gray filed her administrative claim on November 16, 2011. She does not allege in her complaint that the government rendered any decision on her claim [1] thus Gray should not have filed a civil action until May 16, 2012. Gray filed the instant action on May 16, 2011, before ever filing an administrative claim. Therefore, Gray has failed to exhaust her administrative remedies, unless she filed this action within six months of the expiration of the statute of limitations.

Civil actions brought pursuant to section 7433 must be filed within two years of the date the cause of action accrues. 26 U.S.C. § 7433(d)(3). Under this section, a cause of action "accrues when the taxpayer has had a reasonable opportunity to discover all essential elements of a possible cause of action." 26 C.F.R. §301.7433-1(g)(2). Here, Gray filed her original complaint [*9] on May 16, 2011; therefore, in order to be timely, her cause of action must not have accrued before May 16, 2009. Gray's November 16, 2011, administrative claim raised four bases for seeking relief: (1) an illegal audit on May 15, 2009, and June 23, 2009 ("Claim 1"); (2) notices from the IRS regarding abatement of penalties dated November 16, 2009 ("Claim 2"); and (3) a pending Tax Court case ("Claim 3"); (4) a letter from the IRS dated October 8, 1997, that Gray alleges states that for a joint-account with her then-husband "there are no outstanding arrearages for 1992 through 1995" ("Claim 4").

With respect to the audits on May 15, 2009, and June 23, 2009, the government argues that because Gray admits she became aware of the audit on May 15, 2009, the statutory period expired on May 15, 2011, months before the administrative claim and the Second Amended Complaint were filed. Inexplicably and without authority, the government calculates the statutory time period from the filing of the Second Amended Complaint rather than the original complaint. The government does not argue that the Second Amended Complaint is so different from the original complaint that the allegations do not relate [*10] back. Nevertheless, Gray admits that she became aware of the audit on May 15, 2009; therefore, her claims arising from that audit are untimely.

Gray's second claim involves several notices from the IRS regarding abatement of penalties pursuant to 26 U.S.C. § 6404 dated November 16, 2009. The letters attached to the administrative claim show the balances due and owing for tax years 1992 through 1995. Gray appears to take issue with the assessment amount for those years. The letters specifically state that the penalty amounts have been reduced in response to Gray's request and the itemization reflects credits to her account. To the extent that Gray is seeking to challenge the assessment of taxes for the years 1992 through 1995, such a claim is not viable under section 7433, which is limited to unauthorized collection actions. "To be sure, § 7433 provides for a 'civil action' only for damages arising from the 'collection' of taxes, not for damages arising from the investigation and determination of tax liability." *Judicial Watch v. Rossotti*,

---

[1] Gray asserts in her Brief in Opposition to the Motion to Dismiss that the IRS denied her administrative claims on February 29, 2012.

2012 U.S. Dist. LEXIS 125076, *10

317 F.3d 401, 411 (4th Cir. 2003).

Gray's third administrative claim refers to her pending Tax Court case related to tax years 1992 through 1995. Gray **[*11]** is the petitioner in her Tax Court collection due process case and thus it is not a "collection action" taken by the IRS that could be subject to a civil action brought pursuant to section 7433 and Gray makes no allegation of statutory violation by the Tax Court, only that she is challenging the assessment of taxes and arrearages.

Similarly, Gray's fourth claim is a challenge to the assessment of taxes. Though not expressly incorporated into her Administrative Claim, Gray included the "Eppler" letter as an attachment. Gray repeatedly refers to the letter as evidence that she owes no taxes for the years 1992 through 1995. Indeed, the letter states, "We can't consider an installment agreement for you because our records show you don't owe anything on this account." However, it goes on to state that, "[y]our account is being handled by our Special Procedures Unit in our Chicago District Office due to bankruptcy proceedings begun by Mr. Steven Gray on May 12, 1997. All collection activities are currently suspended." The inclusion of this letter with her Administrative Claim as well as in the allegations in her Second Amended Complaint further indicates that Gray is seeking to challenge **[*12]** the assessment of taxes for the years 1992 through 1995 rather than damages resulting from the collection of those taxes. Even if Gray could assert claims based on this letter under section 7433, by her own admission the government resumed collection activities against her in 2007 for tax years 1992 through 1995. Since she did not file her complaint here until 2011, any claim arising from the supposed abatement of her taxes by the letter would be untimely. Accordingly, this Court dismisses Count I and Count IV with prejudice for failure to exhaust administrative remedies and for failure to state a claim upon which relief can be granted.

*2. Count II (Section 7432)*

Count II of the Second Amended Complaint is brought pursuant to 26 U.S.C. § 7432. Gray alleges she received a letter on March 13, 2007, regarding tax years 2001, 2003, and 2004. The government placed a lien on Gray's property. Gray alleges that IRS Officer Barbara Holcomb negligently, recklessly or intentionally told Gray that an "Offer in Compromise" was being discussed and therefore any hearing to contest the lien

was premature. (Second Am. Compl. ¶ 156).

Section 7432 provides for a civil cause of action if any officer or employee **[*13]** of the Internal Revenue Service knowingly, or by reason of negligence, fails to release a lien under section 6325 on property of the taxpayer. 26 U.S.C. § 7432(a). Section 6325 states that the Secretary shall issue a certificate of release of any lien imposed with respect to any internal revenue tax not later than 30 days after the day on which the liability is satisfied or legally unenforceable, or a bond is accepted. Plaintiffs seeking damages under section 7432 must exhaust administrative remedies and file the complaint in the district court within two years of accrual of the cause of action. 26 U.S.C. § 7432(d)(1) and (3).

Here, Gray fails to allege or otherwise suggest that an administrative claim related to these allegations was ever filed. Gray's administrative claim from November 16, 2011, clearly states that the allegations therein are pursuant to section 7433. Moreover, Gray's allegations regarding the lien on her property are not included in her administrative claim. Accordingly, this Court finds that Gray has failed to exhaust her administrative remedies and Count II must be dismissed with prejudice.

*3. Count III (Section 7422)*

In Count III of her Second Amended Complaint, **[*14]** Gray alleges that based on her amended tax returns for 1996 through 1999 that she filed in April of 2009 she is entitled to a refund for overpayment. The government moves to dismiss Count III on the basis that the request for refund is untimely because she did not file her amended returns within three years of the original returns or within two years of her last payment.

Section 7422 provides that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof." 26 U.S.C. § 7422(a). The government assumes in its motion that the amended returns filed in April 2009 were claims for refund from the years 1996 through 1999.

The government asserts that Gray's amended returns

were untimely claims for refund under section 6511(a). Section 6511(a) **[*15]** states that a claim for refund must be filed within three years of the filing of the original return, or two years from the time the taxes were paid, whichever is later. For tax year 1996, Gray filed her original return on November 3, 1997, and made her last payment on November 10, 1997, therefore her April 2009 claim for refund was not submitted within three years of her original return or within two years from the time the taxes were paid. For tax year 1997, Gray filed her original return on April 26, 1999, and made her last payment on May 12, 1999, therefore her April 2009 claim for refund was not submitted within three years of her original return or within two years from the time the taxes were paid. For tax year 1998, Gray filed her original return on April 17, 2000, and made her last payment on May 11, 2000, therefore her April 2009 claim for refund was not submitted within three years of her original return or within two years from the time the taxes were paid. For tax year 1999, Gray filed her original tax return on November 20, 2000, and made her last payment on May 27, 2001, therefore her April 2009 claim for refund was not submitted within three years of her original return **[*16]** or within two years from the time the taxes were paid. Accordingly, this Court finds that Gray's claim for refund in April 2009 for tax years 1996 through 1999 is untimely pursuant to section 6511(a).

Gray argues in opposition that the claim for refund are timely pursuant to section 6532(a)(1). That section states, "[n]o suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates." 26 U.S.C. § 6532(a)(1).

Here, Gray filed her complaint within two years of the IRS's denial of her claims for refund. For tax year 1996, the IRS denied her claim on July 6, 2009. For tax year 1997, her claim for refund was denied on July 20, 2009. For tax year 1998, the last entry of payment is on May 11, 2000. For tax year 1999, the IRS denied Gray's claim for **[*17]** refund on September 28, 2009. Therefore, the situation here is that Gray's claims for refund for tax years 1996 through 1999 were untimely under section 6511(a), but the instant lawsuit was not

untimely based on when the government disallowed her claims under section 6532(a)(1). Since section 7422(a) prohibits the filing of suits before the taxpayer files a claim for refund and Gray's claims for refund were untimely, this Court could dismiss Count III on that basis alone. However, even if this Court were to allow it to proceed, Gray cannot prove any damages because pursuant to section 6511(b)(2)(B), when a claim for refund is not filed within three years, the refund is limited to the amount paid in the two years immediately proceeding the claim for refund. 26 U.S.C. § 6511(b)(2)(B). Gray did not make any payments in the two years prior to submitting her amended returns in 2009, therefore even if Gray overpaid she is not entitled to any refund. Accordingly, this Court dismisses Count III with prejudice.

### 4. Strategic Research Consulting, Inc.

Lastly, the government moves to dismiss claims allegedly brought on behalf of Strategic Research Consulting, Inc. There are no allegations in the **[*18]** Second Amended Complaint that suggest injury to Strategic Research Consulting, Inc., only injury to Gray. Gray's status as the principal and owner of Strategic Research Consulting, Inc., is insufficient by itself to maintain claims against the government on the corporate plaintiff's behalf. Plaintiff cannot amend her complaint by argument in her brief. *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993). This Court dismisses the Second Amended Complaint with respect to the corporate plaintiff Strategic Research Consulting for failure to state a claim pursuant to Rule 12(b)(6).

### Conclusion

Based on the foregoing, the government's motion to dismiss is granted. Gray's Second Amended Complaint is dismissed with prejudice.

IT IS SO ORDERED.

Date: September 4, 2012

Entered: /s/ Sharon Johnson Coleman

Sharon Johnson Coleman

# In re Complaint of Great Lakes Dredge & Dock Co.

United States District Court for the Northern District of Illinois, Eastern Division

February 18, 1993, Decided ; February 19, 1993, Docketed

92 C 6754

**Reporter**
1993 U.S. Dist. LEXIS 16256 *; 1993 AMC 2046

Complaint of GREAT LAKE DREDGE & DOCK COMPANY for Exoneration from or limitation of liability; GREAT LAKES DREDGE & DOCK COMPANY, Plaintiff, v. CITY OF CHICAGO, an Illinois municipal corporation, Defendant.

**Judges:** **[*1]** Kocoras

**Opinion by:** CHARLES P. KOCORAS

# Opinion

*MEMORANDUM OPINION*

CHARLES P. KOCORAS, District Judge:

This matter is before the Court on defendant and claimant's motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons set forth below, the motion is granted.

## BACKGROUND

On April 13, 1992, the Chicago River broke through a breach in an underground freight tunnel lying beneath the river. The river flowed through the tunnel and into the downtown commercial district of the City of Chicago and into the basements of the buildings connected to the tunnel. This inundation of the tunnel caused significant damage and resulted in the mid-day evacuation of the downtown district and the declaration of a state and federal emergency. To aid emergency repair, the Captain of the Port of Chicago ordered the river closed between Grand Avenue on the North Branch, Cermak Road on the South Branch, and Lake Michigan on the Main Branch. The river remained closed for over a month. River traffic ceased, several commuter ferries were stranded, and **[*2]** many barges could not enter the river system even south of Cermak Road because the river level was lowered to aid repair efforts.

Numerous lawsuits against Great Lakes Dredge & Dock Company ("Great Lakes") and the City of Chicago (the "City") arose from this occurrence, including the class action lawsuit on behalf of tens of thousands of individuals and thousands of businesses ("claimants"), which has been filed in Illinois state court and consolidated under the caption *In re Chicago Flood Litigation.,* No. 92 L 5422 ("Class Complaint"). Because resolution of the present motion to dismiss rests in some part on the central issues and allegations raised in the state court litigation, we will address them briefly below.

According to the Class Complaint, the damages sustained by plaintiffs and the Class were caused by the partial collapse of the tunnel at the Kinzie Street Bridge, specifically, in the immediate vicinity of the area where pilings had been installed by Great Lakes pursuant to a contract with the City earlier in the year. Claimants allege that both Great Lakes and the City knew or should have known of the existence and location of the tunnel at the Kinzie Street Bridge **[*3]** and that the pile removal and pile driving work completed by Great Lakes for the City could result in damage to the tunnel. It is also alleged that Great Lakes installed new pilings in a location other than that originally designated in its contract with the City, failed to remove all the pilings contracted to be removed, and failed to take adequate safeguards against a breach of the tunnel. According to the Class Complaint, Great Lakes, in pounding and driving the pilings into the riverbed, caused one or more of the following conditions: an actual hole or breach of the tunnel wall; a weakening of the tunnel wall creating cracks or weakness in the structural integrity of the

1993 U.S. Dist. LEXIS 16256, *3

tunnel; a compacting of the earth around the tunnel walls creating excessive pressure on the tunnel; and such other events which proximately caused the tunnel wall to partially collapse or break. Moreover, the claimants bring a number of claims against the City, arising, *inter alia,* from the City's alleged failure to repair the damage to the breached tunnel when it became known to the City and from the City's alleged failure to warn plaintiffs and the Class about this dangerous condition.

On October 6, 1992, **[*4]** Great Lakes filed suit in this Court seeking exoneration from or limitation of any liability it may incur from claimants' suit against it. Great Lakes seeks to limit its liability to the value of two barges and a launch boat pursuant to 46 U.S.C. App. §§ 183(a) and 185, the relevant sections of the Limitation of Shipowner's Liability Act, Rev.Stat. § 4281 *et seq.,* 46 U.S.C. § 181 *et seq.* (1982 ed.) (Count I), [1] and indemnity (Count II) or contribution (Count III) from the City of Chicago in the event liability is found to exist in this case.

**[*5]** In response to Great Lakes' complaint in this Court, claimant Jerome B. Grubart, Inc. ("Grubart") and the City (collectively, "movants") filed their respective motions to dismiss pursuant to Rules 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Thereafter, an order was entered by this Court on October 8, 1992, which, in part, stayed and restrained the institution or further prosecution of any and all suits, actions, and proceedings against Great Lakes in any other court with respect to any claim or claims arising out of or occasioned by the Chicago tunnel disaster.

We find that this Court does not have subject matter jurisdiction over plaintiff Great Lakes' limitation action under the jurisdictional statutes establishing maritime jurisdiction. Moreover, we determine that Great Lakes' complaint seeking limitation of liability fails to state a claim upon which relief can be granted. Thus, we dismiss the present suit pursuant to both Rule 12(b)(1) and Rule 12(b)(6). In setting forth our present determination, we address the movants' 12(b)(1) motion

and 12(b)(6) motion, respectively.

## ANALYSIS

I. **[*6]** *MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)*

Before discussing the merits of the movants' motions to dismiss, this Court must first recount the factual background to this dispute. While we recognize that many of the ensuing facts are the subject of contention by Great Lakes and the movants, [2] we are guided in our review of these facts by the following legal standard.

**[*7]** 1. *Legal Standard Governing Rule 12(b)(1) Motion*

The movants' 12(b)(1) motions attack the underlying facts asserted by Great Lakes in support of admiralty jurisdiction. Where a party properly raises a factual question concerning the court's jurisdiction, as through a Rule 12(b)(1) motion, the district court is not bound to accept as true the allegations of the complaint as to jurisdiction. *Gervasio v. United States,* 627 F. Supp. 428, 430 (N.D. Ill. 1986). Rather, the court may look beyond the jurisdictional allegations and view whatever evidence has been submitted to determine whether in fact subject matter jurisdiction exists. *Id.* The party asserting jurisdiction, here, Great Lakes, bears the burden of supporting its jurisdictional allegations with competent proof and therefore "must submit affidavits and other relevant evidence to resolve the factual dispute regarding the court's jurisdiction." *Kontos v. United States Department of Labor,* 826 F.2d 573, 576 (7th Cir. 1987); *Norman v. Levy,* 756 F. Supp. 1060, 1062 (N.D. Ill. 1990).

---

[2] Great Lakes responded to the City and Grubart's jurisdictional challenge by submitting seven sworn affidavits and five documentary exhibits. It is against this evidence that Grubart directs his motion to strike, which is also presently before this Court. We find that, for the most part, Grubart's objections go to the weight, not the admissibility, of Great Lakes' evidentiary materials. It is for the Court to determine the relevancy of these materials and the weight to be given to the factual matters asserted therein, which we have done accordingly. *See Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir. 1979). In reaching our present determination to grant Grubart and the City's motions to dismiss Great Lake's limitation action, the Court has accorded proper weight to the affidavits and exhibits submitted by Great Lakes and, therefore, need not lend Grubart's motion to strike any further consideration.

---

[1] The Act itself refers to the proceeding as a petition to limit liability. 46 U.S.C.App. § 185. Procedurally, however, limitation actions under the Act are governed by Supplemental Rules for Certain Admiralty and Maritime Claims, Rule F. These rules refer to the pleading as a complaint for limitation of liability. Fed.R.Civ.P.Supp. Rule F(1). *Joyce v. Joyce,* 975 F.2d 379, 381 n. 2 (7th Cir. 1992).

2. *Facts Pertaining to the Court's Jurisdictional* **[*8]** *Inquiry*

In December, 1990, the City invited marine firms including Great Lakes to bid on a project to replace fourteen pile clusters, also known as timber dolphins, at five separate bridge sites in the Chicago River. Great Lakes won the contract. One of the sites included in the project was located at the south side of the Kinzie Street Bridge. During the last week of August and the first three weeks of September, 1991, Great Lakes's barge crew removed old, deteriorating pile clusters and drove new pilings into the riverbed at the Kinzie Street site. Over six months after Great Lakes completed its work under the contract, on April 13, 1992, the Chicago River broke through the tunnel system running beneath the river and flooded Chicago's business district.

Pursuant to the City and Great Lakes' contract, Great Lakes alleges that in July and August, 1991, it employed three vessels to various sites along the North and South Branches of the Chicago River, ultimately to a point alongside the Kinzie Street Bridge. The three Great Lakes' vessels involved in removing and replacing the Kinzie Street pile clusters consisted of two barges and one launch or tug, called the M/V PEACH STATE. Both **[*9]** barges are allegedly "load line certified" by the American Bureau of Shipping, meaning they are registered to navigate in open, unprotected waters and meet seaworthiness criteria. One barge, G.L. 150, is said to weigh 350 tons and have a length of 131.1 feet and breadth of 34 feet. The other barge, the G.L. 136, weighing 426 tons, with a length of 121 feet and breadth of 44 feet, was called in Great Lakes' Foreman's Daily Reports either "Spud Scow 136" or "Barge 136," a title, according to Grubart, that depended upon the nature of the work being performed. [3] G.L. 136 was fixed at the Kinzie Street site during the pile-driving job, and it is from this barge that the pilings were driven.

 **[*10]** Both barges were used occasionally to transport

the Great Lakes crew from one work site to the next. Barge G.L. 136 transported a crane and related equipment to and from each work site and the Great Lakes' facilities on the Calumet River. The other barge, G.L. 150, primarily served to transport the new pilings from Great Lakes' facilities on the Calumet River to the work sites and to stow the old pilings until the work was completed. With regard to the launch, the M/V PEACH STATE regularly towed the barges whenever the work required repositioning, and every morning and night towed at least one of the barges to and from the night berth and work site. Moreover, pursuant to its contractual duty stated below, the M/V PEACH STATE towed the barges out of the navigable channel whenever another vessel sought passage.

Great Lakes alleges that only marine firms can perform the pile driving work requested by the City because this work must be performed from vessels in the navigable channel and such vessels have to be moved from time to time to permit other maritime traffic to pass. In support of its position, Great Lakes cites Provision 209 of the contract, which specifically required Great **[*11]** Lakes to comply with U.S. Coast Guard regulations protecting the right of other vessels to navigate past the work sites:

> The Contractor's attention is directed to the fact that the Branches of the Chicago River involved are navigable streams. As such, the bridges involved herein must be open to masted vessels at any time on signal . . . . During the execution of the contract, marine regulations shall be complied with in every way, so that river traffic may be protected and any river obstruction avoided . . . .

Moreover, the contract's construction methods indicate that the pile removal and driving work would involve work below the waterline of the Chicago River and required the contractor to supply all labor and equipment necessary to perform the pile driving work, including, *inter alia,* barges and tugs.

Although there is some dispute between the parties as to the intended purpose of the pile clusters at the Kinzie Street location, it is clear that they were principally intended for the protection of the bridge at that site. The City argues that this was their sole purpose and, in the state court litigation, Great Lakes repeatedly stated that the pilings were intended **[*12]** to protect the bridge. In the instant litigation, Great Lakes has taken the position that the pile clusters were designed for several purposes, including the protection of vessels and use as navigational aids.

---

[3] On the sole basis of selective Great Lakes' Foreman Daily Reports, which do not state the tasks to be performed that day, Grubart argues that Great Lakes treated G.L. 136 differently, depending on its use at the time. According to Grubart's unsubstantiated reading of the reports, during the pile-driving activity, Great Lakes considered G.L. 136 to be a spud scow, which is designed as a work platform that is affixed in position by dropping its spuds in the river bed or by lifting itself out of the water for stability. On the other hand, according to Grubart, upon the completion of the pile driving work, when G.L. 136 was being transported back to Great Lakes' yard, Great Lakes considered G.L. 136 to be a barge.

In addition to the fact that the City and Great Lakes have, on prior occasions, repeatedly stated that the purpose for the dolphins was to protect the bridge and bridgehouse, the June 7, 1990 City ordinance authorizing the dolphin replacement project read, in part, "that said Project generally consist of the replacement of pile clusters at various bridges within the City, in order to provide the structures with increased protection from the possibility of collision by marine traffic." Great Lakes' complaint asserts that the pilings are located "next to," and therefore outside, the navigable channel. (G.L. Complaint P 4). Thus, even according to Great Lakes' complaint, pilings are not entirely surrounded by navigable water. Implicit in Great Lakes complaint is the acknowledgment that the pilings are not "solely" or "principally" in aid of navigation.

3. *Discussion*

Both movants contend that Great Lake's complaint should be dismissed under Rule 12(b)(1), because 28 U.S.C. § 1333 **[*13]** (1) and 46 App. U.S.C. § 740, the jurisdictional statutes relied upon by Great Lakes to establish maritime jurisdiction, do not support subject matter jurisdiction in this case. As stated previously, once the existence of subject matter jurisdiction is challenged in a motion to dismiss under Fed.R.Civ.P. 12(b)(1), the burden of establishing such jurisdiction through relevant, competent evidence shifts to the party asserting the same. *Norman,* 756 F. Supp. at 1062; *Gervasio,* 627 F. Supp. at 430. For the reasons set forth below, we find that Great Lakes has not met its burden of establishing this Court's subject matter jurisdiction, and, accordingly, we grant movants' 12(b)(1) motion to dismiss.

A. *The Court Lacks Jurisdiction Under 28 U.S.C. § 1333(1)*

Courts have held that federal admiralty jurisdiction exists in a particular case only if the protection of maritime activity through adherence to a uniform and specialized set of rules governing that activity on navigable waterways is essential. A trilogy of Supreme court cases confines the exercise **[*14]** of admiralty jurisdiction under 28 U.S.C. § 1333(1) to actions satisfying the following two prerequisites:

1. the alleged wrong must occur on navigable waters (situs test); and

2. the alleged wrong must bear a significant relationship to "traditional maritime activities"

(nexus test).

*Sisson v. Ruby,* 497 U.S. 358, 110 S. Ct. 2892, 2895-98, 111 L. Ed. 2d 292 (1990); *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 674, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982); *Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 266, 34 L. Ed. 2d 454, 93 S. Ct. 493 (1972).

Prior to 1972, the determination of whether a tort was maritime depended solely upon the situs of the wrong. In 1972, the Supreme court in *Executive Jet,* a case which arose out of an aircraft accident over navigable water, rejected this strict situs test stating:

it is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the **[*15]** absence of legislation to the contrary.

*Executive Jet,* 409 U.S. at 268. Although the Court's holding in *Executive Jet* was limited by its terms to cases involving aviation torts, the Supreme Court applied *Executive Jet* to determinations of federal admiralty jurisdiction outside the context of aviation torts in *Foremost. Sisson,* 110 S. Ct. at 2895 *(citing Foremost,* 457 U.S. at 673).

With regard to the "nexus" test, the Supreme Court held in *Foremost* that all tort actions invoking admiralty jurisdiction must meet *Executive Jet's* new nexus test, requiring a significant relationship with "traditional maritime activity." *In re Complaint of Sisson,* 867 F.2d 341, 343 (7th Cir. 1989), *rev'd on other grounds,* 497 U.S. 358, 110 S. Ct. 2892, 111 L. Ed. 2d 292 (1990) (citing *Foremost,* 457 U.S. at 673-74). When defining traditional maritime activity, the Court recognized that "the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce," and stated the federal **[*16]** interest in protecting maritime commerce "can be fully vindicated only if all operators of vessels on navigable waters are subject to uniform rules of conduct." *Id.* (citing *Foremost,* 457 U.S. at 674-75). The *Foremost* Court, in holding that the collision between two pleasure boats fell within the federal courts' admiralty jurisdiction, ruled:

The potential disruptive impact of a collision between boats on navigable waters; when coupled with the traditional concern that admiralty law holds

for navigation, compels the conclusion that this collision between two pleasure boats on navigable waters has a significant relationship with maritime commerce.

*Foremost,* 457 U.S. at 675.

In *Sisson v. Ruby,* a case involving a fire on a noncommercial vessel docked at a recreational marina on Lake Michigan, the Supreme Court further clarified the nexus component of the jurisdictional inquiry under § 1333. The *Sisson* Court reiterated the admiralty jurisdiction principles it had stated in a footnote within the *Foremost* opinion, "not every accident in navigable waters that might disrupt maritime commerce will support **[*17]** federal admiralty jurisdiction, but that when a potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity . . . admiralty jurisdiction is appropriate." *Sisson,* 110 S. Ct. at 2895-96 *(citing Foremost,* 457 U.S. at 675 n. 5). In view of this statement, the *Sisson* Court discerned a "two-part *Foremost* test," which requires the party seeking to invoke maritime jurisdiction to show that there existed (1) an incident having a potentially disruptive impact on maritime commerce, and (2) a substantial relationship between the activity giving rise to this incident and traditional maritime activity. *Id.* at 2896-97.

Great Lakes alleges in its complaint that the Admiralty Extension Act, 46 U.S.C. App. § 740 also supplies a jurisdictional base for its complaint. That statute provides in relevant part:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water notwithstanding that **[*18]** such damage or injury be done or consummated on land.

It has been held that the Admiralty Extension Act was intended to eliminate the inequities and anomalies resulting from the strict application of the situs rule in admiralty under then existing law. The Act was not intended to grant claimants new substantive rights of recovery nor relieve them from jurisdictional constraints unrelated to locality imposed on general maritime tort claimants. Claims under the Admiralty Extension Act are to be subject to the "maritime relationship" rule of *Executive Jet. Sohyde Drill & Marine v. Coastal States Gas Producing Co.,* 644 F.2d 1132, 1136 (5th Cir. 1981); *see also Crotwell v. Hockman-Lewis, Ltd.,* 734 F.2d 767, 768 (11th Cir. 1984); *Dean v. Maritime*

*Overseas Corp.,* 770 F. Supp. 309, 312 (E.D. La. 1991); *Felix v. Arizona Dep't of Health Services, Goods, Vital Records Section,* 606 F. Supp. 634, 636 (D. Ariz. 1985); *Jorsch v. Le Beau,* 449 F. Supp. 485, 488-89 (N.D. Ill. 1978).

The test to determine the presence or absence of a significant **[*19]** relationship to traditional maritime activities in a particular case has been described in varying formulations. Judge Aspen of this Court has said that "the preferred course . . . is to evaluate the entire scope of events involving both the defendant's behavior and the manner in which the plaintiff is injured in evaluating whether there is a connection with traditional maritime activity significant enough to establish admiralty jurisdiction." *American Nat. Bank & Trust Co. of Waukegan v. United States,* 636 F. Supp. 147, 149 (N.D. Ill. 1986). This test may be described as the totality of circumstances test. The Fifth Circuit, in the case of *Kelly v. Smith,* 485 F.2d 520, 525 (5th Cir. 1974), has outlined four factors which may be considered in determining the existence of a substantial maritime relationship:

> 1. the functions and roles of the parties;
>
> 2. the types of vehicles and instrumentalities involved;
>
> 3. the causation and type of injury; and
>
> 4. traditional concepts of the role of admiralty law.

*Sohyde,* 644 F.2d at 1136.

In *Molett v. Penrod Drilling Co.,* 826 F.2d 1419 (5th Cir. 1987), **[*20]** the four criteria set forth in *Kelly* were addressed in light of the Supreme Court's decisions in *Executive Jet* and *Foremost.* The indicia of maritime flavor described in the latter two cases was described as (1) the impact of the event on maritime shipping and commerce, (2) the desirability of a uniform national rule to apply to such matters, and (3) the need for admiralty "expertise" in the trial and decision of the case. The Fifth Circuit then held that the analysis of *Kelly* should be applied with the indicia divined from *Executive Jet* and *Foremost.*

However the test is stated, the logical starting point in the analysis is the nature and quality of the wrong or wrongs alleged in the case. Although the Class Complaint alleges a litany of tortious conduct on the part of Great Lakes, at bottom it rests on the proposition that Great Lakes' pile-driving activity was negligently performed, causing a breach in the tunnel wall and the

1993 U.S. Dist. LEXIS 16256, *20

resulting flood of the tunnel and portions of the Chicago business district. The charges against the City also involve alleged failure to prevent or cure Great Lakes' breach of the tunnel wall, thereby failing to prevent the flooding [*21] of the tunnel and the class properties.

It is significant to note that the alleged wrongs did not involve the movement or collision of a vessel. Nor did the alleged wrongs involve the transport of cargo or people on a navigable waterway. Nor can it be said that the tunnel or the walls were somehow part of the Chicago river or any other navigable waterway. Indeed, the tunnel and its environs were part of the land and the significant injuries that were suffered were the result of the *proximity* of the tunnel to the river - an unfortunate but fortuitous geographical configuration.

Additionally, the pile-driving activity and the placement of the new dolphins were undertaken primarily to protect the Kinzie Street bridge and its machinery, long ago held to be part of the land and not part of the river waterway. In *Cleveland Terminal & Valley R. R. Co. v. Cleveland S. S. Co.,* 208 U.S. 316, 52 L. Ed. 508, 28 S. Ct. 414 (1908), plaintiff sued in admiralty for damage sustained to a center pier of a drawbridge and its protective pilings when a steamer collided with the pier. The Supreme Court ruled that the situs requirement had not been established because "the bridges, shore docks, protection [*22] piling, piers, etc, pertain to the land" and thus were not within the court's admiralty jurisdiction. Although the Admiralty Extension Act has eliminated the situs requirement, it did nothing to alter the holding of *Cleveland Terminal* that protective pilings for bridges pertained to the land, and in evaluating the totality of circumstances here, it maintains that character.

The parties are at odds over whether the activity of pile driving is, itself, a traditional maritime activity. The City argues that pile driving is an activity common to the construction industry, regardless of the project's location, and is not unique to rivers or bodies of water. Standing alone, the City's assertion is a truism. Great Lakes' principal argument on this point is that pile clusters, or dolphins, are vital to maritime commerce and their use as navigational aids is not subject to dispute. Both sides cite cases in support of their respective arguments. Frankly, the cited cases are not dispositive in categorizing pile driving activity, and other factors present color the decisions in the cited cases. As we previously held, however, the main purpose of these dolphins was the protection of the bridge [*23] and its operating mechanisms. It is that function which predominates in the overall analysis of whether we are dealing here with a traditional maritime activity.

