**UNPUBLISHED OPINIONS MENTIONED IN MOTION**

**(ARRANGED IN ORDER OF APPEARANCE)**

# Carol Diane Gray & Strategic Research Consulting, Inc. v. United States

United States District Court for the Northern District of Illinois, Eastern Division

September 4, 2012, Decided; September 4, 2012, Filed

No. 11 cv 3269

**Reporter**

2012 U.S. Dist. LEXIS 125076 *; 2012-2 U.S. Tax Cas. (CCH) P50,548; 110 A.F.T.R.2d (RIA) 2012-5804; 2012 WL 3835261

CAROL DIANE GRAY and STRATEGIC RESEARCH CONSULTING, INC., Plaintiffs, v. UNITED STATES OF AMERICA, Defendants.

**Subsequent History:** Affirmed by Gray v. United States, 723 F.3d 795, 2013 U.S. App. LEXIS 14873 (7th Cir. Ill., July 23, 2013)

**Prior History:** Gray v. United States, 2011 U.S. Dist. LEXIS 144731 (N.D. Ill., 2011)

**Counsel: [*1]** Carol Diane Gray, Plaintiff, Pro se, Fox Lake, IL.

For Carol Diane Gray, Strategic Research Consulting, Inc., Plaintiffs: David M Adler, LEAD ATTORNEY, Leavens, Strand, Glover & Adler, LLC, Chicago, IL.

For United States of America, Defendant: Christina Medzius Bixby, LEAD ATTORNEY, United States Department of Justice, Tax Division, Washington, DC; AUSA, United States Attorney's Office (NDIL), Chicago, IL.

**Judges:** Judge Sharon Johnson Coleman.

**Opinion by:** Sharon Johnson Coleman

# Opinion

## Memorandum Opinion and Order

Plaintiffs Carol Gray and Strategic Research Consulting, Inc. (collectively "Gray") filed a four count Second Amended Complaint on January 16, 2012, alleging violations of the Internal Revenue Code, 26 U.S.C. §§ 7422, 7432, 7433. The government moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) on the basis that this Court lacks subject matter jurisdiction since the United States has not waived sovereign immunity and Gray has failed to state a claim upon which relief can be granted. For the reasons stated herein, the Court grants the motion.

## Background

The relevant factual background is reproduced here from this Court's December 16, 2011 Order dismissing [*2] the First Amended Complaint. During Gray's divorce proceedings in the 1990s, it came to light that her ex-husband allegedly failed to file and pay federal income tax for several years including 1992 through 1995, some of the years at issue in the present litigation. Gray alleges that she paid installments on her tax bill for the years 1992 to 1995 until receiving a letter from the IRS on October 8, 1997, in response to her request for an installment plan. The letter stated that the IRS "can't consider an installment agreement for you because our records show you don't owe anything on this account." The letter further states that, due to her ex-husband Steven Gray's bankruptcy proceedings, "[a]ll collection activities are currently suspended." Gray believes the letter indicated that her tax arrearages had been dismissed. Gray alleges that she showed the October 8, 1997, letter to IRS agents and that they ignored the letter and thus the process was unfair and lacked impartiality. Gray alleges that she was

threatened with perjury for asking to amend her 1992 through 1995 tax returns. Gray alleges that Appeals Officer Zimmerman told her in June 2000, that Gray would receive relief from **[*3]** penalties for 1992 through 1995, but in the Appeals Officer's final decision she was denied relief.

Gray claims that she significantly overpaid her taxes for the years 1996 through 1999 and the IRS owes her a refund. She further explains that she did not file timely returns for 2001, 2002, 2003, and 2004 because she had to pay her son's college tuition and incurred significant failure to file penalties for those years.

Gray alleges that in 2007 Revenue Officer Holcomb promised her that no further lien would be placed on her properties as long as Gray complied with the payment schedule, but a month later five additional liens were placed on Gray's business property. Gray claims that the tax liens have ruined her credit and she has lost, among other things, money, equity in her home, and business opportunities.

In 2009, Gray underwent an audit for the years 1992 through 1995. Gray alleges that significant changes were made to her tax returns for those years, resulting in an increase in liability. On November 16, 2011, Gray filed an administrative claim for the determination of her tax liabilities for the years at issue in the Second Amended Complaint. (2d Amend. Compl. at ¶ 140).

## Legal **[*4]** Standard

Rule 12(b)(1) requires dismissal of claims over which the federal court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Jurisdiction is the "power to decide" and must be conferred upon the federal court. *In re Chicago, Rock Island & Pacific R.R. Co.*, 794 F.2d 1182, 1188 (7th Cir. 1986). In reviewing a Rule 12(b)(1) motion, the Court may consider additional materials beyond the complaint to determine whether subject matter jurisdiction exists. *See United Phosphorus Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc). A plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met. *See Western Transp. Co. v. Couzens Warehouse & Distributors, Inc.*, 695 F.2d 1033, 1038 (7th Cir. 1982).

A motion to dismiss tests the legal sufficiency of the complaint. See Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) (quoting *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892

F.2d 583, 586 (7th Cir.1989)). In the context of a motion to dismiss, the Court accepts all well pleaded allegations as true, views them in the light most favorable to the plaintiff, and **[*5]** draws all reasonable inferences in favor of the plaintiff. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010). Although the bar to survive a motion to dismiss is not high, the complaint must allege sufficient factual matter, accepted as true to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

## Discussion

The government moves to dismiss Gray's claims for negligence on the part of IRS officers in the collection of her taxes assessed for tax years 1992 through 1995 (Count I), the placement of a lien on her property relating to tax years 2001, 2003, and 2004 (Count II), refund stemming from an alleged overpayment for tax years 1996 through 1999 (Count III), and the 2009 audit of Gray's tax returns from 1992 through 1995 (Count VI). The government argues that it has not waived sovereign immunity and that Gray fails to state a claim upon which relief can be granted.

Generally, the United States maintains sovereign immunity against civil suits unless Congress expressly waives it. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992). **[*6]** Under 28 U.S.C. § 1346(a)(1), a district court has original jurisdiction in "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." Where a statute provides for a specific consent to suit, "the limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lane v. Pena*, 518 U.S. 187, 192, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996) (quoting *Lehman v. Nakshian*, 453 U.S. 156, 161, 101 S. Ct. 2698, 69 L. Ed. 2d 548 (1981)). The burden is on the plaintiff to establish that the government consents to be sued in this case. *See Whittle v. United States*, 7 F.3d 1259, 1261 (6th Cir. 1993). Here, Gray is seeking to sue the government pursuant to sections 7433, 7432, 7422 of the Internal

Revenue Code therefore this Court will examine Gray's Second Amended Complaint to determine whether all of the conditions and limitations on which the government consents to be sued in those provisions have been met.

### 1. Count  [*7] I and Count IV (Section 7433)

Gray brings both Count I and Count IV of the Second Amended Complaint pursuant to 26 U.S.C. § 7433. In Count I, Gray alleges that various IRS officers acted negligently and recklessly in seeking collection of an assessment for tax years 1992 through 1995. In Count IV, Gray alleges that in May and June of 2009 the IRS conducted an illegal audit of her tax returns from tax years 1992 through 1995, which she became aware of on May 15, 2009.

Section 7433(a) authorizes suits against the government in connection with collection of federal income tax. Section 7433(d) provides for three limitations on such suits, including exhaustion of administrative remedies and that suits may be "brought only within 2 years after the date the right of action accrues." 26 U.S.C. § 7433(d)(1),(3). The government argues that Counts I and IV meet neither of these limitations.

In order to exhaust administrative remedies the taxpayer must file an administrative claim and may not file a civil action in the district court before the earlier of the following dates: the date the decision is rendered on an administrative claim or the date six months after the date an administrative claim  [*8] is filed unless the administrative claim is filed within the last six months before the expiration of the two year statute of limitations in which case a civil action may be filed at any time. 26 C.F.R. §301.7433-1(d).

Here, Gray filed her administrative claim on November 16, 2011. She does not allege in her complaint that the government rendered any decision on her claim [1] thus Gray should not have filed a civil action until May 16, 2012. Gray filed the instant action on May 16, 2011, before ever filing an administrative claim. Therefore, Gray has failed to exhaust her administrative remedies, unless she filed this action within six months of the expiration of the statute of limitations.

---

[1] Gray asserts in her Brief in Opposition to the Motion to Dismiss that the IRS denied her administrative claims on February 29, 2012.

Civil actions brought pursuant to section 7433 must be filed within two years of the date the cause of action accrues. 26 U.S.C. § 7433(d)(3). Under this section, a cause of action "accrues when the taxpayer has had a reasonable opportunity to discover all essential elements of a possible cause of action." 26 C.F.R. §301.7433-1(g)(2). Here, Gray filed her original complaint  [*9] on May 16, 2011; therefore, in order to be timely, her cause of action must not have accrued before May 16, 2009. Gray's November 16, 2011, administrative claim raised four bases for seeking relief: (1) an illegal audit on May 15, 2009, and June 23, 2009 ("Claim 1"); (2) notices from the IRS regarding abatement of penalties dated November 16, 2009 ("Claim 2"); and (3) a pending Tax Court case ("Claim 3"); (4) a letter from the IRS dated October 8, 1997, that Gray alleges states that for a joint-account with her then-husband "there are no outstanding arrearages for 1992 through 1995" ("Claim 4").

With respect to the audits on May 15, 2009, and June 23, 2009, the government argues that because Gray admits she became aware of the audit on May 15, 2009, the statutory period expired on May 15, 2011, months before the administrative claim and the Second Amended Complaint were filed. Inexplicably and without authority, the government calculates the statutory time period from the filing of the Second Amended Complaint rather than the original complaint. The government does not argue that the Second Amended Complaint is so different from the original complaint that the allegations do not relate  [*10] back. Nevertheless, Gray admits that she became aware of the audit on May 15, 2009; therefore, her claims arising from that audit are untimely.

Gray's second claim involves several notices from the IRS regarding abatement of penalties pursuant to 26 U.S.C. § 6404 dated November 16, 2009. The letters attached to the administrative claim show the balances due and owing for tax years 1992 through 1995. Gray appears to take issue with the assessment amount for those years. The letters specifically state that the penalty amounts have been reduced in response to Gray's request and the itemization reflects credits to her account. To the extent that Gray is seeking to challenge the assessment of taxes for the years 1992 through 1995, such a claim is not viable under section 7433, which is limited to unauthorized collection actions. "To be sure, § 7433 provides for a 'civil action' only for damages arising from the 'collection' of taxes, not for damages arising from the investigation and determination of tax liability." *Judicial Watch v. Rossotti*,

317 F.3d 401, 411 (4th Cir. 2003).

Gray's third administrative claim refers to her pending Tax Court case related to tax years 1992 through 1995. Gray **[*11]** is the petitioner in her Tax Court collection due process case and thus it is not a "collection action" taken by the IRS that could be subject to a civil action brought pursuant to section 7433 and Gray makes no allegation of statutory violation by the Tax Court, only that she is challenging the assessment of taxes and arrearages.

Similarly, Gray's fourth claim is a challenge to the assessment of taxes. Though not expressly incorporated into her Administrative Claim, Gray included the "Eppler" letter as an attachment. Gray repeatedly refers to the letter as evidence that she owes no taxes for the years 1992 through 1995. Indeed, the letter states, "We can't consider an installment agreement for you because our records show you don't owe anything on this account." However, it goes on to state that, "[y]our account is being handled by our Special Procedures Unit in our Chicago District Office due to bankruptcy proceedings begun by Mr. Steven Gray on May 12, 1997. All collection activities are currently suspended." The inclusion of this letter with her Administrative Claim as well as in the allegations in her Second Amended Complaint further indicates that Gray is seeking to challenge **[*12]** the assessment of taxes for the years 1992 through 1995 rather than damages resulting from the collection of those taxes. Even if Gray could assert claims based on this letter under section 7433, by her own admission the government resumed collection activities against her in 2007 for tax years 1992 through 1995. Since she did not file her complaint here until 2011, any claim arising from the supposed abatement of her taxes by the letter would be untimely. Accordingly, this Court dismisses Count I and Count IV with prejudice for failure to exhaust administrative remedies and for failure to state a claim upon which relief can be granted.

