**UNPUBLISHED OPINIONS MENTIONED IN MOTION**

**(ARRANGED IN ORDER OF APPEARANCE)**

# Friedman v. Leading Edge Recovery Solutions, LLC

United States District Court for the Northern District of Illinois, Eastern Division

April 28, 2014, Decided; April 28, 2014, Filed

Case No. 13 cv 9034

**Reporter**
2014 U.S. Dist. LEXIS 58694 *; 2014 WL 1674083

VARDA FRIEDMAN, on behalf of plaintiff and a class defined herein, Plaintiff, v. LEADING EDGE RECOVERY SOLUTIONS, LLC and ASSET ACCEPTANCE, LLC, Defendants.

**Counsel:** **[*1]** For Varda Friedman, on behalf of plaintiff and a class defined herein, Plaintiff: Daniel A. Edelman, LEAD ATTORNEY, Cathleen M. Combs, James O. Latturner, Tiffany Nicole Hardy, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, IL.

For Leading Edge Recovery Solutions, LLC, Defendant: Robert M. Horwitz, LEAD ATTORNEY, Dykema Gossett Pllc, Detroit, MI; Amy R Jonker, Bryan James Anderson, Dykema Gossett, PLLC, Chicago, IL.

For Asset Acceptance, LLC, Defendant: Robert M. Horwitz, LEAD ATTORNEY, Dykema Gossett Pllc, Detroit, MI; Amy R Jonker, Bryan James Anderson, Dykema Gossett, PLLC, Chicago, IL.

**Judges:** Sharon Johnson Coleman, United States District Judge.

**Opinion by:** Sharon Johnson Coleman

# Opinion

**MEMORANDUM OPINION AND ORDER**

Plaintiff Varda Friedman brings this class action suit alleging a debt collection letter sent by defendant Leading Edge Recovery Solutions, LLC ("Leading Edge"), on behalf of defendant Asset Acceptance, LLC ("Asset") (collectively, "Defendants") violated the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.* ("FDCPA"). Defendants now move to dismiss Friedman's complaint in its entirety. For the following reasons, Defendants' motion is granted.

**Background**

On March 8, 2103, Leading Edge, a **[*2]** debt collection company, sent a debt collection letter to Friedman, which stated:

Dear Varda Friedman,

Your delinquent account has been placed with our company for collection. We have been authorized by our client to collect the outstanding amount owed to them.

Asset Acceptance LLC may report information about your account to credit bureaus. Correspondence concerning inaccuracies and disputes relating to your credit report should be sent to: Asset Acceptance, LLC, P.O. Box 1630 Warren, MI 48090-1630.

Per our agreement with our client, your account is eligible for settlement. That's right! If you pay just $2,757.92 of the $3,939.89 you currently owe our client, this debt will be settled in full! We are not obligated to renew this offer.

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of the debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. **[*3]** If you request this office in writing within 30 days after receiving

this notice, this office will provide you with the name and address of the original creditor if different from the current creditor.

Federal law prohibits certain methods of debt collection, and requires that we treat you fairly. You can stop us from contacting you by writing a letter to us that tells us to stop the contact or that you refuse to pay the debt. Sending such a letter does not make the debt go away, if you owe it. Once we receive your letter, we may not contact you again, except to let you know that there won't be any more contact or that we intend to take a specific action.

If you have a complaint about the way we are collecting this debt, please write to us at Leading Edge Recovery Solutions, LLC 5440 North Cumberland Ave STE 300 Chicago, IL 60656, email us at AssetComplaints@leadingedgerecovery.com, or call us toll-free at (866) 577-8403 between 9:00 A.M. and 5:00 P.M. CST, Monday — Friday.

The Federal Trade Commission enforces the Fair Debt Collection Practices Act (FDCPA). If you have a complaint about the way we are collecting your debt, please contact the FCT online at www.ftc.gov; by phone at 1-877-FTC-HELP; **[*4]** or by mail at 600 Pennsylvania Ave., N.W., Washington, D.C. 20580.

Sincerely,

Collections Department

(855) 853-6334

(Dkt. #1-1.) Friedman now brings a class action lawsuit alleging that the instruction to contact Asset instead of Leading Edge regarding credit report disputes overshadows the validation notice and is misleading in violation of the FDCPA. Defendants now move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6).

## Legal Standard

A motion to dismiss tests the legal sufficiency of the complaint. *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir.2009). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). In deciding a Rule 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197,

167 L.Ed.2d 1081 (2007). Whether a debt collection letter is confusing is generally a question of fact; however, **[*5]** "a plaintiff fails to state a claim and dismissal is appropriate as a matter of law when it is apparent from a reading of the letter that not even a significant fraction of the population would be misled by it." *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 636 (7th Cir. 2012) (internal quotations omitted).

## Discussion

Friedman's complaint alleges the instruction to contact Asset regarding credit report disputes, instead of Leading Edge, contradicts and overshadows the validation notice in violation of §1692g and is misleading in violation of §1692e. (Dkt. #1, Pl.'s Compl., ¶¶18-24.) "Since inaccuracies and disputes relating to the reporting of the debt are likely to be inaccuracies and disputes relating to the debt itself (e.g., the debt is not mine), this instruction conflicts with the validation notice that appears below. A consumer that follows the instruction to communicate with [Asset] will waive their dispute rights with respect to [Leading Edge]." (Id. at ¶¶19-20.)

Section 1692g requires debt collection letters to include a validation notice explaining that the consumer has 30 days to dispute the validity of the debt. 15 U.S.C. 1692g(b). "Any collection activities **[*6]** and communications during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor." *Id.* The validation notice "must be effective, and it cannot be cleverly couched in such a way as to eviscerate its message." *Chauncey v. JDR Recovery Corp.*, 118 F.3d 516, 518-19 (7th Cir.1997) (citing *Avila*, 84 F.3d at 226). Section 1692e prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. §1692e(10).

In evaluating whether a debt collection letter violates the FDCPA, the Court views the letter from the objective standard of an unsophisticated consumer, who is assumed to be "uninformed, naive, or trusting." *Durkin v. Equifax Check Servs.*, 406 F.3d 410, 414 (7th Cir. 2005). Nevertheless, the unsophisticated consumer "possesses rudimentary knowledge about the financial world, is wise enough to read collection notices with added care, possesses 'reasonable intelligence,' and is

2014 U.S. Dist. LEXIS 58694, *6

capable of making basic logical deductions and inferences." *Pettit v. Retrieval Masters Creditors Bureau, Inc.*, 211 F.3d 1057, 1060 (7th Cir. 2000).

Defendants **[*7]** maintain that Friedman's complaint fails because the instruction to contact Asset regarding credit report disputes does not overshadow and is not inconsistent with the consumer's rights to dispute the validity of the debt with Leading Edge, nor is it misleading. The Court agrees. Overshadowing generally occurs when the debt collector indicates that the time for disputing the debt has passed or when the statements by the debt collector "misrepresent or cloud the amount of time remaining to dispute the debt." *Durkin*, 406 F.3d at 417. Information included along with the validation notice may be overshadowing if it renders the letter confusing or makes the debtor uncertain as to her rights. *Ozkaya v. Telecheck Servs., Inc.*, 982 F. Supp. 578, 582-83 (N.D. Ill. 1997) (citing *Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir. 1997) and *Russell v. Equifax A.R.S.,* 74 F.3d 30, 35 (2d Cir. 1996)). However, the language at issue here is unlike the language the Seventh Circuit has held to overshadow consumers' rights. *See e.g. Chauncey,* 118 F.3d at 519 (7th Cir. 1997) (demand for payment within thirty days contradicts the validation notice); *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir. 1996) (letter **[*8]** giving debtor ten days to pay "or else" inconsistent with validation notice).

Friedman asserts that directing the consumer to contact *the creditor* to dispute her credit report, rather than *the debt collector,* violates the FDCPA because, in doing so, the consumer will waive her verification rights. Friedman also argues that there is no difference between disputing the debt and disputing the reporting of the debt; therefore, directing the consumer to contact two different parties about a single dispute is contradictory and misleading. However, directing a consumer to contact different parties for different purposes does not amount to overshadowing and Friedman's overshadowing claim therefore fails. *See Shapiro v. Dun & Bradstreet Receivable Mgmt. Servs., Inc.*, 59 F. App'x 406, 408 (2d Cir. 2003) (letter instructing consumer to contact creditor for payment purposes or with questions about the account or contact debt collector to dispute the debt does not overshadow or contradict the validation notice). Friedman's allegation that the letter is misleading "for the same reason" summarily fails. (*See* Dkt. 1, Pl's Compl., ¶23.)

## Conclusion

Accordingly, Defendants' motion to dismiss is granted. **[*9]** Friedman's complaint is dismissed without prejudice for 28 days, at which time it will automatically convert to a dismissal with prejudice.

IT IS SO ORDERED.

Date: April 28, 2014

/s/ Sharon Johnson Coleman

United States District Judge

---

**End of Document**

# Simpson v. Saggezza, Inc.

United States District Court for the Northern District of Illinois

August 8, 2018, Decided; August 8, 2018, Filed

Case No. 17-cv-04165

**Reporter**
2018 U.S. Dist. LEXIS 133740 *; 2018 WL 3753431

STEVEN SIMPSON, Plaintiff, v. SAGGEZZA, INC., ARVIND KAPUR, Individually, and SOCKALINGAM SUPPIAH, individually, Defendant.

**Subsequent History:** Motion denied by Simpson v. Saggezza, Inc., 2018 U.S. Dist. LEXIS 161623 (N.D. Ill., Sept. 21, 2018)

**Counsel:** **[*1]** For Steven Simpson, Plaintiff, Counter Defendant: Alexis D Martin, Lorraine Teraldico Peeters, Madeline K. Engel, Alejandro Caffarelli, Caffarelli & Associates Ltd., Chicago, IL.

For Saggezza, Inc., Arvind Kapur, Sockalingam Suppiah, Defendants: Vivek Jayaram, LEAD ATTORNEY, Jayaram Law Group, Ltd., Chicago, IL; Brett Adam Manchel, Johanna R Hyman, Jayaram Law Group, Chicago, IL.

For Saggezza, Inc., Counter Claimant: Vivek Jayaram, LEAD ATTORNEY, Jayaram Law Group, Ltd., Chicago, IL; Brett Adam Manchel, Johanna R Hyman, Jayaram Law Group, Chicago, IL.

**Judges:** SHARON JOHNSON COLEMAN, United States District Judge.

**Opinion by:** SHARON JOHNSON COLEMAN

# Opinion

**MEMORANDUM AND ORDER**

Plaintiff, Steven Simpson brings this suit against Defendants Saggezza, Inc., ("Saggezza"), Arvind Kapur, and Sockalingam Suppiah, (collectively, "Defendants"), for various violations of the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115/1 et seq. ("IWPCA"), when the Defendants failed to provide Simpson with his earned compensation per the agreement between the parties and then retaliated against him for requesting payment. The Defendants now move this Court to dismiss Plaintiff's First Amended Complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). For the reasons **[*2]** set forth below, this Court grants Defendants' Motion in part.

**Background**

The following facts are taken as true for the purpose of resolving this motion. Simpson, a Florida resident, worked for Saggezza from November 2014 through December 2016. Saggezza is an Illinois corporation, based in Chicago, that provides "global solutions" to financial institutions. Kapur is a co-founder and Chief Executive Officer of Saggezza. Suppiah was also a co-founder and the Chief Operating Officer of Saggezza. Both men were Simpson's bosses. They held hiring and firing authority as well as the power to determine the amount and allocation of compensation.

Prior to working at Saggezza, Simpson held positions as Executive Vice President at First Federal Bank in Florida and Chief Strategy Officer of City National Bank-Miami, earning over $300,000 per year in each role. The Defendants were aware of Simpson's professional experience and previous salaries when the company recruited him. On October 28, 2014, Kapur informed Simpson that the company had strong revenues of $40 million during a phone interview. After the conversation,

Simpson agreed to travel to Chicago for an in-person interview. Both Kapur and Suppiah [*3] confirmed the financial health of Saggezza during the second interview. Kapur and Suppiah also mentioned that Saggezza had a five-million-dollar line of credit with Standard Bank and Trust of Hickory Hills, IL that only had a small line drawn on it.

To assist with recruitment, Saggezza initially offered Simpson a base salary of $210,000 per year with a minimum annual bonus of $120,000. Kapur and Suppiah informed Simpson that Saggezza paid its leadership incentive bonuses as a matter of course, which typically brought their salaries up to between $330-350,000 per year. The offer also included 100,000 shares of stock in Saggezza's employee stock option program. Based on the representations made about the strength of the company, the job description, the potential assignments, and the compensation structure, Simpson agreed to accept employment. Saggezza hired Simpson as the Senior Vice President of Financial Institutions Solutions. In that role, he was expected to lead a new line of business that focused on providing advanced analytics solutions for banks and credit unions and was promised a competent staff to support these efforts.

After joining Saggezza, Simpson found discrepancies in [*4] information that Kapur and Suppiah provided. Saggezza released or lost a significant number of qualified employees, who were replaced with "cheaper," less experienced workers. With the employment shifts, Simpson was expected to assume several additional job duties outside of the scope of his originally agreed upon employment terms. Simpson learned that Saggezza's revenues were approximately $23.3 million, not $40 million. Simpson also discovered that the line of credit was fully drawn. Additionally, after Simpson's start, Saggezza introduced a new incentive structure that applied to all company leaders. Since this was different from what Simpson was presented during the interview, he addressed Kapur about his concerns. Kapur assured Simpson that the original agreement discussed during his recruitment would be honored, and Simpson continued his employment based on this information.

One of Simpson's major complaints was that he only received a bonus of $37,000 instead of the $120,000 he expected based on the Defendant's assurances. When approached about the $83,000 difference, Kapur and Suppiah told Simpson that Saggezza was experiencing financial troubles, but they could pay him $75,000 [*5] in three equal installments instead. Each payment would be made upon completing one of Simpson's five performance goals. Kapur also stated that he would provide Simpson with an additional 150,000 shares of Saggezza common stock to bring his ownership of the company up to 1%. Simpson agreed to this payment plan and continued working for Saggezza. A few weeks later, Kapur told him that he would need to sign an onerous employment contract to receive the additional shares. Simpson refused to sign the contract.

Simpson informed Kapur that three of the proposed goals were outside of his control since they were tied to sales of products in a different department's purview and impossible to attain in the 2016 calendar year. Kapur promised Simpson that he would provide alternative goals, but he delayed in doing so. Kapur orally agreed that if the other department's products were not ready for implementation in March 2016 that he would adjust the goals by reducing sales targets and numbers. Despite several attempts to codify this agreement, Kapur refused to put it in writing. In the meantime, Simpson began working on the remaining two goals. Between March and April 2016, Simpson met one of the [*6] goals. Kapur then attempted to back out of the agreement, but Kapur needed additional time to pay the first installment payment. Simpson agreed that the Defendants could pay half of the installment amount in April and the other half in May 2016. The April payment was timely made, but May's payment was not. After repeated requests for payment, Simpson finally received the second half of the first installment payment.

The three remaining goals could not be completed because the underlying products were not ready for implementation and the Defendants could not provide reliable information about their expected completion dates. The Defendants denies that they failed to provide viable product information or alternative goals. Otherwise, Simpson met or exceeded the other agreed-upon expectations required for the payment of his 2015 bonus. The Defendants only paid him the initial $37,000 and one installment payment of $25,000. Kapur was continually elusive about when and whether Simpson would be paid when responding to Simpson's compensation complaints. Saggezza expressed frustration with Plaintiff's complaints about his not receiving his full bonus. In November 2016, an attorney hired by [*7] Simpson sent Saggezza a letter about Simpson's unpaid earned bonuses. After the letter, Simpson was invited to resign. Instead, Simpson continued his employment, even securing another large potential deal, which satisfied any remaining performance requirements for the payment of his 2015

bonus.

On December 28, 2016, Kapur held a meeting with Simpson to inform him that he would be terminated effective immediately. Kapur specifically referenced that he and Suppiah were upset about Simpson involving counsel and complaining about wage violations. No other cause or reasoning was provided for Simpson's termination.

Simpson filed his First Amended Complaint regarding the aforementioned issues for several violations of the Illinois Wage Payment and Collections Act on January 29, 2018. Saggezza now moves to dismiss the pleading in its entirety for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face and raising the right to relief above speculation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). When reviewing a motion to dismiss, the Court must accept all well-pleaded factual allegations **[*8]** as true and draw all reasonable inferences in the plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

## Discussion

### Count I - Earned Bonus Owed

The Saggezza Defendants contend that Simpson's claim to recover his bonus fails and must be dismissed because he does not allege facts indicating that he was entitled to an "earned bonus" or any additional compensation related to his contract. A motion to dismiss is reviewed in a light most favorable to the nonmoving party.

Simpson's complaint is brought under the IWPCA, which provides that "payments to separated employees . . . shall be defined as wages, salaries, earned commissions, [and] *earned bonuses* . . . owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (emphasis added). Earned bonuses are defined as "compensation given in addition to the required compensation for services performed." Ill. Admin. Code tit. 56, § 300.500; 820 Ill. Comp. Stat. 115/12. IWPCA only covers bonuses that are unequivocally promised by the employer, while conditional or discretionary bonuses are not considered "earned." *Sutula-Johnson v. Office Depot, Inc.*, No. 17-1855, 893 F.3d 967, 2018 U.S. App. LEXIS 17179, at *14-15 (7th Cir. June 25, 2018). Employees have the right to receive only an earned bonus at the time of separation when the terms of the bonus are unequivocally promised by the employer, and the employee has satisfied **[*9]** the expectations set forth in the agreement between the parties. Ill. Admin. Code tit. 56, § 300.500(a); *see McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 917 N.E.2d 1065, 1071, 335 Ill. Dec. 1 (Ill. App. Ct. 2009)(explaining that unequivocal right to "earned bonus" under Illinois Administrative Code means employee has no right to it until she has performed the contract requirements.). The agreement need not be in writing to constitute a basis for a IWCPA claim. *See Osorio v. Tile Shop, LLC*, No. 15 C 15, 2015 U.S. Dist. LEXIS 159748, at *6 (N.D. Ill. Nov. 27, 2015)(Kennelly, J.)(finding that "under the IWPCA '[a]n "agreement" is broader than a contract and requires only a manifestation of mutual assent on the part of two or more persons; parties may enter into an "agreement" without the formalities and accompanying legal protections of a contract.'")(citing *Zabinsky v. Gelber Group, Inc.*, 347 Ill. App. 3d 243, 807 N.E.2d 666, 283 Ill. Dec. 61 (2004)); *see e.g., Harris v. Cent. Garden & Pet Co.*, No. 09 C 2354, 2011 U.S. Dist. LEXIS 84098, at *27 (N.D. Ill. Aug. 1, 2011)(Chang, J.)(recognizing an IWPCA claim based on an oral agreement).

