**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

STANLEY BOIM, INDIVIDUALLY AND AS ) 
ADMINISTRATOR OF THE ESTATE OF ) 
DAVID BOIM, DECEASED, AND JOYCE ) 
BOIM, )
       )
      Plaintiffs, )
       )    Civil No. 17-cv-03591
   v. )
       )    **Hon. Sharon Johnson Coleman**
AMERICAN MUSLIMS FOR PALESTINE; )
AMERICANS FOR JUSTICE IN PALESTINE )
EDUCATIONAL FOUNDATION; AND )
RAFEEQ JABER, )
       )
      Defendants. )
       )

**PLAINTIFFS' RESPONSE TO THE MOTION TO DISMISS UNDER RULE 12(b)(1)**

March 13, 2020

Respectfully submitted,

*/s/ Daniel I. Schlessinger*
Daniel I. Schlessinger
Seth Corthell
JASZCZUK, PC
311 South Wacker Drive
Chicago, IL 60606
(312) 442-0366

*Attorneys for Stanley Boim, Individually and as the
Administrator of the Estate of David Boim, Deceased,
and Joyce Boim*

Of Counsel
Nathan Lewin (*pro hac vice*)
Alyza D. Lewin (*pro hac vice*)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, D.C. 20006
(202 828-1000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION ..............................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

I.   IAP/AMS and HLF were formed and operated as the propaganda and fundraising arm of Hamas in the United States.....................................................................................3

II.  IAP/AMS and HLF were found to be financial conduits to Hamas. ...............................4

III. IAP/AMS surrogates formed AMP immediately after IAP/AMS was shuttered due to the *Boim* judgment. ...............................................................................................................5

IV.  AMP/AJP is managed, operated, and essentially owned by the same core group that led IAP/AMS to fill the void left by IAP/AMS. ..................................................................7

A.   The AMP inaugural convention marks the public resurrection of IAP/AMS.................7

B.   AMP/AJP flouts corporate formalities, just like its alter ego IAP/AMS. .....................8

LEGAL ARGUMENT: DEFENDANTS' 12(B)(1) MOTION FAILS BECAUSE THE FAC PROPERLY ALLEGES SUBJECT MATTER JURISDICTION .............................................................................10

I.   The Alter Ego Claims against AMP/AJP Provide an Independent Basis for Subject Matter Jurisdiction................................................................................................................11

A.   As this Court has recognized, federal courts have subject matter jurisdiction over claims to enforce ATA judgments against alter egos. ................................................................11

B.   Subject matter jurisdiction over the alter ego claims is based on conduct in 1996 and prior......12

C.   The FAC provides additional, detailed allegations to support our alter ego claims. ...................14

II.  The remaining claims survive in this Court based on supplemental jurisdiction.........................27

III. Our FAC alleges facts to support successor liability........................................................28

IV.  The alter ego claims provide ample basis for subject matter jurisdiction over Jaber, who is also appropriately sued under the other counts of the FAC................................................29

TABLE OF AUTHORITIES

**Statutes**

18 U.S.C. § 2333(d)(2) .................................................................................................................4

18 U.S.C. § 2339A(b)(1) ............................................................................................................22

28 U.S.C. § 1367(a). ...................................................................................................................27

**Federal Cases**

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031 (7th Cir. 2000) ..1

*Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031 .............. 11, 12

*Boim v. Holy Land Foundation*, 549 F.3d 685 (7th Cir. 2008) .......................................................5

*Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594 (7th Cir. 2005) ......................................31

*Cent. States, Se. and Sw. Areas Pension Fund v. Central Transp., Inc.*, 85 F.3d 1282 (7th Cir. 1996) 1, 12, 26, 27

*Central States, Southeast and Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593 (7th Cir. 1990) ..............14

*Chao v. Int'l Bhd. of Indus. Workers Health & Welfare Fund*, 97 F. Supp. 3d 268 (E.D.N.Y. 2015) ..........31

*DCK/TTEC, LLC V. Postel*, No. 14-1739, 2015 U.S. Dist. LEXIS 63279 (W.D. Pa. May 14, 2015)16, 27

*Emanuel v. Rolling in the Dough, Inc.*, 10-cv-2270, 2010 U.S. Dist. LEXIS 117864 (N.D. Ill. Nov. 2, 2010) ...............................................................................................................................30

*Esmark, Inc. v. NLRB*, 887 F.2d 739 (7th Cir. 1989) ...............................................................16

*Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288 (D.D.C. 2012)31

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ...........................29

*Hankinson v. King*, 117 F. Supp. 3d 1068 (D. Minn. 2015).........................................................31

*In re 650 Fifth Ave. & Related Props.*, 881 F. Supp. 2d 533 (S.D.N.Y. 2012)...........................................28

*Int'l Union of Operating Eng'rs, Local 150 AFLCIO v. Centor Contractors, Inc.*, 831 F.2d 1309 (7th Cir. 1987) .....................................................................................................................26

*International Union of Operating Engineers v. Centor Contractors, Inc.*, 831 F.2d 1309 (7th Cir. 1987)............14

*International Union of Operating Engineers v. Rabine*161 F.3d 427 (7th Cir. 1998).........................................15

*Kaeser & Blair, Inc. v. Willens*, 845 F. Supp. 1228 (N.D. Ill. 1993)............................................................31

*Laborers' Pension Fund v. Innovation Landscape, Inc.*, 2019 WL 6699190 (N.D. Ill. December 9, 2019)...14

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015) ..................................................22

*McCleskey v. CWG Plastering, LLC*, 897 F.3d 899 (7th Cir. 2018) ..............................................14

*McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014) ......................................30

*Sanchez v. Global Parking Mgmt., Inc.*, No. 14 C 4611, 2015 WL 4429024 (N.D. Ill. Jul. 20, 2015). 14, 28

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................. 22

*Technic Eng'g, Ltd. V. Basic Envirotech, Inc.*, 53 F. Supp. 2d 1007 (N.D. Ill. 1999) ..................................... 33

*Trustees of the Pension, A Welfare and Vacation Fringe Benefit Funds v. Favia Electric Co.* 995 F.2d 785 (7th Cir. 1993) ........................................................................................................................... 15

*United States v. Salah*, 03-cr-978 Dkt. 943 (N.D. IL) ................................................................. 20

**State Cases**

*Peetoom v. Swanson*, 778 N.E. 2d 291 (Ill. App. Ct. 2002) ........................................................... 30

*Terminal Freezers, Inc. v. Roberts Frozen Foods, Inc.*, 41 Ill. App. 3d 981 (Ill. Ct. App. 1976) ................... 28

**Supreme Court Cases**

*Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 45 (1987) .......................................... 29

*Peacock v. Thomas*, 516 U.S. 349 (1996) ........................................................................................... 1

## INTRODUCTION

The Court has determined that it need address only one question to decide this motion: Did Plaintiffs, for jurisdictional purposes, sufficiently allege an alter ego claim? (Dkt. 176 at p. 2) Defendants' distractions regarding alternative claims such as veil piercing are not germane. If the alter ego theory is well-pled, the other claims remain on supplemental jurisdiction grounds.

The Court found in considering the original complaint that "[t]he case [was] a close one" for jurisdiction. The First Amended Complaint ("FAC"), with its dozens of additional allegations of ties between the *Boim* I Defendants and their successors, puts us well past the jurisdictional goal line. The factual framework is more than sufficient to establish that the current defendants are alter egos of the original defendants, and there can be no doubt that the Court's August 2017 Order correctly followed Seventh Circuit precedent in finding that alter ego claims provide an independent basis for subject matter jurisdiction. (Dkt. 41 at p. 6) Defendants AMP/AJP and Rafeeq Jaber ("Jaber", together with AMP/AJP, "Defendants") continue to argue here for the second time and in the face of the Court's clear guidance the very opposite. To do so they necessarily overstate the relevance of a Supreme Court case (*Peacock*)[1], misconstrue one Seventh Circuit case (*Central States*)[2], completely ignore another (*Elite Erectors*)[3], and misstate the factual basis of the claims against AMP/AJP.