Both sides have expended considerable energy in debating whether the two barges and the launch are "vessels" within the meaning of section 740. The decided cases support both positions and are, in reality, irreconcilable. In *Ellender v. Kiva Constr. & Eng'g Inc.,* 909 F.2d 803, 806 (5th Cir. 1990), the Fifth Circuit ruled that a spud barge used for pile driving was not a vessel under the Jones Act because the "barge was not designed or used to transport passengers, cargo, or equipment from place to place across navigable waters, where the barge required tug boats or other vessels to move it, and where the barge remained virtually stationary during any particular project." Although the barge at issue there, like Great Lakes' barges here, supported a mobile crane and other equipment, the court held that "these transportation functions [were] incidental[] to its other uses," and thus insufficient to confer "vessel" status on the barge. *Id.* at 807; *see also Bernard v. Binnings Constr. Co.,* 741 F.2d 824, 832 (5th Cir. 1984) [*24] ("a structure whose primary function is to serve as a work platform does not become a vessel [under Jones Act] even if it sometimes moves significant distances across navigable waters in the normal course of operations"); *accord, Powers v. Bethlehem Steel Corp.,* 477 F.2d 643 (1st Cir.), *cert denied,* 414 U.S. 856, 38 L. Ed. 2d 106, 94 S. Ct. 160 (1973).

The Seventh Circuit has also spoken on the issue, however, and we are bound by its view. In *Johnson v. John F. Beasley Constr. Co.,* 742 F.2d 1054 (7th Cir. 1984), *cert. denied,* 469 U.S. 1211, 84 L. Ed. 2d 328, 105 S. Ct. 1180 (1985), the definition of "vessel" for Jones Act purposes was set forth:

> The "vessel in navigation" requirement pertains not to the vessel's mobility at the precise moment of injury, but to whether it has at times been employed as a means of transport on water for passengers or cargo and has not been withdrawn from navigable waters and laid up, say, for the season . . . . Any floating structure, including those designed for special purposes, is a "vessel" capable of having a maritime "crew" so long as the structure at some time serves as a means of transport [*25] on water. "To be a vessel, the purpose and business must to some reasonable degree be the 'transportation of passengers, cargo, or equipment from place to place across navigable waters.'" (citations omitted).

*Id.* at 1063. [4] Mindful of the transport functions performed by each, we determine that the two barges and the launch utilized by Great Lakes to perform the pile removal and driving activity required under the contract were vessels for admiralty purposes.

Having resolved the question of whether the barges and launch were vessels, we next address whether the injuries [*26] at issue were "caused by a vessel on navigable water," the Section 740 requirement, or whether the alleged wrong bears a significant relationship to traditional maritime activities. In analyzing both issues it is apparent that the particular *function* of the vessels involved is far more important than their classification as vessels. Only in this way can we harmonize *Johnson* with the cases, cited above, which differ in result. It bears repeating that the Supreme Court has held that the requisite substantial relationship between the activity giving rise to the incident and traditional maritime activity is not always present whenever navigable water or a vessel is involved.

In determining the jurisdictional issue, it is as important to examine what the case does not involve as it is to examine what it does. The following summary addresses both concepts:

1. None of the vessels were directly involved in the cause of the injury to the tunnel wall and did not strike anything to cause the harm in question.
2. The vessels were acting as fixed platforms and were not involved in navigation on a waterway during the pile driving activities.

3. The injuries were not sustained on [*27] a dock or pier next to the site of the work activity, but were experienced on land, blocks away in Chicago's business district.
4. Pile driving is a common construction activity and is found in both maritime and non-maritime settings. The principal purpose of the placement of the dolphins at the Kinzie Street site was the protection of the bridge, which the Supreme Court views as an extension of the land.
5. The pile driving activity did not present a foreseeable or material disruption of maritime

commerce on the Chicago River. The actual effect on commerce took place many months after the alleged wrongful acts and were part of the massive remediation efforts engaged in by the City and others.
6. There are no allegations of personal injury on a vessel on navigable waters, nor for damage done to a vessel in navigation or its cargo.

In summary, the relevant facts alleged to be present in this now historic calamity to our city do not involve traditional maritime concerns. Federal admiralty jurisdiction will be sustained only if a case presents the need to protect maritime commerce through adherence to a uniform and specialized set of rules such as those involving navigation and [*28] seaworthiness. There is no compelling reason to adjudicate the host of issues raised by the pleadings under this specialized set of rules. Traditional common law rules of tort and contract should do quite nicely in the resolution of the material disputes here; the specialization of admiralty rules is not necessary. The totality of circumstances lead unyieldingly to that conclusion. Simply put, we have land-based injuries caused by land-based activities undertaken upon a non-moving vessel on a river acting as a stationary work platform. The maritime connection of the principal activities is neither direct nor material and supply none of the causation for the alleged injuries. There are no traditional maritime concerns present here and, without it, no admiralty jurisdiction.

The case of *National Union Fire Ins. Co. of Pitts, Pa. v. U.S.,* 436 F. Supp. 1078 (M.D. Tenn. 1977), is instructive. That case involved water damage to some stock stored in a warehouse as a result of flooding by the Cumberland River. The United States was accused of negligent operation of certain dams on the Cumberland. The court stated:

The activity [at issue should be appraised] [*29] in terms of its actual effects as well as its general nature. Thus, while control of the water level does generally involve considerations affecting navigation and commerce upon the water, the only actual impact of concern in this instance is the flooding of a shore-based warehouse. Viewed in this way, it becomes more difficult to perceive an actual maritime incident for which the unique principles and procedures of admiralty are pertinent. Had the rising water caused boats to break from their moorings and sustain damage, or inundated a barge and destroyed its cargo, this court would have little difficulty in finding admiralty

---

[4] *Johnson* involved an ironworker who sued a barge owner under the Jones Act, 46 U.S.C. § 688, for injuries sustained while working on a construction barge, which, like the G.L. 136 present in this case, had no motive power of its own and no steering capability and whose primary role was to provide a construction site and assist in the construction of the designated project.

jurisdiction. However, where the actual untoward consequence is of a kind which can readily be dealt with by resort to established common law tort principles, it makes no sense to dredge up (no pun intended) a whole body of law whose purpose and history is inextricably bound up in matters concerning maritime commerce. It should not be overlooked that the navigability of the Cumberland River, which is a *sine qua non* of admiralty jurisdiction, had nothing whatever to do with the injuries sustained in this case. It is not inconceivable that a stopped up storm **[*30]** drain, during an abnormally heavy rainfall, could have resulted in essentially the same damage to the material in the warehouse. And in such a case, a suit against the municipality (assuming no immunity) alleging negligent failure to keep the sewers cleared of debris, could easily be disposed of within the contours of state tort law. The fact that the alleged culprit in the instant case was the Corps of Engineers and that the destructive force happened to be a navigable stream does not alter the availability, viability, and indeed, the preferability of state law for disposing of this case.

*Id.* at 1083.

Finding similar prior cases to assist in guiding judicial decision is not an exact science. Conjuring up the unique set of facts giving rise to the great Chicago Flood might best be the product of fiction writers -- after all, how many major cities come equipped with miles of subterranean tunnels whose existence is unknown to most of its inhabitants? But even though the facts of *National Union* may be dissimilar to the quite unique facts of the instant case, its reasoning does apply.

As in *National Union,* the mere fact that the injuries were **[*31]** allegedly caused by water from a navigable river is insufficient to establish admiralty jurisdiction. Nor does this case involve issues such as navigation or the seaworthiness of vessels that admiralty law was designed to address. Consequently, there is no basis for federal admiralty jurisdiction.

B. *The Limitation Of Shipowner's Liability Act Does Not Provide A Separate Basis Of Admiralty Jurisdiction*

The Supreme Court in *Sisson* declined to resolve the parties' contentions regarding whether the Limitation of Shipowner's Liability Act, 46 U.S.C. § 181 *et seq.,* provides an independent basis for federal jurisdiction. 110 S. Ct. at 2894 n. 1. Nonetheless, the Seventh Circuit definitively ruled in *In re Complaint of Sisson,* 867 F.2d at 349-50, in a portion of the opinion not reversed by the Supreme Court, that the Limitation of Liability Act does not independently confer admiralty jurisdiction. The Seventh Circuit stated:

> In our view, when a cause of action in tort does not bear any connection to traditional maritime activity, there is no justification for allowing **[*32]** the Limitation of Liability Act--which provides for a practice apparently defensible only in a traditional maritime context--to provide an independent basis for admiralty jurisdiction. . . . We believe that allowing admiralty jurisdiction here would be contrary to the policy of *Executive Jet* and *Foremost.* In creating the nexus requirement, the Supreme Court confined the reach of admiralty jurisdiction to include only those tort actions with which a uniform, sea-going jurisprudence should be concerned. To permit an alleged tortfeasor to circumvent the requirement that the tort bear a connection to traditional maritime activity simply by asserting a right to limit liability would eviscerate the nexus test.

*Id.* Accordingly, in keeping with the Seventh Circuit's clear dictate and our prior discussion, we hold that the Limited Liability Act does not provide this Court with an independent basis for federal jurisdiction.

In sum, Great Lakes has failed to meet its burden of establishing this Court's subject matter jurisdiction over its limitation of liability action, and, therefore, Great Lakes' suit is dismissed pursuant to Rule 12(b)(1).

**II.** ***MOTION TO DISMISS PURSUANT*** **[*33]** ***TO RULE 12(B)(6)***

Even if we were to have found that this Court has subject matter jurisdiction over the present suit, we determine that Great Lake's complaint fails to state a claim upon which relief can be granted. Great Lakes seeks exoneration from or limitation of its liability for the accident pursuant to the Limitation of Shipowner's Liability Act, 46 U.S.C. § 181 *et seq.* (the "Act"). The Act limits the liability of a shipowner for any loss incurred without the knowledge or privity of the owner to the value of the vessel and its freight. 46 U.S.C. § 183(a). A shipowner may petition a district court of proper jurisdiction for exoneration from or limitation of liability. 46 U.S.C. § 185. Upon the shipowner's filing of the petition and his tender of an adequate bond, the district court must enjoin all other proceedings against the shipowner involving issues arising out of the subject matter of the limitation action. *Id. See also Ex Parte*

*Green,* 286 U.S. 437, 438-40, 76 L. Ed. 1212, 52 S. Ct. 602 (1932); *S & E Shipping Corp. v. Chesapeake & O. R. Co.,* 678 F.2d 636, 642 (6th Cir. 1982). **[*34]** The district court must ultimately decide whether the shipowner has a right to limitation of liability; the claimants may pursue their common law remedies in another forum only if they concede that the district court has exclusive jurisdiction over the question of whether liability is limited. *See S & E Shipping Corp.,* 678 F.2d at 643 n. 13; *Helena Marine Service, Inc. v. Sioux City,* 564 F.2d 15, 18 (8th Cir. 1977), *cert. denied,* 435 U.S. 1006, 56 L. Ed. 2d 387, 98 S. Ct. 1875 (1978).

Both movants assert that Great Lakes' complaint should be dismissed on the basis that Great Lakes is foreclosed as a matter of law from obtaining limitation of liability under the Act. The movants base this contention on their allegation that Great Lakes was in privity to and with knowledge of the alleged negligence. The City additionally seeks summary dismissal of Great Lakes' complaint on the ground that Great Lakes is not entitled to limitation based on the "personal contract doctrine." Great Lakes refutes both arguments, arguing that it has stated a *prima facie* case for limitation under the Act and its claim for exoneration is compelling **[*35]** in light of the City's failure to advise Great Lakes about the existence of the tunnel. Before addressing the parties' contentions, we first discuss the appropriate legal standard by which to judge a motion to dismiss pursuant to Rule 12(b)(6).

### 1. *Legal Standard Governing 12(b)(6) Motion*

To withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Conley v. Gibson,* 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). The defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 733 (7th Cir. 1986), *cert. denied,* 482 U.S. 915, 96 L. Ed. 2d 676, 107 S. Ct. 3188 (1987). The allegations of a complaint should be construed liberally and a complaint should not be dismissed for failure to state **[*36]** a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46. *See also Hishon v. King & Spalding,* 467

U.S. 69, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); *Doe on Behalf of Doe v. St. Joseph's Hospital,* 788 F.2d 411 (7th Cir. 1986). The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits of the case. We address the City and Grubart's motion with these principles in mind.

### 2. *Discussion*

A. *Great Lakes' Claim For Limitation Of Liability Under Count I Should Be Dismissed*

i] "*Privity or Knowledge" Basis For Dismissal Of Limitation Claim*

The Limitation of Shipowner's Liability Act allows district courts, under their admiralty jurisdiction conferred by 28 U.S.C. § 1331, to determine whether a shipowner's liability should be limited when that liability may be predicated on an act that was not within the shipowner's "privity or knowledge." *Joyce v. Joyce,* 975 F.2d 379, 383 (7th Cir. 1992). Section **[*37]** 183(a) provides:

> (a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of such owner or owners,* shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

(emphasis added).

In limitations proceedings, the ultimate burden of proving lack of privity or knowledge is on the shipowner. *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1305 (7th Cir. 1992). In discerning the meaning of the Act's phrase "privity or knowledge," the Seventh Circuit in *Joyce* found, "Congress intended the principal beneficiaries of the Act to be innocent shipowners and investors who were sued for damage caused through no fault of their own." *Joyce,* 975 F.2d at 384. The Seventh Circuit **[*38]** observed recently in *In re Oil Spill by the Amoco Cadiz,* 954 F.2d at 1303, "The recent judicial trend has been to enlarge the scope of activities within the 'privity or knowledge' of the shipowner . . . ." *Id.*

In opposing the present motion to dismiss, Great Lakes does not confront the recent Seventh Circuit rulings addressing the "knowledge and privity" inquiry relied

upon by movants but, rather, cites the Eleventh Circuit case, *M/V Sunshine, II v. Beavin,* 808 F.2d 762 (11th Cir. 1987), for the proposition that summary dismissal of a limitation action before the completion of discovery is inappropriate. This argument, however, ignores the recent Seventh Circuit ruling in *Joyce,* where the court affirmed a district court's *sua sponte* dismissal of a limitation complaint for lack of subject matter jurisdiction. 975 F.2d at 385-86. Moreover, this Court finds that the principles recently articulated by the Seventh Circuit in its *Joyce* and *Amoco Cadiz* rulings counsel dismissal of Count I of Great Lakes' complaint under Rule 12(b)(6).

In *Joyce v. Joyce,* a vessel owner, who had **[*39]** been sued in state court for negligent entrustment of his boat to another filed a limitation action in federal court under the Act. The district court *sua sponte* dismissed the vessel owner's complaint for lack of subject matter jurisdiction and the Seventh Circuit affirmed. After exploring the meaning of the phrase "privity or knowledge" under the Act and the law of negligent entrustment, the Seventh Circuit reasoned:

> Given the nature of the tort of negligent entrustment, it is clear that the Limitation of Shipowner's Liability Act affords no protection to William. If William knew or had reason to know that Ivkovich should not have been entrusted with the boat, he not only committed the tort of negligent entrustment but also had either knowledge or constructive knowledge sufficient to place him beyond the protection of the Limitation of Liability Act. On the other hand, if William did not entrust the boat to Ivkovich under circumstances in which he knew or should have known of Ivkovich's inability, he will incur no liability for negligent entrustment and, consequently, has no need of the Act's protection. In either case, the district court could not do anything to affect either **[*40]** party and was correct to dismiss the suit for lack of subject matter jurisdiction. Prompt, *sua sponte* recognition of flaws in subject matter jurisdiction is commendable.

975 F.2d at 385-86.

Regardless of the different allegations of negligence in the present case, we find that the *Joyce* rationale is determinative of the present 12(b)(6) motion. As in *Joyce,* the extension of admiralty jurisdiction in the present case will have no effect on Great Lakes' potential liability. Underlying the claimants' negligence claims against Great Lakes in the consolidated Class Complaint is the allegation that Great Lakes knew or should have known of the existence and location of the

tunnel at the Kinzie Street Bridge and that the work required under the contract could result in damage to the tunnel. [5] Following *Joyce's* reasoning, if Great Lakes is found not negligent, Great Lakes will have no need for the Act's protection. On the other hand, if Great Lakes is found, for example, to have had constructive knowledge of the tunnel system or to have driven the piles into the riverbed in a negligent manner (e.g. at the wrong point along the riverbed), the **[*41]** Act affords Great Lakes no protection because such a finding would establish that Great Lakes had either knowledge or constructive knowledge sufficient to place it beyond the protection of the Act. Accordingly, a finding of negligence liability against Great Lakes will be tantamount to a finding of Great Lakes' privity or knowledge, thereby precluding Great Lakes from seeking limitation pursuant to the Act under *Joyce.* [6]

**[*42]** Thus, the present case, while involving different allegations of negligence, nonetheless, constitutes the identical situation confronted by the Seventh Circuit in

---

[5] For example, the class action claimants allege that the contract between Great Lakes and the City advised Great Lakes in part that moving the pilings in any fashion could result in damage to underground structures. The Court's reading of the relevant portion of the contract confirms the existence of this notification. *See* Contract at DS-5.

[6] The Seventh Circuit's *Amoco Cadiz* decision lends support to our present determination in that it articulates a low threshold for establishing privity or knowledge sufficient to deny petitioners protection under the Act. In *Amoco Cadiz,* the Seventh Circuit rejected the petitioning shipowner's contention that a vessel owner's actual or constructive knowledge of the causal negligence must be shown to establish "privity or knowledge." In refuting this argument, the Seventh Circuit stated:

> Not so. Privity or knowledge is not tantamount to actual knowledge or direct causation. All that is needed to deny limitation is that the shipowner, "by prior action or inaction set[s] into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty . . ." *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1158 (2nd Cir. 1978), *cert. denied,* 440 U.S. 959, 59 L. Ed. 2d 772, 99 S. Ct. 1499 (1979).

*Amoco Cadiz,* 954 F.2d at 1303. In view of this low threshold, a finding of Great Lakes' negligence would satisfy this standard without question.

*Joyce:* a finding of negligence will be tantamount to a finding of privity or knowledge and a finding of nonliability will moot the limitation claim. Mindful of the Seventh Circuit's determination that the petitioner's claim for limitation could not be realized in this very situation, we dismiss Great Lakes' limitation claim under Count I for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6).

ii] "*Personal Contract Doctrine" Basis For Dismissal Of Great Lakes' Limitation Claim*

This Court finds that another independent basis exists for the dismissal of Great Lakes' suit under Rule 12(b)(6), namely, Great Lakes is not entitled to limitation based on the "personal contract doctrine." Great Lakes' pile driving work was performed pursuant to a written contract with the City under which Great Lakes undertook numerous duties and warranties and agreed to indemnify the City against any loss arising from the contract work. *See, e.g.,* contract at G-1 ("Contractor shall indemnify, keep and **[*43]** save harmless the City, its agents, officials, and employees, against all injuries, deaths, loss, damages, claims, patent claims, suits, liabilities, judgments, costs and expenses, which may in anywise accrue against the City in consequence of the granting of this contract or which may in anywise result therefrom, whether or not it shall be alleged or determined that the act was caused through negligence or omission of the Contractor . . . .").

Under clear precedent, the Act has been held not to apply where the liability of the owner rests on his personal contract. *Coryell,* 317 U.S. 406, 409, 87 L. Ed. 363, 63 S. Ct. 291 (1943) (citing *Pendleton v. Benner Line,* 246 U.S. 353, 62 L. Ed. 770, 38 S. Ct. 330 (1917)); *Richardson v. Harmon,* 222 U.S. 96, 106, 56 L. Ed. 110, 32 S. Ct. 27 (1911) (the Limitation Act "limit[s] the owner's risk to his interest in the ship in respect of all claims arising out of the conduct of the master and crew, whether the liability be strictly maritime or from a tort non-maritime, but leaves him liable for his own fault, neglect and contracts"); *S & E Shipping Corp.,* 678 F.2d at 644. The Supreme Court established the personal **[*44]** contract exception because the Act is only intended to limit the shipowner's liability for matters beyond his control, and a personal contract is within the control of the shipowner. *S & E Shipping Corp.,* 678 F.2d at 644 n. 14. On this basis, we find that Great Lakes' liability stemming from its personal contract with the City is not subject to limitation under the Act.

The Supreme Court and lower courts have clearly indicated that the primary purpose of an exoneration or limitation of liability action by vessel owners in federal admiralty court is to ensure the fair distribution of a limitation fund among all claimants. *See Lake Tankers Corp. v. Henn,* 354 U.S. 147, 151, 1 L. Ed. 2d 1246, 77 S. Ct. 1269 (1957); *In re Complaint of Falkiner,* 716 F. Supp. 895, 901 (E.D. Va. 1988). The purpose of the concursus, the proceeding before the admiralty court in which all competing claims must be litigated, is to provide for a marshalling of assets and for *pro rata* distribution of an inadequate fund among claimants. *S & E Shipping Corp.,* 678 F.2d at 642. *See also Lake Tankers Corp.,* 354 U.S. at 151-53. **[*45]**

Here, in light of our present determination under the personal contract doctrine, concursus is no longer required, because the only remaining claims against Great Lakes still subject to the Act are those raised by the class action claimants. *See S & E Shipping Corp.,* 678 F.2d at 643 (the district court must dissolve a stay of proceedings and permit claimants to litigate their claims in the state forum if only one claim against the shipowner is made; "in this situation a concursus is unnecessary because there are no additional claimants competing for portions of the limitation fund"). If concursus of a limitation fund is not necessary, we are instructed to permit claimants to litigate their claim in the state forum. *In re Complaint of Falkiner,* 716 F. Supp. at 901. *See also Lake Tankers Corp.,* 354 U.S. at 151; *S & E Shipping Corp.,* 678 F.2d at 642-45. Thus, this constitutes yet another basis for our dismissal of Great Lakes' limitation claim.

B. *Great Lakes' Claim For Exoneration Under Count I Should Be Dismissed*

Where, as here, an alleged vessel owner is **[*46]** foreclosed from obtaining limitation of liability, the vessel owner is also foreclosed from proceeding in federal court with the exoneration component of its claim against the wishes of the claimants. *Lake Tankers Corp.,* 354 U.S. 147, 1 L. Ed. 2d 1246, 77 S. Ct. 1269 ; *Wheeler v. Marine Navigation Sulphur Carriers, Inc.,* 764 F.2d 1008, 1011 (4th Cir. 1985) (ruling "each circuit that has considered this question has ruled that once limitation is denied, plaintiffs should be permitted to elect whether to remain in the limitation proceeding or to revive their original claims in their original fora"); *Fecht v. Makowski,* 406 F.2d 721, 722-23 (5th Cir. 1969) ("where no grant of limitation is possible, the damage claimants are entitled to have the injunction against other actions dissolved, so that they may, if they wish, proceed in a common law forum as they are entitled to

1993 U.S. Dist. LEXIS 16256, *46

do"); *Moore-McCormack Lines, Inc. v. Richardson,* 295 F.2d 583, 595-96 (2nd Cir. 1961), *cert. denied,* 368 U.S. 989, 7 L. Ed. 2d 526, 82 S. Ct. 606 (1962); *In re Complaint of Falkiner,* 716 F. Supp. at 901. **[\*47]** Under the foregoing authorities and in consideration of the claimants' desire to prosecute their class action in state court, we find it appropriate to dismiss Count I of Great Lakes' complaint in its entirety, including the claim for exoneration.

C. *Counts II and III Should Be Stricken*

Because Count I of Great Lakes' complaint for exoneration or limitation is properly dismissed, Counts II and III, which seek indemnity and contribution from the City by way of impleader under Federal Rule of Civil Procedure 14(a) and (c), should be stricken as well for lack of subject matter jurisdiction. The relief requested in both of these counts is contingent upon a finding of liability under Count I; however, upon Count I's dismissal, the indispensable predicate for the adjudication of Counts II and II is no longer present. Given the central purpose of Rule 14, which is to promote judicial economy and efficiency, *Colton v. Swain,* 527 F.2d 296, 299-300 (7th Cir. 1975), we discern no justification for retaining jurisdiction of Counts II and III, and we strike them accordingly.

**CONCLUSION**

For the foregoing reasons, we dismiss Great Lakes' complaint both for **[\*48]** lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

Charles P. Kocoras

United States District Judge

Dated: February 18, 1993

# Friedman v. Leading Edge Recovery Solutions, LLC

United States District Court for the Northern District of Illinois, Eastern Division

April 28, 2014, Decided; April 28, 2014, Filed

Case No. 13 cv 9034

**Reporter**
2014 U.S. Dist. LEXIS 58694 *; 2014 WL 1674083

VARDA FRIEDMAN, on behalf of plaintiff and a class defined herein, Plaintiff, v. LEADING EDGE RECOVERY SOLUTIONS, LLC and ASSET ACCEPTANCE, LLC, Defendants.

**Counsel:** [*1] For Varda Friedman, on behalf of plaintiff and a class defined herein, Plaintiff: Daniel A. Edelman, LEAD ATTORNEY, Cathleen M. Combs, James O. Latturner, Tiffany Nicole Hardy, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, IL.

For Leading Edge Recovery Solutions, LLC, Defendant: Robert M. Horwitz, LEAD ATTORNEY, Dykema Gossett Pllc, Detroit, MI; Amy R Jonker, Bryan James Anderson, Dykema Gossett, PLLC, Chicago, IL.

For Asset Acceptance, LLC, Defendant: Robert M. Horwitz, LEAD ATTORNEY, Dykema Gossett Pllc, Detroit, MI; Amy R Jonker, Bryan James Anderson, Dykema Gossett, PLLC, Chicago, IL.

**Judges:** Sharon Johnson Coleman, United States District Judge.

**Opinion by:** Sharon Johnson Coleman

# Opinion

**MEMORANDUM OPINION AND ORDER**

Plaintiff Varda Friedman brings this class action suit alleging a debt collection letter sent by defendant Leading Edge Recovery Solutions, LLC ("Leading Edge"), on behalf of defendant Asset Acceptance, LLC ("Asset") (collectively, "Defendants") violated the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.* ("FDCPA"). Defendants now move to dismiss Friedman's complaint in its entirety. For the following reasons, Defendants' motion is granted.

**Background**

On March 8, 2103, Leading Edge, a [*2] debt collection company, sent a debt collection letter to Friedman, which stated:

Dear Varda Friedman,
Your delinquent account has been placed with our company for collection. We have been authorized by our client to collect the outstanding amount owed to them.
Asset Acceptance LLC may report information about your account to credit bureaus. Correspondence concerning inaccuracies and disputes relating to your credit report should be sent to: Asset Acceptance, LLC, P.O. Box 1630 Warren, MI 48090-1630.
Per our agreement with our client, your account is eligible for settlement. That's right! If you pay just $2,757.92 of the $3,939.89 you currently owe our client, this debt will be settled in full! We are not obligated to renew this offer.

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of the debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. [*3] If you request this office in writing within 30 days after receiving

2014 U.S. Dist. LEXIS 58694, *3

this notice, this office will provide you with the name and address of the original creditor if different from the current creditor.

Federal law prohibits certain methods of debt collection, and requires that we treat you fairly. You can stop us from contacting you by writing a letter to us that tells us to stop the contact or that you refuse to pay the debt. Sending such a letter does not make the debt go away, if you owe it. Once we receive your letter, we may not contact you again, except to let you know that there won't be any more contact or that we intend to take a specific action.

If you have a complaint about the way we are collecting this debt, please write to us at Leading Edge Recovery Solutions, LLC 5440 North Cumberland Ave STE 300 Chicago, IL 60656, email us at AssetComplaints@leadingedgerecovery.com, or call us toll-free at (866) 577-8403 between 9:00 A.M. and 5:00 P.M. CST, Monday — Friday.

The Federal Trade Commission enforces the Fair Debt Collection Practices Act (FDCPA). If you have a complaint about the way we are collecting your debt, please contact the FCT online at www.ftc.gov; by phone at 1-877-FTC-HELP; **[*4]** or by mail at 600 Pennsylvania Ave., N.W., Washington, D.C. 20580.

Sincerely,

Collections Department

(855) 853-6334

(Dkt. #1-1.) Friedman now brings a class action lawsuit alleging that the instruction to contact Asset instead of Leading Edge regarding credit report disputes overshadows the validation notice and is misleading in violation of the FDCPA. Defendants now move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6).

## Legal Standard

A motion to dismiss tests the legal sufficiency of the complaint. *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir.2009). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). In deciding a Rule 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197,

167 L.Ed.2d 1081 (2007). Whether a debt collection letter is confusing is generally a question of fact; however, **[*5]** "a plaintiff fails to state a claim and dismissal is appropriate as a matter of law when it is apparent from a reading of the letter that not even a significant fraction of the population would be misled by it." *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 636 (7th Cir. 2012) (internal quotations omitted).

## Discussion

Friedman's complaint alleges the instruction to contact Asset regarding credit report disputes, instead of Leading Edge, contradicts and overshadows the validation notice in violation of §1692g and is misleading in violation of §1692e. (Dkt. #1, Pl.'s Compl., ¶¶18-24.) "Since inaccuracies and disputes relating to the reporting of the debt are likely to be inaccuracies and disputes relating to the debt itself (e.g., the debt is not mine), this instruction conflicts with the validation notice that appears below. A consumer that follows the instruction to communicate with [Asset] will waive their dispute rights with respect to [Leading Edge]." (Id. at ¶¶19-20.)

Section 1692g requires debt collection letters to include a validation notice explaining that the consumer has 30 days to dispute the validity of the debt. 15 U.S.C. 1692g(b). "Any collection activities **[*6]** and communications during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor." *Id.* The validation notice "must be effective, and it cannot be cleverly couched in such a way as to eviscerate its message." *Chauncey v. JDR Recovery Corp.*, 118 F.3d 516, 518-19 (7th Cir.1997) (citing *Avila*, 84 F.3d at 226). Section 1692e prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. §1692e(10).

In evaluating whether a debt collection letter violates the FDCPA, the Court views the letter from the objective standard of an unsophisticated consumer, who is assumed to be "uninformed, naive, or trusting." *Durkin v. Equifax Check Servs.*, 406 F.3d 410, 414 (7th Cir. 2005). Nevertheless, the unsophisticated consumer "possesses rudimentary knowledge about the financial world, is wise enough to read collection notices with added care, possesses 'reasonable intelligence,' and is

capable of making basic logical deductions and inferences." *Pettit v. Retrieval Masters Creditors Bureau, Inc.*, 211 F.3d 1057, 1060 (7th Cir. 2000).

Defendants **[*7]** maintain that Friedman's complaint fails because the instruction to contact Asset regarding credit report disputes does not overshadow and is not inconsistent with the consumer's rights to dispute the validity of the debt with Leading Edge, nor is it misleading. The Court agrees. Overshadowing generally occurs when the debt collector indicates that the time for disputing the debt has passed or when the statements by the debt collector "misrepresent or cloud the amount of time remaining to dispute the debt." *Durkin*, 406 F.3d at 417. Information included along with the validation notice may be overshadowing if it renders the letter confusing or makes the debtor uncertain as to her rights. *Ozkaya v. Telecheck Servs., Inc.*, 982 F. Supp. 578, 582-83 (N.D. Ill. 1997) (citing *Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir. 1997) and *Russell v. Equifax A.R.S.*, 74 F.3d 30, 35 (2d Cir. 1996)). However, the language at issue here is unlike the language the Seventh Circuit has held to overshadow consumers' rights. *See e.g. Chauncey*, 118 F.3d at 519 (7th Cir. 1997) (demand for payment within thirty days contradicts the validation notice); *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir. 1996) (letter **[*8]** giving debtor ten days to pay "or else" inconsistent with validation notice).