### 2. Count II (Section 7432)

Count II of the Second Amended Complaint is brought pursuant to 26 U.S.C. § 7432. Gray alleges she received a letter on March 13, 2007, regarding tax years 2001, 2003, and 2004. The government placed a lien on Gray's property. Gray alleges that IRS Officer Barbara Holcomb negligently, recklessly or intentionally told Gray that an "Offer in Compromise" was being discussed and therefore any hearing to contest the lien

was premature. (Second Am. Compl. ¶ 156).

Section 7432 provides for a civil cause of action if any officer or employee **[*13]** of the Internal Revenue Service knowingly, or by reason of negligence, fails to release a lien under section 6325 on property of the taxpayer. 26 U.S.C. § 7432(a). Section 6325 states that the Secretary shall issue a certificate of release of any lien imposed with respect to any internal revenue tax not later than 30 days after the day on which the liability is satisfied or legally unenforceable, or a bond is accepted. Plaintiffs seeking damages under section 7432 must exhaust administrative remedies and file the complaint in the district court within two years of accrual of the cause of action. 26 U.S.C. § 7432(d)(1) and (3).

Here, Gray fails to allege or otherwise suggest that an administrative claim related to these allegations was ever filed. Gray's administrative claim from November 16, 2011, clearly states that the allegations therein are pursuant to section 7433. Moreover, Gray's allegations regarding the lien on her property are not included in her administrative claim. Accordingly, this Court finds that Gray has failed to exhaust her administrative remedies and Count II must be dismissed with prejudice.

### 3. Count III (Section 7422)

In Count III of her Second Amended Complaint, **[*14]** Gray alleges that based on her amended tax returns for 1996 through 1999 that she filed in April of 2009 she is entitled to a refund for overpayment. The government moves to dismiss Count III on the basis that the request for refund is untimely because she did not file her amended returns within three years of the original returns or within two years of her last payment.

Section 7422 provides that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof." 26 U.S.C. § 7422(a). The government assumes in its motion that the amended returns filed in April 2009 were claims for refund from the years 1996 through 1999.

The government asserts that Gray's amended returns

were untimely claims for refund under section 6511(a). Section 6511(a) **[*15]** states that a claim for refund must be filed within three years of the filing of the original return, or two years from the time the taxes were paid, whichever is later. For tax year 1996, Gray filed her original return on November 3, 1997, and made her last payment on November 10, 1997, therefore her April 2009 claim for refund was not submitted within three years of her original return or within two years from the time the taxes were paid. For tax year 1997, Gray filed her original return on April 26, 1999, and made her last payment on May 12, 1999, therefore her April 2009 claim for refund was not submitted within three years of her original return or within two years from the time the taxes were paid. For tax year 1998, Gray filed her original return on April 17, 2000, and made her last payment on May 11, 2000, therefore her April 2009 claim for refund was not submitted within three years of her original return or within two years from the time the taxes were paid. For tax year 1999, Gray filed her original tax return on November 20, 2000, and made her last payment on May 27, 2001, therefore her April 2009 claim for refund was not submitted within three years of her original return **[*16]** or within two years from the time the taxes were paid. Accordingly, this Court finds that Gray's claim for refund in April 2009 for tax years 1996 through 1999 is untimely pursuant to section 6511(a).

Gray argues in opposition that the claim for refund are timely pursuant to section 6532(a)(1). That section states, "[n]o suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates." 26 U.S.C. § 6532(a)(1).

Here, Gray filed her complaint within two years of the IRS's denial of her claims for refund. For tax year 1996, the IRS denied her claim on July 6, 2009. For tax year 1997, her claim for refund was denied on July 20, 2009. For tax year 1998, the last entry of payment is on May 11, 2000. For tax year 1999, the IRS denied Gray's claim for **[*17]** refund on September 28, 2009. Therefore, the situation here is that Gray's claims for refund for tax years 1996 through 1999 were untimely under section 6511(a), but the instant lawsuit was not untimely based on when the government disallowed her claims under section 6532(a)(1). Since section 7422(a) prohibits the filing of suits before the taxpayer files a claim for refund and Gray's claims for refund were untimely, this Court could dismiss Count III on that basis alone. However, even if this Court were to allow it to proceed, Gray cannot prove any damages because pursuant to section 6511(b)(2)(B), when a claim for refund is not filed within three years, the refund is limited to the amount paid in the two years immediately proceeding the claim for refund. 26 U.S.C. § 6511(b)(2)(B). Gray did not make any payments in the two years prior to submitting her amended returns in 2009, therefore even if Gray overpaid she is not entitled to any refund. Accordingly, this Court dismisses Count III with prejudice.

*4. Strategic Research Consulting, Inc.*

Lastly, the government moves to dismiss claims allegedly brought on behalf of Strategic Research Consulting, Inc. There are no allegations in the **[*18]** Second Amended Complaint that suggest injury to Strategic Research Consulting, Inc., only injury to Gray. Gray's status as the principal and owner of Strategic Research Consulting, Inc., is insufficient by itself to maintain claims against the government on the corporate plaintiff's behalf. Plaintiff cannot amend her complaint by argument in her brief. *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993). This Court dismisses the Second Amended Complaint with respect to the corporate plaintiff Strategic Research Consulting for failure to state a claim pursuant to Rule 12(b)(6).

**Conclusion**

Based on the foregoing, the government's motion to dismiss is granted. Gray's Second Amended Complaint is dismissed with prejudice.

IT IS SO ORDERED.

Date: September 4, 2012

Entered: /s/ Sharon Johnson Coleman

Sharon Johnson Coleman

**End of Document**

# In re Complaint of Great Lakes Dredge & Dock Co.

United States District Court for the Northern District of Illinois, Eastern Division

February 18, 1993, Decided ; February 19, 1993, Docketed

92 C 6754

**Reporter**

1993 U.S. Dist. LEXIS 16256 *; 1993 AMC 2046

Complaint of GREAT LAKE DREDGE & DOCK COMPANY for Exoneration from or limitation of liability; GREAT LAKES DREDGE & DOCK COMPANY, Plaintiff, v. CITY OF CHICAGO, an Illinois municipal corporation, Defendant.

**Judges:** **[\*1]** Kocoras

**Opinion by:** CHARLES P. KOCORAS

# Opinion

*MEMORANDUM OPINION*

CHARLES P. KOCORAS, District Judge:

This matter is before the Court on defendant and claimant's motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons set forth below, the motion is granted.

## BACKGROUND

On April 13, 1992, the Chicago River broke through a breach in an underground freight tunnel lying beneath the river. The river flowed through the tunnel and into the downtown commercial district of the City of Chicago and into the basements of the buildings connected to the tunnel. This inundation of the tunnel caused significant damage and resulted in the mid-day evacuation of the downtown district and the declaration of a state and federal emergency. To aid emergency repair, the Captain of the Port of Chicago ordered the river closed between Grand Avenue on the North Branch, Cermak Road on the South Branch, and Lake Michigan on the Main Branch. The river remained closed for over a month. River traffic ceased, several commuter ferries were stranded, and **[\*2]** many barges could not enter the river system even south of Cermak Road because the river level was lowered to aid repair efforts.

Numerous lawsuits against Great Lakes Dredge & Dock Company ("Great Lakes") and the City of Chicago (the "City") arose from this occurrence, including the class action lawsuit on behalf of tens of thousands of individuals and thousands of businesses ("claimants"), which has been filed in Illinois state court and consolidated under the caption *In re Chicago Flood Litigation.,* No. 92 L 5422 ("Class Complaint"). Because resolution of the present motion to dismiss rests in some part on the central issues and allegations raised in the state court litigation, we will address them briefly below.

According to the Class Complaint, the damages sustained by plaintiffs and the Class were caused by the partial collapse of the tunnel at the Kinzie Street Bridge, specifically, in the immediate vicinity of the area where pilings had been installed by Great Lakes pursuant to a contract with the City earlier in the year. Claimants allege that both Great Lakes and the City knew or should have known of the existence and location of the tunnel at the Kinzie Street Bridge **[\*3]** and that the pile removal and pile driving work completed by Great Lakes for the City could result in damage to the tunnel. It is also alleged that Great Lakes installed new pilings in a location other than that originally designated in its contract with the City, failed to remove all the pilings contracted to be removed, and failed to take adequate safeguards against a breach of the tunnel. According to the Class Complaint, Great Lakes, in pounding and driving the pilings into the riverbed, caused one or more of the following conditions: an actual hole or breach of the tunnel wall; a weakening of the tunnel wall creating cracks or weakness in the structural integrity of the

tunnel; a compacting of the earth around the tunnel walls creating excessive pressure on the tunnel; and such other events which proximately caused the tunnel wall to partially collapse or break. Moreover, the claimants bring a number of claims against the City, arising, *inter alia,* from the City's alleged failure to repair the damage to the breached tunnel when it became known to the City and from the City's alleged failure to warn plaintiffs and the Class about this dangerous condition.

On October 6, 1992, **[*4]** Great Lakes filed suit in this Court seeking exoneration from or limitation of any liability it may incur from claimants' suit against it. Great Lakes seeks to limit its liability to the value of two barges and a launch boat pursuant to 46 U.S.C. App. §§ 183(a) and 185, the relevant sections of the Limitation of Shipowner's Liability Act, Rev.Stat. § 4281 *et seq.,* 46 U.S.C. § 181 *et seq.* (1982 ed.) (Count I), [1] and indemnity (Count II) or contribution (Count III) from the City of Chicago in the event liability is found to exist in this case.

**[*5]** In response to Great Lakes' complaint in this Court, claimant Jerome B. Grubart, Inc. ("Grubart") and the City (collectively, "movants") filed their respective motions to dismiss pursuant to Rules 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Thereafter, an order was entered by this Court on October 8, 1992, which, in part, stayed and restrained the institution or further prosecution of any and all suits, actions, and proceedings against Great Lakes in any other court with respect to any claim or claims arising out of or occasioned by the Chicago tunnel disaster.

We find that this Court does not have subject matter jurisdiction over plaintiff Great Lakes' limitation action under the jurisdictional statutes establishing maritime jurisdiction. Moreover, we determine that Great Lakes' complaint seeking limitation of liability fails to state a claim upon which relief can be granted. Thus, we dismiss the present suit pursuant to both Rule 12(b)(1) and Rule 12(b)(6). In setting forth our present determination, we address the movants' 12(b)(1) motion

---

[1] The Act itself refers to the proceeding as a petition to limit liability. 46 U.S.C.App. § 185. Procedurally, however, limitation actions under the Act are governed by Supplemental Rules for Certain Admiralty and Maritime Claims, Rule F. These rules refer to the pleading as a complaint for limitation of liability. Fed.R.Civ.P.Supp. Rule F(1). *Joyce v. Joyce,* 975 F.2d 379, 381 n. 2 (7th Cir. 1992).

and 12(b)(6) motion, respectively.

## ANALYSIS

I. **[*6]** *MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)*

Before discussing the merits of the movants' motions to dismiss, this Court must first recount the factual background to this dispute. While we recognize that many of the ensuing facts are the subject of contention by Great Lakes and the movants, [2] we are guided in our review of these facts by the following legal standard.

**[*7]** 1. *Legal Standard Governing Rule 12(b)(1) Motion*

The movants' 12(b)(1) motions attack the underlying facts asserted by Great Lakes in support of admiralty jurisdiction. Where a party properly raises a factual question concerning the court's jurisdiction, as through a Rule 12(b)(1) motion, the district court is not bound to accept as true the allegations of the complaint as to jurisdiction. *Gervasio v. United States,* 627 F. Supp. 428, 430 (N.D. Ill. 1986). Rather, the court may look beyond the jurisdictional allegations and view whatever evidence has been submitted to determine whether in fact subject matter jurisdiction exists. *Id.* The party asserting jurisdiction, here, Great Lakes, bears the burden of supporting its jurisdictional allegations with competent proof and therefore "must submit affidavits and other relevant evidence to resolve the factual dispute regarding the court's jurisdiction." *Kontos v. United States Department of Labor,* 826 F.2d 573, 576 (7th Cir. 1987); *Norman v. Levy,* 756 F. Supp. 1060, 1062 (N.D. Ill. 1990).

---

[2] Great Lakes responded to the City and Grubart's jurisdictional challenge by submitting seven sworn affidavits and five documentary exhibits. It is against this evidence that Grubart directs his motion to strike, which is also presently before this Court. We find that, for the most part, Grubart's objections go to the weight, not the admissibility, of Great Lakes' evidentiary materials. It is for the Court to determine the relevancy of these materials and the weight to be given to the factual matters asserted therein, which we have done accordingly. *See Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir. 1979). In reaching our present determination to grant Grubart and the City's motions to dismiss Great Lake's limitation action, the Court has accorded proper weight to the affidavits and exhibits submitted by Great Lakes and, therefore, need not lend Grubart's motion to strike any further consideration.