Here, the initial bonus payment of $120,000 discussed during Simpson's recruitment does not appear, based on the facts alleged, to be tied to the accomplishment of any objective measures and cannot be considered "earned" per the definition. The subsequent installation payment structure agreed upon by both parties, however, was directly and unequivocally tied to the accomplishment of five definitive goals. Per the oral agreement, Saggezza agreed to give Simpson an installment payment of $25,000 **[*10]** for accomplishing each of the outlined goals up to $75,000. Although $75,000 is less than Simpson's initial demand that Saggezza pay the remaining $83,000 of the promised $120,000, Simpson did agree to the new bonus compensation plan. The facts alleged in the complaint show the requisite meeting of minds regarding the objective terms for the bonus. Further, the complaint

alleges that Simpson satisfied the agreed-upon goals to create an entitlement to the agreed upon $75,000. Count I sufficiently plead that there was an unfulfilled earned bonus associated with the installment payment plan agreed upon by all parties. Accordingly, Defendants' motion to dismiss Count I is denied.

*Count II and IV-Retaliation*

The Defendants move to dismiss Simpson's retaliation claim, Count II, because they contend that Simpson fails to allege that the retaliation was motivated by his request for compensation or the hiring of an attorney. They also contend that Simpson failed to demonstrate that his discharge was in contravention of a clearly mandated public policy under Illinois law and so, Count IV should be dismissed.

The IWCPA permits employees to recover if an employer discharges that employee because **[*11]** he "has made a complaint to his employer . . . that he or she has not been paid in accordance with the provisions of this Act." 820 ILCS 115/14(c).

Here, Simpson alleged in paragraph 69 of his First Amended Complaint that "[h]ad [Simpson] not complained about [Saggezza's] failure to fully compensate him per their agreement, and had [Simpson] not brought a lawyer in to assert his rights, [Saggezza] would not have terminated [Simpson]." The facts set forth above clearly state that there existed an agreement for an earned bonus for performance. Further, the facts alleged indicate that Simpson believed the driving force behind his termination was the repeated requests, alone and through counsel, for the compensation he was owed under the agreed payment plan. Accordingly, the Court finds that Simpson sufficiently plead a claim for retaliation under IWCPA and Defendants' motion to dismiss Count II is denied.

Turning to Count IV, a successful claim for retaliatory termination under Illinois common law requires that the plaintiff show that he has been (1) terminated; (2) in retaliation for his action; and (3) that the discharge violates a clearly mandated public policy. *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 700-01, 275 Ill. Dec. 648, 653-54, 793 N.E.2d 128, 133-34 (2003)(citing *Paris v. Cherry Payment Sys.*, 265 Ill. App. 3d 383, 384, 202 Ill. Dec. 705, 707, 638 N.E.2d 351, 353 (1994)). "In order to constitute a clearly **[*12]** mandated public policy exception justifying application of the tort of retaliatory discharge, the matter 'must strike at the heart of a citizen's social rights, duties, and responsibilities.'"

*Id.* (quoting *Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 130, 52 Ill. Dec. 13, 15, 421 N.E.2d 876, 878 (1981)). It is not enough to simply state a constitutional or statutory provision in a complaint to trigger a retaliatory discharge claim. *See McGrath v. CCC Info. Servs.*, 314 Ill. App. 3d 431, 440, 246 Ill. Dec. 856, 863, 731 N.E.2d 384, 391 (2000).

Here, the allegations state that Simpson was terminated in response to his demand for payment of his earned bonus, satisfying the first two prongs. As for the third prong, that the discharge violates clearly mandated policy, Simpson relies on *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, to contend that the narrow application of the common law retaliation tort has been expanded to include IWPCA claims since the Act was amended. No. 00 C 5755, 2001 U.S. Dist. LEXIS 18370 (N.D. Ill. Nov. 7, 2001)(Lefkow, J.). The Court disagrees with Simpson's interpretation of *Ladegaard*. While the *Ladegaard* Court recognizes that IWCPA involves the rights of the public, the holding determined that the rights protected by the act cannot be abrogated by private agreement, as doing so would contravene the act's underlying public policy agenda. The Court did not, however, address whether the rights in IWCPA were the type contemplated **[*13]** under Illinois common law. The precedent is clear that compensation disputes raised under IWPCA are of a private, economic nature and do not implicate the social rights, duties, and responsibilities required for a retaliatory discharge tort. *McGrath*, 314 Ill. App. 3d at 440. Accordingly, Simpson cannot establish that his termination violated a mandated public policy of Illinois so, the common law retaliation claim must be dismissed with prejudice. *See O'Donnell v. Am. at Home Healthcare & Nursing Servs.*, No. 12 CV 6762, 2015 U.S. Dist. LEXIS 18585, at *48 (N.D. Ill. Feb. 17, 2015)(Shah, J.)("But the Illinois courts have made clear that an employer who discharges an employee for asserting his rights under the IWPCA has not contravened a 'clearly mandated' public policy such that an action for retaliatory discharge is permitted."). Defendants' motion as to Count IV is granted.

*Count III - Fraudulent Inducement*

Finally, the Defendants argue that Count III should be dismissed because Simpson did not plead that his reliance on the Kapur and Suppiah's representations was justified.

A successful fraudulent inducement claim under Illinois law requires a plaintiff to allege: (1) a false statement of

material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance **[*14]** on the truth of the statement; and (5) damage to the other party resulting from such reliance. *Integrated Genomics, Inc. v. Gerngross*, 636 F.3d 853, 863 (7th Cir. 2011). A person may justifiably rely on a representation of fact even if he could have ascertained that it was untrue upon making an investigation. *Field v. Mans*, 516 U.S. 59, 70, 116 S. Ct. 437, 444, 133 L. Ed. 2d 351 (1995)(citing Restat 2d of Torts, § 540 (2nd 1979)). This is particularly true in situations where parties do not have equal knowledge or means of obtaining knowledge of the facts in question. *Sec. Ctr. v. Am. Tel. & Tel. Co.*, 94 C 6707, 1995 U.S. Dist. LEXIS 6540, at *19 (N.D. Ill. May 15, 1995)(Coar, J.)(*Ryan v. Wersi Elec. GmbH & Co.*, 3 F.3d 174, 182 (7th Cir. 1993)).

Here, Simpson alleges that Kapur and Suppiah made several statements about the financial health of the company and the opportunities available to Simpson during the initial interview and negotiations stages. The facts presented in Count III are sufficient to proceed on a claim of fraudulent inducement. Kapur and Suppiah were in positions of authority that afforded them easy access to the information they presented. Additionally, in an interview context, it is reasonable that a candidate would presume company's assurances about its status are true. It is critical here that co-founders Kapur and Suppiah were the Chief Executive Officer and Chief Operating Officer of Saggezza, respectively, because they would have intimate knowledge about Saggezza. Given the circumstances and their **[*15]** roles, Simpson had no reason to question Kapur and Suppiah's representations at the time. Accordingly, it is reasonable to ascertain that Simpson could justifiably rely on Kapur and Suppiah's assurances to his detriment.

The Defendants' second point is that Simpson did not allege any false statements of material fact because the assurances were mere puffery that commonly occurs between a prospective employer and employee. For a statement to be actionable as fraudulent, it has to rely on a past or present fact. *Enter. Warehousing Sols., Inc. v. Capital One Servs.*, No. 01C 7725, 2002 U.S. Dist. LEXIS 4335, at *17 (N.D. Ill. Mar. 14, 2002)(Darrah, J.). Expressions of opinions, expectations, or future contingent events do not qualify. *Id.*

These allegations are not puffery. They do not contain superlatives or grandiose language about the strength of the company. *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999). Kapur and Suppiah

provided Simpson with precise, internal figures, capturing the financial state of the company and informed Simpson's potential compensation package. The information came from knowledgeable sources and were based on historical data, not prospective predictions. *Enter. Warehousing Sols.*, 2002 U.S. Dist. LEXIS 4335, at *17 (finding that statements about previous performance and approval does not constitute "puffery"); *cf. Jada Toys, Inc. v. Chi. Imp., Inc.*, No. 07 C 699, 2008 U.S. Dist. LEXIS 29286, at *6 n.4 (N.D. Ill. Apr. 10, 2008)(Brown, J.)("The court held that the allegedly false promise -- that the defendant **[*16]** would obtain millions of dollars of endorsements for a star baseball player -- was puffery because it involved something over which the defendant had no control."). There was no reason why Simpson would not have seriously relied on this insider information coming from credible sources.

As the Defendants have not challenged any other elements, the Court finds that all the elements have been properly alleged to support that Simpson relied on certain representations when he took the job, causing him financial and professional damage. Consequently, Defendants' motion to dismiss is denied as to Count III.

*Count V - Retaliatory Counterclaims*

The Defendants argue that Simpson's allegation of a "retaliatory counterclaim" claim is not legally cognizable under Illinois or federal law and must be dismissed.

Anti-retaliation rights are intended to prevent employers from "intimidating employees and discouraging them from enforcing their rights." *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 833 (N.D. Ill. 2006)(Grady, J.). Courts rarely find that conduct arising during the scope of existing litigation amounts to retaliation, especially the filing of a compulsory counterclaim, because at the point that the counterclaim would have been filed, the plaintiff has already **[*17]** asserted his rights; they will not incur significant additional expenses because they have presumably already hired counsel; and defendants must bring compulsory counterclaims or risk waiver. *Ergo v. Int'l Merch. Servs.*, 519 F. Supp. 2d 765, 783 (N.D. Ill. 2007)(Leinenweber, J.)(citing *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998)). Counterclaims are only considered retaliatory when they are baseless. *Id.*

Here, Defendant's counterclaim was brought in response to Simpson's complaint. However, the mere fact that Defendants filed a counterclaim in this case is

not sufficient to make out a claim for retaliation. *Beltran*, 426 F. Supp. 2d at 834 (finding that since filing a counterclaim is different from initiating a lawsuit, filing a counterclaim, without more, is not an adverse action that can support a retaliation claim."). As the Court finds that the counterclaims are not frivolous and were done in the normal course of litigation, they cannot be deemed retaliatory under the law. Accordingly, Count V is dismissed without prejudice.

**Conclusion**

For the above reasons, Defendants' Motion to Dismiss Plaintiff's Complaint is granted in part as to Counts IV and V and denied as to the remaining three counts.

IT IS SO ORDERED.

/s/ Sharon Johnson Coleman

ENTERED: SHARON JOHNSON COLEMAN

United States District Court Judge

Dated: 8/8/2018

# Villa v. Pearson Educ., Inc.

United States District Court for the Northern District of Illinois, Eastern Division

December 8, 2003, Decided ; December 9, 2003, Docketed

03 C 3717

**Reporter**
2003 U.S. Dist. LEXIS 24686 *; 69 U.S.P.Q.2D (BNA) 1411 **; Copy. L. Rep. (CCH) P28,750

HIRAM VILLA, Plaintiff, vs. PEARSON EDUCATION, INC., a/k/a BRADY PUBLISHING, an imprint of Macmillian USA, party of Pearson PLC, Defendant.

**Prior History:** Villa v. Brady Publ'g, 2002 U.S. Dist. LEXIS 11753 (N.D. Ill., June 26, 2002)

**Disposition: [*1]** Defendants' motion to dismiss denied. Ruling set for December 17, 2003 stricken.

**Counsel:** For Hiram Villa, PLAINTIFF: Donald F Spak, Michael J Hamblet, Hamblet, Oremus & Little, Chicago, IL USA.

For Pearson Education, Inc AKA Brady Publishing, DEFENDANT: Julia Dee Mannix, Davis, Mannix & McGrath, Chicago, IL USA.

**Judges:** Charles P. Kocoras, Chief Judge, United States District Court.

**Opinion by:** Charles P. Kocoras

# Opinion

**[**1412] MEMORANDUM OPINION**

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on the motion of Defendants Pearson Education, Inc. and Brady Publishing (collectively referred to herein as "Brady") to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6). For the reasons set forth below, the motion is denied.

## BACKGROUND

Plaintiff Hiram Villa is an artist who uses the pseudonym "UNONE." His medium of choice is outdoor murals, that often include these letters as part of the work. According to the complaint, Brady included a reproduction of one of his works in a book without permission.

This is the third go-round for Villa's allegations, in one form or another. In the initial complaint, Villa alleged **[*2]** copyright infringement as well as several state-law causes of action. At the time, he had not registered his copyright. On May 1, 2002, we dismissed the copyright action, concluding that we had no subject matter jurisdiction over that claim without some indication of registration or refusal to register from the copyright office. In the same decision, we declined to exercise supplemental jurisdiction over Villa's state-law claims; he had asserted only federal question jurisdiction.

In June 2002, Villa moved to vacate our judgment as to the state-law claims, arguing for the first time that the parties were diverse, so jurisdiction was present even without the federal copyright claim. He sought leave to file an amended complaint that alleged only the state claims. We granted the motion to vacate but did not allow the amended complaint on the grounds that to do so would be futile because each claim was preempted by the Copyright Act.

On February 6, 2003, the Copyright Office issued a Certificate of Registration to Villa for the work at issue in this case. In June, Villa filed a new complaint, containing allegations pertaining to the now-registered copyright.

2003 U.S. Dist. LEXIS 24686, *2; 69 U.S.P.Q.2D (BNA) 1411, **1412

Brady has moved to dismiss **[*3]** pursuant to Fed. R. Civ. Proc. 12(b)(6).

## LEGAL STANDARD

Rule 12(b)(6) motion to dismiss is used to test the legal sufficiency of a complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). In ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff, construe allegations of a complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Bontkowski v. First Nat'l Bank,* 998 F.2d 459, 461 (7th Cir. 1993); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir. 1991). The allegations of a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High Sch.,* 144 F.3d 448, 454-55 (7th Cir. 1998). **[*4]** With these principles in mind, we turn to the motion at hand.

## DISCUSSION

To state a claim for copyright infringement, Villa must allege ownership of the copyright, registration, and infringement. *Sweet v. City of Chicago,* 953 F. Supp. 225, 227 (N.D. Ill. 1996). Each of these elements is alleged in the present complaint, and Brady does not argue that any is missing. Instead, they advance three arguments in support of their motion. They begin by contending that our previous rulings in this case preclude Villa from asserting the copyright claim in his latest complaint. They also assert that the mural in question is not protected by copyright, either because it is illegal graffiti or because it incorporates words or letters.

The initial ground fails for two reasons. For starters, claim preclusion is not a proper basis for the motion to dismiss. It is axiomatic **[**1413]** that the scope of a12(b)(6) motion starts and ends with the complaint. Claim preclusion (or res judicata) is an affirmative defense. Fed. R. Civ. Proc. 8(c). Its presence or absence has no effect on the legal sufficiency of the allegations of the complaint. *See* **[*5]** *Gomez v. Toledo,* 446 U.S. 635, 100 S. Ct. 1920, 64 L. Ed. 2d 572

(1980).

Even if Brady were raising the issue at an appropriate stage of the proceedings, we disagree that the current complaint would be barred. Claim preclusion only applies where there has been a final judgment on the merits of the claim in an earlier action and there must be an identity of parties and causes of action in both suits. *Wilhelm v. County of Milwaukee,* 325 F.3d 843, 846 (7th Cir. 2003). Here, there is no question that the parties in both actions are identical. With respect to the identity of the causes of action, Brady looks not to the initial complaint, which contained a copyright infringement count, but to the proposed amended complaint that accompanied the motion to vacate. Citing to an Eighth Circuit case, Brady insists that because we denied Villa leave to amend his complaint in June 2002, he is precluded from bringing any claim arising from the same facts. *King v. Hoover Group,* 958 F.2d 219, 222-23 (8th Cir. 1992). Brady has cited no authority that the Seventh Circuit is in agreement with the Eighth on this issue, and our research has revealed none. **[*6]** Other courts have rejected the broad pronouncement of *King* upon which Brady relies. *See, e.g., Curtis v. Citibank,* 226 F.3d 133, 139-40 (2d Cir. 2000) (holding that, unless the denial of the leave to amend is itself an adjudication of the merits of a claim, the typical claim preclusion analysis must be employed to determine if a claim is precluded). Furthermore, Brady's argument depends on their assertion that Villa could have brought his copyright claims in the amended complaint. This position is directly contrary to the facts and procedural history of this case. As we stated in our decision on the first motion to dismiss, Villa could not bring any claim of copyright infringement without a certificate of registration or a refusal from the Copyright Office to issue a certificate. Therefore, until the certificate issued on February 6, 2003, more than seven months after the denial of leave to amend, Villa could not have brought any claims rooted in the Copyright Act.

Had our original dismissal of the copyright claim been pursuant to Rule 12(b)(6), Brady might be on firmer ground, but the decision was clearly made on jurisdictional grounds. A dismissal for lack of **[*7]** jurisdiction need not have preclusive effect over later filings, particularly where, as here, the jurisdictional defect that brought about the original dismissal is later cured. *See Shockley v. Jones,* 823 F.2d 1068, 1073 (7th Cir. 1987); *see also Watkins v. U.S.,* 2003 U.S. Dist. LEXIS 6519, 2003 WL 1906176, at *3 (N.D. Ill. Apr. 17, 2003).

Case: 1:17-cv-03591 Document #: 193-2 Filed: 01/14/20 Page 13 of 44 PageID #:3783

Page 3 of 3

2003 U.S. Dist. LEXIS 24686, *7; 69 U.S.P.Q.2D (BNA) 1411, **1413

Both of Brady's other arguments turn on questions of fact; thus neither belongs in a 12(b)(6) motion. The first would require a determination of the legality of the circumstances under which the mural was created. The second would necessitate an evaluation of the degree of creativity exhibited in his original mural. As this would also involve factual inquiries, the issue cannot be resolved at this stage of the proceeding. Accordingly, there is no meritorious basis to dismiss the complaint, and Brady's 12(b)(6) motion is denied.

**CONCLUSION**

Based on the foregoing analysis, Brady's motion to dismiss is denied.

Charles P. Kocoras

Chief Judge

United States District Court

Dated: DEC - 8 2003

End of Document

# Addison Automatics, Inc. v. RTC Group

United States District Court for the Northern District of Illinois, Eastern District

July 16, 2013, Decided; July 16, 2013, Filed

No. 12 C 9869

**Reporter**

2013 U.S. Dist. LEXIS 99448 *; 2013 WL 3771423

ADDISON AUTOMATICS, INC., individually and as the representative of a class of similarly-situated persons, Plaintiff, v. THE RTC GROUP, INC., MICROSOFT CORPORATION, INTEL CORPORATION, AVENT, INC., and JOHN DOES 1-10, Defendants.