The Court's most recent Order was quite clear about our burden. To establish jurisdiction we need to "show that the original defendants and their alleged alter egos have 'substantially identical management, business purpose, operation, equipment, customers, supervision and ownership.'" (Dkt. 176 at p. 2) The additional forty pages of detailed allegations in the FAC amply meet those requirements.

---

[1] *Peacock v. Thomas*, 516 U.S. 349 (1996)

[2] *Cent. States, Se. and Sw. Areas Pension Fund v. Central Transp., Inc.*, 85 F.3d 1282, 1286 (7th Cir. 1996)

[3] *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037-38 (7th Cir. 2000)

First, the individuals who manage AMP/AJP are almost exclusively veterans of the American Muslim Society ("AMS"), and AMS's original alter egos who operated under the name Islamic Association for Palestine ("IAP", together with AMS, "IAP/AMS") or the affiliated Holy Land Foundation ("HLF"). Second, AMP/AJP and IAP/AMS shared the same business purpose that resulted in liability in the original case, namely, serving as Hamas' leading public advocate while raising funds for that designated terrorist organization. Third, AMP/AJP "operat[ed]" in an office down the street from IAP's former office, created chapters in the same locations, and held conventions identical to those hosted by IAP in location, audience, speakers, and content. Fourth, AMP's "equipment" - the expertise and credibility required by a not-for profit - were taken from IAP. Fifth, Defendants' "customers" were the same public and network of Islamic organizations that engaged with IAP. Sixth, AMP is "supervised" by the same distinct, limited, self-perpetuating group of individuals who ran IAP. Seventh, these individuals "owned" both groups. Neither IAP nor AMP had members; both acted with total disregard to corporate form and identity.

The new allegations in the FAC also make clear that, from the very beginning, AMP was designed as a "disguised continuance" of IAP. AMP's "organizers" confided to each other that, although surreptitiously working together, in public they had to "distance" themselves from "well known IAP figures . . . (s)ince this is the *transition* period. . . ." Applying the Court's benchmarks, it is inescapable that the "transition" they had in mind was to create AMP as the alter ego of IAP. The appearance of two new "organizers" – an "intellectual . . . with influence on Palestine" (Bazian) and a newly-minted lawyer (Ahmad) - was nothing more than window dressing for a deeply indebted financier of international terrorism that wanted to be cleansed and stay in business. AMP cannot point to any feature that meaningfully distinguishes it from IAP.

Because the FAC alleges the alter ego components, all other jurisdictional challenges become moot. The Court can assert supplemental jurisdiction over the remaining claims, including those

2

against Jaber, because they are factually related to the valid federal alter ego claim. Defendants' arguments about why there is no independent jurisdiction over the non-alter ego claims misunderstands the basis for subject matter jurisdiction. The Court need not have *independent* jurisdiction over those claims once it is satisfied that the alter ego claim may proceed.

FACTUAL BACKGROUND

## I. IAP/AMS and HLF were formed and operated as the propaganda and fundraising arm of Hamas in the United States.

Khalid Mishal, the future head of Hamas, established IAP in Indiana in 1981. (FAC ¶28) IAP expanded over the years to become "IAP National," an umbrella organization of informal and legal entities throughout the United States including the American Muslim Society ("AMS"), based in the Chicago suburbs. (*See* FAC ¶¶ 29-32) IAP National was Hamas' primary voice and fundraising arm in the United States. (FAC ¶ 30) HLF was organized in California in 1988. (FAC ¶¶ 26-27) Referred to by its leaders as the "Treasury" or the "Fund," HLF was a direct financial conduit to Hamas institutions in Gaza and the West Bank. (*Id.*) IAP and HLF were intertwined with IAP encouraging the public to donate to HLF and giving money itself. *Boim v. Quranic Literacy Institute* (*"QLI"*), 340 F. Supp.2d 885, 910 (N.D. Ill. 2004).

IAP National was very successful. IAP claimed in 2002 that it was "the largest Muslim, Arab, and Palestinian American grassroots organization dedicated to the cause of Palestine. . . ." (FAC ¶ 40) IAP's well-attended annual conventions were the most significant national gatherings of Islamic pro-Palestinian activists. (*Id.*) IAP had a regular roster of speakers who appeared at the annual conventions, "festivals," and meetings. (*Id.*) IAP's nationally circulated Arabic-language pro-Hamas newspaper, *al Zaytouna*, connected IAP/AMS' community and supporters and was its mailing list. (*See id.*)

IAP did not collect dues or have voting members. (FAC ¶ 85) It had a distinct, limited, and identifiable group of activists with a self-perpetuating "board." (*Id.*) In 2002 experienced managers led IAP, most notably President Rafeeq Jaber, newspaper editor and chief spokesman Osama Abuirshaid, and Secretary General and Director of Operations Abdelbasset Hamayel. (FAC ¶¶ 114-128) They were IAP's highest paid employees, essential to its success. (FAC ¶ 123) This combination of assets sustained a national not-for-profit political organization occupying a visible position as the premier pro-Palestinian organization within a network of Islamic organizations in the United States. (FAC ¶ 40)

## II.  IAP/AMS and HLF were found to be financial conduits to Hamas.

In 1995, the United States officially designated Hamas as a Foreign Terrorist Organization in Executive Order 12947, a designation that remains in effect today. (FAC ¶ 21) The next year two Hamas terrorists murdered Stanley and Joyce Boim's son David in Bet El, near Jerusalem. (FAC ¶ 1) Although the murder took place thousands of miles away from the United States, civil liability was directly tied to individuals and organizations in this country who provided material support to Hamas. (*Id.*)

The Boims initiated a lawsuit in this Court in 2000 (the "*Boim* Action"), under the civil liability provisions of the federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d)(2). (FAC ¶2) Among the defendants in the *Boim* Action (the "*Boim* Defendants") were the HLF and IAP/AMS. (*Id.*)

In 2001, the Treasury officially named HLF as a terrorist organization and froze its assets. (FAC ¶58) HLF[4] had claimed to be the largest Islamic charity in North America with the stated

---

[4] HLF's demise and subsequent history is instructive here. After being effectively shuttered by the Treasury Department, a new entity, KindHearts—which employed Hamayel (Hamayel Dep. 44:19-22 (Ex. A)) and Abuirshaid (Abuirshaid Dep. 72:19-22)—filled the void HLF left behind until the Treasury Department froze KindHearts' assets because it was the progeny of HLF. Press Release, United States Department of Treasury,

benign purpose of supporting "social welfare in Palestine." (FAC ¶ 27) Treasury officials determined that HLF's actual primary purpose was to subsidize a designated terrorist organization, namely Hamas. (FAC ¶ 58) Similarly, IAP claimed that it was merely a "humanitarian organization" with the mission to "educate people about Palestine." (FAC ¶ 38) The *Boim* Action proved that this was false. In November 2004, Judge Keys granted summary judgment to the Boims, finding IAP and its alter ego AMS liable under the ATA for aiding and abetting David's murder by raising funds for and donating to HLF. *QLI*, 340 F. Supp.2d, at 90-13 (FAC ¶ 42) In December 2004, a jury found damages of $52 million that were trebled to $156 million. (*Id.*) The Seventh Circuit upheld the summary judgment against IAP. *Boim v. Holy Land Foundation*, 549 F.3d 685, 701 (7th Cir. 2008) (*en banc*) ("*Boim* III"). Neither the District Court nor the Seventh Circuit *en banc* opinion suggested that the question was even close. As a result of the *Boim* decisions, IAP could no longer pursue its pro-Hamas mission under its existing names while saddled with a massive judgment for murdering an American teenager and facing criminal exposure. (FAC ¶ 4)

### III. IAP/AMS surrogates formed AMP immediately after IAP/AMS was shuttered due to the *Boim* judgment.

Defendants contend that Munjed Ahmad, "a young attorney in Wisconsin" who wanted to establish a pro-Palestinian "educational" organization, created AMP *ex nihilo* in 2005. Serendipitously, Mr. Ahmad encountered Hatem Bazian, a University of California Berkeley faculty member, prolific author and speaker, who fully subscribed to the Hamas line of total hostility to the mere existence of the State of Israel. Dr. Bazian describes himself as being "known as an activist, as an intellectual in Palestine since (at least) 1988. . . . (with) a circle of influence on Palestine (that) is extensive." (Bazian Dep. p. 115 (Ex. B)) Bazian was a frequent speaker at IAP events and was

---

Treasury Freezes Assets of Organization Tied to Hamas (February 19, 2006), *available at* https://www.treasury.gov/press-center/press-releases/Pages/js4058.aspx. HLF is the same organization that worked closely with IAP/AMS to direct funds to Hamas. *QLI*, 340 F. Supp.2d, at 910.

closely connected to and admired by the extensive network of Islamic organizations in the United States.