Friedman asserts that directing the consumer to contact *the creditor* to dispute her credit report, rather than *the debt collector,* violates the FDCPA because, in doing so, the consumer will waive her verification rights. Friedman also argues that there is no difference between disputing the debt and disputing the reporting of the debt; therefore, directing the consumer to contact two different parties about a single dispute is contradictory and misleading. However, directing a consumer to contact different parties for different purposes does not amount to overshadowing and Friedman's overshadowing claim therefore fails. *See Shapiro v. Dun & Bradstreet Receivable Mgmt. Servs., Inc.*, 59 F. App'x 406, 408 (2d Cir. 2003) (letter instructing consumer to contact creditor for payment purposes or with questions about the account or contact debt collector to dispute the debt does not overshadow or contradict the validation notice). Friedman's allegation that the letter is misleading "for the same reason" summarily fails. (*See* Dkt. 1, Pl's Compl., ¶23.)

**Conclusion**

Accordingly, Defendants' motion to dismiss is granted. **[*9]** Friedman's complaint is dismissed without prejudice for 28 days, at which time it will automatically convert to a dismissal with prejudice.

IT IS SO ORDERED.

Date: April 28, 2014

/s/ Sharon Johnson Coleman

United States District Judge

---

**End of Document**

# Simpson v. Saggezza, Inc.

United States District Court for the Northern District of Illinois

August 8, 2018, Decided; August 8, 2018, Filed

Case No. 17-cv-04165

**Reporter**
2018 U.S. Dist. LEXIS 133740 *; 2018 WL 3753431

STEVEN SIMPSON, Plaintiff, v. SAGGEZZA, INC., ARVIND KAPUR, Individually, and SOCKALINGAM SUPPIAH, individually, Defendant.

**Subsequent History:** Motion denied by Simpson v. Saggezza, Inc., 2018 U.S. Dist. LEXIS 161623 (N.D. Ill., Sept. 21, 2018)

**Counsel:** **[*1]** For Steven Simpson, Plaintiff, Counter Defendant: Alexis D Martin, Lorraine Teraldico Peeters, Madeline K. Engel, Alejandro Caffarelli, Caffarelli & Associates Ltd., Chicago, IL.

For Saggezza, Inc., Arvind Kapur, Sockalingam Suppiah, Defendants: Vivek Jayaram, LEAD ATTORNEY, Jayaram Law Group, Ltd., Chicago, IL; Brett Adam Manchel, Johanna R Hyman, Jayaram Law Group, Chicago, IL.

For Saggezza, Inc., Counter Claimant: Vivek Jayaram, LEAD ATTORNEY, Jayaram Law Group, Ltd., Chicago, IL; Brett Adam Manchel, Johanna R Hyman, Jayaram Law Group, Chicago, IL.

**Judges:** SHARON JOHNSON COLEMAN, United States District Judge.

**Opinion by:** SHARON JOHNSON COLEMAN

# Opinion

## MEMORANDUM AND ORDER

Plaintiff, Steven Simpson brings this suit against Defendants Saggezza, Inc., ("Saggezza"), Arvind Kapur, and Sockalingam Suppiah, (collectively, "Defendants"), for various violations of the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115/1 et seq. ("IWPCA"), when the Defendants failed to provide Simpson with his earned compensation per the agreement between the parties and then retaliated against him for requesting payment. The Defendants now move this Court to dismiss Plaintiff's First Amended Complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). For the reasons **[*2]** set forth below, this Court grants Defendants' Motion in part.

## Background

The following facts are taken as true for the purpose of resolving this motion. Simpson, a Florida resident, worked for Saggezza from November 2014 through December 2016. Saggezza is an Illinois corporation, based in Chicago, that provides "global solutions" to financial institutions. Kapur is a co-founder and Chief Executive Officer of Saggezza. Suppiah was also a co-founder and the Chief Operating Officer of Saggezza. Both men were Simpson's bosses. They held hiring and firing authority as well as the power to determine the amount and allocation of compensation.

Prior to working at Saggezza, Simpson held positions as Executive Vice President at First Federal Bank in Florida and Chief Strategy Officer of City National Bank-Miami, earning over $300,000 per year in each role. The Defendants were aware of Simpson's professional experience and previous salaries when the company recruited him. On October 28, 2014, Kapur informed Simpson that the company had strong revenues of $40 million during a phone interview. After the conversation,

Simpson agreed to travel to Chicago for an in-person interview. Both Kapur and Suppiah [*3] confirmed the financial health of Saggezza during the second interview. Kapur and Suppiah also mentioned that Saggezza had a five-million-dollar line of credit with Standard Bank and Trust of Hickory Hills, IL that only had a small line drawn on it.

To assist with recruitment, Saggezza initially offered Simpson a base salary of $210,000 per year with a minimum annual bonus of $120,000. Kapur and Suppiah informed Simpson that Saggezza paid its leadership incentive bonuses as a matter of course, which typically brought their salaries up to between $330-350,000 per year. The offer also included 100,000 shares of stock in Saggezza's employee stock option program. Based on the representations made about the strength of the company, the job description, the potential assignments, and the compensation structure, Simpson agreed to accept employment. Saggezza hired Simpson as the Senior Vice President of Financial Institutions Solutions. In that role, he was expected to lead a new line of business that focused on providing advanced analytics solutions for banks and credit unions and was promised a competent staff to support these efforts.

After joining Saggezza, Simpson found discrepancies in [*4] information that Kapur and Suppiah provided. Saggezza released or lost a significant number of qualified employees, who were replaced with "cheaper," less experienced workers. With the employment shifts, Simpson was expected to assume several additional job duties outside of the scope of his originally agreed upon employment terms. Simpson learned that Saggezza's revenues were approximately $23.3 million, not $40 million. Simpson also discovered that the line of credit was fully drawn. Additionally, after Simpson's start, Saggezza introduced a new incentive structure that applied to all company leaders. Since this was different from what Simpson was presented during the interview, he addressed Kapur about his concerns. Kapur assured Simpson that the original agreement discussed during his recruitment would be honored, and Simpson continued his employment based on this information.

One of Simpson's major complaints was that he only received a bonus of $37,000 instead of the $120,000 he expected based on the Defendant's assurances. When approached about the $83,000 difference, Kapur and Suppiah told Simpson that Saggezza was experiencing financial troubles, but they could pay him $75,000 [*5] in three equal installments instead. Each payment would

be made upon completing one of Simpson's five performance goals. Kapur also stated that he would provide Simpson with an additional 150,000 shares of Saggezza common stock to bring his ownership of the company up to 1%. Simpson agreed to this payment plan and continued working for Saggezza. A few weeks later, Kapur told him that he would need to sign an onerous employment contract to receive the additional shares. Simpson refused to sign the contract.

Simpson informed Kapur that three of the proposed goals were outside of his control since they were tied to sales of products in a different department's purview and impossible to attain in the 2016 calendar year. Kapur promised Simpson that he would provide alternative goals, but he delayed in doing so. Kapur orally agreed that if the other department's products were not ready for implementation in March 2016 that he would adjust the goals by reducing sales targets and numbers. Despite several attempts to codify this agreement, Kapur refused to put it in writing. In the meantime, Simpson began working on the remaining two goals. Between March and April 2016, Simpson met one of the [*6] goals. Kapur then attempted to back out of the agreement, but Kapur needed additional time to pay the first installment payment. Simpson agreed that the Defendants could pay half of the installment amount in April and the other half in May 2016. The April payment was timely made, but May's payment was not. After repeated requests for payment, Simpson finally received the second half of the first installment payment.

The three remaining goals could not be completed because the underlying products were not ready for implementation and the Defendants could not provide reliable information about their expected completion dates. The Defendants denies that they failed to provide viable product information or alternative goals. Otherwise, Simpson met or exceeded the other agreed-upon expectations required for the payment of his 2015 bonus. The Defendants only paid him the initial $37,000 and one installment payment of $25,000. Kapur was continually elusive about when and whether Simpson would be paid when responding to Simpson's compensation complaints. Saggezza expressed frustration with Plaintiff's complaints about his not receiving his full bonus. In November 2016, an attorney hired by [*7] Simpson sent Saggezza a letter about Simpson's unpaid earned bonuses. After the letter, Simpson was invited to resign. Instead, Simpson continued his employment, even securing another large potential deal, which satisfied any remaining performance requirements for the payment of his 2015

bonus.

On December 28, 2016, Kapur held a meeting with Simpson to inform him that he would be terminated effective immediately. Kapur specifically referenced that he and Suppiah were upset about Simpson involving counsel and complaining about wage violations. No other cause or reasoning was provided for Simpson's termination.

Simpson filed his First Amended Complaint regarding the aforementioned issues for several violations of the Illinois Wage Payment and Collections Act on January 29, 2018. Saggezza now moves to dismiss the pleading in its entirety for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face and raising the right to relief above speculation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). When reviewing a motion to dismiss, the Court must accept all well-pleaded factual allegations **[*8]** as true and draw all reasonable inferences in the plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

## Discussion

### Count I - Earned Bonus Owed

The Saggezza Defendants contend that Simpson's claim to recover his bonus fails and must be dismissed because he does not allege facts indicating that he was entitled to an "earned bonus" or any additional compensation related to his contract. A motion to dismiss is reviewed in a light most favorable to the nonmoving party.

Simpson's complaint is brought under the IWPCA, which provides that "payments to separated employees . . . shall be defined as wages, salaries, earned commissions, [and] *earned bonuses* . . . owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS

115/2 (emphasis added). Earned bonuses are defined as "compensation given in addition to the required compensation for services performed." Ill. Admin. Code tit. 56, § 300.500; 820 Ill. Comp. Stat. 115/12. IWPCA only covers bonuses that are unequivocally promised by the employer, while conditional or discretionary bonuses are not considered "earned." *Sutula-Johnson v. Office Depot, Inc.*, No. 17-1855, 893 F.3d 967, 2018 U.S. App. LEXIS 17179, at *14-15 (7th Cir. June 25, 2018). Employees have the right to receive only an earned bonus at the time of separation when the terms of the bonus are unequivocally promised by the employer, and the employee has satisfied **[*9]** the expectations set forth in the agreement between the parties. Ill. Admin. Code tit. 56, § 300.500(a); *see McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 917 N.E.2d 1065, 1071, 335 Ill. Dec. 1 (Ill. App. Ct. 2009)(explaining that unequivocal right to "earned bonus" under Illinois Administrative Code means employee has no right to it until she has performed the contract requirements.). The agreement need not be in writing to constitute a basis for a IWCPA claim. *See Osorio v. Tile Shop, LLC*, No. 15 C 15, 2015 U.S. Dist. LEXIS 159748, at *6 (N.D. Ill. Nov. 27, 2015)(Kennelly, J.)(finding that "under the IWPCA '[a]n "agreement" is broader than a contract and requires only a manifestation of mutual assent on the part of two or more persons; parties may enter into an "agreement" without the formalities and accompanying legal protections of a contract.'")(citing *Zabinsky v. Gelber Group, Inc.*, 347 Ill. App. 3d 243, 807 N.E.2d 666, 283 Ill. Dec. 61 (2004)); *see e.g., Harris v. Cent. Garden & Pet Co.*, No. 09 C 2354, 2011 U.S. Dist. LEXIS 84098, at *27 (N.D. Ill. Aug. 1, 2011)(Chang, J.)(recognizing an IWPCA claim based on an oral agreement).

Here, the initial bonus payment of $120,000 discussed during Simpson's recruitment does not appear, based on the facts alleged, to be tied to the accomplishment of any objective measures and cannot be considered "earned" per the definition. The subsequent installation payment structure agreed upon by both parties, however, was directly and unequivocally tied to the accomplishment of five definitive goals. Per the oral agreement, Saggezza agreed to give Simpson an installment payment of $25,000 **[*10]** for accomplishing each of the outlined goals up to $75,000. Although $75,000 is less than Simpson's initial demand that Saggezza pay the remaining $83,000 of the promised $120,000, Simpson did agree to the new bonus compensation plan. The facts alleged in the complaint show the requisite meeting of minds regarding the objective terms for the bonus. Further, the complaint

alleges that Simpson satisfied the agreed-upon goals to create an entitlement to the agreed upon $75,000. Count I sufficiently plead that there was an unfulfilled earned bonus associated with the installment payment plan agreed upon by all parties. Accordingly, Defendants' motion to dismiss Count I is denied.

*Count II and IV-Retaliation*

The Defendants move to dismiss Simpson's retaliation claim, Count II, because they contend that Simpson fails to allege that the retaliation was motivated by his request for compensation or the hiring of an attorney. They also contend that Simpson failed to demonstrate that his discharge was in contravention of a clearly mandated public policy under Illinois law and so, Count IV should be dismissed.

The IWCPA permits employees to recover if an employer discharges that employee because **[*11]** he "has made a complaint to his employer . . . that he or she has not been paid in accordance with the provisions of this Act." 820 ILCS 115/14(c).

Here, Simpson alleged in paragraph 69 of his First Amended Complaint that "[h]ad [Simpson] not complained about [Saggezza's] failure to fully compensate him per their agreement, and had [Simpson] not brought a lawyer in to assert his rights, [Saggezza] would not have terminated [Simpson]." The facts set forth above clearly state that there existed an agreement for an earned bonus for performance. Further, the facts alleged indicate that Simpson believed the driving force behind his termination was the repeated requests, alone and through counsel, for the compensation he was owed under the agreed payment plan. Accordingly, the Court finds that Simpson sufficiently plead a claim for retaliation under IWCPA and Defendants' motion to dismiss Count II is denied.

Turning to Count IV, a successful claim for retaliatory termination under Illinois common law requires that the plaintiff show that he has been (1) terminated; (2) in retaliation for his action; and (3) that the discharge violates a clearly mandated public policy. *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 700-01, 275 Ill. Dec. 648, 653-54, 793 N.E.2d 128, 133-34 (2003)(citing *Paris v. Cherry Payment Sys.*, 265 Ill. App. 3d 383, 384, 202 Ill. Dec. 705, 707, 638 N.E.2d 351, 353 (1994)). "In order to constitute a clearly **[*12]** mandated public policy exception justifying application of the tort of retaliatory discharge, the matter 'must strike at the heart of a citizen's social rights, duties, and responsibilities.'"

*Id.* (quoting *Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 130, 52 Ill. Dec. 13, 15, 421 N.E.2d 876, 878 (1981)). It is not enough to simply state a constitutional or statutory provision in a complaint to trigger a retaliatory discharge claim. *See McGrath v. CCC Info. Servs.*, 314 Ill. App. 3d 431, 440, 246 Ill. Dec. 856, 863, 731 N.E.2d 384, 391 (2000).

Here, the allegations state that Simpson was terminated in response to his demand for payment of his earned bonus, satisfying the first two prongs. As for the third prong, that the discharge violates clearly mandated policy, Simpson relies on *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, to contend that the narrow application of the common law retaliation tort has been expanded to include IWPCA claims since the Act was amended. No. 00 C 5755, 2001 U.S. Dist. LEXIS 18370 (N.D. Ill. Nov. 7, 2001)(Lefkow, J.). The Court disagrees with Simpson's interpretation of *Ladegaard*. While the *Ladegaard* Court recognizes that IWCPA involves the rights of the public, the holding determined that the rights protected by the act cannot be abrogated by private agreement, as doing so would contravene the act's underlying public policy agenda. The Court did not, however, address whether the rights in IWCPA were the type contemplated **[*13]** under Illinois common law. The precedent is clear that compensation disputes raised under IWPCA are of a private, economic nature and do not implicate the social rights, duties, and responsibilities required for a retaliatory discharge tort. *McGrath*, 314 Ill. App. 3d at 440. Accordingly, Simpson cannot establish that his termination violated a mandated public policy of Illinois so, the common law retaliation claim must be dismissed with prejudice. *See O'Donnell v. Am. at Home Healthcare & Nursing Servs.*, No. 12 CV 6762, 2015 U.S. Dist. LEXIS 18585, at *48 (N.D. Ill. Feb. 17, 2015)(Shah, J.)("But the Illinois courts have made clear that an employer who discharges an employee for asserting his rights under the IWPCA has not contravened a 'clearly mandated' public policy such that an action for retaliatory discharge is permitted."). Defendants' motion as to Count IV is granted.

*Count III - Fraudulent Inducement*

Finally, the Defendants argue that Count III should be dismissed because Simpson did not plead that his reliance on the Kapur and Suppiah's representations was justified.

A successful fraudulent inducement claim under Illinois law requires a plaintiff to allege: (1) a false statement of

material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance **[\*14]** on the truth of the statement; and (5) damage to the other party resulting from such reliance. *Integrated Genomics, Inc. v. Gerngross*, 636 F.3d 853, 863 (7th Cir. 2011). A person may justifiably rely on a representation of fact even if he could have ascertained that it was untrue upon making an investigation. *Field v. Mans*, 516 U.S. 59, 70, 116 S. Ct. 437, 444, 133 L. Ed. 2d 351 (1995)(citing Restat 2d of Torts, § 540 (2nd 1979)). This is particularly true in situations where parties do not have equal knowledge or means of obtaining knowledge of the facts in question. *Sec. Ctr. v. Am. Tel. & Tel. Co.*, 94 C 6707, 1995 U.S. Dist. LEXIS 6540, at *19 (N.D. Ill. May 15, 1995)(Coar, J.)(*Ryan v. Wersi Elec. GmbH & Co.*, 3 F.3d 174, 182 (7th Cir. 1993)).

Here, Simpson alleges that Kapur and Suppiah made several statements that the financial health of the company and the opportunities available to Simpson during the initial interview and negotiations stages. The facts presented in Count III are sufficient to proceed on a claim of fraudulent inducement. Kapur and Suppiah were in positions of authority that afforded them easy access to the information they presented. Additionally, in an interview context, it is reasonable that a candidate would presume company's assurances about its status are true. It is critical here that co-founders Kapur and Suppiah were the Chief Executive Officer and Chief Operating Officer of Saggezza, respectively, because they would have intimate knowledge about Saggezza. Given the circumstances and their **[\*15]** roles, Simpson had no reason to question Kapur and Suppiah's representations at the time. Accordingly, it is reasonable to ascertain that Simpson could justifiably rely on Kapur and Suppiah's assurances to his detriment.

The Defendants' second point is that Simpson did not allege any false statements of material fact because the assurances were mere puffery that commonly occurs between a prospective employer and employee. For a statement to be actionable as fraudulent, it has to rely on a past or present fact. *Enter. Warehousing Sols., Inc. v. Capital One Servs.*, No. 01C 7725, 2002 U.S. Dist. LEXIS 4335, at *17 (N.D. Ill. Mar. 14, 2002)(Darrah, J.). Expressions of opinions, expectations, or future contingent events do not qualify. *Id.*

These allegations are not puffery. They do not contain superlatives or grandiose language about the strength of the company. *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999). Kapur and Suppiah

provided Simpson with precise, internal figures, capturing the financial state of the company and informed Simpson's potential compensation package. The information came from knowledgeable sources and were based on historical data, not prospective predictions. *Enter. Warehousing Sols.*, 2002 U.S. Dist. LEXIS 4335, at *17 (finding that statements about previous performance and approval does not constitute "puffery"); *cf. Jada Toys, Inc. v. Chi. Imp., Inc.*, No. 07 C 699, 2008 U.S. Dist. LEXIS 29286, at *6 n.4 (N.D. Ill. Apr. 10, 2008)(Brown, J.)("The court held that the allegedly false promise -- that the defendant **[\*16]** would obtain millions of dollars of endorsements for a star baseball player -- was puffery because it involved something over which the defendant had no control."). There was no reason why Simpson would not have seriously relied on this insider information coming from credible sources.

As the Defendants have not challenged any other elements, the Court finds that all the elements have been properly alleged to support that Simpson relied on certain representations when he took the job, causing him financial and professional damage. Consequently, Defendants' motion to dismiss is denied as to Count III.

*Count V - Retaliatory Counterclaims*

The Defendants argue that Simpson's allegation of a "retaliatory counterclaim" claim is not legally cognizable under Illinois or federal law and must be dismissed.

Anti-retaliation rights are intended to prevent employers from "intimidating employees and discouraging them from enforcing their rights." *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 833 (N.D. Ill. 2006)(Grady, J.). Courts rarely find that conduct arising during the scope of existing litigation amounts to retaliation, especially the filing of a compulsory counterclaim, because at the point that the counterclaim would have been filed, the plaintiff has already **[\*17]** asserted his rights; they will not incur significant additional expenses because they have presumably already hired counsel; and defendants must bring compulsory counterclaims or risk waiver. *Ergo v. Int'l Merch. Servs.*, 519 F. Supp. 2d 765, 783 (N.D. Ill. 2007)(Leinenweber, J.)(citing *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998)). Counterclaims are only considered retaliatory when they are baseless. *Id.*

Here, Defendant's counterclaim was brought in response to Simpson's complaint. However, the mere fact that Defendants filed a counterclaim in this case is

2018 U.S. Dist. LEXIS 133740, *17

not sufficient to make out a claim for retaliation. *Beltran*, 426 F. Supp. 2d at 834 (finding that since filing a counterclaim is different from initiating a lawsuit, filing a counterclaim, without more, is not an adverse action that can support a retaliation claim."). As the Court finds that the counterclaims are not frivolous and were done in the normal course of litigation, they cannot be deemed retaliatory under the law. Accordingly, Count V is dismissed without prejudice.

**Conclusion**

For the above reasons, Defendants' Motion to Dismiss Plaintiff's Complaint is granted in part as to Counts IV and V and denied as to the remaining three counts.

IT IS SO ORDERED.

/s/ Sharon Johnson Coleman

ENTERED: SHARON JOHNSON COLEMAN

United States District Court Judge

Dated: 8/8/2018

# Villa v. Pearson Educ., Inc.

United States District Court for the Northern District of Illinois, Eastern Division

December 8, 2003, Decided ; December 9, 2003, Docketed

03 C 3717

**Reporter**

2003 U.S. Dist. LEXIS 24686 *; 69 U.S.P.Q.2D (BNA) 1411 **; Copy. L. Rep. (CCH) P28,750

HIRAM VILLA, Plaintiff, vs. PEARSON EDUCATION, INC., a/k/a BRADY PUBLISHING, an imprint of Macmillian USA, party of Pearson PLC, Defendant.

**Prior History:** Villa v. Brady Publ'g, 2002 U.S. Dist. LEXIS 11753 (N.D. Ill., June 26, 2002)

**Disposition: [*1]** Defendants' motion to dismiss denied. Ruling set for December 17, 2003 stricken.

**Counsel:** For Hiram Villa, PLAINTIFF: Donald F Spak, Michael J Hamblet, Hamblet, Oremus & Little, Chicago, IL USA.

For Pearson Education, Inc AKA Brady Publishing, DEFENDANT: Julia Dee Mannix, Davis, Mannix & McGrath, Chicago, IL USA.

**Judges:** Charles P. Kocoras, Chief Judge, United States District Court.

**Opinion by:** Charles P. Kocoras

# Opinion

**[**1412]** *MEMORANDUM OPINION*

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on the motion of Defendants Pearson Education, Inc. and Brady Publishing (collectively referred to herein as "Brady") to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6). For the reasons set forth below, the motion is denied.

## BACKGROUND

Plaintiff Hiram Villa is an artist who uses the pseudonym "UNONE." His medium of choice is outdoor murals, that often include these letters as part of the work. According to the complaint, Brady included a reproduction of one of his works in a book without permission.

This is the third go-round for Villa's allegations, in one form or another. In the initial complaint, Villa alleged **[*2]** copyright infringement as well as several state-law causes of action. At the time, he had not registered his copyright. On May 1, 2002, we dismissed the copyright action, concluding that we had no subject matter jurisdiction over that claim without some indication of registration or refusal to register from the copyright office. In the same decision, we declined to exercise supplemental jurisdiction over Villa's state-law claims; he had asserted only federal question jurisdiction.

In June 2002, Villa moved to vacate our judgment as to the state-law claims, arguing for the first time that the parties were diverse, so jurisdiction was present even without the federal copyright claim. He sought leave to file an amended complaint that alleged only the state claims. We granted the motion to vacate but did not allow the amended complaint on the grounds that to do so would be futile because each claim was preempted by the Copyright Act.

On February 6, 2003, the Copyright Office issued a Certificate of Registration to Villa for the work at issue in this case. In June, Villa filed a new complaint, containing allegations pertaining to the now-registered copyright.

2003 U.S. Dist. LEXIS 24686, *2; 69 U.S.P.Q.2D (BNA) 1411, **1412

Brady has moved to dismiss **[*3]** pursuant to Fed. R. Civ. Proc. 12(b)(6).

**LEGAL STANDARD**

Rule 12(b)(6) motion to dismiss is used to test the legal sufficiency of a complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). In ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff, construe allegations of a complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Bontkowski v. First Nat'l Bank,* 998 F.2d 459, 461 (7th Cir. 1993); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir. 1991). The allegations of a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High Sch.,* 144 F.3d 448, 454-55 (7th Cir. 1998). **[*4]** With these principles in mind, we turn to the motion at hand.

**DISCUSSION**

To state a claim for copyright infringement, Villa must allege ownership of the copyright, registration, and infringement. *Sweet v. City of Chicago,* 953 F. Supp. 225, 227 (N.D. Ill. 1996). Each of these elements is alleged in the present complaint, and Brady does not argue that any is missing. Instead, they advance three arguments in support of their motion. They begin by contending that our previous rulings in this case preclude Villa from asserting the copyright claim in his latest complaint. They also assert that the mural in question is not protected by copyright, either because it is illegal graffiti or because it incorporates words or letters.

The initial ground fails for two reasons. For starters, claim preclusion is not a proper basis for the motion to dismiss. It is axiomatic **[**1413]** that the scope of a 12(b)(6) motion starts and ends with the complaint. Claim preclusion (or res judicata) is an affirmative defense. Fed. R. Civ. Proc. 8(c). Its presence or absence has no effect on the legal sufficiency of the allegations of the complaint. *See* **[*5]** *Gomez v. Toledo,* 446 U.S. 635, 100 S. Ct. 1920, 64 L. Ed. 2d 572

(1980).

Even if Brady were raising the issue at an appropriate stage of the proceedings, we disagree that the current complaint would be barred. Claim preclusion only applies where there has been a final judgment on the merits of the claim in an earlier action and there must be an identity of parties and causes of action in both suits. *Wilhelm v. County of Milwaukee,* 325 F.3d 843, 846 (7th Cir. 2003). Here, there is no question that the parties in both actions are identical. With respect to the identity of the causes of action, Brady looks not to the initial complaint, which contained a copyright infringement count, but to the proposed amended complaint that accompanied the motion to vacate. Citing to an Eighth Circuit case, Brady insists that because we denied Villa leave to amend his complaint in June 2002, he is precluded from bringing any claim arising from the same facts. *King v. Hoover Group,* 958 F.2d 219, 222-23 (8th Cir. 1992). Brady has cited no authority that the Seventh Circuit is in agreement with the Eighth on this issue, and our research has revealed none. **[*6]** Other courts have rejected the broad pronouncement of *King* upon which Brady relies. *See, e.g., Curtis v. Citibank,* 226 F.3d 133, 139-40 (2d Cir. 2000) (holding that, unless the denial of the leave to amend is itself an adjudication of the merits of a claim, the typical claim preclusion analysis must be employed to determine if a claim is precluded). Furthermore, Brady's argument depends on their assertion that Villa could have brought his copyright claims in the amended complaint. This position is directly contrary to the facts and procedural history of this case. As we stated in our decision on the first motion to dismiss, Villa could not bring any claim of copyright infringement without a certificate of registration or a refusal from the Copyright Office to issue a certificate. Therefore, until the certificate issued on February 6, 2003, more than seven months after the denial of leave to amend, Villa could not have brought any claims rooted in the Copyright Act.

Had our original dismissal of the copyright claim been pursuant to Rule 12(b)(6), Brady might be on firmer ground, but the decision was clearly made on jurisdictional grounds. A dismissal for lack of **[*7]** jurisdiction need not have preclusive effect over later filings, particularly where, as here, the jurisdictional defect that brought about the original dismissal is later cured. *See Shockley v. Jones,* 823 F.2d 1068, 1073 (7th Cir. 1987); *see also Watkins v. U.S.,* 2003 U.S. Dist. LEXIS 6519, 2003 WL 1906176, at *3 (N.D. Ill. Apr. 17, 2003).

2003 U.S. Dist. LEXIS 24686, *7; 69 U.S.P.Q.2D (BNA) 1411, **1413

Both of Brady's other arguments turn on questions of fact; thus neither belongs in a 12(b)(6) motion. The first would require a determination of the legality of the circumstances under which the mural was created. The second would necessitate an evaluation of the degree of creativity exhibited in his original mural. As this would also involve factual inquiries, the issue cannot be resolved at this stage of the proceeding. Accordingly, there is no meritorious basis to dismiss the complaint, and Brady's 12(b)(6) motion is denied.

**CONCLUSION**

Based on the foregoing analysis, Brady's motion to dismiss is denied.

Charles P. Kocoras

Chief Judge

United States District Court

Dated: DEC - 8 2003

---

**End of Document**

# Addison Automatics, Inc. v. RTC Group

United States District Court for the Northern District of Illinois, Eastern District

July 16, 2013, Decided; July 16, 2013, Filed

No. 12 C 9869

**Reporter**
2013 U.S. Dist. LEXIS 99448 *; 2013 WL 3771423

ADDISON AUTOMATICS, INC., individually and as the representative of a class of similarly-situated persons, Plaintiff, v. THE RTC GROUP, INC., MICROSOFT CORPORATION, INTEL CORPORATION, AVENT, INC., and JOHN DOES 1-10, Defendants.

**Counsel: [*1]** For Addison Automatics, Inc., individually and as the representative of a class of similarly-situated persons, Plaintiff: Brian J Wanca, LEAD ATTORNEY, Ryan M. Kelly, Anderson & Wanca, Rolling Meadows, IL; Phillip A. Bock, LEAD ATTORNEY, James Michael Smith, Phillip James Bullimore, Bock & Hatch, LLC, Chicago, IL.

For The RTC Group, Inc., Defendant: Ellen M. Chapelle, LEAD ATTORNEY, Jordan Michael Hanson, Gould & Ratner LLP, Chicago, IL.

For Microsoft Corporation, Defendant: Richard Francis O'Malley, LEAD ATTORNEY, Alison V. Potter, Eric Stephen Mattson, Sidley Austin LLP, Chicago, IL.

For Intel Corporation, Defendant: Eric D. Brandfonbrener, LEAD ATTORNEY, Perkins Coie LLC, Chicago, IL.

For Avent [SIC], Inc., Defendant: Darrell J. Graham, LEAD ATTORNEY, Peter S. Roeser, Roeser Bucheit & Graham LLC, Chicago, IL.