2. *Facts Pertaining to the Court's Jurisdictional* [*8] *Inquiry*

In December, 1990, the City invited marine firms including Great Lakes to bid on a project to replace fourteen pile clusters, also known as timber dolphins, at five separate bridge sites in the Chicago River. Great Lakes won the contract. One of the sites included in the project was located at the south side of the Kinzie Street Bridge. During the last week of August and the first three weeks of September, 1991, Great Lakes's barge crew removed old, deteriorating pile clusters and drove new pilings into the riverbed at the Kinzie Street site. Over six months after Great Lakes completed its work under the contract, on April 13, 1992, the Chicago River broke through the tunnel system running beneath the river and flooded Chicago's business district.

Pursuant to the City and Great Lakes' contract, Great Lakes alleges that in July and August, 1991, it employed three vessels to various sites along the North and South Branches of the Chicago River, ultimately to a point alongside the Kinzie Street Bridge. The three Great Lakes' vessels involved in removing and replacing the Kinzie Street pile clusters consisted of two barges and one launch or tug, called the M/V PEACH STATE. Both [*9] barges are allegedly "load line certified" by the American Bureau of Shipping, meaning they are registered to navigate in open, unprotected waters and meet seaworthiness criteria. One barge, G.L. 150, is said to weigh 350 tons and have a length of 131.1 feet and breadth of 34 feet. The other barge, the G.L. 136, weighing 426 tons, with a length of 121 feet and breadth of 44 feet, was called in Great Lakes' Foreman's Daily Reports either "Spud Scow 136" or "Barge 136," a title, according to Grubart, that depended upon the nature of the work being performed. [3] G.L. 136 was fixed at the Kinzie Street site during the pile-driving job, and it is from this barge that the pilings were driven.

[*10] Both barges were used occasionally to transport

---

[3] On the sole basis of selective Great Lakes' Foreman Daily Reports, which do not state the tasks to be performed that day, Grubart argues that Great Lakes treated G.L. 136 differently, depending on its use at the time. According to Grubart's unsubstantiated reading of the reports, during the pile-driving activity, Great Lakes considered G.L. 136 to be a spud scow, which is designed as a work platform that is affixed in position by dropping its spuds in the river bed or by lifting itself out of the water for stability. On the other hand, according to Grubart, upon the completion of the pile driving work, when G.L. 136 was being transported back to Great Lakes' yard, Great Lakes considered G.L. 136 to be a barge.

the Great Lakes crew from one work site to the next. Barge G.L. 136 transported a crane and related equipment to and from each work site and the Great Lakes' facilities on the Calumet River. The other barge, G.L. 150, primarily served to transport the new pilings from Great Lakes' facilities on the Calumet River to the work sites and to stow the old pilings until the work was completed. With regard to the launch, the M/V PEACH STATE regularly towed the barges whenever the work required repositioning, and every morning and night towed at least one of the barges to and from the night berth and work site. Moreover, pursuant to its contractual duty stated below, the M/V PEACH STATE towed the barges out of the navigable channel whenever another vessel sought passage.

Great Lakes alleges that only marine firms can perform the pile driving work requested by the City because this work must be performed from vessels in the navigable channel and such vessels have to be moved from time to time to permit other maritime traffic to pass. In support of its position, Great Lakes cites Provision 209 of the contract, which specifically required Great [*11] Lakes to comply with U.S. Coast Guard regulations protecting the right of other vessels to navigate past the work sites:

> The Contractor's attention is directed to the fact that the Branches of the Chicago River involved are navigable streams. As such, the bridges involved herein must be open to masted vessels at any time on signal . . . . During the execution of the contract, marine regulations shall be complied with in every way, so that river traffic may be protected and any river obstruction avoided . . . .

Moreover, the contract's construction methods indicate that the pile removal and driving work would involve work below the waterline of the Chicago River and required the contractor to supply all labor and equipment necessary to perform the pile driving work, including, *inter alia,* barges and tugs.

Although there is some dispute between the parties as to the intended purpose of the pile clusters at the Kinzie Street location, it is clear that they were principally intended for the protection of the bridge at that site. The City argues that this was their sole purpose and, in the state court litigation, Great Lakes repeatedly stated that the pilings were intended [*12] to protect the bridge. In the instant litigation, Great Lakes has taken the position that the pile clusters were designed for several purposes, including the protection of vessels and use as navigational aids.

In addition to the fact that the City and Great Lakes have, on prior occasions, repeatedly stated that the purpose for the dolphins was to protect the bridge and bridgehouse, the June 7, 1990 City ordinance authorizing the dolphin replacement project read, in part, "that said Project generally consist of the replacement of pile clusters at various bridges within the City, in order to provide the structures with increased protection from the possibility of collision by marine traffic." Great Lakes' complaint asserts that the pilings are located "next to," and therefore outside, the navigable channel. (G.L. Complaint P 4). Thus, even according to Great Lakes' complaint, pilings are not entirely surrounded by navigable water. Implicit in Great Lakes complaint is the acknowledgment that the pilings are not "solely" or "principally" in aid of navigation.

### 3. *Discussion*

Both movants contend that Great Lake's complaint should be dismissed under Rule 12(b)(1), because 28 U.S.C. § 1333 **[*13]** (1) and 46 App. U.S.C. § 740, the jurisdictional statutes relied upon by Great Lakes to establish maritime jurisdiction, do not support subject matter jurisdiction in this case. As stated previously, once the existence of subject matter jurisdiction is challenged in a motion to dismiss under Fed.R.Civ.P. 12(b)(1), the burden of establishing such jurisdiction through relevant, competent evidence shifts to the party asserting the same. *Norman,* 756 F. Supp. at 1062; *Gervasio,* 627 F. Supp. at 430. For the reasons set forth below, we find that Great Lakes has not met its burden of establishing this Court's subject matter jurisdiction, and, accordingly, we grant movants' 12(b)(1) motion to dismiss.

### A. *The Court Lacks Jurisdiction Under 28 U.S.C. § 1333(1)*

Courts have held that federal admiralty jurisdiction exists in a particular case only if the protection of maritime activity through adherence to a uniform and specialized set of rules governing that activity on navigable waterways is essential. A trilogy of Supreme court cases confines the exercise **[*14]** of admiralty jurisdiction under 28 U.S.C. § 1333(1) to actions satisfying the following two prerequisites:

1. the alleged wrong must occur on navigable waters (situs test); and

2. the alleged wrong must bear a significant relationship to "traditional maritime activities"

(nexus test).

*Sisson v. Ruby,* 497 U.S. 358, 110 S. Ct. 2892, 2895-98, 111 L. Ed. 2d 292 (1990); *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 674, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982); *Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 266, 34 L. Ed. 2d 454, 93 S. Ct. 493 (1972).

Prior to 1972, the determination of whether a tort was maritime depended solely upon the situs of the wrong. In 1972, the Supreme court in *Executive Jet,* a case which arose out of an aircraft accident over navigable water, rejected this strict situs test stating:

it is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the **[*15]** absence of legislation to the contrary.

*Executive Jet,* 409 U.S. at 268. Although the Court's holding in *Executive Jet* was limited by its terms to cases involving aviation torts, the Supreme Court applied *Executive Jet* to determinations of federal admiralty jurisdiction outside the context of aviation torts in *Foremost. Sisson,* 110 S. Ct. at 2895 *(citing Foremost,* 457 U.S. at 673).

With regard to the "nexus" test, the Supreme Court held in *Foremost* that all tort actions invoking admiralty jurisdiction must meet *Executive Jet's* new nexus test, requiring a significant relationship with "traditional maritime activity." *In re Complaint of Sisson,* 867 F.2d 341, 343 (7th Cir. 1989), *rev'd on other grounds,* 497 U.S. 358, 110 S. Ct. 2892, 111 L. Ed. 2d 292 (1990) (citing *Foremost,* 457 U.S. at 673-74). When defining traditional maritime activity, the Court recognized that "the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce," and stated the federal **[*16]** interest in protecting maritime commerce "can be fully vindicated only if all operators of vessels on navigable waters are subject to uniform rules of conduct." *Id.* (citing *Foremost,* 457 U.S. at 674-75). The *Foremost* Court, in holding that the collision between two pleasure boats fell within the federal courts' admiralty jurisdiction, ruled:

The potential disruptive impact of a collision between boats on navigable waters; when coupled with the traditional concern that admiralty law holds

for navigation, compels the conclusion that this collision between two pleasure boats on navigable waters has a significant relationship with maritime commerce.

*Foremost,* 457 U.S. at 675.

In *Sisson v. Ruby,* a case involving a fire on a noncommercial vessel docked at a recreational marina on Lake Michigan, the Supreme Court further clarified the nexus component of the jurisdictional inquiry under § 1333. The *Sisson* Court reiterated the admiralty jurisdiction principles it had stated in a footnote within the *Foremost* opinion, "not every accident in navigable waters that might disrupt maritime commerce will support **[*17]** federal admiralty jurisdiction, but that when a potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity . . . admiralty jurisdiction is appropriate." *Sisson,* 110 S. Ct. at 2895-96 *(citing Foremost,* 457 U.S. at 675 n. 5). In view of this statement, the *Sisson* Court discerned a "two-part *Foremost* test," which requires the party seeking to invoke maritime jurisdiction to show that there existed (1) an incident having a potentially disruptive impact on maritime commerce, and (2) a substantial relationship between the activity giving rise to this incident and traditional maritime activity. *Id.* at 2896-97.

Great Lakes alleges in its complaint that the Admiralty Extension Act, 46 U.S.C. App. § 740 also supplies a jurisdictional base for its complaint. That statute provides in relevant part:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water notwithstanding that **[*18]** such damage or injury be done or consummated on land.

It has been held that the Admiralty Extension Act was intended to eliminate the inequities and anomalies resulting from the strict application of the situs rule in admiralty under then existing law. The Act was not intended to grant claimants new substantive rights of recovery nor relieve them from jurisdictional constraints unrelated to locality imposed on general maritime tort claimants. Claims under the Admiralty Extension Act are to be subject to the "maritime relationship" rule of *Executive Jet. Sohyde Drill & Marine v. Coastal States Gas Producing Co.,* 644 F.2d 1132, 1136 (5th Cir. 1981); *see also Crotwell v. Hockman-Lewis, Ltd.,* 734 F.2d 767, 768 (11th Cir. 1984); *Dean v. Maritime*

*Overseas Corp.,* 770 F. Supp. 309, 312 (E.D. La. 1991); *Felix v. Arizona Dep't of Health Services, Goods, Vital Records Section,* 606 F. Supp. 634, 636 (D. Ariz. 1985); *Jorsch v. Le Beau,* 449 F. Supp. 485, 488-89 (N.D. Ill. 1978).

The test to determine the presence or absence of a significant **[*19]** relationship to traditional maritime activities in a particular case has been described in varying formulations. Judge Aspen of this Court has said that "the preferred course . . . is to evaluate the entire scope of events involving both the defendant's behavior and the manner in which the plaintiff is injured in evaluating whether there is a connection with traditional maritime activity significant enough to establish admiralty jurisdiction." *American Nat. Bank & Trust Co. of Waukegan v. United States,* 636 F. Supp. 147, 149 (N.D. Ill. 1986). This test may be described as the totality of circumstances test. The Fifth Circuit, in the case of *Kelly v. Smith,* 485 F.2d 520, 525 (5th Cir. 1974), has outlined four factors which may be considered in determining the existence of a substantial maritime relationship:

> 1. the functions and roles of the parties;
>
> 2. the types of vehicles and instrumentalities involved;
>
> 3. the causation and type of injury; and
>
> 4. traditional concepts of the role of admiralty law.

*Sohyde,* 644 F.2d at 1136.