**Counsel:  [*1]** For Addison Automatics, Inc., individually and as the representative of a class of similarly-situated persons, Plaintiff: Brian J Wanca, LEAD ATTORNEY, Ryan M. Kelly, Anderson & Wanca, Rolling Meadows, IL; Phillip A. Bock, LEAD ATTORNEY, James Michael Smith, Phillip James Bullimore, Bock & Hatch, LLC, Chicago, IL.

For The RTC Group, Inc., Defendant: Ellen M. Chapelle, LEAD ATTORNEY, Jordan Michael Hanson, Gould & Ratner LLP, Chicago, IL.

For Microsoft Corporation, Defendant: Richard Francis O'Malley, LEAD ATTORNEY, Alison V. Potter, Eric Stephen Mattson, Sidley Austin LLP, Chicago, IL.

For Intel Corporation, Defendant: Eric D. Brandfonbrener, LEAD ATTORNEY, Perkins Coie LLC, Chicago, IL.

For Avent [SIC], Inc., Defendant: Darrell J. Graham, LEAD ATTORNEY, Peter S. Roeser, Roeser Bucheit & Graham LLC, Chicago, IL.

**Judges:** Virginia M. Kendall, United States District Court Judge.

**Opinion by:** Virginia M. Kendall

# Opinion

## MEMORANDUM OPINION ORDER

Plaintiff Addison Automatics, Inc. filed a three-count complaint against Defendants The RTC Group, Inc., Microsoft Corporation, Intel Corporation and Avnet Inc. (collectively, the "Defendants") asserting claims for a violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.,*  **[*2]** common law conversion and for a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2. The Defendants have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. [1] For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the complaint and are assumed to be true for purposes of this Motion to Dismiss. *See Voelker v. Porsche Cars North America, Inc.,* 353 F.3d 516, 520 (7th Cir. 2003); *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir. 1995). On October 1, 2009, RTC sent a facsmile to Plaintiff, offering Plaintiff the opportunity to attend a free "technical seminar" on embedded computer technology. *See* Doc. 1-1, Plaintiff's First Amended Complaint at ¶¶ 16-18, Ex. A. Specifically, the fax stated that:

Avnet, Microsoft and Intel join together to bring you

---

[1] Defendant RTC only moves to dismiss Count I, the TCPA claim. Microsoft, Intel and Avnet move to dismiss the complaint in its entirety.

the *Avnet Embedded Revolution* technical seminar. Get critical information on the powerful, new and next generation of Windows Embedded Enterprise **[*3]** including Windows 7 FES & Intel's Atom CPU. This unique (preview) opportunity will get you up-close to the experts to glean knowledge and know-how for your next design decision. The Avnet Embedded Revolution Seminar is 100% complimentary and specially designed to exceed your expectations.

Learn exactly how the *Next Generation of* Windows Embedded Enterprise and Intel's Atom CPU explode the Embedded Revolution.

*Id.* at Ex. A (emphasis in original). The remainder of the fax described the agenda for the seminar. *Id.* It identified the "distinguished hosts" of the seminar as Microsoft, Intel and Avnet. *Id.* Microsoft's, Intel's and Avnet's logos were prominently displayed on the fax. *Id.* It also stated that the location of the seminar would be Microsoft's offices in Downers Grove, Illinois. *Id.*

Plaintiff contends that it never consented to receiving the fax from the Defendants and that it did not provide an opt-out notice. *Id.* at ¶¶ 19, 25. Plaintiff also contends that the Defendants intended to use the seminar to market their products and services to the attendees. *Id.* at ¶ 19.

Plaintiff filed an initial complaint against Defendant RTC in the Circuit Court of Cook County asserting claims for **[*4]** violations of the TCPA and the ICFA as well as for common law conversion. RTC moved to dismiss the complaint pursuant to 735 ILC 5/2-615 for failure to set forth a claim for which relief could be granted. The state court dismissed the TCPA claim without prejudice but denied RTC's motion to dismiss with respect to the ICFA and conversion claims. Plaintiff then filed an amended complaint, the operative complaint, which included additional factual allegations and added Microsoft, Intel and Avnet as Defendants. Intel, with the consent of the other Defendants, removed the action to this Court on December 11, 2012 pursuant to 28 U.S.C. § 1441(a). *See* Doc. 1. Defendants Microsoft, Intel and Avnet have now moved to dismiss the Amended Complaint in its entirety while RTC only moves to dismiss the TCPA claim. Doc. 24.

## STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy,* 51 F.3d at 717. To state a claim upon which relief may be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled **[*5]** to relief". Fed. R. Civ. P. 8(a)(2). "Detailed factual allegations are not required, but the plaintiff must allege facts that when "accepted as true... 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). In analyzing whether a complaint meets this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Iqbal,* 129 S. Ct. at 1950. When there are well-pleaded factual allegations, the Court assumes their veracity then determines if they plausibly give rise to an entitlement to relief. *Id.*

## DISCUSSION

## I. The Complaint Sufficiently Alleges a Violation of the TCPA

Defendants assert two reasons for why the TCPA claim should be dismissed. First, the fax received by Plaintiff did not constitute an advertisement within the meaning of the TCPA. Second, since RTC sent the fax to Plaintiff, the claim should be dismissed as to Microsoft, Intel and Avnet because Plaintiff failed to adequately allege that RTC was acting as their agent. Neither argument is persuasive.

## A. Plaintiff Sufficiently Alleged the Fax Was an Advertisement

The relevant portion of **[*6]** the TCPA prohibits the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement. . . ." 47 U.S.C. § 227(b)(1)(C). The statute defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5); *see also, e.g., G.M. Sign, Inc. v. MFG.com, Inc.,* No. 08 C 7106, 2009 U.S. Dist. LEXIS 35291, 2009 WL 1137751, at *1 (N.D. Ill. Apr. 24, 2009); *Physicians Healthsource, Inc. v.*

*Alma Lasers,* No. 12 C 4978, 2012 U.S. Dist. LEXIS 133222, 2012 WL 4120506, at *2 (N.D. Ill. Sept. 18, 2012).

Faxes that are nothing more than "purely informational" documents are not advertisements under the TCPA. *See, e.g., G.M. Sign,* 2009 U.S. Dist. LEXIS 35291, 2009 WL 1137751, at *2. However, faxes promoting free seminars may be unsolicited advertisements because "free seminars are often a pretext to market products or services." *Physicians Healthsource,* 2012 U.S. Dist. LEXIS 133222, 2012 WL 4120506, at *2 (citing *In re Rules and Regulations Implementing the Tel. Protection Act of 1991; Junk Fax Prevention Act of 2005,* 21 F.C.C.R. 3787, 3814 (Apr. 6, 2006)); **[*7]** *see also, e.g., St. Louis Heart Center, Inc. v. Forest Pharms., Inc.,* No. 12 C 02224, 2013 U.S. Dist. LEXIS 35563, 2013 WL 1076540, at *4 (E.D. Mo. Mar. 13, 2013) (finding that a fax that offers a "free seminar serving as a pretext for advertising commercial products and services" would fall within the ambit of the TCPA).

The complaint in this case adequately sets forth a claim for a violation of the TCPA. The plain language of the fax makes it plausible that the seminar would be used to market the Defendants' products and services. For example, the fax states that "[t]his unique (preview) opportunity will get you up-close to the experts to glean knowledge and know-how for your next design decision." Doc. 1-1 at Ex. A. It is plausible to infer from this statement that the Defendants intended to market their products and services at the seminar so that the attendees would purchase those products and services when they make their "next design decision." This plausibility is heightened by the fact the fax specifically describes the Microsoft and Intel products the attendees would receive information and training on. *See id.* ("Get critical information on the powerful, new and next generation of Windows Embedded Enterprise **[*8]** including Windows 7 FES & Intel's Atom CPU."). Based on these statements alone it is plausible to infer that the seminar was nothing more than a pretext for the Defendants to market their products and services.

Additionally, in order for the fax recipients to register for the seminar, they had to visit the website, www.embedded revolution.com. *Id.* The website describes the "embedded" products offered by Microsoft and Intel as well as the customer services provided by Avnet. [2] *See* Avnet Embedded Revolution Home Page,

http://www.embeddedrevolution.com/. The website also describes the conference as making product launches from Avnet and its partners, such as Microsoft and Intel, available to the attendees. *Id.,* http://www.embeddedrevolution.com/conference/. Therefore, these statements also support the allegations that the seminar was simply a pretext for Defendants to market their products and services.

The Defendants reliance on *Phillip Long Dang, D.C., P.C. v. XLHealth Corp.* [3] is misplaced. As an initial matter, an opinion issued by a district court from the Northern District of Georgia is not binding authority. *See Townsel v. Dish Network L.L.C.,* 668 F.3d 967, 970 (7th Cir. 2012) ("district courts' decisions are not authoritative, even in the rendering district"). Additionally, *Phillip Long* was decided on a motion for summary judgment and not a Rule 12(b)(6) motion to dismiss. The court in that case could therefore consider the evidence before it and determine as a matter of law whether the fax was an advertisement. In contrast, the Court must accept all factual allegations as true for purposes of this motion. Finally, the plaintiff in *Phillip Long* apparently failed to allege that the free seminar offered by the fax was itself a commercial enterprise. Instead, the plaintiff argued that "a free seminar fax is an advertisement under the TCPA without regard to whether any commercial activity occurs at the seminar." 2011 U.S. Dist. LEXIS 12166, 2011 WL 553826, at *3. Conversely **[*10]** here, Plaintiff alleges that the purpose of the free seminar offered here was to market the products or services of Defendants Microsoft, Intel and Avnet. Doc. 1-1 at ¶ 19 (the "series of seminars . . .was itself an advertising of the goods or services offered by RTC Group's client those companies hosting and exhibiting at the seminars."). Accordingly, the Plaintiff has sufficiently alleged the fax constituted an advertisement. [4]

_____

628 F.3d 937, 944 (7th Cir. 2011); *Denius v. Dunlap,* 330 F.3d 919, 926 (7th Cir. 2003); *see also Quan v. Gonzales,* 428 F.3d 883, 888 n.5 (9th Cir. 2005) (taking judicial notice **[*9]** of information on commercial travel guide website to establish plausibility of claim that "banks in China are typically open on Sundays").

[3] *See* No. 09 C 1076, 2011 U.S. Dist. LEXIS 12166, 2011 WL 553826, at *3 (N.D. Ga. Feb. 7, 2011).

[4] The Defendants also repeatedly cite the decision by the Circuit Court of Cook County Judge to dismiss the TCPA claim because he found the fax did not offer goods or services for sale and that the complaint failed to sufficiently allege the seminar was a pretext for the Defendants to offer their

_____

[2] The Court may take judicial notice of the contents of a website. *See LaBella Winnetka, Inc. v. Village of Winnetka,*

2013 U.S. Dist. LEXIS 99448, *9

## B. Plaintiff Sufficiently Alleges that Defendants Microsoft, Intel and Avnet May Be Held Liable for the Fax

Title 47 U.S.C. § 227(b)(1) assigns liability to "any person" who sends an unsolicited advertisement to a telephone facsimile machine. The Federal Communications Commission is the agency vested with authority to issue regulations implementing the TCPA. Orders or rules promulgated by the FCC are binding on this Court pursuant to the Administrative Orders Review Act ("Hobbs Act"), 28 U.S.C. § 2342(1). *See CE Design, Ltd. v. Prism Business Media, Inc.,* 606 F.3d 443, 446 (7th Cir. 2010) (holding that the FCC's orders relating to the TCPA are binding under the Hobbs Act). The FCC has specifically promulgated a rule that defines the sender of an unsolicited advertisement for purposes of § 227(b)(1)(C) as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. 64.1200(f)(10); *see also In the Matter of* **[*13]** *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, 21 FCC Rcd 3787, 3808, ¶ 39 (April 5, 2006) ("We take this opportunity to emphasize that under the Commission's interpretation of the facsimile advertising rules, the sender is the person or entity on whose behalf the advertisement is sent."); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 10 FCC Rcd 12391, 12407-08, ¶¶ 34-35 (July 26, 1995) ("entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements."). Since Defendants Microsoft's, Intel's and Avnet's goods or services are advertised in the fax at issue, they are "senders" under the FCC's interpretation of this section of the TCPA. Therefore, Plaintiff has adequately alleged that they can be liable for the alleged violation of the TCPA.

The cases relied on by the Defendants that hold that Plaintiff must establish the existence of an agency relationship in order to hold the Defendants vicariously liable are unpersuasive. [5] None of these cases appears to have considered the rule promulgated **[*14]** by the FCC that defines "senders" as the person or entity whose goods or services are advertised or promoted in the unsolicited advertisement. Indeed, one of the cases, *Mey v. Pinnacle Sec. LLC,* deals with a separate subsection of the TCPA that prohibits automatic dialing equipment from calling wireless phones without the subscriber's consent. *See* 2012 U.S. Dist. LEXIS 129267, 2012 WL 4009718, at *4. Moreover, none of these cases considered that this rule is binding on a district court under the Hobbs Act. Accordingly, even if the Court disagreed with the FCC's definition of a sender, it has no authority to disregard it.

Even if the FCC did not treat advertisers as senders, Plaintiff has still alleged Defendants Microsoft, Intel and Avnet are vicariously liable because it adequately alleged an agency relationship between those entities and RTC. The Supreme Court has held that when Congress creates a tort action, ordinary principles **[*15]** of tort-related vicarious liability are incorporated. *See Meyer v. Holley,* 537 U.S. 280, 285, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003); *see also, e.g., Bridgeview Health Care Ltd.,* 2013 U.S. Dist. LEXIS 37310, 2013

---

products. Since this Court applies the Federal Rules of Civil Procedure once a case has been removed, the Court does not believe much weight should be given to an Illinois state court's decision regarding the sufficiency of allegations in a complaint. While the law of the case doctrine applies to rulings made in state court prior to the removal of a case, a federal district court is vested with full discretion **[*11]** to set aside or reconsider those orders. *See Payne for Hicks v. Churchich,* 161 F.3d 1030, 1037 (7th Cir. 1998). Deciding whether allegations found insufficient pursuant to 735 ILCS 5/2-615 are particularly appropriate for reconsideration after removal because Illinois's fact pleading standard imposes a heightened pleading standard that is not required by the Federal Rules' notice pleading standard. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.,* 536 F.3d 663, 670 (7th Cir. 2008) ("We can see no reason . . . why the standards of Rule of the Federal Rules of Civil Procedure, rather than Illinois fact pleading requirements, should not apply here."); *Axa Corporate Solutions v. Underwriters Reinsurance Corp.,* 347 F.3d 272, 277 (7th Cir. 2003) ("Parties might prefer the notice-pleading regime of the Federal Rules of Civil Procedure over the fact-pleading approach that prevails in Illinois courts, but no one thinks that the Illinois rules of pleading are binding on the federal courts."); *see also, e.g., Drabik v. Drabik,* No. 09 C 0028, 2013 U.S. Dist. LEXIS 72886, 2013 WL 2285791, at *2 (N.D. Ill. May 23, 2013) ("The [defendants] mistakenly seek to hold [the plaintiff] to a fact-pleading standard **[*12]** of Illinois, but it is they who chose to remove [the plaintiff's] suit to federal court where a notice-pleading standard applies.") (internal citations omitted).

---

[5] These cases are *Thomas v. Taco Bell Corp.,* 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012); *Bridgeview Health Care Ctr. Ltd. v. Clark,* No. 09 C 5601, 2013 U.S. Dist. LEXIS 37310, 2013 WL 1154206, at *5 (N.D. Ill. Mar. 19, 2013); *Mey v. Pinnacle Sec. LLC,* No. 5:11CV47, 2012 U.S. Dist. LEXIS 129267, 2012 WL 4009718, at *4 (N.D. W. Va. Sept. 12, 2012).

WL 1154206, at *5 ("[N]othing in the language of § 227(b) indicates that traditional notions of agency law are not applicable."). This Court has previously held that the federal common law of agency should be followed in determining whether agency exists for purposes of establishing vicarious liability under the TCPA. *See Jamison v. First Credit Services,* No. 12 C 4415, 290 F.R.D. 92, 2013 U.S. Dist. LEXIS 43978, 2013 WL 1248306, at *7 (N.D. Ill. Mar. 28, 2013). The federal common law of agency is in accord with the Restatement. *See Opp v. Wheaton Van Lines, Inc.,* 231 F.3d 1060, 1064 (7th Cir. 2000); *Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 865-66 n. 15 (7th Cir. 1998).

The Restatement provides that an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency §1.01; *see also Chemtool, Inc. v. Lubrication Techs.,* 148 F.3d 742, 745 (7th Cir. 1998) **[*16]** (holding that the test for agency is "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal").

To adequately plead the existence of an agency relationship, "a plaintiff must allege a factual predicate to create the inference of agency." *Frazier v. U.S. Bank Nat. Ass'n,* No. 11 C 8775, 2013 U.S. Dist. LEXIS 45330, 2013 WL 1337263, at *4 (N.D. Ill. Mar. 29, 2013); *see also, e.g., Whitley v. Taylor Bean & Whitacker Mortgage Corp.,* 607 F. Supp. 2d 885, 895 (N.D. Ill. 2009). Here, Plaintiff alleges that:

> [Microsoft, Intel and Avnet] through [RTC] approved, authorized and participated in the scheme to broadcast by facsimile by (a) directing a list to be purchased or assembled; (b) directing and supervising employees or third parties to send the facsimiles; (c) creating and approving the form of the facsimile to be sent; (d) determining the number and frequency of facsimile transmissions; and (e) approving or paying the employees or third parties to send the facsimiles.

Doc. 1-1, at ¶ 15. These allegations, accepted as true, provide a sufficient factual basis for the Court **[*17]** to infer that Microsoft, Intel and Avnet controlled the manner and method of work carried out by RTC. This reasonable inference is further supported by the fact the

fax advertised that the conference would be held at Microsoft's Downers Grove offices and identified the Defendants as the conference's hosts. Therefore, Plaintiff has adequately established the factual predicate for the existence of an agency relationship so that Defendants Microsoft, Intel and Avnet may be held vicariously liable for the alleged TCPA violation.

## II. The Conversion Claim Is Adequately Alleged

To sufficiently allege a claim for common law conversion, Plaintiff must allege: (1) an unauthorized and wrongful assumption of control, dominion, or ownership over its property; (2) its right to the property; and (3) its right to immediate possession of the property, absolutely and unconditionally. *See, e.g., Centerline Equip. Corp. v. Banner Pers. Serv.,* 545 F. Supp. 2d 768, 781 (N.D. Ill. 2008) (citing *General Motors Corp. v. Douglass,* 206 Ill. App. 3d 881, 565 N.E.2d 93, 96-97, 151 Ill. Dec. 822 (Ill. App. Ct. 1990)). The Defendants do not dispute, and thus concede, that the complaint sufficiently alleges these elements. Instead, Defendants argue that **[*18]** the conversion claim should be dismissed because Plaintiff fails to sufficiently allege the existence of an agency relationship between RTC and the other Defendants. For the reasons set forth above with respect to the TCPA claim, the complaint adequately pleads agency. Therefore, the motion to dismiss this claim is denied.