IAP had necessarily gone silent, deeply in debt to the Boims. IAP's assets – its know-how, deep credibility in the Islamic pro-Palestinian community, and committed leadership – made it advantageous to surreptitiously keep it alive. (FAC ¶ 40) And that is what happened. IAP reconstituted itself, holding AMP's "first" annual convention – nearly identical in format and content to the IAP conventions – within months of the ostensible shut-down of IAP. Within a relatively short time, the IAP enterprise was up and running again under the new name AMP, operated by largely the same leadership, headquartered just down the street, serving the same functions and purpose.

Defendants' argument that Ahmad and Bazian created AMP on their own without reference to IAP is belied by their contemporaneous statements and actions, which unequivocally meet the Court's requirement to establish jurisdiction. AMP's organizers made it clear in "smoking gun" evidence that from the very beginning they intended to conceal that the "new" organization was a "disguised continuation" of IAP. In December 2005, some of AMP's early planners began communicating on a Yahoo Chat bulletin board entitled "AMP_Transition." (Ex. C) In discussing a proposed "organizational" meeting in Milwaukee, they agreed that former IAP board member and Michigan representative Sufian Nabhan should not be included (even though Nabhan had been involved in early AMP planning) "since he is well associated IAP . . . . [W]e really need to distance ourselves from any well known IAP figures . . .[s]ince this is the *transition period*. . . . " (FAC ¶¶ 67-69 (emphasis added)) Nabhan ██████████████████ worked with other "well-known" IAP leaders in AMP early on, and served as a core AMP board member for approximately ten years. (FAC ¶ 69) Nabhan and most of the other "well known" IAP leaders ultimately went on to lead AMP (FAC ¶ 78), but the so-called "organizers" expressly sought to hide its IAP connection during

the *Boim* and HLF enforcement proceedings.

The "transition" was not difficult nor did it take long to accomplish. Defendant Rafeeq Jaber testified that IAP became "defunct" in early 2005 following the December 2004 *Boim* Judgments. (FAC ¶¶ 53-54, 64) By mid- to late-2005, discussions were under way to transition a new entity, and by the end of 2005, the Yahoo "AMP_Transition" bulletin board was up and running. (FAC ¶¶ 64, 66-68) The organizational meeting of the "new" American Muslims for Palestine was held at an Muslim American Society ("MAS") event in Milwaukee in April 2006. The MAS meeting was the perfect place to organize the continuation of IAP since it was itself an IAP reunion. (FAC ¶¶ 70-71) A panel discussion at the meeting included former IAP and future AMP leader Osama Abuirshaid, future AMP President Hatem Bazian and former IAP President Rafeeq Jaber. Salah Sarsour, an IAP activist who helped organize AMP, chaired the convention. (FAC ¶ 70)

**IV. AMP/AJP is managed, operated, and essentially owned by the same core group that led IAP/AMS to fill the void left by IAP/AMS.**

**A. The AMP inaugural convention marks the public resurrection of IAP/AMS.**

In August 2006, AMP filed articles of incorporation. (FAC ¶ 72) In November 2006, AMP held its first annual convention in Rosemont, Illinois. (*Id.*) Because it was a continuation of IAP, "brand new" AMP was able to stage a major, multi-day convention with 700 attendees and numerous speakers a mere three months after it formally incorporated. (FAC ¶¶ 72, 90-91) The organizers of the "first" AMP convention were able to put together a meeting that was in every way identical to the annual meetings of IAP: the same general location (Rosemont, Illinois) and time (Thanksgiving weekend) with largely the same audience, content, format, management, and roster of speakers. (*Id.*) The purpose of the initial and subsequent conventions – together with AMP's other activities - was to continue IAP's history of promoting material and political support for Hamas. (FAC ¶¶ 110-14) It was obvious to the audience at the initial and subsequent conventions that AMP

was the continuation of IAP. Leading IAP personalities, most notably long-time leader Rafeeq Jaber, recognized and honored as the former president of IAP, were there to speak and provide the approbation. (FAC ¶ 91. *See also* Jaber 2018 Dep. 157:19-158:14 (Ex. D))

When the initial AMP convention was called to order, the "transition" from IAP was in place. The "empty" niche of a pro-Palestinian organization in the Islamic organization network was being filled with the critical assets, individuals, and knowhow of IAP. AMP's inherited substantial goodwill and intangible assets from IAP allowed it to hit the ground running, with the ability to raise money, propagate its message, build its network, and achieve its political objectives. (FAC ¶¶ 87-89) The only reason a "new" organization had to be created by seeming "outsiders" was to avoid the existing debt to the Boims and the ignominy (in the mind of the general public) of being found liable in the murder of an American teenager. No other reason has been suggested or makes any sense. Employing defendants' own language, the "motive and intent to avoid the (Boim) liability" was the "key element" in creation of the purportedly new organization. (Dkt. 189., p. 6)

**B. AMP/AJP flouts corporate formalities, just like its alter ego IAP/AMS.**

The leaders of both IAP/AMS and AMP/AJP repeatedly failed to comply with legal requirements or pay heed to the separateness of the corporate entities. (FAC ¶¶ 145-55) They consistently operated as loose, unstructured enterprises driven by a group of closely connected, like-minded individuals with disdain for corporate formalities. (*Id.*) Neither organization had formal members who elected officers and directors.[5] (*Id.*) The self-appointed board met infrequently and kept no minute book. (*Id.*) Rafeeq Jaber admitted that he never even advised the IAP board about

---

[5] Jaber admitted that AMS did not have members and the board "perpetuated itself." (Jaber Dep. 33:1-16) Ahmad also testified that AMP did not have members and that the board chose its own members. "I don't think anything with AMP was very formal." (Ahmad deposition, 51 – 54 (Ex. E)) ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ (Ahmad Dep. 176:5 – 177:9)

significant developments including entry of the $156 million Boim judgment. (Jaber 2018 Dep. 24:5-25:2). Judge Keys and the Seventh Circuit found that IAP, AMS, and all the entities operating under the "IAP National" umbrella were intertwined alter egos of each other. *See, e.g., QLI*, 340 F. Supp. 3d, at 907-08. IAP did not conduct a formal or proper wind-up. (Jaber 2018 Dep. 15:17-20:5) Carrying on this tradition, AMP and AJP did not comply with corporate formalities or operate as distinct entities; the purported separate entities operated with the same board of directors. (FAC ¶ 152-53) AMP did not show records of separate officers, board meetings, minutes or resolutions. (*Id.*) Directors were never elected and were unaware of which entity they served. (*Id.*) Meetings were often informal, impromptu and without notice. (*Id.*) AMP's current effort to use the formally-separate AMP corporate entity to shield the ongoing IAP enterprise from IAP's liability is wholly at odds with the IAP's and AMP's historical disdain for corporate formalities.