**Judges:** Virginia M. Kendall, United States District Court Judge.

**Opinion by:** Virginia M. Kendall

# Opinion

## MEMORANDUM OPINION ORDER

Plaintiff Addison Automatics, Inc. filed a three-count complaint against Defendants The RTC Group, Inc., Microsoft Corporation, Intel Corporation and Avnet Inc. (collectively, the "Defendants") asserting claims for a violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.,* **[*2]** common law conversion and for a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2. The Defendants have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. [1] For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the complaint and are assumed to be true for purposes of this Motion to Dismiss. *See Voelker v. Porsche Cars North America, Inc.,* 353 F.3d 516, 520 (7th Cir. 2003); *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir. 1995). On October 1, 2009, RTC sent a facsmile to Plaintiff, offering Plaintiff the opportunity to attend a free "technical seminar" on embedded computer technology. *See* Doc. 1-1, Plaintiff's First Amended Complaint at ¶¶ 16-18, Ex. A. Specifically, the fax stated that:

Avnet, Microsoft and Intel join together to bring you

---

[1] Defendant RTC only moves to dismiss Count I, the TCPA claim. Microsoft, Intel and Avnet move to dismiss the complaint in its entirety.

the *Avnet Embedded Revolution* technical seminar. Get critical information on the powerful, new and next generation of Windows Embedded Enterprise **[*3]** including Windows 7 FES & Intel's Atom CPU. This unique (preview) opportunity will get you up-close to the experts to glean knowledge and know-how for your next design decision. The Avnet Embedded Revolution Seminar is 100% complimentary and specially designed to exceed your expectations.

Learn exactly how the *Next Generation of* Windows Embedded Enterprise and Intel's Atom CPU explode the Embedded Revolution.

*Id.* at Ex. A (emphasis in original). The remainder of the fax described the agenda for the seminar. *Id.* It identified the "distinguished hosts" of the seminar as Microsoft, Intel and Avnet. *Id.* Microsoft's, Intel's and Avnet's logos were prominently displayed on the fax. *Id.* It also stated that the location of the seminar would be Microsoft's offices in Downers Grove, Illinois. *Id.*

Plaintiff contends that it never consented to receiving the fax from the Defendants and that it did not provide an opt-out notice. *Id.* at ¶¶ 19, 25. Plaintiff also contends that the Defendants intended to use the seminar to market their products and services to the attendees. *Id.* at ¶ 19.

Plaintiff filed an initial complaint against Defendant RTC in the Circuit Court of Cook County asserting claims for **[*4]** violations of the TCPA and the ICFA as well as for common law conversion. RTC moved to dismiss the complaint pursuant to 735 ILC 5/2-615 for failure to set forth a claim for which relief could be granted. The state court dismissed the TCPA claim without prejudice but denied RTC's motion to dismiss with respect to the ICFA and conversion claims. Plaintiff then filed an amended complaint, the operative complaint, which included additional factual allegations and added Microsoft, Intel and Avnet as Defendants. Intel, with the consent of the other Defendants, removed the action to this Court on December 11, 2012 pursuant to 28 U.S.C. § 1441(a). *See* Doc. 1. Defendants Microsoft, Intel and Avnet have now moved to dismiss the Amended Complaint in its entirety while RTC only moves to dismiss the TCPA claim. Doc. 24.

## STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy,* 51 F.3d at 717. To state a claim upon which relief may be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled **[*5]** to relief". Fed. R. Civ. P. 8(a)(2). "Detailed factual allegations are not required, but the plaintiff must allege facts that when "accepted as true... 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). In analyzing whether a complaint meets this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. When there are well-pleaded factual allegations, the Court assumes their veracity then determines if they plausibly give rise to an entitlement to relief. *Id.*

## DISCUSSION

## I. The Complaint Sufficiently Alleges a Violation of the TCPA

Defendants assert two reasons for why the TCPA claim should be dismissed. First, the fax received by Plaintiff did not constitute an advertisement within the meaning of the TCPA. Second, since RTC sent the fax to Plaintiff, the claim should be dismissed as to Microsoft, Intel and Avnet because Plaintiff failed to adequately allege that RTC was acting as their agent. Neither argument is persuasive.

## A. Plaintiff Sufficiently Alleged the Fax Was an Advertisement

The relevant portion of **[*6]** the TCPA prohibits the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement. . . ." 47 U.S.C. § 227(b)(1)(C). The statute defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5); *see also, e.g., G.M. Sign, Inc. v. MFG.com, Inc.,* No. 08 C 7106, 2009 U.S. Dist. LEXIS 35291, 2009 WL 1137751, at *1 (N.D. Ill. Apr. 24, 2009); *Physicians Healthsource, Inc. v.*

*Alma Lasers,* No. 12 C 4978, 2012 U.S. Dist. LEXIS 133222, 2012 WL 4120506, at *2 (N.D. Ill. Sept. 18, 2012).

Faxes that are nothing more than "purely informational" documents are not advertisements under the TCPA. *See, e.g., G.M. Sign,* 2009 U.S. Dist. LEXIS 35291, 2009 WL 1137751, at *2. However, faxes promoting free seminars may be unsolicited advertisements because "free seminars are often a pretext to market products or services." *Physicians Healthsource,* 2012 U.S. Dist. LEXIS 133222, 2012 WL 4120506, at *2 (citing *In re Rules and Regulations Implementing the Tel. Protection Act of 1991; Junk Fax Prevention Act of 2005,* 21 F.C.C.R. 3787, 3814 (Apr. 6, 2006)); **[*7]** *see also, e.g., St. Louis Heart Center, Inc. v. Forest Pharms., Inc.,* No. 12 C 02224, 2013 U.S. Dist. LEXIS 35563, 2013 WL 1076540, at *4 (E.D. Mo. Mar. 13, 2013) (finding that a fax that offers a "free seminar serving as a pretext for advertising commercial products and services" would fall within the ambit of the TCPA).

The complaint in this case adequately sets forth a claim for a violation of the TCPA. The plain language of the fax makes it plausible that the seminar would be used to market the Defendants' products and services. For example, the fax states that "[t]his unique (preview) opportunity will get you up-close to the experts to glean knowledge and know-how for your next design decision." Doc. 1-1 at Ex. A. It is plausible to infer from this statement that the Defendants intended to market their products and services at the seminar so that the attendees would purchase those products and services when they make their "next design decision." This plausibility is heightened by the fact the fax specifically describes the Microsoft and Intel products the attendees would receive information and training on. *See id.* ("Get critical information on the powerful, new and next generation of Windows Embedded Enterprise **[*8]** including Windows 7 FES & Intel's Atom CPU."). Based on these statements alone it is plausible to infer that the seminar was nothing more than a pretext for the Defendants to market their products and services.

Additionally, in order for the fax recipients to register for the seminar, they had to visit the website, www.embedded revolution.com. *Id.* The website describes the "embedded" products offered by Microsoft and Intel as well as the customer services provided by Avnet. [2] *See* Avnet Embedded Revolution Home Page,

http://www.embeddedrevolution.com/. The website also describes the conference as making product launches from Avnet and its partners, such as Microsoft and Intel, available to the attendees. *Id.,* http://www.embeddedrevolution.com/conference/. Therefore, these statements also support the allegations that the seminar was simply a pretext for Defendants to market their products and services.

The Defendants reliance on *Phillip Long Dang, D.C., P.C. v. XLHealth Corp.* [3] is misplaced. As an initial matter, an opinion issued by a district court from the Northern District of Georgia is not binding authority. *See Townsel v. Dish Network L.L.C.,* 668 F.3d 967, 970 (7th Cir. 2012) ("district courts' decisions are not authoritative, even in the rendering district"). Additionally, *Phillip Long* was decided on a motion for summary judgment and not a Rule 12(b)(6) motion to dismiss. The court in that case could therefore consider the evidence before it and determine as a matter of law whether the fax was an advertisement. In contrast, the Court must accept all factual allegations as true for purposes of this motion. Finally, the plaintiff in *Phillip Long* apparently failed to allege that the free seminar offered by the fax was itself a commercial enterprise. Instead, the plaintiff argued that "a free seminar fax is an advertisement under the TCPA without regard to whether any commercial activity occurs at the seminar." 2011 U.S. Dist. LEXIS 12166, 2011 WL 553826, at *3. Conversely **[*10]** here, Plaintiff alleges that the purpose of the free seminar offered here was to market the products or services of Defendants Microsoft, Intel and Avnet. Doc. 1-1 at ¶ 19 (the "series of seminars . . .was itself an advertising of the goods or services offered by RTC Group's client those companies hosting and exhibiting at the seminars."). Accordingly, the Plaintiff has sufficiently alleged the fax constituted an advertisement. [4]

---

628 F.3d 937, 944 (7th Cir. 2011); *Denius v. Dunlap,* 330 F.3d 919, 926 (7th Cir. 2003); *see also Quan v. Gonzales,* 428 F.3d 883, 888 n.5 (9th Cir. 2005) (taking judicial notice **[*9]** of information on commercial travel guide website to establish plausibility of claim that "banks in China are typically open on Sundays").

[3] *See* No. 09 C 1076, 2011 U.S. Dist. LEXIS 12166, 2011 WL 553826, at *3 (N.D. Ga. Feb. 7, 2011).

[4] The Defendants also repeatedly cite the decision by the Circuit Court of Cook County Judge to dismiss the TCPA claim because he found the fax did not offer goods or services for sale and that the complaint failed to sufficiently allege the seminar was a pretext for the Defendants to offer their

---

[2] The Court may take judicial notice of the contents of a website. *See LaBella Winnetka, Inc. v. Village of Winnetka,*

2013 U.S. Dist. LEXIS 99448, *9

**B. Plaintiff Sufficiently Alleges that Defendants Microsoft, Intel and Avnet May Be Held Liable for the Fax**

Title 47 U.S.C. § 227(b)(1) assigns liability to "any person" who sends an unsolicited advertisement to a telephone facsimile machine. The Federal Communications Commission is the agency vested with authority to issue regulations implementing the TCPA. Orders or rules promulgated by the FCC are binding on this Court pursuant to the Administrative Orders Review Act ("Hobbs Act"), 28 U.S.C. § 2342(1). *See CE Design, Ltd. v. Prism Business Media, Inc.,* 606 F.3d 443, 446 (7th Cir. 2010) (holding that the FCC's orders relating to the TCPA are binding under the Hobbs Act). The FCC has specifically promulgated a rule that defines the sender of an unsolicited advertisement for purposes of § 227(b)(1)(C) as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. 64.1200(f)(10); *see also In the Matter of* **[*13]** *Rules and Regulations Implementing the Telephone Consumer Protection Act*

———————————————————

products. Since this Court applies the Federal Rules of Civil Procedure once a case has been removed, the Court does not believe much weight should be given to an Illinois state court's decision regarding the sufficiency of allegations in a complaint. While the law of the case doctrine applies to rulings made in state court prior to the removal of a case, a federal district court is vested with full discretion **[*11]** to set aside or reconsider those orders. *See Payne for Hicks v. Churchich,* 161 F.3d 1030, 1037 (7th Cir. 1998). Deciding whether allegations found insufficient pursuant to 735 ILCS 5/2-615 are particularly appropriate for reconsideration after removal because Illinois's fact pleading standard imposes a heightened pleading standard that is not required by the Federal Rules' notice pleading standard. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.,* 536 F.3d 663, 670 (7th Cir. 2008) ("We can see no reason . . . why the standards of Rule of the Federal Rules of Civil Procedure, rather than Illinois fact pleading requirements, should not apply here."); *Axa Corporate Solutions v. Underwriters Reinsurance Corp.,* 347 F.3d 272, 277 (7th Cir. 2003) ("Parties might prefer the notice-pleading regime of the Federal Rules of Civil Procedure over the fact-pleading approach that prevails in Illinois courts, but no one thinks that the Illinois rules of pleading are binding on the federal courts."); *see also, e.g., Drabik v. Drabik,* No. 09 C 0028, 2013 U.S. Dist. LEXIS 72886, 2013 WL 2285791, at *2 (N.D. Ill. May 23, 2013) ("The [defendants] mistakenly seek to hold [the plaintiff] to a fact-pleading standard **[*12]** of Illinois, but it is they who chose to remove [the plaintiff's] suit to federal court where a notice-pleading standard applies.") (internal citations omitted).

*of 1991,* CG Docket No. 02-278, 21 FCC Rcd 3787, 3808, ¶ 39 (April 5, 2006) ("We take this opportunity to emphasize that under the Commission's interpretation of the facsimile advertising rules, the sender is the person or entity on whose behalf the advertisement is sent."); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 10 FCC Rcd 12391, 12407-08, ¶¶ 34-35 (July 26, 1995) ("entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements."). Since Defendants Microsoft's, Intel's and Avnet's goods or services are advertised in the fax at issue, they are "senders" under the FCC's interpretation of this section of the TCPA. Therefore, Plaintiff has adequately alleged that they can be liable for the alleged violation of the TCPA.

The cases relied on by the Defendants that hold that Plaintiff must establish the existence of an agency relationship in order to hold the Defendants vicariously liable are unpersuasive. [5] None of these cases appears to have considered the rule promulgated **[*14]** by the FCC that defines "senders" as the person or entity whose goods or services are advertised or promoted in the unsolicited advertisement. Indeed, one of the cases, *Mey v. Pinnacle Sec. LLC,* deals with a separate subsection of the TCPA that prohibits automatic dialing equipment from calling wireless phones without the subscriber's consent. *See* 2012 U.S. Dist. LEXIS 129267, 2012 WL 4009718, at *4. Moreover, none of these cases considered that this rule is binding on a district court under the Hobbs Act. Accordingly, even if the Court disagreed with the FCC's definition of a sender, it has no authority to disregard it.

Even if the FCC did not treat advertisers as senders, Plaintiff has still alleged Defendants Microsoft, Intel and Avnet are vicariously liable because it adequately alleged an agency relationship between those entities and RTC. The Supreme Court has held that when Congress creates a tort action, ordinary principles **[*15]** of tort-related vicarious liability are incorporated. *See Meyer v. Holley,* 537 U.S. 280, 285, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003); *see also, e.g., Bridgeview Health Care Ltd.,* 2013 U.S. Dist. LEXIS 37310, 2013

———————————————————

[5] These cases are *Thomas v. Taco Bell Corp.,* 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012); *Bridgeview Health Care Ctr. Ltd. v. Clark,* No. 09 C 5601, 2013 U.S. Dist. LEXIS 37310, 2013 WL 1154206, at *5 (N.D. Ill. Mar. 19, 2013); *Mey v. Pinnacle Sec. LLC,* No. 5:11CV47, 2012 U.S. Dist. LEXIS 129267, 2012 WL 4009718, at *4 (N.D. W. Va. Sept. 12, 2012).

WL 1154206, at *5 ("[N]othing in the language of § 227(b) indicates that traditional notions of agency law are not applicable."). This Court has previously held that the federal common law of agency should be followed in determining whether agency exists for purposes of establishing vicarious liability under the TCPA. *See Jamison v. First Credit Services,* No. 12 C 4415, 290 F.R.D. 92, 2013 U.S. Dist. LEXIS 43978, 2013 WL 1248306, at *7 (N.D. Ill. Mar. 28, 2013). The federal common law of agency is in accord with the Restatement. *See Opp v. Wheaton Van Lines, Inc.,* 231 F.3d 1060, 1064 (7th Cir. 2000); *Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 865-66 n. 15 (7th Cir. 1998).

The Restatement provides that an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency §1.01; *see also Chemtool, Inc. v. Lubrication Techs.,* 148 F.3d 742, 745 (7th Cir. 1998) **[*16]** (holding that the test for agency is "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal").

To adequately plead the existence of an agency relationship, "a plaintiff must allege a factual predicate to create the inference of agency." *Frazier v. U.S. Bank Nat. Ass'n,* No. 11 C 8775, 2013 U.S. Dist. LEXIS 45330, 2013 WL 1337263, at *4 (N.D. Ill. Mar. 29, 2013); *see also, e.g., Whitley v. Taylor Bean & Whitacker Mortgage Corp.,* 607 F. Supp. 2d 885, 895 (N.D. Ill. 2009). Here, Plaintiff alleges that:

> [Microsoft, Intel and Avnet] through [RTC] approved, authorized and participated in the scheme to broadcast by facsimile by (a) directing a list to be purchased or assembled; (b) directing and supervising employees or third parties to send the facsimiles; (c) creating and approving the form of the facsimile to be sent; (d) determining the number and frequency of facsimile transmissions; and (e) approving or paying the employees or third parties to send the facsimiles.

Doc. 1-1, at ¶ 15. These allegations, accepted as true, provide a sufficient factual basis for the Court **[*17]** to infer that Microsoft, Intel and Avnet controlled the manner and method of work carried out by RTC. This reasonable inference is further supported by the fact the

fax advertised that the conference would be held at Microsoft's Downers Grove offices and identified the Defendants as the conference's hosts. Therefore, Plaintiff has adequately established the factual predicate for the existence of an agency relationship so that Defendants Microsoft, Intel and Avnet may be held vicariously liable for the alleged TCPA violation.

## II. The Conversion Claim Is Adequately Alleged

To sufficiently allege a claim for common law conversion, Plaintiff must allege: (1) an unauthorized and wrongful assumption of control, dominion, or ownership over its property; (2) its right to the property; and (3) its right to immediate possession of the property, absolutely and unconditionally. *See, e.g., Centerline Equip. Corp. v. Banner Pers. Serv.,* 545 F. Supp. 2d 768, 781 (N.D. Ill. 2008) (citing *General Motors Corp. v. Douglass,* 206 Ill. App. 3d 881, 565 N.E.2d 93, 96-97, 151 Ill. Dec. 822 (Ill. App. Ct. 1990)). The Defendants do not dispute, and thus concede, that the complaint sufficiently alleges these elements. Instead, Defendants argue that **[*18]** the conversion claim should be dismissed because Plaintiff fails to sufficiently allege the existence of an agency relationship between RTC and the other Defendants. For the reasons set forth above with respect to the TCPA claim, the complaint adequately pleads agency. Therefore, the motion to dismiss this claim is denied.

## III. The ICFA Claim Against Microsoft, Intel and Avnet Is Barred by the Statute of Limitations

A claim brought pursuant to the ICFA must be filed within three years of the date the claim accrues. *See* 815 ILCS 505/10a(e); *see also, e.g., Indep. Trust Corp. v. Fid. Nat. Title Ins. Co. of N.Y.,* 577 F.Supp.2d 1023, 1041 (N.D. Ill. 2008). Here, there is no dispute that Plaintiff's claim accrued on October 1, 2009, the date it received the facsimile from RTC. There is also no dispute that Defendants Microsoft, Intel and Avnet were not added as parties to this litigation until November 9, 2012, which is obviously more than three years after Plaintiff's claim accrued. As a result, the statute operates to bar this claim.

Plaintiff's argument that its ICFA claim against Defendants Microsoft, Intel and Avnet should relate back to the date it filed its initial complaint against

 **[\*19]** RTC is baseless. [6] Federal Rule of Civil Procedure 15(c)(1)(C) provides that when a plaintiff adds new defendants as parties in an amended complaint, the amendment only relates back to the original complaint if "if there has been an error made concerning the identity of the proper party and where that party is chargeable with knowledge of the mistake." *See also King v. One Unknown Fed. Corr. Officer,* 201 F.3d 910, 914 (7th Cir. 2000); *Pierce v. City of Chicago,* No. 09 C 1462, 2010 U.S. Dist. LEXIS 118356, 2010 WL 4636676, at *2 (N.D. Ill. Nov. 8, 2010). Establishing mistake is necessary for relation back and is "independent from whether the purported party knew that action would be brought against him." *King,* 201 F.3d at 914 (internal citations omitted). Moreover, a "mistake" under Rule 15(c)(1) is not an inability to identify the proper defendant, "the plaintiff must have actually erred in naming the proper defendant." *Pierce,* 2010 U.S. Dist. LEXIS 118356, 2010 WL 4636676, at *2; *Hall v. Norfolk S. Ry. Co.,* 469 F.3d 590, 596 (7th Cir. 2006). In other words, "a potential defendant who has not been named in a lawsuit by the time the statute of limitations has run is entitled to repose — unless it is or should be apparent to that person that **[\*20]** he is beneficiary of a mere slip of the pen, as it were." *Joseph v. Elan Motorsports Tech. Racing Corp.,* 638 F.3d 555, 559-60 (7th Cir. 2011).

The IFCA claim against Defendants Microsoft, Intel and Avnet does not relate back to the original complaint because there was no mistake. Plaintiff did not erroneously name the wrong defendants in its original complaint. For example, it did not accidentally name Microsoft LLC instead of Microsoft Inc. Rather, it simply failed to name Microsoft, Intel and Avnet as defendants. Under these circumstances, Rule 15(c)(1)(C) does not allow Plaintiff to add these defendants after the limitations period has expired. Therefore, the IFCA claim (Count III) against Defendants Microsoft, Intel and Avnet is dismissed with prejudice. [7]

---

[6] Plaintiff's relation back argument is based on the standard set forth in 735 ILCS § 5/2-616(d). However, this statute is inapplicable here; rather, Federal Rule of Civil Procedure 15 governs. *See* Fed. R. Civ. P. 81(c)(1) ("These rules apply to a civil action after it is removed from a state court.").

---

[7] Plaintiff also argues that it is inappropriate to assert a statute of limitations defense in a Rule 12(b)(6) motion to dismiss. **[\*21]** This is incorrect as "the statute of limitations may be raised in a motion to dismiss if 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Brooks v. Ross,* 578 F.3d 574, 579 (7th Cir. 2009)

## CONCLUSION

For the reasons set forth above, the motion to dismiss is granted in part and denied in part. Plaintiff's claim against Defendants Microsoft, Intel and Avnet for a violation of the Illinois Consumer Fraud Act is barred by the statute of limitations. The remainder of the motion to dismiss is denied.

/s/ Virginia M. Kendall

Virginia M. Kendall

United States District Court Judge

Northern District of Illinois

Date: July 16, 2013

---

End of Document

---

(quoting *United States v. Lewis,* 411 F.3d 838, 842 (7th Cir. 2005)). Here, the complaint sets forth everything necessary to satisfy the affirmative defense because it is indisputable that Plaintiff's claims accrued on October 1, 2009, which was more than three years before it filed its amended complaint.

# Puntillo v. Dave Knecht Homes, LLC

United States District Court for the Northern District of Illinois, Eastern Division

May 24, 2019, Decided

Case No. 15 CV 11839

**Reporter**
2019 U.S. Dist. LEXIS 87223 *; 2019 WL 2225987

ANTHONY PUNTILLO and MARY CAROL PUNTILLO, Plaintiffs, v. DAVE KNECHT HOMES, LLC, DAVID J. KNECHT, and KAREN M. KNECHT, individually and as Trustee of the KAREN M. KNECHT TRUST, Defendants.

**Prior History:** Puntillo v. Dave Knecht Homes, LLC, 2016 U.S. Dist. LEXIS 85063 (N.D. Ill., June 30, 2016)

**Counsel:** [*1] For Anthony Puntillo, Mary Carol Puntillo, Plaintiffs: David C. Jensen, Robert Jon Feldt, LEAD ATTORNEYS, Eichhorn & Eichhorn, Hammond, IN; John P. Twohy, Eichhorn & Eichhorn, LLP, Hammond, IN.

For David J. Knecht, Karen M. Knecht, individually and as Trustee of the Karen M. Knecht Trust Dated January 13, 2005, Dave Knecht Homes, LLC, Defendants: Ariel Weissberg, LEAD ATTORNEY, Weissberg & Associates, Chicago, IL; Devvrat Vikram Sinha, LEAD ATTORNEY, Weissberg & Associates, Ltd., Chicago, IL; John M. Drews, LEAD ATTORNEY, Drews & Associates, Oak Brook, IL.

**Judges:** Harry D. Leinenweber, United States District Judge.

**Opinion by:** Harry D. Leinenweber

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiffs Anthony and Mary Carol Puntillo (collectively "Plaintiffs" or the "Puntillos") and Defendants Dave Knecht Homes, LLC, David J. Knecht, and Karen M. Knecht, individually and as Trustee of the Karen M. Knecht Trust (collectively "Defendants") cross-move for summary judgment. Plaintiffs also move to strike most of Defendants' Statement of Facts and some of Defendants' Statement of Additional Facts. Defendants also move to exclude the expert opinion testimony of G. Scott Solomon. For the reasons stated herein, Plaintiffs' Motions [*2] to Strike (Dkt. Nos. 75, 92) are denied. Defendants' Motion to Exclude Expert Testimony (Dkt. No. 88) is denied. Plaintiffs' Motion for Summary Judgment (Dkt. No. 65) is granted in part and denied in part, and Defendants' Motion for Summary Judgment (Dkt. No. 69) is granted in part and denied in part.

## I. UNDISPUTED FACTS

For convenience of the reader, the Court provides both a succinct summary and a more detailed overview of the facts. The following facts are undisputed unless designated otherwise.

This case arises from a dispute between the Puntillos and a housing development company, Northridge Builders, Inc. ("Northridge"), over the construction of a luxury home. Apparently, Northridge constructed a home for the Puntillos that was riddled with defects. In response, the Puntillos filed suit against Northridge in state court and received a judgment of monetary damages. Northridge however dissolved, and the Puntillos were unable to enforce that judgment against it. In the wake of it all, a new housing development company, Dave Knecht Homes, LLC, was created with allegedly very similar, if not the same, owners, management, staff, resources, and so forth. The crux of this lawsuit is whether [*3] the Puntillos can enforce the Northridge judgment against the newly developed Dave

Knecht Homes.

## A. Northridge Builders, Inc.

Northridge specialized in building high-end custom homes and maintained its office at 15 Spinning Wheel Road in Hinsdale, Illinois. (Defs.' Resp. to Pls.' Stmt. of Facts ("PSOF") ¶ 5, Dkt. No. 79.) Defendant David J. Knecht was President and Director of Northridge, as well as its sole shareholder since Northridge's inception until October 2008. (PSOF ¶ 6.) Defendant Karen M. Knecht is David Knecht's wife and the trustee of Defendant Karen M. Knecht Trust (the "Trust"). (PSOF ¶ 8.) Karen and David (collectively the "Knechts") are the beneficiaries of that Trust. (*Id.*) The Trust instrument provided that if stock or an ownership interest in Northridge is included in trust assets, the trustee—Karen Knecht—shall entrust to herself the management of Northridge. (*Id.*) On October 24, 2008, David Knecht transferred his shares in Northridge to the Trust. (PSOF ¶ 9.) While Plaintiffs contend there was no consideration for this transfer, Defendants assert that David transferred his personal property, not corporate property, to the Trust. (*Id.*) Following the transfer, David **[*4]** Knecht continued to serve as President and Director of Northridge. (PSOF ¶ 10.) The parties dispute, however, given the instructions of the Trust instrument, whether Karen or David Knecht was to have managerial authority over Northridge. (*Id.*) Northridge also made cash distributions directly into a bank account owned by David and Karen Knecht, but the parties dispute the amounts of those distributions. (PSOF ¶11.)

For the most part, Northridge was a successful and profitable business. (PSOF ¶ 27.) From December 2003 through to May 2012, Northridge was a party to more than thirty-three contracts for the construction or renovation of single-family custom homes. (PSOF ¶ 26.) These contracts had a value of approximately $50,229,000.00. (*Id.*) Northridge had gross revenues of over twelve million dollars in 2008; over eight million in 2009 and 2010; over seven million in 2011; and over ten million in 2012. (PSOF ¶ 27.) Then, between 2012 and 2013, Northridge incurred approximately $1,128,000.00 in expenses, which were personal to the Knechts and included federal and state income tax payments; landscaping, pool and retaining-wall work at the Knechts' personal residences; premiums for personal **[*5]** insurance policies; fees owed to the Knechts' personal attorneys; interior design fees; and automobile registration fees for Karen Knecht's personal vehicle. (PSOF ¶¶ 16-17.) After the fact, Northridge, through David Knecht, classified these expenses as shareholder "dividends" or "distributions." (PSOF ¶ 19.) The Knechts paid for these expenses using American Express cards issued to Northridge, which paid the interest owed for such expenses. (PSOF ¶ 20.) On January 20, 2014, David and Karen Knecht ratified the wind-down of Northridge's business affairs. (PSOF ¶ 28.) And on September 11, 2015, the Illinois Secretary of State effectively dissolved Northridge. (PSOF ¶ 30.)

David and Karen Knecht said they closed Northridge for several reasons, including that David "was burned out on the business" and that the two of them intended to move to Alabama. (PSOF ¶ 33.) However, the Knechts never moved to Alabama nor ceased participating in the home building business. (*Id.*)

## B. Dave Knecht Homes, LLC

Dave Knecht Homes, LLC was organized on October 17, 2012, in the state of Illinois. (PSOF ¶ 22.) Its principal office is located at 15 Spinning Wheel Road in Hinsdale, Illinois, and its initial members **[*6]** were David Knecht and Mario Cirignani. (*Id.*) From January to May 2013, Dave Knecht Homes hired all of the people working for Northridge at the time, except for Karen Knecht. (PSOF ¶ 23.) Dave Knecht Homes hired Northridge's accountant, Anthony Recchia, to serve as its accountant. (*Id.*) It also contracted with approximately 115 subcontractors, tradesmen, suppliers, and other vendors that had formerly contracted with Northridge. (PSOF ¶ 39.) Dave Knecht Homes even displayed photographs of numerous homes constructed by Northridge. (PSOF ¶ 40.)

From October 2012, to January 2013, prior to hiring Northridge's employees, Dave Knecht Homes was a party to fifteen contracts having a total value of approximately $22,800,000.00. (PSOF ¶ 36.) From March 2013, to May 2017, Dave Knecht Homes was a party to forty more contracts having a total value of approximately $49,153,085. (PSOF ¶ 37.) All of those contracts involved work relating to the construction or renovation of single-family custom homes. (*Id.*) Dave Knecht Homes recorded at least $5,179,000.00 in revenue from clients who were former customers of Northridge. (PSOF ¶ 38.) It had gross revenues in the amount of $2,524,172.00 in 2013; $8,223,305.00 **[*7]** in 2014; and $11,002,918.00 in 2015. (PSOF ¶ 41.) The combined total annual revenue of Northridge and Dave Knecht Homes was never less than $5.2 million. (*Id.*)

Northridge and Dave Knecht Homes utilized the same credit line. Beginning in 2006, Dave Knecht began using a personal credit line provided by Morgan Stanley to fund Northridge's business operations. (PSOF ¶ 42.) The credit line authorized Northridge to borrow up to $618,000.00 from Morgan Stanley in David Knecht's name. (*Id.*) Northridge, in fact, first borrowed $400,000.00 from this credit line on January 10, 2006. (*Id.*) It kept track of the funds it borrowed on the credit line by using a handwritten ledger, which tracked disbursements as well as repayments to the line. (PSOF ¶ 43.) In 2012, Ocwen Loan Servicing became the servicing lender on David Knecht's credit line. (*Id.*) According to the ledger, Dave Knecht Homes utilized this same credit line. (PSOF ¶ 44.) For example, Dave Knecht Homes borrowed $100,000.00 from the credit line in December 2014, and made a repayment of $200,000.00 in April 2015. (*Id.*)

## C. The Underlying Incident

In June 2006, Plaintiffs contracted with Northridge for the construction of a luxury custom home **[*8]** in Chesterton, Indiana. (PSOF ¶ 5.) After moving into their new home, Plaintiffs noted problems with the structure, including cracks in the walls and floors, as well as an inability to operate certain doors and windows. (PSOF ¶ 7.) They communicated these problems to Northridge, apparently to no avail. (*Id.*)

On August 22, 2011, Plaintiffs' attorneys at the time sent David Knecht and Northridge a written notice of a construction defect claim under Indiana's New Home Construction Warranty Act. (PSOF ¶ 13.) David Knecht responded, informing Plaintiffs that his insurance company would deny the claim. (*Id.*) At the time, Northridge maintained a policy of Commercial General Liability (CGL) insurance with Cincinnati Insurance Company, but not any form of "builders' risk" insurance. (*Id.*) On January 18, 2012, Plaintiffs sued Northridge in the Superior Court of Porter County, Indiana, asserting a single claim for breach of warranty in connection with Northridge's construction of the Chesterton home. (PSOF ¶ 15.) In that case, Plaintiffs presented evidence that their home had subsided because it had been built on unsuitable soils, and that the subsidence had caused numerous problems with the home, **[*9]** including the cracks in the walls and floors and inability to operate certain windows and doors. (PSOF ¶ 24.) On December 10, 2003, the Porter Superior Court entered a judgement for Plaintiffs in the amount of $800,835.00. (PSOF ¶ 25.)