In *Molett v. Penrod Drilling Co.,* 826 F.2d 1419 (5th Cir. 1987), **[*20]** the four criteria set forth in *Kelly* were addressed in light of the Supreme Court's decisions in *Executive Jet* and *Foremost.* The indicia of maritime flavor described in the latter two cases was described as (1) the impact of the event on maritime shipping and commerce, (2) the desirability of a uniform national rule to apply to such matters, and (3) the need for admiralty "expertise" in the trial and decision of the case. The Fifth Circuit then held that the analysis of *Kelly* should be applied with the indicia divined from *Executive Jet* and *Foremost.*

However the test is stated, the logical starting point in the analysis is the nature and quality of the wrong or wrongs alleged in the case. Although the Class Complaint alleges a litany of tortious conduct on the part of Great Lakes, at bottom it rests on the proposition that Great Lakes' pile-driving activity was negligently performed, causing a breach in the tunnel wall and the

resulting flood of the tunnel and portions of the Chicago business district. The charges against the City also involve alleged failure to prevent or cure Great Lakes' breach of the tunnel wall, thereby failing to prevent the flooding [*21] of the tunnel and the class properties.

It is significant to note that the alleged wrongs did not involve the movement or collision of a vessel. Nor did the alleged wrongs involve the transport of cargo or people on a navigable waterway. Nor can it be said that the tunnel or the walls were somehow part of the Chicago river or any other navigable waterway. Indeed, the tunnel and its environs were part of the land and the significant injuries that were suffered were the result of the *proximity* of the tunnel to the river - an unfortunate but fortuitous geographical configuration.

Additionally, the pile-driving activity and the placement of the new dolphins were undertaken primarily to protect the Kinzie Street bridge and its machinery, long ago held to be part of the land and not part of the river waterway. In *Cleveland Terminal & Valley R. R. Co. v. Cleveland S. S. Co.,* 208 U.S. 316, 52 L. Ed. 508, 28 S. Ct. 414 (1908), plaintiff sued in admiralty for damage sustained to a center pier of a drawbridge and its protective pilings when a steamer collided with the pier. The Supreme Court ruled that the situs requirement had not been established because "the bridges, shore docks, protection [*22] piling, piers, etc, pertain to the land" and thus were not within the court's admiralty jurisdiction. Although the Admiralty Extension Act has eliminated the situs requirement, it did nothing to alter the holding of *Cleveland Terminal* that protective pilings for bridges pertained to the land, and in evaluating the totality of circumstances here, it maintains that character.

The parties are at odds over whether the activity of pile driving is, itself, a traditional maritime activity. The City argues that pile driving is an activity common to the construction industry, regardless of the project's location, and is not unique to rivers or bodies of water. Standing alone, the City's assertion is a truism. Great Lakes' principal argument on this point is that pile clusters, or dolphins, are vital to maritime commerce and their use as navigational aids is not subject to dispute. Both sides cite cases in support of their respective arguments. Frankly, the cited cases are not dispositive in categorizing pile driving activity, and other factors present color the decisions in the cited cases. As we previously held, however, the main purpose of these dolphins was the protection of the bridge [*23] and its operating mechanisms. It is that function which

predominates in the overall analysis of whether we are dealing here with a traditional maritime activity.

Both sides have expended considerable energy in debating whether the two barges and the launch are "vessels" within the meaning of section 740. The decided cases support both positions and are, in reality, irreconcilable. In *Ellender v. Kiva Constr. & Eng'g Inc.,* 909 F.2d 803, 806 (5th Cir. 1990), the Fifth Circuit ruled that a spud barge used for pile driving was not a vessel under the Jones Act because the "barge was not designed or used to transport passengers, cargo, or equipment from place to place across navigable waters, where the barge required tug boats or other vessels to move it, and where the barge remained virtually stationary during any particular project." Although the barge at issue there, like Great Lakes' barges here, supported a mobile crane and other equipment, the court held that "these transportation functions [were] incidental[] to its other uses," and thus insufficient to confer "vessel" status on the barge. *Id.* at 807; *see also Bernard v. Binnings Constr. Co.,* 741 F.2d 824, 832 (5th Cir. 1984) [*24] ("a structure whose primary function is to serve as a work platform does not become a vessel [under Jones Act] even if it sometimes moves significant distances across navigable waters in the normal course of operations"); *accord, Powers v. Bethlehem Steel Corp.,* 477 F.2d 643 (1st Cir.), *cert denied,* 414 U.S. 856, 38 L. Ed. 2d 106, 94 S. Ct. 160 (1973).

The Seventh Circuit has also spoken on the issue, however, and we are bound by its view. In *Johnson v. John F. Beasley Constr. Co.,* 742 F.2d 1054 (7th Cir. 1984), *cert. denied,* 469 U.S. 1211, 84 L. Ed. 2d 328, 105 S. Ct. 1180 (1985), the definition of "vessel" for Jones Act purposes was set forth:

> The "vessel in navigation" requirement pertains not to the vessel's mobility at the precise moment of injury, but to whether it has at times been employed as a means of transport on water for passengers or cargo and has not been withdrawn from navigable waters and laid up, say, for the season . . . . Any floating structure, including those designed for special purposes, is a "vessel" capable of having a maritime "crew" so long as the structure at some time serves as a means of transport [*25] on water. "To be a vessel, the purpose and business must to some reasonable degree be the 'transportation of passengers, cargo, or equipment from place to place across navigable waters.'" (citations omitted).

*Id.* at 1063. [4] Mindful of the transport functions performed by each, we determine that the two barges and the launch utilized by Great Lakes to perform the pile removal and driving activity required under the contract were vessels for admiralty purposes.

Having resolved the question of whether the barges and launch were vessels, we next address whether the injuries [*26] at issue were "caused by a vessel on navigable water," the Section 740 requirement, or whether the alleged wrong bears a significant relationship to traditional maritime activities. In analyzing both issues it is apparent that the particular *function* of the vessels involved is far more important than their classification as vessels. Only in this way can we harmonize *Johnson* with the cases, cited above, which differ in result. It bears repeating that the Supreme Court has held that the requisite substantial relationship between the activity giving rise to the incident and traditional maritime activity is not always present whenever navigable water or a vessel is involved.

In determining the jurisdictional issue, it is as important to examine what the case does not involve as it is to examine what it does. The following summary addresses both concepts:

1. None of the vessels were directly involved in the cause of the injury to the tunnel wall and did not strike anything to cause the harm in question.

2. The vessels were acting as fixed platforms and were not involved in navigation on a waterway during the pile driving activities.

3. The injuries were not sustained on [*27] a dock or pier next to the site of the work activity, but were experienced on land, blocks away in Chicago's business district.

4. Pile driving is a common construction activity and is found in both maritime and non-maritime settings. The principal purpose of the placement of the dolphins at the Kinzie Street site was the protection of the bridge, which the Supreme Court views as an extension of the land.

5. The pile driving activity did not present a foreseeable or material disruption of maritime commerce on the Chicago River. The actual effect on commerce took place many months after the alleged wrongful acts and were part of the massive remediation efforts engaged in by the City and others.

6. There are no allegations of personal injury on a vessel on navigable waters, nor for damage done to a vessel in navigation or its cargo.

In summary, the relevant facts alleged to be present in this now historic calamity to our city do not involve traditional maritime concerns. Federal admiralty jurisdiction will be sustained only if a case presents the need to protect maritime commerce through adherence to a uniform and specialized set of rules such as those involving navigation and [*28] seaworthiness. There is no compelling reason to adjudicate the host of issues raised by the pleadings under this specialized set of rules. Traditional common law rules of tort and contract should do quite nicely in the resolution of the material disputes here; the specialization of admiralty rules is not necessary. The totality of circumstances lead unyieldingly to that conclusion. Simply put, we have land-based injuries caused by land-based activities undertaken upon a non-moving vessel on a river acting as a stationary work platform. The maritime connection of the principal activities is neither direct nor material and supply none of the causation for the alleged injuries. There are no traditional maritime concerns present here and, without it, no admiralty jurisdiction.

The case of *National Union Fire Ins. Co. of Pitts, Pa. v. U.S.,* 436 F. Supp. 1078 (M.D. Tenn. 1977), is instructive. That case involved water damage to some stock stored in a warehouse as a result of flooding by the Cumberland River. The United States was accused of negligent operation of certain dams on the Cumberland. The court stated:

The activity [at issue should be appraised] [*29] in terms of its actual effects as well as its general nature. Thus, while control of the water level does generally involve considerations affecting navigation and commerce upon the water, the only actual impact of concern in this instance is the flooding of a shore-based warehouse. Viewed in this way, it becomes more difficult to perceive an actual maritime incident for which the unique principles and procedures of admiralty are pertinent. Had the rising water caused boats to break from their moorings and sustain damage, or inundated a barge and destroyed its cargo, this court would have little difficulty in finding admiralty

---

[4] *Johnson* involved an ironworker who sued a barge owner under the Jones Act, 46 U.S.C. § 688, for injuries sustained while working on a construction barge, which, like the G.L. 136 present in this case, had no motive power of its own and no steering capability and whose primary role was to provide a construction site and assist in the construction of the designated project.

jurisdiction. However, where the actual untoward consequence is of a kind which can readily be dealt with by resort to established common law tort principles, it makes no sense to dredge up (no pun intended) a whole body of law whose purpose and history is inextricably bound up in matters concerning maritime commerce. It should not be overlooked that the navigability of the Cumberland River, which is a *sine qua non* of admiralty jurisdiction, had nothing whatever to do with the injuries sustained in this case. It is not inconceivable that a stopped up storm **[*30]** drain, during an abnormally heavy rainfall, could have resulted in essentially the same damage to the material in the warehouse. And in such a case, a suit against the municipality (assuming no immunity) alleging negligent failure to keep the sewers cleared of debris, could easily be disposed of within the contours of state tort law. The fact that the alleged culprit in the instant case was the Corps of Engineers and that the destructive force happened to be a navigable stream does not alter the availability, viability, and indeed, the preferability of state law for disposing of this case.

*Id.* at 1083.

Finding similar prior cases to assist in guiding judicial decision is not an exact science. Conjuring up the unique set of facts giving rise to the great Chicago Flood might best be the product of fiction writers -- after all, how many major cities come equipped with miles of subterranean tunnels whose existence is unknown to most of its inhabitants? But even though the facts of *National Union* may be dissimilar to the quite unique facts of the instant case, its reasoning does apply.

As in *National Union,* the mere fact that the injuries were **[*31]** allegedly caused by water from a navigable river is insufficient to establish admiralty jurisdiction. Nor does this case involve issues such as navigation or the seaworthiness of vessels that admiralty law was designed to address. Consequently, there is no basis for federal admiralty jurisdiction.

### B. *The Limitation Of Shipowner's Liability Act Does Not Provide A Separate Basis Of Admiralty Jurisdiction*

The Supreme Court in *Sisson* declined to resolve the parties' contentions regarding whether the Limitation of Shipowner's Liability Act, 46 U.S.C. § 181 *et seq.,* provides an independent basis for federal jurisdiction. 110 S. Ct. at 2894 n. 1. Nonetheless, the Seventh Circuit definitively ruled in *In re Complaint of Sisson,* 867 F.2d at 349-50, in a portion of the opinion not reversed by the Supreme Court, that the Limitation of Liability Act does not independently confer admiralty jurisdiction. The Seventh Circuit stated:

> In our view, when a cause of action in tort does not bear any connection to traditional maritime activity, there is no justification for allowing **[*32]** the Limitation of Liability Act--which provides for a practice apparently defensible only in a traditional maritime context--to provide an independent basis for admiralty jurisdiction. . . . We believe that allowing admiralty jurisdiction here would be contrary to the policy of *Executive Jet* and *Foremost.* In creating the nexus requirement, the Supreme Court confined the reach of admiralty jurisdiction to include only those tort actions with which a uniform, sea-going jurisprudence should be concerned. To permit an alleged tortfeasor to circumvent the requirement that the tort bear a connection to traditional maritime activity simply by asserting a right to limit liability would eviscerate the nexus test.

*Id.* Accordingly, in keeping with the Seventh Circuit's clear dictate and our prior discussion, we hold that the Limited Liability Act does not provide this Court with an independent basis for federal jurisdiction.

In sum, Great Lakes has failed to meet its burden of establishing this Court's subject matter jurisdiction over its limitation of liability action, and, therefore, Great Lakes' suit is dismissed pursuant to Rule 12(b)(1).