## III. The ICFA Claim Against Microsoft, Intel and Avnet Is Barred by the Statute of Limitations

A claim brought pursuant to the ICFA must be filed within three years of the date the claim accrues. *See* 815 ILCS 505/10a(e); *see also, e.g., Indep. Trust Corp. v. Fid. Nat. Title Ins. Co. of N.Y.,* 577 F.Supp.2d 1023, 1041 (N.D. Ill. 2008). Here, there is no dispute that Plaintiff's claim accrued on October 1, 2009, the date it received the facsimile from RTC. There is also no dispute that Defendants Microsoft, Intel and Avnet were not added as parties to this litigation until November 9, 2012, which is obviously more than three years after Plaintiff's claim accrued. As a result, the statute operates to bar this claim.

Plaintiff's argument that its ICFA claim against Defendants Microsoft, Intel and Avnet should relate back to the date it filed its initial complaint against

2013 U.S. Dist. LEXIS 99448, *18

**[\*19]** RTC is baseless. [6] Federal Rule of Civil Procedure 15(c)(1)(C) provides that when a plaintiff adds new defendants as parties in an amended complaint, the amendment only relates back to the original complaint if "if there has been an error made concerning the identity of the proper party and where that party is chargeable with knowledge of the mistake." *See also King v. One Unknown Fed. Corr. Officer,* 201 F.3d 910, 914 (7th Cir. 2000); *Pierce v. City of Chicago,* No. 09 C 1462, 2010 U.S. Dist. LEXIS 118356, 2010 WL 4636676, at \*2 (N.D. Ill. Nov. 8, 2010). Establishing mistake is necessary for relation back and is "independent from whether the purported party knew that action would be brought against him." *King,* 201 F.3d at 914 (internal citations omitted). Moreover, a "mistake" under Rule 15(c)(1) is not an inability to identify the proper defendant, "the plaintiff must have actually erred in naming the proper defendant." *Pierce,* 2010 U.S. Dist. LEXIS 118356, 2010 WL 4636676, at \*2; *Hall v. Norfolk S. Ry. Co.,* 469 F.3d 590, 596 (7th Cir. 2006). In other words, "a potential defendant who has not been named in a lawsuit by the time the statute of limitations has run is entitled to repose — unless it is or should be apparent to that person that **[\*20]** he is beneficiary of a mere slip of the pen, as it were." *Joseph v. Elan Motorsports Tech. Racing Corp.,* 638 F.3d 555, 559-60 (7th Cir. 2011).

The IFCA claim against Defendants Microsoft, Intel and Avnet does not relate back to the original complaint because there was no mistake. Plaintiff did not erroneously name the wrong defendants in its original complaint. For example, it did not accidentally name Microsoft LLC instead of Microsoft Inc. Rather, it simply failed to name Microsoft, Intel and Avnet as defendants. Under these circumstances, Rule 15(c)(1)(C) does not allow Plaintiff to add these defendants after the limitations period has expired. Therefore, the IFCA claim (Count III) against Defendants Microsoft, Intel and Avnet is dismissed with prejudice. [7]

---

[6] Plaintiff's relation back argument is based on the standard set forth in 735 ILCS § 5/2-616(d). However, this statute is inapplicable here; rather, Federal Rule of Civil Procedure 15 governs. *See* Fed. R. Civ. P. 81(c)(1) ("These rules apply to a civil action after it is removed from a state court.").

---

[7] Plaintiff also argues that it is inappropriate to assert a statute of limitations defense in a Rule 12(b)(6) motion to dismiss. **[\*21]** This is incorrect as "the statute of limitations may be raised in a motion to dismiss if 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Brooks v. Ross,* 578 F.3d 574, 579 (7th Cir. 2009)

## CONCLUSION

For the reasons set forth above, the motion to dismiss is granted in part and denied in part. Plaintiff's claim against Defendants Microsoft, Intel and Avnet for a violation of the Illinois Consumer Fraud Act is barred by the statute of limitations. The remainder of the motion to dismiss is denied.

/s/ Virginia M. Kendall

Virginia M. Kendall

United States District Court Judge

Northern District of Illinois

Date: July 16, 2013

---

**End of Document**

---

(quoting *United States v. Lewis,* 411 F.3d 838, 842 (7th Cir. 2005)). Here, the complaint sets forth everything necessary to satisfy the affirmative defense because it is indisputable that Plaintiff's claims accrued on October 1, 2009, which was more than three years before it filed its amended complaint.

# MAC Funding Corp. v. MNdustries, Inc.

United States District Court for the Northern District of Illinois, Eastern Division

May 2, 2018, Decided; May 2, 2018, Filed

Case No. 17 cv 6470

**Reporter**
2018 U.S. Dist. LEXIS 74149 *; 2018 WL 2045450

MAC FUNDING CORPORATION, a Delaware corporation, Plaintiff, v. MNDUSTRIES, INC., a Georgia corporation, and MICHAEL E. NANCE II, a Georgia citizen, Defendants.MNDUSTRIES, INC., a Georgia corporation, and MICHAEL E. NANCE II, a Georgia citizen, Third-Party Plaintiffs, v. MC MACHINERY SYSTEMS, INC., a Delaware corporation, Third-Party Defendants.

**Counsel:** **[*1]** For MAC Funding Corporation, a Delaware corporation, Plaintiff: Rein F. Krammer, LEAD ATTORNEY, David Joseph Stein, Michael Semyon Golenson, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL.

For MNdustries, Inc., a Georgia corporation, Michael E. Nance, II, a Georgia citizen, Defendants: John Deaton Steel, LEAD ATTORNEY, PRO HAC VICE, Steel and Moss, LLP, Atlanta, GA; Edward J. Aucoin, Jr., Lisa B Weinstein, Whitney Kendall Siehl, Grant & Eisenhofer P.A., Chicago, IL.

For Michael E. Nance, II, a Georgia citizen, MNdustries, Inc., a Georgia corporation, ThirdParty Plaintiffs: John Deaton Steel, LEAD ATTORNEY, PRO HAC VICE, Steel and Moss, LLP, Atlanta, GA; Edward J. Aucoin, Jr., Lisa B Weinstein, Whitney Kendall Siehl, Grant & Eisenhofer P.A., Chicago, IL.

For MC Machinery Systems, Inc., Third Party Defendant: Rein F. Krammer, LEAD ATTORNEY, David Joseph Stein, Michael Semyon Golenson, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL.

For MC Machinery Systems, Inc., Counter Claimant: Rein F. Krammer, LEAD ATTORNEY, David Joseph Stein, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL.

For MNdustries, Inc., a Georgia corporation, Counter Defendant: John Deaton Steel, LEAD ATTORNEY, **[*2]** Steel and Moss, LLP, Atlanta, GA; Lisa B Weinstein, Whitney Kendall Siehl, Grant & Eisenhofer P.A., Chicago, IL.

For MC Machinery Systems, Inc., Counter Claimant: Rein F. Krammer, LEAD ATTORNEY, David Joseph Stein, Michael Semyon Golenson, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL.

For MNdustries, Inc., a Georgia corporation, Counter Defendant: John Deaton Steel, LEAD ATTORNEY, PRO HAC VICE, Steel and Moss, LLP, Atlanta, GA; Edward J. Aucoin, Jr., Lisa B Weinstein, Whitney Kendall Siehl, Grant & Eisenhofer P.A., Chicago, IL.

**Judges:** SHARON JOHNSON COLEMAN, United States District Judge.

**Opinion by:** SHARON JOHNSON COLEMAN

# Opinion

## MEMORANDUM OPINION AND ORDER

Defendants and third-party plaintiffs, Mndustries, Inc. and Michael E. Nance (collectively "MN"), filed an amended four-count third-party complaint against MC Machinery Systems, Inc. ("MMS") seeking indemnification for MN's alleged breach of financing contract with MAC Funding Corporation ("MAC Funding"), and alleging breach of express and implied

warranty, and fraud. Third-party defendants, MMS, move to dismiss the amended third-party complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated herein, the motion is granted.

## Background

The **[*3]** following facts are gathered from MN's Amended Third-Party Complaint which the Court takes as true for purposes of the instant motion. MN was a sheet metal fabricator that used laser cutting machines to fabricate specified metal goods for its customers. MMS is a subsidiary of Mitsubishi that markets, sells, installs, and services metal fabrication machinery including laser-cutting machines and associated material handling systems. MN previously purchased equipment from MMS. MN had gone through several cycles of laser machine purchases over its period of operations to keep its equipment current.

In 2014, MMS approached MN to purchase new Mitsubishi laser-cutting machines and the new MMS automated handling system to update MN's production capabilities. MAC Funding Corporation would finance the purchase. MN alleges that MAC Funding is the "captive financing arm" of MMS. MN purchased four new machines from MMS with financing by MAC Funding. The total purchase price for all the equipment exceeded $5 million. The first purchase was executed on July 14, 2014 by Nance on behalf of MN. MMS was to deliver the three other laser cutting machines to MN in September, October, and December of 2015. **[*4]** MN alleges that it spent over $300,000 to prepare its Georgia facility for the installation of the new laser cutting machines.

After some delays, which MN attributes to MMS, the first new laser machine was finally operational at MN's facility on February 18, 2016. It was installed without the River System automation that was to accompany the machine. Over the next seven months the four machines and the River System were installed but never functioned at the cutting proficiency, accuracy, and speed that MMS had represented it would.

MMS representative Rosengren remained on site to work with the machines precision and automation. MMS laser services technician Tracy Marcotte documented in his service report, that the "machine [is] still not cutting good consistently" and that the system had crashed when he arrived on March 29, 2016. All four machines were up and running on March 29, 2016, but MN alleges

that problems persisted, causing improper and inconsistent cuts and the cutting head on one of the machines would fall off during use. Marcotte continued to report issues with the machines and make adjustments to try to fix the problems.

On April 12, 2016, Jim Altenbach and Landon Frick, **[*5]** MMS field service engineers, were on site because of the ongoing issues with the new machines. They documented slow, imprecise, poor, and inconsistent cutting. Altenbach informed Nance that he had resolved the cutting and speed problems. Based on this representation, Nance told MN customers that their overdue orders would be filled shortly. According to MN, Altenbach knew his representations were false because the nozzle he replaced was not the recommended size according to MMS' specifications. Altenbach also knew that MN, through its principal Nance, would rely on the representation.

Within a few weeks Marcotte was back on site to address additional problems with the machines. The problems persisted, MMS sent additional engineers to address the issues. After seven months the inconsistent cutting issues were resolved with a design modification. MN alleges that this design flaw or defect was hidden by MN. According to MN, its failure to deliver orders to its customers for over seven months caused the company to lose business. MN was forced to cease operations.

The sales contract between MN and MMS included a warranty that "the Equipment sold hereunder will be free from defects in material **[*6]** and workmanship." The warranty was for two years from the date of installation at the MN's facility. MN alleges that MMS breached the warranty by providing materially defective equipment, which they repeatedly failed to repair, replace, or refund as required by the sales contract. As a result of the alleged breach of warranty, MN claims to have suffered damages from its continued responsibility for payment for the defective equipment in excess of $5 million and other damages. MN also alleges that MMS breached an implied warranty under the Uniform Commercial Code from the sale of the defective equipment.

MN further alleges that MMS employees repeatedly represented that the laser machines were not defective and "have at all times performed within published specifications for the machine." MN relied on these representations that the cause of the problem was not a design defect, but external factors relating to the facility. MN alleges that the representations by MMS employees were knowingly false and misleading. The MMS

representatives allegedly were aware that the laser machines were defective.

Lastly, MN alleges that it is entitled to indemnification from MMS for any damages resulting **[*7]** from the suit filed by MAC Funding against MN for default on the financing contract. MN alleges that MAC Funding is the "admitted captive", under the full control of MMS. Dkt. 35 at P100. Further, MN alleges that MAC Funding and MMS are both owned by Mitsubishi Corporation. Thus, MN is seeking implied indemnity through an alter ego theory liability for MN's failure to pay the financing contracts.

## Legal Standard

A motion to dismiss brought pursuant to Rule 12(b)(6) challenges the legal sufficiency of the pleading. Rule 8(a) applies to most claims and requires a short and plain statement of the claim upon which relief can be granted. To survive dismissal, the counterclaims must state a facially plausible claim that puts the defending party, the Receiver, on notice of the basis of the claims against it. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 403-404 (7th Cir. 2010). The Seventh Circuit has explained that "plausibility" means, that "the plaintiff [or counterplaintiff] must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Id.* at 404 (emphasis in original). In determining the sufficiency of a counterclaim, the Court accepts as true all **[*8]** well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (quoting *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir.2011)). "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s

heightened pleading requirements." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

## Discussion

First, MMS argues that this Court should dismiss the amended third-party complaint for failure to state a claim for indemnity. MN concedes that it is not asserting express indemnity, and therefore, this Court only considers whether MN adequately alleges a claim for implied indemnity or non-contractual indemnity.

"Under implied indemnity, a promise to indemnify will be implied by law where a blameless party is derivatively liable to the plaintiff based on the party's relationship with the one who actually caused the injury." *Schulson v. D'Ancona and Pflaum LLC*, 354 Ill. App. 3d 572, 576, 821 N.E.2d 643, 290 Ill. Dec. 331 (1st Dist. 2004). To state a claim for implied indemnity, under Illinois law, the **[*9]** third-party plaintiff, MN, must allege: (1) a pre-tort relationship between the third-party plaintiff, MN, and the third-party defendant, MMS; and (2) a qualitative distinction between the conduct of MN and MMS. *Id.* Here, MN claims that it is blameless for the alleged default on the financing agreements with MAC Funding because MMS actually caused the default by providing defective equipment that prevented MN from fulfilling customer orders and earning the funds to pay the financing agreements.

In *Schulson*, the Illinois Appellate Court answered one of the questions at issue here - whether a pre-tort relationship can exist where the underlying suit is solely for breach of contract. *Id.* at 577. The court held that a stranger to a contract between two parties cannot be held liable to indemnify one of the parties for breach of contract absent the stranger's express agreement to indemnify. *Id.* (citing with approval the holdings in *Talandis Construction Corp. v. Illinois Building Authority*, 23 Ill. App. 3d 929, 321 N.E.2d 154 (1st Dist. 1974), and *Board of Education of High School District No. 88 v. Joseph J. Duffy Co.*, 97 Ill. App. 2d 158, 240 N.E.2d 5 (2d Dist. 1968)). The court in *Schulson* found that the plaintiff could not seek indemnification for an underlying breach of contract claim against the law firm that assisted in drafting a contract because the law firm was a stranger to the contract and, thus, there was no pre-tort **[*10]** relationship. *Id.*

The same is true here. MMS was not a party to the financing contracts that are the subject of the underlying law suit brought by MAC Funding against MN.

Furthermore, there is no express agreement by MMS to indemnify MN for its default on the financing agreements for the equipment. MN contends instead that MAC Funding is the alter ego of MMS, meaning that MMS is not a stranger to the financing agreements.

A party seeking recovery under an alter ego theory must show: (1) "such unity of interest and ownership that the separate personalities of the corporation" and the individual or entity behind it no longer exist; and (2) circumstances indicating that "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751-52 (7th Cir. 2012). To assess the "unity of interest and ownership" element, courts consider factors including: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) non-functioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation **[*11]** by or to a shareholder; (10) failure to maintain arm's length relationships among related entities; and (11) whether the corporation is a mere façade for the operation of the dominant shareholders." *Wachovia Secs., LLC v. Neuhauser*, 528 F. Supp. 2d 834, 854-55 (N.D. Ill. 2007) (internal quotation marks omitted); *see also Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 840 N.E.2d 767, 778, 298 Ill. Dec. 654 (Ill. App. Ct. 2005). No single factor is dispositive. *Neuhauser*, 528 F. Supp. 2d at 855.

Here, MN claims a unity of interest in the barest possible terms. The Amended Third-Party Complaint alleges only that MAC Funding is the captive financing arm of MMS and that MMS promotes and represents to customers that MAC Funding is controlled by MMS. MN points to only one employee, Takashi Aoki, as holding dual titles and roles, but MN does not even provide his title or role. Moreover, the allegation that both MMS and MAC Funding are owned by Mitsubishi does not support a finding that MMS and MAC Funding share a unity of interest. None of the factors usually considered by courts are alleged in the complaint here. Thus, this Court finds the complaint fails to sufficiently allege that MMS is not a stranger to the financing agreements to establish the requisite pre-tort relationship to sustain an implied indemnity claim.

MN's claim for implied indemnity fails for the additional reason that implied indemnity **[*12]** must be premised on vicarious liability, which is reasonably foreseeable. *See Canadian Pacific Ry. Co. v. Williams-Hayward*

*Protective Coatings, Inc.*, No. 02 C 8800, 2004 U.S. Dist. LEXIS 18920, 2004 WL 2108413, *5 (N.D. Ill. Sept. 21, 2004) (St. Eve, J.). Illinois courts recognize that claims for implied contractual immunity may arise where "one party's breach of contract causes a second party to breach a separate contract with a third party." *Id.* (quoting *Carrillo v. Jam Prods., Ltd.*, 173 Ill. App. 3d 693, 697, 527 N.E.2d 964, 123 Ill. Dec. 326 (1st Dist. 1988)). To justify this result, the damages arising from the breach of the underlying contract must be reasonably within the contemplation of the parties as a probable result of the breach of the second contract with the third party. *Case Prestressing Corp. v. Chicago College of Osteopathic Medicine*, 118 Ill. App. 3d 782, 788, 455 N.E.2d 811, 74 Ill. Dec. 382 (1st Dist. 1983).

Here, while it is undoubtedly true that if a manufacturer such as MN is unable to fulfill customer orders for a long enough period of time, it is likely to cause financial distress causing it to default on loan agreements. This reasoning however would result in MMS being liable for implied indemnity on any debt owed by MN. This Court has found no authority supporting such a result.