### C. <u>AMP/AJP is managed, operated, and essentially owned by IAP/AMS leaders.</u>

There was a striking overlap in the limited group of individuals who formed the leadership of the old and new entities. There was never a "myriad of individuals" running either IAP or AMP as defendants attempt to argue. (Motion p. 11) To the contrary, a distinct group of core supporters was the backbone of IAP and continued with AMP. The FAC identifies each of these individuals by name and includes a diagram showing that the core leadership of AMP came from IAP and HLF. (*See* FAC ¶¶ 77-84; 109-144) That some IAP leaders did not continue with AMP – primarily because they left the United States or were never active in the first place – is beside the point. The questions are who came on board to run AMP and where did they come from? Out of the nine people who became the core leadership of AMP/AJP, *only* Ahmad had no previous known connection to the judgment debtors, simply because he was too young. (FAC ¶¶ 78-84)

It is obvious why AMP leadership had to be populated with IAP and HLF veterans and could not rely on the purported founders, Bazian and Ahmad. Bazian, who claims that he came into

9

contact with "300 people" a day at numerous events, was unable to attract new people to run AMP. (Bazian Dep. 15:06-20) Bazian met IAP veteran leader Abuirshaid for the very first time at the 2006 Milwaukee meeting where he invited him to join the "new" organization. Bazian opened the original AMP office in Berkeley, California. It was promptly superseded with the first national office on Roberts Road, Palos Hills, Illinois, a short distance down the same street from the former offices of IAP/AMS. (FAC ¶ 72) Munjed Ahmad, the other AMP "founder," claimed to have a significant group of contemporaries who were joining with him to start this new organization. The record is clear that none of them took any significant roles at AMP.[6] AMP's success depended on, and can only be explained by, its continuity with IAP/AMS and the availability and willingness of former IAP/AMS veterans to run the "new" organization. Despite early efforts in 2005 to hide that continuity from the Boims and prosecutors, the AMP that ultimately emerged is, in every relevant sense, nearly identical to the IAP organization that preceded it.

### LEGAL ARGUMENT: DEFENDANTS' 12(b)(1) MOTION[7] FAILS BECAUSE THE FAC PROPERLY ALLEGES SUBJECT MATTER JURISDICTION

The alter ego claims against AMP/AJP provide an independent basis for subject matter jurisdiction exactly in accordance with well-established law. Flowing from this, the Court can properly exercise supplemental jurisdiction over the remaining, closely factually related claims against Jaber and AMP/AJP.

---

[6]  (Ex. F) (Ahmad Dep. 119-129)

[7] Defendants filed a Rule 12(b)(1) motion, limited to the narrow issue of whether this Court has federal subject-matter jurisdiction to hear Plaintiffs' claims. Such motions relate to jurisdiction issues—e.g. amount in controversy or existence of diversity-of-citizenship—not the whether the claims have merit. *See Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (finding that there is a "gulf" between "deficient" even on a 12(b)(6) standard and "too feeble to invoke federal jurisdiction").

I. **The Alter Ego Claims against AMP/AJP Provide an Independent Basis for Subject Matter Jurisdiction.**

Defendants' brief confuses the issue by bringing our "veil-piercing" and other non-alter ego claims into the discussion. But, as was true when Defendants made the same argument in their opposition to our motion to amend, this argument misses the point and is obviously designed to attempt to distract the Court. Subject matter jurisdiction is based on our *alter-ego claim against AMP/AJP*. The extensive new factual allegations in the FAC are more than sufficient to establish jurisdiction on that basis.

A. <u>As this Court has recognized, federal courts have subject matter jurisdiction over claims to enforce ATA judgments against alter egos.</u>

Federal courts have independent subject matter jurisdiction over actions seeking to enforce ATA judgments against alter egos. As this Court's August 2017 rulings recognized, the alter-ego allegations against AMP/AJP seek to hold it *directly* liable under the ATA because it is a "disguised continuance" of the *same organizations* as the judgment debtor. (Dkt. 41, at 4-6) The alter-ego claims are not vicarious "veil-piercing" claims and are therefore not subject to the jurisdictional limitations of cases decided under that rationale, such as *Peacock v. Thomas*, 516 U.S. 349 (1996). *See, e.g., Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037-38 (7th Cir. 2000); *Cent. States, Se. and Sw. Areas Pension Fund v. Central Transp., Inc.*, 85 F.3d 1282, 1286 (7th Cir. 1996).

Defendants misconstrue the breadth of *Peacock* by claiming that it addressed jurisdiction over third parties where the third party's liability is alleged to be direct—*e.g.* based on an alter-ego claim—not vicarious. It did not. *Peacock* was limited to cases where a plaintiff seeks to make a third party vicariously liable for a prior judgment—*e.g.* via a veil-piercing claim. *Central Transport, Inc.*, 85 F.3d, at 1286-87. Independent jurisdiction can and does arise where, as here, the third party is alleged to be directly liable for a judgment. *Elite Erectors, Inc.*, 212 F.3d at 1037-38.

**B. Subject matter jurisdiction over the alter ego claims is based on conduct in 1996 and prior.**

Citing language from *Peacock*, defendants argue that the Court cannot have subject matter jurisdiction over our alter ego claims because they are based on "post-judgment actions." (Dkt. 189, at p. 13) This argument again misstates our alter-ego theory and misapplies *Peacock*. First, we are not suing AMP/AJP for "post-judgment actions." *Id.* The actions that give rise to its liability are IAP/AMS's and HLF's conduct *in and before 1996*. That AMP/AJP did not exist as legal entities at that time is precisely the point. AMP/AJP is an alter ego, or "disguised continuance," with no true separate existence from the defendants that were found liable. Second, the new facts and new theories argument Defendants rely on comes from a section of *Peacock* addressing *ancillary jurisdiction*. In *Peacock*, unlike here, the plaintiff sought federal jurisdiction over a second enforcement lawsuit because it was "ancillary to the original" lawsuit by virtue of the district court's power to enforce judgments. *Peacock*, 516 U.S. at 354. The Supreme Court found there was no ancillary jurisdiction because the new lawsuit was based on theories of relief that did not exist at the time of the original lawsuit that was the basis for jurisdiction. *Id.* at 359. We do not invoke "ancillary" jurisdiction against AMP/AJP based on jurisdiction in the 2000 *Boim* action.[8] We claim, based on Seventh Circuit precedent, that the alter-ego claims provide an *independent* basis for jurisdiction. The cited language from *Peacock* does not apply to our case.

In interpreting *Central States*—notably Defendants do not even try to distinguish *Elite Erectors*[9]—Defendants draw a distinction without difference, claiming that the case was not about

---

[8] We do claim ancillary jurisdiction over our non-alter ego claims against AMP/AJP and Jaber, because they are factually related to alter ego claims against AMP/AJP.

[9] To the extent *Central States* is unclear on whether an alter ego claim can give rise to direct liability and serve as a basis for independent subject matter jurisdiction, *Elite Erectors* clarifies that it can. *Elite Erectors, Inc.*, 212 F.3d at 38 (". . . a contention that A is B's "alter ego" asserts that A and B are the same entity; liability then is not vicarious but direct.").

alter ego but whether a party exerted common control such that that party is directly liable for the underlying claim. That is exactly what we are claiming here. It does not matter that the legal entities AMP/AJP were not in existence at the time. As explained below, IAP/AMS and AMP/AJP were and are managed and effectively owned by the same individuals, individuals who have never respected corporate formalities. The small gap in time between IAP/AMS shuttering due to the original *Boim* debt and AMP/IAP setting up shop down the road, for the same purpose, with the same leadership does not wipe the slate clean for the new entity. Allowing such conduct would sanction fraud and promote injustice. (See Dkt. 41at 6-8 (citing *Sanchez v. Global Parking Mgmt., Inc.*, No. 14 C 4611, 2015 WL 4429024 (N.D. Ill. Jul. 20, 2015) (Ex. G); Cent. States, 85 F.2d at 1287))

The Seventh Circuit and a District Judge in this District have made it entirely clear that a commercial enterprise may not permanently avoid a court judgment by continuing its operations under a different name and purporting to alter its administrative or proprietary personnel. *McCleskey v. CWG Plastering, LLC*, 897 F.3d 899 (7th Cir. 2018); *Central States, Southeast and Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593 (7th Cir. 1990); *International Union of Operating Engineers v. Centor Contractors, Inc.*, 831 F.2d 1309 (7th Cir. 1987); *Laborers' Pension Fund v. Innovation Landscape, Inc.*, 2019 WL 6699190 (N.D. Ill. December 9, 2019) (Shah, U.S.D.J.) As Judge Eshbach said in the *Centor Contractors* opinion, alter ego liability results if there is "a disguised continuance of a former business entity." 831 F.2d at 1312.