Between the start and end of that litigation, on October 5, 2012, Northridge's insurer, Cincinnati Insurance Company, sued Northridge and Plaintiffs in the Circuit Court of Cook County, Illinois. (PSOF ¶ 21.) The case was removed to this District. (*Id.*) The Insurance Company sought declaratory judgment that Plaintiffs' claim against Northridge was not covered by Northridge's CGL insurance policy. (*Id.*) Judge Shadur entered an Order granting that declaratory relief. *See Cincinnati Ins. Co. v. Northridge Builders, Inc.*, No. 12 C 9102, 2015 U.S. Dist. LEXIS 132165, 2015 WL 5720256 (N.D. Ill. Sept. 30, 2015).

Northridge never paid the $800,835.00 judgment. (PSOF ¶ 47.) Dave Knecht testified that he never paid that amount because he believed that insurance—either Northridge's, the Puntillos', the project architects', or the soils engineer's—covered the judgment. (*Id.*) However, neither Northridge nor the Puntillos asserted any claims against the project architects or the soils engineer. (*Id.*)

## D. The Instant Litigation

Based on the foregoing, the Puntillos brought this suit, claiming that Defendants **[*10]** should be held liable for paying the $800,835.00 judgment against Northridge. The Puntillos pursue three separate theories of liability: (1) Count I: fraudulent transfers; (2) Count II: successor liability; and (3) Count III: piercing the corporate veil. Both sides now move for summary judgment. Plaintiffs move for summary judgment as to Counts I, II, and III, and Defendants move for partial summary judgment as to Counts I and III of the Complaint. The Puntillos also move to strike most of Defendants' statements of facts, and Defendants move to exclude the expert opinion testimony of G. Scott Solomon.

As a preliminary matter, the Court will address the Puntillos' Motions to Strike Defendants' Statements of Facts. The facts underlying summary judgment proceedings are drawn from the parties' Local Rule 56.1 submissions. This Rule assists courts "by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (internal quotation marks omitted). It is designed, in part, "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend **[*11]** the time combing the record to locate the relevant information in determining whether a trial is

necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation marks omitted).

Local Rule 56.1(a)(3) requires a movant "to submit a statement of material facts that, according to the movant, entitles that party to judgment as a matter of law." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000); Local Rule 56.1(a)(3). The statement must (1) be limited to facts and not opinions or arguments; (2) state only *material* facts; and (3) include only facts supported with a citation to admissible evidence. *Malec*, 191 F.R.D. at 583. For the most part, Plaintiffs argue that Defendants recite facts that are irrelevant and thus immaterial to the instant lawsuit. As laid out above, the Court includes and considers facts here relevant only to the issues and claims before it. As such, the Court need not give further thought to Plaintiffs' motions to strike certain of Defendants' statements of facts and thus denies those motions as moot.

Now the Court will turn to the merits of this case, considering first the admissibility of the expert opinion testimony before evaluating the Puntillos' three theories of liability.

## II. ANALYSIS

### A. Expert Opinion Testimony

Exclusion of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Rule 702 provides that a qualified witness—one with the **[*12]** appropriate knowledge, skill, experience, training, or education— may testify in the form of an opinion if "(a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. To determine whether the opinion is admissible under this Rule, the Court must consider whether (1) the witness is qualified; (2) the expert's methodology is reliable; and (3) the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

Rule 702 is "flexible." *Daubert*, 509 U.S. at 594. The Court must make sure not to abrogate the role of the jury as it examines the admissibility of the evidence. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). In particular, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In other words, "[d]eterminations **[*13]** on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Finally, the proponent of testimony bears the burden of persuading the Court that the proffered testimony should be admitted. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

G. Scott Solomon is the Puntillos' financial expert. He is a Certified Public Accountant with Charles River Associates in Chicago. (G. Scott Solomon Decl. ¶ 3, Ex. 6 to Pls.' Mot. for Summ. J., Dkt. No. 65-6.) Solomon has provided accounting, auditing, and financial and dispute-related services for 18 years. (*Id.*) He is also Certified in Financial Forensics and a Certified Fraud Examiner. Plaintiffs retained Solomon to opine on factors that a trier of fact can consider when deciding successor liability, including indicia of fraudulent transfers, and whether to pierce the corporate veil. (Solomon Decl. ¶ 1.) Solomon opined that Northridge and Dave Knecht Homes operated with similar management, ownership, financing, personnel, locations, and general business operations, and Northridge received little, if any, consideration for the transition of the foregoing from one company to the other. (Solomon **[*14]** Decl. ¶ 20.) He further opined that Northridge and Dave Knecht Homes commingled funds, and Northridge customers transitioned to Dave Knecht Homes. (*Id.*) With respect to David Knecht, Karen Knecht, the Trust, and Northridge, Solomon opined that they all commingled funds, that there were transactions between them that "are not arm's length," and that Northridge "paid distributions, personal expenses, and outstanding loans benefiting Defendants" to the detriment of the Puntillos securing their judgment. (*Id.*)

Defendants argue that Solomon's testimony should be excluded because Solomon: (1) offers contradictory statements; (2) renders opinions that do not require specialized knowledge; (3) improperly usurps the role of

the fact finder; and (4) provides testimony that is cumulative and unnecessary. The Court will consider these arguments separately.

Defendants offer numerous examples of Solomon allegedly providing contradictory statements. First, Solomon recognized that, unlike Northridge, Mario Cirignani is a fifty percent owner of Dave Knecht Homes. (*See* G. Scott Solomon Dep. 60:1-10, Ex. 1 to Defs.' Mot. to Strike Solomon Test., Dkt. No. 88-1.) Defendants assert this recognition contradicts **[*15]** Solomon's opinion that Northridge and Dave Knecht homes operated with similar ownership. Second, Solomon concluded that Cirignani's borrowing of funds from Dave Knecht's line of credit has "no apparent business purpose" and was "not an arm's length transaction." (Solomon Dep. 62:19-23.) Defendants assert this conclusion contradicts Solomon's later statement that there was nothing wrong with the transaction if Cirignani was personally obligated. (Solomon Decl. ¶ 30; Solmon Dep. 65:2-3.) Third, Solomon opined that Northridge and Dave Knecht Homes operated at similar locations, but then admitted that the two operated from different suites. (*See* Solomon Decl. ¶ 41.) Fourth, Solomon claimed that Northridge and Dave Knecht Homes improperly commingled funds since employees continued to use Northridge credit cards after their last dates of employment with Northridge, yet later admitted that it was unclear whether those charges were for Northridge or Dave Knecht Homes. (Solomon Decl. ¶ 54.)

The foregoing alleged contradictions go to the weight, not reliability, of Solomon's testimony. *See In re Fluidmaster, Inc., Water Connector Components Prods. Liabl. Litig.*, No. 14-CV-5696, 2017 U.S. Dist. LEXIS 48792, 2017 WL 1196990, at *23 (N.D. Ill. Mar. 31, 2017) (citing *Smith*, 215 F.3d at 718 (7th Cir. 2000)). For purposes of admissibility, reliability "is primarily a question of validity of the methodology **[*16]** employed by an expert, not the quality of the data used in applying the methodology or conclusion produced." *Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.* (quoting *Smith*, 215 F.3d at 718).

Moreover, the alleged contradictions are illusory. For example, there is no dispute that Dave Knecht was and is an owner of both Northridge and Dave Knecht

Homes, with a management role in both companies. That finding could have formed the basis of Solomon's opinion that Northridge and Dave Knecht Homes operated with similar ownership, regardless of Cirignani owning fifty percent of Dave Knecht Homes. Another example is Defendants' alleged contradiction about the companies occupying different suites in the same building. Neither party disputes that both Northridge and Dave Knecht Homes had their principal offices at 15 Spinning Wheel Road in Hinsdale, Illinois. The fact that their offices were in different suites does not contradict the conclusion that they were in a similar location—*i.e.*, the office building. The alleged **[*17]** contradictions fail to rise to the applicable legal standards regarding expert testimony. Accordingly, Defendants' argument fails.

Defendants' second and third arguments—that Solomon's opinions do not require specialized knowledge and that he has usurped the role of fact finder—fare no better. To admit expert testimony, the expert must use his specific, specialized knowledge of the subject matter to assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702; *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778, 732 Fed. Appx. 484 (7th Cir. 2017). As explained above, Solomon has extensive experience in financial forensics and holds various certificates to demonstrate his qualifications. In conducting his analysis, Solomon sifted through and analyzed a vast array of documents produced through discovery, including tax returns, financial statements, general ledger data, loan documentation, credit card statements, and so forth. (Solomon Decl. ¶¶ 4-5.) Solomon traced the history of the parties' dispute and the financial origins and development of both Northridge and Dave Knecht Homes to reach his conclusions. To further support his findings, Solomon provided fourteen schedules containing detailed calculations that he asserts helped him to **[*18]** reach his conclusions.

The crux of Defendants' argument is that Solomon's conclusions do not require specialized knowledge and, instead, can be derived through common sense. For example, Defendants point to the fact that Northridge and Dave Knecht Homes maintained their office in the same building. This fact led Solomon to conclude that the two entities operated with similar locations. While such a determination is commonsensical, Solomon's conclusion does more than just connect the dots. Solomon is also identifying factors for the trier of fact to consider in reaching the ultimate conclusions regarding liability. He relies on his specialized knowledge in the area to identify which transactions and facts are relevant

to consider. As such, his proffered opinions "advance[ ] the inquiry." *Thompson v. City of Chicago*, 472 F.3d 444, 453 (7th Cir. 2006). Moreover, Solomon has not usurped the role of the finder of fact. While he has identified factors to guide the jury, he has steered clear from expressing opinions on the ultimate issues of this case: a determination on the Puntillos' claims for fraudulent transfers, successor liability, and piercing the corporate veil. Accordingly, Defendants' second and third arguments miss the mark.

Finally, Defendants **[*19]** argue that Solomon's testimony is cumulative and unnecessary under Federal Rule of Evidence 403. This argument was raised in Defendants' reply brief, which failed to give the Puntillos adequate opportunity to respond. Thus, the argument is waived. *Judge v. Quinn*, 612 F.3d 537, 542 (7th Cir. 2010).

For the foregoing reasons, Defendants' motion to exclude Solomon's expert opinion testimony is denied. The Court will consider next the parties' cross-motions for summary judgment.

## B. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Liu v. T&H Mach., Inc.*, 191 F.3d 790, 794 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). When considering the Puntillos' Motion for Summary Judgment, the Court construes the facts in the light most favorable to Defendants, and when considering Defendants' Motion for Summary Judgment, the Court construes the facts in the light most favorable to the Puntillos. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

## 1. Count I: Fraudulent Transfer

The Illinois Uniform Fraudulent Transfer Act ("IUFTA") enables creditors to defeat a debtor's transfer of assets to which the creditor was **[*20]** entitled. 740 ILCS 160/5; *see Rush Univ. Med. Cntr. v. Sessions*, 2012 IL 112906, 980 N.E. 2d 45, 51, 366 Ill. Dec. 245 (Ill. 2012). The IUFTA supplements common law principles of "law

and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause[.]" 740 ILCS 160/11. Under the IUFTA, a transfer is fraudulent as to a creditor if the debtor made the transfer:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a). Illinois recognizes two categories of fraudulent transfers: "fraud in law" and "fraud in fact," with the two distinguished by "whether the transfer was supported by consideration." *Reagan v. Baird*, 140 Ill. App. 3d 58, 487 N.E. 2d 1028, 1033, 94 Ill. Dec. 151 (Ill. App. Ct. 1985). A "fraud in law" transfer is one that is made for no or inadequate consideration. *Id.* In such a case, the "fraud **[*21]** is presumed" and "intent is immaterial." *Anderson v. Ferris*, 128 Ill. App. 3d 149, 470 N.E. 2d 518, 521, 83 Ill. Dec. 392 (Ill. App. Ct. 1984) (citation omitted). Conversely, where "actual consideration has been given for the transfer and a specific intent to defraud" has been proven, such transfer constitutes "fraud in fact." *Id.*

The Puntillos claim that both types of fraudulent transfers are present in this case. They assert that Defendants fraudulently transferred from Northridge to Dave Knecht Homes the "goodwill, business methods and know-how, business contacts, intellectual property, and the custom home-building business itself (with associated corporate opportunities)." (Pls.' Mot. for Summ. J. at 11, Dkt. No. 67.) Moreover, the Puntillos contend no consideration was paid for this transfer. Defendants respond by arguing that they cannot mount a proper defense since they are unsure of what the Puntillos are claiming constitute fraudulent transfers. They point out that, aside from cash, Northridge did not have substantial assets such as equipment, inventory, intellectual property, and commercial paper that could have been transferred. As for any distributions that

Dave Knecht Homes received, Defendants contend that it gave adequate consideration. For example, with David Knecht **[*22]** specifically, Defendants argue David contributed capital towards Northridge, and Northridge received new clients as the source of its new business. However, Defendants point out that David Knecht had an at-will employment relationship with Northridge. Given that relationship, Defendants argue that David's "goodwill and ability to generate business is uniquely his and based on his personal reputation" and thus could not have been transferred. (Defs.' Mot. for Summ. J. at 15, Dkt. No. 69.) As such, no consideration was required.

The Court finds Defendants' first point persuasive. It is unclear what exactly the Puntillos are claiming as fraudulent transfers. Instead, the Puntillos vaguely and generally assert that most everything related to Northridge had been transferred to Dave Knecht Homes, and that those transfers were likely fraudulent due to the judgment Northridge owed to the Puntillos. In other words, the Puntillos have merely restated the applicable rules as conclusions specific to the facts of this case. That does not suffice. *See United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011) ("Undeveloped and unsupported arguments may be deemed waived."). This Court is not obliged to research and construct legal arguments for the parties, **[*23]** especially when they are represented by counsel. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

The Puntillos also briefly mention "the many transfers to the Knechts through the direct payment of personal expenses." (Pls.' Reply to Pls.' Mot. for Summ. J. at 5, Dkt. No. 84.) This point, however, was raised in Plaintiffs' reply brief. Since Defendants did not have an adequate opportunity to respond, the argument is waived. *Judge*, 612 F.3d at 542. It bears mentioning though that the specification is still undeveloped since the Puntillos do not do much by way of elaborating on its significance or relevance to the applicable standards. Summary judgment is the "put up or shut up moment" in litigation. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Plaintiffs have neither put up enough evidence nor raised adequate arguments to establish that a reasonable jury could find that fraud in fact or fraud in law occurred. Defendants are thus entitled to judgment as a matter of law on Count I.

**2. Count II: Successor Liability**

Generally, a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation. *Nilsson v. Cont'l Mach. Mfg. Co.*, 251 Ill. App. 3d 415, 621 N.E.2d 1032, 1034, 190 Ill. Dec. 579 (Ill. App. Ct. 1993). There are, however, four exceptions to this general rule of successor corporate nonliability: (1) where an express or implied **[*24]** agreement of assumption exists; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. *Vernon v. Schuster*, 179 Ill. 2d 338, 688 N.E. 2d 1172, 1176-77, 228 Ill. Dec. 195 (Ill. 1997). Relying on the latter two exceptions, the Puntillos argue that Dave Knecht Homes is a "mere continuation" of Northridge, and that Dave Knecht Homes was created for the "fraudulent purpose" of escaping liability for Northridge's obligations. The Court finds that the continuation exception is dispositive of the instant matter, so it need not consider the fraudulent purpose exception.

The continuation exception applies when the purchasing corporation is "merely a continuation or reincarnation of the selling corporation." *Vernon*, 688 N.E. 2d at 1176 (citation omitted). In other words, the purchasing corporation "maintains the same or similar management and ownership, but merely wears different clothes." *Id.* (internal quotation marks and citation omitted). The Illinois Supreme Court made clear that "[t]he [continuation] exception is designed to prevent a situation whereby the specific purpose of acquiring assets **[*25]** is to place those assets out of the reach of the predecessor's creditors." *Id.* (citation omitted). To determine whether one corporate entity is a continuation of another, courts consider "whether there is a continuation of the corporate *entity of the seller*—not whether there is a continuation of the *seller's business operation*." *Id.* (emphasis in original). A common identity of officers, directors, ownership, and stocks between the selling and purchasing corporation is a key element of what constitutes a continuation. *Id.*; *see also Dearborn Maple Venture, LLC v. SCI Ill. Servs., Inc.*, 2012 IL App (1st) 103513, 968 N.E. 2d 1222, 1234, 360 Ill. Dec. 469 (Ill. App. Ct. 2012), *as modified on denial of reh'g* (May 29, 2012).

Here, there is no doubt that the two home development companies share many similarities. The main question is, however, whether those similarities constitute a "continuation" for purposes of liability. Defendants predominately rely on *Vernon v. Schuster*, 179 Ill. 2d

338, 688 N.E. 2d 1172, 228 Ill. Dec. 195 (Ill. 1997), to argue that such liability is unwarranted. In *Vernon*, the owner of a sole proprietorship, Diversey Heating, passed away and his son continued the business. *Vernon*, 688 N.E. 2d at 1174. The plaintiffs in that case subsequently sued the son for a debt owned by Diversey Heating. *Id.* However, the court found against imposing liability because, despite finding that the nature of the business remained the **[*26]** same, the ownership of the business changed when the father passed away. *Id.* at 1177.

Defendants' reliance on *Vernon* is misplaced. In *Vernon*, there was no allegation of fraud, no transfer of assets from one company to another, and no evidence that any such transfer in ownership was intended to avoid a judgment of liability. Moreover, the facts in *Vernon* are distinguishable. The court in *Vernon* did not consider the identity of officers, directors, or stockholders, which is relevant and even crucial in determining continuity in the instant matter. Thus *Vernon* is not particularly useful for considering the instant matter.

Here, David Knecht exercised ownership over both Dave Knecht Homes and Northridge at one point as a shareholder. David Knecht later turned over his shares in Northridge to the Karen M. Knecht Trust, the beneficiaries of which were both he and his wife, Karen. Defendants argue that Karen Knecht, not David Knecht, exercised managerial authority over Northridge, since the Trust instrument provided as much. But the fact that Karen Knecht is the trustee of the Trust does not render the continuation exception fatal. *See Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill. App. 3d 241, 662 N.E. 2d 595, 600, 214 Ill. Dec. 1029 (Ill. App. Ct. 1996) (finding continuity of shareholders where wife of shareholder of **[*27]** predecessor corporation gratuitously received 80% of shares and husband acted as chief executive officer in successor corporation). The Court "cannot allow the law to be circumvented by an individual exerting control through his spouse. A creditor's rights cannot be cut off by a corporation which merely puts on a new coat." *Id.* While David Knecht assigned his shares to the Trust, he continued to serve as Northridge's President and maintained an executive position.

Soon after the Puntillos filed suit against Northridge in 2011, Defendants organized Dave Knecht Homes, LLC in Illinois. In that alleged successor company, Dave Knecht owns 50% of the shares, while Mario Cirignani owns the other half. Defendants point to the fact that Cirignani was not involved in the ownership or

management of Northridge as demonstrative of a lack of continuity between Northridge and Dave Knecht Homes. Nevertheless, "the continuity of shareholders necessary to a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporation." *Workforce Solutions v. Urban Servs. of America, Inc.*, 2012 IL App (1st) 111410, 977 N.E. 2d 267, 285, 364 Ill. Dec. 778 (Ill. App. Ct. 2012) (citation omitted); *Park v. Townson & Alexander, Inc.*, 287 Ill. App. 3d 772, 679 N.E. 2d 107, 110, 223 Ill. Dec. 163 (Ill. App. Ct. 1997). Moreover, "[a] change of shareholders is consistent with mere continuation as long as the former **[*28]** owners retain a controlling interest in the successor entity." *Pielet v. Pielet*, 407 Ill. App. 3d 474, 942 N.E.2d 606, 638, 347 Ill. Dec. 403 (Ill. App. Ct. 2010), *aff'd in part, rev'd in part on other grounds*, 2012 IL 112064, 978 N.E. 2d 1000, 365 Ill. Dec. 497 (Ill. 2012). Thus, Cirignani's involvement in ownership and management is beside the point. There is no doubt that David Knecht retains a considerable, even controlling, interest in Dave Knecht Homes, LLC. As such, the identity of ownership and management between Northridge and Dave Knecht Homes is sufficiently similar and weighs heavily in Plaintiffs' favor for finding a continuation.

And there are more similarities between the two housing development companies that are important to note. Both companies are general contractors that derive revenue from building and renovating luxury homes. Dave Knecht Homes hired the project managers and other persons formerly employed by Northridge. It also contracted with the same suppliers, material-men, and subcontractors as Northridge for its construction projects. Dave Knecht Homes is headquartered in the same building where Northridge was headquartered. The successor company even utilizes the same credit facility as Northridge, controlled by David Knecht, to finance its operations. Based on the foregoing, it is evident that Dave Knecht Homes **[*29]** is a continuation or reincarnation of Northridge. *See Dearborn Maple Venture, LLC*, 968 N.E. 2d at 1234 (finding successor liability where company shared common ownership and purpose of developing real property with predecessor company); *Kennedy v. Four Boys Labor Servs.*, 279 Ill. App. 3d 361, 664 N.E.2d 1088, 1094, 216 Ill. Dec. 160 (Ill. App. Ct. 1996). Accordingly, the Puntillos are entitled to judgment as a matter of law on Count II.

### 3. Count III: Piercing the Corporate Veil

The Puntillos also claim that Northridge served as an "alter ego" for the Knechts, and as such, the Court should pierce the corporate veil of Northridge and impose individual liability against the Knechts.

Under Illinois law, "a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 840 N.E. 2d 767, 775, 298 Ill. Dec. 654 (Ill. App. Ct. 2005). This doctrine imposes liability on the individual or entity that "uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Id.* at 775-76 (citation omitted). Liability arises from "fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation." *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 778 N.E. 2d 291, 295, 268 Ill. Dec. 305 (Ill. App. Ct. 2002).

In Illinois, courts use a two-prong test to determine whether to pierce the corporate veil: "(1) there must be such unity of interest and ownership that the separate [*30] personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Fontana*, 840 N.E. 2d at 776. The party seeking to pierce the corporate veil has the burden of making a "substantial showing that one corporation is clearly dummy or sham for another." *In re Estate of Wallen*, 262 Ill. App. 3d 61, 633 N.E. 2d 1350, 1357, 199 Ill. Dec. 359 (Ill. App. Ct. 1994).

Defendants first argue that this case is a breach of contract case, and as such, the Puntillos have a greater burden to establish liability. Courts apply a more stringent standard in contract cases to determine when to pierce the corporate veil. *Salatech, LLC v. East Balt. Inc.*, 2014 IL App (1st) 132639, 386 Ill. Dec. 420, 20 N.E.3d 796, 806 (Ill. App. Ct. 2014). This is because "a party seeking relief for a breach of contract presumably entered into the contract with the corporate entity voluntarily and knowingly and expecting to suffer the consequences of the limited liability status of the corporate form." *Id.* Where there is "no evidence of any misrepresentation, no attempt to conceal any facts, and the parties possess a total understanding of all of the transactions involved, Illinois courts will not pierce the corporate veil in a breach of contract situation." *Tower Inv'rs, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 864 N.E. 2d 927, 942, 309 Ill. Dec.

686 (Ill. App. Ct. 2007). However, Defendants are misguided. [*31] This is not a breach of contract case. It is about the alleged fraudulent transfer of assets from one company to another in an attempt to immunize the original company from an adverse judgment.

As Plaintiffs correctly identify, *A.L. Dougherty Real Estate Management Co., LLC v. Su Chin Tsai*, 2017 IL App (1st) 161949, 420 Ill. Dec. 887, 98 N.E. 3d 504 (Ill. App. Ct. 2017), *appeal denied*, 420 Ill. Dec. 34, 95 N.E.3d 497 (Ill. 2018), is instructive here. In that case, the plaintiff, a commercial landlord, obtained a default judgment for breach of a lease it had with a corporation called March Fasteners, Inc. ("March"), owned by the defendant Su Chin Tsai. *Id.* at 508. During the pendency of the litigation for that judgment, Su Chin Tsai transferred March's asset to another defendant corporation he organized, called Cube Global, LLC ("Cube"). *Id.* at 509. The plaintiff then sued Su Chin Tsai and Cube, alleging both alter ego and fraudulent transfer claims. *Id.* At trial, the plaintiff's forensic account established that Su Chin Tsai transferred all of March's assets, including inventory, accounts receivable, employees, contracts, vendor relationships and business good will to Cube without consideration. *Id.* at 511. Su Chin Tsai had also taken substantial distributions directly from both of the corporations. *Id.* The court ultimately concluded that Cube was the alter ego and mere instrumentality of the first [*32] corporation, March, and was thus liable, along with Su Chin Tsai, for the judgment against March. *Id.* at 517. That ruling was affirmed by the Illinois Appellate Court, which rejected the same breach of contract argument Defendants now raise. *Id.*

As was the case in *A.L. Dougherty*, the activities at issue here are the Knechts' alleged attempts to transfer assets to avoid a judgment. Plaintiffs point to extensive financial documents and forensic analysis that the Knechts exercised control over Northridge and treated the company's assets as their own, causing Northridge to pay significant sums of money for their own personal expenses. These expenses included federal and state income tax payments; landscaping for their personal residences; personal life insurance premiums; attorney's fees; and a $167,274 payment to a title company to refinance the Knechts' personal residence in Hinsdale. (PSOF ¶¶ 11, 17, 20.) Moreover, the Knechts had Northridge pay their personal expenses using David Knecht's credit line. Northridge also borrowed hundreds of thousands of dollars from this credit line, all of which was tracked in a handwritten ledger. Northridge eventually repaid the balance owed on the credit

line, **[*33]** but this repayment left Northridge with diminished assets, valuing far less than what was owed to the Puntillos for their judgment. By causing Northridge to pay their significant personal expenses, the Knechts treated Northridge's assets as their own, to the detriment of the Puntillos. Therefore, as was the case in *A.L. Dougherty*, piercing the corporate veil of Dave Knecht Homes is appropriate. Plaintiffs are entitled to judgment as a matter of law as to Count III.

## III. CONCLUSION

For the reasons stated herein, Plaintiffs' Motions to Strike (Dkt. Nos. 75, 92) are denied. Defendants' Motion to Exclude Expert Testimony (Dkt. No. 88) is denied. Plaintiffs' Motion for Summary Judgment (Dkt. No. 65) is granted as to Counts II and III and denied as to Count I, and Defendants' Motion for Summary Judgment (Dkt. No. 69) is granted as to Count I and denied as to Counts II and III.

Plaintiffs have two weeks to set forth their claim for damages; Defendants then have two weeks to file their objections. The Court will rule on the damages issue by mail.

/s/ Harry D. Leinenweber, Judge

Harry D. Leinenweber, Judge

United States District Court

Dated: 5/23/201

# Sanchez v. Global Parking Mgmt.

United States District Court for the Northern District of Illinois, Eastern Division

July 20, 2015, Decided; July 20, 2015, Filed

No. 14-cv-04611

**Reporter**
2015 U.S. Dist. LEXIS 93782 *; 2015 WL 4429024

ALFREDO SANCHEZ and MIGUEL ARRIAGA, on behalf of themselves and other persons similarly situated, Plaintiffs, v. GLOBAL PARKING MANAGEMENT, INC., CAR PARKING SOLUTIONS, LLC, MICHAEL S. DENIGRIS, JOSEPH GRILLO, ROSEANNE PARONE-DENIGRIS, and CASIMIR A. RINCON, individually, Defendants.

**Counsel:** **[*1]** For Alfredo Sanchez, Miguel Arriaga, Plaintiffs: Alvar Ayala, Christopher J. Williams, Workers' Law Office, P.C., Chicago, IL; Ryan Matthew Thoma, Sara Stewart Schumann, Karen I. Engelhardt, Allison, Slutsky & Kennedy, P.C., Chicago, IL.

For Global Parking Management, Inc., Michael S Denigris, Joseph Grillo, Roseanne Parone-Denigris, Car Parking Solutions LLC, Defendants: Elizabeth A. Boratto, Jennifer Ann Kunze, The Miller Law Group, LLC, Hinsdale, IL.

**Judges:** Andrea R. Wood, United States District Judge.

**Opinion by:** Andrea R. Wood

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiffs Alfredo Sanchez and Miguel Arriaga have brought this putative class action against Defendants Global Parking Management, Inc. ("Global"), Car Parking Solutions, LLC ("Car Parking"), Michael S. DeNigris, Joseph Grillo, Roseanne Parone-DeNigris, and Casimir Rincon, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, as well as retaliation in violation of all of those statutes. Before the Court is Car Parking's motion to dismiss the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion") (Dkt. No. 60). For the reasons stated **[*2]** below, the Court finds that Plaintiffs have sufficiently stated claims against Car Parking and therefore denies the Motion.

## BACKGROUND

Except when otherwise noted, the following facts are taken from the Second Amended Complaint ("SAC") and accepted as true for the purposes of deciding the Motion.[1]

Global provides its clients with attendants to monitor parking lots and take action against drivers who park on the lots even though they are not customers of the related businesses. (Compl. ¶ 15, Dkt. No. 47.) Global is jointly owned and operated by DeNigris, Grillo, and Parone-DeNigris. (*Id.* ¶ 16.) Plaintiffs are both former Global employees who were hired by the company in 2011. (*Id.* ¶ 17.) They claim that in the past three years they were "regularly and customarily" required to work in excess of 40 hours per week but were not compensated at 1.5 times their regular rate of pay for their overtime work; instead, they were compensated for overtime work at their normal rate plus $1. (*Id.* ¶¶ 18-20, 22-23.) Plaintiffs **[*3]** also allege that Global made unlawful

---

[1] For the purposes of deciding a Rule 12(b)(6) motion, a district court must accept the allegations of the complaint as true and draw all permissible inferences in the plaintiff's favor. *See, e.g., Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

2015 U.S. Dist. LEXIS 93782, *3

deductions from their wages. (*Id.* ¶¶ 26-33.) For example, Plaintiffs would be assessed a fine if they did not arrive 15 minutes early for their shifts. (*Id.* ¶ 26.) They were also subject to discipline and monetary fines for more than 40 separate infractions, such as failing to tuck in their shirts, leaving equipment at home or at the office, and failing to call the office when arriving at a job location. (*Id.* ¶ 27.)

The initial complaint in this lawsuit named only Global, DeNigris, Grillo, and Parone-DeNigris as defendants. Plaintiffs filed the case on June 18, 2014 and were terminated shortly thereafter. (*Id.* ¶ 17) They subsequently amended their complaint on July 25, 2014 to add a claim for retaliation. Plaintiffs and the originally-named defendants discussed settlement in November 2014, but no agreement was reached. (*Id.* ¶ 34.) The next month, Car Parking was registered with the Illinois Secretary of State as a limited liability corporation. (*Id.*) Rincon, who had been an office manager and parking lot attendant for Global, became the registered agent and managing member of Car Parking. (*Id.* ¶¶ 35-36.)