### II. *MOTION TO DISMISS PURSUANT* **[*33]** *TO RULE 12(B)(6)*

Even if we were to have found that this Court has subject matter jurisdiction over the present suit, we determine that Great Lake's complaint fails to state a claim upon which relief can be granted. Great Lakes seeks exoneration from or limitation of its liability for the accident pursuant to the Limitation of Shipowner's Liability Act, 46 U.S.C. § 181 *et seq.* (the "Act"). The Act limits the liability of a shipowner for any loss incurred without the knowledge or privity of the owner to the value of the vessel and its freight. 46 U.S.C. § 183(a). A shipowner may petition a district court of proper jurisdiction for exoneration from or limitation of liability. 46 U.S.C. § 185. Upon the shipowner's filing of the petition and his tender of an adequate bond, the district court must enjoin all other proceedings against the shipowner involving issues arising out of the subject matter of the limitation action. *Id. See also Ex Parte*

*Green,* 286 U.S. 437, 438-40, 76 L. Ed. 1212, 52 S. Ct. 602 (1932); *S & E Shipping Corp. v. Chesapeake & O. R. Co.,* 678 F.2d 636, 642 (6th Cir. 1982). **[*34]** The district court must ultimately decide whether the shipowner has a right to limitation of liability; the claimants may pursue their common law remedies in another forum only if they concede that the district court has exclusive jurisdiction over the question of whether liability is limited. *See S & E Shipping Corp.,* 678 F.2d at 643 n. 13; *Helena Marine Service, Inc. v. Sioux City,* 564 F.2d 15, 18 (8th Cir. 1977), *cert. denied,* 435 U.S. 1006, 56 L. Ed. 2d 387, 98 S. Ct. 1875 (1978).

Both movants assert that Great Lakes' complaint should be dismissed on the basis that Great Lakes is foreclosed as a matter of law from obtaining limitation of liability under the Act. The movants base this contention on their allegation that Great Lakes was in privity to and with knowledge of the alleged negligence. The City additionally seeks summary dismissal of Great Lakes' complaint on the ground that Great Lakes is not entitled to limitation based on the "personal contract doctrine." Great Lakes refutes both arguments, arguing that it has stated a *prima facie* case for limitation under the Act and its claim for exoneration is compelling **[*35]** in light of the City's failure to advise Great Lakes about the existence of the tunnel. Before addressing the parties' contentions, we first discuss the appropriate legal standard by which to judge a motion to dismiss pursuant to Rule 12(b)(6).

### 1. *Legal Standard Governing 12(b)(6) Motion*

To withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Conley v. Gibson,* 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). The defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 733 (7th Cir. 1986), *cert. denied,* 482 U.S. 915, 96 L. Ed. 2d 676, 107 S. Ct. 3188 (1987). The allegations of a complaint should be construed liberally and a complaint should not be dismissed for failure to state **[*36]** a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46. *See also Hishon v. King & Spalding,* 467 U.S. 69, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); *Doe on Behalf of Doe v. St. Joseph's Hospital,* 788 F.2d 411 (7th Cir. 1986). The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits of the case. We address the City and Grubart's motion with these principles in mind.

### 2. *Discussion*

A. *Great Lakes' Claim For Limitation Of Liability Under Count I Should Be Dismissed*

i] "*Privity or Knowledge" Basis For Dismissal Of Limitation Claim*

The Limitation of Shipowner's Liability Act allows district courts, under their admiralty jurisdiction conferred by 28 U.S.C. § 1331, to determine whether a shipowner's liability should be limited when that liability may be predicated on an act that was not within the shipowner's "privity or knowledge." *Joyce v. Joyce,* 975 F.2d 379, 383 (7th Cir. 1992). Section **[*37]** 183(a) provides:

> (a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of such owner or owners,* shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

(emphasis added).

In limitations proceedings, the ultimate burden of proving lack of privity or knowledge is on the shipowner. *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1305 (7th Cir. 1992). In discerning the meaning of the Act's phrase "privity or knowledge," the Seventh Circuit in *Joyce* found, "Congress intended the principal beneficiaries of the Act to be innocent shipowners and investors who were sued for damage caused through no fault of their own." *Joyce,* 975 F.2d at 384. The Seventh Circuit **[*38]** observed recently in *In re Oil Spill by the Amoco Cadiz,* 954 F.2d at 1303, "The recent judicial trend has been to enlarge the scope of activities within the 'privity or knowledge' of the shipowner . . . ." *Id.*

In opposing the present motion to dismiss, Great Lakes does not confront the recent Seventh Circuit rulings addressing the "knowledge and privity" inquiry relied

upon by movants but, rather, cites the Eleventh Circuit case, *M/V Sunshine, II v. Beavin,* 808 F.2d 762 (11th Cir. 1987), for the proposition that summary dismissal of a limitation action before the completion of discovery is inappropriate. This argument, however, ignores the recent Seventh Circuit ruling in *Joyce,* where the court affirmed a district court's *sua sponte* dismissal of a limitation complaint for lack of subject matter jurisdiction. 975 F.2d at 385-86. Moreover, this Court finds that the principles recently articulated by the Seventh Circuit in its *Joyce* and *Amoco Cadiz* rulings counsel dismissal of Count I of Great Lakes' complaint under Rule 12(b)(6).

In *Joyce v. Joyce,* a vessel owner, who had **[*39]** been sued in state court for negligent entrustment of his boat to another filed a limitation action in federal court under the Act. The district court *sua sponte* dismissed the vessel owner's complaint for lack of subject matter jurisdiction and the Seventh Circuit affirmed. After exploring the meaning of the phrase "privity or knowledge" under the Act and the law of negligent entrustment, the Seventh Circuit reasoned:

> Given the nature of the tort of negligent entrustment, it is clear that the Limitation of Shipowner's Liability Act affords no protection to William. If William knew or had reason to know that Ivkovich should not have been entrusted with the boat, he not only committed the tort of negligent entrustment but also had either knowledge or constructive knowledge sufficient to place him beyond the protection of the Limitation of Liability Act. On the other hand, if William did not entrust the boat to Ivkovich under circumstances in which he knew or should have known of Ivkovich's inability, he will incur no liability for negligent entrustment and, consequently, has no need of the Act's protection. In either case, the district court could not do anything to affect either **[*40]** party and was correct to dismiss the suit for lack of subject matter jurisdiction. Prompt, *sua sponte* recognition of flaws in subject matter jurisdiction is commendable.

975 F.2d at 385-86.

Regardless of the different allegations of negligence in the present case, we find that the *Joyce* rationale is determinative of the present 12(b)(6) motion. As in *Joyce,* the extension of admiralty jurisdiction in the present case will have no effect on Great Lakes' potential liability. Underlying the claimants' negligence claims against Great Lakes in the consolidated Class Complaint is the allegation that Great Lakes knew or should have known of the existence and location of the

tunnel at the Kinzie Street Bridge and that the work required under the contract could result in damage to the tunnel. [5] Following *Joyce's* reasoning, if Great Lakes is found not negligent, Great Lakes will have no need for the Act's protection. On the other hand, if Great Lakes is found, for example, to have had constructive knowledge of the tunnel system or to have driven the piles into the riverbed in a negligent manner (e.g. at the wrong point along the riverbed), the **[*41]** Act affords Great Lakes no protection because such a finding would establish that Great Lakes had either knowledge or constructive knowledge sufficient to place it beyond the protection of the Act. Accordingly, a finding of negligence liability against Great Lakes will be tantamount to a finding of Great Lakes' privity or knowledge, thereby precluding Great Lakes from seeking limitation pursuant to the Act under *Joyce.* [6]

**[*42]** Thus, the present case, while involving different allegations of negligence, nonetheless, constitutes the identical situation confronted by the Seventh Circuit in

―――――――――――――――――

[5] For example, the class action claimants allege that the contract between Great Lakes and the City advised Great Lakes in part that moving the pilings in any fashion could result in damage to underground structures. The Court's reading of the relevant portion of the contract confirms the existence of this notification. *See* Contract at DS-5.

[6] The Seventh Circuit's *Amoco Cadiz* decision lends support to our present determination in that it articulates a low threshold for establishing privity or knowledge sufficient to deny petitioners protection under the Act. In *Amoco Cadiz,* the Seventh Circuit rejected the petitioning shipowner's contention that a vessel owner's actual or constructive knowledge of the causal negligence must be shown to establish "privity or knowledge." In refuting this argument, the Seventh Circuit stated:

> Not so. Privity or knowledge is not tantamount to actual knowledge or direct causation. All that is needed to deny limitation is that the shipowner, "by prior action or inaction set[s] into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty . . ." *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1158 (2nd Cir. 1978), *cert. denied,* 440 U.S. 959, 59 L. Ed. 2d 772, 99 S. Ct. 1499 (1979).

*Amoco Cadiz,* 954 F.2d at 1303. In view of this low threshold, a finding of Great Lakes' negligence would satisfy this standard without question.

*Joyce:* a finding of negligence will be tantamount to a finding of privity or knowledge and a finding of nonliability will moot the limitation claim. Mindful of the Seventh Circuit's determination that the petitioner's claim for limitation could not be realized in this very situation, we dismiss Great Lakes' limitation claim under Count I for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6).

### ii] "*Personal Contract Doctrine" Basis For Dismissal Of Great Lakes' Limitation Claim*

This Court finds that another independent basis exists for the dismissal of Great Lakes' suit under Rule 12(b)(6), namely, Great Lakes is not entitled to limitation based on the "personal contract doctrine." Great Lakes' pile driving work was performed pursuant to a written contract with the City under which Great Lakes undertook numerous duties and warranties and agreed to indemnify the City against any loss arising from the contract work. *See, e.g.,* contract at G-1 ("Contractor shall indemnify, keep and **[*43]** save harmless the City, its agents, officials, and employees, against all injuries, deaths, loss, damages, claims, patent claims, suits, liabilities, judgments, costs and expenses, which may in anywise accrue against the City in consequence of the granting of this contract or which may in anywise result therefrom, whether or not it shall be alleged or determined that the act was caused through negligence or omission of the Contractor . . . .").

Under clear precedent, the Act has been held not to apply where the liability of the owner rests on his personal contract. *Coryell,* 317 U.S. 406, 409, 87 L. Ed. 363, 63 S. Ct. 291 (1943) (citing *Pendleton v. Benner Line,* 246 U.S. 353, 62 L. Ed. 770, 38 S. Ct. 330 (1917)); *Richardson v. Harmon,* 222 U.S. 96, 106, 56 L. Ed. 110, 32 S. Ct. 27 (1911) (the Limitation Act "limit[s] the owner's risk to his interest in the ship in respect of all claims arising out of the conduct of the master and crew, whether the liability be strictly maritime or from a tort non-maritime, but leaves him liable for his own fault, neglect and contracts"); *S & E Shipping Corp.,* 678 F.2d at 644. The Supreme Court established the personal **[*44]** contract exception because the Act is only intended to limit the shipowner's liability for matters beyond his control, and a personal contract is within the control of the shipowner. *S & E Shipping Corp.,* 678 F.2d at 644 n. 14. On this basis, we find that Great Lakes' liability stemming from its personal contract with the City is not subject to limitation under the Act.

The Supreme Court and lower courts have clearly indicated that the primary purpose of an exoneration or limitation of liability action by vessel owners in federal admiralty court is to ensure the fair distribution of a limitation fund among all claimants. *See Lake Tankers Corp. v. Henn,* 354 U.S. 147, 151, 1 L. Ed. 2d 1246, 77 S. Ct. 1269 (1957); *In re Complaint of Falkiner,* 716 F. Supp. 895, 901 (E.D. Va. 1988). The purpose of the concursus, the proceeding before the admiralty court in which all competing claims must be litigated, is to provide for a marshalling of assets and for *pro rata* distribution of an inadequate fund among claimants. *S & E Shipping Corp.,* 678 F.2d at 642. *See also Lake Tankers Corp.,* 354 U.S. at 151-53. **[*45]**

Here, in light of our present determination under the personal contract doctrine, concursus is no longer required, because the only remaining claims against Great Lakes still subject to the Act are those raised by the class action claimants. *See S & E Shipping Corp.,* 678 F.2d at 643 (the district court must dissolve a stay of proceedings and permit claimants to litigate their claims in the state forum if only one claim against the shipowner is made; "in this situation a concursus is unnecessary because there are no additional claimants competing for portions of the limitation fund"). If concursus of a limitation fund is not necessary, we are instructed to permit claimants to litigate their claim in the state forum. *In re Complaint of Falkiner,* 716 F. Supp. at 901. *See also Lake Tankers Corp.,* 354 U.S. at 151; *S & E Shipping Corp.,* 678 F.2d at 642-45. Thus, this constitutes yet another basis for our dismissal of Great Lakes' limitation claim.