This case is factually analogous to *Wilder Corp. of Delaware v. Thompson Drainage and Levee Dist.*, 658 F.3d 802 (7th Cir. 2011), though the court was considering an appeal from a summary judgment. In that case, the plaintiff was seeking indemnity to shift liability for an underlying breach of contract claim against it. The plaintiff, Wilder Corporation, expressly warranted in **[*13]** the contract of sale for land that there was no petroleum contamination. The purchaser discovered that the land was contaminated and successfully sued Wilder Corporation for breach of warranty. Wilder Corporation then sought indemnification from the drainage district, the party who allegedly caused the contamination. The court held that a blameless or involuntary contract breaker cannot invoke non-contractual indemnity to shift the risk that he assumed in the contract. *Id.* at 805. The court reasoned that to find otherwise could cause the absurd result that an involuntary contract breaker could sue anyone for indemnity who a court might find contributed to the breach. *Id.* Although the court acknowledged that the drainage district was probably the only entity in a position to prevent the contamination, it held that the drainage district could not become the insurer of Wilder's contract for the sale of the land. *Id.* at 806.

Similarly, in this case, MN claims to be the involuntary contract breaker. It was unable to pay on the financing agreements with MAC Funding because it was unable

to fill its customer orders. MN is thus seeking to shift the blame for breach of its agreements with MAC Funding to MMS, claiming **[*14]** that MMS caused MN to breach its contract by supplying defective equipment rendering MMS inoperable. However, MN took the risk of not being able to sustain the payments on the financing agreements when it entered those agreements. Any number of occurrences could cause MN to default. This Court has found no authority to support the type of indemnity that MN is seeking.

MMS also moves to dismiss Counts I-III for breach of warranty and common law fraud, arguing that these claims are duplicative of the First Amended Complaint in *MNdustries, Inc. v. MC Machinery Systems, Inc.*, No. 17 C 7226 (N.D. Ill. 2017), currently pending before Judge Gettleman. "As a general rule, a federal suit may be dismissed for reasons of wise judicial administration whenever it is duplicative of a parallel action already pending in another federal court." *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993) (internal quotations omitted). Courts generally consider a suit duplicative if the "claims, parties, and available relief do not significantly differ between the two actions." *Id.* A review of the First Amended Complaint in the case pending before Judge Gettleman establishes that it is identical to the Amended Third-Party Complaint in this case with the exception **[*15]** of the indemnity count in this case. With dismissal of the indemnity count here the two complaints are identical and MN can recover for its remaining counts against MMS in that case. *See La Hispamex Food Prods., Inc. v. Specialty Cheese Co.*, No. 99 C 8479, 2000 U.S. Dist. LEXIS 10194, *9 (N.D. Ill. Jul. 7, 2000) (Leinenweber, J.) (granting dismissal of several counts of a third-party complaint that were duplicative of another action finding that dismissal cannot adversely affect any litigant's interest). This Court dismisses Counts I-III as duplicative of case No. 17 C 7226.

Because this Court finds that MN has not alleged a proper claim for indemnification against MMS, this Court grants dismissal of Count IV of the Amended Third-Party Complaint, and need not address MMS' alternative arguments for dismissal.

## Conclusion

For the reasons stated herein the Court grants MC Machinery Systems, Inc.'s Motion to Dismiss the Amended Third-Party Complaint[57].

IT IS SO ORDERED.

ENTERED:

Dated: 5/2/18

/s/ Sharon Johnson Coleman

SHARON JOHNSON COLEMAN

United States District Judge

---

**End of Document**

# Puntillo v. Dave Knecht Homes, LLC

United States District Court for the Northern District of Illinois, Eastern Division

May 24, 2019, Decided

Case No. 15 CV 11839

**Reporter**
2019 U.S. Dist. LEXIS 87223 *; 2019 WL 2225987

ANTHONY PUNTILLO and MARY CAROL PUNTILLO, Plaintiffs, v. DAVE KNECHT HOMES, LLC, DAVID J. KNECHT, and KAREN M. KNECHT, individually and as Trustee of the KAREN M. KNECHT TRUST, Defendants.

**Prior History:** Puntillo v. Dave Knecht Homes, LLC, 2016 U.S. Dist. LEXIS 85063 (N.D. Ill., June 30, 2016)

**Counsel:** [*1] For Anthony Puntillo, Mary Carol Puntillo, Plaintiffs: David C. Jensen, Robert Jon Feldt, LEAD ATTORNEYS, Eichhorn & Eichhorn, Hammond, IN; John P. Twohy, Eichhorn & Eichhorn, LLP, Hammond, IN.

For David J. Knecht, Karen M. Knecht, individually and as Trustee of the Karen M. Knecht Trust Dated January 13, 2005, Dave Knecht Homes, LLC, Defendants: Ariel Weissberg, LEAD ATTORNEY, Weissberg & Associates, Chicago, IL; Devvrat Vikram Sinha, LEAD ATTORNEY, Weissberg & Associates, Ltd., Chicago, IL; John M. Drews, LEAD ATTORNEY, Drews & Associates, Oak Brook, IL.

**Judges:** Harry D. Leinenweber, United States District Judge.

**Opinion by:** Harry D. Leinenweber

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiffs Anthony and Mary Carol Puntillo (collectively "Plaintiffs" or the "Puntillos") and Defendants Dave Knecht Homes, LLC, David J. Knecht, and Karen M. Knecht, individually and as Trustee of the Karen M. Knecht Trust (collectively "Defendants") cross-move for summary judgment. Plaintiffs also move to strike most of Defendants' Statement of Facts and some of Defendants' Statement of Additional Facts. Defendants also move to exclude the expert opinion testimony of G. Scott Solomon. For the reasons stated herein, Plaintiffs' Motions [*2] to Strike (Dkt. Nos. 75, 92) are denied. Defendants' Motion to Exclude Expert Testimony (Dkt. No. 88) is denied. Plaintiffs' Motion for Summary Judgment (Dkt. No. 65) is granted in part and denied in part, and Defendants' Motion for Summary Judgment (Dkt. No. 69) is granted in part and denied in part.

## I. UNDISPUTED FACTS

For convenience of the reader, the Court provides both a succinct summary and a more detailed overview of the facts. The following facts are undisputed unless designated otherwise.

This case arises from a dispute between the Puntillos and a housing development company, Northridge Builders, Inc. ("Northridge"), over the construction of a luxury home. Apparently, Northridge constructed a home for the Puntillos that was riddled with defects. In response, the Puntillos filed suit against Northridge in state court and received a judgment of monetary damages. Northridge however dissolved, and the Puntillos were unable to enforce that judgment against it. In the wake of it all, a new housing development company, Dave Knecht Homes, LLC, was created with allegedly very similar, if not the same, owners, management, staff, resources, and so forth. The crux of this lawsuit is whether [*3] the Puntillos can enforce the Northridge judgment against the newly developed Dave

Knecht Homes.

## A. Northridge Builders, Inc.

Northridge specialized in building high-end custom homes and maintained its office at 15 Spinning Wheel Road in Hinsdale, Illinois. (Defs.' Resp. to Pls.' Stmt. of Facts ("PSOF") ¶ 5, Dkt. No. 79.) Defendant David J. Knecht was President and Director of Northridge, as well as its sole shareholder since Northridge's inception until October 2008. (PSOF ¶ 6.) Defendant Karen M. Knecht is David Knecht's wife and the trustee of Defendant Karen M. Knecht Trust (the "Trust"). (PSOF ¶ 8.) Karen and David (collectively the "Knechts") are the beneficiaries of that Trust. (*Id.*) The Trust instrument provided that if stock or an ownership interest in Northridge is included in trust assets, the trustee—Karen Knecht—shall entrust to herself the management of Northridge. (*Id.*) On October 24, 2008, David Knecht transferred his shares in Northridge to the Trust. (PSOF ¶ 9.) While Plaintiffs contend there was no consideration for this transfer, Defendants assert that David transferred his personal property, not corporate property, to the Trust. (*Id.*) Following the transfer, David **[*4]** Knecht continued to serve as President and Director of Northridge. (PSOF ¶ 10.) The parties dispute, however, given the instructions of the Trust instrument, whether Karen or David Knecht was to have managerial authority over Northridge. (*Id.*) Northridge also made cash distributions directly into a bank account owned by David and Karen Knecht, but the parties dispute the amounts of those distributions. (PSOF ¶11.)

For the most part, Northridge was a successful and profitable business. (PSOF ¶ 27.) From December 2003 through to May 2012, Northridge was a party to more than thirty-three contracts for the construction or renovation of single-family custom homes. (PSOF ¶ 26.) These contracts had a value of approximately $50,229,000.00. (*Id.*) Northridge had gross revenues of over twelve million dollars in 2008; over eight million in 2009 and 2010; over seven million in 2011; and over ten million in 2012. (PSOF ¶ 27.) Then, between 2012 and 2013, Northridge incurred approximately $1,128,000.00 in expenses, which were personal to the Knechts and included federal and state income tax payments; landscaping, pool and retaining-wall work at the Knechts' personal residences; premiums for personal **[*5]** insurance policies; fees owed to the Knechts' personal attorneys; interior design fees; and automobile registration fees for Karen Knecht's personal vehicle. (PSOF ¶¶ 16-17.) After the fact, Northridge, through David Knecht, classified these expenses as shareholder "dividends" or "distributions." (PSOF ¶ 19.) The Knechts paid for these expenses using American Express cards issued to Northridge, which paid the interest owed for such expenses. (PSOF ¶ 20.) On January 20, 2014, David and Karen Knecht ratified the wind-down of Northridge's business affairs. (PSOF ¶ 28.) And on September 11, 2015, the Illinois Secretary of State effectively dissolved Northridge. (PSOF ¶ 30.)

David and Karen Knecht said they closed Northridge for several reasons, including that David "was burned out on the business" and that the two of them intended to move to Alabama. (PSOF ¶ 33.) However, the Knechts never moved to Alabama nor ceased participating in the home building business. (*Id.*)

## B. Dave Knecht Homes, LLC

Dave Knecht Homes, LLC was organized on October 17, 2012, in the state of Illinois. (PSOF ¶ 22.) Its principal office is located at 15 Spinning Wheel Road in Hinsdale, Illinois, and its initial members **[*6]** were David Knecht and Mario Cirignani. (*Id.*) From January to May 2013, Dave Knecht Homes hired all of the people working for Northridge at the time, except for Karen Knecht. (PSOF ¶ 23.) Dave Knecht Homes hired Northridge's accountant, Anthony Recchia, to serve as its accountant. (*Id.*) It also contracted with approximately 115 subcontractors, tradesmen, suppliers, and other vendors that had formerly contracted with Northridge. (PSOF ¶ 39.) Dave Knecht Homes even displayed photographs of numerous homes constructed by Northridge. (PSOF ¶ 40.)

From October 2012, to January 2013, prior to hiring Northridge's employees, Dave Knecht Homes was a party to fifteen contracts having a total value of approximately $22,800,000.00. (PSOF ¶ 36.) From March 2013, to May 2017, Dave Knecht Homes was a party to forty more contracts having a total value of approximately $49,153,085. (PSOF ¶ 37.) All of those contracts involved work relating to the construction or renovation of single-family custom homes. (*Id.*) Dave Knecht Homes recorded at least $5,179,000.00 in revenue from clients who were former customers of Northridge. (PSOF ¶ 38.) It had gross revenues in the amount of $2,524,172.00 in 2013; $8,223,305.00 **[*7]** in 2014; and $11,002,918.00 in 2015. (PSOF ¶ 41.) The combined total annual revenue of Northridge and Dave Knecht Homes was never less than $5.2 million. (*Id.*)

Northridge and Dave Knecht Homes utilized the same credit line. Beginning in 2006, Dave Knecht began using a personal credit line provided by Morgan Stanley to fund Northridge's business operations. (PSOF ¶ 42.) The credit line authorized Northridge to borrow up to $618,000.00 from Morgan Stanley in David Knecht's name. (*Id.*) Northridge, in fact, first borrowed $400,000.00 from this credit line on January 10, 2006. (*Id.*) It kept track of the funds it borrowed on the credit line by using a handwritten ledger, which tracked disbursements as well as repayments to the line. (PSOF ¶ 43.) In 2012, Ocwen Loan Servicing became the servicing lender on David Knecht's credit line. (*Id.*) According to the ledger, Dave Knecht Homes utilized this same credit line. (PSOF ¶ 44.) For example, Dave Knecht Homes borrowed $100,000.00 from the credit line in December 2014, and made a repayment of $200,000.00 in April 2015. (*Id.*)

## C. The Underlying Incident

In June 2006, Plaintiffs contracted with Northridge for the construction of a luxury custom home **[*8]** in Chesterton, Indiana. (PSOF ¶ 5.) After moving into their new home, Plaintiffs noted problems with the structure, including cracks in the walls and floors, as well as an inability to operate certain doors and windows. (PSOF ¶ 7.) They communicated these problems to Northridge, apparently to no avail. (*Id.*)

On August 22, 2011, Plaintiffs' attorneys at the time sent David Knecht and Northridge a written notice of a construction defect claim under Indiana's New Home Construction Warranty Act. (PSOF ¶ 13.) David Knecht responded, informing Plaintiffs that his insurance company would deny the claim. (*Id.*) At the time, Northridge maintained a policy of Commercial General Liability (CGL) insurance with Cincinnati Insurance Company, but not any form of "builders' risk" insurance. (*Id.*) On January 18, 2012, Plaintiffs sued Northridge in the Superior Court of Porter County, Indiana, asserting a single claim for breach of warranty in connection with Northridge's construction of the Chesterton home. (PSOF ¶ 15.) In that case, Plaintiffs presented evidence that their home had subsided because it had been built on unsuitable soils, and that the subsidence had caused numerous problems with the home, **[*9]** including the cracks in the walls and floors and inability to operate certain windows and doors. (PSOF ¶ 24.) On December 10, 2003, the Porter Superior Court entered a judgement for Plaintiffs in the amount of $800,835.00. (PSOF ¶ 25.)

Between the start and end of that litigation, on October 5, 2012, Northridge's insurer, Cincinnati Insurance Company, sued Northridge and Plaintiffs in the Circuit Court of Cook County, Illinois. (PSOF ¶ 21.) The case was removed to this District. (*Id.*) The Insurance Company sought declaratory judgment that Plaintiffs' claim against Northridge was not covered by Northridge's CGL insurance policy. (*Id.*) Judge Shadur entered an Order granting that declaratory relief. *See Cincinnati Ins. Co. v. Northridge Builders, Inc.*, No. 12 C 9102, 2015 U.S. Dist. LEXIS 132165, 2015 WL 5720256 (N.D. Ill. Sept. 30, 2015).

Northridge never paid the $800,835.00 judgment. (PSOF ¶ 47.) Dave Knecht testified that he never paid that amount because he believed that insurance—either Northridge's, the Puntillos', the project architects', or the soils engineer's—covered the judgment. (*Id.*) However, neither Northridge nor the Puntillos asserted any claims against the project architects or the soils engineer. (*Id.*)

## D. The Instant Litigation

Based on the foregoing, the Puntillos brought this suit, claiming that Defendants **[*10]** should be held liable for paying the $800,835.00 judgment against Northridge. The Puntillos pursue three separate theories of liability: (1) Count I: fraudulent transfers; (2) Count II: successor liability; and (3) Count III: piercing the corporate veil. Both sides now move for summary judgment. Plaintiffs move for summary judgment as to Counts I, II, and III, and Defendants move for partial summary judgment as to Counts I and III of the Complaint. The Puntillos also move to strike most of Defendants' statements of facts, and Defendants move to exclude the expert opinion testimony of G. Scott Solomon.

As a preliminary matter, the Court will address the Puntillos' Motions to Strike Defendants' Statements of Facts. The facts underlying summary judgment proceedings are drawn from the parties' Local Rule 56.1 submissions. This Rule assists courts "by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (internal quotation marks omitted). It is designed, in part, "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend **[*11]** the time combing the record to locate the relevant information in determining whether a trial is

necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation marks omitted).

Local Rule 56.1(a)(3) requires a movant "to submit a statement of material facts that, according to the movant, entitles that party to judgment as a matter of law." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000); Local Rule 56.1(a)(3). The statement must (1) be limited to facts and not opinions or arguments; (2) state only *material* facts; and (3) include only facts supported with a citation to admissible evidence. *Malec*, 191 F.R.D. at 583. For the most part, Plaintiffs argue that Defendants recite facts that are irrelevant and thus immaterial to the instant lawsuit. As laid out above, the Court includes and considers facts here relevant only to the issues and claims before it. As such, the Court need not give further thought to Plaintiffs' motions to strike certain of Defendants' statements of facts and thus denies those motions as moot.

Now the Court will turn to the merits of this case, considering first the admissibility of the expert opinion testimony before evaluating the Puntillos' three theories of liability.

## II. ANALYSIS

### A. Expert Opinion Testimony

Exclusion of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Rule 702 provides that a qualified witness—one with the **[*12]** appropriate knowledge, skill, experience, training, or education—may testify in the form of an opinion if "(a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. To determine whether the opinion is admissible under this Rule, the Court must consider whether (1) the witness is qualified; (2) the expert's methodology is reliable; and (3) the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

Rule 702 is "flexible." *Daubert*, 509 U.S. at 594. The Court must make sure not to abrogate the role of the jury as it examines the admissibility of the evidence. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). In particular, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In other words, "[d]eterminations **[*13]** on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Finally, the proponent of testimony bears the burden of persuading the Court that the proffered testimony should be admitted. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

G. Scott Solomon is the Puntillos' financial expert. He is a Certified Public Accountant with Charles River Associates in Chicago. (G. Scott Solomon Decl. ¶ 3, Ex. 6 to Pls.' Mot. for Summ. J., Dkt. No. 65-6.) Solomon has provided accounting, auditing, and financial and dispute-related services for 18 years. (*Id.*) He is also Certified in Financial Forensics and a Certified Fraud Examiner. Plaintiffs retained Solomon to opine on factors that a trier of fact can consider when deciding successor liability, including indicia of fraudulent transfers, and whether to pierce the corporate veil. (Solomon Decl. ¶ 1.) Solomon opined that Northridge and Dave Knecht Homes operated with similar management, ownership, financing, personnel, locations, and general business operations, and Northridge received little, if any, consideration for the transition of the foregoing from one company to the other. (Solomon **[*14]** Decl. ¶ 20.) He further opined that Northridge and Dave Knecht Homes commingled funds, and Northridge customers transitioned to Dave Knecht Homes. (*Id.*) With respect to David Knecht, Karen Knecht, the Trust, and Northridge, Solomon opined that they all commingled funds, that there were transactions between them that "are not arm's length," and that Northridge "paid distributions, personal expenses, and outstanding loans benefiting Defendants" to the detriment of the Puntillos securing their judgment. (*Id.*)

Defendants argue that Solomon's testimony should be excluded because Solomon: (1) offers contradictory statements; (2) renders opinions that do not require specialized knowledge; (3) improperly usurps the role of

2019 U.S. Dist. LEXIS 87223, *14

the fact finder; and (4) provides testimony that is cumulative and unnecessary. The Court will consider these arguments separately.