The decided cases concern businesses that have attempted to avoid judgments by assuming new names or being controlled by different individuals. Courts that must decide whether a second entity is the alter ego of the first in a business context look to the tangible assets of the two entities, and if they are distinct, alter ego liability is denied. *E.g.. International Union of Operating Engineers v. Rabine*161 F.3d 427 (7th Cir. 1998); *Trustees of the Pension, Welfare and Vacation Fringe Benefit Funds v. Favia Electric Co.*995 F.2d 785 (7th Cir. 1993). When the original entity is not, as it is in the reported

judicial precedents cited above, a for-profit operation that relies on tangible assets to generate additional income, the identity of tangible assets is less material. If the entities that are alleged to be alter egos are not engaged in business but are, instead, collecting funds in order to promote terrorism, the most probative consideration should not be the identity of tangible assets held by the two entities but the comparable factors that enable the second entity to continue to achieve the goals of the first.

## C. __The FAC provides additional, detailed allegations to support our alter ego claims.__[10]

Our FAC's 40 pages of detailed additional facts convert a case that was already "close" into a one that can, if proven, support an alter ego finding. (Dkt. 41 at 8, 10) Only by ignoring dozens of the FAC's allegations could this Court satisfy the Defendants' wish that the FAC be dismissed. The Court laid out the relevant factors in its August 2017 Order and reiterated its position in a recent order. It said we must show AMP/AJP has "substantially identical management, business purpose, operation, equipment, customers, supervision and ownership" to IAP/AMS. (Dkt. 176, at p. 2) The FAC addresses all of these factors.

### 1. *The FAC alleges the AMP/AJP is the "disguised continuance" of the underlying enterprise that controlled its predecessor organizations.*

Fundamental to the alter-ego analysis is whether there is a "unity of interest and control," such that the new entity is a "disguised continuance of the preceding entity." (*See* Dkt. 41 at 10) A "disguised continuance" exists where the entities were "in effect a single entity." (Dkt. 189, at 7 (citing *Esmark, Inc. v. NLRB*, 887 F.2d 739, 754 (7th Cir. 1989)) *See also DCK/TTEC, LLC V. Postel*,

---

[10] The allegations of the FAC are more than sufficient to establish our alter ego theory. Defendants nonetheless urge the Court to dismiss our claims because of purported lack of detail regarding corporate leadership and operation. Not only does this ignore the substantial allegations of the FAC, but it would also permit Defendants to benefit from their own failure to follow corporate formalities and record-keeping requirements.

No. 14-1739, 2015 U.S. Dist. LEXIS 63279, at *15 (W.D. Pa. May 14, 2015) (alter ego where the later-formed entity is "a mere continuation of its predecessor:").

    a. <u>AMP/AJP is managed, supervised, and effectively owned by IAP/AMS leaders and surrogates.</u>

The FAC lays out in detail the similarities between the leadership of IAP/AMS and AMP/AJP. Documents from IAP/AMS identify thirteen persons as being part of the IAP/AMS board of directors in 2002 and 2004. (FAC ¶79) Emails, meeting minutes, and the AMP/AJP website show nine individuals acting as part of the core leadership of the organizations. (*Id.*) Almost all of these individuals were either IAP/AMS leaders or prominent supporters.



    i. *IAP/AMS leaders who directly transitioned to AMP/AJP leadership positions.*

**Osama Abuirshaid:** Defendants overlook the intimate and immediate connections between IAP and AMP. Of particular note is Osama Abuirshaid, identified by Defendant and IAP/AMS President Rafeeq Jaber as one if its three highest paid employees (the other two were Jaber himself and Hamayel). (Jaber Dep. April 9, 2003 p. 105:11-15) Bazian and IAP activist and donor Salah Sarsour (who helped transition IAP to AMP) solicited Abuirshaid at the 2006 MAS

meeting to help them to form the "new" organization.[11] Abuirshaid says he declined a formal position because he "didn't want to be a target"[12] of the ongoing investigations pending against HLF. But Abuirshaid became immediately active, speaking at events, raising funds and "working on setting the tone of AMP and trying to articulate (its) positions. . . . "[13] before becoming a board member in 2010. (FAC ¶125) Bazian testified that Abuirshaid's involvement arose out of "necessity." (Bazian Dep. 120:13-22) Abuirshaid, who ultimately became AMP's National Policy Director, "transitioned" *al Zaytouna*, the Arabic-language newspaper he edited for IAP, into *al Meezan*, the AMP organ. (FAC ¶ 66) The two newspapers had the same format, a nearly identical web page, consistent content and outlook, overlapping advertisers, and similar circulation. (*Id.*) Both newspapers functioned as the means of communication between IAP and then AMP and their audiences, essentially acting as their mailing lists. (FAC ¶¶ 66, 93) Defendants' naked assertion that Abuirshaid "had no involvement in the creation of AMP or AJP" (Motion p. 5) cannot obscure his essential role in AMP's success.

**Abdelbasset Hamayel**: Hamayel was the Director and Secretary General of IAP from 2002 until its closing. (FAC ¶120) In 2003, Jaber described Hamayel as "[t]he employee that works for us, the executive director, the secretary. He is everything." (Jaber Dep. April 9, 2003 51:17-18 (Ex. I)) After IAP/AMS closed, Hamayel moved to HLF's successor entity, KindHearts, until its assets were frozen. (Hamayel Dep. 48:11-49:19) By 2008, Hamayel was working for AMP/AJP and the next year became the "voluntary" and "temporary" Executive Director, a "temporary" role Hamayel held up until the filing of this lawsuit. (Hamayel Dep. 92:22-95:10, 98:17-20) Critically for

---

[11] This was the first time Abuirshaid had ever met Bazian. (Abuirshaid Dep. 179:1-4 (Ex. H))

[12] Abuirshaid Dep. 184:17.

[13] Abuirshaid Dep. 18:1-2.

our purposes, Hamayel admits that he transferred his essential operating role from IAP to AMP, becoming AMP's Executive Director in January 2009 to "help the organization start functioning." (Hamayel Dep. 96:11)

**Rafeeq Jaber:** Jaber immediately became involved with AMP/AJP as a prominent speaker at the first convention in 2006 (and at many subsequent events). (Jaber 2018 Dep. 157:19-20) AMP promptly turned to Jaber for tax and financial advice. While Jaber claims not to have been on the AMP board in an "official capacity,"[14] he was a central participant in board-level business decisions. If AMP truly intended to sever ties with IAP, the first person they should have "distanced [themselves] from" was Defendant IAP President Rafeeq Jaber. But that did not happen. Jaber was the leader of IAP/AMS when it dissolved following the original *Boim* judgment. (Jaber 2018 Dep. 9:24-10:24)



---

[14] Jaber 2018 Dep. 13:8-16.

[15] Jaber attempted in this litigation to minimize his close relationship with AMP. ██████████████ (Jaber 2018 Dep. 7:21-8:8) ████████████ (Jaber 2018 Dep. 115:8 – 116:8; 118:16-22; 119:15-24; 120:22-23)

[16] ███████████████████████ Ex. J. Doc. Numbers 2594-96; 2601-03.