Car Parking took over Global's business, including **[*4]** using the same signs (with the new company name covering up the old), employing the same individuals, and utilizing the same equipment, labor management, and office staff. (*Id.* ¶¶ 37-39, 44.) As alleged by Plaintiffs, Global and Car Parking "are a single employer and/or Car Parking is Global's alter-ego" and Car Parking is Global's "successor." (*Id.* ¶¶ 40, 44.) Plaintiffs further claim that Global is "no longer operating or is in the process of ceasing its business" and that Car Parking currently provides services at commercial parking lots where Global had an established relationship. (*Id.* ¶ 43.)

On January 21, 2015, Plaintiffs were granted leave to amend their complaint a second time to add Car Parking and Rincon as defendants. The SAC includes five counts: claims for violation of the FLSA and the IMWL for failure to pay overtime wages, a claim for violation of the IWPCA based on the allegedly unlawful deductions, a claim under the IWPCA for failure to pay earned wages, bonuses, and commissions, and a claim under all of the aforementioned statutes alleging that Plaintiffs were retaliated against for filing this lawsuit.[2] Global, DeNigris, Grillo, and Parone-DeNigris answered the SAC. **[*5]** Car Parking, however, has moved to dismiss the claims against it. The Motion challenges only

whether Car Parking is properly named as a defendant in this matter as a purported alter ego or successor of Global or because it is a single employer with Global.

## DISCUSSION

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). While a complaint need not include detailed factual allegations, there "must be enough to raise a right to relief above the speculative level." *Id.* at 555. A plaintiff must "'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* In addition, "although the complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *Id.*

Here, Car Parking argues that it is not properly named as a defendant in this **[*6]** matter because it cannot be held liable for the acts of which Plaintiffs complain. Specifically, it contends that the factual allegations in the SAC do not show that Car Parking is an alter-ego or successor corporation of Global; nor do they show that Car Parking and Global constitute a single employer.[3] Instead, according to Car Parking, Plaintiffs misconstrue and misrepresent the facts regarding its creation in order "to impose liability on an innocent and separate

---

[2] All but the retaliation claim in Count V are putative class claims.

---

[3] Car Parking attacked Plaintiffs' alter-ego theory of liability in its opening brief without mentioning the two other theories of liability asserted against it—namely, that Car Parking is a successor corporation of Global and that Car Parking and Global constitute a single employer. After Plaintiffs raised Car Parking's failure to challenge the successor and single employer theories in their response, Car Parking argued for the first time in its reply that Plaintiffs also has failed to state claims under those theories as well. By waiting until its reply to challenge successor and single employer liability, Car Parking has waived those arguments. *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012). Nonetheless, the Court will **[*7]** proceed to consider the merits of the motion to dismiss the successor and single employer claims because it is clear that Plaintiffs have successfully pleaded those claims.

company." (Car Parking Reply at 1, Dkt. No. 66.)

In support of the Motion, Car Parking has submitted an affidavit from Rincon. (Car Parking Mot., Ex. A, Dkt. No. 60-1.) The purpose of the affidavit is to dispute the factual allegations of the SAC. "Rule 12(b) requires that if the district court wishes to consider material outside the pleadings in ruling on a motion to dismiss, it must treat the motion as one for summary judgment and provide each party notice and an opportunity to submit affidavits or other additional forms of proof." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 479 (7th Cir. 2002). In its reply brief, Car Parking requests that the Court consider Rincon's affidavit and treat its Motion as one for summary judgment. The Court declines to do so.

Converting the Motion from a Rule 12(b)(6) motion to dismiss to a Rule 56 motion for summary judgment makes little sense under the circumstances and would prejudice Plaintiffs, who have not yet had the opportunity to depose Rincon or otherwise to develop the factual record necessary to challenge the assertions in his affidavit. At this point, there is no reason for the Court to believe that it has all **[*8]** of the probative evidence regarding Car Parking's liability before it. *Cf. Santana v. Cook Cnty. Bd. of Review*, 679 F.3d 614, 619-20 (7th Cir. 2012) (finding that it would not be error for the district court to convert the defendants' motion to one seeking partial summary judgment under Rule 56 where the parties had ample notice and time to respond, and "the district court considered everything that the parties claimed to be probative of the scope of the ban"). This is particularly true given that the material Car Parking asks this Court to consider consists of an affidavit from its own managing member who is also named individually as a defendant in this case. Car Parking's request that the Court accept Rincon's untested affidavit testimony turns the Rule 12(b)(6) standard on its head; rather than accepting Plaintiffs' allegations as true, Car Parking asks this Court to accept Car Parking's own version of the facts as true. Thus, the Court excludes Rincon's affidavit and will not consider it in deciding the Motion.

Plaintiffs assert three theories of liability against Car Parking: alter-ego, successor, and single employer. First, under Illinois law, "a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter **[*9]** ego or business conduit of another person or entity." *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 778 N.E.2d 291, 294-95, 268 Ill. Dec. 305 (Ill. App. Ct. 2002) (internal

citations omitted). Such alter ego liability requires that two criteria be satisfied: "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751-52 (7th Cir. 2012) (internal quotation marks omitted). Similarly, "[s]ingle employer status exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.' Factors which establish a formal relationship between the two employers, such as common ownership or common management, are relevant to determine whether two seemingly independent businesses are really one enterprise." *N.L.R.B. v. W. Temp. Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir. 1987) (internal citations and quotation omitted). Finally, successor entities can be held liable for the actions of their predecessors in certain situations, including "where (1) there is an express or implied assumption of liability; (2) the transaction amounts to a consolidation, merger, or similar restructuring **[*10]** of the two corporations; (3) the purchasing corporation is a mere continuation of the seller; and (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325-26 (7th Cir. 1990) (internal quotation omitted).

In the SAC, Plaintiffs have alleged facts sufficient to support all three theories of liability against Car Parking. For example, the SAC alleges that: Rincon, managing member of Car Parking, was also a managerial employee of Global; employees who formerly worked for Global continued to work in identical positions for Car Parking after Car Parking was formed; and Car Parking performs the same work as Global and effectively took over Global's business when it was formed in December 2014. (Compl. ¶¶ 11, 12, 38, 39, Dkt. No. 47.) Plaintiffs clearly intend to suggest that Global and the individual defendants formed Car Parking after the unsuccessful settlement discussions in November 2014 in an attempt to protect their assets in case they are found liable for Plaintiffs claims. Considering only the pleadings, in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently pleaded claims against Car Parking under **[*11]** each of the three theories they assert.

For these reasons, Plaintiffs have sufficiently stated

Case: 1:17-cv-03591 Document #: 186-2 Filed: 01/14/20 Page 52 of 74 PageID #:3473

Page 4 of 4

2015 U.S. Dist. LEXIS 93782, *11

claims against Car Parking and therefore the Motion is denied.

**CONCLUSION**

For the foregoing reasons, Car Parking's motion to dismiss the Second Amended Complaint (Dkt. No. 60) is denied.

Dated: July 20, 2015

/s/ Andrea R. Wood

Andrea R. Wood

United States District Judge

---

End of Document

# Blankenship v. Pushpin Holdings

United States District Court for the Northern District of Illinois, Eastern Division

October 6, 2015, Decided; October 6, 2015, Filed

No. 14 C 6636

**Reporter**
2015 U.S. Dist. LEXIS 135944 *; 2015 WL 5895416

RONALD W. BLANKENSHIP, and GARY BRASSFIELD, on behalf of themselves and all others similarly situated, Plaintiffs, v. PUSHPIN HOLDINGS, LLC, LEASE FINANCE GROUP LLC, and JAY COHEN, Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Without prejudice Blankenship v. Pushpin Holdings, LLC, 2016 U.S. Dist. LEXIS 5688 (N.D. Ill., Jan. 19, 2016)

**Counsel:** **[*1]** For Ronald W Blankenship, Gary Brassfield, on behalf of themselves and all others similarly situated, Plaintiffs: Howard Brian Prossnitz, LEAD ATTORNEY, Law Offices of Howard Prossnitz, Chicago, IL.

For Pushpin Holdings LLC, Lease Finance Group LLC, Jay Cohen, Defendants: Jason Brett Hirsh, LEAD ATTORNEY, PRO HAC VICE, Levenfeld Pearlstein, LLC, Chicago, IL; John V Baranello, Scott E Silberfein, PRO HAC VICE, Moses & Singer LLP, New York, NY.

**Judges:** AMY J. ST. EVE, United States District Judge.

**Opinion by:** AMY J. ST. EVE

# Opinion

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendants Pushpin Holdings, LLC's ("Pushpin's"), Lease Finance Group LLC's ("Lease Finance's"), and Jay Cohen's ("Cohen's") (collectively, "Defendants'") Motion to Dismiss Plaintiffs' First Amended Class Action Complaint or in the Alternative, to Strike Scandalous and Class Allegations Therefrom. (R.53.)

On July 28, 2014, Plaintiffs Ronald W. Blankenship ("Blankenship") and Gary Brassfield ("Brassfield"), filed this action, individually and on behalf of a putative class of similarly situated plaintiffs, in the Circuit Court of Cook County, Illinois, against Defendants. (*See* R.1, Notice of Removal, ¶ 1.) Plaintiffs **[*2]** allege that Defendants filed suits against them and obtained *ex parte* judgments—against Blankenship for $2,497.65 plus costs and against Brassfield for $2,753.00 plus costs. (R.45, Am. Compl., ¶¶ 3, 32, 41.) According to the Cook County Small Claims Court complaint, Pushpin originally acquired the claims against Plaintiffs based on "a commercial equipment finance lease agreement and accompanying Personal Guaranty Agreement" between Plaintiff Blankenship and Pushpin and between Plaintiff Brassfield and Lease Finance Group. (R.45-4, at 12, *Pushpin Holdings LLC v. Blankenship*, Case No 13-M1-155481, Circuit Court of Cook County, Illinois, Verified Complt., ¶ 4, attached as Ex. 4 to Am. Compl; R.45-5, at 4, *Lease Finance Grp. v. Brassfield*, Case No. 13-M1-152732, Circuit Court of Cook County, Illinois, Verified Complt., ¶ 5, attached as Ex. 5 to Am. Compl.) Defendants removed the case pursuant to 28 U.S.C. §§ 1446 and 1453, premising federal jurisdiction on the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Plaintiffs have since filed their First Amended Class Action Complaint ("Amended Complaint") alleging a claim for violation of the Illinois Consumer Fraud and Deceptive Practice Act ("ICFA"), 815 ILCS 505/1 *et seq.* (R.45, ¶¶ 58-66 **[*3]** (Count I)) and a breach of contract claim (*id.*, ¶¶ 67-68 (Count II)). Defendants' motion seeks dismissal of both counts. For

2015 U.S. Dist. LEXIS 135944, *3

the reasons set forth below, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND

Viewing the allegations in the light most favorable to Plaintiffs, Plaintiffs allege the following:

### I. The Parties

Plaintiff Blankenship operates a shoe repair business doing business as "Grand Shoe Repair" in Bessemer, Alabama. (*See* R.45, ¶ 9.) Plaintiff Brassfield operates an oil lube shop in Greenwood, Arkansas. (*See id.*, ¶ 10.) Defendant Pushpin is a limited liability company with three (3) members—themselves limited liability companies with individuals as sole members. (*See* R.1, ¶¶ 4-7; R.45, ¶ 11; R.54, Baranello Decl., ¶ 3; R.54-2, Ex. B., at 2 (Pushpin Holdings LLC Details from Delaware Department of State website).) Defendant Lease Finance Group is a limited liability company with a single listed member—Defendant Cohen.[1] (R.45, ¶ 13; *see also* R.54, Baranello Decl., ¶ 2; R.54-2, at 3 (Lease Finance Group LLC Details from Delaware Department of State website).) Defendant Cohen is a citizen of New York who, according to Plaintiffs, owns and operates numerous [*4] shell entities that sell equipment leases, buy debts, and collect debts acquired through purchase of leases. (R.1, ¶ 9; R.45, ¶ 14.) Defendant Cohen's alleged shell entities include Defendants Pushpin and Lease Finance. (R.45, ¶ 14.) Plaintiffs further allege that Defendant Cohen is also the managing member of and controls the operations for GCN Holdings, LLC—a corporation that acquires debts and subsequently assigns them to Defendant Pushpin. (*Id.*, ¶ 15.) As "President" of Pushpin and managing member of GCN Holdings, LLC, Defendant Cohen is on both sides of the alleged assignment. (*Id.*) Plaintiffs allege that Defendant Cohen controls each of Defendants Pushpin and Lease Finance, as well as GCN Holdings, LLC and assigns and transfers claims by and between them "as he sees fit." (*Id.*)

---

[1] In their Notice of Removal, Defendants assert that Lease Finance is a limited liability company whose sole member is another limited liability company, LF Platform, LLC. (*See* R.1, ¶ 8.) Although contradictory to Plaintiffs' allegations, for the purposes of the present motion and the Court's requirement to take facts in the light most favorable to Plaintiffs, the Court relies on the allegations in Plaintiffs' [*5] Amended Complaint.

### II. Plaintiff Blankenship - Lease Agreement & Assignment

Blankenship is a 71-year old sole proprietor operating a shoe repair store in Bessemer, Alabama under the name "Grand Shoe Repair." (R.45, ¶ 17.) Blankenship has been in the shoe repair business for 45 years. (*Id.*, ¶ 18.) In 2002—when Blankenship's shoe repair store was located at 102 W. 3rd Street in Sheffield, Alabama—a representative of Retriever Payment Systems marketed a credit card swiping machine to Blankenship's assistant and then left a machine at the store a few days later. (*Id.*, ¶ 19.) Blankenship was not present at his store on the day Retriever Payment Systems marketed the machine to his assistant. (*Id.*) Blankenship's machine never worked properly—credit cards did not swipe correctly and it may not have processed some transactions. (*Id.*, ¶ 27.) In addition, the lessor did not directly deposit payments from credit card customers into Blankenship's bank account within 48 hours. (*Id.*, ¶¶ 29, 30.) Blankenship's numerous calls complaining that the machine did not work were never addressed and the machine was never fixed. (*Id.*) Although the machine did not work properly, a monthly base payment of $39.95 [*6] was deducted from Blankenship's bank account for a period of months. (*Id.*, ¶ 28.) After seven or eight months, he turned in the machine. (*Id.* ¶ 27.) Lease Finance took a deduction of $500 out of his bank account after Blankenship turned in the machine. (*Id.*, ¶ 31.)

A Non-Cancellable Lease, dated November 25, 2002, bears a signature for "Ronald Blankenship" as Lessee and "Lease Finance Group, a Division of CIT Financial USA, Inc." as Lessor. (R.45, ¶ 20; *id.*, ¶ 32 (citing R.45-4, Non-Cancellable Lease, attached to the Am. Compl. as Ex. 4, at 8 ("Blankenship Lease")).) Blankenship alleges his signature on the Blankenship Lease is forged. (R.45, ¶¶ 20-24.) The Blankenship Lease lists "Retriever Payment Systems" as the "Rep Code" and indicates the equipment as a "Hypercom", Model/License Agreement "T7P". (R.45-4, at 8; R.45, ¶ 24.) The schedule of payments is listed as $39.95 per month for a term of 48 months, and there is a provision authorizing automatic withdrawal of payments from an account at Compass Bank. (R.45-4, at 8.) The Blankenship Lease contains various provisions, including a Personal Guaranty "[t]o induce Lessor to enter into this Lease" which also bears a signature for "Ronald [*7] Blankenship" as Guarantor and states that "the undersigned unconditionally guarantees to Lessor the prompt payment when due of all of Lessee's

2015 U.S. Dist. LEXIS 135944, *7

obligations to Lessor under [] Lease ..." (*Id.*) Relevant to the dispute here, the Blankenship Lease also has a "Choice of Law; Arbitration" provision which states:

> CHOICE OF LAW; ARBITRATION: Any claim or controversy, including any contract or tort claim, between or among us, you or any Guarantor related to this Lease, shall be determined by binding arbitration in accordance with Title 9 of the U.S. Code and the Commercial Arbitration rules of the American Arbitration Association.

(R.45, ¶ 23; R45-4, at 9.)

Defendant Pushpin filed a claim against Plaintiff Blankenship in Cook County Small Claims Court on October 8, 2013 and obtained an *ex parte* judgment for $2,497.65 plus costs on January 6, 2014. (R.45, ¶ 32; R.45-4, at 2; *id.*, at 4-12, *Pushpin Holdings LLC v. Blankenship*, Case No 13-M1-155481, Circuit Court of Cook County, Illinois, Verified Complt., ¶ 4.) Along with the Blankenship Lease, Defendant Pushpin attached two assignment agreements to its complaint in the Small Claims Court related to assignment. First, Pushpin attached an "Instrument of Assignment", [*8] dated November 30, 2005, that lists CIT Financial USA, Inc., a Delaware Corporation as "Seller" and GCN Holding LLC, a Delaware limited liability company as "Buyer" and indicates "Seller does hereby sell, assign, transfer, convey and deliver unto Buyer, its successors and assigns each and all of the US Purchased Assets (as such term is defined in the Agreement) ...". (R.45-4, at 12 ("Instrument of Assignment").) The Instrument of Assignment does not contain an explicit reference to the Blankenship Lease. (*Id.*) Second, Pushpin attached an "Assignment and Assumption Agreement", dated March 1, 2010, that lists GCN HOLDING LLC, a Delaware limited liability company, and GCN HOLDING (CANADA) ULC, a Canadian unlimited liability company" as "Seller" and "PUSHPIN HOLDINGS LLC, a Delaware limited liability company" as "Buyer" and indicates "Seller ... does hereby transfer and assign to Buyer, its successors and assignees, all of the Receivables as of the Closing Date". (R.45-4, at 10-11 ("Assignment and Assumption Agreement").) Defendant Cohen, as President of Pushpin Holdings, LLC, signed the Assignment and Assumption Agreement. (*Id.*) The Assignment and Assumption Agreement does not contain [*9] an explicit reference to the Blankenship Lease. (*Id.*)

**III. Plaintiff Brassfield - Lease Agreement & Bill of Sale**

Plaintiff Brassfield operates an auto lube shop in Arkansas. (R.45, ¶¶ 1, 35.) Brassfield also received a credit card swiping machine from Lease Finance that broke down and after unsuccessful efforts to have Lease Finance fix the machine, he tendered the machine to Lease Finance—which never came to retrieve it. (*Id.*, ¶¶ 35, 38, 39.)[2] Lease Finance took payments for the defective machine from Brassfield's bank account. (*Id.*, ¶ 44.)

A Non-Cancellable Lease, dated March 15, 2010, bears a purported signature for "Gary Brassfield" as Lessee and "RPSI, Inc. d/b/a Retriever [*10] Payment Systems" as Lessor. (R.45-5, Non-Cancellable Lease, attached to the Am. Compl. as Ex. 5, at 8 ("Brassfield Lease")).) Like Blankenship, Brassfield alleges that his signature on the Brassfield Lease is forged. (R.45, ¶¶ 36, 41.) The Brassfield Lease indicates the equipment manufacturer as "Omni 3730". (R.45-5, at 8.) The schedule of payments is listed as $89.00 per month for a term of 48 months, and a provision authorizes automatic withdrawal of payments from a bank account. (*Id.*) Like the Blankenship Lease, the Brassfield Lease contains various provisions, including a Personal Guaranty "[t]o induce Lessor to enter into this Lease" which also bears a signature for "Gary Brassfield" as Guarantor and states that "the undersigned unconditionally guarantees to Lessor the prompt payment when due of all of Lessee's obligations to Lessor under [] Lease ..." (R.45-5, at 8.) The Brassfield Lease also contains the same "Choice of Law; Arbitration" provision as the Blankenship Lease which states:

> CHOICE OF LAW; ARBITRATION: Any unsettled claim or controversy, including any contract or tort claim, between or among us, you or any Guarantor related to this Lease, shall be determined by binding [*11] arbitration in accordance under the Commercial Arbitration Rules of American Arbitration Association, or if you choose, the Rules of Arbitration (Binding) of the Better Business Bureau. All statutes otherwise applicable shall

---

[2] In their allegations related to Plaintiff Brassfield's claim, Plaintiffs' Amended Complaint refers to "Blankenship", stating "Timothy George, the sales person, left a credit card swiping machine at Blankenship's business, but said nothing about Blankenship signing any Lease." (R.45, ¶ 35.) The Court reasonably infers from the surrounding allegations involving Brassfield, that Plaintiffs' seemingly erroneous reference includes Lease Finance leaving a credit card swiping machine at Plaintiff Brassfield's business.

apply. Judgment upon the arbitration award may be entered in any court having jurisdiction. In event you or Guarantor Defaults, these provisions regarding arbitration shall not apply to our right to repossess the Equipment. This Lease is made in interstate commerce. Any arbitration shall take place in Chicago, Illinois

(R.45, ¶ 40; R45-5, at 11.)

Defendant Lease Finance filed a claim against Plaintiff Brassfield in Cook County Small Claims Court on September 25, 2013 and obtained an *ex parte* judgment for $2,753.00 plus costs on January 28, 2014. (R.45, ¶ 41.) Along with the Brassfield Lease, Defendant Lease Finance attached an additional agreement to its complaint in the Small Claims Court related to a purported assignment. Specifically, Lease Finance attached a "Bill of Sale" between "NATIONAL PROCESSING COMPANY, F/K/A RPSI, Inc., D/B/A/ RETRIEVER PAYMENT SYSTEMS, a Nebraska Corporation" as "Seller" and "LEASE FINANCE GROUP, LLC, a Delaware limited liability company" [*12] as "Purchaser". (R.45-5, at 12 ("Bill of Sale").) The Bill of Sale refers to—but does not include a copy of—an "Assignment Agreement", dated January 1, 2006, that provides for "the sale and assignment by Seller to Purchaser of the Contract Documents and the related Equipment under this Bill of Sale". (*Id.*) The Bill of Sale does not contain an explicit reference to the Brassfield Lease. (*Id.*)

On March 19, 2014—after Lease Finance obtained the judgment against Brassfield on January 28, 2014 for $2,753.00—Lease Finance mailed a "Pre-Judgment Notice" to Brassfield indicating that it would attempt to obtain a judgment against Brassfield for $4,476.93, demanding payment of the same within ten (10) days, and threatening liens on Brassfield's property and bank account as well as wage garnishment proceedings. (R.45, ¶ 43; R.45-5, at 13 ("Judgment Notice Letter"); *id.*, at 14 ("Pre-Judgment Notice Letter").)

## IV. General Allegations

Plaintiffs allege that Defendants are engaged in a scheme—taking money out of customer bank accounts on an unauthorized basis, and then obtaining *ex parte* default judgments in violation of mandatory arbitration clauses if the customer takes action to stop the unauthorized withdrawals. [*13] (*Id.*, ¶ 8.) Plaintiffs allege that Pushpin and Lease Finance have filed hundreds of small claims cases in Cook County,

Illinois—filing over 150 small claims cases in the first two weeks of July 2014 alone. (*Id.*, ¶¶ 2, 4, 50; R.45-2, attached as Ex. 2 to Am. Compl.; R.45-3, attached as Ex. 3 to Am. Compl.) Defendants base many of these small claims cases on forged signatures and they initiated them in violation of mandatory arbitration clauses. (R.45, ¶¶ 5, 50.) The amount in controversy in each case is usually less than $5,000.00—relatively small amounts that render the cases non-economical for out of state defendants to hire lawyers to contest the small claims suits and appear in Chicago, Illinois to file *pro se* court appearances. (*Id.*, ¶ 47.)

Retriever Payment Systems is the Rep Code on the Blankenship Lease signed by Lease Finance and the signatory of the Brassfield Lease purportedly assigned to Lease Finance. (*Id.*, ¶¶ 24, 37.) Plaintiffs allege that although the Retriever Payment Systems website deceptively promises the "finest merchant services support team in the industry", the opposite is true. (*Id.*, ¶ 25.) Plaintiffs rely on a website, www.cardpaymentoptions.com , and allege [*14] it further links Retriever Payment Systems to Lease Finance, stating: "[t]here are multiple complaints online that claim that Retriever Payment Systems signs merchants up for 48-month, non-cancellable leases through [Lease Finance], a DBA of Northern Leasing Systems. Aside from the poor contract terms, Northern Leasing is notorious for poor service, deceptive advertising, and costly equipment." (*Id.*, ¶ 26.)

## LEGAL STANDARD

Defendants move to dismiss Plaintiffs' Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). "A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 12(b)(6), a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A district court's analysis under Rule 12(b)(6) "rests on the complaint, and [the court] construe[s] it in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts alleged and drawing all permissible inferences in their favor." *Fortres Grand*

2015 U.S. Dist. LEXIS 135944, *14

*Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014); *see also Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014); *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013). "[T]he complaint must supply 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' **[*15]** supporting the plaintiff's allegations." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (quoting *Twombly*, 550 U.S. at 556). "A claim must be plausible rather than merely conceivable or speculative, meaning that the plaintiff must include 'enough details about the subject-matter of the case to present a story that holds together.'" *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826-27 (7th Cir. 2014) (citations omitted).

## II. Federal Rules of Civil Procedure 8(a) and 9(b)

Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted). "[T]he complaint must supply 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Indep. Trust Corp.*, 665 F.3d at 935 (quoting *Twombly*, 550 U.S. at 556). "A claim must be plausible rather than merely conceivable or speculative, meaning that the plaintiff must include 'enough details about the subject-matter of the case to present a story that holds together.'" *Carlson*, 758 F.3d at 826-27 (citations omitted). A plaintiff's pleading burden "should be commensurate with the amount of information available" to him. *Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1100 (7th Cir. 2015).

Under Rule 9(b), a party pleading fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Moreover, in pleading fraud in **[*16]** federal court, Rule 9(b) imposes a higher pleading standard than that required under Rule 8(a)(2). *See Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). Thus, "[t]he requirement of pleading fraud with particularity includes pleading facts that make the allegation of fraud plausible." *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014). Specifically, Rule 9(b) requires a pleading to state with particularity: "the identity of the person making

the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Id.* (citations omitted). "[T]he particularity requirement of Rule 9(b) is designed to discourage a 'sue first, ask questions later' philosophy." *Pirelli*, 631 F.3d at 441 (citation omitted).

## ANALYSIS

### I. Jurisdiction

Although not raised by the parties, "Federal Courts are obligated to inquire into the existence of jurisdiction *sua sponte*." *Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 465 (7th Cir. 2015). The Court has original jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA") which states "district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and is a class action in which—(A) any member of a class of plaintiffs is a citizen of a State different from any defendant" *See* 28 U.S.C. § 1332(d)(2)(A) **[*17]** . "Another provision of the [CAFA] forbids a district court from exercising jurisdiction if the plaintiff class numbers less than one hundred." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 772 (*citing* 28 U.S.C. § 1332(d)(5)).

Plaintiff Blankenship is a citizen of Alabama. (*See* R.1, ¶¶ 2, 23;[3] R.45, ¶ 9.) Plaintiff Brassfield is a citizen of Arkansas. (*See* R.1, ¶¶ 3, 23; R.45, ¶ 10.) Defendant Cohen is a citizen of New York. (*See* R.1 ¶ 23; R.45, ¶ 14.) Regardless of the citizenship of Defendants Pushpin and Lease Finance—both of which are limited liability companies and share citizenship with their respective members—the parties have minimal

---

[3] The Court considers the Notice of Removal and original complaint attached **[*18]** to it in order to determine whether this case is properly before the Court. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (explaining that district courts may consider evidence outside the pleadings to make the necessary factual determinations to resolve their own jurisdiction); *see also Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002) ("[T]he district court had not only the right, but the duty to look beyond the allegations of the complaint to determine that it had jurisdiction to hear the [plaintiff's] claim").

diversity. *See Eubank v. Pella Corp.*, 753 F.3d 718, 721 (7th Cir. 2014) (finding federal jurisdiction existed under the CAFA's grant due to "at least minimal (as distinct from complete) diversity of citizenship"); *IP of A West 86th Street 1, LLC v. Morgan Stanley Mortg.. Capital Holdings, LLC*, 686 F.3d 361, 363 (7th Cir. 2012) ("[A] limited liability company shares the citizenship of its members ..."). Furthermore, the putative class members allegedly exceed 100 members and the alleged amount in controversy exceeds $5,000,000.[4] (R.1, ¶¶ 24, 25, 27; R.45, ¶¶ 2, 4, 5, 16.) *See Dart Cherokee Basin Operating Co., LLC v. Owens*, _ U.S. _, 135 S.Ct. 547, 554, 190 L.Ed.2d 495 (2014) ("a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold").

## II. ICFA Count (Count I)

The ICFA provides a remedy for "unfair methods of competition and unfair or deceptive acts or practices" in specified "commercial transactions." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (quoting 815 ILCS 505/2). Specifically, the ICFA, 815 ILCS 505/1, *et seq.*, prohibits:

> ...unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact ... in the conduct of trade or commerce ... whether any person has in fact been misled, deceived or damages thereby.

815 ILCS 505/2. In addition, **[*19]** Section 505/10a provides that "[a]ny person who suffers actual damages as a result of a violation of this Act, committed by any other person may bring an action against such person." 815 ILCS 505/10a.

To state a claim under the ICFA, Plaintiffs must allege five elements: (1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) the damages were proximately caused by the defendant's deception. *See Armbrister v. Pushpin Holdings, LLC*, 896

F.Supp.2d 746, 754 (N.D. Ill. 2012) (*citing Hardaway v. CIT Group/Consumer Fin. Inc.*, 836 F.Supp.2d 677, 685 (N.D. Ill. 2011); *Martis v. Pekin Mem'l Hosp. Inc.*, 395 Ill. App. 3d 943, 334 Ill. Dec. 772, 917 N.E.2d 598, 603 (Ill. App. Ct. 2009). The pleading standard applicable to allegations of deceptive practices in violation of the ICFA requires sufficient particularity under Rule 9(b) because such allegations sound in fraud, whereas allegations of unfair practices need only meet the notice pleading standards of Rule 8(a). *See* Fed. R. Civ. P. 8(a); Fed. R. Civ. P. 9(b); *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008); *McKenney-Becker v. Safeguard Properties, LLC, et al.*, No. 14-cv-4514, 2015 U.S. Dist. LEXIS 3507, 2015 WL 175020, at *9 (N.D. Ill. Jan. 13, 2015).

Defendants argue several grounds for dismissal of Plaintiffs' ICFA claim. First, Defendants argue that Plaintiffs' ICFA claim is implausible, does not meet the heightened pleading standards required under Rule 9(b), and is improperly asserted against them. Defendants further argue that Plaintiffs **[*20]** have failed to sufficiently state a claim for relief under the ICFA because Defendants committed no deceptive or unfair acts and because Plaintiffs failed to allege reliance, are not "consumers", do not assert allegations that involve "trade" or "commerce", and fail to allege actual damages that Defendants proximately caused. The Court addresses each argument in turn.

### A. Deceptive and Unfair Practices

Plaintiffs allege Defendants engaged in both deceptive and unfair practices. (R.45, ¶ 61-62.) Specifically, Plaintiffs allege that Defendants' acts of filing suits against persons whose signatures were forged on Non-Cancellable Leases are unfair and deceptive. (*Id.*, ¶ 61.) Plaintiffs allege that "Retriever Payments Systems" caused [Blankenship's] signature to be forged" and that someone by the name of "Timothy George" left a credit card swiping machine at Brassfield's business and that his Lease Agreement was a forgery. (R.45, ¶¶ 20, 35, 36.)