### B. *Great Lakes' Claim For Exoneration Under Count I Should Be Dismissed*

Where, as here, an alleged vessel owner is **[*46]** foreclosed from obtaining limitation of liability, the vessel owner is also foreclosed from proceeding in federal court with the exoneration component of its claim against the wishes of the claimants. *Lake Tankers Corp.,* 354 U.S. 147, 1 L. Ed. 2d 1246, 77 S. Ct. 1269 ; *Wheeler v. Marine Navigation Sulphur Carriers, Inc.,* 764 F.2d 1008, 1011 (4th Cir. 1985) (ruling "each circuit that has considered this question has ruled that once limitation is denied, plaintiffs should be permitted to elect whether to remain in the limitation proceeding or to revive their original claims in their original fora"); *Fecht v. Makowski,* 406 F.2d 721, 722-23 (5th Cir. 1969) ("where no grant of limitation is possible, the damage claimants are entitled to have the injunction against other actions dissolved, so that they may, if they wish, proceed in a common law forum as they are entitled to

do"); *Moore-McCormack Lines, Inc. v. Richardson,* 295 F.2d 583, 595-96 (2nd Cir. 1961), *cert. denied,* 368 U.S. 989, 7 L. Ed. 2d 526, 82 S. Ct. 606 (1962); *In re Complaint of Falkiner,* 716 F. Supp. at 901. **[*47]** Under the foregoing authorities and in consideration of the claimants' desire to prosecute their class action in state court, we find it appropriate to dismiss Count I of Great Lakes' complaint in its entirety, including the claim for exoneration.

C. *Counts II and III Should Be Stricken*

Because Count I of Great Lakes' complaint for exoneration or limitation is properly dismissed, Counts II and III, which seek indemnity and contribution from the City by way of impleader under Federal Rule of Civil Procedure 14(a) and (c), should be stricken as well for lack of subject matter jurisdiction. The relief requested in both of these counts is contingent upon a finding of liability under Count I; however, upon Count I's dismissal, the indispensable predicate for the adjudication of Counts II and II is no longer present. Given the central purpose of Rule 14, which is to promote judicial economy and efficiency, *Colton v. Swain,* 527 F.2d 296, 299-300 (7th Cir. 1975), we discern no justification for retaining jurisdiction of Counts II and III, and we strike them accordingly.

**CONCLUSION**

For the foregoing reasons, we dismiss Great Lakes' complaint both for **[*48]** lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

Charles P. Kocoras

United States District Judge

Dated: February 18, 1993

# Sanchez v. Global Parking Mgmt.

United States District Court for the Northern District of Illinois, Eastern Division

July 20, 2015, Decided; July 20, 2015, Filed

No. 14-cv-04611

**Reporter**
2015 U.S. Dist. LEXIS 93782 *; 2015 WL 4429024

ALFREDO SANCHEZ and MIGUEL ARRIAGA, on behalf of themselves and other persons similarly situated, Plaintiffs, v. GLOBAL PARKING MANAGEMENT, INC., CAR PARKING SOLUTIONS, LLC, MICHAEL S. DENIGRIS, JOSEPH GRILLO, ROSEANNE PARONE-DENIGRIS, and CASIMIR A. RINCON, individually, Defendants.

**Counsel:** **[*1]** For Alfredo Sanchez, Miguel Arriaga, Plaintiffs: Alvar Ayala, Christopher J. Williams, Workers' Law Office, P.C., Chicago, IL; Ryan Matthew Thoma, Sara Stewart Schumann, Karen I. Engelhardt, Allison, Slutsky & Kennedy, P.C., Chicago, IL.

For Global Parking Management, Inc., Michael S Denigris, Joseph Grillo, Roseanne Parone-Denigris, Car Parking Solutions LLC, Defendants: Elizabeth A. Boratto, Jennifer Ann Kunze, The Miller Law Group, LLC, Hinsdale, IL.

**Judges:** Andrea R. Wood, United States District Judge.

**Opinion by:** Andrea R. Wood

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiffs Alfredo Sanchez and Miguel Arriaga have brought this putative class action against Defendants Global Parking Management, Inc. ("Global"), Car Parking Solutions, LLC ("Car Parking"), Michael S. DeNigris, Joseph Grillo, Roseanne Parone-DeNigris, and Casimir Rincon, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, as well as retaliation in violation of all of those statutes. Before the Court is Car Parking's motion to dismiss the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion") (Dkt. No. 60). For the reasons stated **[*2]** below, the Court finds that Plaintiffs have sufficiently stated claims against Car Parking and therefore denies the Motion.

## BACKGROUND

Except when otherwise noted, the following facts are taken from the Second Amended Complaint ("SAC") and accepted as true for the purposes of deciding the Motion.[1]

Global provides its clients with attendants to monitor parking lots and take action against drivers who park on the lots even though they are not customers of the related businesses. (Compl. ¶ 15, Dkt. No. 47.) Global is jointly owned and operated by DeNigris, Grillo, and Parone-DeNigris. (*Id.* ¶ 16.) Plaintiffs are both former Global employees who were hired by the company in 2011. (*Id.* ¶ 17.) They claim that in the past three years they were "regularly and customarily" required to work in excess of 40 hours per week but were not compensated at 1.5 times their regular rate of pay for their overtime work; instead, they were compensated for overtime work at their normal rate plus $1. (*Id.* ¶¶ 18-20, 22-23.) Plaintiffs **[*3]** also allege that Global made unlawful

---

[1] For the purposes of deciding a Rule 12(b)(6) motion, a district court must accept the allegations of the complaint as true and draw all permissible inferences in the plaintiff's favor. *See, e.g., Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

2015 U.S. Dist. LEXIS 93782, *3

deductions from their wages. (*Id.* ¶¶ 26-33.) For example, Plaintiffs would be assessed a fine if they did not arrive 15 minutes early for their shifts. (*Id.* ¶ 26.) They were also subject to discipline and monetary fines for more than 40 separate infractions, such as failing to tuck in their shirts, leaving equipment at home or at the office, and failing to call the office when arriving at a job location. (*Id.* ¶ 27.)

The initial complaint in this lawsuit named only Global, DeNigris, Grillo, and Parone-DeNigris as defendants. Plaintiffs filed the case on June 18, 2014 and were terminated shortly thereafter. (*Id.* ¶ 17) They subsequently amended their complaint on July 25, 2014 to add a claim for retaliation. Plaintiffs and the originally-named defendants discussed settlement in November 2014, but no agreement was reached. (*Id.* ¶ 34.) The next month, Car Parking was registered with the Illinois Secretary of State as a limited liability corporation. (*Id.*) Rincon, who had been an office manager and parking lot attendant for Global, became the registered agent and managing member of Car Parking. (*Id.* ¶¶ 35-36.)

Car Parking took over Global's business, including **[*4]** using the same signs (with the new company name covering up the old), employing the same individuals, and utilizing the same equipment, labor management, and office staff. (*Id.* ¶¶ 37-39, 44.) As alleged by Plaintiffs, Global and Car Parking "are a single employer and/or Car Parking is Global's alter-ego" and Car Parking is Global's "successor." (*Id.* ¶¶ 40, 44.) Plaintiffs further claim that Global is "no longer operating or is in the process of ceasing its business" and that Car Parking currently provides services at commercial parking lots where Global had an established relationship. (*Id.* ¶ 43.)

On January 21, 2015, Plaintiffs were granted leave to amend their complaint a second time to add Car Parking and Rincon as defendants. The SAC includes five counts: claims for violation of the FLSA and the IMWL for failure to pay overtime wages, a claim for violation of the IWPCA based on the allegedly unlawful deductions, a claim under the IWPCA for failure to pay earned wages, bonuses, and commissions, and a claim under all of the aforementioned statutes alleging that Plaintiffs were retaliated against for filing this lawsuit.[2] Global, DeNigris, Grillo, and Parone-DeNigris answered the SAC. **[*5]** Car Parking, however, has moved to dismiss the claims against it. The Motion challenges only

whether Car Parking is properly named as a defendant in this matter as a purported alter ego or successor of Global or because it is a single employer with Global.

## DISCUSSION

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). While a complaint need not include detailed factual allegations, there "must be enough to raise a right to relief above the speculative level." *Id.* at 555. A plaintiff must "'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* In addition, "although the complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *Id.*

Here, Car Parking argues that it is not properly named as a defendant in this **[*6]** matter because it cannot be held liable for the acts of which Plaintiffs complain. Specifically, it contends that the factual allegations in the SAC do not show that Car Parking is an alter-ego or successor corporation of Global; nor do they show that Car Parking and Global constitute a single employer.[3] Instead, according to Car Parking, Plaintiffs misconstrue and misrepresent the facts regarding its creation in order "to impose liability on an innocent and separate

_____

[2] All but the retaliation claim in Count V are putative class claims.

_____

[3] Car Parking attacked Plaintiffs' alter-ego theory of liability in its opening brief without mentioning the two other theories of liability asserted against it—namely, that Car Parking is a successor corporation of Global and that Car Parking and Global constitute a single employer. After Plaintiffs raised Car Parking's failure to challenge the successor and single employer theories in their response, Car Parking argued for the first time in its reply that Plaintiffs also has failed to state claims under those theories as well. By waiting until its reply to challenge successor and single employer liability, Car Parking has waived those arguments. *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012). Nonetheless, the Court will **[*7]** proceed to consider the merits of the motion to dismiss the successor and single employer claims because it is clear that Plaintiffs have successfully pleaded those claims.

company." (Car Parking Reply at 1, Dkt. No. 66.)

In support of the Motion, Car Parking has submitted an affidavit from Rincon. (Car Parking Mot., Ex. A, Dkt. No. 60-1.) The purpose of the affidavit is to dispute the factual allegations of the SAC. "Rule 12(b) requires that if the district court wishes to consider material outside the pleadings in ruling on a motion to dismiss, it must treat the motion as one for summary judgment and provide each party notice and an opportunity to submit affidavits or other additional forms of proof." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 479 (7th Cir. 2002). In its reply brief, Car Parking requests that the Court consider Rincon's affidavit and treat its Motion as one for summary judgment. The Court declines to do so.

Converting the Motion from a Rule 12(b)(6) motion to dismiss to a Rule 56 motion for summary judgment makes little sense under the circumstances and would prejudice Plaintiffs, who have not yet had the opportunity to depose Rincon or otherwise to develop the factual record necessary to challenge the assertions in his affidavit. At this point, there is no reason for the Court to believe that it has all **[*8]** of the probative evidence regarding Car Parking's liability before it. *Cf. Santana v. Cook Cnty. Bd. of Review*, 679 F.3d 614, 619-20 (7th Cir. 2012) (finding that it would not be error for the district court to convert the defendants' motion to one seeking partial summary judgment under Rule 56 where the parties had ample notice and time to respond, and "the district court considered everything that the parties claimed to be probative of the scope of the ban"). This is particularly true given that the material Car Parking asks this Court to consider consists of an affidavit from its own managing member who is also named individually as a defendant in this case. Car Parking's request that the Court accept Rincon's untested affidavit testimony turns the Rule 12(b)(6) standard on its head; rather than accepting Plaintiffs' allegations as true, Car Parking asks this Court to accept Car Parking's own version of the facts as true. Thus, the Court excludes Rincon's affidavit and will not consider it in deciding the Motion.

Plaintiffs assert three theories of liability against Car Parking: alter-ego, successor, and single employer. First, under Illinois law, "a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter **[*9]** ego or business conduit of another person or entity." *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 778 N.E.2d 291, 294-95, 268 Ill. Dec. 305 (Ill. App. Ct. 2002) (internal

citations omitted). Such alter ego liability requires that two criteria be satisfied: "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751-52 (7th Cir. 2012) (internal quotation marks omitted). Similarly, "[s]ingle employer status exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.' Factors which establish a formal relationship between the two employers, such as common ownership or common management, are relevant to determine whether two seemingly independent businesses are really one enterprise." *N.L.R.B. v. W. Temp. Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir. 1987) (internal citations and quotation omitted). Finally, successor entities can be held liable for the actions of their predecessors in certain situations, including "where (1) there is an express or implied assumption of liability; (2) the transaction amounts to a consolidation, merger, or similar restructuring **[*10]** of the two corporations; (3) the purchasing corporation is a mere continuation of the seller; and (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325-26 (7th Cir. 1990) (internal quotation omitted).