Defendants offer numerous examples of Solomon allegedly providing contradictory statements. First, Solomon recognized that, unlike Northridge, Mario Cirignani is a fifty percent owner of Dave Knecht Homes. (*See* G. Scott Solomon Dep. 60:1-10, Ex. 1 to Defs.' Mot. to Strike Solomon Test., Dkt. No. 88-1.) Defendants assert this recognition contradicts **[*15]** Solomon's opinion that Northridge and Dave Knecht homes operated with similar ownership. Second, Solomon concluded that Cirignani's borrowing of funds from Dave Knecht's line of credit has "no apparent business purpose" and was "not an arm's length transaction." (Solomon Dep. 62:19-23.) Defendants assert this conclusion contradicts Solomon's later statement that there was nothing wrong with the transaction if Cirignani was personally obligated. (Solomon Decl. ¶ 30; Solmon Dep. 65:2-3.) Third, Solomon opined that Northridge and Dave Knecht Homes operated at similar locations, but then admitted that the two operated from different suites. (*See* Solomon Decl. ¶ 41.) Fourth, Solomon claimed that Northridge and Dave Knecht Homes improperly commingled funds since employees continued to use Northridge credit cards after their last dates of employment with Northridge, yet later admitted that it was unclear whether those charges were for Northridge or Dave Knecht Homes. (Solomon Decl. ¶ 54.)

The foregoing alleged contradictions go to the weight, not reliability, of Solomon's testimony. *See In re Fluidmaster, Inc., Water Connector Components Prods. Liabl. Litig.*, No. 14-CV-5696, 2017 U.S. Dist. LEXIS 48792, 2017 WL 1196990, at *23 (N.D. Ill. Mar. 31, 2017) (citing *Smith*, 215 F.3d at 718 (7th Cir. 2000)). For purposes of admissibility, reliability "is primarily a question of validity of the methodology **[*16]** employed by an expert, not the quality of the data used in applying the methodology or conclusion produced." *Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.* (quoting *Smith*, 215 F.3d at 718).

Moreover, the alleged contradictions are illusory. For example, there is no dispute that Dave Knecht was and is an owner of both Northridge and Dave Knecht

Homes, with a management role in both companies. That finding could have formed the basis of Solomon's opinion that Northridge and Dave Knecht Homes operated with similar ownership, regardless of Cirignani owning fifty percent of Dave Knecht Homes. Another example is Defendants' alleged contradiction about the companies occupying different suites in the same building. Neither party disputes that both Northridge and Dave Knecht Homes had their principal offices at 15 Spinning Wheel Road in Hinsdale, Illinois. The fact that their offices were in different suites does not contradict the conclusion that they were in a similar location—*i.e.*, the office building. The alleged **[*17]** contradictions fail to rise to the applicable legal standards regarding expert testimony. Accordingly, Defendants' argument fails.

Defendants' second and third arguments—that Solomon's opinions do not require specialized knowledge and that he has usurped the role of fact finder—fare no better. To admit expert testimony, the expert must use his specific, specialized knowledge of the subject matter to assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702; *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778, 732 Fed. Appx. 484 (7th Cir. 2017). As explained above, Solomon has extensive experience in financial forensics and holds various certificates to demonstrate his qualifications. In conducting his analysis, Solomon sifted through and analyzed a vast array of documents produced through discovery, including tax returns, financial statements, general ledger data, loan documentation, credit card statements, and so forth. (Solomon Decl. ¶¶ 4-5.) Solomon traced the history of the parties' dispute and the financial origins and development of both Northridge and Dave Knecht Homes to reach his conclusions. To further support his findings, Solomon provided fourteen schedules containing detailed calculations that he asserts helped him to **[*18]** reach his conclusions.

The crux of Defendants' argument is that Solomon's conclusions do not require specialized knowledge and, instead, can be derived through common sense. For example, Defendants point to the fact that Northridge and Dave Knecht Homes maintained their office in the same building. This fact led Solomon to conclude that the two entities operated with similar locations. While such a determination is commonsensical, Solomon's conclusion does more than just connect the dots. Solomon is also identifying factors for the trier of fact to consider in reaching the ultimate conclusions regarding liability. He relies on his specialized knowledge in the area to identify which transactions and facts are relevant

to consider. As such, his proffered opinions "advance[ ] the inquiry." *Thompson v. City of Chicago*, 472 F.3d 444, 453 (7th Cir. 2006). Moreover, Solomon has not usurped the role of the finder of fact. While he has identified factors to guide the jury, he has steered clear from expressing opinions on the ultimate issues of this case: a determination on the Puntillos' claims for fraudulent transfers, successor liability, and piercing the corporate veil. Accordingly, Defendants' second and third arguments miss the mark.

Finally, Defendants **[*19]** argue that Solomon's testimony is cumulative and unnecessary under Federal Rule of Evidence 403. This argument was raised in Defendants' reply brief, which failed to give the Puntillos adequate opportunity to respond. Thus, the argument is waived. *Judge v. Quinn*, 612 F.3d 537, 542 (7th Cir. 2010).

For the foregoing reasons, Defendants' motion to exclude Solomon's expert opinion testimony is denied. The Court will consider next the parties' cross-motions for summary judgment.

## B. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Liu v. T&H Mach., Inc.*, 191 F.3d 790, 794 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). When considering the Puntillos' Motion for Summary Judgment, the Court construes the facts in the light most favorable to Defendants, and when considering Defendants' Motion for Summary Judgment, the Court construes the facts in the light most favorable to the Puntillos. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

## 1. Count I: Fraudulent Transfer

The Illinois Uniform Fraudulent Transfer Act ("IUFTA") enables creditors to defeat a debtor's transfer of assets to which the creditor was **[*20]** entitled. 740 ILCS 160/5; *see Rush Univ. Med. Cntr. v. Sessions*, 2012 IL 112906, 980 N.E.2d 45, 51, 366 Ill. Dec. 245 (Ill. 2012). The IUFTA supplements common law principles of "law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause[.]" 740 ILCS 160/11. Under the IUFTA, a transfer is fraudulent as to a creditor if the debtor made the transfer:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a). Illinois recognizes two categories of fraudulent transfers: "fraud in law" and "fraud in fact," with the two distinguished by "whether the transfer was supported by consideration." *Reagan v. Baird*, 140 Ill. App. 3d 58, 487 N.E. 2d 1028, 1033, 94 Ill. Dec. 151 (Ill. App. Ct. 1985). A "fraud in law" transfer is one that is made for no or inadequate consideration. *Id.* In such a case, the "fraud **[*21]** is presumed" and "intent is immaterial." *Anderson v. Ferris*, 128 Ill. App. 3d 149, 470 N.E. 2d 518, 521, 83 Ill. Dec. 392 (Ill. App. Ct. 1984) (citation omitted). Conversely, where "actual consideration has been given for the transfer and a specific intent to defraud" has been proven, such transfer constitutes "fraud in fact." *Id.*

The Puntillos claim that both types of fraudulent transfers are present in this case. They assert that Defendants fraudulently transferred from Northridge to Dave Knecht Homes the "goodwill, business methods and know-how, business contacts, intellectual property, and the custom home-building business itself (with associated corporate opportunities)." (Pls.' Mot. for Summ. J. at 11, Dkt. No. 67.) Moreover, the Puntillos contend no consideration was paid for this transfer. Defendants respond by arguing that they cannot mount a proper defense since they are unsure of what the Puntillos are claiming constitute fraudulent transfers. They point out that, aside from cash, Northridge did not have substantial assets such as equipment, inventory, intellectual property, and commercial paper that could have been transferred. As for any distributions that

Dave Knecht Homes received, Defendants contend that it gave adequate consideration. For example, with David Knecht **[\*22]** specifically, Defendants argue David contributed capital towards Northridge, and Northridge received new clients as the source of its new business. However, Defendants point out that David Knecht had an at-will employment relationship with Northridge. Given that relationship, Defendants argue that David's "goodwill and ability to generate business is uniquely his and based on his personal reputation" and thus could not have been transferred. (Defs.' Mot. for Summ. J. at 15, Dkt. No. 69.) As such, no consideration was required.

The Court finds Defendants' first point persuasive. It is unclear what exactly the Puntillos are claiming as fraudulent transfers. Instead, the Puntillos vaguely and generally assert that most everything related to Northridge had been transferred to Dave Knecht Homes, and that those transfers were likely fraudulent due to the judgment Northridge owed to the Puntillos. In other words, the Puntillos have merely restated the applicable rules as conclusions specific to the facts of this case. That does not suffice. *See United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011) ("Undeveloped and unsupported arguments may be deemed waived."). This Court is not obliged to research and construct legal arguments for the parties, **[\*23]** especially when they are represented by counsel. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

The Puntillos also briefly mention "the many transfers to the Knechts through the direct payment of personal expenses." (Pls.' Reply to Pls.' Mot. for Summ. J. at 5, Dkt. No. 84.) This point, however, was raised in Plaintiffs' reply brief. Since Defendants did not have an adequate opportunity to respond, the argument is waived. *Judge*, 612 F.3d at 542. It bears mentioning though that the specification is still undeveloped since the Puntillos do not do much by way of elaborating on its significance or relevance to the applicable standards. Summary judgment is the "put up or shut up moment" in litigation. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Plaintiffs have neither put up enough evidence nor raised adequate arguments to establish that a reasonable jury could find that fraud in fact or fraud in law occurred. Defendants are thus entitled to judgment as a matter of law on Count I.

**2. Count II: Successor Liability**

Generally, a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation. *Nilsson v. Cont'l Mach. Mfg. Co.*, 251 Ill. App. 3d 415, 621 N.E.2d 1032, 1034, 190 Ill. Dec. 579 (Ill. App. Ct. 1993). There are, however, four exceptions to this general rule of successor corporate nonliability: (1) where an express or implied **[\*24]** agreement of assumption exists; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. *Vernon v. Schuster*, 179 Ill. 2d 338, 688 N.E. 2d 1172, 1176-77, 228 Ill. Dec. 195 (Ill. 1997). Relying on the latter two exceptions, the Puntillos argue that Dave Knecht Homes is a "mere continuation" of Northridge, and that Dave Knecht Homes was created for the "fraudulent purpose" of escaping liability for Northridge's obligations. The Court finds that the continuation exception is dispositive of the instant matter, so it need not consider the fraudulent purpose exception.

The continuation exception applies when the purchasing corporation is "merely a continuation or reincarnation of the selling corporation." *Vernon*, 688 N.E. 2d at 1176 (citation omitted). In other words, the purchasing corporation "maintains the same or similar management and ownership, but merely wears different clothes." *Id.* (internal quotation marks and citation omitted). The Illinois Supreme Court made clear that "[t]he [continuation] exception is designed to prevent a situation whereby the specific purpose of acquiring assets **[\*25]** is to place those assets out of the reach of the predecessor's creditors." *Id.* (citation omitted). To determine whether one corporate entity is a continuation of another, courts consider "whether there is a continuation of the corporate *entity of the seller*—not whether there is a continuation of the *seller's business operation*." *Id.* (emphasis in original). A common identity of officers, directors, ownership, and stocks between the selling and purchasing corporation is a key element of what constitutes a continuation. *Id.*; *see also Dearborn Maple Venture, LLC v. SCI Ill. Servs., Inc.*, 2012 IL App (1st) 103513, 968 N.E. 2d 1222, 1234, 360 Ill. Dec. 469 (Ill. App. Ct. 2012), *as modified on denial of reh'g* (May 29, 2012).

Here, there is no doubt that the two home development companies share many similarities. The main question is, however, whether those similarities constitute a "continuation" for purposes of liability. Defendants predominately rely on *Vernon v. Schuster*, 179 Ill. 2d

338, 688 N.E. 2d 1172, 228 Ill. Dec. 195 (Ill. 1997), to argue that such liability is unwarranted. In *Vernon*, the owner of a sole proprietorship, Diversey Heating, passed away and his son continued the business. *Vernon*, 688 N.E. 2d at 1174. The plaintiffs in that case subsequently sued the son for a debt owned by Diversey Heating. *Id.* However, the court found against imposing liability because, despite finding that the nature of the business remained the **[*26]** same, the ownership of the business changed when the father passed away. *Id.* at 1177.

Defendants' reliance on *Vernon* is misplaced. In *Vernon*, there was no allegation of fraud, no transfer of assets from one company to another, and no evidence that any such transfer in ownership was intended to avoid a judgment of liability. Moreover, the facts in *Vernon* are distinguishable. The court in *Vernon* did not consider the identity of officers, directors, or stockholders, which is relevant and even crucial in determining continuity in the instant matter. Thus *Vernon* is not particularly useful for considering the instant matter.

Here, David Knecht exercised ownership over both Dave Knecht Homes and Northridge at one point as a shareholder. David Knecht later turned over his shares in Northridge to the Karen M. Knecht Trust, the beneficiaries of which were both he and his wife, Karen. Defendants argue that Karen Knecht, not David Knecht, exercised managerial authority over Northridge, since the Trust instrument provided as much. But the fact that Karen Knecht is the trustee of the Trust does not render the continuation exception fatal. *See Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill. App. 3d 241, 662 N.E. 2d 595, 600, 214 Ill. Dec. 1029 (Ill. App. Ct. 1996) (finding continuity of shareholders where wife of shareholder of **[*27]** predecessor corporation gratuitously received 80% of shares and husband acted as chief executive officer in successor corporation). The Court "cannot allow the law to be circumvented by an individual exerting control through his spouse. A creditor's rights cannot be cut off by a corporation which merely puts on a new coat." *Id.* While David Knecht assigned his shares to the Trust, he continued to serve as Northridge's President and maintained an executive position.

Soon after the Puntillos filed suit against Northridge in 2011, Defendants organized Dave Knecht Homes, LLC in Illinois. In that alleged successor company, Dave Knecht owns 50% of the shares, while Mario Cirignani owns the other half. Defendants point to the fact that Cirignani was not involved in the ownership or

management of Northridge as demonstrative of a lack of continuity between Northridge and Dave Knecht Homes. Nevertheless, "the continuity of shareholders necessary to a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporation." *Workforce Solutions v. Urban Servs. of America, Inc.*, 2012 IL App (1st) 111410, 977 N.E. 2d 267, 285, 364 Ill. Dec. 778 (Ill. App. Ct. 2012) (citation omitted); *Park v. Townson & Alexander, Inc.*, 287 Ill. App. 3d 772, 679 N.E. 2d 107, 110, 223 Ill. Dec. 163 (Ill. App. Ct. 1997). Moreover, "[a] change of shareholders is consistent with mere continuation as long as the former **[*28]** owners retain a controlling interest in the successor entity." *Pielet v. Pielet*, 407 Ill. App. 3d 474, 942 N.E.2d 606, 638, 347 Ill. Dec. 403 (Ill. App. Ct. 2010), *aff'd in part, rev'd in part on other grounds*, 2012 IL 112064, 978 N.E. 2d 1000, 365 Ill. Dec. 497 (Ill. 2012). Thus, Cirignani's involvement in ownership and management is beside the point. There is no doubt that David Knecht retains a considerable, even controlling, interest in Dave Knecht Homes, LLC. As such, the identity of ownership and management between Northridge and Dave Knecht Homes is sufficiently similar and weighs heavily in Plaintiffs' favor for finding a continuation.

And there are more similarities between the two housing development companies that are important to note. Both companies are general contractors that derive revenue from building and renovating luxury homes. Dave Knecht Homes hired the project managers and other persons formerly employed by Northridge. It also contracted with the same suppliers, material-men, and subcontractors as Northridge for its construction projects. Dave Knecht Homes is headquartered in the same building where Northridge was headquartered. The successor company even utilizes the same credit facility as Northridge, controlled by David Knecht, to finance its operations. Based on the foregoing, it is evident that Dave Knecht Homes **[*29]** is a continuation or reincarnation of Northridge. *See Dearborn Maple Venture, LLC*, 968 N.E. 2d at 1234 (finding successor liability where company shared common ownership and purpose of developing real property with predecessor company); *Kennedy v. Four Boys Labor Servs.*, 279 Ill. App. 3d 361, 664 N.E.2d 1088, 1094, 216 Ill. Dec. 160 (Ill. App. Ct. 1996). Accordingly, the Puntillos are entitled to judgment as a matter of law on Count II.

### 3. Count III: Piercing the Corporate Veil

The Puntillos also claim that Northridge served as an "alter ego" for the Knechts, and as such, the Court should pierce the corporate veil of Northridge and impose individual liability against the Knechts.

Under Illinois law, "a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 840 N.E. 2d 767, 775, 298 Ill. Dec. 654 (Ill. App. Ct. 2005). This doctrine imposes liability on the individual or entity that "uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Id.* at 775-76 (citation omitted). Liability arises from "fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation." *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 778 N.E. 2d 291, 295, 268 Ill. Dec. 305 (Ill. App. Ct. 2002).

In Illinois, courts use a two-prong test to determine whether to pierce the corporate veil: "(1) there must be such unity of interest and ownership that the separate [*30] personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Fontana*, 840 N.E. 2d at 776. The party seeking to pierce the corporate veil has the burden of making a "substantial showing that one corporation is clearly dummy or sham for another." *In re Estate of Wallen*, 262 Ill. App. 3d 61, 633 N.E. 2d 1350, 1357, 199 Ill. Dec. 359 (Ill. App. Ct. 1994).

Defendants first argue that this case is a breach of contract case, and as such, the Puntillos have a greater burden to establish liability. Courts apply a more stringent standard in contract cases to determine when to pierce the corporate veil. *Salatech, LLC v. East Balt. Inc.*, 2014 IL App (1st) 132639, 386 Ill. Dec. 420, 20 N.E.3d 796, 806 (Ill. App. Ct. 2014). This is because "a party seeking relief for a breach of contract presumably entered into the contract with the corporate entity voluntarily and knowingly and expecting to suffer the consequences of the limited liability status of the corporate form." *Id.* Where there is "no evidence of any misrepresentation, no attempt to conceal any facts, and the parties possess a total understanding of all of the transactions involved, Illinois courts will not pierce the corporate veil in a breach of contract situation." *Tower Inv'rs, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 864 N.E. 2d 927, 942, 309 Ill. Dec.

686 (Ill. App. Ct. 2007). However, Defendants are misguided. [*31] This is not a breach of contract case. It is about the alleged fraudulent transfer of assets from one company to another in an attempt to immunize the original company from an adverse judgment.