████████████████████████████████████████ ██ ███

███████████████████████████

**Sufian Nabhan:**  Nahban was also a member of the IAP/AMS board from 2002-2004 and led the Detroit chapter. (FAC ¶141) During a "transition" chat, he was identified by Salah Sarsour as "ready to start working" on forming AMP. (Ex. C, at. p. 8) Although another member stated that Nabhan was too closely associated with IAP/AMS, Nabhan quickly found his way into an AMP/AJP leadership role as he ████████████████████████████ and now is a chapter leader for AMP/AJP's Detroit chapter. (*Id.*)

  ii. *Several prominent IAP/AMS supporters became part of AMP/AJP's core leadership.*

**Salah Sarsour:**  Salah Sarsour operates Prime Furniture with his brothers Emad—a former IAP/AMS board member—and Jamil. (FAC ¶132) Sarsour was identified by Jaber as "active" in IAP, had previously served on an IAP planning committee, and was a financial sponsor. (*Id.*) Sarsour was a member of the "transition" chat and became deeply involved with the formation of AMP/AJP. (FAC ¶134) He was the chairman of the 2006 MAS convention where AMP was organized and had spoken with Bazian about forming AMP at that convention. (FAC ¶134) As noted above, Sarsour and Bazian attempted to induce Abuirshaid to help launch AMP. Sarsour joined the AMP/AJP board in 2009. (*Id.*) Currently, Salah serves a similar role in AMP/AJP as he did with IAP/AMS, acting as an important fundraiser for the organization and was one of the initial donors to AMP/AJP. (*Id.*)[18]

---

[17] ██████████████████████████████████████████ ██
████████ (*See, e.g.*, Jaber 2018 Dep. 124:3-9; 124:23
████████████████████████████████████████ ████
████████████████████████████████████

[18] Salah Sarsour is deeply connected to Hamas leaders in the Middle East and has a background as a Hamas operative and funder. (FAC ¶¶ 132-34) According to his brother Jamil, Salah provided funds to Adel Ahmad Awadallah, a senior Hamas military leader with whom Salah shared a cell in an Israeli prison. It is of note that

**Yousef Shahin:** Shahin was an IAP/AMS board member until 1999 and an active member of its New Jersey Chapter. (FAC ¶ 142) By 2009, Shahin was a board member at AMP. (*Id.*)

**Hussein al-Khatib:** al-Khatib was an original AMP/AJP board member. (FAC ¶ 137) In the days of IAP/AMS, al-Khatib was the Regional Director in Minneapolis for IAP/AMS's affiliate entity, HLF, until it was designated as a terrorist organization and had its assets frozen. (FAC ¶ 135)

**Hatem Bazian:** Bazian is the chairman of AMP/AJP and was a part of the "transition" chat concerning the formation of AMP in 2005. (FAC ¶ 129) Bazian was a regular participant in IAP/AMS events, has a long-standing relationship with former IAP/AMS leader Jaber, and was a speaker for at least five IAP conferences and events. (FAC ¶ 130)

        iii. *The remaining IAP/AMS board members were involved with AMP/AJP, fled the country, or were not core leaders of IAP/AMS.*

Defendants identify eight former IAP/AMS board members who did not become part of the AMP/AJP core leadership. But their brief glosses over important details for each of these cases.

Salah Daoud,[19] Sabri Samirah, Fawaz Mushtaha, and Hasan Sabri could not take roles at AMP/AJP because they left the country around the time IAP/AMP was shuttered and HLF was indicted. (FAC ¶ 82) Evidence later used against HLF in the criminal case was found buried in Mushtaha's backyard. (FAC ¶ 65) Samirah was not allowed to return to the United States until 2014. (*Id.*) Daoud's sister-in-law Sanaa took an AMP board seat and was affiliated with Middle East

---

*Boim* Action defendant Muhammad Salah also provided substantial funds to Awadallah. Muhammed Salah was convicted of obstruction of justice and sent to prison for filing false interrogatories in the *Boim* action. His connection with Awadallah was highlighted in the government's sentencing memorandum. *United States v. Salah*, 03-cr-978 Dkt. 943, p. 12. (N.D. IL.).

[19] Salah Daoud's sister-in-law Sanaa is a member of the AMP/AJP core leadership group. Sanaa, like her brother-in-law Salah was affiliated with Middle East Financial Services a money forwarding company in Bridgeview, Illinois that Salah testified in a separate matter was sending money to a designated terror organization called Palestinian Islamic Jihad.

Financial Services a money forwarding company in Bridgeview, Illinois that Salah testified was sending money to a designated terror organization called Palestinian Islamic Jihad.

Mahmoud Shafeeq, Mohammad El-Natour, and Muhamad Abdel'al did not become part of the AMP/AJP core leadership, but they were never part of the IAP/AMS core leadership either. (FAC ¶ 83) Imad Sarsour is the brother and business partner of Salah Sarsour. (FAC ¶ 81) Both were active in IAP and HLF. (*Id.*) As explained above, Salah Sarsour now serves on the board of AMP/AJP. (*Id.*)

 Prior to the *Boim* judgment, Mustapha was an IAP/AMS board member in 2001 and a frequent speaker at its conventions. (FAC ¶¶ 81 and 139) In addition to his role with IAP/AMS, he also was an Illinois representative for HLF. (*Id.*) Like Jaber, Mustapha immediately became involved in AMP/AJP events, speaking at the inaugural convention and participating in many subsequent conferences and fundraisers. (*Id.*)

> b. The FAC alleges transfer of assets (equipment) in the form of good will, reputation, and other intangible assets.

As Defendants recognized in their Motion, transfer of intangible assets can support successor or alter ego liability. (*See* Opp., at p. 11) This is especially true of non-profits such as AMP/AJP and IAP/AMS which are not commercial businesses that generate profits by exploiting tangible assets, but organizations that raise funds by propagating ideologies such as the message of pro-Hamas founders and leaders. *See, e.g., Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 435 n.14 (E.D.N.Y. 2013) (examining charities "operating as Hamas front groups," the court questioned "whether legitimate corporations are sufficiently analogous to terrorist groups such that every corporate veil piercing factor applies here"); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 334 (E.D.N.Y. 2015) (noting "skepticism" as to whether "legitimate corporations are sufficiently

analogous to terrorist groups such that every corporate veil piercing factor applies" to charities allegedly controlled by Hamas)

Without specifically addressing any of the transferred assets, Defendants attempt to downplay their significance. But their value is readily apparent. The FAC is replete with examples of valuable assets that have been transferred from IAP/AMS, including, but not limited to: (1) a broad and loyal constituency (the 2006 inaugural convention is one example of this); (2) an ability to send its message to a discrete public (Abuirshaid and *Al-Zaytounah*, which became *El Meezan*); (3) a network of volunteers with years of service on a variety of projects (Mustapha); (4) the experience and know-how to arrange large conventions, fundraisers, and festivals (Hamayel); (5) prominent speakers who brought the IAP/AMS stamp of credibility (Bazian, Abuirshaid, Jaber, Mustapha, and many others); (6) an experienced director and administrator (Hamayel); (7) a tax expert with deep connections to the target audience and a strong reputation built through IAP/AMS (Jaber); and (8) a network of constituents from which AMP/AJP could raise funds. (FAC ¶ 91). The FAC alleges transfer of assets sufficient to support an alter ego theory.

c. <u>AMP/AJP serves the same business purpose as IAP/AMS.</u>

Prior to its dissolution following the original *Boim* case, IAP/AMS was the primary propaganda arm of Hamas in the United States. (FAC ¶ 30) IAP/AMS's support was not limited to vocal support. The organizations promoted HLF and directed donors to give money to HLF. (FAC ¶ 30) Judge Keys found that IAP/AMS's use of HLF as an intermediary to direct funds to Hamas was material support sufficient to violate the ATA. *QLI*, 340 F. Supp. at 910. The Seventh Circuit echoed this opinion. *Boim III*, 549 F.3d at 701.

AMP/AJP follows the IAP/AMS playbook, AMP/AJP's support for Hamas does not stop with public advocacy. Like its alter ego IAP/AMS, AMP/AJP directs funds to Hamas. (FAC ¶ 99) The only difference is that AMP/AJP has slightly adjusted its transfer methodology. Whereas

IAP/AMS used HLF as its conduit, AMP/AJP instead uses a network of intermediaries. This distinction makes no difference. These intermediaries, "charities" that act as sponsors at AMP events, have close connections to Hamas and distribute funds through Hamas operatives. (FAC ¶¶ 100-108)

None of this appears to have mattered to AMP leaders.



This is exactly the conduct of IAP/AMS that was rejected and led to liability in the original Boim case. *Boim III* at 698-99.[20]

The most striking example of raising funds for Hamas, well beyond that described above, is AMP/AJP's direct support for an organization called Viva Palestina. (FAC ¶ 105) AMP/AJP worked closely with Viva Palestina's founder George Galloway to raise money that Galloway then directly provided to Hamas. (FAC¶¶ 105-107) Galloway literally handed substantial money and equipment to a Hamas leader and boasted, "This is not charity. This is politics."[21] (FAC¶105)

According to Galloway, one fundraiser organized by AMP/AJP Viva Palestina raised $360,000 (FAC ¶ 107), and the money went directly into the hand of Hamas. Moreover, AMP/AJP

---

[20] ████████████████████████████████████████████████████████████ (Ahmad dep. 79-83) Jaber testified that IAP did not inquire where these organizations "were sending their money" (Jaber 2018 Dep. 87:19-21) even though they "(gave) them permission to be there." (Jaber 2018 Dep. 88:21-24) The Seventh Circuit made it very clear that a donor to an Islamic charity would be liable under the ATA if he was "reckless, in the sense of strongly suspecting the truth but not caring . . . that the charity gives money to Hamas . . . ." *Boim III* at 699.