To determine whether a practice is unfair under the ICFA, the Court considers whether the practice offends public policy, whether it is immoral, unethical, oppressive, or unscrupulous, and whether it causes substantial injury to consumers. *See In re Michaels Stores Pin Pad Litig.*, 830 F.Supp.2d at 525 (*citing **[*21]** Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403,

---

[4] Plaintiffs do not dispute Defendants' allegations of citizenship, putative class member number, or amount in controversy in the Notice of Removal (R.1).

266 Ill. Dec. 879, 775 N.E.2d 951, 961 (2002)). A plaintiff does not need to satisfy all three criteria to support a finding of unfairness. *Id.* A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *Id.* A practice is deceptive if it "creates a likelihood of deception or has the capacity to deceive." *Aliano v. Louisville Distilling Co., LLC*, No. 15 C 00794, 115 F. Supp. 3d 921, 2015 U.S. Dist. LEXIS 93790, 2015 WL 4429202, at *5 (N.D. Ill. July 20, 2015) (*citing Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001). Plaintiffs must allege facts suggesting a deceptive practice with particularity. *See id.* To satisfy the heightened pleading standard of Rule 9(b), "the circumstances [of the alleged misrepresentation] must be pleaded in detail. The who, what, when, where, and how: the first paragraph of any newspaper story." *O'Brien v. Landers*, No. 1:10-CV-02765, 2011 U.S. Dist. LEXIS 6434, 2011 WL 221865, at *4 (N.D. Ill. Jan. 24, 2011) (*citing DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

Defendants contend that Plaintiffs' allegations of deceptive and unfair acts are limited to Defendants' actions in filing suits in small claims courts. This narrow reading, however, ignores other facts alleged as deceptive and unfair, e.g., the forged leases, misleading collection demand letters, faulty assignments that do not refer to either the Blankenship Lease or the Brassfield Lease, and filing small claims court actions premised on the forged leases. Plaintiffs allege that Defendants are engaged **[*22]** in a scheme—making unauthorized withdrawals from customer bank accounts and then obtaining *ex parte* default judgments in violation of mandatory arbitration clauses if the customer stops the unauthorized withdrawals. (*Id.* ¶ 8.) Regarding the class allegations, Plaintiffs assert that "many of the hundreds of cases filed by Pushpin and Lease Finance are based on forged signatures and initiated in violation of mandatory arbitration clauses." (*Id.*, ¶ 5.) Specifically, Plaintiff Blankenship alleges that the credit card machine was brought to his business on a day when he was absent and Blankenship first saw a lease, purportedly bearing his signature, when Lease Finance started sending collection demand letters to him and making collection demands. (R.45, ¶ 20.) Similarly, Plaintiff Brassfield alleges that the credit card machine was left at his business without any discussion of a lease. (*Id.*, ¶ 35.) Brassfield further alleges that no one ever told him about a lease or asked him to sign one and he only learned about his signature on the lease when Lease Finance started making collection demands. (*Id.*, ¶ 36.) In addition, Plaintiffs allege that

after the small claims had already entered judgment **[*23]** against Brassfield, Defendant Lease Finance sent misleading letters demanding a payment totaling $2,000 more than the default judgment. (*See id.*, ¶ 43; R.45-5, at 13-14.) Plaintiff Blankenship further alleges that the deceptive actions took place in 2002, the Non-Cancellable Lease was dated in 2002, that over a period of seven to eight months Defendants automatically deducted money from his account and did not process his credit card transactions, and that Defendants sent misleading collection demands. (*See e.g., id.*, ¶¶ 19, 20, 27-29.) Plaintiff Brassfield alleges that the deceptive actions took place related to a Non-Cancellable Lease dated March 2010 and that over a period of time Defendants automatically deducted money from his account for a defective machine and sent deceptive and misleading collection notices in an attempt to collect on an alleged debt, even after entry of default judgment. (*See e.g., id.*, ¶¶ 35, 38, 39, 42-44.) These allegations identify the misleading conduct, who conducted it, when it occurred, and how Plaintiffs were deceived.

Plaintiffs further allege that Defendant Cohen owns, controls and operates numerous shell entities—including Pushpin and Lease Finance—which **[*24]** sell equipment leases, buy debts, and collect debts acquired through purchase of leases. (R.45, ¶ 14.) Indeed, Defendant Cohen signed—as President of Pushpin Holdings, LLC—Blankenship's Assignment and Assumption Agreement and Defendant Lease Finance signed Brassfield's Bill of Sale. (*See id.*, ¶ 15; R.45-4, at 10-11; R.45-5, at 12.) These assignments form a basis for Plaintiffs' allegations that Defendants' misrepresentations deceived Plaintiffs as part of the scheme to collect on Plaintiffs' debt allegedly owed under the Non-Cancellable Leases. Practices surrounding debt collection can form the basis for an ICFA claim, if the plaintiff disputes the underlying debt or the defendants' right to collect on the debt. *See Maldanado v. Freedman Anselmo Lindberg, LLC*, No. 14 C 10176, 2015 U.S. Dist. LEXIS 63157, 2015 WL 2330213, at *4 (N.D. Ill. May 14, 2015). Indeed, "debt collection practices are embraced by the [ICFA]". *See Johnson v. Pushpin Holdings LLC*, No. 13 C 7468, 2015 U.S. Dist. LEXIS 36386, 2015 WL 1345768, at * 9 (N.D. Ill. Mar. 23, 2015) (*citing People ex rel. Daley v. Datacom Sys. Corp*, 146 Ill. 2d 1, 31, 165 Ill. Dec. 655, 668, 585 N.E.2d 51, 64 (1991) ("Daley")); *see also Maldanado*, 2015 U.S. Dist. LEXIS 63157, 2015 WL 2330213, at *4 (*citing Grant—Hall v. Cavalry Portfolio Servs., LLC*, 856 F.Supp.2d 929, 945 (N.D. Ill. 2012)) ("debt collectors may violate the ICFA if they fabricate

the debt or lie about their right to collect on a debt").

Based on Plaintiffs' allegations of forgery on leases they only first saw when they received collection notices, letters misrepresenting judgments owed under the Non-Cancellable Leases, assertion of rights to collect on a debt based on faulty **[*25]** assignments, and Defendants' similar conduct in hundreds of cases filed in Illinois involving other business owners, Plaintiffs have sufficiently alleged a claim of deceptive practices and unfair practices under the ICFA. *See e.g., Grant-Hall v. Cavalry Portfolio Servs., LLC*, 856 F.Supp.2d 929, 942 (N.D. Ill. 2012) (finding a deceptive practices claim adequately pled where the plaintiff alleged the defendant "[m]israepresent[ed] to consumers and courts that it had the right to file suit" and defendants intended the plaintiff to rely on that deceptive practice); *see Jackson v. Payday Fin. LLC*, 79 F.Supp.3d 779, 788 (N.D. Ill. 2015) (finding an unfair practices claim adequately pled where the plaintiff alleged a practice of contracting for and collecting finance charges, interest, and fees, from Illinois residents, in excess of the amounts permitted by law).

## B. "Reliance"

Defendants assert that Plaintiffs fail to plead that Defendants intended them to rely on any deceptive or unfair practice. The Court disagrees. Plaintiffs allege that Defendants deceived them by producing the Non-Cancellable Leases at a time when they were ready to collect on their alleged debt. Plaintiffs do not allege that they had knowledge of the Non-Cancellable Leases prior to that time and Defendants concealment of the leases from Plaintiffs constitutes concealment of information **[*26]** upon which it can be expected that Plaintiffs would rely in deciding to enter into an agreement for leasing equipment with a lessor. *See Lateef v. Pharmavite LLC*, No. 12 C 5611, 2013 U.S. Dist. LEXIS 51457, 2013 WL 1499029, at *3 (N.D. Ill. Apr. 10, 2013) (*citing Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 575 n. 13 (7th Cir. 2012) (collecting cases)) ("[o]missions are also actionable under the ICFA if they are intended to induce the plaintiff's reliance"); *see also Haymer v. Countrywide Bank, FSB*, 2011 U.S. Dist. LEXIS 76910, 2011 WL 2790172, at *4 (N.D. Ill. July 15, 2011) (finding the plaintiffs allegations sufficient to show reliance under the ICFA where the defendants were shown to have omitted or concealed a material fact in the loan application process); *Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927, 274 Ill. Dec. 461, 791 N.E.2d 553, 558 (Ill. App. Ct. 2003) ("A

defendant need not have intended to deceive the plaintiff; innocent misrepresentations or omissions intended to induce the plaintiff's reliance are actionable under [the ICFA]"). Indeed, as alleged, Defendants intended Plaintiffs to rely on the absence of any formal agreement to induce them to agree to continue using the machines—feeling that they were under no obligations. Plaintiffs suffered actual damages (*see infra,*Analysis II.E) from unauthorized withdrawals and default judgments due to Defendants' alleged deceptive acts. These allegations sufficiently plead reliance under the ICFA.

## C. "Trade" or "Commerce"

The ICFA defines "trade" and "commerce" to mean "the advertising, offering for sale, sale, or distribution of any **[*27]** services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of [Illinois]." 815 ILCS 505/1(f). Additionally, the ICFA provides that it "shall be liberally construed to effect the purposes thereof." 815 ILCS 505/11a.

Defendants argue that Plaintiffs fail to allege that Defendants advertise or sell any product or service. Defendants cite to *Daley*, (*see supra*, Analysis II.A)—in which the Illinois Supreme Court explicitly states "debt collection practices are embraced by the [ICFA]"—and attempt to distinguish their actions with the simple assertion that "Pushpin and LFG LLC do not collect debt for anyone. No one has hired them to do so." (R.53, at 12; *see also* R.64, Defs' Reply, at 10.) *See Johnson*, 2015 U.S. Dist. LEXIS 36386, 2015 WL 1345768, at * 9 (*citing Daley*, 146 Ill. 2d at 31). Taking the facts in the light most favorable to Plaintiffs, however, Pushpin "has no other business other than debt collection" and Pushpin and Lease Finance are shell entities for Defendant Cohen who "buys debts, and collect[s] debts acquired through purchase of leases." (R.45, ¶¶ 11, 14.) Accordingly, Plaintiffs have sufficiently alleged "trade" or "commerce" **[*28]** under the ICFA.

## D. "Consumers"

A "consumer" under the ICFA is defined as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of

his household." 815 ILCS 505/1(e); *see also McKenney-Becker*, 2015 U.S. Dist. LEXIS 3507, 2015 WL 175020, at *8. Specifically, Defendants contend that the dispute concerns leases, not the purchase or contract to purchase anything, and because Plaintiffs are businesspeople who contest the authenticity of their signatures on the Non-Cancellable Leases, they cannot also argue they are purchasers of merchandise. Plaintiffs do not directly assert that they are not consumers under the ICFA, but rely on cases where non-consumers were found to have standing under the ICFA because their claims involved trade or commerce and implicated consumer protection concerns. Indeed, a right of action under the ICFA is not limited to "consumers" as "*[a]ny person* who suffers actual damage as a result of a violation of [the ICFA] committed by another person may bring an action against such person." 815 ILCS 505/10a(a); *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 579 (7th Cir. 2004) (noting that section 10a(a) of the ICFA "does not protect just consumers, but any person"); *see also* 815 ILCS 505/1 *et seq.*, titled as "[a]n Act to protect consumers and borrowers and businessmen against [*29] fraud, unfair methods of competition and unfair or deceptive acts"). "In the context of an ICFA claim based upon a breach of contract between two businesses, courts have rejected this argument"—that a non-consumer is precluded from alleging a violation of the ICFA. *Frazier v. U.S. Bank Nat'l Ass'n*, 11 C 8875, 2013 U.S. Dist. LEXIS 48601, 2013 WL 1385612, at *3 (N.D. Ill. Apr. 4, 2013) (citations omitted). Instead, in these circumstances, a non-consumer plaintiff may prevail by alleging a consumer nexus with the alleged conduct. *Id.* To determine whether Plaintiffs have met the consumer nexus test, the Court looks to whether Plaintiffs have pled: (1) that [their] actions were akin to a consumer's actions to establish a link between [them] and consumers; (2) how defendant's representations ... concerned consumers other than Plaintiff; (3) how defendant's particular acts involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers. *See Thrasher-Lyon v. Illinois Farmers Ins. Co.* 861 F.Supp.2d 898, 912 (N.D. Ill. 2012) (citations omitted); *see also Brody v. Finch Univ. of Health Sciences/The Chicago Med. Sch.*, 298 Ill. App. 3d 146, 232 Ill. Dec. 419, 698 N.E.2d 257, 268 (1998). "Put another way, a non-consumer plaintiff must allege "conduct [that] involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *See Roppo v. Travelers Cos.*, 100 F. Supp. 3d 636, 2015 U.S. Dist. LEXIS 50006, 2015 WL 1777469, at *8 (N.D. Ill. 2015) (*citing Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*,

190 Ill. App. 3d 524, 137 Ill. Dec. 409, 546 N.E.2d 33, 41 (1989)).

Here, Plaintiffs allege a series of "Common Allegations" that reference themselves as typical [*30] victims of Defendants' practices—"sole proprietors or persons operating small businesses". (R.45, ¶ 45.) Plaintiffs further allege that the small claims suits filed by Defendants in Illinois involve proprietors or small business owners—located throughout the country—who were similarly involved with Non-Cancellable Leases, alleged forgery, and default judgments. (*See e.g., id.*, ¶¶ 5, 8, 12, 45-47, 49, 50.) In addition, Plaintiffs provide a link between Retriever Payment Systems—the company named on the Blankenship Lease and the Brassfield Lease—and Lease Finance, alleging that Retriever Payment Systems "deceptively promises the 'finest merchant services support team in the industry'" and that "[t]here are multiple complaints online that claim that Retriever Payment Systems signs merchants up for 48-month, non-cancellable leases through Lease Finance Group ...". (*Id.*, ¶¶ 25, 26.) Viewing these allegations in the light most favorable to Plaintiffs, Plaintiffs have sufficiently alleged a consumer nexus to survive a motion to dismiss. *See Frazier*, 2013 U.S. Dist. LEXIS 48601, 2013 WL 1385612, at *4 (finding the plaintiffs allegations that the defendants had an "established" practice of tracking loans and unlawfully ordering property removal services during [*31] periods when the plaintiffs and other loan borrowers' had a right to remain in their home sufficient to plead a "consumer nexus" under the ICFA); *CustomGuide v. CareerBuilder, LLC*, 813 F.Supp.2d 990, 1001 (N.D. Ill. 2011) (allegations that the defendant "intended that general consumers and the general public rely on its unfair, unlawful and deceptive business practices" sufficient). Accordingly, Plaintiffs have sufficiently pled a "consumer nexus" as non-consumers under the ICFA. *See e.g., Bank One Milwaukee v. Sanchez*, 336 Ill. App. 3d 319, 324, 270 Ill. Dec. 642, 646-47, 783 N.E.2d 217, 221-22 (Ill. App. Ct. 2003) (holding that there was a consumer nexus when the plaintiff alleged that "a merchant bound her to a commercial transaction through a fraudulent act").

## E. Actual Damages

Only a person who suffers actual damage may bring an action under the ICFA. 815 ILCS 505/10a(a). The plaintiff must allege a purely economic injury, measurable by the plaintiff's loss. *See In re Michaels Stores Pin Pad Litig.*, 830 F.Supp.2d 518, 526 (N.D. Ill.

2011) (*citing Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill. App. 3d 399, 331 Ill. Dec. 819, 911 N.E.2d 1049, 1053 (Ill. App. Ct. 2009) and *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 321 Ill. Dec. 257, 888 N.E.2d 1190, 1197-98 (Ill. App. Ct. 2008) ("If the plaintiff is not materially harmed by the defendant's conduct, however flagrant it may have been, there may be no recovery")).

Plaintiffs maintain that they suffered actual damages of various forms. Both Plaintiffs Blankenship and Brassfield argue that due to the default judgment entered against them, they incurred economic harm. (R.45, ¶¶ 3, 23, 41.) Plaintiff Blankenship further alleges that the machine provided by **[*32]** Defendants did not work properly in that some transactions were not processed at all and that for other transactions, that were processed, Lessor did not directly deposit the money into his bank account within 48 hours—both resulting in a loss of income over a period of time. (*Id.*, ¶¶ 27, 28.) In addition, Plaintiff Blankenship alleges that Defendants made multiple unauthorized monthly withdrawals for $39.95 for a defective machine and made an additional $500 withdrawal after Blankenship turned over his machine to Lease Finance. (*Id.*, ¶ 31.) Plaintiff Brassfield alleges he was "damaged by having payments taken from his bank account for a defective machine and by having an *ex parte* judgment entered against him which will adversely affect his consumer credit report." (*Id.*, ¶ 44.) Defendants argue that Plaintiffs' allegations are insufficient because "Plaintiffs do not allege that they have satisfied the judgments entered against them or that they have incurred actual damages as a result of alleged misleading letters." (R.53, at 13.) Defendants further assert that any claims of adverse affects on their credit reports are "too speculative" to warrant consideration. (*Id.*) Taking the facts **[*33]** alleged in the light most favorable to Plaintiffs, however, the allegations suffice to plead actual damage due to the unprocessed transactions and unauthorized withdrawals, in addition to the fact that the Court can reasonably infer that—regardless of any alleged future harm from their credit reports—Plaintiffs suffered economic loss and have not been reimbursed for any of the loss related to the claims asserted here. Accordingly, Plaintiffs sufficiently allege that they suffered actual damages in the form of economic loss from unauthorized withdrawals and unlawful default judgments.

## F. Proximate Cause

To prevail under the ICFA, "a plaintiff must demonstrate

that the defendant's conduct is the proximate cause of the injury." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (*citing Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 267 Ill. Dec. 14, 776 N.E.2d 151, 160 (2002)). "Unlike an action brought by the Attorney General under [the ICFA], which does not require that 'any person has in fact been misled, deceived or damaged[,]' ... a private cause of action brought under [ICFA] requires proof of 'actual damage' ... [and] proof that the damage occurred 'as a result of' the deceptive act or practice." *Id.* (citations omitted)). Plaintiffs must, therefore, set forth sufficient allegations to find it plausible that "but for" Defendants' **[*34]** unfair and deceptive acts, Plaintiffs would not have been damaged, i.e., would not have incurred economic harm from enforcement of the unlawful Non-Cancellable Leases.

Defendants argue that because Plaintiffs do not allege that any of Defendants forged the Non-Cancellable Leases or Personal Guaranties, Plaintiffs cannot establish proximate cause for any alleged damages. Defendants' argument fails, however, because as discussed above, Plaintiffs do not so narrowly focus their allegations under the ICFA on the act of forgery, but rather include the act of forgery, along with the later provision of a forged lease, the filing of an unlawful small claims action based on a faulty assignment, and misrepresentations in letters mailed to demand collection of an unlawful debt. Plaintiffs have also alleged that Defendants were involved at each of these later steps. In particular, Plaintiffs have alleged that (1) Defendant Lease Finance signed as Lessor on the Blankenship Lease (R.45-4, at 8); (2) Defendant Cohen signed as "President" of Pushpin and "Buyer" on the Assignment and Assumption Agreement purportedly related to the Blankenship Lease (*id.*, at 11), (3) Pushpin filed a small claims court action **[*35]** against Blankenship resulting in a default judgment (*id.*, at 2-7); (4) Lease Finance—Defendant Cohen's alleged alter ego—signed as "Purchaser" on the Bill of Sale purportedly related to the Brassfield Lease (*id.*, at 12); (5) Lease Finance mailed Plaintiff Brassfield a Pre-Judgment Notice Letter on March 19, 2014 and a Judgment Notice Letter on April 24, 2014 (*id.*, at 13-14); and (6) Lease Finance filed a small claims court action against Brassfield resulting in a default judgment (*id.*, at 2-7). These allegations specific to Defendants and linked to the default judgments and actions related to enforcement of the Non-Cancellable Leases sufficiently plead proximate cause for Plaintiffs' alleged damages under the ICFA.

In addition, the Illinois Supreme Court has rejected the

argument that "deception must always be direct between the defendant and the plaintiff to satisfy the requirement of proximate cause under the [ICFA]" in the context of an ICFA claim based upon deceptive advertising. *See Shannon v. Boise Cascade Corp.*, 208 Ill.2d 517, 525-26, 281 Ill. Dec. 845, 805 N.E.2d 213, 218 (2004) (noting that "traditional privity [is] not a requirement in fraud actions" and that it is sufficient that "the statements by the defendant be made with the intention that it reach the plaintiff and influence his action and that it **[\*36]** does reach him and that he may rely upon it") (citations omitted). Plaintiffs' allegations provide connections between Defendants and each stage of the alleged deceptive conduct (1) from the first interactions with Retriever Payment Systems—alleged to be connected with Defendant Lease Finance (R.45, ¶¶ 25, 26); (2) from the alleged assignment of the Non-Cancellable Leases by Pushpin, Cohen and Lease Finance (*id.*, ¶ 15; R.45-4, at 12; R.45-5, at 12); and (3) through to filing of the lawsuits in small claims court by Pushpin and Lease Finance (R.45-4; R.45-5). These alleged actions sufficiently plead direct and indirect deceptive acts by Defendants linked to Plaintiffs' actual damages. Accordingly, Plaintiffs have sufficiently alleged that Defendants deceptive and unfair conduct was the proximate cause of their actual damages.

### III. Breach of Contract Claim (Count II)

Under Illinois law, a breach of contract claim must allege four elements: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Goldberg v. 401 N. Wabash Venture LLC*, No. 09 C 6455, 2010 U.S. Dist. LEXIS 39774, 2010 WL 1655089, at \*11 (N.D. Ill. Apr. 22, 2010). Defendants argue that Plaintiffs have failed to allege each of the required elements for **[\*37]** their breach of contract claim.

### A. The "Valid and Enforceable Contract"

First, Defendants assert that the Court should dismiss Plaintiffs breach of contract claim as to Defendant Cohen because the Amended Complaint does not contain any allegations related to a contract with Cohen. Plaintiffs fail to identify factual allegations in the Amended Complaint to support the elements in a breach of contract claim, but rather assert that the mandatory arbitration clause in the Lease Agreements applies and the Court should liberally construe it.

Plaintiffs do not identify a factual basis for the validity and enforceability of the Lease Agreements. Indeed, Plaintiffs' Amended Complaint is filled with allegations that the Lease Agreements were forged and entered into without the authorization or knowledge of Plaintiffs Blankenship and Brassfield. (*See e.g.*, R.45, ¶ 20 ("Blankenship never signed the Lease and did not even see it until Lease Finance started sending collection letters to him and making collection demands"); *id.*, ¶ 23 ("The Lease is not enforceable against Blankenship due to the forged signature"); *id.*, ¶ 36 ("Brassfield's signature was forged on the Non-Cancellable Lease and the accompanying **[\*38]** Guarantee"); *id.*, ¶ 41 ("The Lease is not enforceable against Brassfield because Brassfield's signature is forged")). Although Plaintiffs may plead a breach of contract claim in the alternative, Plaintiffs do not provide allegations for such a claim. Accordingly, Plaintiffs have failed to sufficiently allege the Lease Agreements are valid and enforceable contracts in order to support a breach of contract claim, and the Court dismisses Count II without prejudice.

### B. Substantial Performance

Second, Defendants assert that Plaintiffs fail to allege substantial performance under the applicable Lease Agreements.[5] A "party cannot sue for breach of contract without alleging and proving that he has himself substantially complied with all the material terms of the agreement." *Costello v. Grundon*, 651 F.3d 614, 640 (7th Cir. 2011) (citation omitted). Again, Plaintiffs ignore Defendants arguments regarding substantial performance. Plaintiffs do not point the Court to allegations that support Plaintiffs' obligations and responsibilities under the Lease Agreements. Nor do they provide factual allegations that demonstrate Plaintiffs' actions taken in line with their obligations under the Lease Agreements, aside from the fact that Plaintiffs each made initial **[\*39]** monthly payments to Defendants—at least until the credit card machines stopped working properly. (*See* R.45, ¶¶ 27-30, 38, 39, 44.) Plaintiffs failed to include any allegations regarding substantial performance, thus they have failed to

---

[5] Defendants also contend that Plaintiffs did not comply with their obligations as Guarantors under the Personal Guaranties. This is a factual issue, however, and thus inappropriate for resolution at the pleading stage. *See Cushing v. City of Chicago*, 3 F.3d 1156, 1163 (7th Cir. 1993) (holding that determinations that necessarily involve issues of fact are "inappropriate for resolution in a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6)").

2015 U.S. Dist. LEXIS 135944, *39

sufficiently plead a claim for breach of contract.


## C. Defendants' Breach

Third, Defendants assert that Plaintiffs have failed to allege that Defendants breached the Lease Agreements. According to Plaintiffs, Defendants failed to honor the mandatory arbitration clause resulting in a breach of the contract. Defendants contend that Plaintiffs' focus on the mandatory arbitration clause is irrelevant to the dispute here because the Lease Agreements and the Personal Guaranties are "two separate and distinct contractual agreements" and the "operative agreement in the state court actions is the **[*40]** Personal Guaranty and the Personal Guaranty does not contain an arbitration clause." (R.53, at 15.) Plaintiffs have alleged that Defendants breached the Lease Agreement and to the extent Defendants argue they are not parties to those agreements, these are factual issues to be resolved at a later stage. For the purposes of this motion to dismiss, Plaintiffs have sufficiently alleged breach.


## D. Damages

Lastly, Defendants assert that even if they breached the Lease Agreements due to failure to engage in mandatory arbitration, Plaintiffs have still failed to allege damages. In particular, Defendants contend that Plaintiffs failed to allege they satisfied state court judgments and that any additional damages, e.g., deductions of money from Plaintiffs' checking accounts, do not stem from Defendants' alleged breach of a failure to seek arbitration. Plaintiffs simply respond that the "relief sought by Plaintiffs includes a declaration that the disputes are subject to mandatory arbitration". (R.63, Pl. Opp'n, at 15 (*citing* R.45, at 14).) Taking the facts alleged in the light most favorable to Plaintiffs, however, the Court can reasonably infer that Plaintiffs satisfied the default judgments. **[*41]** Accordingly, Plaintiffs have sufficiently pled damages stemming from Defendants' alleged breach of the Lease Agreements based on their failure to engage in mandatory arbitration and instead filing of suits in small claims court.


## IV. Defendants' Request to Strike Class Allegations

Defendants ask the Court to strike Plaintiffs' class allegations pursuant to Rule 23 because the pleadings are facially defective and establish that a class action

cannot be maintained. (R.53, at 16.)


## A. Legal Standard

Rule 23(c)(1)(A) directs that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). Although "[m]ost often it will not be practicable' for the court to do that at the pleadings stage, ... sometimes the complaint will make it clear that class certification is inappropriate." *Hill v. Wells Fargo Bank, N.A.*, 946 F.Supp.2d 817, 829 (N.D. Ill. 2013) (*citing General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)); *see also Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011) ("Consistent with [Rule 23(c)(1)(A)'s] language, a court may deny class certification even before the plaintiff files a motion requesting certification.") In those situations, a court may determine that class certification is inappropriate before the parties conduct class discovery. *See Bohn v. Boiron, Inc.*, No. 11 C 8704, 2013 U.S. Dist. LEXIS 107928, 2013 WL 3975126, at *5 (N.D. Ill. Aug. 1, 2013).

If the plaintiff's class allegations are facially **[*42]** and inherently deficient, for example, "a motion to strike class allegations ... can be an appropriate device to determine whether [the] case will proceed as a class action." *See Bohn*, 2013 U.S. Dist. LEXIS 107928, 2013 WL 3975126, at *5; *Wright v. Family Dollar*, No. 10 C 4410, 2010 U.S. Dist. LEXIS 126643, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010); *Muehlbauer v. General Motors Corp.*, 431 F.Supp.2d 847, 870 (N.D. Ill. 2006). If, on the other hand, the dispute concerning class certification is factual in nature and "discovery is needed to determine whether a class should be certified," a motion to strike class allegations at the pleading stage is premature. *See Wright*, 2010 U.S. Dist. LEXIS 126643, 2010 WL 4962838, at *1; *Santiago v. RadioShack Corp.*, No 11 C 3508, 2012 U.S. Dist. LEXIS 46389, 2012 WL 934524, at *4 (N.D. Ill. Feb. 10, 2012); *see also Boatwright v. Walgreen Co.*, No. 10 C 3902, 2011 U.S. Dist. LEXIS 22102, 2011 WL 843898, at *2 (N.D. Ill. Mar. 4, 2011) ("Because a class determination decision generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, ... a decision denying class status by striking class allegations at the pleading stage is inappropriate.")

To obtain class certification under Rule 23, a plaintiff

must satisfy the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one subsection of Rule 23(b). *See Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). "Failure to meet any of [Rule 23's] requirements precludes class certification." *Harper*, 581 F.3d at 513 (*quoting Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008)).

## B. Defendants' Challenges to the Putative Classes

In this case, Plaintiffs' Amended Complaint alleges two putative classes. The first putative class consists of "all persons who were sued in small claims court in the **[\*43]** last ten years in the Circuit Court of Cook County, Illinois[,] by the Class Action Defendants in violation of the mandatory arbitration clauses". (R.45, ¶ 53.) The second putative class consists of "all persons who were sued in small claims court in the last three years on Leases where their signature was forged in violation of the [ICFA]". (*Id.*) Defendants contend that Plaintiffs' fraud claims are "plaintiff-specific" and make it unlikely that Plaintiffs will meet the requirements of commonality.[6] (R.53, at 16.) Defendants argue that Plaintiffs fail to allege the circumstances of their forgery story as common to all putative class members and indeed, fail to allege any facts that permit an inference that the putative class members are somehow affected by the same particularized facts. (*Id.*) Defendants contend that the circumstances of the named Plaintiffs—Blankenship and Brassfield—demonstrate the fact-intensive nature of the fraud claims and do not

_____

[6] Defendants also argue that Plaintiffs claims "are particularly unlikely to meet the predominance requirement because they are 'plaintiff-specific'". (R.53, at 17.) Although the requirements for predominance are similar to those for commonality, predominance is one of the optional required Rule 23(b) requirements. *See Harper*, 581 F.3d at 513; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2548, 180 L.Ed.2d 374 (2011). Because Plaintiffs have not yet specified what subsection of Rule 23(b) the class should be certified under, analysis of Plaintiffs claims for meeting the predominance requirement is premature. The requirements for predominance, however, are similar to those for commonality, which is one of the unavoidable requirements for class certification under Rule 23(a) and is further addressed herein. *See Wal-Mart Stores, Inc.*, 131 S.Ct. at 2549-50; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 814 (7th Cir. 2012).

meet the commonality requirements and that any damages claims would also be highly fact-specific. (*Id.*, at 17-18.) The Court therefore turns to the Amended Complaint and the Class Allegations to determine whether they "are facially and inherently **[\*44]** deficient" such that they warrant dismissal. *See Bohn*, 2013 U.S. Dist. LEXIS 107928, 2013 WL 3975126, at \*5.

## C. Commonality and Plaintiffs' ICFA Claims

Commonality requires a plaintiff to show that "questions of law or fact common to the class" exist. *See* Fed. R. Civ. P. 23(a)(2). To establish commonality, a plaintiff must do more than raise "common questions—even in droves" in that the plaintiff must show that a class-wide proceeding will "generate common *answers* apt to drive the resolution of the litigation." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (internal quotations omitted; emphasis in original). "If, **[\*45]** to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 815 (7th Cir. 2012) (*quoting Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). If, however, "the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc.*, 131 S.Ct. at 2551 (citations omitted). This does not mean, however, "that they have all suffered a violation of the same provision of law." *Id.*

Having dismissed the breach of contract claim, the Court focuses on the elements of the ICFA claim. The Court first looks to the unfair practices claim. To determine whether a business practice is unfair, the Court considers "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Robinson*, 266 Ill. Dec. 879, 775 N.E.2d at 960.