In the SAC, Plaintiffs have alleged facts sufficient to support all three theories of liability against Car Parking. For example, the SAC alleges that: Rincon, managing member of Car Parking, was also a managerial employee of Global; employees who formerly worked for Global continued to work in identical positions for Car Parking after Car Parking was formed; and Car Parking performs the same work as Global and effectively took over Global's business when it was formed in December 2014. (Compl. ¶¶ 11, 12, 38, 39, Dkt. No. 47.) Plaintiffs clearly intend to suggest that Global and the individual defendants formed Car Parking after the unsuccessful settlement discussions in November 2014 in an attempt to protect their assets in case they are found liable for Plaintiffs claims. Considering only the pleadings, in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently pleaded claims against Car Parking under **[*11]** each of the three theories they assert.

For these reasons, Plaintiffs have sufficiently stated

claims against Car Parking and therefore the Motion is denied.

**CONCLUSION**

For the foregoing reasons, Car Parking's motion to dismiss the Second Amended Complaint (Dkt. No. 60) is denied.

Dated: July 20, 2015

/s/ Andrea R. Wood

Andrea R. Wood

United States District Judge

---

End of Document

# Lincoln Nat'l Life Ins. Co. v. Nicklau, Inc.

United States District Court for the Northern District of Illinois, Eastern Division

May 17, 2000, Decided ; May 18, 2000, Docketed

No. 98 C 2453

**Reporter**
2000 U.S. Dist. LEXIS 6936 *; 2000 WL 656683

LINCOLN NATIONAL LIFE INSURANCE COMPANY, Plaintiff, v. NICKLAU, INC., an Illinois Corporation, d/b/a/ "PASTEUR," DAN NYUGEN, and TUAN NYUGEN, Defendants.

**Disposition:** **[*1]** Judgment entered in favor of plaintiff Lincoln National Life Insurance Company and against Defendants Nicklau, Inc., d/b/a Pasteur, Dan Nguyen and Tuan Nguyen.

**Counsel:** For LINCOLN NATIONAL LIFE INSURANCE COMPANY, THE, plaintiff: Donald Alan Murday, Sean Patrick MacCarthy, Peterson & Ross, Chicago, IL.

For LINCOLN NATIONAL LIFE INSURANCE COMPANY, THE, plaintiff: R. Lindsay Wilson, II, Sullivan & Worcester, LLP, Boston, MA.

For NICKLAU INC, DAN NGUYEN, TUAN NGUYEN, defendants: Robert H Itzkow, Robert H. Itzkow and Associates, Chicago, IL.

For NICKLAU INC, DAN NGUYEN, TUAN NGUYEN, defendants: Paul A. Caghan, Paul Caghan, P.C., Chicago, IL.

**Judges:** David H. Coar, United States District Judge.

**Opinion by:** David H. Coar

# Opinion

## *MEMORANDUM OPINION AND ORDER*

Lincoln National Life Insurance Company ("Lincoln") filed this action against Nicklau, Inc., d/b/a "Pasteur," Dan Nguyen, and Tuan Nguyen, (collectively, "Defendants"). Seeking to collect on an outstanding state court judgment, Lincoln proceeded against Defendants on a theory of successor liability (Count I), fraudulent transfer, intentional and constructive fraud (Counts II and III, respectively), and breach of fiduciary duty **[*2]** against Dan and Tuan Nguyen (Counts IV and V, respectively). A bench trial was held on May 15, 2000. The following findings of fact and conclusion of law are entered pursuant to Federal Rule of Civil Procedure 52(a).

## I. Factual Findings

Brothers Dan and Tuan Nguyen co-owned a Vietnamese restaurant named Pasteur, located at 4759 N. Sheridan Road in Chicago ("Pasteur-Sheridan"). The restaurant was incorporated in Illinois as Pasteur-Restaurant, Inc., in 1985. In June 1995, a fire destroyed Pasteur-Sheridan. The Illinois Secretary of State's office involuntarily dissolved Pasteur-Sheridan in May 1996. In July 1992, Dan and Tuan Nguyen opened a second Vietnamese restaurant, again named Pasteur, at 45 E. Chicago Avenue in Chicago ("Pasteur-Chicago"). That restaurant was incorporated in Illinois as Pasteur Cafe, Inc.

Kim Nguyen, Dan's wife, undertook a significant role at both restaurants. She worked at the Pasteur restaurants from their inception in 1985 until their demise in 1996. During that period, she did not hold any other employment. Kim Nguyen maintained the books, paid bills, waitressed, and cooked at Pasteur-Sheridan and Pasteur-Chicago (together, "old Pasteurs"). Kim **[*3]**

signed a legal document renewing Pasteur-Sheridan's liquor and food license. To enable Pasteur-Sheridan to participate in the Taste of Chicago festival, Kim Nguyen, holding herself out as an officer, signed a document for the City of Chicago. When Dan and Tuan traveled, Kim was in charge of the two restaurants. At trial, Kim Nguyen indicated that the experience she brought to the old Pasteurs was "critical." Dan Nguyen agreed, stating that his wife was a "very important person in running" the old Pasteurs.

In February 1996, Lincoln, an Indiana corporation that owned the property on which Pasteur-Chicago was located, filed a Forcible Entry and Detainer action against Pasteur-Sheridan in state court. Lincoln sought to recover rent damages and to repossess the space occupied by Pasteur-Chicago. Subsequently, Pasteur-Chicago was also named a co-defendant in that suit. On January 31, 1997, the state court granted Lincoln's motion for summary judgment on the Forcible Entry and Detainer action. Pursuant to the state court judgment, Pasteur-Sheridan was ordered to pay Lincoln $ 89, 926.36 in rent damages and $ 20,000 in attorney's fees.

On May 12 or 13, 1997, during the pendency of the summary [*4] judgment motion before the state court, Kim Nguyen incorporated a restaurant in Illinois as Nicklau, Inc., d/b/a Pasteur. This Vietnamese restaurant is located at 5525 N. Broadway in Chicago ("Pasteur-Broadway"). Kim Nguyen is the sole director and shareholder of this restaurant. She also serves as the President and Secretary of Pasteur-Broadway. In Defendants' Answers to Interrogatories, signed by Dan and Tuan Nguyen, Kim, Dan, Tuan and Quynh Nguyen were listed as officers of Nicklau Inc. d/b/a/ Pasteur. [1] Dan Nguyen's relatives, including his parents, his sister, and two brothers loaned money to Kim and Dan to help finance the purchase of the property at 5525 N. Broadway. No money from the old Pasteurs was used toward the purchase or operation of Pasteur-Broadway.

Since the restaurant's opening in May 1997, Dan Nguyen has worked 50-60 hours a week at Pasteur - Broadway. Dan, [*5] who was responsible for maintaining the books at the old Pasteurs, continues to maintain the books for Pasteur-Broadway. He also cooks, pays the bills, and owns the building at 5525 N. Broadway with his wife. Dan Nguyen cams approximately $ 40,000 a year for his work at the restaurant.

Tuan Nguyen has worked an average of 50 hours per week at Pasteur-Broadway since 1997. He manages the cash register and oversees the cleaning crew. On many occasions, Tuan has issued personal checks, for which he is later reimbursed, to pay for Pasteur-Broadway's financial obligations. On one such occasion, Tuan Nguyen paid over $ 1,000 out of his personal account for Pasteur-Broadway's liquor license. In 1997, he signed a Taste of Chicago document stating that he was Secretary of Pasteur-Broadway. Tuan Nguyen, who earns $ 45,000 a year at Pasteur-Broadway, is the highest paid employee among Pasteur-Broadway's 26 employees, including Kim Nguyen. Kim Nguyen testified at trial that Tuan Nguyen, "to a certain extent," brings valuable restaurant experience to Pasteur-Broadway. Neither Dan nor Tuan have held any employment other than working at Pasteur-Broadway since its opening.

Hieu Tran, who cooked at [*6] Pasteur-Chicago, is one of the primary cooks at Pasteur-Broadway. Dan Nyugen's niece, Quynh Nguyen, bartends at Pasteur-Broadway. Some of the recipes used at the old Pasteurs are also used at Pasteur-Broadway. Customer from the old Pasteurs comprise about 10% of Pasteur-Broadway's customer base. Kim Nguyen stated that some customers frequent Pasteur-Broadway because of the goodwill associated with the old Pasteurs. In fact, customers at the new restaurant have commented that it's "good to be back."

Kim and Tuan Nguyen testified that the name Pasteur enjoyed a reputation for excellent Vietnamese food in Chicago. Kim also agreed that the name Pasteur was good for business. When Kim Nyugen spoke with Phil Vettel, a restaurant critic for the Chicago Tribune, she informed him that it was important to "keep the [Pasteur] name alive." At trial, she testified that the name was recognized in Chicago. For several years, the old Pasteurs were a participating vendor at the Taste of Chicago festival, and after 1997, Pasteur-Broadway sent employees, donned in shirts from the old Pasteurs, to operate at the festival.

Time and again, Pasteur-Broadway has been associated with the old Pasteurs. [*7] Customers have assumed that Tuan Nguyen, who owned the old Pasteurs, also owns Pasteur-Broadway. In addition, the media has assumed that Pasteur-Broadway is related to the old Pasteurs, and Kim Nguyen has not informed them otherwise. An article in Chicago Magazine noted that Pasteur-Broadway "rose from its ashes like a

---

[1] When asked about this particular answer at trial, Tuan Nguyen testified that he had not reviewed it before signing the interrogatory.

Phoenix." A Chicago Sun Times article also connects the old Pasteurs with the new, stating that Pasteur-Broadway has "finally found a permanent home."

There are differences between the old Pasteurs and Pasteur-Broadway. Pasteur-Broadway occupies a much larger space, and according to Kim Nguyen, it embraces a new "concept." Kim Nguyen has made the food lighter and has added a wider range of entrees than were served at the old Pasteurs. The average customer spent $ 10-15 at the old Pasteurs, while at Pasteur-Broadway, the average meal costs anywhere from $ 30-75. Although the old Pasteurs did not serve alcohol, Pasteur-Broadway has a full service bar. Pasteur-Broadway grossed a million dollars in 1998, and 2 million in 1999. Kim Nguyen testified that the ongoing value of the business today, apart from the real estate and the value of the property, was $ 300,000 to $ 400,000.

 **[*8]** After the demise of the old Pasteurs, all of the remaining assets--namely, 15-20 old chairs and tables, a kitchen hood, a burner, and some utensils were transferred to Pasteur-Broadway. These assets, which are worth no more than $ 2,000, are now kept in a garage at 5525 N. Broadway.

Lincoln seeks relief under Illinois law. This Court retains jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

## II. Conclusions of Law

As a general rule, a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation. *Vernon v. Schuster*, 179 Ill. 2d 338, 344-45, 688 N.E.2d 1172, 1175, 228 Ill. Dec. 195, 198 (Ill. 1997). To "offset the potentially harsh impact of the rule, however, the law has also developed methods to protect the rights of corporate creditors after dissolution." *Id.* (quoting *Tucker v. Paxson Machine Co.*, 645 F.2d 620, 623 (8th Cir. 1981)). The following four exceptions to the general rule provide for successor liability: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation **[*9]** or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligation. *Id.*

In the usual case, successor liability has been applied where there has been a sale of assets. Here, there did

not exist a "sale" in the sense that money did not change hands in exchange for a good. Yet the fact that the old Pasteurs' name and goodwill were transferred to Pasteur-Broadway without any consideration does not preclude Pasteur-Broadway's liability. Kim, Dan and Tuan Nuygens' testimonies firmly established that the Pasteur name and goodwill were of significant value. Even if the name and goodwill were not sold in the conventional sense, these valuable intangibles were transferred to Pasteur-Broadway. *See, e.g., Frank Ix & Sons, Inc. v. Phillipp Indus., Inc.*, 1997 U.S. Dist. LEXIS 12889, No. 95 C. 3195, 1997 WL 534509, at *6 (N.D. Ill. Aug. 25, 1997) (finding a conveyance where property transferred for inadequate consideration).

Defendants point out that the name Pasteur was never copyrighted, and that another Vietnamese restaurant in Moline, Illinois, **[*10]** as well as a handful of others across the country, also use that name. The existence of other restaurants named Pasteur, none of which are located in the City of Chicago, does not undermine the value of the name and the goodwill built up by the old Pasteurs. Kim Nguyen insisted on keeping the name "alive" precisely because of the value of these assets. Clearly, Pasteur-Broadway benefitted from the goodwill associated with the name Pasteur, whether it be through the favorable restaurant reviews connecting the restaurants, or the customer assumption of identity between the old Pasteurs and Pasteur-Broadway. In fact, when the old Pasteurs were unable to participate in the Taste of Chicago festival, Pasteur-Broadway appropriated that same vending opportunity. Pasteur-Broadway, having profited from the transfer of the old Pasteurs' most precious asset, is subject to successor liability.