As Plaintiffs correctly identify, *A.L. Dougherty Real Estate Management Co., LLC v. Su Chin Tsai*, 2017 IL App (1st) 161949, 420 Ill. Dec. 887, 98 N.E. 3d 504 (Ill. App. Ct. 2017), *appeal denied*, 420 Ill. Dec. 34, 95 N.E.3d 497 (Ill. 2018), is instructive here. In that case, the plaintiff, a commercial landlord, obtained a default judgment for breach of a lease it had with a corporation called March Fasteners, Inc. ("March"), owned by the defendant Su Chin Tsai. *Id.* at 508. During the pendency of the litigation for that judgment, Su Chin Tsai transferred March's asset to another defendant corporation he organized, called Cube Global, LLC ("Cube"). *Id.* at 509. The plaintiff then sued Su Chin Tsai and Cube, alleging both alter ego and fraudulent transfer claims. *Id.* At trial, the plaintiff's forensic account established that Su Chin Tsai transferred all of March's assets, including inventory, accounts receivable, employees, contracts, vendor relationships and business good will to Cube without consideration. *Id.* at 511. Su Chin Tsai had also taken substantial distributions directly from both of the corporations. *Id.* The court ultimately concluded that Cube was the alter ego and mere instrumentality of the first [*32] corporation, March, and was thus liable, along with Su Chin Tsai, for the judgment against March. *Id.* at 517. That ruling was affirmed by the Illinois Appellate Court, which rejected the same breach of contract argument Defendants now raise. *Id.*

As was the case in *A.L. Dougherty*, the activities at issue here are the Knechts' alleged attempts to transfer assets to avoid a judgment. Plaintiffs point to extensive financial documents and forensic analysis that the Knechts exercised control over Northridge and treated the company's assets as their own, causing Northridge to pay significant sums of money for their own personal expenses. These expenses included federal and state income tax payments; landscaping for their personal residences; personal life insurance premiums; attorney's fees; and a $167,274 payment to a title company to refinance the Knechts' personal residence in Hinsdale. (PSOF ¶¶ 11, 17, 20.) Moreover, the Knechts had Northridge pay their personal expenses using David Knecht's credit line. Northridge also borrowed hundreds of thousands of dollars from this credit line, all of which was tracked in a handwritten ledger. Northridge eventually repaid the balance owed on the credit

line, **[*33]** but this repayment left Northridge with diminished assets, valuing far less than what was owed to the Puntillos for their judgment. By causing Northridge to pay their significant personal expenses, the Knechts treated Northridge's assets as their own, to the detriment of the Puntillos. Therefore, as was the case in *A.L. Dougherty*, piercing the corporate veil of Dave Knecht Homes is appropriate. Plaintiffs are entitled to judgment as a matter of law as to Count III.

### III. CONCLUSION

For the reasons stated herein, Plaintiffs' Motions to Strike (Dkt. Nos. 75, 92) are denied. Defendants' Motion to Exclude Expert Testimony (Dkt. No. 88) is denied. Plaintiffs' Motion for Summary Judgment (Dkt. No. 65) is granted as to Counts II and III and denied as to Count I, and Defendants' Motion for Summary Judgment (Dkt. No. 69) is granted as to Count I and denied as to Counts II and III.

Plaintiffs have two weeks to set forth their claim for damages; Defendants then have two weeks to file their objections. The Court will rule on the damages issue by mail.

/s/ Harry D. Leinenweber, Judge

Harry D. Leinenweber, Judge

United States District Court

Dated: 5/23/201

---

**End of Document**

# Sanchez v. Global Parking Mgmt.

United States District Court for the Northern District of Illinois, Eastern Division

July 20, 2015, Decided; July 20, 2015, Filed

No. 14-cv-04611

**Reporter**
2015 U.S. Dist. LEXIS 93782 *; 2015 WL 4429024

ALFREDO SANCHEZ and MIGUEL ARRIAGA, on behalf of themselves and other persons similarly situated, Plaintiffs, v. GLOBAL PARKING MANAGEMENT, INC., CAR PARKING SOLUTIONS, LLC, MICHAEL S. DENIGRIS, JOSEPH GRILLO, ROSEANNE PARONE-DENIGRIS, and CASIMIR A. RINCON, individually, Defendants.

**Counsel:** **[*1]** For Alfredo Sanchez, Miguel Arriaga, Plaintiffs: Alvar Ayala, Christopher J. Williams, Workers' Law Office, P.C., Chicago, IL; Ryan Matthew Thoma, Sara Stewart Schumann, Karen I. Engelhardt, Allison, Slutsky & Kennedy, P.C., Chicago, IL.

For Global Parking Management, Inc., Michael S Denigris, Joseph Grillo, Roseanne Parone-Denigris, Car Parking Solutions LLC, Defendants: Elizabeth A. Boratto, Jennifer Ann Kunze, The Miller Law Group, LLC, Hinsdale, IL.

**Judges:** Andrea R. Wood, United States District Judge.

**Opinion by:** Andrea R. Wood

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiffs Alfredo Sanchez and Miguel Arriaga have brought this putative class action against Defendants Global Parking Management, Inc. ("Global"), Car Parking Solutions, LLC ("Car Parking"), Michael S. DeNigris, Joseph Grillo, Roseanne Parone-DeNigris, and Casimir Rincon, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, as well as retaliation in violation of all of those statutes. Before the Court is Car Parking's motion to dismiss the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion") (Dkt. No. 60). For the reasons stated **[*2]** below, the Court finds that Plaintiffs have sufficiently stated claims against Car Parking and therefore denies the Motion.

## BACKGROUND

Except when otherwise noted, the following facts are taken from the Second Amended Complaint ("SAC") and accepted as true for the purposes of deciding the Motion.[1]

Global provides its clients with attendants to monitor parking lots and take action against drivers who park on the lots even though they are not customers of the related businesses. (Compl. ¶ 15, Dkt. No. 47.) Global is jointly owned and operated by DeNigris, Grillo, and Parone-DeNigris. (*Id.* ¶ 16.) Plaintiffs are both former Global employees who were hired by the company in 2011. (*Id.* ¶ 17.) They claim that in the past three years they were "regularly and customarily" required to work in excess of 40 hours per week but were not compensated at 1.5 times their regular rate of pay for their overtime work; instead, they were compensated for overtime work at their normal rate plus $1. (*Id.* ¶¶ 18-20, 22-23.) Plaintiffs **[*3]** also allege that Global made unlawful

---

[1] For the purposes of deciding a Rule 12(b)(6) motion, a district court must accept the allegations of the complaint as true and draw all permissible inferences in the plaintiff's favor. *See, e.g., Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

deductions from their wages. (*Id.* ¶¶ 26-33.) For example, Plaintiffs would be assessed a fine if they did not arrive 15 minutes early for their shifts. (*Id.* ¶ 26.) They were also subject to discipline and monetary fines for more than 40 separate infractions, such as failing to tuck in their shirts, leaving equipment at home or at the office, and failing to call the office when arriving at a job location. (*Id.* ¶ 27.)

The initial complaint in this lawsuit named only Global, DeNigris, Grillo, and Parone-DeNigris as defendants. Plaintiffs filed the case on June 18, 2014 and were terminated shortly thereafter. (*Id.* ¶ 17) They subsequently amended their complaint on July 25, 2014 to add a claim for retaliation. Plaintiffs and the originally-named defendants discussed settlement in November 2014, but no agreement was reached. (*Id.* ¶ 34.) The next month, Car Parking was registered with the Illinois Secretary of State as a limited liability corporation. (*Id.*) Rincon, who had been an office manager and parking lot attendant for Global, became the registered agent and managing member of Car Parking. (*Id.* ¶¶ 35-36.)

Car Parking took over Global's business, including **[*4]** using the same signs (with the new company name covering up the old), employing the same individuals, and utilizing the same equipment, labor management, and office staff. (*Id.* ¶¶ 37-39, 44.) As alleged by Plaintiffs, Global and Car Parking "are a single employer and/or Car Parking is Global's alter-ego" and Car Parking is Global's "successor." (*Id.* ¶¶ 40, 44.) Plaintiffs further claim that Global is "no longer operating or is in the process of ceasing its business" and that Car Parking currently provides services at commercial parking lots where Global had an established relationship. (*Id.* ¶ 43.)

On January 21, 2015, Plaintiffs were granted leave to amend their complaint a second time to add Car Parking and Rincon as defendants. The SAC includes five counts: claims for violation of the FLSA and the IMWL for failure to pay overtime wages, a claim for violation of the IWPCA based on the allegedly unlawful deductions, a claim under the IWPCA for failure to pay earned wages, bonuses, and commissions, and a claim under all of the aforementioned statutes alleging that Plaintiffs were retaliated against for filing this lawsuit.[2] Global, DeNigris, Grillo, and Parone-DeNigris answered the SAC. **[*5]** Car Parking, however, has moved to dismiss the claims against it. The Motion challenges only

whether Car Parking is properly named as a defendant in this matter as a purported alter ego or successor of Global or because it is a single employer with Global.

## DISCUSSION

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). While a complaint need not include detailed factual allegations, there "must be enough to raise a right to relief above the speculative level." *Id.* at 555. A plaintiff must "'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* In addition, "although the complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *Id.*

Here, Car Parking argues that it is not properly named as a defendant in this **[*6]** matter because it cannot be held liable for the acts of which Plaintiffs complain. Specifically, it contends that the factual allegations in the SAC do not show that Car Parking is an alter-ego or successor corporation of Global; nor do they show that Car Parking and Global constitute a single employer.[3] Instead, according to Car Parking, Plaintiffs misconstrue and misrepresent the facts regarding its creation in order "to impose liability on an innocent and separate

---

[2] All but the retaliation claim in Count V are putative class claims.

---

[3] Car Parking attacked Plaintiffs' alter-ego theory of liability in its opening brief without mentioning the two other theories of liability asserted against it—namely, that Car Parking is a successor corporation of Global and that Car Parking and Global constitute a single employer. After Plaintiffs raised Car Parking's failure to challenge the successor and single employer theories in their response, Car Parking argued for the first time in its reply that Plaintiffs also has failed to state claims under those theories as well. By waiting until its reply to challenge successor and single employer liability, Car Parking has waived those arguments. *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012). Nonetheless, the Court will **[*7]** proceed to consider the merits of the motion to dismiss the successor and single employer claims because it is clear that Plaintiffs have successfully pleaded those claims.

company." (Car Parking Reply at 1, Dkt. No. 66.)

In support of the Motion, Car Parking has submitted an affidavit from Rincon. (Car Parking Mot., Ex. A, Dkt. No. 60-1.) The purpose of the affidavit is to dispute the factual allegations of the SAC. "Rule 12(b) requires that if the district court wishes to consider material outside the pleadings in ruling on a motion to dismiss, it must treat the motion as one for summary judgment and provide each party notice and an opportunity to submit affidavits or other additional forms of proof." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 479 (7th Cir. 2002). In its reply brief, Car Parking requests that the Court consider Rincon's affidavit and treat its Motion as one for summary judgment. The Court declines to do so.

Converting the Motion from a Rule 12(b)(6) motion to dismiss to a Rule 56 motion for summary judgment makes little sense under the circumstances and would prejudice Plaintiffs, who have not yet had the opportunity to depose Rincon or otherwise to develop the factual record necessary to challenge the assertions in his affidavit. At this point, there is no reason for the Court to believe that it has all [*8] of the probative evidence regarding Car Parking's liability before it. *Cf. Santana v. Cook Cnty. Bd. of Review*, 679 F.3d 614, 619-20 (7th Cir. 2012) (finding that it would not be error for the district court to convert the defendants' motion to one seeking partial summary judgment under Rule 56 where the parties had ample notice and time to respond, and "the district court considered everything that the parties claimed to be probative of the scope of the ban"). This is particularly true given that the material Car Parking asks this Court to consider consists of an affidavit from its own managing member who is also named individually as a defendant in this case. Car Parking's request that the Court accept Rincon's untested affidavit testimony turns the Rule 12(b)(6) standard on its head; rather than accepting Plaintiffs' allegations as true, Car Parking asks this Court to accept Car Parking's own version of the facts as true. Thus, the Court excludes Rincon's affidavit and will not consider it in deciding the Motion.

Plaintiffs assert three theories of liability against Car Parking: alter-ego, successor, and single employer. First, under Illinois law, "a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter [*9] ego or business conduit of another person or entity." *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 778 N.E.2d 291, 294-95, 268 Ill. Dec. 305 (Ill. App. Ct. 2002) (internal

citations omitted). Such alter ego liability requires that two criteria be satisfied: "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751-52 (7th Cir. 2012) (internal quotation marks omitted). Similarly, "[s]ingle employer status exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.' Factors which establish a formal relationship between the two employers, such as common ownership or common management, are relevant to determine whether two seemingly independent businesses are really one enterprise." *N.L.R.B. v. W. Temp. Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir. 1987) (internal citations and quotation omitted). Finally, successor entities can be held liable for the actions of their predecessors in certain situations, including "where (1) there is an express or implied assumption of liability; (2) the transaction amounts to a consolidation, merger, or similar restructuring [*10] of the two corporations; (3) the purchasing corporation is a mere continuation of the seller; and (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325-26 (7th Cir. 1990) (internal quotation omitted).

In the SAC, Plaintiffs have alleged facts sufficient to support all three theories of liability against Car Parking. For example, the SAC alleges that: Rincon, managing member of Car Parking, was also a managerial employee of Global; employees who formerly worked for Global continued to work in identical positions for Car Parking after Car Parking was formed; and Car Parking performs the same work as Global and effectively took over Global's business when it was formed in December 2014. (Compl. ¶¶ 11, 12, 38, 39, Dkt. No. 47.) Plaintiffs clearly intend to suggest that Global and the individual defendants formed Car Parking after the unsuccessful settlement discussions in November 2014 in an attempt to protect their assets in case they are found liable for Plaintiffs claims. Considering only the pleadings, in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently pleaded claims against Car Parking under [*11] each of the three theories they assert.

For these reasons, Plaintiffs have sufficiently stated

2015 U.S. Dist. LEXIS 93782, *11

claims against Car Parking and therefore the Motion is denied.

**CONCLUSION**

For the foregoing reasons, Car Parking's motion to dismiss the Second Amended Complaint (Dkt. No. 60) is denied.

Dated: July 20, 2015

/s/ Andrea R. Wood

Andrea R. Wood

United States District Judge

---

End of Document

# Lincoln Nat'l Life Ins. Co. v. Nicklau, Inc.

United States District Court for the Northern District of Illinois, Eastern Division

May 17, 2000, Decided ; May 18, 2000, Docketed

No. 98 C 2453

**Reporter**
2000 U.S. Dist. LEXIS 6936 *; 2000 WL 656683

LINCOLN NATIONAL LIFE INSURANCE COMPANY, Plaintiff, v. NICKLAU, INC., an Illinois Corporation, d/b/a/ "PASTEUR," DAN NYUGEN, and TUAN NYUGEN, Defendants.

**Disposition:** **[*1]** Judgment entered in favor of plaintiff Lincoln National Life Insurance Company and against Defendants Nicklau, Inc., d/b/a Pasteur, Dan Nguyen and Tuan Nguyen.

**Counsel:** For LINCOLN NATIONAL LIFE INSURANCE COMPANY, THE, plaintiff: Donald Alan Murday, Sean Patrick MacCarthy, Peterson & Ross, Chicago, IL.

For LINCOLN NATIONAL LIFE INSURANCE COMPANY, THE, plaintiff: R. Lindsay Wilson, II, Sullivan & Worcester, LLP, Boston, MA.

For NICKLAU INC, DAN NGUYEN, TUAN NGUYEN, defendants: Robert H Itzkow, Robert H. Itzkow and Associates, Chicago, IL.

For NICKLAU INC, DAN NGUYEN, TUAN NGUYEN, defendants: Paul A. Caghan, Paul Caghan, P.C., Chicago, IL.

**Judges:** David H. Coar, United States District Judge.

**Opinion by:** David H. Coar

# Opinion

### *MEMORANDUM OPINION AND ORDER*

Lincoln National Life Insurance Company ("Lincoln") filed this action against Nicklau, Inc., d/b/a "Pasteur," Dan Nguyen, and Tuan Nguyen, (collectively, "Defendants"). Seeking to collect on an outstanding state court judgment, Lincoln proceeded against Defendants on a theory of successor liability (Count I), fraudulent transfer, intentional and constructive fraud (Counts II and III, respectively), and breach of fiduciary duty **[*2]** against Dan and Tuan Nguyen (Counts IV and V, respectively). A bench trial was held on May 15, 2000. The following findings of fact and conclusion of law are entered pursuant to Federal Rule of Civil Procedure 52(a).

### I. Factual Findings

Brothers Dan and Tuan Nguyen co-owned a Vietnamese restaurant named Pasteur, located at 4759 N. Sheridan Road in Chicago ("Pasteur-Sheridan"). The restaurant was incorporated in Illinois as Pasteur-Restaurant, Inc., in 1985. In June 1995, a fire destroyed Pasteur-Sheridan. The Illinois Secretary of State's office involuntarily dissolved Pasteur-Sheridan in May 1996. In July 1992, Dan and Tuan Nguyen opened a second Vietnamese restaurant, again named Pasteur, at 45 E. Chicago Avenue in Chicago ("Pasteur-Chicago"). That restaurant was incorporated in Illinois as Pasteur Cafe, Inc.

Kim Nguyen, Dan's wife, undertook a significant role at both restaurants. She worked at the Pasteur restaurants from their inception in 1985 until their demise in 1996. During that period, she did not hold any other employment. Kim Nguyen maintained the books, paid bills, waitressed, and cooked at Pasteur-Sheridan and Pasteur-Chicago (together, "old Pasteurs"). Kim **[*3]**

signed a legal document renewing Pasteur-Sheridan's liquor and food license. To enable Pasteur-Sheridan to participate in the Taste of Chicago festival, Kim Nguyen, holding herself out as an officer, signed a document for the City of Chicago. When Dan and Tuan traveled, Kim was in charge of the two restaurants. At trial, Kim Nguyen indicated that the experience she brought to the old Pasteurs was "critical." Dan Nguyen agreed, stating that his wife was a "very important person in running" the old Pasteurs.

In February 1996, Lincoln, an Indiana corporation that owned the property on which Pasteur-Chicago was located, filed a Forcible Entry and Detainer action against Pasteur-Sheridan in state court. Lincoln sought to recover rent damages and to repossess the space occupied by Pasteur-Chicago. Subsequently, Pasteur-Chicago was also named a co-defendant in that suit. On January 31, 1997, the state court granted Lincoln's motion for summary judgment on the Forcible Entry and Detainer action. Pursuant to the state court judgment, Pasteur-Sheridan was ordered to pay Lincoln $ 89,926.36 in rent damages and $ 20,000 in attorney's fees.