[21] The Court should not entertain any suggestion by defendants that these "donations" were somehow exempt as "humanitarian" or within the statutory exemption of "medicine" from the definition of "material support." 18 U.S.C. § 2339A(b)(1). As explained by the Seventh Circuit, the exemption is designed to protect neutral humanitarian organizations such as Doctors Without Borders or the Red Cross who attempt to aid individuals not international terrorist groups. *Boim III* at 699.

even acknowledged its own direct role in facilitating these fundraising efforts with Bazian and Abuirshaid as featured speakers, repeating Galloway's praise that he "would not have had . . . success . . . if it weren't for AMP". (FAC ¶ 106)[22] While this fundraising for Galloway may constitute fresh violations of the ATA, our claim in this case does not require the Boims to prove that AMP/AJP is continuing to violate the ATA. The striking similarity to the conduct of IAP/AMS that led Judge Keys and the Seventh Circuit to conclude it violated the ATA strongly supports the alter-ego relationship alleged in our complaint. (FAC ¶¶ 46-49, 157-158.)

        d.   AMP/AJP operates in the same manner as IAP/AMS and serves the same "customers."

IAP/AMS operated as a series of intertwined legal and informal organizations. (*See, e.g.,* FAC ¶¶145-151) These purported separate entities did not observe corporate formalities and "were so intertwined and involved" that Judge Keys refused to treat them as separate entities. *Boim v. QLI,* 340 F Supp. 2d at 908. It maintained "chapters" in various locations including Detroit, Wisconsin, New Jersey, and California. (FAC ¶47) It was largely operated by its core leadership group, which included Hamayel (the National Director and Secretary General), Jaber (President and CEO), and Abuirshaid (board members and publisher of *Al-Zaytounah*). The organization had no "customers" because it was a non-profit, not a commercial business entity. Its constituents were, however, the same. It generated support among, and funds from, the Palestinian community in the United States and others sympathetic to the cause. (*See, e.g.,* FAC ¶ 89)

AMP/AJP has operated with the same disregard for corporate formalities as IAP/AMS. (FAC ¶ 152) From the time AJP was incorporated until AMP was suspended by the California

---



22   (Ahmad Dep. Ex. 37, (Ex. K))

(Ahmad Dep. 235:17-236:17)

Secretary of State, it was never treated as a separate organization from AMP. (*Id.*) The purported separate entities utilized the same board of directors—many of whom such as Hamayel were never elected—and lack important records of corporate minutes, board meetings, or other formalities. (*Id.*)

Defendants' legal premise that IAP/AMS and AMP/AJP each had a meaningful separate corporate existence is unsupportable. They never cared about corporate form when the organizations operated and they should not be allowed to use that argument as a defense in this case. AMP/AJP did not operate as two separate corporate entities but as a loose unstructured enterprise driven by a core group of like-minded individuals. (FAC ¶ 153) As explained above, this core group is almost identical to the core group that lead IAP/AMS.

AMP/AJP also relies on a similar chapter system that overlaps almost completely with IAP/AMS's chapter system. Specifically, AMP/AJP maintains chapters in Chicago, Detroit, New Jersey, the District of Columbia, and Milwaukee. (FAC ¶ 94) At least one of AMP/AJP's chapters, Detroit, appears to have the same leader as IAP/AMS's Detroit chapter (Sufian Nahban). (FAC ¶ 141) The Chicago chapter, which acts as AMP/AJP's national office, is located in the same suburb, just down the road from the former offices of IAP/AMS and its leader Jaber. (FAC ¶ 72) AMP/AJP similarly does not have "customers" but markets its message and aims its fundraising efforts at the same audience as its alter ego, IAP/AMS. (FAC ¶ 95) Indeed, because AMP/AJP stepped into the void left by IAP/AMS, within three months of forming AMP was able to organize an inaugural convention held in the same location as prior IAP/AMS conventions that attracted a 700-person audience. (FAC ¶ 91)

## 2. *The FAC alleges facts illustrating that AMP/AJP was formed with the motive and intent to avoid liability for the original Boim judgment.*

This Court and defendants also identify "motive and intent" to avoid liability as a factor in the alter ego analysis. (Dkt. 41 at 6 (*citing Int'l Union of Operating Eng'rs, Local 150 AFLCIO v. Centor*

24

*Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987); *Cent. States*, 85 F.3d at 1287); Opp. at 9) The FAC includes compelling motive and intent allegations. In early-2005, IAP/AMS was held liable and subject to enforcement proceedings on the $156 million Boim Judgment for aiding and abetting the murder of an American teenager. (FAC ¶¶ 42, 53)

IAP/AMS claimed to be "defunct" in order to evade enforcement efforts and further liability. (FAC ¶ 74) Re-starting the enterprise under "AMP" enabled it to shed the burden of the Boim Judgment and proceed with its work—with the same leadership, network of supporters, reputation, good will, slate of events, speakers, and fundraising apparatus. (FAC ¶¶ 74-76) And, as described in detail above, there was clear intent to hide this "transition."

### 3. The FAC demonstrates that neither IAP/AMP nor AMP/AJP respected corporate separateness.

Defendants' argument is premised on their claim that AMP has a separate corporate identity from IAP. Decisions of the Seventh Circuit and of this Court have emphasized "the amount of respect given to the separate identity of the corporation," including whether leaders of the old organization "failed to properly wind-up" its business affairs. (*See* Dkt. 41 at 6, 7 (citing *Cent. States*, 85 F.2d at 1287; *Trs. of Sheet Metal Workers Local No. 1 Welfare Trust v. Pekin Climate Control, Ltd.*, 669 F. Supp. 2d 924, 929 (C.D. Ill. 2009)); Opp. at 10) *See also DCK/TTEC*, 2015 U.S. Dist. LEXIS 63279, at *15 (later-formed entity may be alter ego if "independence of the separate corporate entities was disregarded"). IAP/AMP did not conduct a formal or proper wind-up (FAC ¶ 119), and AMP/AJP did not comply with corporate formalities or operate as distinct entities. Our FAC demonstrates that none of the current or former entities observed corporate formalities or paid heed to the separateness of the corporate entities. Judge Keys and the Seventh Circuit found that IAP, AMS and all the entities operating under the "IAP National" umbrella were intertwined and were alter egos of each other. (FAC ¶¶ 150-151) The U.S. Treasury Department froze KindHearts' assets,

finding it was the "progeny" of HLF. (FAC ¶ 60) The purported separate entities operated with the same board of directors. There are no records of separate officers, board meetings, minutes or resolutions. Directors were not elected and were unaware of which entity they served. Meetings were often informal, impromptu and without notice. (FAC ¶¶ 152-153)

Defendants have previously acknowledged that AMP/AJP were "less than ideal record-keepers" but urge that this shows only that the contemporaneous entities are alter egos with each other and does not demonstrate that the "old and new corporations" are alter egos. (Dkt. 160 at 10-11) This is an overly narrow distinction. Organizations cannot disregard corporate formalities for decades and then seek to rely on the fiction of separate juridical "front" entities to shield their ongoing enterprise from liability. Here, the old and the new organizations have not operated as separate juridical entities, but as a single, loose, unstructured enterprise driven by the same core group of individuals, with no regard for corporate formalities. (FAC ¶¶ 154, 155) AMP/AJP has no more ground than the alter egos of IAP to invoke corporate separateness as a shield.