Although devoid of detailed facts, Plaintiffs assert the following question of fact and law as common to the members of the putative class for their ICFA claim:

> a. Whether the conduct of the Class Action Defendants was a violation of the [ICFA]; **[\*46]**
> b. Whether the Class Action Defendants regularly file suit in violation of mandatory arbitration clauses.

(R.45, ¶ 55.)

Unfairness under the ICFA "depends on a case-by-case analysis," *Siegel*, 612 F.3d at 935, however, Plaintiffs have alleged a series of Common Allegations that, if proven to be true by evidence obtained during the discovery process, could meet the commonality requirement for certification of the class. In particular, Plaintiffs allege common facts surrounding the alleged forgery and subsequent applicability of the Leases. (R.45, ¶ 45.) Plaintiffs further allege that "[t]he persons that are the victims of these practices are typically sole proprietors or persons operating small business." (*Id.*) In addition, Plaintiffs allege facts commonly shared between the Lease Agreements, for example, that they each: (1) have signature lines typically identifying the Lessee as an individual, (2) have Personal Guaranty provisions, (3) have mandatory arbitration agreements which have language of the arbitration clauses including actions relating to the Guarantees, and (4) that the Lessees as individuals would have benefits from the arbitration clause, if the signatures were not forged. (*Id.*, ¶ 46.) Plaintiffs also **[*47]** allege the amounts in controversy are usually less than $5,000 and that these relatively small amounts present the out of state defendants with a situation where it is not economical to hire lawyers to contest the small claims suits. (*Id.*, ¶ 47.) The Plaintiffs further allege facts common to the method of service on the class members in that they are often served at addresses which are no longer valid and that the documents relied upon by the Defendants in the small claims actions are also invalid on their face, even apart from the forgeries. (*Id.*, ¶¶ 48, 49.) Defendants' disputes with these allegations are highly factual in nature and "discovery is needed to determine whether a class should be certified," making it premature to strike class allegations at this stage. *See Wright*, 2010 U.S. Dist. LEXIS 126643, 2010 WL 4962838, at *1; *Santiago v. RadioShack Corp.*, No 11 C 3508, 2012 U.S. Dist. LEXIS 46389, 2012 WL 934524, at *4 (N.D. Ill. Feb. 10, 2012); *see also Boatwright*, 2011 U.S. Dist. LEXIS 22102, 2011 WL 843898, at *2.

The same result is true for Plaintiffs' deceptive practices claim under the ICFA. A practice is deceptive if it "creates a likelihood of deception or has the capacity to deceive." *Aliano v. Louisville Distilling Co., LLC*, No. 15 C 00794, 115 F. Supp. 3d 921, 2015 U.S. Dist. LEXIS 93790, 2015 WL 4429202, at *5 (N.D. Ill. July 20, 2015) (*citing Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001)). Plaintiffs generally rely on the same common allegations to establish deceptive practices as they do for unfair practices. Plaintiffs allege

that Defendants perpetrated a scheme—forging Non-Cancellable Leases, making **[*48]** unauthorized withdrawals from customer bank accounts, obtaining *ex parte* default judgments in small claims court based on violation of mandatory arbitration clauses of the Leases based on misrepresentations of inadequate and incomplete documentation of assignment. (*Id.*, ¶¶ 8, 20-22, 32-33.) Defendants base many of these small claims cases on forged signatures on the Lease Agreements. (*Id.*, ¶¶ 5, 50.) Each of the Common Allegations addressed above is also applicable to the deceptive practices claim under the ICFA and sufficiently plead a class allegation for a claim under the ICFA sounding in fraud. It would be premature for the Court to strike class allegations on the pleadings without affording Plaintiffs the opportunity to identify individuals who have been subjected to a common set of practices that state an ICFA unfairness or deceptive acts claim. *See Wright*, 2010 U.S. Dist. LEXIS 126643, 2010 WL 4962838, at *1 (explaining that when a dispute concerning class certification is factual in nature and "discovery is needed to determine whether a class should be certified," a motion to strike class allegations at the pleading stage is premature); *Boatwright*, 2011 U.S. Dist. LEXIS 22102, 2011 WL 843898, at *2 ("[b]ecause a class determination decision generally involves considerations that are enmeshed in the factual **[*49]** and legal issues comprising the plaintiff's cause of action, ... a decision denying class status by striking class allegations at the pleading stage is inappropriate"); *Hill v. Wells Fargo Bank, N.A.*, No. 12 C 7240, 2015 U.S. Dist. LEXIS 5720, 2015 WL 232127, at *16 (N.D. Ill. Jan. 16, 2015) (finding it premature to strike class allegations at the pleading stage for ICFA unfairness claim); *accord. Thrasher-Lyon*, 861 F.Supp.2d at 913 (*citing Daley*, 165 Ill. Dec. 655, 585 N.E.2d at 66) (declining to dismiss the plaintiff's complaint regarding whether the letters and notices the defendants sent to the plaintiff were deceptive as it "is a factual issue which must be decided by the trier of fact").

Accordingly, at this early stage, Plaintiffs have made a prima facie showing on the proposed common questions of law and fact for the putative classes, and with the aid of additional evidence during discovery will be provided the opportunity to certify the class by motion for class certification, which Defendants can challenge at that time. Thus, the Court denies Defendants' motion to strike Plaintiffs' class allegations without prejudice.

**V. Scandalous Allegations**

Defendants ask the Court to strike the allegations regarding a 2013 settlement between Northern Leasing Systems Inc. and its affiliates—including Defendant Lease Finance—and the New York Attorney General referred to in the Amended **[*50]** Complaint as scandalous. Defendants argue that "there are no facts to support the conclusion that the allegations relate in any way to consumer fraud in Illinois." (R.53, at 19.) Plaintiffs respond that the allegations regarding the New York settlement are relevant to punitive damages because the alleged wrongful conduct "is part of a policy and practice of unlawfully taking money from small businesses under the guise of collecting monies supposedly due under business equipment leases." (R.63, at 16.)

Pursuant to Rule 12(f), the Court can strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009). A district court may strike an allegation as scandalous when it "bears no possible relation to the controversy," or when the allegations are "devoid of any factual basis." *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664-65 (7th Cir. 1992); *see also Anderson v. Bd. of Educ. Of City of Chicago*, 169 F.Supp.2d 864, 867-68 (N.D. Ill. 2001) ("[p]rejudice results when the matter complained of has the effect of confusing the issues"). Motions to strike are appropriate if they serve to expedite litigation. *See Heller Fin., Inc. v. Midwhey Powder*, 883 F.2d 1286, 1294 (7th Cir. 1989). District courts have considerable discretion under Rule 12(f). *See Delta*, 554 F.3d at 1141-42.

Plaintiffs characterize the presented New York practices as "not very different" from Defendants' practices in Illinois and Defendant argues that intertwining these **[*51]** allegations with those against Defendants Pushpin, Lease Finance, and Cohen has no purpose other than confusing the issues. The Court agrees. Plaintiffs allege the New York practices are "part of a policy and practice of unlawfully taking money from small businesses under the guise of collecting monies supposedly due under business equipment leases." (R.63, at 16.) Yet, the allegations concerning the New York scheme share only one Defendant with the Illinois allegations of the present action—Lease Finance. This difference in parties prejudices and confuses the issues as they relate to Defendants Cohen and Pushpin in the present action. In addition, Plaintiffs do not allege any factual support for the allegations that the New York practices and the Illinois practices are a part of a "policy

and practice" for Defendants Lease Finance, Pushpin and Cohen. Although Plaintiffs allege that Defendants' Illinois scheme is "not very different" from Northern Leasing Systems, Inc. and its affiliates scheme in New York, Plaintiffs provide only a cursory factual connection between them in that they both involve credit card processing equipment. Specifically, Plaintiffs plead that Northern Leasing **[*52]** Systems, Inc. and its affiliates entered into a settlement regarding the provision of credit card processing equipment and unauthorized withdrawals from bank accounts. (*Id.*, ¶¶ 6, 7.) On the other hand, Plaintiffs allege that Defendants Lease Finance, Pushpin, and Cohen engaged in a scheme also involving lease of credit card swiping machines, but further allege that Plaintiffs entered into Non-Cancellable Leases by forgery and that Defendants sent misleading collection letters and obtained *ex parte* default judgments in Illinois in violation of mandatory arbitration clauses. (*See e.g.*, R.45, ¶ 8.) Furthermore, Plaintiffs do not allege that Defendants Pushpin and Cohen were involved with Defendant Lease Finance at the time of the New York action. Plaintiffs' allegations, therefore, fail to provide a factual connection for a "policy and practice" by Defendants in the present action with only one party's involvement linking it to the New York action. As such, the Court grants Defendants' motion to strike the allegations regarding the New York scheme and strikes paragraphs 6 and 7 of Plaintiffs' Amended Complaint.

## VI. Dismissal of Claims Against Cohen

Lastly, Defendants argue that the Court **[*53]** should dismiss all claims against Defendant Cohen because Plaintiffs have failed to allege any specific acts (or resulting damage) attributable to him. Taking the facts in the light most favorable to Plaintiffs, Plaintiffs allege that Defendant Cohen is the only listed member of Defendant Lease Finance, an Illinois registered LLC. (R.45, ¶ 13.) Plaintiffs further allege that Defendant Cohen owns, operates and controls numerous shell entitles—including Pushpin and Lease Finance—which sell equipment leases, buy debts, and collect debts acquired through purchases of leases. (*Id.*, ¶ 14.) Plaintiffs further allege that Defendant Cohen is also the managing member of and controls the operations for GCN Holdings, LLC—a corporation that acquires debts and subsequently assigns them to Defendant Pushpin. (*Id.*, ¶ 15.) The Instrument of Assignment associated with the Blankenship Lease lists GCN Holdings, LLC as "Buyer" and the Assignment and Assumption Agreement, also associated with the Blankenship

2015 U.S. Dist. LEXIS 135944, *53

Lease, is signed by Defendant Cohen, as President of Pushpin Holdings, LLC as "Buyer" and Pushpin as "Seller"—putting Cohen on both sides of the alleged assignment. (R.45-4, at 10-11.) Based on these **[\*54]** allegations, Plaintiffs have sufficiently alleged Defendant Cohen's involvement in various transactions related to Pushpin. Lease Finance, and GCN Holdings, LLC. Thus, Defendants' motion to dismiss all claims against Defendant Cohen is denied.

## CONCLUSION

For the forgoing reasons, the Court grants in part and denies in part Defendants' Motion to Dismiss the First Amended Class Action Complaint or, In the Alternative, to Strike Scandalous and Class Allegations Therefrom.

**DATED: October 6, 2015**

/s/ Amy J. St. Eve

AMY J. ST. EVE

United States District Court Judge

End of Document

# West v. Act II Jewelry, LLC

United States District Court for the Northern District of Illinois, Eastern Division

March 18, 2016, Decided; March 18, 2016, Filed

No. 15 C 5569

**Reporter**
2016 U.S. Dist. LEXIS 34963 *; 2016 WL 1073095

CYNTHIA WEST, et al., Plaintiffs, v. ACT II JEWELRY, LLC d/b/a LIA SOPHIA, et al., Defendants.

**Counsel: [*1]** For Cynthia West, individually and on behalf of all others similarly situated, Kristine Hollander, individually and on behalf of all others similarly situated, Plaintiffs: John Shannon Marrese, Joseph J Siprut, Todd Lawrence McLawhorn, LEAD ATTORNEYS, Siprut PC, Chicago, IL.

For Act II Jewelry, LLC, a Delaward limited liability corporation, doing business as Lia Sophia, Kiam Equities Corporation, a Delaware corporation, Victor K Kiam, III, Elena Kiam, Defendants: Eric L. Samore, LEAD ATTORNEY, Albert M Bower, SmithAmundsen LLC (Chgo), Chicago, IL; Ronald David Balfour, Yesha Sutaria Hoeppner, Smithamundsen Llc, Chicago, IL.

**Judges:** Samuel Der-Yeghiayan, United States District Judge.

**Opinion by:** Samuel Der-Yeghiayan

# Opinion

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Act II Jewelry, LLC d/b/a Lia Sophia's (Lia Sophia) partial motion to dismiss, and on Defendant Kiam Equities Corporation's (KEC), Defendant Victor K. Kiam, III's (Tory Kiam), and Elena Kiam's (collectively referred to as "Kiam Defendants") motion to dismiss. For the reasons stated below, Lia Sophia's motion to dismiss is denied, and Kiam Defendants' motion to dismiss is granted.

## BACKGROUND

Lia Sophia **[*2]** is allegedly a seller of fashion jewelry. As part of Lia Sophia's sales model, it allegedly provided a lifetime guarantee (Lifetime Guarantee) that promised that it would replace any jewelry it sold for as long as the customer owned the jewelry. In the event that Lia Sophia could not replace the jewelry, the Lifetime Guarantee allegedly specified that customers would receive certificates (Certificates) that the customer could redeem for another piece of jewelry of comparable value. On December 1, 2014, Lia Sophia allegedly announced that it was winding down its U.S. and Canadian operations and would be ceasing operations. Lia Sophia also allegedly announced that it would honor the Lifetime Guarantee only until December 28, 2014. Plaintiffs contend that although Lia Sophia continues to operate its business in an on-line e-commerce operation, Lia Sophia refuses to honor the Lifetime Guarantee. Plaintiffs also contend that Lia Sophia induced its Sales Advisors to continue to sell and purchase additional products and to recruit other Sales Advisors during 2014, when Lia Sophia allegedly knew that it was not going to honor the Lifetime Guarantee.

Plaintiff Cindy West (West) allegedly worked **[*3]** as a Sales Advisor for Lia Sophia for nearly three years and purchased pieces of jewelry from Lia Sophia for her personal use. Plaintiff Kristine Hollander (Hollander) allegedly purchased Lia Sophia Jewelry for her personal use through an authorized Lia Sophia representative. KEC is allegedly the sole member of Lia Sophia. Tory Kiam is allegedly the Chief Executive Officer of Lia Sophia and President of KEC and one of the owners of KEC. Elena Kiam is allegedly the Creative Director of

2016 U.S. Dist. LEXIS 34963, *3

Lia Sophia and one of the owners of KEC. Plaintiffs include in their complaint breach of contract claims brought by Hollander against Lia Sophia and KEC (Count I), claims brought under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.* brought by Hollander (Count II), state law common law fraud claims brought by Hollander (Count III), unjust enrichment claims brought by Hollander (Count IV), ICFA claims brought by West (Count V), state law common law fraud claims brought by West (Count VI), and unjust enrichment claims brought by West (Count VII). Lia Sophia now moves to dismiss certain claims brought by West and Hollander and to strike the class allegations made by West. Kiam Defendants **[*4]** also move to dismiss all claims brought against them.

**LEGAL STANDARD**

In ruling on a motion to dismiss brought pursuant Federal Rule of Civil Procedure 12(b)(6) (Rule 12(b)(6)), the court must draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 622 (7th Cir. 2012); *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). A plaintiff is required to include allegations in the complaint that "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'" and "if they do not, the plaintiff pleads itself out of court." *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)(quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)); *see also Morgan Stanley Dean Witter, Inc.*, 673 F.3d at 622 (stating that "[t]o survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged")(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009))(internal quotations omitted).

**DISCUSSION**

I. Lia Sophia's Motion to Dismiss

Lia Sophia moves to dismiss certain claims brought by West and certain claims brought by Hollander.

A. West's **[*5]** Claims Brought Against Lia Sophia

Lia Sophia moves to dismiss the ICFA claim, the fraud claim, and the unjust enrichment claim brought by West against Lia Sophia and to strike the class allegations brought by West.

1. Class Allegations

Lia Sophia moves to dismiss or strike the class allegations to the extent that they are brought by West. Lia Sophia contends that West signed a Sales Advisor Agreement that contained a waiver, which specified that West agreed not to serve as a class representative in litigation brought against Lia Sophia. Although Plaintiffs preserved their right to pursue a motion for class certification in this action, this court has not yet certified a class in this action and there is no motion for class certification pending at this time. At the appropriate juncture in these proceedings, the court will reinstate Plaintiffs' motion for class certification and the parties will be given an opportunity to brief the motion. Thus, to the extent that Lia Sophia challenges West's right to pursue a class action or to act as a class representative, Lia Sophia's arguments are premature.

2. West's ICFA Claim Brought Against Lia Sophia

Lia Sophia argues that West is a citizen of **[*6]** Iowa and has not shown that her claims have a sufficient nexus with Illinois to fall within the protection of the ICFA. The Illinois Supreme Court has held that "a plaintiff may pursue a private cause of action under the [ICFA] if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 835 N.E.2d 801, 853-54, 296 Ill. Dec. 448 (Ill. 2005)(indicating that the standard applies even to plaintiffs who are not residents of Illinois).

In the instant action, Plaintiffs allege that West is a citizen of Iowa. (Compl. Par. 10). Plaintiffs also present allegations that suggest that Lia Sophia devised its alleged fraudulent scheme in Illinois. (Compl. Par. 12, 60). Plaintiffs further allege that West had direct communications with Lia Sophia in Illinois, such as

when Lia Sophia allegedly had communications with Sales Advisors regarding sales incentives. (Compl. Par. 58). In addition, Plaintiffs allege that West purchased supplies directly from Lia Sophia in Illinois. (Compl. Par. 60). Such allegations at this juncture are sufficient to indicate that the alleged misconduct by Lia Sophia relating to West occurred primarily and substantially in Illinois. Therefore, Lia Sophia's motion to dismiss the **[*7]** ICFA claim brought by West against Lia Sophia is denied. The court notes that at the summary judgment stage, Plaintiffs will need to point to sufficient evidence to show that the alleged conduct falls within the scope of the ICFA protections.

### 3. West's Fraud Claim Brought Against Lia Sophia

Lia Sophia argues that West is barred from pursuing fraud claims based on the Sales Advisor Agreement. For an Illinois common-law fraud claim, a plaintiff must establish: (1) that the defendant made "a false statement of material fact," (2) that the defendant knew that the "statement was false," (3) that the defendant intended the statement to "induce the plaintiff to act," (4) that the plaintiff relied "upon the truth of the statement," and (5) that the plaintiff suffered "damages . . . from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 675 N.E.2d 584, 591, 221 Ill. Dec. 389 (Ill. 1996). Lia Sophia contends that language in the Sales Advisor Agreement forecloses any possibility of fraud on Lia Sophia's part. For example, Lia Sophia contends that the Sales Advisor Agreement provides that it has the right to terminate the Sales Advisor Agreement "for any reason immediately upon written notice to the other party." (W Mot. 13). However, West is not seeking to challenge **[*8]** Lia Sophia's right to terminate the Sales Advisor Agreement. Instead, West is seeking to hold Lia Sophia liable for fraudulent conduct such as allegedly knowingly deceiving West and inducing her to continue to make sales and recruit new advisors under false pretenses. (Compl. Par. 108). Lia Sophia has not pointed to any language in the Sales Advisor Agreement that would preclude the possibility of such fraudulent conduct. While Lia Sophia can point to contractual language in the Sales Advisor Agreement at the summary judgment stage, Lia Sophia has not pointed to any contractual language that on its face would negate the plausibility of West's allegations of fraud. Therefore, the motion to dismiss West's fraud claim brought against Lia Sophia is denied.

### 4. West's Unjust Enrichment Claim Brought Against Lia

Sophia

Lia Sophia contends that West cannot pursue an unjust enrichment claim because West has asserted a breach of contract claim. Under Illinois law, "[w]hen two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 570-71 (7th Cir. 2016)(quoting *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004)). West indicates that she is not basing her unjust enrichment claim upon her **[*9]** contractual relationship with Lia Sophia. Instead, West bases her unjust enrichment claim on the alleged fraud by Lia Sophia that involved conduct that was not covered by any contractual relationship. West contends that Lia Sophia knew in 2014 that as it continued to sell jewelry that it was not going to honor the Lifetime Guarantee. That alleged fraud is separate and apart from the alleged contractual relationship and to the extent that Lia Sophia was unjustly enriched by such fraud, West can pursue an unjust enrichment claim. Therefore, the motion to dismiss West's unjust enrichment claim brought against Lia Sophia is denied.

### B. Hollander's Claims Brought Against Lia Sophia

Lia Sophia moves to dismiss the ICFA claim, the fraud claim, and the unjust enrichment claim brought by Hollander against Lia Sophia.

### 1. Hollander's ICFA Claim Brought Against Lia Sophia

Lia Sophia argues that Hollander, like West, is a citizen of Iowa and has not shown that her claims have a sufficient nexus with Illinois to fall within the protection of the ICFA. As indicated above, a plaintiff can "pursue a private cause of action under the [ICFA] if the circumstances that relate to the disputed transaction occur **[*10]** primarily and substantially in Illinois." *Avery*, 835 N.E.2d at 853-54. Plaintiffs allege that Lia Sophia formulated its alleged scheme to defraud Plaintiffs in its headquarters in Illinois and that it sent out the fraudulent communications via the internet from its Illinois headquarters. (Compl. Par. 12, 86). Plaintiffs also identify certain communications from Lia Sophia that focus on Lia Sophia's activities in Illinois and the need for customers to deal directly with Lia Sophia. For example Plaintiffs allege that Lia Sophia stated that "ALL returns or exchanges must be handled through the company and NOT the advisor." (Compl. Par. 26-27). In

addition, Lia Sophia allegedly informed all customers that its orders are shipped directly from Lia Sophia in Illinois. (Compl. Par. 12, 26-27). Such allegations at this juncture are sufficient to suggest that the alleged misconduct by Lia Sophia relating to Hollander occurred primarily and substantially in Illinois.

Lia Sophia argues that Hollander dealt exclusively with a Lia Sophia Sales Advisor in Iowa. However, it is premature at this juncture to consider such evidence outside of the pleadings. *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 538 (7th Cir. 2011)(stating that while the court could not "say that the complaint and **[*11]** answer contain enough to point unerringly to Illinois law," the Court could not "say that the complaint does not defeat application of Illinois law" and that the court could not consider evidence at the pleadings stage).

Lia Sophia also argues that Hollander's ICFA claim is based upon a contractual guarantee and cannot be a basis for fraud under Illinois law. A breach of a contractual obligation, "without more, is not actionable under the" ICFA. *Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 901 (7th Cir. 2006)(internal quotations omitted)(quoting *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 724 N.E.2d 988, 992, 244 Ill. Dec. 100 (Ill. App. Ct. 2000)). Hollander argues that her ICFA claim is based upon more than the Lifetime Guarantee. Hollander does assert that Lia Sophia provided a guarantee and that Lia Sophia failed to honor that guarantee. However, Hollander also alleges that "for much of 2014" Lia Sophia knew that it was going to be closing operations, and knew that it was not going to honor the Lifetime Guarantee. (Compl. Par. 5, 84). Hollander also contends that she purchased jewelry from Lia Sophia in 2014. (Compl. Par. 53). Thus, Hollander has presented sufficient allegations at this pleadings stage to state a valid ICFA claim. Lia Sophia contends that Hollander failed to allege a specific date that Lia Sophia decided it would not honor the **[*12]** Lifetime Guarantee and Hollander failed to allege the specific dates that she purchased jewelry. Hollander, however, is not required to provide such detail in her pleadings to state a valid ICFA claim. At the summary judgment stage, Hollander will need to point to sufficient evidence showing that Lia Sophia did not intend to honor the Lifetime Guarantee at some point and that Hollander purchased jewelry after that point. Therefore, Lia Sophia's motion to dismiss the ICFA claim brought by Hollander against Lia Sophia is denied.

## 2. Hollander's Fraud Claim Brought Against Lia Sophia

Lia Sophia argues that Hollander's fraud claim is based upon a contractual guarantee and cannot be a basis for fraud under Illinois law. However, as indicated above in regard to Hollander's ICFA claim, Hollander has premised her allegations of fraudulent conduct upon more than the contractual relationship she formed with Lia Sophia. Therefore, Lia Sophia's motion to dismiss the fraud claim brought by Hollander against Lia Sophia is denied.

## 3. Hollander's Unjust Enrichment Claim Brought Against Lia Sophia

Lia Sophia contends that Hollander cannot pursue an unjust enrichment claim because Hollander has asserted **[*13]** a breach of contract claim. However, as explained above, Hollander has alleged facts to suggest a valid fraud claim and Hollander can base her unjust enrichment claim upon such alleged fraudulent conduct. Hollander has also pled the unjust enrichment claim in the alternative. Therefore, Lia Sophia's motion to dismiss the unjust enrichment claim brought by Hollander against Lia Sophia is denied.

## II. Kiam Defendants' Motion to Dismiss

Kiam Defendants argue that Plaintiffs have not alleged sufficient facts to suggest that they should be held liable for the alleged misconduct by Lia Sophia. Generally, a corporation has an existence apart from "its shareholders, officers, directors and related corporations, and those individuals and entities ordinarily are not subject to corporate liabilities." *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009); *see also* Del. Code Ann. tit. 6, § 18-303(a)(stating that "no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company"). However, a plaintiff may seek to hold such individuals or entities liable under the piercing of the corporate veil theory, **[*14]** which "is an equitable remedy governed by state law." *Laborers' Pension Fund*, 580 F.3d at 610. The parties agree that since Lia Sophia is incorporated in Delaware, Delaware state law governs the piercing of the corporate veil theory in this case. (K Mot. 4); (Resp. K Mot. 7 n.2).

Under Delaware law, a plaintiff can "pierce the corporate veil of a company 'where there is fraud or where [it] is in

fact a mere instrumentality or alter ego of its owner.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456-57 (2d Cir. 1995)(quoting in part *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)). To hold a defendant personally liable under the piercing the corporate veil theory, a plaintiff must establish: (1) that the defendant and the sham entity "operated as a single economic unit," and (2) that failure to pierce the corporate veil would result in "an overall element of injustice or unfairness." *Wilson v. Thorn Energy, LLC*, 787 F. Supp. 2d 286, 297 (S.D.N.Y. 2011); *see also Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 2015 U.S. Dist. LEXIS 134147, 2015 WL 5773895, at *50 (S.D.N.Y. Sept. 30, 2015)(stating that the test "focus[es] on (1) whether the [dominant shareholder and the corporation] in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness"). In determining whether there is a unity of interests the court can consider factors such as: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation **[*15]** at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528-29 (D. Del. 2008); *see also Sprint Nextel Corp. v. iPCS, Inc.*, 2008 Del. Ch. LEXIS 90, 2008 WL 2737409, at *11 (Del. Ch. 2008)(stating that "[i]t is only the exceptional case where a court will disregard the corporate form").

A. Individual Defendants

In the instant action, Plaintiffs contend that they can pierce the corporate veil in regard to Tory Kiam and Elena Kiam (collectively referred to as "Individual Defendants") because they allegedly perpetrated the fraud themselves. (Reps. 6). Plaintiffs must however show more than that the Individual Defendants engaged in wrongful conduct. Although Plaintiffs accuse Individual Defendants of committing fraud in regard to the Lifetime Guarantee, the fraud that must be established to pierce the corporate veil would be the use of Lia Sophia by Individual Defendants as a fictitious sham entity for their own interests.

Plaintiffs also failed to suggest that the corporate veil should be pierced in regard to the Individual Defendants because Plaintiffs have failed to allege facts that suggest that KEC **[*16]** was a shell corporation for Individual Defendants' interests. Plaintiffs allege only that KEC "took distributions from Lia Sophia. . . ." (Compl. Par. 46). There are no allegations that the Individual Defendants themselves took funds from Lia Sophia. To the extent that Plaintiffs would argue that KEC was itself a sham company for the Individual Defendants' personal use, Plaintiffs have failed to present facts in the complaint to suggest such a conclusion. Plaintiffs' allegations that Individual Defendants "benefitted from [the] distributions by virtue of their ownership of KEC," is not sufficient to show that KEC was a sham company. (Compl. Par. 13). Nor have Plaintiffs shown that there will be any injustice or unfairness if the corporate veil is not pierced to hold Individual Defendants liable.

Plaintiffs also contend that they can bring claims directly against the Individual Defendants for fraud because they allegedly were personally involved in the alleged misconduct. However, Plaintiffs have failed to alleged facts to plead any fraud-based claims against Individual Defendants with particularity in accordance with Federal Rule of Civil Procedure 9(b) (Rule 9(b)). *See Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013)(stating that to plead with particularity, the plaintiff **[*17]** must allege "the who, what, when, where, and how: the first paragraph of any newspaper story"). Plaintiffs allege generally that Lia Sophia made alleged fraudulent representations, but Plaintiffs allege only a few statements made personally by Individual Defendants such as Tory Kiam's alleged statement relating to a "Black Friday" sale, which did not include a promise relating to the Lifetime Guarantee. Plaintiffs have failed to present facts as to either of the Individual Defendants that would suffice under Rule 9(b). Thus, the Individual Defendants cannot be held liable for Lia Sophia's alleged wrongdoing.

B. KEC

In regard to piercing the corporate veil to hold KEC liable, Plaintiffs allege that the Individual Defendants were heavily involved in the day to day operations of Lia Sophia, that Elena Kiam is the Creative Director of Lia Sophia, and that Tory Kiam is the CEO of Lia Sophia, and that KEC is the sole member of Lia Sophia. (Compl. Par. 43). Plaintiffs also alleged that KEC controlled the operations of Lia Sophia. (Compl. Par. 87). However, the mere fact that Kiam Defendants may have had extensive control over Lia Sophia does not show that Lia Sophia was merely a sham corporation used **[*18]** to further the interests of KEC. Nor is it sufficient that

Plaintiffs have alleged that Kiam Defendants mismanaged Lia Sophia's funds. (Compl. Par. 45-46). Plaintiffs' allegations, even when accepted as true, do not rise to the level that the court should take the extraordinary step of piercing the corporate veil.

Plaintiffs also make a vague reference to the Individual Defendants "siphoning millions of dollars out of the company." (Compl. Par. 34). First of all, Plaintiffs fail to even suggest that such facts are more than a mere possibility since Plaintiffs acknowledge in the complaint that it was only "rumored that" such "siphoning" occurred. (Compl. Par. 34). Secondly, although Plaintiffs use the sinister sounding word "siphoning," Plaintiffs fail to allege facts to suggest that Kiam Defendants did anything other than take the distribution as alleged by Plaintiffs or to suggest that KEC took any action that was unlawful or not in the ordinary course of business. Plaintiffs also fail to adequately present facts to indicate that Lia Sophia was undercapitalized or to indicate that Lia Sophia failed to observe corporate formalities. Nor have Plaintiffs shown that there will be any injustice **[\*19]** or unfairness if the corporate veil is not pierced to hold KEC liable. Plaintiffs have thus not alleged sufficient facts to suggest that the corporate veil should be pierced to hold KEC liable. *See Heyman v. Beatrice Co.*, 1995 U.S. Dist. LEXIS 4135, 1995 WL 151872, at *7 (N.D. Ill. 1995)(stating that "Delaware courts will allow the corporate veil to be pierced only under the most exceptional of circumstances"). Based on the above, Kiam Defendants' motion to dismiss is granted.

**CONCLUSION**

Based on the foregoing analysis, Lia Sophia's motion to dismiss is denied, and Kiam Defendants' motion to dismiss is granted.

/s/ Samuel Der-Yeghiayan

Samuel Der-Yeghiayan

United States District Court Judge

Dated: March 18, 2016