### A. Continuation Exception

The "continuation exception," which is the third exception to successor nonliability outlined above, applies when the purchasing corporation is "merely a continuation or reincarnation of the selling corporation." *Vernon*, 179 Ill. 2d at 346, 688 N.E.2d at 1176 **[*11]** (citing *Grand Lab., Inc. v. Midcon Labs of Iowa, Inc.*, 32 F.3d 1277, 1282 (8th Cir. 1994)). Where the purchasing corporation "maintains the same or similar management and ownership, but merely 'wears different clothes,'" liability will be imposed upon the successor corporation. *Id.* (citing *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985)).

Once the state court suit was filed, Nicklau, Inc., d/b/a

Pasteur, was incorporated, with Kim Nguyen as the sole officer and shareholder of Pasteur-Broadway. This ruse was a transparent attempt to escape the liabilities about to be incurred by the old Pasteurs. The continuation exception to successor nonliability, however, was designed to protect creditors in these situations. The Illinois Supreme Court observed:

> To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.

179 Ill. 2d at 346, 688 N.E.2d at 1176 (quoting *Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282, 297, 562 A.2d 1286, 1293 (Md. 1989)). **[*12]**

The relationship between the old Pasteurs and Pasteur-Broadway satisfies the test for the continuation exception. One corporation is deemed to be a continuation of another where there exists a common identity of officers, directors, and/or shareholders. 179 Ill. 2d at 347, 688 N.E.2d at 1176. Dan and Tuan Nyugen served as the sole shareholders and officers of the old Pasteurs, while Kim Nguyen served as the sole shareholder, officer and director of Pasteur-Broadway. Although on its face, this fact alone would serve to defeat the imposition of successor liability, a closer look at the facts compels the opposition conclusion.

Regardless of whether they officially served as owners, directors, or officers, Dan, Tuan and Kim Nguyen were substantially interwined in the operation of all three Pasteur restaurants. Kim was heavily involved in the operation and management of the old Pasteurs. When Dan and Tuan traveled, Kim was left in charge of the two restaurants. She also held herself out as an officer, as evidenced by two documents that she signed as a "Secretary" of Pasteur-Sheridan. *See H & H Press, Inc. v. Drew Axelrod*, 265 Ill. App. 3d 670, 679, 638 N.E.2d 333, 339, 202 Ill. Dec. 687 (Ill. App. Ct. 1994) **[*13]** (defendant deemed de facto officer where he held himself out as one). At trial, Kim Nguyen conceded that she took on a "critical" role, and Dan Nguyen affirmed her, admitting that his wife was a "very important person in running" the old Pasteurs.

Similarly, Dan and Tuan Nguyen, although not official owners of Pasteur-Broadway, continued to be significantly involved. Dan's relatives loaned the money

to Dan and Kim Nguyen to purchase the property at 5525 N. Broadway. Dan and Tuan devoted their days to working full time at Pasteur-Broadway. At $ 45,000 a year, Tuan Nyugen is the highest paid employee among Pasteur-Broadway's 26 employees. On many occasions, Tuan Nguyen issued personal checks, for which he was later reimbursed, to pay for Pasteur-Broadway's financial obligations. On one such occasion, Tuan Nguyen paid over $ 1,000 out of his personal account for Pasteur-Broadway's liquor license. In 1997, Tuan signed a Taste of Chicago document stating that he was Secretary of Pasteur-Broadway. In their answer to Plaintiff's interrogatories, Defendants identified Kim, Dan and Tuan Nguyen as officers of Pasteur-Broadway. Kim, Dan and Tuan's managerial involvement in the three Pasteur **[*14]** restaurants, not to mention their holding themselves out as officers, establishes a continuation in ownership.

*Park v. Townson & Alexander, Inc.*, 287 Ill. App. 3d 772, 774, 679 N.E.2d 107, 109, 223 Ill. Dec. 163 (Ill. App. Ct. 1997) is illustrative of the way Illinois courts have analyzed similar facts. In *Park*, the state court determined that an identity of ownership existed where the husband and his business partner were sole shareholders of a predecessor corporation, while the wife was the sole shareholder of the successor corporation. 287 Ill. App. 3d at 775, 679 N.E.2d at 110. Although the wife was designated as sole shareholder of successor company, the husband continued to make major decisions for the successor corporation. *Id.* In addition, tax documents, albeit claimed as erroneous by defendants, showed that the husband was president of successor corporation. *Id.* The court also noted that "while the spousal relationship between the owners of the corporations does not in itself establish a continuity of shareholders, it is certainly a factor which can be considered." *Id. See also Steel Co. v. Morgan Marshall Indus.*, 278 Ill. App. 3d 241, 248-49, 662 N.E.2d 595, 600, 214 Ill. Dec. 1029 (Ill. App. Ct. 1996) **[*15]** (continuity found where husband was sole shareholder of predecessor company and wife was 80% shareholder of successor company).

Not only was there an identity of ownership between the old Pasteurs and Pasteur-Broadway, but the business operation of the three restaurants evidenced a substantial continuity. Pasteur-Broadway is located only a couple of miles away from Pasteur-Sheridan. The old Pasteurs' name and goodwill were carried forward to Pasteur-Broadway. The restaurants continued to serve Vietnamese food. *See Kennedy v. Four Boys Labor Serv. Inc.*, 279 Ill. App. 3d 361, 368, 664 N.E.2d 1088,

1092, 216 Ill. Dec. 160 (Ill. App. Ct. 1996) (continuity established where successor operated the same business, used the same name). Hieu Tran, the cook at the old Pasteurs, was transferred to the new restaurant. The same recipes were used. Some of the same customers who used to frequent the old Pasteurs now patronize Pasteur-Broadway. Kim Nguyen insists that the "concept" and "ambiance" of the old and new restaurants differ, and that she has added lighter fare to a more expansive menu, but those are distinctions without a meaningful difference. The point is that Pasteur-Broadway, **[*16]** even if it has evolved into a more sophisticated version, is a mere continuation of the old Pasteurs. As such, it is liable for the judgment entered against the old Pasteurs.

### B. Fraudulent Transfer

Not only does the continuation exception serve as a basis for imposing liability upon Pasteur-Broadway, but the Uniform Fraudulent Transfer Act ("Act") provides alternative grounds for successor liability. The Act states that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation as incurred, if the debtor made the transfer or incurred the obligation:
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (2) without receiving a reasonable equivalent value in exchange for the transfer or obligation, and the debtor:
> (A) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed he would incur, debts beyond his ability to pay as they **[*17]** became due.

740 ILCS 160/5(a).

Pursuant to this provision, Illinois courts have categorized fraudulent conveyance cases into the categories of "fraud in law" and "fraud in fact." Fraud in law presumes a fraudulent intent when a voluntary transfer, made for no or inadequate consideration, directly impairs the rights of creditors. *Frank Ix & Sons, Inc. v. Phillipp Indus., Inc.*, 1997 U.S. Dist. LEXIS 12889, No. 95 C 3195, 1997 WL 534509, at *6 (N.D. Ill. Aug. 25, 1997) (citing *Casey Nat'l Bank v. Roan*, 282 Ill.

App. 3d 55, 668 N.E.2d 608, 611, 218 Ill. Dec. 124 (Ill. App. Ct. 1996)). In the instant case, the name and goodwill of the old Pasteurs were transferred to Pasteur-Broadway for no consideration at a time when Defendants were anticipating a significant judgment against them in state court. By 1997, the old Pasteurs were left with $ 0.24 in their bank account, and could not afford to pay off their debt.

Not only is this court satisfied that fraud-in-law applies to this case, but the numerous "badges of fraud" present in this case give rise to a presumption of fraud-in-fact, which Defendants have failed to rebut. *Frank Ix*, 1997 U.S. Dist. LEXIS 12889, 1997 WL 534509, at *8 (citing **[*18]** *Kaibab Indus., Inc. v. Family Ready Homes, Inc.*, 80 Ill. App. 3d 782, 786, 14 Ill. Dec. 334, 372 N.E.2d 139 (Ill. App. Ct. 1978)). The Act sets forth eleven indicia of fraud, *see* 740 ILCS 160/5(b)(1)-(11), and this case qualifies for at least seven of those factors. First, the Pasteur name and goodwill were transferred to an insider; that is, the wife and sister-in-law of the owners of predecessor restaurants. Second, Dan and Tuan Nguyen, the debtors, retained possession and control of the transferred property by exercising significant managerial control at Pasteur-Broadway. Third, before the transfer was made, the Dan and Tuan Nguyen had been sued by Lincoln. Fourth, all of old Pasteur's remaining assets-- from the valuable name and goodwill to the useless old chairs, tables, and kitchenware-- were transferred to Pasteur-Broadway. Fifth, no consideration was received for these assets. Sixth, the old Pasteurs had been insolvent. Finally, the transfer occurred shortly before a substantial debt was incurred. The overwhelming evidence demonstrates that a fraudulent transfer occurred, and Pasteur-Broadway will be held liable for the judgment debt of the old Pasteurs.

**[*19]** Lincoln also advances claims against Dan and Than Nguyen for breach of fiduciary duty, but those counts need not be addressed in light of this court's disposition of the successor liability claim.

### C. Amount of Liability

As the successor of the old Pasteurs, Pasteur-Broadway is directed to pay for the state court judgment entered against Pasteur-Sheridan in the amount of $ 89,926.36 for rent damages and $ 20,000 for attorneys' fees incurred in the state court action. In addition, Pasteur-Broadway is ordered to pay for attorneys' fees and costs incurred in the instant action. The lease

2000 U.S. Dist. LEXIS 6936, *19

agreement between Pasteur-Sheridan and their original landlord, Centrum Properties, purports to bind the parties as well as their successors. P 27.9 In addition, the lease provides that:

The Tenant shall pay upon demand all Landlord's costs, charges and expenses including the fees and out-

> of-pocket expenses of counsel, agents, and others retained by landlord incurred in enforcing the Tenant's obligations hereunder or incurred by the Landlord in any litigation, negotiation, or transaction in which the Tenant causes the Landlord without Landlord's fault to become involved or concerned. **[*20]**

P 20.1(d). This federal suit was incurred in order to enforce Defendants' obligations under the lease, and fees and costs will be awarded to Lincoln pursuant to the lease agreement.

### III. Conclusion

Pursuant to the foregoing findings of fact and conclusions of law, the court enters judgment in favor of plaintiff, Lincoln National Life Insurance Company, and against Defendants Nicklau, Inc., d/b/a Pasteur, Dan Nguyen, and Tuan Nguyen. Nicklau, Inc., d/b/a/ Pasteur is liable for the state court judgment entered against Pasteur-Sheridan in the amount of $ 89,926.36 for rent damages and $ 20,000 for attorneys' fees incurred in the state court action. The parties are ordered to proceed with a motion for fees pertaining to the federal action against Defendants in accordance with Federal Rule of Civil Procedure 54(d) and Local Rule LR 54.3. *See* Local Rule LR 54.3(d)-(g) (requiring parties to make a good faith attempt to agree on the amount of fees due and outlining additional procedures).

**Enter:**

**David H. Coar**

**United States District Judge**

**Dated:** MAY 17 2000

### JUDGMENT IN A CIVIL CASE

Decision by Court. This action came to trial or **[*21]** hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff, Lincoln National Life Insurance Company, and against Defendants Nicklau, Inc., d/b/a Pasteur, Dan Nguyen, and Tuan Nguyen. Nicklau, Inc., d./b/a/ Pasteur is liable for the state court judgment entered against Pasteur-Sheridan in the amount of $ 89,926.36 for rent damages and $ 20,000 for attorneys' fees incurred in the state court action. The parties are ordered to proceed with a motion for fees pertaining to the federal action against Defendants in accordance with Federal Rule of Civil Procedure 54(d) and Local Rule LR 54.3. *See* Local Rule LR 54.3(d)-(g) (requiring parties to make a good faith attempt to agree on the amount of fees due and outlining additional procedures).

Date: 5/17/2000

**End of Document**