On May 12 or 13, 1997, during the pendency of the summary [*4] judgment motion before the state court, Kim Nguyen incorporated a restaurant in Illinois as Nicklau, Inc., d/b/a Pasteur. This Vietnamese restaurant is located at 5525 N. Broadway in Chicago ("Pasteur-Broadway"). Kim Nguyen is the sole director and shareholder of this restaurant. She also serves as the President and Secretary of Pasteur-Broadway. In Defendants' Answers to Interrogatories, signed by Dan and Tuan Nguyen, Kim, Dan, Tuan and Quynh Nguyen were listed as officers of Nicklau Inc. d/b/a/ Pasteur. [1] Dan Nguyen's relatives, including his parents, his sister, and two brothers loaned money to Kim and Dan to help finance the purchase of the property at 5525 N. Broadway. No money from the old Pasteurs was used toward the purchase or operation of Pasteur-Broadway.

Since the restaurant's opening in May 1997, Dan Nguyen has worked 50-60 hours a week at Pasteur - Broadway. Dan, [*5] who was responsible for maintaining the books at the old Pasteurs, continues to maintain the books for Pasteur-Broadway. He also cooks, pays the bills, and owns the building at 5525 N. Broadway with his wife. Dan Nguyen earns approximately $ 40,000 a year for his work at the

restaurant.

Tuan Nguyen has worked an average of 50 hours per week at Pasteur-Broadway since 1997. He manages the cash register and oversees the cleaning crew. On many occasions, Tuan has issued personal checks, for which he is later reimbursed, to pay for Pasteur-Broadway's financial obligations. On one such occasion, Tuan Nguyen paid over $ 1,000 out of his personal account for Pasteur-Broadway's liquor license. In 1997, he signed a Taste of Chicago document stating that he was Secretary of Pasteur-Broadway. Tuan Nguyen, who earns $ 45,000 a year at Pasteur-Broadway, is the highest paid employee among Pasteur-Broadway's 26 employees, including Kim Nguyen. Kim Nguyen testified at trial that Tuan Nguyen, "to a certain extent," brings valuable restaurant experience to Pasteur-Broadway. Neither Dan nor Tuan have held any employment other than working at Pasteur-Broadway since its opening.

Hieu Tran, who cooked at [*6] Pasteur-Chicago, is one of the primary cooks at Pasteur-Broadway. Dan Nyugen's niece, Quynh Nguyen, bartends at Pasteur-Broadway. Some of the recipes used at the old Pasteurs are also used at Pasteur-Broadway. Customer from the old Pasteurs comprise about 10% of Pasteur-Broadway's customer base. Kim Nguyen stated that some customers frequent Pasteur-Broadway because of the goodwill associated with the old Pasteurs. In fact, customers at the new restaurant have commented that it's "good to be back."

Kim and Tuan Nguyen testified that the name Pasteur enjoyed a reputation for excellent Vietnamese food in Chicago. Kim also agreed that the name Pasteur was good for business. When Kim Nyugen spoke with Phil Vettel, a restaurant critic for the Chicago Tribune, he informed him that it was important to "keep the [Pasteur] name alive." At trial, she testified that the name was recognized in Chicago. For several years, the old Pasteurs were a participating vendor at the Taste of Chicago festival, and after 1997, Pasteur-Broadway sent employees, donned in shirts from the old Pasteurs, to operate at the festival.

Time and again, Pasteur-Broadway has been associated with the old Pasteurs. [*7] Customers have assumed that Tuan Nguyen, who owned the old Pasteurs, also owns Pasteur-Broadway. In addition, the media has assumed that Pasteur-Broadway is related to the old Pasteurs, and Kim Nguyen has not informed them otherwise. An article in Chicago Magazine noted that Pasteur-Broadway "rose from its ashes like a

---

[1] When asked about this particular answer at trial, Tuan Nguyen testified that he had not reviewed it before signing the interrogatory.

Phoenix." A Chicago Sun Times article also connects the old Pasteurs with the new, stating that Pasteur-Broadway has "finally found a permanent home."

There are differences between the old Pasteurs and Pasteur-Broadway. Pasteur-Broadway occupies a much larger space, and according to Kim Nguyen, it embraces a new "concept." Kim Nguyen has made the food lighter and has added a wider range of entrees than were served at the old Pasteurs. The average customer spent $ 10-15 at the old Pasteurs, while at Pasteur-Broadway, the average meal costs anywhere from $ 30-75. Although the old Pasteurs did not serve alcohol, Pasteur-Broadway has a full service bar. Pasteur-Broadway grossed a million dollars in 1998, and 2 million in 1999. Kim Nguyen testified that the ongoing value of the business today, apart from the real estate and the value of the property, was $ 300,000 to $ 400,000.

 **[*8]** After the demise of the old Pasteurs, all of the remaining assets--namely, 15-20 old chairs and tables, a kitchen hood, a burner, and some utensils were transferred to Pasteur-Broadway. These assets, which are worth no more than $ 2,000, are now kept in a garage at 5525 N. Broadway.

Lincoln seeks relief under Illinois law. This Court retains jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

## II. Conclusions of Law

As a general rule, a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation. *Vernon v. Schuster*, 179 Ill. 2d 338, 344-45, 688 N.E.2d 1172, 1175, 228 Ill. Dec. 195, 198 (Ill. 1997). To "offset the potentially harsh impact of the rule, however, the law has also developed methods to protect the rights of corporate creditors after dissolution." *Id.* (quoting *Tucker v. Paxson Machine Co.*, 645 F.2d 620, 623 (8th Cir. 1981)). The following four exceptions to the general rule provide for successor liability: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation **[*9]** or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligation. *Id.*

In the usual case, successor liability has been applied where there has been a sale of assets. Here, there did

not exist a "sale" in the sense that money did not change hands in exchange for a good. Yet the fact that the old Pasteurs' name and goodwill were transferred to Pasteur-Broadway without any consideration does not preclude Pasteur-Broadway's liability. Kim, Dan and Tuan Nuygens' testimonies firmly established that the Pasteur name and goodwill were of significant value. Even if the name and goodwill were not sold in the conventional sense, these valuable intangibles were transferred to Pasteur-Broadway. *See, e.g., Frank Ix & Sons, Inc. v. Phillipp Indus., Inc.*, 1997 U.S. Dist. LEXIS 12889, No. 95 C. 3195, 1997 WL 534509, at *6 (N.D. Ill. Aug. 25, 1997) (finding a conveyance where property transferred for inadequate consideration).

Defendants point out that the name Pasteur was never copyrighted, and that another Vietnamese restaurant in Moline, Illinois, **[*10]** as well as a handful of others across the country, also use that name. The existence of other restaurants named Pasteur, none of which are located in the City of Chicago, does not undermine the value of the name and the goodwill built up by the old Pasteurs. Kim Nguyen insisted on keeping the name "alive" precisely because of the value of these assets. Clearly, Pasteur-Broadway benefitted from the goodwill associated with the name Pasteur, whether it be through the favorable restaurant reviews connecting the restaurants, or the customer assumption of identity between the old Pasteurs and Pasteur-Broadway. In fact, when the old Pasteurs were unable to participate in the Taste of Chicago festival, Pasteur-Broadway appropriated that same vending opportunity. Pasteur-Broadway, having profited from the transfer of the old Pasteurs' most precious asset, is subject to successor liability.

### A. Continuation Exception

The "continuation exception," which is the third exception to successor nonliability outlined above, applies when the purchasing corporation is "merely a continuation or reincarnation of the selling corporation." *Vernon*, 179 Ill. 2d at 346, 688 N.E.2d at 1176 **[*11]** (citing *Grand Lab., Inc. v. Midcon Labs of Iowa, Inc.*, 32 F.3d 1277, 1282 (8th Cir. 1994)). Where the purchasing corporation "maintains the same or similar management and ownership, but merely 'wears different clothes,'" liability will be imposed upon the successor corporation. *Id.* (citing *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985)).

Once the state court suit was filed, Nicklau, Inc., d/b/a

Pasteur, was incorporated, with Kim Nguyen as the sole officer and shareholder of Pasteur-Broadway. This ruse was a transparent attempt to escape the liabilities about to be incurred by the old Pasteurs. The continuation exception to successor nonliability, however, was designed to protect creditors in these situations. The Illinois Supreme Court observed:

To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.

179 Ill. 2d at 346, 688 N.E.2d at 1176 (quoting *Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282, 297, 562 A.2d 1286, 1293 (Md. 1989)). **[*12]**

The relationship between the old Pasteurs and Pasteur-Broadway satisfies the test for the continuation exception. One corporation is deemed to be a continuation of another where there exists a common identity of officers, directors, and/or shareholders. 179 Ill. 2d at 347, 688 N.E.2d at 1176. Dan and Tuan Nyugen served as the sole shareholders and officers of the old Pasteurs, while Kim Nguyen served as the sole shareholder, officer and director of Pasteur-Broadway. Although on its face, this fact alone would serve to defeat the imposition of successor liability, a closer look at the facts compels the opposition conclusion.

Regardless of whether they officially served as owners, directors, or officers, Dan, Tuan and Kim Nguyen were substantially interwined in the operation of all three Pasteur restaurants. Kim was heavily involved in the operation and management of the old Pasteurs. When Dan and Tuan traveled, Kim was left in charge of the two restaurants. She also held herself out as an officer, as evidenced by two documents that she signed as a "Secretary" of Pasteur-Sheridan. *See H & H Press, Inc. v. Drew Axelrod*, 265 Ill. App. 3d 670, 679, 638 N.E.2d 333, 339, 202 Ill. Dec. 687 (Ill. App. Ct. 1994) **[*13]** (defendant deemed de facto officer where he held himself out as one). At trial, Kim Nguyen conceded that she took on a "critical" role, and Dan Nguyen affirmed her, admitting that his wife was a "very important person in running" the old Pasteurs.

Similarly, Dan and Tuan Nguyen, although not official owners of Pasteur-Broadway, continued to be significantly involved. Dan's relatives loaned the money

to Dan and Kim Nguyen to purchase the property at 5525 N. Broadway. Dan and Tuan devoted their days to working full time at Pasteur-Broadway. At $ 45,000 a year, Tuan Nyugen is the highest paid employee among Pasteur-Broadway's 26 employees. On many occasions, Tuan Nguyen issued personal checks, for which he was later reimbursed, to pay for Pasteur-Broadway's financial obligations. On one such occasion, Tuan Nguyen paid over $ 1,000 out of his personal account for Pasteur-Broadway's liquor license. In 1997, Tuan signed a Taste of Chicago document stating that he was Secretary of Pasteur-Broadway. In their answer to Plaintiff's interrogatories, Defendants identified Kim, Dan and Tuan Nguyen as officers of Pasteur-Broadway. Kim, Dan and Tuan's managerial involvement in the three Pasteur **[*14]** restaurants, not to mention their holding themselves out as officers, establishes a continuation in ownership.

*Park v. Townson & Alexander, Inc.*, 287 Ill. App. 3d 772, 774, 679 N.E.2d 107, 109, 223 Ill. Dec. 163 (Ill. App. Ct. 1997) is illustrative of the way Illinois courts have analyzed similar facts. In *Park*, the state court determined that an identity of ownership existed where the husband and his business partner were sole shareholders of a predecessor corporation, while the wife was the sole shareholder of the successor corporation. 287 Ill. App. 3d at 775, 679 N.E.2d at 110. Although the wife was designated as sole shareholder of successor company, the husband continued to make major decisions for the successor corporation. *Id.* In addition, tax documents, albeit claimed as erroneous by defendants, showed that the husband was president of successor corporation. *Id.* The court also noted that "while the spousal relationship between the owners of the corporations does not in itself establish a continuity of shareholders, it is certainly a factor which can be considered." *Id. See also Steel Co. v. Morgan Marshall Indus.*, 278 Ill. App. 3d 241, 248-49, 662 N.E.2d 595, 600, 214 Ill. Dec. 1029 (Ill. App. Ct. 1996) **[*15]** (continuity found where husband was sole shareholder of predecessor company and wife was 80% shareholder of successor company).

Not only was there an identity of ownership between the old Pasteurs and Pasteur-Broadway, but the business operation of the three restaurants evidenced a substantial continuity. Pasteur-Broadway is located only a couple of miles away from Pasteur-Sheridan. The old Pasteurs' name and goodwill were carried forward to Pasteur-Broadway. The restaurants continued to serve Vietnamese food. *See Kennedy v. Four Boys Labor Serv. Inc.*, 279 Ill. App. 3d 361, 368, 664 N.E.2d 1088,

1092, 216 Ill. Dec. 160 (Ill. App. Ct. 1996) (continuity established where successor operated the same business, used the same name). Hieu Tran, the cook at the old Pasteurs, was transferred to the new restaurant. The same recipes were used. Some of the same customers who used to frequent the old Pasteurs now patronize Pasteur-Broadway. Kim Nguyen insists that the "concept" and "ambiance" of the old and new restaurants differ, and that she has added lighter fare to a more expansive menu, but those are distinctions without a meaningful difference. The point is that Pasteur-Broadway, **[*16]** even if it has evolved into a more sophisticated version, is a mere continuation of the old Pasteurs. As such, it is liable for the judgment entered against the old Pasteurs.

### B. Fraudulent Transfer

Not only does the continuation exception serve as a basis for imposing liability upon Pasteur-Broadway, but the Uniform Fraudulent Transfer Act ("Act") provides alternative grounds for successor liability. The Act states that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation as incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonable equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed he would incur, debts beyond his ability to pay as they **[*17]** became due.

740 ILCS 160/5(a).

Pursuant to this provision, Illinois courts have categorized fraudulent conveyance cases into the categories of "fraud in law" and "fraud in fact." Fraud in law presumes a fraudulent intent when a voluntary transfer, made for no or inadequate consideration, directly impairs the rights of creditors. *Frank Ix & Sons, Inc. v. Phillipp Indus., Inc.*, 1997 U.S. Dist. LEXIS 12889, No. 95 C 3195, 1997 WL 534509, at *6 (N.D. Ill. Aug. 25, 1997) (citing *Casey Nat'l Bank v. Roan*, 282 Ill.

App. 3d 55, 668 N.E.2d 608, 611, 218 Ill. Dec. 124 (Ill. App. Ct. 1996)). In the instant case, the name and goodwill of the old Pasteurs were transferred to Pasteur-Broadway for no consideration at a time when Defendants were anticipating a significant judgment against them in state court. By 1997, the old Pasteurs were left with $ 0.24 in their bank account, and could not afford to pay off their debt.

Not only is this court satisfied that fraud-in-law applies to this case, but the numerous "badges of fraud" present in this case give rise to a presumption of fraud-in-fact, which Defendants have failed to rebut. *Frank Ix*, 1997 U.S. Dist. LEXIS 12889, 1997 WL 534509, at *8 (citing **[*18]** *Kaibab Indus., Inc. v. Family Ready Homes, Inc.*, 80 Ill. App. 3d 782, 786, 14 Ill. Dec. 334, 372 N.E.2d 139 (Ill. App. Ct. 1978)). The Act sets forth eleven indicia of fraud, *see* 740 ILCS 160/5(b)(1)-(11), and this case qualifies for at least seven of those factors. First, the Pasteur name and goodwill were transferred to an insider; that is, the wife and sister-in-law of the owners of predecessor restaurants. Second, Dan and Tuan Nguyen, the debtors, retained possession and control of the transferred property by exercising significant managerial control at Pasteur-Broadway. Third, before the transfer was made, the Dan and Tuan Nguyen had been sued by Lincoln. Fourth, all of old Pasteur's remaining assets-- from the valuable name and goodwill to the useless old chairs, tables, and kitchenware-- were transferred to Pasteur-Broadway. Fifth, no consideration was received for these assets. Sixth, the old Pasteurs had been insolvent. Finally, the transfer occurred shortly before a substantial debt was incurred. The overwhelming evidence demonstrates that a fraudulent transfer occurred, and Pasteur-Broadway will be held liable for the judgment debt of the old Pasteurs.

**[*19]** Lincoln also advances claims against Dan and Than Nguyen for breach of fiduciary duty, but those counts need not be addressed in light of this court's disposition of the successor liability claim.

### C. Amount of Liability

As the successor of the old Pasteurs, Pasteur-Broadway is directed to pay for the state court judgment entered against Pasteur-Sheridan in the amount of $ 89,926.36 for rent damages and $ 20,000 for attorneys' fees incurred in the state court action. In addition, Pasteur-Broadway is ordered to pay for attorneys' fees and costs incurred in the instant action. The lease

agreement between Pasteur-Sheridan and their original landlord, Centrum Properties, purports to bind the parties as well as their successors. P 27.9 In addition, the lease provides that:

The Tenant shall pay upon demand all Landlord's costs, charges and expenses including the fees and out-

of-pocket expenses of counsel, agents, and others retained by landlord incurred in enforcing the Tenant's obligations hereunder or incurred by the Landlord in any litigation, negotiation, or transaction in which the Tenant causes the Landlord without Landlord's fault to become involved or concerned. **[*20]**

P 20.1(d). This federal suit was incurred in order to enforce Defendants' obligations under the lease, and fees and costs will be awarded to Lincoln pursuant to the lease agreement.

## III. Conclusion

Pursuant to the foregoing findings of fact and conclusions of law, the court enters judgment in favor of plaintiff, Lincoln National Life Insurance Company, and against Defendants Nicklau, Inc., d/b/a Pasteur, Dan Nguyen, and Tuan Nguyen. Nicklau, Inc., d/b/a/ Pasteur is liable for the state court judgment entered against Pasteur-Sheridan in the amount of $ 89,926.36 for rent damages and $ 20,000 for attorneys' fees incurred in the state court action. The parties are ordered to proceed with a motion for fees pertaining to the federal action against Defendants in accordance with Federal Rule of Civil Procedure 54(d) and Local Rule LR 54.3. *See* Local Rule LR 54.3(d)-(g) (requiring parties to make a good faith attempt to agree on the amount of fees due and outlining additional procedures).

**Enter:**

**David H. Coar**

**United States District Judge**

**Dated:** MAY 17 2000

## JUDGMENT IN A CIVIL CASE

Decision by Court. This action came to trial or **[*21]** hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff, Lincoln National Life Insurance Company, and against Defendants Nicklau, Inc., d/b/a Pasteur, Dan Nguyen, and Tuan Nguyen. Nicklau, Inc., d./b/a/ Pasteur is liable for the state court judgment entered against Pasteur-Sheridan in the amount of $ 89,926.36 for rent damages and $ 20,000 for attorneys' fees incurred in the state court action. The parties are ordered to proceed with a motion for fees pertaining to the federal action against Defendants in accordance with Federal Rule of Civil Procedure 54(d) and Local Rule LR 54.3. *See* Local Rule LR 54.3(d)-(g) (requiring parties to make a good faith attempt to agree on the amount of fees due and outlining additional procedures).

Date: 5/17/2000

**End of Document**