### 4. *Permitting AMP/AJP to avoid liability would inequitably nullify the ATA.*

Finally, courts consider whether there are circumstances "such that adherence to the fiction of separate corporate existence would sanction fraud or promote injustice." (See Dkt. 41 at 6-8 (citing *Sanchez*, 2015 WL 4429024; *Cent. States*, 85 F.2d at 1287); Opp. at 10) In the terrorism context, courts have held that "'equitable principles[s]' allow a court to disregard the corporate form 'where it is interposed to defeat legislative purposes' or would 'work fraud or injustice.'" *In re 650 Fifth Ave. & Related Props.*, 881 F. Supp. 2d 533, 548 (S.D.N.Y. 2012) (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627 (1983)).

There are ample equitable reasons here to disregard the invented corporate forms. AMP/AJP is a disguised continuance of the judgment debtors under the common leadership of the bankrupt organization and its successor. Permitting AMP/AJP to act as a separate corporate entity

from IAP/AMS and allowing it to operate free of the *Boim* Judgment would be manifestly unjust to the Boims. It would permit IAP/AMS to avoid full payment of the judgment while transmitting goodwill, reputation, fundraising capability, and intangible assets to AMP/AJP.

Nor have the Boims renewed their lawsuit just to avoid a "pyrrhic" victory or only to collect a judgment. Joyce Boim told the jury in 2004 that she and her husband filed suit so that other families will not experience similar pain attributable to money raised in the United States supporting terrorism. *Boim* was an important victory. It set the precedent that material supporters of terrorism under the guise of charity face substantial legal risk. "[S]uits against financiers of terrorism can cut the terrorists' lifeline." *Boim III* at 691. What the Boims seek with this lawsuit is to ensure that *Boim III* is not erased by the sharp practices and cynicism of AMP's "organizers."

A terrible precedent would be set if an organization held, in hard-fought judicial proceedings, to be civilly liable under the ATA for the terrorist murder of an American teenager could readily re-open under a different name down the street and continue its activities free of the unpaid judgment. This would effectively eradicate the remedial provisions of the ATA and leave terror victims with uncollectible judgments. (*See* FAC ¶¶ 8, 164-165)

## II.  The remaining claims survive in this Court based on supplemental jurisdiction.

District courts have "supplemental jurisdiction" over any claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A "loose factual connection between the claims is generally sufficient." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014); *Emanuel v. Rolling in the Dough, Inc.*, 10-cv-2270, 2010 U.S. Dist. LEXIS 117864 (N.D. Ill. Nov. 2, 2010)(J. Coleman) (Ex. L)

Defendants argue there is no independent basis for jurisdiction over the (i) veil piercing claim against Jaber (Dkt. 197 at 4-7); (ii) fraudulent concealment claim against Jaber (*id.* at 7-8); and

(iii) successor claims against AMP/AJP. (Dkt. 189 at 13-14) These arguments miss the controlling legal principle. This Court has supplemental jurisdiction over the non-alter-ego claims because they are based on the same facts as the alter ego claims, including (i) the close overlap between the old and new entities, (ii) the efforts to conceal that IAP/AMS had not really shut down but had transitioned to AMP, and (iii) Jaber's extensive involvement in both the old and new entities.

**III. Our FAC alleges facts to support successor liability.**

Defendants attack our successor liability claim because we purportedly "present no new bases for jurisdiction other than those already defeated in the first round of pleadings." (Dkt. 189 at 13-14) But defendants overstate the reach of the Court's August 2017 opinion. That ruling (which was vacated) held only that the initial Complaint did not allege facts to support (for jurisdiction purposes) any of the four exceptions to the general successor liability rule. (Dkt. 41 at 8) The FAC adds facts sufficient to plead successor liability (i) as a "mere continuation" (or de facto merger) or (ii) based on a fraudulent assets transfer to avoid liability. (*See* Dkt. 41 at 8)

The principle behind these exceptions is that an obligor cannot avoid its obligations by continuing its operations under a different corporate name. *Kaeser & Blair, Inc. v. Willens*, 845 F. Supp. 1228, 1233 (N.D. Ill. 1993) (citing *Terminal Freezers, Inc. v. Roberts Frozen Foods, Inc.*, 41 Ill. App. 3d 981 (Ill. Ct. App. 1976)); *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594, 598-599 (7th Cir. 2005) (corporation that goes through change in form without change of substance should not escape liability). Courts consider factors such as (1) timing between the dissolution of the former entity and incorporation of the latter; (2) overlap of ownership interest; and (3) overlap of management. *Kaeser*, 845 F. Supp. at 1233. While continuity of ownership is ordinarily required for the "mere continuation" exception, courts have recognized that this factor is not applicable to not-for-profit entities that have no owners. *See, e.g., Hankinson v. King*, 117 F. Supp. 3d 1068, 1074 (D. Minn. 2015); *Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288,

324 (D.D.C. 2012); *Chao v. Int'l Bhd. of Indus. Workers Health & Welfare Fund*, 97 F. Supp. 3d 268, 274 (E.D.N.Y. 2015).

The FAC alleges that (a) the same core group of leaders controlled IAP/AMS and AMP/AJP; (b) AMP was started shortly after IAP was shut down for the purpose of avoiding liability; (c) IAP/AMS's good will and intangible assets were transferred to AMP; (d) Jaber engaged in fraudulent concealment in shutting down IAP; and (e) AMP continued the same enterprise. Despite these compelling successorship allegations, defendants urge that the "gap" between the shutdown of IAP and startup of AMP defeats successor liability. (Motion at 14) The Supreme Court rejected this argument in *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 45 (1987), holding that a "hiatus" may be a factor in assessing continuity but is not determinative. We allege that the pressure and scrutiny arising from the *Boim* Judgment forced IAP/AMS to lay low and regroup. (FAC ¶¶ 4, 64-65) The "gap" was necessary for this purpose and fully consistent with our successor theory.

**IV. The alter ego claims provide ample basis for subject matter jurisdiction over Jaber, who is also appropriately sued under the other counts of the FAC.**

Defendant Jaber filed and then voluntarily withdrew a Rule 12(b)(6) motion challenging the FAC's claims against him, so there is no issue before the Court as to whether those allegations state a claim upon which relief can be granted. As demonstrated above, the alter ego count is the direct basis for federal jurisdiction, and the closely related claims of veil piercing and fraudulent concealment belong here under principles of supplemental jurisdiction. For additional context, we remind the Court that Jaber is not the unconnected innocent that Defendants attempt to portray, but is, rather, the alter ego embodiment of IAP/AMS.

It is undisputed that Jaber held high level positions with the Boim Defendants: He was the leader of IAP/AMS when it dissolved in 2004 and 2005. (FAC ¶ 114) Jaber personally participated

in IAP/AMS's conduct that gave rise to the Boim judgement (FAC ¶114) and oversaw the distribution of its assets after the Boim judgment. (FAC ¶119) It is also evident in the FAC that IAP/AMS failed to comply with any of its requirements for maintaining corporate existence. (FAC ¶ 48) Upholding corporate separateness between Jaber and IAP/AMS in these circumstances would perpetrate a fraud on the Boims. *Peetoom v. Swanson*, 778 N.E. 2d 291, 295 (Ill. App. Ct. 2002).

Furthermore, Jaber's disregard for his fiduciary duties to the Boims entailed flagrant fraud. As a director and officer of IAP/AMS, and the sole individual who oversaw the liquidation of its assets to satisfy the Boim judgment, Jaber had a fiduciary duty to the Boims as judgment creditors of IAP/AMS. *See Technic Eng'g, Ltd. V. Basic Envirotech, Inc.*, 53 F. Supp. 2d 1007, 1011 (N.D. Ill. 1999) Instead of adhering to that duty, Jaber failed to disclose material facts and made misleading statements regarding IAP/AMS, its assets, and its "transition" into AMP/AJP. (FAC ¶¶182-83) The Boims relied on these omissions and misrepresentations when they discontinued their efforts to collect the Boim judgment. The end result is the Boims were unable to enforce their judgment against IAP/AMS and IAP/AMS was able to continue its ideological and financial support for Hamas as AMP/AJP free of any of liability.

## Conclusion

For the foregoing reasons, this Court should deny the Defendants' motion and grant such further relief as the Court deems just and appropriate.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed electronically using the Court's CM/ECF system and has been served to all parties via email through CM/ECF on this 13th day of March 2020.


*/s/ Daniel I. Schlessinger*

82545215v.1