# EXHIBIT A

## (Unpublished Cases)

 Caution
As of: October 27, 2021 2:48 PM Z

## *Addison Automatics, Inc. v. RTC Group*

United States District Court for the Northern District of Illinois, Eastern District

July 16, 2013, Decided; July 16, 2013, Filed

No. 12 C 9869

**Reporter**
2013 U.S. Dist. LEXIS 99448 *; 2013 WL 3771423

ADDISON AUTOMATICS, INC., individually and as the representative of a class of similarly-situated persons, Plaintiff, v. THE RTC GROUP, INC., MICROSOFT CORPORATION, INTEL CORPORATION, AVENT, INC., and JOHN DOES 1-10, Defendants.

## Core Terms

advertisement, fax, seminar, facsimile, motion to dismiss, allegations, Embedded, unsolicited, conversion, products and services, agency relationship, Telephone, entity, sender, common law, vicariously, Revolution

**Counsel: [*1]** For Addison Automatics, Inc., individually and as the representative of a class of similarly-situated persons, Plaintiff: Brian J Wanca, LEAD ATTORNEY, Ryan M. Kelly, Anderson & Wanca, Rolling Meadows, IL; Phillip A. Bock, LEAD ATTORNEY, James Michael Smith, Phillip James Bullimore, Bock & Hatch, LLC, Chicago, IL.

For The RTC Group, Inc., Defendant: Ellen M. Chapelle, LEAD ATTORNEY, Jordan Michael Hanson, Gould & Ratner LLP, Chicago, IL.

For Microsoft Corporation, Defendant: Richard Francis O'Malley, LEAD ATTORNEY, Alison V. Potter, Eric Stephen Mattson, Sidley Austin LLP, Chicago, IL.

For Intel Corporation, Defendant: Eric D. Brandfonbrener, LEAD ATTORNEY, Perkins Coie LLC, Chicago, IL.

For Avent [SIC], Inc., Defendant: Darrell J. Graham, LEAD ATTORNEY, Peter S. Roeser, Roeser Bucheit & Graham LLC, Chicago, IL.

**Judges:** Virginia M. Kendall, United States District Court Judge.

**Opinion by:** Virginia M. Kendall

## Opinion

### MEMORANDUM OPINION ORDER

Plaintiff Addison Automatics, Inc. filed a three-count complaint against Defendants The RTC Group, Inc., Microsoft Corporation, Intel Corporation and Avnet Inc. (collectively, the "Defendants") asserting claims for a violation of the Telephone Consumer Protection Act, *47 U.S.C. § 227 et seq.,* **[*2]** common law conversion and for a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, *815 ILCS 505/2*. The Defendants have moved to dismiss the complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim. [1] For the reasons set forth below, the motion is granted in part and denied in part.

### BACKGROUND

The following facts are taken from the complaint and are assumed to be true for purposes of this Motion to Dismiss. *See Voelker v. Porsche Cars North America, Inc., 353 F.3d 516, 520 (7th Cir. 2003)*; *Murphy v. Walker, 51 F.3d 714, 717 (7th Cir. 1995)*. On October 1, 2009, RTC sent a facsmile to Plaintiff, offering Plaintiff the opportunity to attend a free "technical seminar" on embedded computer technology. *See* Doc. 1-1, Plaintiff's First Amended Complaint at ¶¶ 16-18, Ex. A. Specifically, the fax stated that:

> Avnet, Microsoft and Intel join together to bring you the *Avnet Embedded Revolution* technical seminar. Get critical information on the powerful, new and

---

[1] Defendant RTC only moves to dismiss Count I, the TCPA claim. Microsoft, Intel and Avnet move to dismiss the complaint in its entirety.

next generation of Windows Embedded Enterprise [*3] including Windows 7 FES & Intel's Atom CPU. This unique (preview) opportunity will get you up-close to the experts to glean knowledge and know-how for your next design decision. The Avnet Embedded Revolution Seminar is 100% complimentary and specially designed to exceed your expectations.

Learn exactly how the *Next Generation of* Windows Embedded Enterprise and Intel's Atom CPU explode the Embedded Revolution.

*Id.* at Ex. A (emphasis in original). The remainder of the fax described the agenda for the seminar. *Id.* It identified the "distinguished hosts" of the seminar as Microsoft, Intel and Avnet. *Id.* Microsoft's, Intel's and Avnet's logos were prominently displayed on the fax. *Id.* It also stated that the location of the seminar would be Microsoft's offices in Downers Grove, Illinois. *Id.*

Plaintiff contends that it never consented to receiving the fax from the Defendants and that it did not provide an opt-out notice. *Id.* at ¶¶ 19, 25. Plaintiff also contends that the Defendants intended to use the seminar to market their products and services to the attendees. *Id.* at ¶ 19.

Plaintiff filed an initial complaint against Defendant RTC in the Circuit Court of Cook County asserting claims for [*4] violations of the TCPA and the ICFA as well as for common law conversion. RTC moved to dismiss the complaint pursuant to 735 ILC 5/2-615 for failure to set forth a claim for which relief could be granted. The state court dismissed the TCPA claim without prejudice but denied RTC's motion to dismiss with respect to the ICFA and conversion claims. Plaintiff then filed an amended complaint, the operative complaint, which included additional factual allegations and added Microsoft, Intel and Avnet as Defendants. Intel, with the consent of the other Defendants, removed the action to this Court on December 11, 2012 pursuant to *28 U.S.C. § 1441(a)*. *See* Doc. 1. Defendants Microsoft, Intel and Avnet have now moved to dismiss the Amended Complaint in its entirety while RTC only moves to dismiss the TCPA claim. Doc. 24.

## STANDARD OF REVIEW

When considering a motion to dismiss under *Rule 12(b)(6)*, the Court accepts as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy, 51 F.3d at 717*. To state a claim upon which relief may be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled [*5] to relief". *Fed. R. Civ. P. 8(a)(2)*. "Detailed factual allegations are not required, but the plaintiff must allege facts that when "accepted as true... 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (*quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. In analyzing whether a complaint meets this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Iqbal, 129 S. Ct. at 1950*. When there are well-pleaded factual allegations, the Court assumes their veracity then determines if they plausibly give rise to an entitlement to relief. *Id.*

## DISCUSSION

## I. The Complaint Sufficiently Alleges a Violation of the TCPA

Defendants assert two reasons for why the TCPA claim should be dismissed. First, the fax received by Plaintiff did not constitute an advertisement within the meaning of the TCPA. Second, since RTC sent the fax to Plaintiff, the claim should be dismissed as to Microsoft, Intel and Avnet because Plaintiff failed to adequately allege that RTC was acting as their agent. Neither argument is persuasive.

## A. Plaintiff Sufficiently Alleged the Fax Was an Advertisement

The relevant portion of [*6] the TCPA prohibits the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement. . . ." *47 U.S.C. § 227(b)(1)(C)*. The statute defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *47 U.S.C. § 227(a)(5)*; *see also, e.g., G.M. Sign, Inc. v. MFG.com, Inc., No. 08 C 7106, 2009 U.S. Dist. LEXIS 35291, 2009 WL 1137751, at *1 (N.D. Ill. Apr. 24, 2009)*; *Physicians Healthsource, Inc. v. Alma Lasers, No. 12 C 4978, 2012 U.S. Dist. LEXIS 133222, 2012 WL 4120506, at *2 (N.D. Ill. Sept. 18, 2012)*.

Faxes that are nothing more than "purely informational" documents are not advertisements under the TCPA. *See, e.g.,* G.M. Sign, 2009 U.S. Dist. LEXIS 35291, 2009 WL 1137751, at *2. However, faxes promoting free seminars may be unsolicited advertisements because "free seminars are often a pretext to market products or services." Physicians Healthsource, 2012 U.S. Dist. LEXIS 133222, 2012 WL 4120506, at *2 (citing *In re Rules and Regulations Implementing the Tel. Protection Act of 1991; Junk Fax Prevention Act of 2005,* 21 F.C.C.R. 3787, 3814 (Apr. 6, 2006)); **[*7]** *see also, e.g.,* St. Louis Heart Center, Inc. v. Forest Pharms., Inc., No. 12 C 02224, 2013 U.S. Dist. LEXIS 35563, 2013 WL 1076540, at *4 (E.D. Mo. Mar. 13, 2013) (finding that a fax that offers a "free seminar serving as a pretext for advertising commercial products and services" would fall within the ambit of the TCPA).

The complaint in this case adequately sets forth a claim for a violation of the TCPA. The plain language of the fax makes it plausible that the seminar would be used to market the Defendants' products and services. For example, the fax states that "[t]his unique (preview) opportunity will get you up-close to the experts to glean knowledge and know-how for your next design decision." Doc. 1-1 at Ex. A. It is plausible to infer from this statement that the Defendants intended to market their products and services at the seminar so that the attendees would purchase those products and services when they make their "next design decision." This plausibility is heightened by the fact the fax specifically describes the Microsoft and Intel products the attendees would receive information and training on. *See id.* ("Get critical information on the powerful, new and next generation of Windows Embedded Enterprise **[*8]** including Windows 7 FES & Intel's Atom CPU."). Based on these statements alone it is plausible to infer that the seminar was nothing more than a pretext for the Defendants to market their products and services.

Additionally, in order for the fax recipients to register for the seminar, they had to visit the website, www.embedded revolution.com. *Id.* The website describes the "embedded" products offered by Microsoft and Intel as well as the customer services provided by Avnet. [2] *See* Avnet Embedded Revolution Home Page,

http://www.embeddedrevolution.com/. The website also describes the conference as making product launches from Avnet and its partners, such as Microsoft and Intel, available to the attendees. *Id.,* http://www.embeddedrevolution.com/conference/. Therefore, these statements also support the allegations that the seminar was simply a pretext for Defendants to market their products and services.

The Defendants reliance on *Phillip Long Dang, D.C., P.C. v. XLHealth Corp.* [3] is misplaced. As an initial matter, an opinion issued by a district court from the Northern District of Georgia is not binding authority. *See* Townsel v. Dish Network L.L.C., 668 F.3d 967, 970 (7th Cir. 2012) ("district courts' decisions are not authoritative, even in the rendering district"). Additionally, *Phillip Long* was decided on a motion for summary judgment and not a Rule 12(b)(6) motion to dismiss. The court in that case could therefore consider the evidence before it and determine as a matter of law whether the fax was an advertisement. In contrast, the Court must accept all factual allegations as true for purposes of this motion. Finally, the plaintiff in *Phillip Long* apparently failed to allege that the free seminar offered by the fax was itself a commercial enterprise. Instead, the plaintiff argued that "a free seminar fax is an advertisement under the TCPA without regard to whether any commercial activity occurs at the seminar." 2011 U.S. Dist. LEXIS 12166, 2011 WL 553826, at *3. Conversely **[*10]** here, Plaintiff alleges that the purpose of the free seminar offered here was to market the products or services of Defendants Microsoft, Intel and Avnet. Doc. 1-1 at ¶ 19 (the "series of seminars . . .was itself an advertising of the goods or services offered by RTC Group's client those companies hosting and exhibiting at the seminars."). Accordingly, the Plaintiff has sufficiently alleged the fax constituted an advertisement. [4]

_____

[2] The Court may take judicial notice of the contents of a website. *See* LaBella Winnetka, Inc. v. Village of Winnetka, 628 F.3d 937, 944 (7th Cir. 2011); Denius v. Dunlap, 330 F.3d 919, 926 (7th Cir. 2003); *see also* Quan v. Gonzales, 428 F.3d 883, 888 n.5 (9th Cir. 2005) (taking judicial notice **[*9]** of

information on commercial travel guide website to establish plausibility of claim that "banks in China are typically open on Sundays").

[3] *See* No. 09 C 1076, 2011 U.S. Dist. LEXIS 12166, 2011 WL 553826, at *3 (N.D. Ga. Feb. 7, 2011).

[4] The Defendants also repeatedly cite the decision by the Circuit Court of Cook County Judge to dismiss the TCPA claim because he found the fax did not offer goods or services for sale and that the complaint failed to sufficiently allege the seminar was a pretext for the Defendants to offer their products. Since this Court applies the Federal Rules of Civil Procedure once a case has been removed, the Court does not believe much weight should be given to an Illinois state court's

**B. Plaintiff Sufficiently Alleges that Defendants Microsoft, Intel and Avnet May Be Held Liable for the Fax**

Title 47 U.S.C. § 227(b)(1) assigns liability to "any person" who sends an unsolicited advertisement to a telephone facsimile machine. The Federal Communications Commission is the agency vested with authority to issue regulations implementing the TCPA. Orders or rules promulgated by the FCC are binding on this Court pursuant to the Administrative Orders Review Act ("Hobbs Act"). 28 U.S.C. § 2342(1). See CE Design, Ltd. v. Prism Business Media, Inc., 606 F.3d 443, 446 (7th Cir. 2010) (holding that the FCC's orders relating to the TCPA are binding under the Hobbs Act). The FCC has specifically promulgated a rule that defines the sender of an unsolicited advertisement for purposes of § 227(b)(1)(C) as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. 64.1200(f)(10); see also In the Matter of [*13] Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, 21 FCC Rcd 3787, 3808, ¶ 39 (April 5, 2006) ("We take this opportunity to emphasize that under the Commission's interpretation of

the facsimile advertising rules, the sender is the person or entity on whose behalf the advertisement is sent."); In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 10 FCC Rcd 12391, 12407-08, ¶¶ 34-35 (July 26, 1995) ("entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements."). Since Defendants Microsoft's, Intel's and Avnet's goods or services are advertised in the fax at issue, they are "senders" under the FCC's interpretation of this section of the TCPA. Therefore, Plaintiff has adequately alleged that they can be liable for the alleged violation of TCPA.

The cases relied on by the Defendants that hold that Plaintiff must establish the existence of an agency relationship in order to hold the Defendants vicariously liable are unpersuasive. [5] None of these cases appears to have considered the rule promulgated [*14] by the FCC that defines "senders" as the person or entity whose goods or services are advertised or promoted in the unsolicited advertisement. Indeed, one of the cases, Mey v. Pinnacle Sec. LLC, deals with a separate subsection of the TCPA that prohibits automatic dialing equipment from calling wireless phones without the subscriber's consent. See 2012 U.S. Dist. LEXIS 129267, 2012 WL 4009718, at *4. Moreover, none of these cases considered that this rule is binding on a district court under the Hobbs Act. Accordingly, even if the Court disagreed with the FCC's definition of a sender, it has no authority to disregard it.

Even if the FCC did not treat advertisers as senders, Plaintiff has still alleged Defendants Microsoft, Intel and Avnet are vicariously liable because it adequately alleged an agency relationship between those entities and RTC. The Supreme Court has held that when Congress creates a tort action, ordinary principles [*15] of tort-related vicarious liability are incorporated. See Meyer v. Holley, 537 U.S. 280, 285, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003); see also, e.g., Bridgeview Health Care Ltd., 2013 U.S. Dist. LEXIS 37310, 2013 WL 1154206, at *5 ("[N]othing in the language of § 227(b) indicates that traditional notions of agency law

---

decision regarding the sufficiency of allegations in a complaint. While the law of the case doctrine applies to rulings made in state court prior to the removal of a case, a federal district court is vested with full discretion [*11] to set aside or reconsider those orders. See Payne for Hicks v. Churchich, 161 F.3d 1030, 1037 (7th Cir. 1998). Deciding whether allegations found insufficient pursuant to 735 ILCS 5/2-615 are particularly appropriate for reconsideration after removal because Illinois's fact pleading standard imposes a heightened pleading standard that is not required by the Federal Rules' notice pleading standard. See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., 536 F.3d 663, 670 (7th Cir. 2008) ("We can see no reason . . . why the standards of Rule of the Federal Rules of Civil Procedure, rather than Illinois fact pleading requirements, should not apply here."); Axa Corporate Solutions v. Underwriters Reinsurance Corp., 347 F.3d 272, 277 (7th Cir. 2003) ("Parties might prefer the notice-pleading regime of the Federal Rules of Civil Procedure over the fact-pleading approach that prevails in Illinois courts, but no one thinks that the Illinois rules of pleading are binding on the federal courts."); see also, e.g., Drabik v. Drabik, No. 09 C 0028, 2013 U.S. Dist. LEXIS 72886, 2013 WL 2285791, at *2 (N.D. Ill. May 23, 2013) ("The [defendants] mistakenly seek to hold [the plaintiff] to a fact-pleading standard [*12] of Illinois, but it is they who chose to remove [the plaintiff's] suit to federal court where a notice-pleading standard applies.") (internal citations omitted).

---

[5] These cases are Thomas v. Taco Bell Corp., 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012); Bridgeview Health Care Ctr. Ltd. v. Clark, No. 09 C 5601, 2013 U.S. Dist. LEXIS 37310, 2013 WL 1154206, at *5 (N.D. Ill. Mar. 19, 2013); Mey v. Pinnacle Sec. LLC, No. 5:11CV47, 2012 U.S. Dist. LEXIS 129267, 2012 WL 4009718, at *4 (N.D. W. Va. Sept. 12, 2012).

are not applicable."). This Court has previously held that the federal common law of agency should be followed in determining whether agency exists for purposes of establishing vicarious liability under the TCPA. *See Jamison v. First Credit Services, No. 12 C 4415, 290 F.R.D. 92, 2013 U.S. Dist. LEXIS 43978, 2013 WL 1248306, at \*7 (N.D. Ill. Mar. 28, 2013)*. The federal common law of agency is in accord with the Restatement. *See Opp v. Wheaton Van Lines, Inc., 231 F.3d 1060, 1064 (7th Cir. 2000)*; *Moriarty v. Glueckert Funeral Home, Ltd., 155 F.3d 859, 865-66 n. 15 (7th Cir. 1998)*.

The Restatement provides that an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency §1.01*; *see also Chemtool, Inc. v. Lubrication Techs., 148 F.3d 742, 745 (7th Cir. 1998)* **[\*16]** (holding that the test for agency is "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal").

To adequately plead the existence of an agency relationship, "a plaintiff must allege a factual predicate to create the inference of agency." *Frazier v. U.S. Bank Nat. Ass'n, No. 11 C 8775, 2013 U.S. Dist. LEXIS 45330, 2013 WL 1337263, at \*4 (N.D. Ill. Mar. 29, 2013)*; *see also, e.g., Whitley v. Taylor Bean & Whittacker Mortgage Corp., 607 F. Supp. 2d 885, 895 (N.D. Ill. 2009)*. Here, Plaintiff alleges that:

> [Microsoft, Intel and Avnet] through [RTC] approved, authorized and participated in the scheme to broadcast by facsimile by (a) directing a list to be purchased or assembled; (b) directing and supervising employees or third parties to send the facsimiles; (c) creating and approving the form of the facsimile to be sent; (d) determining the number and frequency of facsimile transmissions; and (e) approving or paying the employees or third parties to send the facsimiles.

Doc. 1-1, at ¶ 15. These allegations, accepted as true, provide a sufficient factual basis for the Court **[\*17]** to infer that Microsoft, Intel and Avnet controlled the manner and method of work carried out by RTC. This reasonable inference is further supported by the fact the fax advertised that the conference would be held at Microsoft's Downers Grove offices and identified the

Defendants as the conference's hosts. Therefore, Plaintiff has adequately established the factual predicate for the existence of an agency relationship so that Defendants Microsoft, Intel and Avnet may be held vicariously liable for the alleged TCPA violation.

## II. The Conversion Claim Is Adequately Alleged

To sufficiently allege a claim for common law conversion, Plaintiff must allege: (1) an unauthorized and wrongful assumption of control, dominion, or ownership over its property; (2) its right to the property; and (3) its right to immediate possession of the property, absolutely and unconditionally. *See, e.g., Centerline Equip. Corp. v. Banner Pers. Serv., 545 F. Supp. 2d 768, 781 (N.D. Ill. 2008)* (citing *General Motors Corp. v. Douglass, 206 Ill. App. 3d 881, 565 N.E.2d 93, 96-97, 151 Ill. Dec. 822 (Ill. App. Ct. 1990))*. The Defendants do not dispute, and thus concede, that the complaint sufficiently alleges these elements. Instead, Defendants argue that **[\*18]** the conversion claim should be dismissed because Plaintiff fails to sufficiently allege the existence of an agency relationship between RTC and the other Defendants. For the reasons set forth above with respect to the TCPA claim, the complaint adequately pleads agency. Therefore, the motion to dismiss this claim is denied.

## III. The ICFA Claim Against Microsoft, Intel and Avnet Is Barred by the Statute of Limitations

A claim brought pursuant to the ICFA must be filed within three years of the date the claim accrues. *See 815 ILCS 505/10a(e)*; *see also, e.g., Indep. Trust Corp. v. Fid. Nat. Title Ins. Co. of N.Y., 577 F.Supp.2d 1023, 1041 (N.D. Ill. 2008)*. Here, there is no dispute that Plaintiff's claim accrued on October 1, 2009, the date it received the facsimile from RTC. There is also no dispute that Defendants Microsoft, Intel and Avnet were not added as parties to this litigation until November 9, 2012, which is obviously more than three years after Plaintiff's claim accrued. As a result, the statute operates to bar this claim.

Plaintiff's argument that its ICFA claim against Defendants Microsoft, Intel and Avnet should relate back to the date it filed its initial complaint against **[\*19]** RTC is baseless. [6] *Federal Rule of Civil*

---

[6] Plaintiff's relation back argument is based on the standard

2013 U.S. Dist. LEXIS 99448, *19

*Procedure 15(c)(1)(C)* provides that when a plaintiff adds new defendants as parties in an amended complaint, the amendment only relates back to the original complaint if "if there has been an error made concerning the identity of the proper party and where that party is chargeable with knowledge of the mistake." *See also King v. One Unknown Fed. Corr. Officer, 201 F.3d 910, 914 (7th Cir. 2000); Pierce v. City of Chicago, No. 09 C 1462, 2010 U.S. Dist. LEXIS 118356, 2010 WL 4636676, at *2 (N.D. Ill. Nov. 8, 2010)*. Establishing mistake is necessary for relation back and is "independent from whether the purported party knew that action would be brought against him." *King, 201 F.3d at 914* (internal citations omitted). Moreover, a "mistake" under *Rule 15(c)(1)* is not an inability to identify the proper defendant, "the plaintiff must have actually erred in naming the proper defendant." *Pierce, 2010 U.S. Dist. LEXIS 118356, 2010 WL 4636676, at *2; Hall v. Norfolk S. Ry. Co., 469 F.3d 590, 596 (7th Cir. 2006)*. In other words, "a potential defendant who has not been named in a lawsuit by the time the statute of limitations has run is entitled to repose — unless it is or should be apparent to that person that **[*20]** he is beneficiary of a mere slip of the pen, as it were." *Joseph v. Elan Motorsports Tech. Racing Corp., 638 F.3d 555, 559-60 (7th Cir. 2011)*.

The IFCA claim against Defendants Microsoft, Intel and Avnet does not relate back to the original complaint because there was no mistake. Plaintiff did not erroneously name the wrong defendants in its original complaint. For example, it did not accidentally name Microsoft LLC instead of Microsoft Inc. Rather, it simply failed to name Microsoft, Intel and Avnet as defendants. Under these circumstances, *Rule 15(c)(1)(C)* does not allow Plaintiff to add these defendants after the limitations period has expired. Therefore, the IFCA claim (Count III) against Defendants Microsoft, Intel and Avnet is dismissed with prejudice. [7]

---

set forth in *735 ILCS § 5/2-616(d)*. However, this statute is inapplicable here; rather, *Federal Rule of Civil Procedure 15* governs. *See Fed. R. Civ. P. 81(c)(1)* ("These rules apply to a civil action after it is removed from a state court.").

[7] Plaintiff also argues that it is inappropriate to assert a statute of limitations defense in a *Rule 12(b)(6)* motion to dismiss. **[*21]** This is incorrect as "the statute of limitations may be raised in a motion to dismiss if 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Brooks v. Ross, 578 F.3d 574, 579 (7th Cir. 2009)* (quoting *United States v. Lewis, 411 F.3d 838, 842 (7th Cir. 2005))*. Here, the complaint sets forth everything necessary to satisfy the affirmative defense because it is indisputable that

## CONCLUSION

For the reasons set forth above, the motion to dismiss is granted in part and denied in part. Plaintiff's claim against Defendants Microsoft, Intel and Avnet for a violation of the Illinois Consumer Fraud Act is barred by the statute of limitations. The remainder of the motion to dismiss is denied.

/s/ Virginia M. Kendall

Virginia M. Kendall

United States District Court Judge

Northern District of Illinois

Date: July 16, 2013

---

End of Document

---

Plaintiff's claims accrued on October 1, 2009, which was more than three years before it filed its amended complaint.

 Neutral
As of: October 27, 2021 2:50 PM Z

## *Boim v. Am. Muslims for Palestine*

United States Court of Appeals for the Seventh Circuit

May 27, 2021, Argued; August 16, 2021, Decided

No. 20-3233

**Reporter**
9 F.4th 545 *; 2021 U.S. App. LEXIS 24373 **

STANLEY BOIM, individually and as Administrator of the ESTATE OF DAVID BOIM, and JOYCE BOIM, Plaintiffs-Appellants, v. AMERICAN MUSLIMS FOR PALESTINE, et al., Defendants-Appellees.

**Subsequent History:** Rehearing denied by, En banc, Rehearing denied by *Boim v. Am. Muslims, 2021 U.S. App. LEXIS 27619 (7th Cir. Ill., Sept. 14, 2021)*

**Prior History:** [**1] Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. *1*:17-cv-03591 — Sharon Johnson Coleman, Judge.

*Boim v. Am. Muslims for Palestine, 2020 U.S. Dist. LEXIS 194081, 2020 WL 6149572 (N.D. Ill., Oct. 20, 2020)*

## Core Terms

district court, entity, alter ego, amended complaint, ego, subject matter jurisdiction, proceedings, new lawsuit, allegations, merits, million judgment, federal court, cause of action, federal law, federal jurisdiction, terrorism, lawsuit, federal cause of action, organizations, possessed, cases, ancillary jurisdiction, ancillary, vicarious liability, new organization, discovery, piercing, parties, invoke, veil

## Case Summary

**Overview**
HOLDINGS: [*1*]-The district court erred in dismissing plaintiffs' lawsuit alleging that defendants were alter egos of the now defunct nonprofit organizations, against which plaintiffs had secured a judgment under the Anti-Terrorism Act, 18 U.S.C.S. § 2333(a), and were therefore liable for the remainder of the judgment, because the district court's finding on the alter ego question constituted a merits determination that went beyond a proper jurisdictional inquiry; [2]-Because plaintiffs' new lawsuit arose under the Anti-Terrorism Act, the district court possessed federal jurisdiction and should have allowed the case to proceed on the merits, consistent with the ordinary course of civil litigation.

**Outcome**
Judgment reversed and case remanded.

## LexisNexis® Headnotes

International Law > Dispute Resolution > Remedies > Damages

International Law > Individuals & Sovereign States > Human Rights > Terrorism

International Law > ... > Foreign Sovereign Immunities Act > Exceptions > Terrorism

*HN1*[ ] **Remedies, Damages**

The Anti-Terrorism Act, *18 U.S.C.S. § 2333(a)*, creates a federal cause of action by providing any United States national (or his estate, survivors, or heirs) with a right to sue in federal court and to recover treble damages for injuries resulting from an act of international terrorism.

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > Limited Jurisdiction

Governments > Courts > Authority to Adjudicate

*HN2*[ ] **Jurisdiction Over Actions, Limited**

## Jurisdiction

Because federal courts possess limited jurisdiction, and jurisdiction is power to declare the law, the first step in any federal lawsuit is ensuring the district court possesses authority to adjudicate the dispute—in short, that it has jurisdiction over the subject matter. Limits on a federal court's authority flow from both the Constitution and Congress.

> Constitutional Law > The Judiciary > Congressional Limits
>
> Governments > Courts > Authority to Adjudicate
>
> Constitutional Law > Congressional Duties & Powers > Lower Federal Courts
>
> Governments > Federal Government > US Congress

**HN3**[↴] **The Judiciary, Congressional Limits**

U.S. Const. art. III restricts a federal court's jurisdiction to resolving cases and controversies. *U.S. Const. art. III, § 2*. Further, district courts can only exercise power if authorized by Congress, so each case in federal court must rest upon an independent statutory basis for federal jurisdiction. Congress' greater power to create lower federal courts includes its lesser power to limit the jurisdiction of those courts.

> Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Ancillary Jurisdiction

**HN4**[↴] **Supplemental Jurisdiction, Ancillary Jurisdiction**

Two statutes authorize a majority of cases in federal court: *28 U.S.C.S. § 1331*, which grants jurisdiction over cases arising under federal law (so-called federal question jurisdiction), and *28 U.S.C.S. § 1332*, which authorizes jurisdiction over cases between diverse parties involving more than $75,000 in controversy (so-called diversity jurisdiction). A third source of jurisdiction—supplemental or ancillary jurisdiction—also plays a role. Once a federal court acquires an independent basis for subject matter jurisdiction over a case (often pursuant to *§ 1331* or *§ 1332*), the court can

entertain certain claims or incidental proceedings that would not, on their own, suffice for federal jurisdiction. Ancillary jurisdiction may extend to claims having a factual and logical dependence on the primary lawsuit, but that primary lawsuit must contain an independent basis for federal jurisdiction.

> Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Ancillary Jurisdiction
>
> Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Applicability

**HN5**[↴] **Supplemental Jurisdiction, Ancillary Jurisdiction**

A federal court may exercise ancillary jurisdiction for two separate, though sometimes related, purposes: (*1*) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees. Congress codified much of the first category in the supplemental jurisdiction statute, *28 U.S.C.S. § 1367*, while the latter category—at times called ancillary enforcement jurisdiction—remains grounded in federal common law.

> Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions

**HN6**[↴] **Subject Matter Jurisdiction, Jurisdiction Over Actions**

A federal court must assure itself of subject matter jurisdiction in every case, even those that function to enforce a preexisting judgment.

> Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Ancillary Jurisdiction

**HN7**[↴] **Supplemental Jurisdiction, Ancillary Jurisdiction**

The most straightforward path for enforcing a judgment is a continuation of legal proceedings in the same court

9 F.4th 545, *545; 2021 U.S. App. LEXIS 24373, **1

(and often before the same judge) that entered the judgment. *Fed. R. Civ. P. 69* provides a mechanism for a court to enforce its own judgments, drawing upon state law for the procedures to govern such proceedings. *Rule 69(a)*. These supplementary enforcement proceedings generally fall within a federal court's ancillary jurisdiction as part of its inherent power to enforce its judgments.

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions

*HN8*[⬇] **Subject Matter Jurisdiction, Jurisdiction Over Actions**

The jurisdictional analysis takes on added complexity when the enforcement effort seeks to proceed in a new law-suit.

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Ancillary Jurisdiction

*HN9*[⬇] **Supplemental Jurisdiction, Ancillary Jurisdiction**

Ancillary enforcement jurisdiction does not extend over a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > Alter Ego

*HN10*[⬇] **Piercing the Corporate Veil, Alter Ego**

Alter ego allegations assert that one entity is in reality the same employer and is subject to all the legal and contractual obligations of the other entity.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > Alter Ego

*HN11*[⬇] **Piercing the Corporate Veil, Alter Ego**

The mere fact that two entities are alter egos does not give rise to liability on its own—the underlying liability must arise from some source of substantive law, state or federal.

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Ancillary Jurisdiction

*HN12*[⬇] **Supplemental Jurisdiction, Ancillary Jurisdiction**

A federal court, after issuing a judgment, possesses ancillary jurisdiction over subsequent proceedings to enforce its own decrees. Each standalone case must have an independent basis for subject matter jurisdiction, because ancillary jurisdiction does not extend over new lawsuits to enforce an existing judgment against a party not already bound to that judgment.

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > Federal Questions

*HN13*[⬇] **Subject Matter Jurisdiction, Federal Questions**

A new lawsuit against an alleged alter ego can satisfy 18 U.S.C.S. § 1331 when the new action arises under federal law—when it proceeds pursuant to a federal cause of action to hold the alter ego directly liable.

Criminal Law & Procedure > ... > Terrorism > Support of Terrorist Organizations > Elements

International Law > ... > Foreign Sovereign Immunities Act > Exceptions > Terrorism

International Law > Individuals & Sovereign States > Human Rights > Terrorism

*HN14*[⬇] **Support of Terrorist Organizations, Elements**

The civil liability provision of the Anti-Terrorism Act, *18 U.S.C.S. § 2333(a)*, authorizes a private action against entities that provided material support to terrorism knowing the resources would be used to further the

killing or attempted killing of an American citizen abroad.

*Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > Federal Questions*

### *HN15*[⬇]  Subject Matter Jurisdiction, Federal Questions

*28 U.S.C.S. § 1331* confers federal jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States. The United States Supreme Court has long instructed that a case arises under federal law when federal law creates the cause of action asserted. At the threshold stage of litigation, it matters not whether the plaintiffs' amended complaint states a meritorious claim on a federal cause of action. The absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case. All that matters for *§ 1331* jurisdiction is that the amended complaint pleads a colorable claim arising under the Constitution or laws of the United States. Courts, in assessing jurisdiction, must look to the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and laws of the United States.

*Criminal Law & Procedure > ... > Terrorism > Support of Terrorist Organizations > Elements*

*International Law > ... > Foreign Sovereign Immunities Act > Exceptions > Terrorism*

*International Law > Individuals & Sovereign States > Human Rights > Terrorism*

### *HN16*[⬇]  Support of Terrorist Organizations, Elements

The Anti-Terrorism Act does not appear to provide a cause of action for imposing vicarious liability. A donor to terrorism must have provided material support to be liable under *18 U.S.C.S. § 2333(a)*.

*Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule*

### *HN17*[⬇]  Federal Questions, Well Pleaded Complaint Rule

The great weight of authority makes it clear that a failure to name the particular statute, treaty, or provision of the Constitution under which the action arises is not fatal if the remainder of the complaint shows that a federal question actually is involved or relied upon by the pleader.

*Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint*

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*

### *HN18*[⬇]  Complaints, Requirements for Complaint

A viable pleading need only include a short and plain statement of the claim showing that the pleader is entitled to relief, and district courts are to construe pleadings in the plaintiff's favor, affording the complaint a fair and reasonable construction so as to do justice. *Fed. R. Civ. P. 8(a)*, *(e)*. One objective of *Rule 8* is to decide cases fairly on their merits, not to debate finer points of pleading where opponents have fair notice of the claim or defense.

*Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint*

### *HN19*[⬇]  Complaints, Requirements for Complaint

The plaintiffs are the master of their complaint. The party who brings a suit is master to decide what law he will rely upon, and does determine whether he will bring a suit arising under the Constitution or laws of the United States by his declaration or bill.

*Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim*

### *HN20*[⬇]  Motions to Dismiss, Failure to State Claim

The United States Supreme Court has cautioned

9 F.4th 545, *545; 2021 U.S. App. LEXIS 24373, **1

against deciding merits questions when evaluating challenges to jurisdiction. Jurisdiction is not defeated by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. To the contrary, whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. Where a challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the district court should handle the objection as a direct attack on the merits of plaintiff's case, applying the protections inherent to merits challenges under *Fed. R. Civ. P. 12(b)(6)* or *56*.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

### *HN21*[🔽] Entitlement as Matter of Law, Appropriateness

Under *Fed. R. Civ. P. 12(b)(6)*, courts must assume the truth of the allegations in the complaint, and on a motion for summary judgment under *Fed. R. Civ. P. 56*, a court similarly must view the evidence and draw all inferences in the light most favorable to the opposing party, By contrast, when considering a factual challenge to jurisdiction under *Rule 12(b)(1)*, no presumptive truthfulness attaches to plaintiff's allegations.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

### *HN22*[🔽] Motions to Dismiss, Failure to State Claim

Dismissals on the pleadings should be granted sparingly and with caution to make certain that the plaintiff is not improperly denied a right to have his claim adjudicated on the merits.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > Alter Ego

### *HN23*[🔽] Piercing the Corporate Veil, Alter Ego

The alter ego doctrine is not rigid and must account for the context in which the doctrine is being applied.

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > Federal Questions

Governments > Courts > Authority to Adjudicate

### *HN24*[🔽] Subject Matter Jurisdiction, Federal Questions

As long as federal jurisdiction lies in each proceeding, both may properly remain in federal court.

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Ancillary Jurisdiction

### *HN25*[🔽] Supplemental Jurisdiction, Ancillary Jurisdiction

It is a proper use of a court's ancillary enforcement jurisdiction to bring subsequent proceedings in the same case, even against third parties, to assist in the protection and enforcement of federal judgments.

**Counsel:** For STANLEY BOIM, individually and as Administrator of the ESTATE OF DAVID BOIM, JOYCE BOIM, Plaintiffs - Appellants: Seth Corthell, Attorney, Daniel I. Schlessinger, Attorney, JASZCZUK P.C., Chicago, IL; Alyza D. Lewin, Attorney, Nathan Lewin, Attorney, LEWIN & LEWIN, Washington, DC.

For AMERICAN MUSLIMS FOR PALESTINE, AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION, RAFEEQ JABER, Defendants - Appellees: Christina Jump, Attorney, Alyssa Fini Morrison, Attorney, CONSTITUTIONAL LAW CENTER FOR MUSLIMS IN AMERICA, Richardson, TX.

For ROBERT BARTLETT, Amicus Curiae: Gary M. Osen, Attorney, OSEN LLC, Hackensack, NJ.

For JEWISH COMMUNITY RELATIONS COUNCIL OF THE JEWISH UNITED FUND OF METROPOLITAN CHICAGO, Amicus Curiae: Michael E. Kenneally, Attorney, MORGAN, LEWIS & BOCKIUS LLP, Washington, DC.

9 F.4th 545, *545; 2021 U.S. App. LEXIS 24373, **1

**Judges:** Before KANNE, SCUDDER, and KIRSCH, Circuit Judges.

**Opinion by:** SCUDDER

# Opinion

 [*547] SCUDDER, *Circuit Judge.* In 1996 David Boim was shot and killed by Hamas terrorists while studying abroad in Israel. His parents later sued several American nonprofit organizations for their **[**2]** role in funding Hamas and secured a $156 million judgment under the federal Anti-Terrorism Act. Those organizations then shuttered, leaving Stanley and Joyce Boim mostly empty handed. So in 2017 they filed a new lawsuit against two different American entities and three individuals, alleging that these new defendants are alter egos of the now-defunct nonprofit organizations and therefore liable for the remainder of the $156 million judgment.

In the new lawsuit, the district court allowed limited jurisdictional discovery, decided the new entities and individuals were not alter egos of the defunct nonprofits, and then dismissed the action for lack of subject matter jurisdiction. This should not have happened, for the district court's finding on the alter ego question constituted a merits determination that went beyond a proper jurisdictional inquiry. Because the Boims' new lawsuit arises under the Anti-Terrorism Act, the district court possessed federal jurisdiction and should have allowed the case to proceed on the **[*548]** merits, consistent with the ordinary course of civil litigation. We therefore reverse and remand for renewed proceedings.

I

A

The tragic end to David Boim's life marked the beginning **[**3]** of a decades-long effort by his parents to hold those responsible to account. David, a 17-year-old American citizen, was studying in Israel when two Hamas terrorists shot him in the head at a bus stop near Jerusalem in 1996. David's parents responded by suing several United States-based organizations and individuals under the civil liability provision of the Anti-Terrorism Act. See *18 U.S.C. § 2333(a) (1992).* *HN1*[↑] This statute creates a federal cause of action by providing any United States national (or his estate, survivors, or heirs) with a right to sue in federal court

and to recover treble damages for injuries resulting from an act of international terrorism. See *id.*

The Boims alleged that the defendant organizations and individuals fundraised for and funneled money to Hamas operatives in the West Bank and Gaza, who in turn used those funds to carry out the attack on David. In that way, the Boims contended, these entities provided material support or resources to terrorism and to a foreign terrorist organization in violation of *18 U.S.C. §§ 2339A* and *2339B,* and therefore were civilly liable under *§ 2333(a)* for David's killing.

Although the murder occurred overseas, the Boims filed their action in federal court in Chicago because several **[**4]** of the organizational defendants maintained offices in the Northern District of Illinois. The case proceeded to summary judgment, and the district court determined that the evidence compelled a finding that three defendants were liable under *§ 2333(a):* the Islamic Association for Palestine (which also went by the name American Muslim Society); Holy Land Foundation for Relief and Development; and one individual named Mohammed Abdul Hamid Khalil Salah. A jury convened to assess damages and returned an award for the Boims, holding the defendants jointly and severally liable for $52 million, which the district court then tripled to $156 million under the treble-damages clause Congress included in *§ 2333(a).* The district court entered this judgment in December 2004.

On appeal, we affirmed the judgment against the Islamic Association but reversed as to Holy Land Foundation and Salah. See *Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685, 701 (7th Cir. 2008)* (*Boim III*) (en banc). On remand, the district court again found Holy Land jointly and severally liable under *§ 2333(a).* See *Boim v. Quranic Literacy Inst., No. 00 C 2905, 2012 U.S. Dist. LEXIS 126063, 2012 WL 13171764, at *9 (N.D. Ill. Aug. 31, 2012).*

The Boims then turned their focus to enforcing the judgment—an effort that has spawned new litigation and its own jurisdictional complexity.

B

The Boims have had little success collecting their $156 million judgment. **[**5]** Shortly after the district court entered the judgment in 2004, the Islamic Association and Holy Land Foundation claimed they no longer had any assets and announced they were closing. Less than a year later, a new organization named American Muslims for Palestine emerged and then incorporated in

2006. Some of the Islamic Association's former leaders migrated to positions at the new American Muslims for Palestine organization, and the new organization held its first convention in November 2006 at the same location and during the same time of year as the Islamic Association had **[*549]** done in the past. A few years later, American Muslims for Palestine's leaders formed a separate organization called Americans for Justice in Palestine Educational Foundation—but the two legal entities now operate as one and we refer to them jointly as American Muslims for Palestine for the purpose of this opinion.

The Boims—observing these developments and believing American Muslims for Palestine was a mere continuation of the Islamic Association under a new name—reacted with a renewed attempt in 2017 to collect their judgment. Their enforcement efforts progressed along two tracks.

First, the Boims resumed their **[**6]** post-judgment efforts in case no. 00-cv-2905—the original proceeding in which they received the $156 million judgment in the first instance. On May 12, 2017, the Boims filed several motions, including one under *Federal Rule of Civil Procedure 25(c)* to join the new organization, American Muslims for Palestine (and its affiliate Americans for Justice in Palestine Educational Foundation), and three individuals as judgment debtors responsible for satisfying the $156 million judgment.

Second, on that same day, the Boims filed a new lawsuit in the Northern District of Illinois against American Muslims for Palestine (and its affiliate) and the same three individuals. It is this action—case no. 17-cv-3591—that is the focus of this appeal. The Boims aimed to prove that American Muslims for Palestine is merely a new name for the same terrorism funding enterprise that previously operated under the guise of the Islamic Association, its alternative name American Muslim Society, and Holy Land Foundation. As a result, the Boims contended, the new entity—American Muslims for Palestine—was liable under the Anti-Terrorism Act for the full amount of the prior $156 million judgment. Likewise, the Boims' new complaint alleged that three individuals **[**7]** were alter egos of the original defendant organizations and these individuals, too, participated in the terrorism-funding conduct leading to David's death.

Two weeks after resuming the litigation in the original proceeding and filing the new lawsuit, the Boims moved to consolidate the two cases before the same district

judge. Before any consolidation occurred, however, the district judge presiding over the new lawsuit granted the defendants' motion to dismiss the complaint under *Rule 12(b)(1)* for lack of subject matter jurisdiction. But a few months later, the same district court reconsidered its decision, vacated the dismissal, and permitted the Boims to conduct limited jurisdictional discovery on the existence of an alter ego relationship between the new entity and the defunct ones.

After a year of jurisdictional discovery, the Boims filed an amended complaint, narrowing the defendants to two: American Muslims for Palestine (with its affiliate Americans for Justice in Palestine Educational Foundation) and an individual named Rafeeq Jaber. This amended complaint alleged at length how the Islamic Association's leaders, including Jaber, closed the Islamic Association in name only to avoid paying the **[**8]** $156 million owed, plotted a transition to a purportedly new entity, continued the old Islamic Association's activities under the new name American Muslims for Palestine, and attempted to disguise any connection between the defunct and new organizations.

In their amended complaint, the Boims asserted that the new American Muslims for Palestine is one and the same organization as the purportedly defunct Islamic Association and Holy Land Foundation, just with a different name—in other words, it is an alter ego of the original defendant organizations. For that reason, **[*550]** the Boims contended, American Muslims for Palestine is inherently and necessarily linked to the underlying wrongdoing connected to David's death, and therefore is liable under the *Anti-Terrorism Act, 18 U.S.C. § 2333(a)*, and responsible for the unpaid portion of the $156 million judgment. For their part, American Muslims for Palestine and Rafeeq Jaber dispute these allegations and maintain they have no relationship with the Islamic Association or Holy Land.

The Boims' amended complaint raised two counts against American Muslims for Palestine—one seeking a declaration establishing alter ego identity and liability under the Anti-Terrorism Act for the unpaid judgment, **[**9]** and the other requesting the entry of a money judgment for the remainder of the $156 million left unsatisfied. The Boims also raised two claims against Rafeeq Jaber, who was responsible for winding up the Islamic Association's affairs: first, that he fraudulently concealed material facts regarding the Islamic Association's assets, and second, that he was jointly liable for the $156 million judgment under the doctrine of veil piercing or as an alter ego of the original

defendants.

C

The defendants moved to dismiss the amended complaint for lack of subject matter jurisdiction under *Rule 12(b)(1)*, and once more, the district court granted the motion. Over the Boims' objection, the district court reasoned that because it had allowed jurisdictional discovery, the defendants' motion to dismiss effectively constituted a challenge to the *factual* basis for subject matter jurisdiction. Accordingly, the district court looked beyond the pleadings to the evidence submitted by both parties to decide whether it possessed jurisdiction. See *Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 443-44 (7th Cir. 2009)* (explaining factual challenges to jurisdiction).

Focused on the Boims' alter ego argument, the district court applied an ERISA-based test for alter ego liability and found that, **[\*\*10]** on balance, the facts showed that American Muslims for Palestine and the original defendants were separate and distinct entities. The district court then determined that because the facts did not bear out the Boims' allegations of alter ego status, it lacked subject matter jurisdiction over the Boims' new lawsuit. From there the court declined to exercise supplemental jurisdiction over the Boims' state law successor liability claim against American Muslims for Palestine and the state law claims against Rafeeq Jaber. In the end, then, the district court dismissed the amended complaint in its entirety for lack of subject matter jurisdiction.

The Boims now appeal.

II

The district court's assessment of subject matter jurisdiction reflected legal error.

A

**HN2**[⬆] Because federal courts possess limited jurisdiction, and "[j]urisdiction is power to declare the law," the first step in any federal lawsuit is ensuring the district court possesses authority to adjudicate the dispute—in short, that it has jurisdiction over the subject matter. *Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)* (quoting *Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514, 19 L. Ed. 264 (1868)*). Limits on a federal court's authority flow from both the Constitution and Congress. See *Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005)*.

**[\*551]** **HN3**[⬆] *Article III of the Constitution* restricts a federal court's jurisdiction to resolving "Cases" and **[\*\*11]** "Controversies." See *U.S. Const. art. III, § 2*; *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157-58, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)* (explaining the standing aspect of Article III's Case or Controversy requirement); *DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006)* (reminding that mootness, ripeness, and the political question doctrine also flow from the Case or Controversy requirement). Further, district courts can only exercise power if authorized by Congress, so each case in federal court must rest upon an independent statutory basis for federal jurisdiction. See *Exxon Mobil, 545 U.S. at 552*; see also *Patchak v. Zinke, 138 S. Ct. 897, 906, 200 L. Ed. 2d 92 (2018)* ("Congress' greater power to create lower federal courts includes its lesser power to 'limit the jurisdiction of those Courts.'" (quoting *United States v. Hudson, 11 U.S. (7 Cranch) 32, 33, 3 L. Ed. 259 (1812)*)).

The latter requirement—the statutory basis for federal jurisdiction—is the focus of this appeal. **HN4**[⬆] Two statutes authorize a majority of cases in federal court: *28 U.S.C. § 1331*, which grants jurisdiction over cases arising under federal law (so-called federal question jurisdiction), and *28 U.S.C. § 1332*, which authorizes jurisdiction over cases between diverse parties involving more than $75,000 in controversy (so-called diversity jurisdiction). See *Home Depot U.S.A., Inc. v. Jackson, 139 S. Ct. 1743, 1746, 204 L. Ed. 2d 34 (2019)*. A third source of jurisdiction—supplemental or ancillary jurisdiction—also plays a role. Once a federal court acquires an independent basis for subject matter jurisdiction over a case (often pursuant to *§ 1331* or *§ 1332*), the court can **[\*\*12]** entertain certain claims or incidental proceedings that would not, on their own, suffice for federal jurisdiction. See *Peacock v. Thomas, 516 U.S. 349, 355, 116 S. Ct. 862, 133 L. Ed. 2d 817 (1996)* ("Ancillary jurisdiction may extend to claims having a factual and logical dependence on 'the primary lawsuit,' but that primary lawsuit must contain an independent basis for federal jurisdiction." (citation omitted)).

**HN5**[⬆] The Supreme Court has long recognized that a federal court may exercise ancillary jurisdiction for "two separate, though sometimes related, purposes: (*1*) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent;

9 F.4th 545, *551; 2021 U.S. App. LEXIS 24373, **12

and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 379-80, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)* (citations omitted); see also *Root v. Woolworth, 150 U.S. 401, 413, 14 S. Ct. 136, 37 L. Ed. 1123 (1893)*. Congress codified much of the first category in the supplemental jurisdiction statute, *28 U.S.C. § 1367*, while the latter category—at times called "ancillary enforcement jurisdiction"—remains grounded in federal common law. See *Peacock, 516 U.S. at 354 n.5, 356*; see also *Butt v. United Brotherhood of Carpenters & Joiners of Am., 999 F.3d 882, 886-87, 886 n.3 (3d Cir. 2021)* (reviewing the history of pendent, ancillary, and ancillary enforcement jurisdiction); Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 3523, 3523.2 (3d ed. 2021) (explaining **[**13]** the development of supplemental jurisdiction and that ancillary enforcement jurisdiction is still governed by common law).

B

**HN6**[⬆] A federal court must assure itself of subject matter jurisdiction in every **[*552]** case, even those that function to enforce a preexisting judgment. See, *e.g.*, *Peacock, 516 U.S. 349*. The jurisdictional analysis, however, plays out differently depending on the posture of the enforcement proceeding, as the following examples illustrate.

**HN7**[⬆] The most straightforward path for enforcing a judgment is a continuation of legal proceedings in the same court (and often before the same judge) that entered the judgment. *Federal Rule of Civil Procedure 69* provides a mechanism for a court to enforce its own judgments, drawing upon state law for the procedures to govern such proceedings. See *Fed. R. Civ. P. 69(a)*. As the Supreme Court observed in *Peacock*, these supplementary enforcement proceedings generally fall within a federal court's ancillary jurisdiction as part of its "inherent power to enforce its judgments." *516 U.S. at 356*. The Boims themselves followed this path in 2017 when they filed motions in the original underlying proceeding (case no. 00-cv-2905) to revive the $156 million judgment and to add American Muslims for Palestine as a judgment debtor. But the district **[**14]** court deferred any action on these motions, and those proceedings have since stalled.

**HN8**[⬆] The jurisdictional analysis takes on added complexity when the enforcement effort seeks to proceed in a new law-suit. In some situations, for example, a prevailing litigant attempts to recover a money judgment from a new defendant, different from the one named in the judgment, by filing a separate lawsuit and arguing the new defendant is vicariously responsible for the preexisting judgment.

The Supreme Court addressed this scenario in *Peacock* and, on the theory of vicarious liability pursued there, held that the action did not belong in federal court. See *516 U.S. at 351*. The plaintiff, Jack Thomas, secured a money judgment under ERISA against his former employer and later filed a new law-suit to hold a corporate officer, D. Grant Peacock, vicariously liable for that judgment through the doctrine of veil piercing. See *id. at 351-52*.

At the outset, the Supreme Court determined Thomas's new lawsuit to impose vicarious liability did not rest on any federal cause of action supplied by Congress in ERISA. See *id. at 353-54*. The Court observed that no part of ERISA recognizes an action to impose vicarious liability on a third party through veil piercing, **[**15]** and although ERISA does provide a cause of action in 28 U.S.C. § 1132(a)(3) for direct liability—to redress violations of ERISA—Thomas's complaint did not raise any allegation that Peacock *himself* violated ERISA. See *id.* "Because Thomas alleged no 'underlying' violation of any provision of ERISA" in his complaint, the Court explained, *§ 1331* could not support federal jurisdiction. *Id. at 354*.

As for ancillary jurisdiction, the Court recognized that it had "approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances." *Id. at 356*. **HN9**[⬆] But the Court clarified that ancillary enforcement jurisdiction did not extend over "a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment." *Id. at 357*. The district court therefore lacked jurisdiction over Thomas's new suit against Peacock as a new defendant. See *id. at 360*; see also *E. Cent. Ill. Pipe Trades Health & Welfare Fund v. Prather Plumbing & Heating, Inc., 3 F.4th 954, 960-63 [*553]* (7th Cir. 2021) (applying *Peacock* and concluding a district court lacked jurisdiction over a new lawsuit to impose an existing ERISA judgment against a new company **[**16]** under a theory of successor liability—another form of vicarious liability).

Not all efforts to enforce a preexisting judgment fall

9 F.4th 545, *553; 2021 U.S. App. LEXIS 24373, **16

within *Peacock's* ambit, though. Consider a third scenario in which a prevailing litigant attempts to recover a money judgment by suing an entity purported to be *one and the same* as—the alter ego of—the original judgment debtor. See *Howard Johnson Co. v. Detroit Loc. Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union, 417 U.S. 249, 259 n.5, 94 S. Ct. 2236, 41 L. Ed. 2d 46 (1974)* (explaining that **HN10**[↑] alter ego allegations assert that one entity "is in reality the same employer and is subject to all the legal and contractual obligations of" the other entity).

If Company *A* and Company *B*, though nominally two enterprises, are effectively a singular organization operating under two names, then *A* is directly responsible for *B's* obligations and wrongdoings because they are one and the same organization. See *id.*; *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc., 212 F.3d 1031, 1038 (7th Cir. 2000)*. **HN11**[↑] But the mere fact that two entities are alter egos does not give rise to liability on its own—the underlying liability must arise from some source of substantive law, state or federal. See, *e.g.*, *McCleskey v. CWG Plastering, LLC, 897 F.3d 899, 901 (7th Cir. 2018)* (seeking to hold one company responsible for collective bargaining obligations as an alter ego of a defunct company through an ERISA cause of action). Here, the Boims seek in their amended complaint to hold [**17] American Muslims for Palestine liable for the $156 million judgment re-ceived in the original private action brought against the Islamic Association and Holy Land Foundation pursuant to *§ 2333(a)* of the Anti-Terrorism Act.

We encountered a similar situation in *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, where a fund obtained an ERISA judgment and then brought a new lawsuit against two entities, Central Transport and Central Cartage, alleged to be alter egos of the original judgment debtors. See *85 F.3d 1282, 1284 (7th Cir. 1996)*. Because the complaint alleged that Central Transport and Central Cartage exercised common control with the original defendants—and thereby "played a part in the initial ERISA violation"—we determined that the funds' second lawsuit brought a "specific claim for relief under ERISA." *Id. at 1286*; see also *Ellis v. All Steel Const., Inc., 389 F.3d 1031, 1035 (10th Cir. 2004)* (explaining that "the distinctive feature of direct liability underpinning *Central States'* holding [is] that it turns on the alter ego's direct participation in the underlying violation"). As a result, we concluded the funds' claim—rooted in an alter ego theory of liability—

arose under federal law, meaning the district court possessed subject matter jurisdiction pursuant [**18] to *§ 1331*. See *Cent. States, 85 F.3d at 1286-87*.

We adhered to analogous reasoning in *Elite Erectors*, where we determined that a complaint—by alleging that two defendants were alter egos of a third ERISA-covered employer—asserted they were all "the same entity" and therefore sought to hold the defendants "directly liable under federal law" for an ERISA violation. See *212 F.3d at 1037-38*. For that reason, we concluded the plaintiffs invoked a federal cause of action under ERISA against the alter egos, satisfying *§ 1331* jurisdiction. See *id. at 1038*.

The Boims' lawsuit, then, is not our first encounter with these questions of [*554] jurisdiction. The Supreme Court's teachings and our own case law supply and define the framework necessary to review the district court's conclusion that it lacked subject matter jurisdiction over the Boims' new lawsuit and amended complaint. **HN12**[↑] We know from *Peacock* that a federal court, after issuing a judgment, possesses ancillary jurisdiction over subsequent proceedings to enforce its own decrees. *Peacock* also provides the important reminder that each standalone case must have an independent basis for subject matter jurisdiction, because ancillary jurisdiction does not extend over new lawsuits to enforce an existing judgment against a party [**19] not already bound to that judgment. Finally, *Central States* and *Elite Erectors* tell us that **HN13**[↑] a new lawsuit against an alleged alter ego can satisfy *§ 1331* when the new action arises under federal law—when it proceeds pursuant to a federal cause of action to hold the alter ego *directly* liable.

C

Guided by these precedents, the proper jurisdictional analysis of the Boims' amended complaint comes into clearer focus.

The Boims seek to recover their existing $156 million judgment from entities they contend are one and the same as the original defendants. The Boims' current action, filed under a new case number and assigned to a different district judge, alleges that American Muslims for Palestine is an alter ego of the original defendants, Islamic Association for Palestine and Holy Land Foundation. **HN14**[↑] They invoke the civil liability provision of the *AntiTerrorism Act, § 2333(a)*, which authorizes a private action against entities that provided material support to terrorism knowing the resources

9 F.4th 545, *554; 2021 U.S. App. LEXIS 24373, **19

would be used to further the killing or attempted killing of an American citizen abroad. See *Boim III, 549 F.3d at 691* (describing the elements for holding a terrorism donor liable under *§ 2333(a)*). The Boims maintain that because these nominally distinct **[\*\*20]** entities are in reality the same terrorism-funding organization, American Muslims for Palestine is liable under *§ 2333(a)* for the unpaid judgment that resulted from Hamas's murder of their son David in 1996.

The Boims have satisfied the prerequisites for federal jurisdiction under Article III—they have standing to sue, there is a live dispute about whether American Muslims for Palestine is liable as an alter ego of the former entities, the issue is ripe for resolution, and the action presents a case arising under the laws of the United States—in particular, the Anti-Terrorism Act. See *U.S. Const. art. III, § 2*; *Susan B. Anthony List, 573 U.S. at 157-58*; *Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 492-95, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983)* (explaining the broad meaning of "arising under" federal law as used in Article III).

The inquiry into the statutory basis for subject matter jurisdiction is more complex. The Boims purport to invoke federal question jurisdiction under *28 U.S.C. § 1331*, and our analysis begins—and ends—with that contention.

*HN15*[⬆] *Section 1331* confers federal jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." *28 U.S.C. § 1331*. The Supreme Court has long instructed that a case arises under federal law "when federal law creates the cause of action asserted." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning, 578 U.S. 901, 136 S. Ct. 1562, 1569, 194 L. Ed. 2d 671 (2016)*; *Am. Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260, 36 S. Ct. 585, 60 L. Ed. 987 (1916)*. At this threshold stage of litigation, it matters not whether the Boims' amended **[\*\*21]** complaint states a meritorious **[\*555]** claim on a federal cause of action. See *Steel Co., 523 U.S. at 89* ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case."). All that matters for *§ 1331* jurisdiction is that the amended complaint "pleads a colorable claim 'arising under' the Constitution or laws of the United States." *Arbaugh v. Y&H Corp., 546 U.S. 500, 513, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006)*; see also *Bell v. Hood, 327 U.S. 678, 681, 66 S. Ct. 773, 90 L. Ed. 939 (1946)* (instructing that courts, in assessing jurisdiction, "must

look to the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and laws of the United States").

The Boims' amended pleading satisfies these requirements. The complaint alleges that "AMP/AJP *is* IAP/AMS and HLF, but just has a different name." Am. Compl. ¶ 162. Right to it, the Boims claim that American Muslims for Palestine, whom the parties refer to as AMP/AJP, is the alter ego of the original judgment debtors—Islamic Association for Palestine and Holy Land Foundation. If that assertion proves true on the merits, the necessary consequence is that American Muslims for Palestine is the same organization that **[\*\*22]** provided material support to Hamas in connection with David Boim's death—meaning it is *directly* liable under the Anti-Terrorism Act. See *Elite Erectors, 212 F.3d at 1038*; *Cent. States, 85 F.3d at 1286*. The Boims make this point explicit in their amended complaint by contending that, "[a]s alter egos and/or successors of *Boim* Defendants IAP/AMS and HLF, AMP/AJP and Jaber are effectively the same entity or person as these *Boim* Defendants and are liable to Plaintiffs under *18 U.S.C. § 2333(a)* for the unpaid portion of the *Boim* judgment." Am. Compl. ¶ 166.

We read the pleading to mean what it says. The Boims' amended complaint claims a right to recover from American Muslims of Palestine under the Anti-Terrorism Act, *§ 2333(a)*. And by resting their claim on a federal statute that itself supplies a cause of action, the Boims have brought a case "arising under" federal law within the meaning of *28 U.S.C. § 1331*. See *Merrill Lynch, 136 S. Ct. at 1569*.

Recognize how the Boims' action differs from the situation in *Peacock*, where the plaintiff sought to hold a corporate officer vicariously liable by piercing the corporate veil under a statute that did not contain a cause of action for such vicarious liability. See *516 U.S. at 353-54*. *HN16*[⬆] The Anti-Terrorism Act likewise does not appear to provide a cause of action for imposing vicarious liability. See **[\*\*23]** *Boim III, 549 F.3d at 691* (explaining that a donor to terrorism must have provided material support to be liable under *§ 2333(a)*).

But the Boims do not contend that this new defendant is only derivatively or vicariously liable for a predecessor's past violations, as was the case in *Peacock*. See also *Prather Plumbing & Heating, 3 F.4th at 962-63*; *Ellis, 389 F.3d at 1034-36*. To the contrary, the Boims allege that American Muslims for Palestine is just a new name

for the same preexisting organization that provided material support to Hamas in furtherance of David Boim's death. Indeed, the amended complaint is replete with factual allegations that show, in the Boims' view, that American Muslims for Palestine is a disguised continuance of the Islamic Association and Holy Land Foundation, and in that way, American Muslims for Palestine played a role in the original wrongdoing that led to their son's murder at the hands of Hamas. See *Cent. States, 85 F.3d at 1286* (concluding a complaint  **[*556]** raised a specific claim for relief under federal law where it contained alter ego allegations linking the defendant to the underlying ERISA violation). Put another way, the Boims allege that American Muslims for Palestine is directly liable for providing material support leading to David's death—and the statutory cause of action in the Anti-Terrorism **[**24]** Act, *§ 2333(a)*, permits a suit to redress that harm.

We acknowledge that two features of the Boims' amended complaint complicate our analysis. First, the specific numbered counts against American Muslims for Palestine seek a declaratory judgment (Count I) and entry of a monetary judgment (Count III) without expressly citing the cause of action in *§ 2333(a)*. Second, the Boims are explicit about their goals, asserting that "this declaratory judgment action seeks to enforce the *Boim* Judgment against AMP and AJP as alter egos and successors of the *Boim* Defendants." Am. Compl. ¶ 7.

But the observation that the precise counts do not expressly invoke *§ 2333(a)* does not establish the absence of a claim arising under federal law. For one, each count explicitly incorporates the detailed factual allegations that precede its place in the amended complaint, including those claiming that American Muslims for Palestine is liable under *§ 2333(a)* because it is one and the same entity as the Islamic Association and Holy Land Foundation. **HN17[⬆]** For another, "the great weight of authority makes it clear that a failure to name the particular statute, treaty, or provision of the Constitution under which the action arises is not fatal if the remainder **[**25]** of the complaint shows that a federal question actually is involved or relied upon by the pleader." Wright & Miller, *Federal Practice and Procedure* § 1209; see, *e.g.*, *Johnson v. City of Shelby, 574 U.S. 10, 11, 135 S. Ct. 346, 190 L. Ed. 2d 309 (2014)* (summarily reversing a decision that required a complaint to expressly invoke *42 U.S.C. § 1983* and explaining that federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim

asserted"); *AmSouth Bank v. Dale, 386 F.3d 763, 779 (6th Cir. 2004)* (collecting cases from various circuits following the same approach).

**HN18[⬆]** What is more, a viable pleading need only include a "short and plain statement of the claim showing that the pleader is entitled to relief," and district courts are to construe pleadings in the plaintiff's favor, affording the complaint a fair and reasonable construction "so as to do justice." *Fed. R. Civ. P. 8(a), (e)*; see also *Bausch v. Stryker Corp., 630 F.3d 546, 562 (7th Cir. 2010)* ("One objective of *Rule 8* is to decide cases fairly on their merits, not to debate finer points of pleading where opponents have fair notice of the claim or defense."). Given the comprehensive nature of the Boims' amended complaint, it does not require a fine-toothed comb to see that, in substance, the complaint advances a claim to impose liability on American Muslims for Palestine under *§ 2333(a)* through the mechanism of **[**26]** a declaratory judgment action.

The opening pages of their amended complaint make expressly clear that the Boims "seek to impose liability on AMP, AJP and Rafeeq Jaber arising from the civil liability provisions of the [Anti-Terrorism Act]" by bringing an action pursuant to *§ 2333(a)*. Am. Compl. ¶ 11. The subsequent pages allege in depth the facts and events which, the Boims maintain, entitle them to damages under *§ 2333(a)* from the new organization and Jaber as alter egos of the Islamic Association. A fair reading of the amended complaint, then, reveals that the Boims aim to hold American Muslims for Palestine liable under *§ 2333(a)* by **[*557]** connecting the organization, as an alter ego of the Islamic Association, to the wrongdoing that led to the $156 million judgment. The district court seemed to read the complaint this same way, describing the Boims' action as one seeking relief under the Anti-Terrorism Act.

Remember, too, that **HN19[⬆]** the plaintiffs are the master of their complaint. See *Bell, 327 U.S. at 681* ("[T]he party who brings a suit is master to decide what law he will rely upon, and ... does determine whether he will bring a 'suit arising under' the ... (Constitution or laws) of the United States by his declaration or bill." (quoting **[**27]** *The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S. Ct. 410, 57 L. Ed. 716, 1913 Dec. Comm'r Pat. 530 (1913)*)). The Boims have elected to pursue a federal claim to hold the new organization, American Muslims for Palestine, liable under the Anti-Terrorism Act as an alter ego of the Islamic Association and Holy Land Foundation and therefore responsible in

connection with David's death. Whether the Boims can ultimately prove that claim is of no consequence at this stage. All that matters is a recognition that here, unlike the claim for veil piercing in *Peacock*, the Boims' claim rests on a federal cause of action in § 2333(a) and therefore arises under federal law within the meaning of 28 U.S.C. § 1331. Cf. *Peacock, 516 U.S. at 353-54*. That is enough to confer federal subject matter jurisdiction on the district court.

D

The district court reached a contrary conclusion by conflating a merits inquiry—whether American Muslims for Palestine is, in fact, the same entity as the Islamic Association or Holy Land Foundation—with the question of federal jurisdiction.

HN20[ ] The Supreme Court has cautioned against deciding merits questions when evaluating challenges to jurisdiction. See, *e.g., Steel Co., 523 U.S. at 89*; *Bell, 327 U.S. at 681-82*. Jurisdiction, the Court has emphasized, "is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually [**28] recover." *Bell, 327 U.S. at 682*; see also *Craftwood II, Inc. v. Generac Power Sys., Inc., 920 F.3d 479, 481 (7th Cir. 2019)*. To the contrary, "[w]hether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided *after* and not before the court has assumed jurisdiction over the controversy." *Bell, 327 U.S. at 682* (emphasis added); see also *Steel Co., 523 U.S. at 89* (reinforcing this principle); *Thornton v. M7 Aerospace LP, 796 F.3d 757, 765 (7th Cir. 2015)* (applying the *Bell* rule). This principle explains why we instructed in *Malak v. Associated Physicians, Inc.* that "where a challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action," the district court should handle the objection "as a direct attack on the merits of plaintiff's case," applying the protections inherent to merits challenges under *Rule 12(b)(6)* or *Rule 56. 784 F.2d 277, 279-80 (7th Cir. 1986)*.

The defendants here moved to dismiss the Boims' amended complaint by arguing that the evidence assembled during jurisdictional discovery did not support a finding that American Muslims for Palestine is an alter ego of the original judgment debtors. But this contention is an attack on the *merits* of the Boims' claim, not a challenge to the factual basis for the district court's constitutional and statutory authority to adjudicate the dispute. That is because the district [**29] court's jurisdiction did not hinge on a finding that American Muslims for Palestine is, *in fact*, an alter ego of the original defendants.

[*558] The district court saw things differently, construing the defendants' motion as a factual attack on subject matter jurisdiction. This mistake was not a mere trivial error in labeling the type of challenge. It had significant and detrimental consequences for the viability of the Boims' suit.

To begin, the district court permitted only limited jurisdictional discovery on the existence of an alter ego relationship. We cannot say the factual record was fully developed on the question.

Even more, the Boims did not receive the protections afforded to nonmoving parties when courts assess merits challenges via *Rule 12(b)(6)* or *Rule 56*—protections that do not apply in factual challenges to jurisdiction under *Rule 12(b)(1)*. See *Apex Digital, 572 F.3d at 444*. HN21[ ] Under *Rule 12(b)(6)*, courts must assume the truth of the allegations in the complaint, see *Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008)*, and on a motion for summary judgment under *Rule 56*, a court similarly must view the evidence and draw all inferences "in the light most favorable to the opposing party," *Tolan v. Cotton, 572 U.S. 650, 657, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)* (quoting *Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*). By contrast, when considering a factual challenge to jurisdiction under *Rule 12(b)(1)*, "no presumptive truthfulness attaches [**30] to plaintiff's allegations." *Apex Digital, 572 F.3d at 444* (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)*).

The district court, analyzing what it deemed a factual attack on jurisdiction, assessed the merits of the Boims' action but failed to presume the truth of the allegations or take the facts in the light most favorable to the Boims. And our review shows that the district court's error contributed to, if not accounted for, the unfavorable ruling against the Boims.

One example illustrates the point in stark terms. The Boims alleged and proffered evidence that, by late 2005, a group of individuals began using an online Yahoo! bulletin board titled "AMP_Transition" to discuss the formation of the new organization, making comments such as "we really need to distance ourselves from any well known IAP figures ... [s]ince this is the transition period." Am. Compl. ¶¶ 67, 69. The Boims highlighted this particular post to show that the new organization's founders intentionally and

9 F.4th 545, *558; 2021 U.S. App. LEXIS 24373, **30

deceptively concealed that American Muslims for Palestine, the new entity, was a continuation of the old Islamic Association. In the district court's view, however, this evidence showed that the new entity's founders made legitimate efforts to distinguish themselves from the Islamic [**31] Association, which the court considered to be proof that American Muslims for Palestine is *not* an alter ego of the Islamic Association.

If the district court had applied the requisite presumptions under *Rule 12(b)(6)* or *Rule 56*, it would have been compelled to view the facts and make inferences from this evidence in the Boims' favor. Here, that would mean viewing the bulletin board posting as evidence showing fraudulent intent to avoid liability—one factor supporting alter ego liability, not negating it. See *Cent. States, 85 F.3d at 1288* (explaining that, at least in the ERISA context, "[e]ssential to the application of the alter-ego doctrine is a finding of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as a sham transfer of assets"); see also *McCleskey, 897 F.3d at 903* (same).

*HN22*[↑] Dismissals on the pleadings "should be granted sparingly and with caution to [*559] make certain that the plaintiff is not improperly denied a right to have his claim adjudicated on the merits." Wright & Miller, *Federal Practice and Procedure* § 1349. The liberal pleading standard in *Rule 8* and the presumptions accorded to nonmovants on dispositive motions should have played a role in the district court's consideration [**32] of the merits of the Boims' alter ego allegations. See *Erickson v. Pardus, 551 U.S. 89, 93-94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)*.

Our point with all of this is to say that the district court committed legal error when terminating the Boims' new case on jurisdictional grounds.

### III

### A

Because we conclude the district court possessed federal jurisdiction under *§ 1331* and erred in dismissing the Boims' amended complaint, we remand for further proceedings. The Boims are entitled to have their claim—that American Muslims for Palestine, as an alter ego of the Islamic Association and Holy Land Foundation, is liable under *§ 2333(a)*—proceed to adjudication on the merits, and that warrants a few words on the legal standard.

In analyzing the Boims' alter ego allegations, the district court applied a test from the ERISA context for establishing alter ego liability. See *McCleskey, 897 F.3d at 903*. In so doing, the district court considered factors traditionally used to determine if an employer has flouted its obligations under collective bargaining agreements through a sham change in its corporate form—factors like whether the companies have overlapping management, ownership, assets, business purpose, equipment, and customers. See *id.*

*HN23*[↑] But the alter ego doctrine is not rigid and must account for the context in which [**33] the doctrine is being applied—here, to terrorism financing organizations. Cf. *Nat'l Council of Resistance of Iran v. Dep't of State, 373 F.3d 152, 157, 362 U.S. App. D.C. 143 (D.C. Cir. 2004)* (flexibly applying the alias concept in the terrorism context to an entity designated as the alias of a foreign terrorist organization). Not all of the alter ego factors relevant in the employee benefit plan context will be probative. It is difficult, for instance, to see how substantial similarity (or lack thereof) in customers, equipment, or ownership would have any meaningful bearing on the alter ego inquiry in the context of terrorism financing nonprofit organizations, which do not have customers, equipment, or owners in the traditional corporate sense. Factors like overlap in leadership, same organizational purpose, similarity of operations, and unlawful motive or intent to escape liability would seem to take on added weight, as could other factors that have not expressly played a role in assessing alter ego liability in the labor law context. The district court, aided by the parties' briefing, is best equipped to discern the apt analysis for alter ego status in this context.

The Boims' amended complaint alleged in the alternative that American Muslims for Palestine was liable under the doctrine of successor [**34] liability and also included two claims against Rafeeq Jaber—one asserting he is liable for the $156 million judgment either under the doctrine of veil piercing or as an alter ego of the original defendants, and the other presenting a state law claim of fraudulent concealment. The district court declined to exercise supplemental jurisdiction over these claims. Our conclusion—that the district court indeed possessed an independent basis for subject matter jurisdiction—necessitates a fresh look by the district court at these additional claims as well.

[*560] B

9 F.4th 545, *560; 2021 U.S. App. LEXIS 24373, **34

The action we reinstate today is only one of two tracks the Boims pursued to hold American Muslims for Palestine to account as an alter ego, the other being the resumption of efforts in the original proceeding that resulted in the $156 million judgment—case no. 00-cv-2905. *HN24*[↑] As long as federal jurisdiction lies in each proceeding, both may properly remain in federal court.

We have concluded the district court possesses jurisdiction pursuant to *28 U.S.C. § 1331* over the Boims' new lawsuit in case no. 17-cv-3591 because the amended complaint invokes a federal cause of action under the Anti-Terrorism Act and thus arises under federal law. *HN25*[↑] Regarding the judgment [**35] enforcement proceedings in the original action, the Supreme Court in *Peacock* expressly instructed that it is a proper use of a court's "ancillary enforcement jurisdiction" to bring subsequent proceedings in the same case, even against third parties, "to assist in the protection and enforcement of federal judgments." *516 U.S. at 356*.

On remand, the district court may use its discretion to permit the Boims to file an amended pleading to sharpen their allegations in light of our decision. The Boims are likewise free, if they choose, to resume proceedings before the original trial court and move to consolidate the two proceedings before the same district court judge.

For these reasons, we REVERSE and REMAND.

---

**End of Document**

 Positive
As of: October 27, 2021 2:52 PM Z

# *Brown v. Skyline Furniture Mfg.*

United States District Court for the Northern District of Illinois, Eastern Division

June 12, 2017, Decided; June 12, 2017, Filed

Case No. 17-cv-1244

**Reporter**

2017 U.S. Dist. LEXIS 90008 *; 2017 WL 2536590

TERRENCE L. BROWN, Plaintiff, v. SKYLINE FURNITURE MANUFACTURING, INC., SEA PRODUCTS, INC., and TED WECKER, Defendants.

**Subsequent History:** Summary judgment granted by, Costs and fees proceeding at *Brown v. Skyline Furniture Mfg., 2019 U.S. Dist. LEXIS 87295 (N.D. Ill., May 23, 2019)*

## Core Terms

allegations, stock, fraudulent misrepresentation, per share, fiduciary duty, shares, share price, disclose

**Counsel:** **[*1]** For Terrence L. Brown, Plaintiff, Counter Defendant: Robert Blake McMonagle, LEAD ATTORNEY, Lane & Waterman, Davenport, IA; Douglas W. Michaud, Thomas Anthony Smith, Senak Keegan Gleason Smith & Michaud, Ltd., Chicago, IL.

For Skyline Furniture Manufacturing, Inc., Sea Products, Inc., Ted Wecker, Defendants, Counter Claimants: Patrick Williamson Spangler, LEAD ATTORNEY, Martin T Mcelligott, Randall Marc Lending, Vedder Price P.C., Chicago, IL.

**Judges:** Sharon Johnson Coleman, United States District Judge.

**Opinion by:** Sharon Johnson Coleman

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff, Terrence L. Brown, brings this action against defendants Skyline Furniture Manufacturing, Inc., SEA Products, Inc., and Ted Wecker, asserting claims of fraudulent misrepresentation, breach of fiduciary duty,

*Family and Medical Leave Act* violations, and *Illinois Wage Payment and Collection Act* violations. The defendants move this Court to dismiss Brown's fraudulent misrepresentation and breach of fiduciary duty claims or, alternatively, to dismiss SEA Products from the fraudulent misrepresentation claim. For the reasons set forth herein, that motion is granted in part and denied in part.

### Background

The following allegations taken from the **[*2]** plaintiff's amended complaint are accepted as true for the purpose of ruling on this motion. Skyline is a closely-held Illinois corporation that designs and manufactures furniture. SEA Products, Inc. is an Illinois corporation that shares several common owners or shareholders with Skyline and that shares Skyline's offices, showrooms, staff, and financial resources. Ted Wecker is the CEO of Skyline and SEA Products. Brown was continuously employed by SEA Products or Skyline between 1993 and December 29, 2014, at which time he was working for SEA Products as a sales executive. SEA Products fired Brown on December, 29, 2014, for reasons that are contested but that are not at issue in the present motion. At the time of his termination, Brown held 46,000 shares in Skyline, which constituted approximately 12% of Skyline's outstanding shares.

Immediately after terminating Brown on December 29, 2014, Wecker informed Brown that Skyline would be willing to purchase his stock for $15 per share. When pressed, Wecker stated that the stock was worth $15 per share, but refused to conduct a third-party valuation of the company when Brown requested one. Brown returned to Skyline the next day, and again **[*3]** questioned Wecker about the value of his shares. Wecker again asserted that they were worth $15. In an effort to persuade Brown, Wecker agreed to notify Brown of any sales of Skyline stock over the next 18 months that exceeded $15 per share and to pay Brown

"the additional amount based on the selling stock price" above $15 per share, "less $75,000."

In reliance on these statements, Brown sold his stock back to Skyline for $15 per share. No Skyline stock was sold in the next 18 months, and Brown therefore received the agreed to price of $15 per share. Brown subsequently filed the present action based, in part, on his assertion that the Skyline stock was worth more than $15 per share.

## Legal Standard

A motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* tests the legal sufficiency of the complaint, not the merits of the allegations. The allegations must contain sufficient factual material to raise a plausible right to relief. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 569 n.14, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*. Although *Rule 8* does not require a plaintiff to plead particularized facts, the complaint must contain factual "allegations that raise a right to relief above the speculative level." *Arnett v. Webster, 658 F.3d 742, 751-52 (7th Cir. 2011)*. Put differently, *Rule 8* "does not require 'detailed factual allegations,' but it demands more than an unadorned, [*4] the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)*, see also *Fed. R. Civ. P. 8(a)*. When ruling on a motion to dismiss, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Park v. Ind. Univ. Sch. of Dentistry, 692 F.3d 828, 830 (7th Cir. 2012)*. When a complaint sounds in fraud, *Federal Rule of Civil Procedure 9(b)* requires that the complaint "state with particularity the circumstances constituting fraud or mistake." A plaintiff must allege the identity of the person making the misrepresentation and the means, time, place, and content of the misrepresentation. *Borsellino v. Goldman Sachs Grp., Inc., 477 F.3d 502, 507 (7th Cir. 2007)*.

## Discussion

The defendants first contend that Brown has failed to state a claim for fraudulent misrepresentation. In order to state a claim for fraudulent misrepresentation, a plaintiff must allege (1) a false statement of material fact; (2) knowledge or belief of the falsity by the party making the statement; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damages resulting from that reliance. *Dloogatch v. Brincat, 920 N.E.2d 1161, 1166, 396 Ill. App. 3d 842, 336 Ill. Dec. 571 (2009)*.

The defendants contend that Brown has not alleged a legally actionable false statement of material fact. Generally, an expression of opinion does not constitute a statement of fact and therefore [*5] cannot support an action for fraud. Statements as to the value of property are often treated as expressions of opinion and, if so intended and understood, cannot give rise to a fraud claim. *Duhl v. Nash Realty Inc., 429 N.E.2d 1267, 1272, 102 Ill.App.3d 483, 57 Ill. Dec. 904 (1981)*. An exception exists, however, when the representation as to value "is not a mere expression of opinion but is made as a statement of fact for the listener to rely upon. . . ." *Id.*

Here, the defendants contend that Wecker's statement that the stock was worth $15 constituted his opinion and not a statement of fact. In support of this assertion, the defendants argue, not incorrectly, that the value of closely-held corporations is hard to appraise and that Wecker's statement was unsupported by anything suggesting that it constituted an accurate valuation. A reasonable factfinder, however, could conclude from the context that Wecker's statements as to the value of the stock (as opposed to what Skyline would offer for it) constituted statements of fact. Accordingly, Brown has adequately alleged a legally actionable false statement of material fact.

The defendants also contend that Brown has failed to plausibly allege justifiable reliance. A plaintiff justifiably relies on a defendant's misrepresentation [*6] where the circumstances are such as to make it reasonable for the plaintiff to accept the defendant's statements without an independent inquiry or investigation. *Equity Builders and Contractors, Inc. v. Russell, 406 F. Supp. 2d 882, 889 (N.D. Ill. 2005)*. The defendants' argument on this point, however, does not actually assert that it was unreasonable for Brown to accept Wecker's statement of value. Instead, it asserts that Brown had the ability to independently assess the share price value himself or to request the information necessary to do so. The ability to independently estimate Skyline's share price, however, has no direct bearing on whether or not it was reasonable for Brown to rely on Wecker's statement of that share price. Here, Brown has alleged facts sufficient to establish justifiable reliance, and this Court therefore holds that he has plausibly alleged that element of his fraudulent misrepresentation claim.

The defendants alternatively contend that, if the fraudulent misrepresentation claim is not dismissed in its entirety, SEA Products should be dismissed from it because Brown does not allege any facts stating a plausible fraud claim against SEA Products. Brown, in response, asserts that SEA Products was an alter ego of Skyline.

Under Illinois law, a court [*7] may pierce the corporate veil when (1) there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) adhering to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc., 356 F.3d 731, 736 (7th Cir. 2004)*. In assessing whether a unity of interest exists, the Court considers a number of nondispositive factors including inadequate capitalization, failure to issue stock, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation, nonfunctioning of the other officers or directors, absence of corporate records, commingling of funds, diversion of assets, failure to maintain arm's-length relationships among related entities, and whether the corporation serves as a façade for the operation of the dominant stockholders. *Fontana v. TLD Builders, Inc., 840 N.E.2d 767, 778, 362 Ill.App.3d 491, 298 Ill. Dec. 654 (2005)*.

Here, Brown has alleged that Skyline and SEA Products had common leadership and stockholders, that they shared space, and that they comingled employees, assets, and resources. These conclusory allegations, absent more, are insufficient to establish the circumstances necessary to warrant piercing the corporate veil. *See [*8] Marvellous Day Elec. (S.Z.) Co., Ltd. v. Ace Hardware Corp., 900 F. Supp. 2d 835, 846-47 (N.D. Ill. 2012)* (Tharp, J.) ("[a] plaintiff who seeks to pierce the corporate veil and hold an individual defendant liable for actions of the corporation must plead facts sufficient to pierce the veil."), *vacated in part on other grounds by Nos. 11C 8756, 11 C 8768, 2013 U.S. Dist. LEXIS 74869, 2013 WL 2356008 (N.D. Ill. May 28, 2013)*; *Saletech, LLC v. East Balt, Inc., 20 N.E.3d 796, 806, 2014 Il App (1st) 132639 ¶ 29, 386 Ill. Dec. 420* (holding that allegations that the defendants "commingled funds 'as a means of defrauding creditors'" were conclusory absent supporting factual allegations and accordingly affirming the dismissal of that claim). This Court accordingly dismisses SEA Products from the fraudulent misrepresentation claim contained in count one.

Finally, the defendants contend that Brown has failed to state a claim for breach of fiduciary duty. In order to state a claim for breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary duty, that the duty was breached, and that the resulting damages were caused by that breach. *Autotech Tech. L.P. v. Automationdirect.com, 471 F.3d 745, 748 (7th Cir. 2006)*. Here, Brown alleges the breach of the duties of utmost loyalty, good faith, honesty, and the duty to disclose all material facts relevant to a shareholder's interest.

The defendants' argument that Brown has failed to state a claim is based on *Scarabello v. Reichle*, a case from this district which clearly sets forth the limitations on the fiduciary [*9] duties of closely held corporations engaged in the repurchasing of stock. *See Scarabello v. Reichle, 856 F. Supp. 404, 407-409 (N.D. Ill. 1994)* (Nordberg, J.) (recognizing that closely held corporations do not have a fiduciary obligation to disclose their share value, so long as they disclose "special facts" that would be known only to insiders). That case is inapposite, however, because Brown's allegations here are not premised on the duty to disclose share prices, but rather on the duties of good faith and fair dealing once the decision to disclose share prices has been made. As previously set forth, Brown has plausibly alleged that Wecker falsely represented that the value of the Skyline shares was $15 when in fact it was not. Accordingly, Brown's allegations are sufficient to state a claim for breach of fiduciary duty.

**Conclusion**

For the foregoing reasons, the defendants' motion to dismiss [21] is granted in part and denied in part. SEA Products is dismissed without prejudice from count one. The motion is denied in all other respects.

SO ORDERED.

/s/ Sharon Johnson Coleman

Sharon Johnson Coleman

United States District Court Judge

DATED: June 12, 2017

---

✛ Positive
As of: October 27, 2021 2:52 PM Z

## *Fieldturf Int'l, Inc. v. Triexe Mgmt. Group Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

April 14, 2004, Decided ; April 16, 2004, Docketed

Case No. 03 C 3512

### Reporter
2004 U.S. Dist. LEXIS 6676 *; 2004 WL 866494

FIELDTURF INTERNATIONAL, INC., and FIELDTURF, INC., Plaintiffs, v. TRIEXE MANAGEMENT GROUP INC., SPORTEXE CONSTRUCTION SERVICES, INC., SPORTEXE INTERNATIONAL, INC., and SPORTEXE, INC., Defendants.

**Disposition: [*1]** Plaintiffs' motion to compel granted in part and denied in part.

## Core Terms

plaintiffs', defendants', Sportexe, discovery, entity, corporate veil, synthetic, records, punitive damages, requests, shareholder, piercing, factors, turf, financial condition, commingling, documents, damages, financial information, motion to compel, infringement, dividends, products, veil

## Case Summary

### Procedural Posture
Plaintiffs patent holders sued defendants, a parent corporation and its subsidiaries, alleging patent infringement of its patents U.S. Patent No. 6,338,885 ('885 patent) and U.S. Patent No. 6,551,689 B1 ('689 patent), and state law claims for intentional interference with prospective economic advantage and conversion. The patent holders moved to compel answers to discovery requests.

### Overview
Both parties were involved in the synthetic turf business and were competitors. The patent holders sought discovery concerning defendants' financial status and the relationship between defendants. The court found that defendants' financial information was relevant to the issue of punitive damages and defendants had to produce information that revealed defendants' current assets and liabilities. However, dissemination of the financial information was limited to outside counsel

"attorneys eyes only" basis. The patent holders were also allowed to conduct discovery regarding piercing the corporate veil but such discovery was denied with regard to compensation paid to officers or stockholder dividends. Furthermore, defendants did not have to produce information concerning insurance policies licensing agreements, and trademark applications to the veil piercing inquiry.

### Outcome
The patent holders' motion to compel was granted in part and was denied in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

*HN1*[⬇] **Discovery, Privileged Communications**

*Fed. R. Civ. P. 26(b)(1)* prescribes the scope of matters upon which a party may seek discovery. Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. *Fed. R. Civ. P. 26(b)(1)*. Trial courts have broad discretion in resolving matters relating to discovery.

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

2004 U.S. Dist. LEXIS 6676, *1

Torts > ... > Types of Damages > Punitive Damages > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

Civil Procedure > Remedies > Damages > General Overview

Civil Procedure > Remedies > Damages > Punitive Damages

Torts > ... > Commercial Interference > Prospective Advantage > General Overview

Torts > ... > Prospective Advantage > Intentional Interference > Remedies

**HN2**[⬇] **Discovery, Methods of Discovery**

When punitive damages are sought, a party's financial condition is at issue and discovery on that subject is relevant. There can be no doubt that net worth is discoverable under _Fed. R. Civ. P. 26(b)(1)_, as it regards a matter "that is relevant to the claim" of a party: that is, a plaintiff's punitive damages claim.

Civil Procedure > Remedies > Damages > Punitive Damages

Patent Law > Remedies > Damages > Increased Damages

Torts > ... > Types of Damages > Punitive Damages > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

Civil Procedure > Remedies > Damages > General Overview

Patent Law > Remedies > Damages > General Overview

Torts > ... > Punitive Damages > Measurement of Damages > Determinative Factors

**HN3**[⬇] **Damages, Punitive Damages**

Under _35 U.S.C.S. § 284_, damages may be enhanced up to three time the compensatory award. The Federal Circuit has set forth nine factors, including a defendant's size and financial condition, that are to be considered when district courts are making a decision about enhanced damages. Discovery into a party's net worth is relevant to the issue of treble damages under _35 U.S.C.S. § 284_. Moreover, under Illinois law, one of the relevant factors in determining punitive damages is the defendant's financial status.

Civil Procedure > Remedies > Damages > Punitive Damages

Torts > ... > Punitive Damages > Availability > Corporations

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

Civil Procedure > Remedies > Damages > General Overview

Torts > Remedies > Damages > General Overview

Torts > ... > Types of Damages > Punitive Damages > General Overview

**HN4**[⬇] **Damages, Punitive Damages**

Illinois law allows consideration of a defendant's net worth in determining punitive damages. Moreover, the United States District Court for the Northern District of Illinois, Eastern Division holds that despite the United States Court of Appeals for the Seventh Circuit's suggestion in Zazu Designs, a corporate defendant's financial information may be relevant to punitive damages for purposes of _Fed. R. Civ. P. 26_.

Civil Procedure > Remedies > Damages > Punitive Damages

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

Civil Procedure > Remedies > Damages > General Overview

HN5[⤓] **Damages, Punitive Damages**

Only current financial documents are relevant to a claim for punitive damages.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

HN6[⤓] **Federal & State Interrelationships, Choice of Law**

Choice of law, not being jurisdictional, is normally waivable.

Bankruptcy Law > Procedural Matters > State Insolvency Laws

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Misappropriation of Funds

Torts > Vicarious Liability > Corporations > Subsidiary Corporations

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > General Overview

Torts > Vicarious Liability > Corporations > General Overview

HN7[⤓] **Procedural Matters, State Insolvency Laws**

The general rule, of course, in Illinois as elsewhere, is that a shareholder qua shareholder, and a parent, subsidiary, or other affiliate, qua affiliate, is not liable for a corporation's debts. However, a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity. In determining whether a corporation is really a dummy or sham for another dominating entity or individual, courts look at a number of factors, including: inadequate capitalization; failure to issue stock; failure to observe corporate formalities; nonpayment of dividends; insolvency of the debtor corporation; nonfunctioning of other officers or directors; absence of corporate records; commingling of funds; diversion of assets from the corporation by or to another dominant entity or individual; failure to maintain arm's-length relationships among related entities; and whether the corporation is a mere facade for the operation of another dominant entity or individual. With respect to whether adhering to the fiction of a separate corporate existence is appropriate, courts also look to whether "unfairness akin to fraud or deception" or "the existence of a compelling public interest" exists.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

Business & Corporate Law > ... > Corporate Governance > Directors & Officers > General Overview

Business & Corporate Law > Corporations > Corporate Finance > General Overview

HN8[⤓] **Shareholder Duties & Liabilities, Piercing the Corporate Veil**

Although common officers and directors is an insufficient basis, by itself, for piercing the corporate veil, such evidence in combination with other factors may be sufficient to pierce defendants' corporate veil. Stock control and the existence of common officers and directors are generally prerequisites to the piercing of the corporate veil although these factors alone will not suffice. Separate corporate entities may not be disregarded merely because the two share common officers.

**Counsel:** For FIELDTURF INTERNATIONAL, INC., a Florida corporation, FIELDTURF, INC., a Canadian company, plaintiffs: Jacob D Koering, Factor & Lake, LTD, Chicago, IL. Micheal D. Lake, Jody L. Factor, Factor & Lake, LTD, Chicago, IL.

For TRIEXE MANAGEMENT GROUP, INC., a Canadian company dba Sportexe, SPORTEXE CONSTRUCTION SERVICES, INC., a Georgia Corporation dba Sportexe, SPORTEXE INTERNATIONAL, INC., a Florida corporation dba Sportexe, defendants: William Francis Dolan, Brooke P Weinstein, Bell, Boyd & Lloyd, Chicago, IL. Paul W.

2004 U.S. Dist. LEXIS 6676, *1

Carroll, Theodore F. Kommers, Gould & Ratner, Chicago, IL. Michael James Berchou, Phillips, Lytle, Hitchcock, Blaine & Huber LLP, Buffalo, NY.

For SPORTEXE INC, a Delaware Corporation, dba Sportexe, defendant: William Francis Dolan, Brooke P Weinstein, Bell, Boyd & Lloyd, Chicago, IL.

For TRIEXE MANAGEMENT GROUP, INC. dba Sportexe, counter-claimant: Brooke P Weinstein, Bell, Boyd & Lloyd, Chicago, IL. Paul W. Carroll, Theodore F. Kommers, Gould & Ratner, Chicago, IL. Michael James Berchou, Phillips, Lytle, Hitchcock, Blaine & Huber LLP, Buffalo, NY.

For SPORTEXE CONSTRUCTION SERVICES, [*2] INC. dba Sportexe, counter-claimant: William Francis Dolan, Bell, Boyd & Lloyd, Chicago, IL. Paul W. Carroll, Theodore F. Kommers, Gould & Ratner, Chicago, IL. Michael James Berchou, Phillips, Lytle, Hitchcock, Blaine & Huber LLP, Buffalo, NY.

For SPORTEXE INTERNATIONAL, INC. dba Sportexe, counter-claimant: William Francis Dolan, Brooke P Weinstein, Bell, Boyd & Lloyd, Chicago, IL. Paul W. Carroll, Theodore F. Kommers, Gould & Ratner, Chicago, IL. Michael James Berchou, Phillips, Lytle, Hitchcock, Blaine & Huber LLP, Buffalo, NY.

For FIELDTURF INTERNATIONAL, INC., FIELDTURF, INC., counter-defendants: Jacob D Koering, Factor & Lake, LTD, Chicago, IL. Micheal D. Lake, Jody L. Factor, Factor & Lake, LTD, Chicago, IL.

**Judges:** Nan R. Nolan, United States Magistrate Judge.

**Opinion by:** Nan R. Nolan

# Opinion

### MEMORANDUM OPINION AND ORDER

This patent infringement action is before the Court on plaintiffs' motion to compel. For the reasons explained below, the motion is granted in part and denied in part.

### BACKGROUND

Unless otherwise noted, the following facts are taken from plaintiffs' Stipulated Third Amended Complaint and the parties' Initial Joint Status Report. Plaintiff [*3] Fieldturf International, Inc. is a Florida corporation which manufacturers, sells, and installs synthetic turf products

in the United States. Plaintiff Fieldturf, Inc. is a Canadian corporation which designs synthetic turf products and distributes these products worldwide. Fieldturf, Inc. is the owner, by assignment, of U.S. Patent No. 6,338,885 (the "'885 patent") entitled "Synthetic Turf" which discloses and claims a synthetic grass sports surface for use in connection with, among other things, sporting activities such as soccer and football. Fieldturf, Inc. is also the owner, by assignment, of U.S. Patent No. 6,551,689 B1 (the "'689 patent") entitled "Synthetic Grass with Resilient Granular Top Surface Layer." FieldTurf International, Inc. is the exclusive licensee from FieldTurf Inc. under the '885 and '689 patents for the right to manufacture, sell, offer to sell and install synthetic turf products in the United States. Defendants Triexe Management Group, Inc. ("Triexe"), Sportexe Construction Services, Inc. ("Sportexe Construction"), and Sportexe, Inc. supply and install artificial turf systems. Defendants' Answer states that defendant Sportexe International was dissolved on [*4] or about October 17, 2003.

Plaintiffs assert claims against defendants for infringement of the '885 patent and the '689 patent, for intentional interference with prospective economic advantage, and for common law conversion arising from the sale or offer to sell by defendants of synthetic turf products to the University of Wisconsin, the University of California at Berkeley, the Baltimore Ravens, and a fourth project in Ireland. Defendants have denied the material allegations of the Third Amended Complaint and three of the four defendants have asserted counterclaims. The counterclaims seek, among other things, a declaratory judgment on non-infringement as to the '885 patent and '689 patent as well as U.S. Patent No. 5,958,527 (the "'527 patent") entitled "Process for Laying Synthetic Grass." Defendants have additionally asserted counterclaims for alleged violations of *§ 43(a) of the Lanham Act* and *15 U.S.C. § 2*, tortious interference with contract, tortious interference with pre-contractual relations, and common law unfair competition based on plaintiffs' alleged misrepresentations to defendants' customers and prospective customers.

### DISCUSSION

*Federal Rule of Civil Procedure 26(b)(1)* [*5] *HN1*[↑] prescribes the scope of matters upon which a party may seek discovery. "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . Relevant information need not

2004 U.S. Dist. LEXIS 6676, *5

be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Fed. R. Civ. P. 26(b)(1)*. Trial courts have broad discretion in resolving matters relating to discovery. *Patterson v. Avery Dennison Corp., 281 F.3d 676, 681 (7th Cir. 2002)*. The discovery requests at issue in plaintiffs' motion to compel seek information relating to: (1) defendants' financial status and (2) the relationship between the corporate defendants. The Court discusses each of these categories in turn.

## A. *Defendants' Financial Status*

Plaintiffs' First Set of Document Requests seek, among other things, the following documents that refer or relate to defendants' financial status for the period six months prior to incorporation to the present: (1) shares issued by defendants (Request No. 2); (2) current assets and/or liabilities (Request No. 3); (3) director and **[*6]** officer compensation (Request Nos. 8 & 9); (4) stockholder dividends issued by defendants (Request No. 10); (5) tax and tax-related filings (Request No. 14); (6) bank accounts and/or bank account statements (Request No. 15); (7) payment of debts and/or liabilities (Request No. 16); (8) indemnifications given by defendants to any other defendant or any third party (Request Nos. 17 & 18); (9) transfer of assets between defendants (Request No. 19); and (10) transfer, loan or other exchange of monies between defendants (Request No. 20). Plaintiffs state that these requests are relevant to the determination of punitive and enhanced damages. Defendants object to these requests as overbroad and unduly burdensome. Defendants argue that no basis exists to demand financial records going back to the birth of defendants because only the defendants' present financial condition may be considered in determining the appropriate measure of punitive or increased damages.

Plaintiffs' infringement counts seeks enhanced damages, and their state law claim for intentional interference with prospective advantage seeks punitive damages. *HN2*[↑] When punitive damages are sought, a party's financial condition is at **[*7]** issue and discovery on that subject is relevant. *Cruce v. Schuchmann, 1993 U.S. Dist. LEXIS 5608, 1993 WL 139222, *1 (D. Kan. March. 30, 1993)* (holding "information of a party's net worth or financial condition is relevant . . . because it can be considered in determining punitive damages."); *Mid Continent Cabinetry, Inc. v. George Koch Sons, Inc., 130 F.R.D. 149, 151 (D. Kan. 1990)*. "There can be no doubt that

net worth is discoverable under *Rule 26(b)(1) of the Federal Rules of Civil Procedure*, as it regards a matter 'that is relevant to the claim' of a party: that is, plaintiff's punitive damages claim." *Challenge Aspen v. King World Productions Corp., 2001 U.S. Dist. LEXIS 18357, 2001 WL 1403001, *3 (N.D. Ill. Nov. 9, 2001)* (Schenkier, J.).

In the present case, defendants' present financial condition is relevant to plaintiffs' claim for punitive damages under federal and state law. *HN3*[↑] Under *35 U.S.C. § 284*, damages may be enhanced up to three time the compensatory award. The Federal Circuit has set forth nine factors, including a defendant's size and financial condition, that are to be considered when district courts are making **[*8]** a decision about enhanced damages. *Read Corp. v. Portec, Inc., 970 F.2d 816, 826-27 (Fed. Cir. 1992)*; see also *Manildra Milling Corp. v. Ogilvie Mills, Inc., 1991 U.S. Dist. LEXIS 1793, 1991 WL 17610 (D. Kan. Jan. 31, 1991)* (finding that discovery into a party's net worth is relevant to the issue of treble damages under *35 U.S.C. § 284*). Moreover, under Illinois law, one of the relevant factors in determining punitive damages is the defendant's financial status. *Pickering v. Owens-Corning Fiberglas Corp., 265 Ill. App. 3d 806, 638 N.E.2d 1127, 1139, 203 Ill. Dec. 1 (Ill.App. 1994)*; *Howard v. Zack Co., 264 Ill. App. 3d 1012, 637 N.E.2d 1183, 1194, 202 Ill. Dec. 447 (Ill.App. 1994)*. [1]

_____

[1] The Court notes that neither party mentions the Seventh Circuit's decision in *Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 508-09 (7th Cir. 1992)*, in which the court suggested that it is inappropriate to consider a corporate defendant's wealth or net worth in assessing punitive damages at least for claims based on federal law. See *Kemezy v. Peters, 79 F.3d 33, 36 (7th Cir. 1996)* (stating that there was merely a "suggestion in *Zazu Designs* that the defendant's net worth is irrelevant to the size of the award of punitive damages when the defendant is a corporation or other institution rather than an individual."); *Pivot Point International, Inc. v. Charlene Products, Inc., 932 F. Supp. 220, 223 (N.D. Ill. Aug. 2, 1996)*.

In any event, plaintiffs' punitive damages claim here is based on state tort law, and *HN4*[↑] Illinois law allows consideration of a defendant's net worth in determining punitive damages. *Pivot Point International, Inc. v. Charlene Products, Inc., 170 F. Supp.2d 828, 839 (N.D. Ill. Oct. 2, 2001)* (recognizing that Illinois treats wealth as a permissible consideration in setting the amount of punitive damages). Moreover, this Court has previously held that despite the *Zazu Designs* court's suggestion, a corporate defendant's financial information may be relevant to punitive damages for purposes of *Rule 26.*

 **[*9]** However, defendants' objection to the broad scope of the plaintiffs' request for financial information is well-taken. **HN5[↑]** Only current financial documents are relevant to a claim for punitive damages. *See Audiotext Communications Network, Inc. v. US Telecom, Inc., 1995 U.S. Dist. LEXIS 15416, 1995 WL 625962, *4 (D. Kan. Oct. 5, 1995)* (finding the current information of plaintiffs' net worth or financial condition relevant to the issue of punitive damages); *Raiser v. O'Shaughnessy, 1992 U.S. Dist. LEXIS 16001, 1992 WL 309541, *1 (N.D. Ill. Oct. 21, 1992)* (Moran, J.) (holding plaintiff's request for defendants' financial records would "be met by disclosure of the most recent of the types of documents described that substantially discloses the defendant's assets and liabilities."). Plaintiffs' request for non-current financial information is irrelevant to a punitive damages determination. *Audiotext Communications Network, Inc., 1995 U.S. Dist. LEXIS 15416, 1995 WL 625962 at *4.* Plaintiffs' motion to compel is granted with respect to Request Nos. 2, 3, 8-10, and 14-20 to the extent the information sought reveals defendants' current assets and liabilities.

Defendants also point out that plaintiffs and defendants are direct **[*10]** competitors. Defendants state that plaintiffs are attempting to use this proceeding to obtain financial information for competitive purposes which are not relevant to the claims or defenses in this action. Plaintiffs do not dispute that defendants are competitors. In fact, plaintiffs have stated that the "synthetic turf industry is highly competitive." Plaintiffs' Resp. to Defs' Motion for a Temporary Restraining Order, p. 1. The Court recognizes that disclosure of confidential financial information to a competitor may cause a party great harm. *Mid Continent Cabinetry, 130 F.R.D. at 152* (stating that "if a plaintiff and defendant were business competitors, disclosure of defendant's financial records to the plaintiff, even with a protective order, could cause the defendant great harm."). However, after balancing the confidentiality concerns of defendants against plaintiffs' need for access to the information, the Court finds that defendants' present financial information is discoverable on an outside counsel "attorneys' eyes only" basis. The Court believes this restriction on the scope of dissemination "strikes a proper balance between plaintiffs' right to discover **[*11]** relevant information and the defendants' confidentiality interests." *Challenge Aspen, 2001 U.S. Dist. LEXIS 18357, 2001 WL 1403001 at *5.* [2]

---

*Equal Employment Opportunity Commission v. Staffing Network, L.L.C., 2002 U.S. Dist. LEXIS 21318, 2002 WL 31473840 (N.D. Ill. Nov. 4, 2002); see also Jones v. Scientific Colors, Inc., 2001 WL 902778 (N.D. Ill. July 3, 2001).*

## B. *Relationship Between the Corporate Defendants*

Plaintiffs' discovery requests also seek additional financial records and various corporate documents to support plaintiffs' attempt to pierce the corporate veil of the defendants. [3] Plaintiffs **[*12]** assert that defendants

---

[2] The *Mid Continent Cabinetry* court suggested that where the parties are business competitors, a delay in discovery of financial information until a prima facie showing of entitlement to punitive damages is shown might be justified. The circumstances of this case do not justify a delay in the discovery of defendants' current financial information. The Court believes it is more efficient to promptly produce relevant financial information. Defendants have also not demonstrated that disclosure of current financial information to plaintiffs' outside counsel only and only for purposes of this litigation would cause defendants harm.

[3] Plaintiffs' document requests seek documents that refer or relate to: (1) the articles of incorporation of any of defendants (Request No. 1); (2) the issued shares of any of defendants, including when and where those shares were issues, and what compensation the shares were issued for (Request No. 2); (3) the current assets and/or liabilities of any of the defendants (Request No. 3); (4) the identity of the persons serving on the board of directors of any of defendants, including any and all changes to the board of directors, and the dates of those changes (Request No. 4); (5) the identity of the persons serving as officers of any of defendants, including any and all changes to the makeup of the officers, such as hiring, firing, promoting, demoting or other change in position (whether in name or otherwise), and the dates of those changes (Request No. 5); (6) the meetings of the board of directors of any of defendants, including but not limited to the minutes of those meetings (Request No. 6); (7) shareholder meetings for the shareholders of any of defendants, including but not limited to the minutes of those meetings (Request No. 7); (8) the compensation paid to each of the members of the board of directors, as well as any changes made to the compensation packages provided, and the dates for the initiation and change of the compensation packages (Request No. 8); (9) the compensation paid to each of the officers of any of defendants, as well as any changes made to the compensation packages provided, and the dates for the initiation and change of the compensation package (Request No. 9); (10) stockholder dividends issued by any of the defendants (Request No. 10); (11) the election of the board of directors for any of Defendants, including the votes undertaken by the shareholders and the results of those votes (Request No. 11); (12) insurance policies of any of defendants (Request No. 12); (13) licensing agreements by and between any of defendants (Request No. 13); (14) tax and tax-related filings done by or on the behalf of defendants; (Request No. 14); (15) bank accounts and/or bank account statements for any of the defendants (Request No. 15); (16) the payment of

are essentially acting as a single corporate entity. According to plaintiffs, questions exist regarding which of the defendants are responsible for the conduct alleged because all of the defendants hold themselves out to the public as a single company, namely Sportexe, and as being able to "handle any aspect of a project, from initial design, to the final supply and installation of equipment." Pls' motion, pp. 5-6. Plaintiffs are concerned that "defendants are attempting to utilize a sham liability shield to allow their various corporate 'arms' to freely infringe, while protecting the real assets of the corporation in a parent company, namely Triexe." Pls' Reply, p. 2. Defendants contend that plaintiffs should not be permitted discovery relative to their corporate veil theory because there is no evidence of failing to maintain adequate corporate records, failing to comply with corporate formalities, commingling of assets, undercapitalization, or treating the assets of one corporation as the assets of another.

[*13] Defendants' objection to discovery regarding plaintiffs' corporate veil theory is overruled in part. It is not surprising the factual record has not been fully developed regarding the relationship among the defendants because the very purpose of discovery is to obtain relevant information. Nevertheless, the current record indicates that Sportexe Construction and Sportexe, Inc. are wholly-owned subsidiaries of Triexe. Triexe, Sportexe Construction, and Sportexe, Inc. have the same place of business in Fonthill, Ontario, Canada. Sportexe International also had a place of business in Fonthill, Ontario, Canada. Defendants confirm that each defendant has used the "Sportexe" mark. The Florida Secretary of State's online records regarding Triexe gives a "cross-reference name" of Sportexe Inc. Pls' Motion, Ex. B. Further online records from the Florida

_____

debts and/or liabilities owed by any one of Defendants by any and/or all of Defendants (Request No. 16); (17) indemnifications given by one or more of defendants to one or more of the other defendants (Request No. 17); (18) indemnifications given by one or more of defendants to any third party (Request No. 18); (19) transfer of assets between defendants, including compensation paid for such transfer and the date such transfer took place (Request No. 19); (20) the transfer, loan, or other exchange of monies from one or more of defendants to one or more of the other defendants (Request No. 20); (21) trademark applications undertaken on the behalf of any of defendants on the name "Sportexe" (Request No. 40); (22) licensing arrangements regarding the name "Sportexe" between any of defendants and any other party (Request No. 41). Request Nos. 3-20 are limited to the period of time from six months prior to the incorporation of Sportexe Construction Services, Inc., which was in 2001.

Secretary of State's office and the Georgia Secretary of State's office indicate that Triexe, Sportexe Construction, and Sportexe Inc. have common officers. *Id.,* Exs. B, C, D. The website of "Sportexe" (*www.sportexe.com*) indicates that it has offices in Calhoun, Georgia and Lake Worth, Florida. *Id.,* Ex. E. Plaintiffs state that **[*14]** Sportexe Construction and Sportexe Inc. operate out of the same Calhoun, Georgia and Lake Worth, Florida locations.

As an initial matter, the Court notes that neither side has analyzed whether state or federal common law governs the veil-piercing inquiry in a patent infringement action. Although this case is founded on federal question jurisdiction, Plaintiffs' Reply seems to assume, without discussion, that Illinois' substantive law applies to the veil piercing issue. [4] Defendants' pleadings fail to cite any case law regarding the veil-piercing question. Because the parties have not argued the choice of law question, the Court will not disturb plaintiffs' assumption that Illinois law applies. The Court for purposes of this motion assumes that Illinois law applies without determining whether Illinois law is the proper choice of law. *United States v. Bestfoods, 524 U.S. 51, 63 n.9, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998)*; *Vukadinovich v. McCarthy, 59 F.3d 58, 62 (7th Cir. 1995)* (stating *HN6*[⬆] "choice of law, not being jurisdictional, is normally . . . waivable. . . .").

[*15] *HN7*[⬆] "The general rule, of course, in Illinois as elsewhere, is that a shareholder qua shareholder, and a parent, subsidiary, or other affiliate, qua affiliate, is not liable for a corporation's debts." *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat, 195 F.3d 953, 959 (7th Cir. 1999)*. "However, a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *Peetoom v. Swanson, 334 Ill. App. 3d 523, 778 N.E.2d 291, 295-96, 268 Ill. Dec. 305 (Ill.App. 1992)*. In determining whether a corporation is really a dummy or sham for another dominating entity or individual, courts look at a number of factors, including: inadequate capitalization;

_____

[4] Plaintiffs cite three cases regarding the piercing of the corporate veil issue. Two of the three decisions applied Illinois law. *See Van Dorn Co v. Future Chem. & Oil Corp., 753 F.2d 565, 570 (7th Cir. 1985)*; *Holland v. Joy Candy Mfg. Corp., 14 Ill. App. 2d 531, 145 N.E.2d 101 (Ill.App. 1957)*. The other case cited by plaintiffs, *Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157 (7th Cir. 1963)*, relied primarily on a treatise as the source for its pronouncement of a rule for the disregard of corporate entities. *Van Dorn, 753 F.2d at 571*.

2004 U.S. Dist. LEXIS 6676, *15

failure to issue stock; failure to observe corporate formalities; nonpayment of dividends; insolvency of the debtor corporation; nonfunctioning of other officers or directors; absence of corporate records; commingling of funds; diversion of assets from the corporation by or to another dominant entity or individual; failure to maintain arm's-length relationships among related entities; and whether the **[*16]** corporation is a mere facade for the operation of another dominant entity or individual. *Cosgrove Dist. v. Haff, 343 Ill. App. 3d 426, 798 N.E.2d 139, 141-42, 278 Ill. Dec. 292 (Ill.App. 2003)*. With respect to whether adhering to the fiction of a separate corporate existence is appropriate, courts also look to whether "unfairness . . . akin to fraud or deception" or "the existence of a compelling public interest" exists. *Hystro Products, Inc. v. MNP Corp., 18 F.3d 1384, 1390 (7th Cir. 1994)*.

Plaintiffs' requests are relevant to several veil piercing factors, such as: (1) the failure to maintain adequate corporate records or to comply with corporate formalities (Request Nos. 1, 6, 7, and 11); (2) the commingling of funds or assets (Request Nos. 15, 19, 20); and (3) undercapitalization (Request Nos. 14-18). In addition, the failure to issue shares of stock (Request No. 2) and the nonpayment of dividends (Request No. 10) are relevant factors in determining whether to pierce the corporate veil. *Cosgrove, 798 N.E.2d at 141*. **HN8** ⬆ Although common officers and directors (Request Nos. 4 and 5) is an insufficient basis, by itself, for piercing the **[*17]** corporate veil, such evidence in combination with other factors may be sufficient to pierce defendants' corporate veil. *See Hystro, 18 F.3d at 1389* (stating "stock control and the existence of common officers and directors are generally prerequisites to the piercing of the corporate veil although these factors alone will not suffice."); *Sumner Realty Co. v. Willcott, 148 Ill. App. 3d 497, 499 N.E.2d 554, 557, 101 Ill. Dec. 966 (Ill.App. 1986)* (holding separate corporate entities may not be disregarded merely because the two share common officers); *Holland v. Joy Candy Manufacturing Corp., 14 Ill. App. 2d 531, 145 N.E.2d 101 (Ill.App. 1957)* (upholding trial court's finding that one corporate defendant was the mere instrumentality of the other corporate defendant where the "affairs of the two corporations were so managed and controlled by the same interlocking officers, directors, and single shareholder, as to constitute one corporate entity in its dealings with creditors"). Finally, defendants' current assets and/or liabilities (Request No. 3) are relevant to determining whether defendants are inadequately funded, whether funds are **[*18]** being commingled or whether one entity is treating the assets of another as

its own. [5]

**[*19]** Plaintiffs' Request Nos. 8, 9, and 10 seek documents that refer or relate to the compensation paid to the board of directors and officers of defendants as well as stockholder dividends issued by any of the defendants. Plaintiffs argue that such requests are relevant to determining "the treatment of the assets of one corporation as the assets of another, or as assets of the shareholders directly." Pls' Reply, p. 4. While the compensation of directors and officers and shareholder dividends might be relevant if plaintiffs were seeking to pierce the corporate veil of defendants and hold the directors, officers, or shareholders liable for the corporate defendants' obligations, they do not seem to be relevant to determining whether one corporate defendant is treating the assets of another corporate defendant as its own. Because plaintiffs have not alleged that they are seeking to hold the defendants' shareholders, directors, of officers liable for the defendants' obligations, Request Nos. 8, 9, and 10 are denied as irrelevant to plaintiffs' veil piercing theory.

Finally, the Court is unpersuaded that the defendants' insurance policies (Request No. 12), licensing

---

[5] In their supplemental memorandum, defendants contend that responding to Request Nos. 3, 14, 15, and 16 would be unduly burdensome and disruptive to defendants' business because these requests seek documents for the period six months before defendants' incorporation date. In support of this contention, defendants' rely on an affidavit from James Schinkel, the Vice President for Business Development for Triexe. Schinkel's affidavit points out that Triexe has been in business since the early 1980's. Defendants' burdensomeness objection and Schinkel's affidavit appear to be based on an erroneous belief that plaintiffs' requests seek documents dating six months prior to defendants' incorporation, which would be back to the 1980's for Triexe. As plaintiffs clarified in their Reply, they only seek information for the period six months prior to the incorporation of Sportexe Construction, which was in 2001. The Court is not persuaded that this less than five year period of discovery is of such little potential benefit compared with the burden or expense imposed that it should be limited. *See Fed.R.Civ.P. 26(b)(2)*. Having said that, the Court is mindful that it does not have specific knowledge of all of the subcategories of documents that may be involved in responding to plaintiffs' requests and the actual burden of production. The Court directs the parties as they become more familiar with the subcategories involved and the likely burdensomeness, that they confer about producing some of the requested materials in full when necessary and some by sample when appropriate, with the objective of reducing the time and cost of production and review.

2004 U.S. Dist. LEXIS 6676, *19

agreements by and between **[*20]** defendants (Request No. 13), trademark applications undertaken on behalf of defendants on the name "Sportexe" (Request No. 40), and licensing arrangements regarding the name "Sportexe" between defendants and any other party (Request No. 41) are relevant to plaintiffs' corporate veil piercing theory. Without explanation, plaintiffs state that these requests are relevant to ascertaining whether the corporate defendants are commingling assets and liabilities. The relevancy of these categories of documents to determining whether defendants commingle assets and liabilities is not self-evident to the Court. Plaintiffs have not adequately demonstrated their relevancy. Absent an explanation as to the relevance of insurance policies, licensing agreements, and trademark applications to the veil piercing inquiry, plaintiffs' motion to compel their production is denied without prejudice.

### *CONCLUSION*

For the reasons stated above, plaintiffs' motion to compel is granted in part and denied in part. Plaintiffs' request for fees associated with bringing this present motion is denied.

**Nan R. Nolan**

**United States Magistrate Judge**

**Dated:** 4/14/04

 Neutral
As of: October 27, 2021 2:53 PM Z

## *Free Green Can, LLC v. Green Recycling Enters., LLC*

United States District Court for the Northern District of Illinois, Eastern Division

October 27, 2011, Filed

Case No. 10-cv-5764

**Reporter**

2011 U.S. Dist. LEXIS 125399 *; 2011 WL 5130359

FREE GREEN CAN, LLC and FGC FRANCHISES, LLC, Plaintiffs, v. GREEN RECYCLING ENTERPRISES, LLC (a/ka GREEN RECYCLING ENTERPRISES, INC.), ASLAN FINANCIAL GROUP, INC., EDWARD JARZOBSKI, DEDRIC GILL, and ROBB JORGENSEN, Defendants.

**Prior History:** *Free Green Can, LLC v. Green Recycling Enters., LLC, 2011 U.S. Dist. LEXIS 65132 (N.D. Ill., June 20, 2011)*

## Core Terms

individual defendant, franchise agreement, personal jurisdiction, second amended complaint, Plaintiffs', allegations, defendants', Franchises, Recycling, infringed, contacts, counts, motion to dismiss, Franchisee, trademarks, dual purpose, Additionally, block, bins, trademark infringement, fail to state a claim, individual capacity, corporate veil, signature, courts, notice, cases

## Case Summary

### Overview

Franchisees filed a motion to dismiss a franchisor's complaint, which asserted a variety of claims that arose from the franchisees' alleged failure to comply with the parties' franchise agreement. The court found that the franchisors failed to assert sufficient minimum contacts of the franchisee for purposes of personal jurisdiction under *735 ILCS 5/2-209(c)* (2011). No facts were alleged to suggest that the individual franchisee personally connected with the franchisor or the State of Illinois whatsoever.

### Outcome

Dismissal motion granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN1*[ ] **Motions to Dismiss, Failure to State Claim**

A motion under *Fed. R. Civ. P. 12(b)(6)* challenges the sufficiency of the complaint to state a claim upon which relief may be granted. Pursuant to the federal notice pleading standard, a complaint need only provide a short and plain statement of the claim showing that the plaintiff is entitled to relief and sufficient to provide the defendant with fair notice of the claim and its basis. In order to withstand a motion to dismiss under *Rule 12(b)(6)*, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. For a claim to have facial plausibility, a plaintiff must plead factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Thus, the complaint need not set forth "detailed factual allegations," but it must plead facts that raise a right to relief above the speculative level. As such, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Challenges

Evidence > Burdens of Proof > Allocation

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

### HN2[↓] In Personam Actions, Challenges

On a motion to dismiss for lack of personal jurisdiction, a court accepts all well-plead allegations in the complaint as true unless controverted by the defendants' affidavits. While a complaint need not include facts alleging personal jurisdiction, once a defendant moves to dismiss under *Fed. R. Civ. P. 12(b)(2)*, plaintiff bears the burden of demonstrating the existence of jurisdiction.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Due Process

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Long Arm Jurisdiction

### HN3[↓] In Personam Actions, Due Process

A federal district court has jurisdiction over a defendant only if an Illinois state court would have jurisdiction. The exercise of jurisdiction in Illinois must comply with the Illinois long-arm statute, the Illinois Constitution, and federal due process. The Illinois statute provides that an Illinois court may exercise jurisdiction on any basis now or hereafter permitted by the Illinois Constitution and the United States Constitution. *735 ILCS 5/2-209(c)* (2011). The Seventh Circuit has opined that there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction. Therefore, district courts often proceed directly to the federal due process analysis. Federal due process requires that a nonresident defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." Depending on the nature of a defendant's minimum contacts, a court can assert either "general" or "specific" jurisdiction. General jurisdiction is proper when the defendant has had "continuous and systematic contacts" with the state in question. In the absence of general jurisdiction, courts may exercise specific

jurisdiction in cases where the litigation arises out of or is related to the defendant's contacts with the forum state.

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

### HN4[↓] Management Duties & Liabilities, Causes of Action

Under Illinois law, officers of a corporation are only liable for the torts of the corporation in which they actively participate.

Business & Corporate Compliance > ... > Parties > Defendants > Personal Liability of Corporate Directors, Employees & Shareholders

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

### HN5[↓] Infringement Actions, Personal Liability of Corporate Directors, Employees & Shareholders

Although trademark infringement is a tort, the Court of Appeals for the Seventh Circuit has applied a stricter standard for holding a corporate officer liable for direct infringement. The Seventh Circuit has held that officers are held liable only if they personally, knowingly and willfully participated in the infringing activity. Therefore, in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

### HN6[↓] Fiduciary Duties, Business Judgment Rule

Corporate officers are not generally held liable for a

corporation's contractual obligations solely by their association with the corporation. It is well known that corporations operate through their officers and directors, and those agents must be able to exercise business judgment without the constant threat of personal liability.

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > General Overview

*HN7*[↧] **Piercing the Corporate Veil, Alter Ego**

Courts are reluctant to pierce the corporate veil and will only do so where: (1) there is such a unity of interest and ownership that separate personalities of the corporation and the individual no longer exist; and (2) where adherence to the fiction of separate corporate existence would promote injustice or inequity. To determine whether a unity of interest and ownership exists, Illinois courts consider four factors: (1) failure to maintain adequate corporate records or failure to comply with corporate formalities; (2) commingling of funds or assets; (3) undercapitalization; and (4) failure to maintain an arms-length relationship with related entities.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Challenges

Evidence > Burdens of Proof > Allocation

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Purposeful Availment

*HN8*[↧] **In Personam Actions, Challenges**

For a court to determine that specific personal jurisdiction exists, first a plaintiff must demonstrate that the defendant has purposefully established minimum contacts with the forum state such that he would reasonably anticipate being haled into court. Second, the suit must be related to or arise out of those contacts. Accordingly, specific jurisdiction is not appropriate merely because a plaintiff's cause of action arose out of the general relationship between the parties.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Challenges

Evidence > Burdens of Proof > Allocation

*HN9*[↧] **In Personam Actions, Challenges**

Even where all other conduct takes place elsewhere, specific jurisdiction is proper in Illinois if an injury transpires in Illinois. However, where the injury is economic, a plaintiff must additionally demonstrate an intent to affect Illinois interest to establish personal jurisdiction.

**Counsel:** [*1] For Free Green Can LLC, FGC Franchises LLC, Plaintiffs, Counter Defendants: Amy Christine Haywood, Cheng Cohen, Chicago, IL; Fredric Adam Cohen, Cheng Cohen LLC, Chicago, IL.

For Green Recycling Enterprises LLC, also known as Green Recycling Enterprises, Inc., Aslan Financial Group Inc., Edward Jarzobski, Dedric Gill, Robb Jorgensen, Defendants: Vincent P. Schmeltz, III, LEAD ATTORNEY, Matthew Patrick Tyrrell, Barnes & Thornburg LLP, Chicago, IL; Maris Jean Jager, Dewey & Leboeuf, Chicago, IL.

For Brian Gubbels, Defendant: Maris Jean Jager, Dewey & Leboeuf, Chicago, IL; Matthew Patrick Tyrrell, Vincent P. Schmeltz, III, Barnes & Thornburg LLP, Chicago, IL.

For Green Recycling Enterprises LLC, Counter Claimant: Vincent P. Schmeltz, III, LEAD ATTORNEY, Matthew Patrick Tyrrell, Barnes & Thornburg LLP, Chicago, IL.

For Michael J. Menas, Counter Defendant: Fredric Adam Cohen, LEAD ATTORNEY, Cheng Cohen LLC, Chicago, IL; Amy Christine Haywood, Cheng Cohen, Chicago, IL.

For Michael J. Menas, Counter Defendant: Amy Christine Haywood, Cheng Cohen, Chicago, IL.

For Michael J. Menas, Counter Defendant: Amy Christine Haywood, Cheng Cohen, Chicago, IL.

**Judges:** Judge Sharon Johnson Coleman. Magistrate Judge Arlander Keys. [*2]

**Opinion by:** Sharon Johnson Coleman

# Opinion

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on motion by Defendants Dedric Gill, Robb Jorgensen, Edward Jarzobski and Brian Gubbels (collectively "Moving Defendants" or "Individual Defendants") to dismiss the Plaintiffs', Free Green Can, LLC and FGC Franchises, LLC (collectively "Plaintiffs"), Second Amended Complaint for its failure to state a claim. Individual Defendant Gubbels also seeks to dismiss the complaint for lack of personal jurisdiction. (Dkt. No. 102.) In the second amended complaint, Plaintiffs assert trademark infringement (count I), unfair competition (count II), breach of franchise agreement (count IV) and specific performance of the franchise agreement (counts V and VI) against Defendants Green Recycling Enterprises, LLC, ("GRE"), Edward Jarzobski, Dedric Gill, Robb Jorgensen, and Brian Gubbels (collectively the "GRE Defendants"). Plaintiffs also seek a declaratory judgment finding the franchise agreement valid and enforceable (count III) and to enjoin the GRE Defendants from using Plaintiffs' trademarks and copyrighted material (count VII). Lastly, plaintiffs assert a violation of the Illinois Trade Secret Act (count VIII) **[*3]** against the GRE Defendants. [1] For the following reasons, the Court grants the Moving Defendants' motion.

## FACTS

The relevant factual allegations in the second amended complaint, which the Court must accept as true for present purposes, are as follows: Plaintiff Free Green Can LLC ("Free Green Can") developed the business concept of providing dual purpose recycle and trash bins to public and private institutions and selling advertising rights on those bins to third-parties. (Sec. Am. Compl. ¶ 6.) Free Green Can envisioned the placement of the bins in heavily-trafficked "host site" locations. (Id. at ¶ 19.) Host sites would receive a cost-free trash and recycling solution and earn a share of the advertising revenue. (Id.) Free Green Can is the owner of registered trademarks licensed and used in connection with **[*4]** the Free Green Can operation. (Id. at ¶ 6.) Free Green Can licenses its registered trademarks to Plaintiff FGC Franchises, LLC ("FGC Franchises"), who in turn sub-licenses the trademarks to

Free Green Can franchises. (Id.)

Defendant Green Recycling Enterprises, LLC ("GRE") is a Nebraska limited liability company with its principal place of business in Omaha, Nebraska. (Id. at ¶ 7.) Defendants Edward Jarzobski, Dedric Gill, Robb Jorgensen, and Brian Gubbels are all members of GRE and Gill is its president. (Id. at ¶¶ 9-12.) They are also citizens and residents of Nebraska. [2] (Id. at ¶ 7.) Defendants Gill, Jarzobski and/or Jorgensen approached Free Green Can and proposed to acquire franchise rights to the Free Green Can business in Nebraska. (Id. at ¶ 31.) In October 2009, Free Green Can and GRE and Defendants Gill, Jarzobski, and Jorgensen executed a franchise agreement that contained a forum selection clause providing that:

> "[a]ny legal action or proceeding with respect to this Agreement shall be brought exclusively in state or federal court in Chicago, Illinois and each Party consents to the jurisdiction of said court as the proper and convenient forum for all matters that arise under **[*5]** this Agreement." (Dkt. No. 100, Ex. A.)

The preamble to the franchise agreement states that the agreement was entered into by and between Free Green Can Products, LLC and "the individual or business entity indentified in the signature block of this Agreement ("Franchisee")." (Id.) Green Recycling Enterprises, Inc. was listed in the signature block as the Franchisee. (Id.) Defendants Gill, Jorgensen, and Jarzobski signed the franchise agreement without indicating their corporate affiliation. (Id.) Steve Holland executed the franchise agreement on behalf of Green Can Products, LLC in his capacity as its president. (Id.)

After the franchise agreement was executed, Free Green Can received the initial $125,000 initial fee owed under the agreement. **[*6]** (Sec. Am. Compl ¶ 38.) The initial fee included the cost for 100 of the Free Green Can proprietary dual purpose recycle and trash containers. (Id.) Free Green Can was also paid $40,000 for an additional 100 dual purpose containers. (Id.) Defendant Jorgensen allegedly funded these initial

---

[1] Plaintiffs also assert breach of a consulting and a confidentiality agreement (count IX) and breach of fiduciary duty (count X) against Defendant Aslan Financial Group, Inc. ("Aslan"). The Defendants' Motion to Dismiss did not address either of these claims and, therefore, they will not be addressed in this Memorandum Opinion and Order but will remain viable for future proceedings.

[2] Aslan remains a defendant in this case, but has not been named as a moving party to defendants' motion to dismiss the second amended complaint. The details of Aslan's alleged wrongdoings have already previously been set forth in some detail in this courts January 28, 2011 Memorandum Opinion and Order granting in defendants' motion to dismiss the first amended complaint, and therefore will not be reiterated here. Order Granting Mot. Dismiss Jan. 28, 2011.

payments to Free Green Can. (*Id.* at ¶ 39.)

After purchasing the dual purpose containers, GRE allegedly placed these bins in several venues and secured advertising commitments from major organizations. (*Id.* at ¶ 41.) However, the GRE Defendants allegedly violated the franchise agreement by failing to pay Free Green Can the advertising fees due under the franchise agreement. (*Id.*) Additionally, the GRE Defendants failed to report on the placement and solicitation of the dual purpose bins, submit financial statements to Free Green Can and permit Free Green Can to inspect their financial books and records. (*Id.* at ¶ 42.) Nevertheless, plaintiffs allege that GRE Defendants have used the Free Green Can trademarks, have represented themselves as having the right to sell franchises and have provided the proprietary dual purpose bins to a third-party outside of Nebraska. (*Id.* at ¶ 45.) In July 2010, Free Green **[*7]** Can advised Gill, Jarzobski and Jorgensen that these actions constituted an Event of Default and were grounds for terminating the franchise agreement. (*Id.* at ¶ 44.) In response, GRE Defendants informed Free Green Can that the franchise agreement was null and void because Free Green Can did not register its franchise with the Nebraska Department of Banking. (*Id.* at ¶ 45.) Also around this time, Defendant Gubbels became a director and member of GRE. (*Id.* at 43.) By written notice, Free Green Can denied the franchise agreement was a nullity and demanded the GRE Defendants comply with the agreement. (*Id.* at ¶ 46.) Plaintiffs also provided the GRE Defendants with notice that their acts infringed Free Green Can's trademarks. (*Id.*) In response, GRE Defendants again claimed that the franchise agreement was null and void. (*Id.* at ¶ 47.)

Additionally, Plaintiffs further allege that the Individual Defendants are now doing business under a new name, Second Nature Public Recycling, ("Second Nature"), and continue to use Free Green Can copyrighted information to operate their business. (*Id.* at ¶¶ 50-57.)

On September 10, 2010, Plaintiffs filed their original Complaint after the GRE Defendants allegedly **[*8]** refused to comply with the franchise agreement and continued to infringe Plaintiffs' trademarks. (Dkt. No. 1.) Plaintiffs filed their First Amended Complaint one month later on October 14, 2010. (Dkt. No. 23.) Aslan and the GRE Defendants sought and obtained dismissal of that complaint because this Court found that: (1) the Plaintiffs failed to allege sufficient facts to establish subject matter jurisdiction over both the claims against Defendant Aslan and over the contract claims against

the Individual Defendants and (2) the Plaintiffs' allegations of trademark infringement and unfair competition were insufficient to state a claim against the Individual Defendants. (Dkt. No. 31.)

In response, the Plaintiffs filed the second amended complaint in an effort to repair the deficiencies contained in the first amended complaint. (Dkt. No. 79.) The Moving Defendants, however, seek dismissal of counts I-VIII of the second amended complaint alleging that, it, again, fails to state a claim upon which the Court can grant relief. (Dkt. No. 92.) Additionally, Defendant Gubbels moves to dismiss the second amended complaint for lack of personal jurisdiction. (*Id.*)

## STANDARD OF REVIEW

### 1. Failure to State **[*9]** a Claim

*HN1*[↑] A motion under *Rule 12(b)(6)* challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *Christensen v. County of Boone, 483 F.3d 454, 458 (7th Cir. 2007)*. Pursuant to the federal notice pleading standard, a complaint need only provide "a short and plain statement of the claim" showing that the plaintiff is entitled to relief and sufficient to provide the defendant with fair notice of the claim and its basis. *Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008)*. In order to withstand a motion to dismiss under *12(b)(6)*, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). For a claim to have facial plausibility, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, the complaint need not set forth "detailed factual allegations," but it must plead facts that "raise a right to relief above the speculative level. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*. **[*10]** As such, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft, 129 S. Ct. at 1949* (quoting *Bell Atl. Corp., 550 U.S. at 555*.

### 2. Personal Jurisdiction

HN2[↑] On a motion to dismiss for lack of personal jurisdiction, a court accepts all well-pleaded allegations in the complaint as true unless controverted by the defendants' affidavits. *Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)* (citations omitted). While a complaint "need not include facts alleging personal jurisdiction," once a defendant moves to dismiss under *12(b)(2)*, "plaintiff bears the burden of demonstrating the existence of jurisdiction." *Id.*

HN3[↑] This Court has jurisdiction over a defendant only if an Illinois state court would have jurisdiction. The exercise of jurisdiction in Illinois must comply with the Illinois long-arm statute, the Illinois Constitution, and federal due process. *See, e.g., Citadel Group Ltd. v. Washington Reg'l Med. Ctr., 536 F.3d 757, 760-61 (7th Cir. 2008)*. The Illinois state statute the provides that an Illinois court "may ... exercise jurisdiction on any ... basis now or hereafter permitted by the Illinois **[*11]** Constitution and the Constitution of the United States." *735 Ill. Comp. Stat. 5/2-209(c)*. Additionally, the Seventh Circuit has opined that there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction. Therefore, district courts often proceed directly to the federal due process analysis. *Id.; see also Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 715 (7th Cir. 2003)*; *735 ILCS § 5/2-209(c)* (West 2011). Federal due process requires that a nonresident defendant have certain minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'" *Hyatt, 302 F.3d at 716* (quoting *Int'l Shoe Co., v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.ED 95 (1945))* (additional citations omitted). Depending on the nature of a defendant's minimum contacts, a court can assert either "general" or "specific" jurisdiction. *International Medical Group, Inc. v. American Arbitration Assoc., Inc. 312 F.3d 833, 846 (7th Cir. 2002)*. General jurisdiction is proper when the defendant has had "continuous and systematic contacts" with the state in question. **[*12]** *Hyatt Int'l Corp., 302 F.3d at 713*. In the absence of general jurisdiction, courts may exercise specific jurisdiction in cases where the "litigation arises out of or is related to the defendant's contacts with the forum state." *Hyperquest Inc., v. NuGen I.T., Inc. 627 F.Supp. 2d 884 (N.D. Ill. 2008)* (citing *Logan Productions Optibase, Inc., 103 F.3d 49, 52 (7th Cir. 1996)*.

**DISCUSSION**

In ruling upon this motion to dismiss, the Court will first determine whether the complaint fails to state a claim upon which relief may be granted. The court will, then consider whether this Court has personal jurisdiction over Defendant Gubbels.

**1. Plaintiffs' Fail to State a Claim Against the Individual Defendants on Counts I, II, and VIII of the Second Amended Complaint.**

In counts I and II, plaintiffs assert trademark infringement and unfair competition claims against the Individual Defendants for violating section 32(1) of the Lanham Act, *15 U.S.C. § 1114(1)*. In count VIII, plaintiffs also assert that the Individual Defendants violated the Illinois Trade Secret Act. The Individual Defendants are all members and officers of Defendant GRE, Inc. ("GRE"). HN4[↑] Under Illinois law, officers of a corporation are **[*13]** only liable for the torts of the corporation in which they actively participate. *People ex rel. Madigan v. Tang., 346 Ill. App. 3d 277, 284, 805 N.E.2d 243, 281 Ill. Dec. 875 (Ill.App.Ct. 2004)*. Therefore, to survive a motion to dismiss, by the Individual Defendants, plaintiffs must allege that each of the officers directly and personally engaged in the conduct alleged. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 421-22 (7th Cir. 1994)*. More specifically, the complaint must contain allegations showing the officers' active participation in, or the exercise of specific control over the wrongful acts. *Id. at 422*.

HN5[↑] Although trademark infringement is a tort, *Honeywell, Inc. v Metz Apparatewerke, 509 F.2d 1137, 1141 (7th Cir. 1975)*, the Court of Appeals for the Seventh Circuit has applied a stricter standard for holding a corporate officer liable for direct infringement. The Seventh Circuit has held that officers are held liable only if they personally, knowingly and willfully participated in the infringing activity. *Panther Pumps and Equipment Co., v. Hydrocraft, Inc. 468 F.2d 225, 233 (7th Cir. 1972)* (citing *Dangler v. Imperial Machine Co., 11 F.2d 945, 946-48 (7th Cir. 1926)*. Therefore, in the absence **[*14]** of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction. *Dangler v. Imperial Machine Co., 11 F.2d 945, 946-48 (7th Cir. 1926)*. In its Order dated January 28, 2011, this Court dismissed the plaintiffs' trademark infringement and unfair competition claims for failing to allege acts demonstrating this level of active participation by any of the Individual

Defendants. Order Granting Mot. Dismiss Jan. 28, 2011.

Here, plaintiffs again have failed to assert any factual allegations that plausibly suggest that the Individual Defendants willfully and deliberately infringed Free Green marks in their individual capacities. Instead, the facts alleged in the second amended complaint are very similar to those already deemed insufficient in the previously filed complaint. The plaintiffs distinguish the second amended complaint from the first amended complaint by replacing the defined term of "GRE Defendants" and with a repetitive list of the individuals that comprise the GRE Defendants. The second amended complaint also states one new set of facts, namely that the Individual Defendants remain **[*15]** officers of GRE and are doing business under a new trade name, Second Nature, which uses the plaintiffs' copyrighted information to conduct its business. Plaintiffs have failed, however, to offer any additional facts that plausibly suggest that the Individual Defendants exercised willful and specific control over the wrongful acts alleged.

Instead, plaintiffs argue that by replacing the general term GRE Defendants with the names of the Individual Defendants, they have gone further than plaintiffs in _QSRSOFT, Inc. v. Rest. Tech. Inc., No. 06 C 2734, 2006 U.S. Dist. LEXIS 80729 (N.D. Ill. Nov. 2, 2006) *1_, who prevailed against a motion to dismiss by using the term "QSR Defendants" to state a claim against individual officers as well as the corporate entity. In _QSRSOFT_, the court held that failing to identify each individual defendant did not impact the significance of the plaintiffs' claims, because the plaintiff provided sufficient factual allegations related to all the defendants. _Id. at *3_. Additionally, the court held that the claims alleged against each defendant provided defendants with sufficient notice of the claims against them. _Id._

Here, unlike in _QSRSOFT_, nowhere in the second **[*16]** amended complaint do plaintiffs offer sufficient facts that suggest that the Individual Defendants were acting outside the scope of their corporate duties or exercising specific control over the wrongdoing alleged. While the plaintiffs' facts do suggest that the Individual Defendants were involved in the tortious acts, they do not suggest the type of willful conduct committed outside the scope of the Individual Defendants' corporate duties that is necessary for individual liability for infringement. _See Jones Day v. Blockshopper L.L.C., 2008 U.S. Dist. LEXIS 94442, 2008 WL 4925644, at *5, (N.D. Ill 2008)_ (quoting _The Drink Group, Inc. v._

_Gulfstream Communications, Inc., 7 F.Supp.2d 1009, 1010-11 (N.D. Ill 1998)_ (holding that allegations that an individual or officer was the 'principal of' and 'driving force behind' allegedly infringing activities of corporate defendant are insufficient to state a claim against officers). Therefore, plaintiffs' statements are insufficient to state a claim against the Individual Defendants.

**2. Plaintiffs Fail to State a Claim Against the Individual Defendants on Counts III Through VII of the Second Amended Complaint.**

In counts III through VII, Plaintiffs assert various contract claims **[*17]** against the Individual Defendants arising from the Individual Defendants' participation in the franchise agreement. _HN6_[⬆] Corporate officers are not generally held liable for a corporation's contractual obligations solely by their association with the corporation. See _Itofca, Inc. v. Hellhake, 8 F.3d 1202, 1204 (7th Cir. 1993)_. It is well known that corporations operate through their officers and directors, and those agents must be able to exercise business judgment without the constant threat of personal liability. See _Stafford v. Puro, 63 F.3d 1436, 1442 (7th Cir. 1993)_.

Here, however, plaintiffs argue that the Individual Defendants _should_ be held liable for wrongdoings committed under the franchise agreement based on their belief that the Individual Defendants entered into the franchise agreement in their individual capacities. Plaintiffs' belief stems from allegations that the Individual Defendants, Jarzobski, Gill, and Jorgensen solicited the plaintiffs to grant the defendants franchise rights, negotiated the terms of the franchise agreement without using corporate formalities, and signed the franchise agreement without indicating their official capacities or corporate titles.

In support, **[*18]** plaintiffs rely on several cases that hold individual defendants liable under contracts that defendants executed in their individual capacities as opposed to their corporate capacities. The plaintiffs' reliance on these cases, however, is misplaced. In _84 Lumber Co. v. Denni Constr. Co., 212 Ill. App. 3d 441, 442, 571 N.E.2d 231, 156 Ill. Dec. 644 (1991)_, the Court held that two individuals who signed a contract under the designation "Applicant" were personally liable on the contract. _Id. at 443_. The Court rejected the argument that the defendants were signing on behalf of their company, Denni Construction, because, the contract included language that said, "Applicant agrees that he will be personally responsible and liable" under the

contract. *Id.* Also, there was no indication within the agreement that Denni Construction was a party to the contract. *Id. at 443*.

In *Jubber v. Sleater, 404 B.R. 929 (D. Utah Bankr. 2009)* and *Lustig v. Brown, 2004 U.S. Dist. LEXIS 18827, 2004 WL 2095667, at *1 (N.D. Ill Sept. 16, 2004)*, the court also upheld claims against individual defendants for failure to demonstrate that they were acting on behalf of a corporation in their official capacities. In *Jubber*, the court held that an individual who signed only his name **[*19]** on two notes as the "maker" of the notes was liable for repaying them because there was no indication that he had signed the notes in his official capacity. Also, the court relied on the fact that the Utah Uniform Commercial Code defines "maker" as a "person who signs or is identified in a note as a person undertaking to pay." *Id. at 940*. Lastly, in *Lustig*, the court held that because at no time did the defendant indicate that she was acting on behalf of another nor did the contract between the parties indicate that the defendant maintained a corporate status, defendant's motion to dismiss for failing to state a claim against her in her individual capacity was denied. *Lustig, 2004 U.S. Dist. LEXIS 18827, 2004 WL 2095667, at *3*.

Here, the defendants' intention to enter the franchise agreement on behalf of GRE is clear. As defendants pointed out, unlike the contracts in *84 Lumber*, *Jubber* and *Lustig*, the opening paragraph of the franchise agreement provides that "this Agreement is made and entered into. . . by and between [Free Green Can as Free Green Can Products, LLC]. . . and the individual or business entity identified in the signature block of this agreement ("Franchisee")." (Franchise Agmt., attached as Ex. **[*20]** A to Dkt. No. 100, at 1.) Then, on page 11 of the agreement, the signatory block specifically identifies "Green Recycling Enterprises, Inc." as the franchisee with Dedric H. Gill designated as the Franchisee contact. *Id.* at 11. Further, there is no other additional language in the document or on the agreement's signature block that indicates that the Individual Defendants intended to be the Franchisee to the agreement. Thus, while in isolation, failing to include corporate titles on the signature block is somewhat ambiguous, when viewing the Franchise Agreement in its entirety, the defendants' intent to have GRE serve as the Franchisee is apparent. Because the plaintiffs have failed to allege any other facts that plausibly suggest that the Individual Defendants signed the franchise agreement in their individual capacities, plaintiffs have failed to sufficiently state a claim against the Individual Defendants for breach of the franchise agreement.

**3. Plaintiffs fail to allege facts sufficient to pierce the corporate veil to hold the Individual defendants liable for wrongdoings committed by GRE.**

In the second amended complaint, the Plaintiffs asked the Court to pierce the corporate veil **[*21]** of GRE to hold the Individual Defendants personally liable for wrongdoings alleged in counts I-VIII of the complaint. *HN7*[↑] Courts are reluctant to pierce the corporate veil and will only do so where: (1) there is such a unity of interest and ownership that separate personalities of the corporation and the individual no longer exist; and (2) where adherence to the fiction of separate corporate existence would promote injustice or inequity. *Int'l Fin. Servs. Corp. v.Chromas Techs. Can., Inc., 356 F.3d 731, 736 (7th Cir. 2004)*. "To determine whether a unity of interest and ownership exists, Illinois courts consider four factors: (1) failure to maintain adequate corporate records or failure to comply with corporate formalities; (2) commingling of funds or assets; (3) undercapitalization; and (4) failure to maintain an arms-length relationship with related entities." *First Place Bank v. Skyline Funding, Inc. 2011 U.S. Dist. LEXIS 83430, 2011 WL 3273071, at *1 N.D. Ill, 2011*, citing *Van Dorn Co. v. Future Chemical and Oil Corp., 753 F.2d 565, 570 (7th Cir. 1985)*.

Plaintiffs have not alleged the necessary unity of interest between the Individual Defendants and GRE to warrant the Court's piercing of the corporate veil. The **[*22]** second amended complaint alleges that the Individual Defendants directed the actions and decisions of GRE, engaged in business without regard to corporate formalities and that Defendant Jorgensen made significant financial investments in GRE due to the corporation's undercapitalization. Plaintiffs, however, have not alleged any additional facts to support these conclusory allegations. Instead, the allegations are formulaic recitations of two of the elements of an alter ego cause of action. Without additional factual support, the allegations do nothing more than suggest that the Individual Defendants were serving as active officers of a small company. Further, plaintiffs have not even begun to allege any facts that plausibly suggest that the Individual Defendants failed to maintain corporate records, commingled their funds or assets with GRE or treated GRE assets as their own. Thus, plaintiffs have failed to raise their alter ego claims beyond the speculative level. As such, the Court denies Plaintiffs' request to pierce the corporate veil and hold the Individual Defendants personally liable for counts I-VIII under an alter ego theory.

**4. Plaintiffs Fail to Allege Facts Sufficient to [*23] Subject Individual Defendant Gubbels to Personal Jurisdiction.**

Plaintiffs allege that Defendant Gubbels is subject to specific jurisdiction in Illinois. *HN8*[↑] For a court to determine that specific personal jurisdiction exists, first the plaintiff must demonstrate that the defendant has purposefully established minimum contacts with the forum state such that he would reasonably anticipate being haled into court. *Hyatt, 302 F.3d at 716* (citing *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985))*. Second, the suit must be related to or arise out of those contacts. *Id.* Accordingly, "Specific jurisdiction is not appropriate merely because a plaintiff's cause of action arose out of the general relationship between the parties, [. . .]." *RAR, Inc. v Turner Diesel, Ltd., 107 F.3d 1272, 1277 (7th Cir. 1997)*.

Here, defendants first argue that Defendant Gubbels should not be subject to personal jurisdiction in this Court because plaintiffs have abandoned their claims against him. This Court agrees. Previously, in its January Order, this Court held that it was proper to exercise personal jurisdiction over the Individual Defendants based on their participation in the [*24] franchise agreement. Order Granting Mot. Dismiss Jan. 28, 2011. Defendants correctly noted, however, that Defendant Gubbels has never been a party to the franchise agreement nor was he a member of GRE at the time this agreement was made. Given this fact, in their original motion to dismiss, defendants challenged the inclusion of Gubbels as a defendant. Def. Mot. Dismiss ¶ 6, fn. 2. In their reply brief, plaintiffs failed to respond to defendants' challenge. Plaintiffs' Mem. in Opp. to Mot. Dismiss. By failing to address the defendants' opposition of Gubbles' inclusion in this matter in their original response, plaintiffs have effectively abandoned their claims against him. *Steen v. Myers, 486 F.3d 1017, 1020 (7th Cir. 2007)*.

Further, plaintiffs have also failed to establish that Gubbels has had sufficient contacts with the State of Illinois that would subject him to personal jurisdiction. Plaintiffs argue that *Interlease Aviation II (Aloha), LLC v. Vanguard Airlines, Inc., 262 F. Supp. 2d 898, 910 (N.D. Ill. 2003)* and *Celozzi v. Boot, No. 00 C 3285, 2000 U.S. Dist. LEXIS 11768, at *1 (N.D. Ill. Aug. 10, 2000)* stand for the proposition that *HN9*[↑] even where all other conduct takes place elsewhere, [*25] specific jurisdiction is proper in Illinois if the injury transpires in Illinois. Thus, plaintiffs conclude that because Defendant Gubbels' alleged conduct caused injury to an Illinois corporation, jurisdiction in this Court is proper. Plaintiffs, however, have overlooked that each of the aforementioned cases also relied on the principle that "where the injury is economic, the plaintiff must additionally demonstrate an intent to affect Illinois interest" to establish personal jurisdiction. *Vanguard, 262 F.Supp. 2d at 910*; *Celozzi, 2000 U.S. Dist. LEXIS, at *3*. In *Vanguard* and *Celozzi*, both courts found that the defendants held the requisite intent to affect Illinois interest because, in both cases, defendants repeatedly communicated and collaborated with plaintiffs, and this communication enabled the both defendants to conduct the fraudulent activity alleged. *Vanguard, 262 F.Supp. 2d at 911*; *Celozzi, 2000 U.S. Dist. LEXIS, at *3*.

Here, plaintiffs do not allege any facts that suggest Defendant Gubbels personally connected with the plaintiffs or the State of Illinois whatsoever, let alone engaged in any actions that demonstrated his intent to affect Illinois interest. Accordingly, the [*26] second amended complaint fails to properly allege that Defendant Gubbels has established sufficient minimum contacts with the state so as to subject himself to personal jurisdiction..

Because the Court determined that it does not have personal jurisdiction over Defendant Gubbels for the reasons stated above, the Court does not need to consider defendants' argument that the fiduciary shield doctrine precludes the Court from exercising personal jurisdiction over Defendant Gubbels as well.

/s/ Sharon Johnson Coleman

---

**End of Document**

Positive
As of: October 27, 2021 2:54 PM Z

# *Friedman v. Leading Edge Recovery Solutions, LLC*

United States District Court for the Northern District of Illinois, Eastern Division

April 28, 2014, Decided; April 28, 2014, Filed

Case No. 13 cv 9034

**Reporter**
2014 U.S. Dist. LEXIS 58694 *; 2014 WL 1674083

VARDA FRIEDMAN, on behalf of plaintiff and a class defined herein, Plaintiff, v. LEADING EDGE RECOVERY SOLUTIONS, LLC and ASSET ACCEPTANCE, LLC, Defendants.

## Core Terms

consumer, notice, overshadow, validation, disputes, collection, debt collection, credit report, misleading, rights

**Counsel: [*1]** For Varda Friedman, on behalf of plaintiff and a class defined herein, Plaintiff: Daniel A. Edelman, LEAD ATTORNEY, Cathleen M. Combs, James O. Latturner, Tiffany Nicole Hardy, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, IL.

For Leading Edge Recovery Solutions, LLC, Defendant: Robert M. Horwitz, LEAD ATTORNEY, Dykema Gossett Pllc, Detroit, MI; Amy R Jonker, Bryan James Anderson, Dykema Gossett, PLLC, Chicago, IL.

For Asset Acceptance, LLC, Defendant: Robert M. Horwitz, LEAD ATTORNEY, Dykema Gossett Pllc, Detroit, MI; Amy R Jonker, Bryan James Anderson, Dykema Gossett, PLLC, Chicago, IL.

**Judges:** Sharon Johnson Coleman, United States District Judge.

**Opinion by:** Sharon Johnson Coleman

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff Varda Friedman brings this class action suit alleging a debt collection letter sent by defendant Leading Edge Recovery Solutions, LLC ("Leading Edge"), on behalf of defendant Asset Acceptance, LLC ("Asset") (collectively, "Defendants") violated the Fair Debt Collection Practices Act, *15 U.S.C. §1692 et seq.* ("FDCPA"). Defendants now move to dismiss Friedman's complaint in its entirety. For the following reasons, Defendants' motion is granted.

### Background

On March 8, 2103, Leading Edge, a **[*2]** debt collection company, sent a debt collection letter to Friedman, which stated:

Dear Varda Friedman,
Your delinquent account has been placed with our company for collection. We have been authorized by our client to collect the outstanding amount owed to them.
Asset Acceptance LLC may report information about your account to credit bureaus. Correspondence concerning inaccuracies and disputes relating to your credit report should be sent to: Asset Acceptance, LLC, P.O. Box 1630 Warren, MI 48090-1630.
Per our agreement with our client, your account is eligible for settlement. That's right! If you pay just $2,757.92 of the $3,939.89 you currently owe our client, this debt will be settled in full! We are not obligated to renew this offer.

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of the debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. **[*3]** If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor if different from the current creditor.

Federal law prohibits certain methods of debt collection, and requires that we treat you fairly. You can stop us from contacting you by writing a letter to us that tells us to stop the contact or that you refuse to pay the debt. Sending such a letter does not make the debt go away, if you owe it. Once we receive your letter, we may not contact you again, except to let you know that there won't be any more contact or that we intend to take a specific action.

If you have a complaint about the way we are collecting this debt, please write to us at Leading Edge Recovery Solutions, LLC 5440 North Cumberland Ave STE 300 Chicago, IL 60656, email us at AssetComplaints@leadingedgerecovery.com, or call us toll-free at (866) 577-8403 between 9:00 A.M. and 5:00 P.M. CST, Monday — Friday.

The Federal Trade Commission enforces the Fair Debt Collection Practices Act (FDCPA). If you have a complaint about the way we are collecting your debt, please contact the FCT online at *www.ftc.gov*; by phone at 1-877-FTC-HELP; [*4] or by mail at 600 Pennsylvania Ave., N.W., Washington, D.C. 20580.

Sincerely,
Collections Department
(855) 853-6334

(Dkt. #1-1.) Friedman now brings a class action lawsuit alleging that the instruction to contact Asset instead of Leading Edge regarding credit report disputes overshadows the validation notice and is misleading in violation of the FDCPA. Defendants now move to dismiss the complaint pursuant to *Fed.R.Civ.P. 12(b)(6)*.

## Legal Standard

A motion to dismiss tests the legal sufficiency of the complaint. *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7, 570 F.3d 811, 820 (7th Cir.2009)*. To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (*citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. In deciding a *Rule 12(b)(6)* motion to dismiss, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)*. Whether a debt collection letter is confusing is generally a question of fact;

however, [*5] "a plaintiff fails to state a claim and dismissal is appropriate as a matter of law when it is apparent from a reading of the letter that not even a significant fraction of the population would be misled by it." *Zemeckis v. Global Credit & Collection Corp., 679 F.3d 632, 636 (7th Cir. 2012)* (internal quotations omitted).

## Discussion

Friedman's complaint alleges the instruction to contact Asset regarding credit report disputes, instead of Leading Edge, contradicts and overshadows the validation notice in violation of *§1692g* and is misleading in violation of *§1692e*. (Dkt. #1, Pl.'s Compl., ¶¶18-24.) "Since inaccuracies and disputes relating to the reporting of the debt are likely to be inaccuracies and disputes relating to the debt itself (e.g., the debt is not mine), this instruction conflicts with the validation notice that appears below. A consumer that follows the instruction to communicate with [Asset] will waive their dispute rights with respect to [Leading Edge]." (Id. at ¶¶19-20.)

*Section 1692g* requires debt collection letters to include a validation notice explaining that the consumer has 30 days to dispute the validity of the debt. *15 U.S.C. 1692g(b)*. "Any collection activities [*6] and communications during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor." *Id.* The validation notice "must be effective, and it cannot be cleverly couched in such a way as to eviscerate its message." *Chauncey v. JDR Recovery Corp., 118 F.3d 516, 518-19 (7th Cir.1997)* (citing *Avila, 84 F.3d at 226*). *Section 1692e* prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." *15 U.S.C. §1692e(10)*.

In evaluating whether a debt collection letter violates the FDCPA, the Court views the letter from the objective standard of an unsophisticated consumer, who is assumed to be "uninformed, naive, or trusting." *Durkin v. Equifax Check Servs., 406 F.3d 410, 414 (7th Cir. 2005)*. Nevertheless, the unsophisticated consumer "possesses rudimentary knowledge about the financial world, is wise enough to read collection notices with added care, possesses 'reasonable intelligence,' and is capable of making basic logical deductions and inferences." *Pettit v. Retrieval Masters Creditors*

*Bureau, Inc., 211 F.3d 1057, 1060 (7th Cir. 2000)*.

Defendants **[*7]** maintain that Friedman's complaint fails because the instruction to contact Asset regarding credit report disputes does not overshadow and is not inconsistent with the consumer's rights to dispute the validity of the debt with Leading Edge, nor is it misleading. The Court agrees. Overshadowing generally occurs when the debt collector indicates that the time for disputing the debt has passed or when the statements by the debt collector "misrepresent or cloud the amount of time remaining to dispute the debt." *Durkin, 406 F.3d at 417*. Information included along with the validation notice may be overshadowing if it renders the letter confusing or makes the debtor uncertain as to her rights. *Ozkaya v. Telecheck Servs., Inc., 982 F. Supp. 578, 582-83 (N.D. Ill. 1997)* (citing *Bartlett v. Heibl, 128 F.3d 497, 500 (7th Cir. 1997)* and *Russell v. Equifax A.R.S., 74 F.3d 30, 35 (2d Cir. 1996)*). However, the language at issue here is unlike the language the Seventh Circuit has held to overshadow consumers' rights. *See e.g. Chauncey, 118 F.3d at 519 (7th Cir. 1997)* (demand for payment within thirty days contradicts the validation notice); *Avila v. Rubin, 84 F.3d 222, 226 (7th Cir. 1996)* (letter **[*8]** giving debtor ten days to pay "or else" inconsistent with validation notice).

Friedman asserts that directing the consumer to contact *the creditor* to dispute her credit report, rather than *the debt collector,* violates the FDCPA because, in doing so, the consumer will waive her verification rights. Friedman also argues that there is no difference between disputing the debt and disputing the reporting of the debt; therefore, directing the consumer to contact two different parties about a single dispute is contradictory and misleading. However, directing a consumer to contact different parties for different purposes does not amount to overshadowing and Friedman's overshadowing claim therefore fails. *See Shapiro v. Dun & Bradstreet Receivable Mgmt. Servs., Inc., 59 F. App'x 406, 408 (2d Cir. 2003)* (letter instructing consumer to contact creditor for payment purposes or with questions about the account or contact debt collector to dispute the debt does not overshadow or contradict the validation notice). Friedman's allegation that the letter is misleading "for the same reason" summarily fails. (*See* Dkt. 1, Pl's Compl., ¶23.)

**Conclusion**

Accordingly, Defendants' motion to dismiss is granted. **[*9]** Friedman's complaint is dismissed without prejudice for 28 days, at which time it will automatically convert to a dismissal with prejudice.

IT IS SO ORDERED.

Date: April 28, 2014

/s/ Sharon Johnson Coleman

United States District Judge

***

*End of Document*



Neutral
As of: October 27, 2021 2:55 PM Z

# *Harris Davis Rebar, LLC v. Structural Iron Workers Local Union No. 1, Pension Trust Fund*

United States District Court for the Northern District of Illinois, Eastern Division

February 5, 2019, Decided; February 5, 2019, Filed

17 C 6473

**Reporter**

2019 U.S. Dist. LEXIS 17794 *; 2019 WL 454324

HARRIS DAVIS REBAR, LLC, Plaintiff, v. STRUCTURAL IRON WORKERS LOCAL UNION NO. 1, PENSION TRUST FUND, Defendant.

**Prior History:** *Harris Davis Rebar, LLC v. Structural Iron Workers Local Union No. 1, Pension Trust Fund, 2019 U.S. Dist. LEXIS 17798 (N.D. Ill., Feb. 5, 2019)*

## Core Terms

discovery, successor, discovery request, withdrawal, communications, alter ego, customers, documents, entities, parties, contributions, records, Interrogatory, projects, requests

**Counsel: [*1]** For Harris Davis Rebar, LLC, Plaintiff: Michael Giuseppe Congiu, LEAD ATTORNEY, Littler Mendelson, P.C., Minneapolis, MN; Kevin L Wright, Melissa Marjorie Harclerode, Littler Mendelson, P.C., Tysons Corner, VA; Robert Andrew Chapman, Shannon Therese Knight, Chapman Spingola, LLP, Chicago, IL.

For Structural Iron Workers Local Union No, 1 Pension Trust Fund, Defendant: Joseph Edward Mallon, LEAD ATTORNEY, Jeffrey Allen Krol, Johnson & Krol, LLC, Chicago, IL; Matthew D Grabell, Johnson & Krol, Llc, Chicago, IL.

**Judges:** John Z. Lee, United States District Judge.

**Opinion by:** John Z. Lee

## Opinion

### MEMORANDUM OPINION & ORDER

Defendant Structural Iron Workers Local Union No. 1, Pension Trust Fund ("the Fund") has filed a motion to compel discovery responses and a motion for extension of time to complete discovery. For the reasons stated herein, Defendant's motion to compel [44] is granted in part and denied in part, and its motion for extension of time to complete discovery [42] is granted. Fact discovery to close on June 4, 2019. To the extent the parties seek discovery of electronically-stored information ("ESI"), they are directed to meet and confer and, by February 25, 2019, submit a proposed ESI discovery plan consistent [*2] with this order. A status hearing is set for April 4, 2019.

### Background

Plaintiff Harris Davis Rebar, LLC ("HDR") filed this action in September 2017 seeking a declaratory judgment that it is not subject to withdrawal liability to the Fund under the *Employee Retirement Income Security Act ("ERISA")* and the *Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 et seq.* HDR contends that the Fund is seeking to hold it liable as the successor or alter ego of either one of two companies: Old Chicago Steel, LLC ("Old Chicago") and Davis J.D. Steel, Inc. ("DJD"). The Fund's position is that, before one or both of Old Chicago and DJD sold their assets to HDR in November 2012, they were liable for monthly contributions to the Fund. The Fund argues that HDR, Old Chicago, and DJD structured the asset purchase to avoid withdrawal liability under ERISA for any of the three entities.

The Fund served its first requests for production and first set of interrogatories on HDR on February 16, 2018. Def.'s 1st RFPs, ECF No. 44-2; Def.'s 1st Set Interr., ECF No. 44-3. HDR responded on April 17, 2018, asserting a number of general and specific objections to each request. Pl.'s Resp. Def.'s 1st RFPs, ECF No. 44-4; Pl.'s Resp. Def.'s 1st Set Interr., ECF No. **[*3]** 44-5. On May 4, 2018, at the parties' *Local Rule 37.2*

conference, the Fund agreed to limit the timeframe for which it is seeking documents to November 1, 2012, through December 31, 2014. HDR, in response, agreed to produce some documents, but generally stood by its objections. Accordingly, the Fund has filed a motion to compel responses to its first set of discovery requests, as well as a motion for extension of time to complete discovery. These motions are now before the Court.

## Legal Standard

District courts enjoy broad discretion in controlling discovery. *Crawford-El v. Britton, 523 U.S. 574, 598, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)*; *Patterson v. Avery Dennison Corp., 281 F.3d 676, 681 (7th Cir. 2002)*. Under *Federal Rules of Civil Procedure ("Rules") 26(c)* and *(d)*, a court may limit the scope of discovery or control its sequence. Under *Rule 26(b)(1)*, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.] . . . Information within [the] scope of discovery need not be admissible in evidence to be discoverable." Relevance in discovery is broader than relevance at trial; during discovery, "a broad range of potentially useful information should be allowed" when it pertains to issues raised by the parties' claims. *N.L.R.B. v. Pfizer, Inc., 763 F.2d 887, 889-90 (7th Cir. 1985)*. A court can, however, further limit relevant information sought in discovery if the information is "unreasonably cumulative or duplicative" [*4] or "the burden or expense of the proposed discovery outweighs its likely benefit." *Fed. R. Civ. P. 26(b)(2)(C)*.

## Discussion

The Fund contends that HDR has failed to produce documents in response to the Fund's initial discovery requests. Indeed, HDR has raised a number of objections in response to the requests. The Court will address each objection in turn.

## I. Geographic Jurisdiction of the Fund

Through its requests for production and interrogatories, the Fund seeks information about HDR's nationwide business activities, including documents such as customer lists, accounts receivable, communications with customers and vendors, and employment records. The Fund contends that such information is highly relevant to its theory that HDR is an alter ego or

successor of Old Chicago or DJD. It argues that both the alter ego doctrine and the successor doctrine "require a review of the entirety of the operations of the entities alleged to be, or in this case not to be, alter egos / successors." Def.'s Mot. Compel at 5, ECF No. 44.

HDR, by contrast, takes the position that its activities are relevant to alter ego or successor liability only to the extent they fall within the geographic jurisdiction of the Structural Iron Workers [*5] Local Union No. 1 ("Local 1")—the union that contracts with employers to require contributions to the Fund. What is more, HDR contends, even if some information about its outside activities may be relevant, it would take 150 to 200 hours of investigation to gather responsive material and therefore would be far more burdensome than appropriate. Accordingly, it has objected to each of the Fund's discovery requests for seeking "expansive information about HDR's and other entities' operations and relationships outside of" Local 1's jurisdiction. Pl.'s Resp. Def.'s 1st RFP at 2-3.

Both parties are half right. Withdrawal liability—which, under the MPPAA, applies to employers that cease contributions to multiemployer pension plans—may attach to a successor or alter ego of the employer that originally was obligated to pay into the pension fund. Successor liability requires "substantial continuity of the business," which is determined by looking to the totality of circumstances, emphasizing six factors: (1) ownership, (2) physical assets, (3) intangible assets, (4) management and workforce, (5) business services, and (6) customers. *See Ind. Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc., 884 F.3d 770, 777-78 (7th Cir. 2018)*; *see also Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1325-26 (7th Cir. 1990)*. The alter-ego analysis looks at similar factors, but also requires "the existence [*6] of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through the sham transfer of assets." *Chi. Dist. Council of Carpenters Pension Fund v. Vacala Masonry, Inc., 946 F. Supp. 612, 617 (N.D. Ill. 1996)* (quoting *Trs. of Pension, Welfare, & Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co., Inc., 995 F.2d 785, 789 (7th Cir. 1993))*. Neither inquiry is explicitly limited to the jurisdiction of the contributing union.

The Fund does not dispute, however, that HDR is a "building and construction" employer subject to the particular withdrawal liability provisions under *29 U.S.C.*

§ 1383(b). In the construction industry, a "withdrawal" from a multiemployer pension plan is considered to have occurred only when (1) an employer "ceases to have an obligation to contribute under the plan," and (2) it either "continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required" or "resumes such work within 5 years" after the obligation to contribute ceased. 29 U.S.C. § 1383(b). Therefore, even if a company is a "successor" or an "alter ego" of a previously contributing company, it cannot be liable for a withdrawal from the plan unless it has continued or resumed the work of its predecessor—in other words, the "withdrawal" must be complete for liability to attach to either entity.

In this case, then, [*7] there are two relevant questions. First, has a withdrawal occurred, *i.e.*, has HDR continued or resumed work that created DJD's or Old Chicago's contribution obligations *within the Fund's jurisdiction*? Second, can HDR properly be considered a successor or alter ego to either previous entity? The second question is not strictly limited to the Fund's jurisdiction, but the first question is.

These questions provide a useful lens through which to view the Fund's discovery requests. Evidence of HDR's continuation or resumption of Old Chicago's or DJD's business activities within Local 1's jurisdiction is most probative, as it goes to both questions. Evidence of HDR's activities in other jurisdictions, however, goes only to the question of HDR's status as a corporate successor or alter ego, and has nothing to do with the issue of whether a withdrawal has occurred. What is more, the probative value of HDR's activities in other jurisdictions is limited even as to the successorship or alter-ego analysis. See Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc., 801 F.3d 1079, 1095-97 (9th Cir. 2015) (explaining that the most important factor for successorship analysis in the construction industry is whether the putative successor takes over the original company's business within the [*8] "funding base of the Plan," *i.e.*, the "construction projects in the area" of the union's jurisdiction). Asking HDR to provide unlimited discovery related to its nationwide business activities therefore would be unduly burdensome and unlikely to lead to more than a minimal amount of relevant evidence.

The Court concludes that the best way to handle this tension is to divide the Fund's discovery requests into two categories. First, there are requests related to

customers, vendors, and projects. As to this category, the Court concludes that the most relevant evidence will come from inside the jurisdiction of Local 1. *See id.* Although customers, vendors, and projects outside the jurisdiction may bear some relevance to the successor or alter-ego issues, it is more likely that this information will be irrelevant and, to the extent it has any relevance, the burden to obtain and produce such information would substantially outweigh its usefulness here.

As to the first category, therefore, HDR is ordered to produce responsive documents and information only to the extent it possesses any such records pertaining to activities within the geographic jurisdiction of Local 1. This applies to customer [*9] lists (Requests for Production ("RFP") 1-2); accounts receivable information (RFP 3); communications with customers (RFP 4); communications pertaining to jobs and projects (RFPs 5-8, 21, 23-24 and RFP 22 insofar as it seeks information regarding work and projects, and Interrogatory 5); invoices, work orders, and bids for work (RFPs 9-10); and contracts with vendors and suppliers (RFPs 11-12, and Interrogatory 6).

The second category consists of requests related to the management, administration, employment, financial records, property and assets, business locations, and communications regarding the Fund or other employee benefits plans. These activities are less tied to a specific location and may shed light on HDR's status as a successor or alter ego of Old Chicago and/or DJD, regardless of where they occurred.

As to this second category, HDR is ordered to produce responsive documents and information, regardless of geography. This applies to communications between HDR personnel and Old Chicago and/or DJD about the Fund (RFPs 13-15), payroll and employment records (RFPs 16-17), financial and corporate records (RFPs 18-19, 30-31), communications regarding the appointment of managers and [*10] officers (RFP 20), communications regarding the transfer of employees between and among HDR, Old Chicago, and/or DJD (RFPs 25-29, and RFP 22 insofar as it seeks information regarding employees), records relating to assets and property (RFPs 29, 32-35), communications regarding withdrawal liability (RFP 36), and communications regarding the National Reinforcing Steel Agreement (RFPs 37-40). Similarly, HDR must produce information responsive to Interrogatories 1-4.

## II. Attorney-Client Privilege & Work Product Doctrine

HDR asserts attorney-client privilege and the work product doctrine in response to a number of the Fund's discovery requests. However, HDR does not provide any information to substantiate its claims of privilege or work-product protection. Accordingly, to the extent HDR believes any relevant, responsive documents are subject to privilege or work-product protection, it is ordered to comply with *Rule 26(b)(5)* and to produce a privilege log. *See Naik v. Boehringer-Ingelheim Pharms., Inc., No. 07 C 3500, 2008 U.S. Dist. LEXIS 47567, 2008 WL 4866015, at *3 (N.D. Ill. June 19, 2008)*.[1]

## III. Confidential & Proprietary Information

HDR has also objected broadly to the Fund's requests for "extensive confidential and proprietary information," but indicates that it will produce responsive material "after a suitable protective order and **[*11]** a privilege claw-back agreement are agreed to by the parties and entered by the Court." Pl.'s Resp. Def.'s 1st RFPs at 2. The parties have since entered into such an agreement. Thus, to the extent it has not yet done so, HDR is ordered to produce relevant and responsive materials in accordance with the confidentiality order in this case.

## IV. Remaining Objections

HDR has raised several other objections in its responses to the Fund's discovery requests, such as relevance, vagueness, and ambiguity. The Fund has countered each of these objections in its motion, but HDR has not responded to those arguments. Accordingly, HDR waives its remaining objections to the Fund's discovery requests. *See Bonte v. U.S. Bank, N.A., 624 F.3d 461, 466 (7th Cir. 2010)*.

The Court will, however, lay out a few general principles to guide the parties in response to HDR's objections. First, the Court observes that the majority of HDR's objections—to relevance, vagueness, overbreadth, and proportionality—are meaningless boilerplate that are "tantamount to not making any objection at all." *Fudali v. Napolitano, 283 F.R.D. 400, 403 (N.D. Ill. 2012)* (internal quotation marks and citation omitted). The Court will not

waste time in the future on such arguments devoid of analysis (and, frankly, neither should the parties).

HDR also objects to many of the Fund's discovery **[*12]** requests on the basis that they provided no reasonable time limitation, but the Fund has informed the Court that it is willing to limit its discovery requests to the period between November 1, 2012, and December 31, 2014. The Court agrees that this limitation is reasonable.

Lastly, HDR objects generally to the Fund's discovery requests insofar as they "seek and/or presume that HDR has or had knowledge relating [to] the operations and/or customers of other separate legal entities." Pl.'s Resp. Def.'s 1st RFP at 3. The Court agrees that HDR cannot be compelled to produce documents or information it does not possess. Otherwise, HDR has waived any arguments concerning the Fund's inquiries into its relationships with other legal entities. *See Bonte, 624 F.3d at 466*.

## Conclusion

The Fund's motion to compel [44] is granted in part and denied in part as stated above. The Funds motion for extension of time to complete discovery [42] is granted. Fact discovery to close on June 4, 2019. To the extent the parties seek discovery of ESI, they are directed to meet and confer and, by February 25, 2019, submit a proposed ESI discovery plan that is consistent with this order. A status hearing is set for April 4, 2019.

**IT IS SO ORDERED.**

**ENTERED 2/5/19**

/s/ John **[*13]** Z. Lee

**John Z. Lee**

**United States District Judge**

---

[1] This conclusion applies to documents not yet produced, as well as to the "Struble Documents" identified in HDR's motion for sanctions [51]. The Court incorporates its conclusions with respect to attorney-client privilege and the necessity of a privilege log as discussed in its order on that motion [79].

⚠ Caution
As of: October 27, 2021 2:55 PM Z

## *Lincoln Nat'l Life Ins. Co. v. Nicklau, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

May 17, 2000, Decided ; May 18, 2000, Docketed

No. 98 C 2453

**Reporter**
2000 U.S. Dist. LEXIS 6936 *; 2000 WL 656683

LINCOLN NATIONAL LIFE INSURANCE COMPANY, Plaintiff, v. NICKLAU, INC., an Illinois Corporation, d/b/a/ "PASTEUR," DAN NYUGEN, and TUAN NYUGEN, Defendants.

**Disposition:** [*1] Judgment entered in favor of plaintiff Lincoln National Life Insurance Company and against Defendants Nicklau, Inc., d/b/a Pasteur, Dan Nguyen and Tuan Nguyen.

## Core Terms

restaurant, continuation, state court, successor, goodwill, transferred, customer, successor liability, fraudulent, sole shareholder, Landlord, attorney's fees, shareholder, damages, parties, rent

## Case Summary

**Procedural Posture**
Plaintiff brought an action against defendants to collect on an outstanding judgment, alleging fraudulent transfer, intentional and constructive fraud, and breach of fiduciary duty.

**Overview**

Seeking to collect on an outstanding state court judgment, stemming from obligations under a lease, plaintiff brought an action against defendants, a restaurant business and its owners, alleging fraudulent transfer, intentional and constructive fraud, and breach of fiduciary duty. Following a bench trial, the court ruled that defendants, having profited from the transfer of the restaurant's name to a successor operation, were subject to successor liability. The relationship between the old restaurant and the new satisfied the test for the continuation exception to nonsuccessor liability, as all defendants were heavily involved in the operation and management of both the old and new operations.

Further, under the Uniform Fraudulent Transfer Act, *740 Ill. Comp. Stat. 160/5(a)*, liability was imposed where the name and goodwill of the old restaurant was transferred to the new for no consideration, at a time when defendants were anticipating a significant judgment against them in state court.

**Outcome**
The court found defendants were subject to successor liability. Defendants were heavily involved in the operation and management of both the old and new restaurant operations, and the name and goodwill of the old restaurant was transferred for no consideration, when defendants were anticipating a significant judgment against them.

## LexisNexis® Headnotes

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > General Overview

Mergers & Acquisitions Law > Liabilities & Rights of Successors > General Overview

Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine

*HN1*[⬇] **Directors & Officers, Management Duties & Liabilities**

A corporation that purchases the assets of another corporation is generally not liable for the debts or liabilities of the transferor corporation. However, the following four exceptions to the general rule provide for successor liability: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligation.

Mergers & Acquisitions Law > General Business Considerations > General Overview

Torts > Vicarious Liability > Corporations > Predecessor & Successor Corporations

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > General Overview

Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation

### HN2[⤓] Mergers & Acquisitions Law, General Business Considerations

The "continuation exception," which is the third exception to successor nonliability, applies when the purchasing corporation is merely a continuation or reincarnation of the selling corporation. Where the purchasing corporation maintains the same or similar management and ownership, but merely "wears different clothes," liability will be imposed upon the successor corporation.

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > General Overview

Environmental Law > Hazardous Wastes & Toxic Substances > Toxic Torts

Business & Corporate Law > ... > Directors &

Officers > Management Duties & Liabilities > General Overview

### HN3[⤓] Shareholders, Shareholder Duties & Liabilities

To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception to successor nonliability is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > General Overview

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

### HN4[⤓] Shareholders, Shareholder Duties & Liabilities

One corporation is deemed to be a continuation of another where there exists a common identity of officers, directors, and/or shareholders.

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > General Overview

Mergers & Acquisitions Law > General Business Considerations > General Overview

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

### HN5[⤓] Shareholders, Shareholder Duties & Liabilities

While the spousal relationship between the owners of the corporations does not in itself establish a continuity of shareholders, it is certainly a factor which can be considered.

Torts > Business Torts > Fraud & Misrepresentation > General Overview

HN6[↓] **Business Torts, Fraud & Misrepresentation**

See *740 Ill. Comp. Stat. 160/5(a)*.

> Real Property Law > Purchase & Sale > Fraudulent Transfers

> Torts > Business Torts > Fraud & Misrepresentation > General Overview

HN7[↓] **Purchase & Sale, Fraudulent Transfers**

Fraud in law presumes a fraudulent intent when a voluntary transfer, made for no or inadequate consideration, directly impairs the rights of creditors.

**Counsel:** For LINCOLN NATIONAL LIFE INSURANCE COMPANY, THE, plaintiff: Donald Alan Murday, Sean Patrick MacCarthy, Peterson & Ross, Chicago, IL.

For LINCOLN NATIONAL LIFE INSURANCE COMPANY, THE, plaintiff: R. Lindsay Wilson, II, Sullivan & Worcester, LLP, Boston, MA.

For NICKLAU INC, DAN NGUYEN, TUAN NGUYEN, defendants: Robert H Itzkow, Robert H. Itzkow and Associates, Chicago, IL.

For NICKLAU INC, DAN NGUYEN, TUAN NGUYEN, defendants: Paul A. Caghan, Paul Caghan, P.C., Chicago, IL.

**Judges:** David H. Coar, United States District Judge.

**Opinion by:** David H. Coar

# Opinion

### *MEMORANDUM OPINION AND ORDER*

Lincoln National Life Insurance Company ("Lincoln") filed this action against Nicklau, Inc., d/b/a/ "Pasteur," Dan Nguyen, and Tuan Nguyen, (collectively, "Defendants"). Seeking to collect on an outstanding state court judgment, Lincoln proceeded against Defendants on a theory of successor liability (Count I), fraudulent transfer, intentional and constructive fraud (Counts II and III, respectively), and breach of fiduciary duty **[*2]** against Dan and Tuan Nguyen (Counts IV and V, respectively). A bench trial was held on May 15, 2000. The following findings of fact and conclusion of

law are entered pursuant to *Federal Rule of Civil Procedure 52(a)*.

**I. Factual Findings**

Brothers Dan and Tuan Nguyen co-owned a Vietnamese restaurant named Pasteur, located at 4759 N. Sheridan Road in Chicago ("Pasteur-Sheridan"). The restaurant was incorporated in Illinois as Pasteur-Restaurant, Inc., in 1985. In June 1995, a fire destroyed Pasteur-Sheridan. The Illinois Secretary of State's office involuntarily dissolved Pasteur-Sheridan in May 1996. In July 1992, Dan and Tuan Nguyen opened a second Vietnamese restaurant, again named Pasteur, at 45 E. Chicago Avenue in Chicago ("Pasteur-Chicago"). That restaurant was incorporated in Illinois as Pasteur Cafe, Inc.

Kim Nguyen, Dan's wife, undertook a significant role at both restaurants. She worked at the Pasteur restaurants from their inception in 1985 until their demise in 1996. During that period, she did not hold any other employment. Kim Nguyen maintained the books, paid bills, waitressed, and cooked at Pasteur-Sheridan and Pasteur-Chicago (together, "old Pasteurs"). Kim **[*3]** signed a legal document renewing Pasteur-Sheridan's liquor and food license. To enable Pasteur-Sheridan to participate in the Taste of Chicago festival, Kim Nguyen, holding herself out as an officer, signed a document for the City of Chicago. When Dan and Tuan traveled, Kim was in charge of the two restaurants. At trial, Kim Nguyen indicated that the experience she brought to the old Pasteurs was "critical." Dan Nguyen agreed, stating that his wife was a "very important person in running" the old Pasteurs.

In February 1996, Lincoln, an Indiana corporation that owned the property on which Pasteur-Chicago was located, filed a Forcible Entry and Detainer action against Pasteur-Sheridan in state court. Lincoln sought to recover rent damages and to repossess the space occupied by Pasteur-Chicago. Subsequently, Pasteur-Chicago was also named a co-defendant in that suit. On January 31, 1997, the state court granted Lincoln's motion for summary judgment on the Forcible Entry and Detainer action. Pursuant to the state court judgment, Pasteur-Sheridan was ordered to pay Lincoln $ 89, 926.36 in rent damages and $ 20,000 in attorney's fees.

On May 12 or 13, 1997, during the pendency of the summary **[*4]** judgment motion before the state court, Kim Nguyen incorporated a restaurant in Illinois as Nicklau, Inc., d/b/a Pasteur. This Vietnamese restaurant

is located at 5525 N. Broadway in Chicago ("Pasteur-Broadway"). Kim Nguyen is the sole director and shareholder of this restaurant. She also serves as the President and Secretary of Pasteur-Broadway. In Defendants' Answers to Interrogatories, signed by Dan and Tuan Nguyen, Kim, Dan, Tuan and Quynh Nguyen were listed as officers of Nicklau Inc. d/b/a/ Pasteur. [1] Dan Nguyen's relatives, including his parents, his sister, and two brothers loaned money to Kim and Dan to help finance the purchase of the property at 5525 N. Broadway. No money from the old Pasteurs was used toward the purchase or operation of Pasteur-Broadway.

Since the restaurant's opening in May 1997, Dan Nguyen has worked 50-60 hours a week at Pasteur-Broadway. Dan, [*5] who was responsible for maintaining the books at the old Pasteurs, continues to maintain the books for Pasteur-Broadway. He also cooks, pays the bills, and owns the building at 5525 N. Broadway with his wife. Dan Nguyen earns approximately $ 40,000 a year for his work at the restaurant.

Tuan Nguyen has worked an average of 50 hours per week at Pasteur-Broadway since 1997. He manages the cash register and oversees the cleaning crew. On many occasions, Tuan has issued personal checks, for which he is later reimbursed, to pay for Pasteur-Broadway's financial obligations. On one such occasion, Tuan Nguyen paid over $ 1,000 out of his personal account for Pasteur-Broadway's liquor license. In 1997, he signed a Taste of Chicago document stating that he was Secretary of Pasteur-Broadway. Tuan Nguyen, who earns $ 45,000 a year at Pasteur-Broadway, is the highest paid employee among Pasteur-Broadway's 26 employees, including Kim Nguyen. Kim Nguyen testified at trial that Tuan Nguyen, "to a certain extent," brings valuable restaurant experience to Pasteur-Broadway. Neither Dan nor Tuan have held any employment other than working at Pasteur-Broadway since its opening.

Hieu Tran, who cooked at [*6] Pasteur-Chicago, is one of the primary cooks at Pasteur-Broadway. Dan Nyugen's niece, Quynh Nguyen, bartends at Pasteur-Broadway. Some of the recipes used at the old Pasteurs are also used at Pasteur-Broadway. Customer from the old Pasteurs comprise about 10% of Pasteur-Broadway's customer base. Kim Nguyen stated that some customers frequent Pasteur-Broadway because of

the goodwill associated with the old Pasteurs. In fact, customers at the new restaurant have commented that it's "good to be back."

Kim and Tuan Nguyen testified that the name Pasteur enjoyed a reputation for excellent Vietnamese food in Chicago. Kim also agreed that the name Pasteur was good for business. When Kim Nyugen spoke with Phil Vettel, a restaurant critic for the Chicago Tribune, she informed him that it was important to "keep the [Pasteur] name alive." At trial, she testified that the name was recognized in Chicago. For several years, the old Pasteurs were a participating vendor at the Taste of Chicago festival, and after 1997, Pasteur-Broadway sent employees, donned in shirts from the old Pasteurs, to operate at the festival.

Time and again, Pasteur-Broadway has been associated with the old Pasteurs. [*7] Customers have assumed that Tuan Nguyen, who owned the old Pasteurs, also owns Pasteur-Broadway. In addition, the media has assumed that Pasteur-Broadway is related to the old Pasteurs, and Kim Nguyen has not informed them otherwise. An article in Chicago Magazine noted that Pasteur-Broadway "rose from its ashes like a Phoenix." A Chicago Sun Times article also connects the old Pasteurs with the new, stating that Pasteur-Broadway has "finally found a permanent home."

There are differences between the old Pasteurs and Pasteur-Broadway. Pasteur-Broadway occupies a much larger space, and according to Kim Nguyen, it embraces a new "concept." Kim Nguyen has made the food lighter and has added a wider range of entrees than were served at the old Pasteurs. The average customer spent $ 10-15 at the old Pasteurs, while at Pasteur-Broadway, the average meal costs anywhere from $ 30-75. Although the old Pasteurs did not serve alcohol, Pasteur-Broadway has a full service bar. Pasteur-Broadway grossed a million dollars in 1998, and 2 million in 1999. Kim Nguyen testified that the ongoing value of the business today, apart from the real estate and the value of the property, was $ 300,000 to $ 400,000.

[*8] After the demise of the old Pasteurs, all of the remaining assets--namely, 15-20 old chairs and tables, a kitchen hood, a burner, and some utensils were transferred to Pasteur-Broadway. These assets, which are worth no more than $ 2,000, are now kept in a garage at 5525 N. Broadway.

Lincoln seeks relief under Illinois law. This Court retains jurisdiction over this matter pursuant to _28 U.S.C. §_

---

[1] When asked about this particular answer at trial, Tuan Nguyen testified that he had not reviewed it before signing the interrogatory.

1332(a)(1).

## II. Conclusions of Law

As a general rule, **HN1**[⬆] a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation. *Vernon v. Schuster, 179 Ill. 2d 338, 344-45, 688 N.E.2d 1172, 1175, 228 Ill. Dec. 195, 198 (Ill. 1997).* To "offset the potentially harsh impact of the rule, however, the law has also developed methods to protect the rights of corporate creditors after dissolution." *Id.* (quoting *Tucker v. Paxson Machine Co., 645 F.2d 620, 623 (8th Cir. 1981)).* The following four exceptions to the general rule provide for successor liability: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation **[*9]** or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligation. *Id.*

In the usual case, successor liability has been applied where there has been a sale of assets. Here, there did not exist a "sale" in the sense that money did not change hands in exchange for a good. Yet the fact that the old Pasteurs' name and goodwill were transferred to Pasteur-Broadway without any consideration does not preclude Pasteur-Broadway's liability. Kim, Dan and Tuan Nyugens' testimonies firmly established that the Pasteur name and goodwill were of significant value. Even if the name and goodwill were not sold in the conventional sense, these valuable intangibles were transferred to Pasteur-Broadway. *See, e.g., Frank Ix & Sons, Inc. v. Phillipp Indus., Inc., 1997 U.S. Dist. LEXIS 12889*, No. 95 C. 3195, *1997 WL 534509*, at *6 (N.D. Ill. Aug. 25, 1997) (finding a conveyance where property transferred for inadequate consideration).

Defendants point out that the name Pasteur was never copyrighted, and that another Vietnamese restaurant in Moline, Illinois, **[*10]** as well as a handful of others across the country, also use that name. The existence of other restaurants named Pasteur, none of which are located in the City of Chicago, does not undermine the value of the name and the goodwill built up by the old Pasteurs. Kim Nguyen insisted on keeping the name "alive" precisely because of the value of these assets. Clearly, Pasteur-Broadway benefitted from the goodwill associated with the name Pasteur, whether it be through the favorable restaurant reviews connecting the restaurants, or the customer assumption of identity

between the old Pasteurs and Pasteur-Broadway. In fact, when the old Pasteurs were unable to participate in the Taste of Chicago festival, Pasteur-Broadway appropriated that same vending opportunity. Pasteur-Broadway, having profited from the transfer of the old Pasteurs' most precious asset, is subject to successor liability.

### A. Continuation Exception

**HN2**[⬆] The "continuation exception," which is the third exception to successor nonliability outlined above, applies when the purchasing corporation is "merely a continuation or reincarnation of the selling corporation." *Vernon, 179 Ill. 2d at 346, 688 N.E.2d at 1176* **[*11]** (citing *Grand Lab., Inc. v. Midcon Labs of Iowa, Inc., 32 F.3d 1277, 1282 (8th Cir. 1994)).* Where the purchasing corporation "maintains the same or similar management and ownership, but merely 'wears different clothes,'" liability will be imposed upon the successor corporation. *Id.* (citing *Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451, 1458 (11th Cir. 1985)).*

Once the state court suit was filed, Nicklau, Inc., d/b/a Pasteur, was incorporated, with Kim Nguyen as the sole officer and shareholder of Pasteur-Broadway. This ruse was a transparent attempt to escape the liabilities about to be incurred by the old Pasteurs. The continuation exception to successor nonliability, however, was designed to protect creditors in these situations. The Illinois Supreme Court observed:

**HN3**[⬆] To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.

*179 Ill. 2d at 346, 688 N.E.2d at 1176* (quoting *Baltimore Luggage Co. v. Holtzman, 80 Md. App. 282, 297, 562 A.2d 1286, 1293 (Md. 1989)).* **[*12]**

The relationship between the old Pasteurs and Pasteur-Broadway satisfies the test for the continuation exception. **HN4**[⬆] One corporation is deemed to be a continuation of another where there exists a common identity of officers, directors, and/or shareholders. *179 Ill. 2d at 347, 688 N.E.2d at 1176.* Dan and Tuan Nyugen served as the sole shareholders and officers of

the old Pasteurs, while Kim Nguyen served as the sole shareholder, officer and director of Pasteur-Broadway. Although on its face, this fact alone would serve to defeat the imposition of successor liability, a closer look at the facts compels the opposition conclusion.

Regardless of whether they officially served as owners, directors, or officers, Dan, Tuan and Kim Nguyen were substantially interwined in the operation of all three Pasteur restaurants. Kim was heavily involved in the operation and management of the old Pasteurs. When Dan and Tuan traveled, Kim was left in charge of the two restaurants. She also held herself out as an officer, as evidenced by two documents that she signed as a "Secretary" of Pasteur-Sheridan. *See H & H Press, Inc. v. Drew Axelrod, 265 Ill. App. 3d 670, 679, 638 N.E.2d 333, 339, 202 Ill. Dec. 687 (Ill. App. Ct. 1994)* [*13] (defendant deemed de facto officer where he held himself out as one). At trial, Kim Nguyen conceded that she took on a "critical" role, and Dan Nguyen affirmed her, admitting that his wife was a "very important person in running" the old Pasteurs.

Similarly, Dan and Tuan Nguyen, although not official owners of Pasteur-Broadway, continued to be significantly involved. Dan's relatives loaned the money to Dan and Kim Nguyen to purchase the property at 5525 N. Broadway. Dan and Tuan devoted their days to working full time at Pasteur-Broadway. At $ 45,000 a year, Tuan Nyugen is the highest paid employee among Pasteur-Broadway's 26 employees. On many occasions, Tuan Nguyen issued personal checks, for which he was later reimbursed, to pay for Pasteur-Broadway's financial obligations. On one such occasion, Tuan Nguyen paid over $ 1,000 out of his personal account for Pasteur-Broadway's liquor license. In 1997, Tuan signed a Taste of Chicago document stating that he was Secretary of Pasteur-Broadway. In their answer to Plaintiff's interrogatories, Defendants identified Kim, Dan and Tuan Nguyen as officers of Pasteur-Broadway. Kim, Dan and Tuan's managerial involvement in the three Pasteur [*14] restaurants, not to mention their holding themselves out as officers, establishes a continuation in ownership.

*Park v. Townson & Alexander, Inc., 287 Ill. App. 3d 772, 774, 679 N.E.2d 107, 109, 223 Ill. Dec. 163 (Ill. App. Ct. 1997)* is illustrative of the way Illinois courts have analyzed similar facts. In *Park*, the state court determined that an identity of ownership existed where the husband and his business partner were sole shareholders of a predecessor corporation, while the wife was the sole shareholder of the successor

corporation. *287 Ill. App. 3d at 775, 679 N.E.2d at 110*. Although the wife was designated as sole shareholder of successor company, the husband continued to make major decisions for the successor corporation. *Id.* In addition, tax documents, albeit claimed as erroneous by defendants, showed that the husband was president of successor corporation. *Id.* The court also noted that HN5[⬆] "while the spousal relationship between the owners of the corporations does not in itself establish a continuity of shareholders, it is certainly a factor which can be considered." *Id. See also Steel Co. v. Morgan Marshall Indus., 278 Ill. App. 3d 241, 248-49, 662 N.E.2d 595, 600, 214 Ill. Dec. 1029 (Ill. App. Ct. 1996)* [*15] (continuity found where husband was sole shareholder of predecessor company and wife was 80% shareholder of successor company).

Not only was there an identity of ownership between the old Pasteurs and Pasteur-Broadway, but the business operation of the three restaurants evidenced a substantial continuity. Pasteur-Broadway is located only a couple of miles away from Pasteur-Sheridan. The old Pasteurs' name and goodwill were carried forward to Pasteur-Broadway. The restaurants continued to serve Vietnamese food. *See Kennedy v. Four Boys Labor Serv. Inc., 279 Ill. App. 3d 361, 368, 664 N.E.2d 1088, 1092, 216 Ill. Dec. 160 (Ill. App. Ct. 1996)* (continuity established where successor operated the same business, used the same name). Hieu Tran, the cook at the old Pasteurs, was transferred to the new restaurant. The same recipes were used. Some of the same customers who used to frequent the old Pasteurs now patronize Pasteur-Broadway. Kim Nguyen insists that the "concept" and "ambiance" of the old and new restaurants differ, and that she has added lighter fare to a more expansive menu, but those are distinctions without a meaningful difference. The point is that Pasteur-Broadway, [*16] even if it has evolved into a more sophisticated version, is a mere continuation of the old Pasteurs. As such, it is liable for the judgment entered against the old Pasteurs.

*B. Fraudulent Transfer*

Not only does the continuation exception serve as a basis for imposing liability upon Pasteur-Broadway, but the Uniform Fraudulent Transfer Act ("Act") provides alternative grounds for successor liability. The Act states that:

HN6[⬆] A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the

creditor's claim arose before or after the transfer was made or the obligation as incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonable equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed he would incur, debts beyond his ability to pay as they [*17] became due.

*740 ILCS 160/5(a).*

Pursuant to this provision, Illinois courts have categorized fraudulent conveyance cases into the categories of "fraud in law" and "fraud in fact." *HN7*[↑] Fraud in law presumes a fraudulent intent when a voluntary transfer, made for no or inadequate consideration, directly impairs the rights of creditors. *Frank Ix & Sons, Inc. v. Phillipp Indus., Inc., 1997 U.S. Dist. LEXIS 12889*, No. 95 C 3195, *1997 WL 534509*, at *6 (N.D. Ill. Aug. 25, 1997) (citing *Casey Nat'l Bank v. Roan, 282 Ill. App. 3d 55, 668 N.E.2d 608, 611, 218 Ill. Dec. 124 (Ill. App. Ct. 1996)).* In the instant case, the name and goodwill of the old Pasteurs were transferred to Pasteur-Broadway for no consideration at a time when Defendants were anticipating a significant judgment against them in state court. By 1997, the old Pasteurs were left with $ 0.24 in their bank account, and could not afford to pay off their debt.

Not only is this court satisfied that fraud-in-law applies to this case, but the numerous "badges of fraud" present in this case give rise to a presumption of fraud-in-fact, which Defendants have failed to rebut. *Frank Ix, 1997 U.S. Dist. LEXIS 12889, 1997 WL 534509*, at *8 (citing [*18] *Kaibab Indus., Inc. v. Family Ready Homes, Inc., 80 Ill. App. 3d 782, 786, 14 Ill. Dec. 334, 372 N.E.2d 139 (Ill. App. Ct. 1978)).* The Act sets forth eleven indicia of fraud, *see 740 ILCS 160/5(b)(1)-(11)*, and this case qualifies for at least seven of those factors. First, the Pasteur name and goodwill were transferred to an insider; that is, the wife and sister-in-law of the owners of predecessor restaurants. Second, Dan and Tuan Nguyen, the debtors, retained possession and control of the transferred property by exercising significant managerial control at Pasteur-

Broadway. Third, before the transfer was made, the Dan and Tuan Nguyen had been sued by Lincoln. Fourth, all of old Pasteur's remaining assets-- from the valuable name and goodwill to the useless old chairs, tables, and kitchenware-- were transferred to Pasteur-Broadway. Fifth, no consideration was received for these assets. Sixth, the old Pasteurs had been insolvent. Finally, the transfer occurred shortly before a substantial debt was incurred. The overwhelming evidence demonstrates that a fraudulent transfer occurred, and Pasteur-Broadway will be held liable for the judgment debt of the old Pasteurs.

 [*19] Lincoln also advances claims against Dan and Than Nguyen for breach of fiduciary duty, but those counts need not be addressed in light of this court's disposition of the successor liability claim.

*C. Amount of Liability*

As the successor of the old Pasteurs, Pasteur-Broadway is directed to pay for the state court judgment entered against Pasteur-Sheridan in the amount of $ 89,926.36 for rent damages and $ 20,000 for attorneys' fees incurred in the state court action. In addition, Pasteur-Broadway is ordered to pay for attorneys' fees and costs incurred in the instant action. The lease agreement between Pasteur-Sheridan and their original landlord, Centrum Properties, purports to bind the parties as well as their successors. P 27.9 In addition, the lease provides that:

The Tenant shall pay upon demand all Landlord's costs, charges and expenses including the fees and out-

of-pocket expenses of counsel, agents, and others retained by landlord incurred in enforcing the Tenant's obligations hereunder or incurred by the Landlord in any litigation, negotiation, or transaction in which the Tenant causes the Landlord without Landlord's fault to become involved or concerned.  [*20]

P 20.1(d). This federal suit was incurred in order to enforce Defendants' obligations under the lease, and fees and costs will be awarded to Lincoln pursuant to the lease agreement.

### III. Conclusion

Pursuant to the foregoing findings of fact and conclusions of law, the court enters judgment in favor of plaintiff, Lincoln National Life Insurance Company, and

against Defendants Nicklau, Inc., d/b/a Pasteur, Dan Nguyen, and Tuan Nguyen. Nicklau, Inc., d/b/a/ Pasteur is liable for the state court judgment entered against Pasteur-Sheridan in the amount of $ 89,926.36 for rent damages and $ 20,000 for attorneys' fees incurred in the state court action. The parties are ordered to proceed with a motion for fees pertaining to the federal action against Defendants in accordance with *Federal Rule of Civil Procedure 54(d)* and Local Rule LR 54.3. *See* Local Rule LR 54.3(d)-(g) (requiring parties to make a good faith attempt to agree on the amount of fees due and outlining additional procedures).

**Enter:**

**David H. Coar**

**United States District Judge**

**Dated:** MAY 17 2000

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to trial or **[*21]** hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff, Lincoln National Life Insurance Company, and against Defendants Nicklau, Inc., d/b/a Pasteur, Dan Nguyen, and Tuan Nguyen. Nicklau, Inc., d./b/a/ Pasteur is liable for the state court judgment entered against Pasteur-Sheridan in the amount of $ 89,926.36 for rent damages and $ 20,000 for attorneys' fees incurred in the state court action. The parties are ordered to proceed with a motion for fees pertaining to the federal action against Defendants in accordance with *Federal Rule of Civil Procedure 54(d)* and Local Rule LR 54.3. *See* Local Rule LR 54.3(d)-(g) (requiring parties to make a good faith attempt to agree on the amount of fees due and outlining additional procedures).

Date: 5/17/2000

No *Shepard's* Signal™
As of: October 27, 2021 2:56 PM Z

## *MAC Funding Corp. v. MNdustries, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

May 2, 2018, Decided; May 2, 2018, Filed

Case No. 17 cv 6470

**Reporter**

2018 U.S. Dist. LEXIS 74149 *; 2018 WL 2045450

MAC FUNDING CORPORATION, a Delaware corporation, Plaintiff, v. MNDUSTRIES, INC., a Georgia corporation, and MICHAEL E. NANCE II, a Georgia citizen, Defendants.MNDUSTRIES, INC., a Georgia corporation, and MICHAEL E. NANCE II, a Georgia citizen, Third-Party Plaintiffs, v. MC MACHINERY SYSTEMS, INC., a Delaware corporation, Third-Party Defendants.

## Core Terms

machines, Funding, third-party, alleges, cutting, indemnity, implied indemnity, financing, warranty, laser, financing agreement, customers, default, defective equipment, indemnification, installation, duplicative, stranger, orders

**Counsel:** **[*1]** For MAC Funding Corporation, a Delaware corporation, Plaintiff: Rein F. Krammer, LEAD ATTORNEY, David Joseph Stein, Michael Semyon Golenson, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL.

For MNdustries, Inc., a Georgia corporation, Michael E. Nance, II, a Georgia citizen, Defendants: John Deaton Steel, LEAD ATTORNEY, PRO HAC VICE, Steel and Moss, LLP, Atlanta, GA; Edward J. Aucoin, Jr., Lisa B Weinstein, Whitney Kendall Siehl, Grant & Eisenhofer P.A., Chicago, IL.

For Michael E. Nance, II, a Georgia citizen, MNdustries, Inc., a Georgia corporation, ThirdParty Plaintiffs: John Deaton Steel, LEAD ATTORNEY, PRO HAC VICE, Steel and Moss, LLP, Atlanta, GA; Edward J. Aucoin, Jr., Lisa B Weinstein, Whitney Kendall Siehl, Grant & Eisenhofer P.A., Chicago, IL.

For MC Machinery Systems, Inc., Third Party Defendant: Rein F. Krammer, LEAD ATTORNEY, David Joseph Stein, Michael Semyon Golenson, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL.

For MC Machinery Systems, Inc., Counter Claimant:

Rein F. Krammer, LEAD ATTORNEY, David Joseph Stein, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL.

For MNdustries, Inc., a Georgia corporation, Counter Defendant: John Deaton Steel, LEAD ATTORNEY, **[*2]** Steel and Moss, LLP, Atlanta, GA; Lisa B Weinstein, Whitney Kendall Siehl, Grant & Eisenhofer P.A., Chicago, IL.

For MC Machinery Systems, Inc., Counter Claimant: Rein F. Krammer, LEAD ATTORNEY, David Joseph Stein, Michael Semyon Golenson, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL.

For MNdustries, Inc., a Georgia corporation, Counter Defendant: John Deaton Steel, LEAD ATTORNEY, PRO HAC VICE, Steel and Moss, LLP, Atlanta, GA; Edward J. Aucoin, Jr., Lisa B Weinstein, Whitney Kendall Siehl, Grant & Eisenhofer P.A., Chicago, IL.

**Judges:** SHARON JOHNSON COLEMAN, United States District Judge.

**Opinion by:** SHARON JOHNSON COLEMAN

## Opinion

### MEMORANDUM OPINION AND ORDER

Defendants and third-party plaintiffs, Mndustries, Inc. and Michael E. Nance (collectively "MN"), filed an amended four-count third-party complaint against MC Machinery Systems, Inc. ("MMS") seeking indemnification for MN's alleged breach of financing contract with MAC Funding Corporation ("MAC Funding"), and alleging breach of express and implied warranty, and fraud. Third-party defendants, MMS, move to dismiss the amended third-party complaint for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons stated herein, the

motion is granted.

## Background

The **[*3]** following facts are gathered from MN's Amended Third-Party Complaint which the Court takes as true for purposes of the instant motion. MN was a sheet metal fabricator that used laser cutting machines to fabricate specified metal goods for its customers. MMS is a subsidiary of Mitsubishi that markets, sells, installs, and services metal fabrication machinery including laser-cutting machines and associated material handling systems. MN previously purchased equipment from MMS. MN had gone through several cycles of laser machine purchases over its period of operations to keep its equipment current.

In 2014, MMS approached MN to purchase new Mitsubishi laser-cutting machines and the new MMS automated handling system to update MN's production capabilities. MAC Funding Corporation would finance the purchase. MN alleges that MAC Funding is the "captive financing arm" of MMS. MN purchased four new machines from MMS with financing by MAC Funding. The total purchase price for all the equipment exceeded $5 million. The first purchase was executed on July 14, 2014 by Nance on behalf of MN. MMS was to deliver the three other laser cutting machines to MN in September, October, and December of 2015. **[*4]** MN alleges that it spent over $300,000 to prepare its Georgia facility for the installation of the new laser cutting machines.

After some delays, which MN attributes to MMS, the first new laser machine was finally operational at MN's facility on February 18, 2016. It was installed without the River System automation that was to accompany the machine. Over the next seven months the four machines and the River System were installed but never functioned at the cutting proficiency, accuracy, and speed that MMS had represented it would.

MMS representative Rosengren remained on site to work with the machines precision and automation. MMS laser services technician Tracy Marcotte documented in his service report, that the "machine [is] still not cutting good consistently" and that the system had crashed when he arrived on March 29, 2016. All four machines were up and running on March 29, 2016, but MN alleges that problems persisted, causing improper and inconsistent cuts and the cutting head on one of the machines would fall off during use. Marcotte continued to report issues with the machines and make adjustments to try to fix the problems.

On April 12, 2016, Jim Altenbach and Landon Frick, **[*5]** MMS field service engineers, were on site because of the ongoing issues with the new machines. They documented slow, imprecise, poor, and inconsistent cutting. Altenbach informed Nance that he had resolved the cutting and speed problems. Based on this representation, Nance told MN customers that their overdue orders would be filled shortly. According to MN, Altenbach knew his representations were false because the nozzle he replaced was not the recommended size according to MMS' specifications. Altenbach also knew that MN, through its principal Nance, would rely on the representation.

Within a few weeks Marcotte was back on site to address additional problems with the machines. The problems persisted, MMS sent additional engineers to address the issues. After seven months the inconsistent cutting issues were resolved with a design modification. MN alleges that this design flaw or defect was hidden by MN. According to MN, its failure to deliver orders to its customers for over seven months caused the company to lose business. MN was forced to cease operations.

The sales contract between MN and MMS included a warranty that "the Equipment sold hereunder will be free from defects in material **[*6]** and workmanship." The warranty was for two years from the date of installation at the MN's facility. MN alleges that MMS breached the warranty by providing materially defective equipment, which they repeatedly failed to repair, replace, or refund as required by the sales contract. As a result of the alleged breach of warranty, MN claims to have suffered damages from its continued responsibility for payment for the defective equipment in excess of $5 million and other damages. MN also alleges that MMS breached an implied warranty under the Uniform Commercial Code from the sale of the defective equipment.

MN further alleges that MMS employees repeatedly represented that the laser machines were not defective and "have at all times performed within published specifications for the machine." MN relied on these representations that the cause of the problem was not a design defect, but external factors relating to the facility. MN alleges that the representations by MMS employees were knowingly false and misleading. The MMS representatives allegedly were aware that the laser machines were defective.

Lastly, MN alleges that it is entitled to indemnification from MMS for any damages resulting **[*7]** from the suit

filed by MAC Funding against MN for default on the financing contract. MN alleges that MAC Funding is the "admitted captive", under the full control of MMS. Dkt. 35 at P100. Further, MN alleges that MAC Funding and MMS are both owned by Mitsubishi Corporation. Thus, MN is seeking implied indemnity through an alter ego theory liability for MN's failure to pay the financing contracts.

## Legal Standard

A motion to dismiss brought pursuant to *Rule 12(b)(6)* challenges the legal sufficiency of the pleading. *Rule 8(a)* applies to most claims and requires a short and plain statement of the claim upon which relief can be granted. To survive dismissal, the counterclaims must state a facially plausible claim that puts the defending party, the Receiver, on notice of the basis of the claims against it. *See Swanson v. Citibank, N.A., 614 F.3d 400, 403-404 (7th Cir. 2010)*. The Seventh Circuit has explained that "plausibility" means, that "the plaintiff [or counterplaintiff] must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Id. at 404* (emphasis in original). In determining the sufficiency of a counterclaim, the Court accepts as true all **[*8]** well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 555 (7th Cir. 2012)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)* and *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))*.

*Rule 9(b)* requires a party alleging fraud to "state with particularity the circumstances constituting fraud." *Fed. R. Civ. P. 9(b)*. This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer, 649 F.3d 610, 615 (7th Cir. 2011)* (quoting *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co., 631 F.3d 436, 441-42 (7th Cir.2011))*. "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate *Rule 9(b)*'s heightened pleading requirements." *Borsellino v. Goldman Sachs Grp., Inc., 477 F.3d 502, 507 (7th Cir. 2007)*.

## Discussion

First, MMS argues that this Court should dismiss the amended third-party complaint for failure to state a claim for indemnity. MN concedes that it is not asserting express indemnity, and therefore, this Court only considers whether MN adequately alleges a claim for implied indemnity or non-contractual indemnity.

"Under implied indemnity, a promise to indemnify will be implied by law where a blameless party is derivatively liable to the plaintiff based on the party's relationship with the one who actually caused the injury." *Schulson v. D'Ancona and Pflaum LLC, 354 Ill. App. 3d 572, 576, 821 N.E.2d 643, 290 Ill. Dec. 331 (1st Dist. 2004)*. To state a claim for implied indemnity, under Illinois law, the **[*9]** third-party plaintiff, MN, must allege: (1) a pre-tort relationship between the third-party plaintiff, MN, and the third-party defendant, MMS; and (2) a qualitative distinction between the conduct of MN and MMS. *Id.* Here, MN claims that it is blameless for the alleged default on the financing agreements with MAC Funding because MMS actually caused the default by providing defective equipment that prevented MN from fulfilling customer orders and earning the funds to pay the financing agreements.

In *Schulson*, the Illinois Appellate Court answered one of the questions at issue here - whether a pre-tort relationship can exist where the underlying suit is solely for breach of contract. *Id. at 577*. The court held that a stranger to a contract between two parties cannot be held liable to indemnify one of the parties for breach of contract absent the stranger's express agreement to indemnify. *Id.* (citing with approval the holdings in *Talandis Construction Corp. v. Illinois Building Authority, 23 Ill. App. 3d 929, 321 N.E.2d 154 (1st Dist. 1974)*, and *Board of Education of High School District No. 88 v. Joseph J. Duffy Co., 97 Ill. App. 2d 158, 240 N.E.2d 5 (2d Dist. 1968))*. The court in *Schulson* found that the plaintiff could not seek indemnification for an underlying breach of contract claim against the law firm that assisted in drafting a contract because the law firm was a stranger to the contract and, thus, there was no pre-tort **[*10]** relationship. *Id*

The same is true here. MMS was not a party to the financing contracts that are the subject of the underlying law suit brought by MAC Funding against MN. Furthermore, there is no express agreement by MMS to indemnify MN for its default on the financing agreements for the equipment. MN contends instead that MAC Funding is the alter ego of MMS, meaning that

MMS is not a stranger to the financing agreements.

A party seeking recovery under an alter ego theory must show: (1) "such unity of interest and ownership that the separate personalities of the corporation" and the individual or entity behind it no longer exist; and (2) circumstances indicating that "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Secs., LLC v. Banco Panamericano, Inc., 674 F.3d 743, 751-52 (7th Cir. 2012)*. To assess the "unity of interest and ownership" element, courts consider factors including: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) non-functioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation **[*11]** by or to a shareholder; (10) failure to maintain arm's length relationships among related entities; and (11) whether the corporation is a mere façade for the operation of the dominant shareholders." *Wachovia Secs., LLC v. Neuhauser, 528 F. Supp. 2d 834, 854-55 (N.D. Ill. 2007)* (internal quotation marks omitted); *see also Fontana v. TLD Builders, Inc., 362 Ill. App. 3d 491, 840 N.E.2d 767, 778, 298 Ill. Dec. 654 (Ill. App. Ct. 2005)*. No single factor is dispositive. *Neuhauser, 528 F. Supp. 2d at 855*.

Here, MN claims a unity of interest in the barest possible terms. The Amended Third-Party Complaint alleges only that MAC Funding is the captive financing arm of MMS and that MMS promotes and represents to customers that MAC Funding is controlled by MMS. MN points to only one employee, Takashi Aoki, as holding dual titles and roles, but MN does not even provide his title or role. Moreover, the allegation that both MMS and MAC Funding are owned by Mitsubishi does not support a finding that MMS and MAC Funding share a unity of interest. None of the factors usually considered by courts are alleged in the complaint here. Thus, this Court finds the complaint fails to sufficiently allege that MMS is not a stranger to the financing agreements to establish the requisite pre-tort relationship to sustain an implied indemnity claim.

MN's claim for implied indemnity fails for the additional reason that implied indemnity **[*12]** must be premised on vicarious liability, which is reasonably foreseeable. *See Canadian Pacific Ry. Co. v. Williams-Hayward Protective Coatings, Inc., No. 02 C 8800, 2004 U.S. Dist. LEXIS 18920, 2004 WL 2108413, *5 (N.D. Ill. Sept. 21, 2004)* (St. Eve, J.). Illinois courts recognize that claims for implied contractual immunity may arise where

"one party's breach of contract causes a second party to breach a separate contract with a third party." *Id.* (quoting *Carrillo v. Jam Prods., Ltd., 173 Ill. App. 3d 693, 697, 527 N.E.2d 964, 123 Ill. Dec. 326 (1st Dist. 1988))*. To justify this result, the damages arising from the breach of the underlying contract must be reasonably within the contemplation of the parties as a probable result of the breach of the second contract with the third party. *Case Prestressing Corp. v. Chicago College of Osteopathic Medicine, 118 Ill. App. 3d 782, 788, 455 N.E.2d 811, 74 Ill. Dec. 382 (1st Dist. 1983)*.

Here, while it is undoubtedly true that if a manufacturer such as MN is unable to fulfill customer orders for a long enough period of time, it is likely to cause financial distress causing it to default on loan agreements. This reasoning however would result in MMS being liable for implied indemnity on any debt owed by MN. This Court has found no authority supporting such a result.

This case is factually analogous to *Wilder Corp. of Delaware v. Thompson Drainage and Levee Dist., 658 F.3d 802 (7th Cir. 2011)*, though the court was considering an appeal from a summary judgment. In that case, the plaintiff was seeking indemnity to shift liability for an underlying breach of contract claim against it. The plaintiff, Wilder Corporation, expressly warranted in **[*13]** the contract of sale for land that there was no petroleum contamination. The purchaser discovered that the land was contaminated and successfully sued Wilder Corporation for breach of warranty. Wilder Corporation then sought indemnification from the drainage district, the party who allegedly caused the contamination. The court held that a blameless or involuntary contract breaker cannot invoke non-contractual indemnity to shift the risk that he assumed in the contract. *Id. at 805*. The court reasoned that to find otherwise could cause the absurd result that an involuntary contract breaker could sue anyone for indemnity who a court might find contributed to the breach. *Id.* Although the court acknowledged that the drainage district was probably the only entity in a position to prevent the contamination, it held that the drainage district could not become the insurer of Wilder's contract for the sale of the land. *Id. at 806*.

Similarly, in this case, MN claims to be the involuntary contract breaker. It was unable to pay on the financing agreements with MAC Funding because it was unable to fill its customer orders. MN is thus seeking to shift the blame for breach of its agreements with MAC Funding to MMS, claiming **[*14]** that MMS caused MN to breach its contract by supplying defective equipment rendering

2018 U.S. Dist. LEXIS 74149, *14

MMS inoperable. However, MN took the risk of not being able to sustain the payments on the financing agreements when it entered those agreements. Any number of occurrences could cause MN to default. This Court has found no authority to support the type of indemnity that MN is seeking.

MMS also moves to dismiss Counts I-III for breach of warranty and common law fraud, arguing that these claims are duplicative of the First Amended Complaint in *MNdustries, Inc. v. MC Machinery Systems, Inc.,* No. 17 C 7226 (N.D. Ill. 2017), currently pending before Judge Gettleman. "As a general rule, a federal suit may be dismissed for reasons of wise judicial administration whenever it is duplicative of a parallel action already pending in another federal court." *Serlin v. Arthur Andersen & Co., 3 F.3d 221, 223 (7th Cir. 1993)* (internal quotations omitted). Courts generally consider a suit duplicative if the "claims, parties, and available relief do not significantly differ between the two actions." *Id.* A review of the First Amended Complaint in the case pending before Judge Gettleman establishes that it is identical to the Amended Third-Party Complaint in this case with the exception **[*15]** of the indemnity count in this case. With dismissal of the indemnity count here the two complaints are identical and MN can recover for its remaining counts against MMS in that case. *See La Hispamex Food Prods., Inc. v. Specialty Cheese Co., No. 99 C 8479, 2000 U.S. Dist. LEXIS 10194, *9 (N.D. Ill. Jul. 7, 2000)* (Leinenweber, J.) (granting dismissal of several counts of a third-party complaint that were duplicative of another action finding that dismissal cannot adversely affect any litigant's interest). This Court dismisses Counts I-III as duplicative of case No. 17 C 7226.

Because this Court finds that MN has not alleged a proper claim for indemnification against MMS, this Court grants dismissal of Count IV of the Amended Third-Party Complaint, and need not address MMS' alternative arguments for dismissal.

**Conclusion**

For the reasons stated herein the Court grants MC Machinery Systems, Inc.'s Motion to Dismiss the Amended Third-Party Complaint[57].

IT IS SO ORDERED.

ENTERED:

Dated: 5/2/18

/s/ Sharon Johnson Coleman

SHARON JOHNSON COLEMAN

United States District Judge

*End of Document*

 Positive
As of: October 27, 2021 2:57 PM Z

## *Ring v Elizabeth Found. for the Arts*

Supreme Court of New York, New York County

November 12, 2014, Decided

113849/2011

**Reporter**

2014 N.Y. Misc. LEXIS 5879 *; 2014 NY Slip Op 33487(U) **; 2014 WL 5908429

[**2] MICHAEL RING and FRANK RING, as Tenants-in-Common, Plaintiffs -against- THE ELIZABETH FOUNDATION FOR THE ARTS and THE ROBERT BLACKBURN PRINTMAKING WORKSHOP, Defendants. Index No.: 113849/2011

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**Subsequent History:** Affirmed by *Ring v. Elizabeth Found. for the Arts, 2016 N.Y. App. Div. LEXIS 1129, 2016 NY Slip Op 1127 (N.Y. App. Div. 1st Dep't, Feb. 16, 2016)*

**Prior History:** *Ring v. Elizabeth Found., 2013 N.Y. Misc. LEXIS 3224 (N.Y. Sup. Ct., July 16, 2013)*

## Core Terms

continuity, de facto merger, ownership, mere continuation, successor, summary judgment motion, predecessor, advisory board, summary judgment, Printmaking, entities, ceased, predecessor corporation, underlying action, question of fact, cause of action, not-for-profit, dissolution, sequence, merger, lease

**Judges:** [*1] JOAN M. KENNEY, J.S.C.

**Opinion by:** JOAN M. KENNEY

## Opinion

DECISION & ORDER

**KENNEY, JOAN M., J.**:

Motion sequence numbers 002 and 003 are consolidated for disposition.

In this action to enforce a judgment, defendants, The Elizabeth Foundation for the Arts (EFA) and the Robert Blackburn Printmaking Workshop (RBPW) move, pursuant to *CPLR 3212*, for summary judgment dismissing the complaint (motion sequence 002).

By separate motion, plaintiffs Michael Ring and Frank Ring (collectively the Rings) move, pursuant to *CPLR 3212*, for summary judgment on the complaint (motion sequence 003).

### BACKGROUND

In July 1997, The Printmaking Workshop, Inc. (PMW), a cooperative press run by Robert Blackburn which produced prints and artwork, entered into a seven-year lease agreement for commercial space in a building located at 19 West 24th Street in Manhattan. Plaintiffs were the owners of that building. It is undisputed that PMW had trouble paying its rent and that the Rings commenced an action against PMW to recover amounts due under the lease and to recover possession of the premises. The Rings obtained a judgment against PMW in the amount of $34,631.05 for arrears on the lease through June 2001 and PMW was evicted from the premises.

Thereafter, on [*2] July 1, 2002, the Rings commenced an action to recover $226,117.00, which [**3] they claimed was the balance due under the lease from July 2001, when PMW was evicted from the building, through July 2004, the end of the lease term. In addition, they sought damages for additional rent, late fees, and costs and expenses; including attorneys' fees[1] (the Underlying Action).

On July 19, 2002, PMW and its owner, Robert

---

[1] *Ring v Printmaking Workshop*, Index # 602434/2002.

Case: 1:17-cv-03591 Document #: 236-2 Filed: 10/27/21 Page 65 of 74 PageID #:4307

Page 2 of 5

2014 N.Y. Misc. LEXIS 5879, *2; 2014 NY Slip Op 33487(U), **3

Blackburn (Blackburn), entered into a letter agreement (the Agreement) with EFA, a foundation which supports the arts, "to create the Robert Blackburn Printmaking Workshop [RBPW], a new entity formed to carry on the traditions of PMW and operate as a program of EFA" (Ring aff, exhibit J). Pursuant to the agreement, EFA purchased, for the RBPW program's use, "the existing equipment and operating assets of PMW, the existing records of PMW and all of the prints in the PMW collection . . ." (*id.*). The agreement also provides that: a) upon execution of the agreement, PMW would cease to exist; b) "EFA has no legal obligation to pay past debts of PMW, but may elect to pay any vendors whose non-payment would provide obstacles to the operations [*3] of RBPW"; and c) "[t]his agreement. . . is not in effect and shall not go into effect until such time as the lawsuit[s] brought by Mr. Ring, former landlord of PMW, have been settled, or EFA deems that it [sic] this specific matter is satisfactorily resolved" (*id.*).

In addition, the Agreement states that RBPW was being formed to carry on the traditions of printmaking, that EFA would use the Blackburn name in connection with RBPW, and that Blackburn would be the artistic director.

Attachment F to the Agreement, titled "Agreement to Purchase the Operation of the Printmaking Workshop with the Elizabeth Foundation for the Arts" provides,

> "As a program of EFA, RBPW will establish and draw upon the advice of a working Advisory Board in matters of operation and funding. The initial advisory board members shall include [**4] Robert Blackburn, Deborah Cullen, Will Barnett, Jane Stephenson, Guy S. Buckles, Virginia Myers, Townsend Wolfe, Helen Ramsaran, Tara Sabharwal, and Ademola Olugbefola."

It is undisputed that, at the time the Agreement was signed, Blackburn was PMW's sole member and Deborah Cullen and Will Barnett were its only directors.

Although EFA anticipated that the RBPW program would open in 2002, the evidence [*4] establishes that it did not begin operation until 2005.

Thereafter, in December 2011, plaintiffs obtained a judgment against PMW in the Underlying Action in the amount of $812,066.45.[2]

Here, the Rings seek to hold EFA and RBPW liable for the $812,066.45 judgment against PMW on the grounds that there is successor liability based on a de facto merger between PMW and RBPW and/or EFA (first cause of action) or, alternatively, that the RBPW program at EFA is a mere continuation of PMW (second cause of action).

## FACTUAL CONTENTIONS

In support of their motion for summary judgment dismissing the complaint and in opposition to plaintiffs' motion for summary judgment on the complaint, EFA argues that both the de facto merger and mere continuation causes of action must be dismissed [*5] because: 1) both EFA and PMW are not-for profit entities which do not have "owners" or shareholders and, therefore, there can be no continuity of ownership; 2) PMW has not been dissolved or discontinued; that it is registered as [**5] an active not-for-profit corporation with the New York Department of State and that PMW continued its operations in a meaningful way when it defended itself in the Underlying Action; 3) there was a four year gap between PMW ceasing its ordinary business operations in 2001 and EFA's opening the RBPW program in 2005; 4) there was only one director who was on both PMW and EFA's board of directors, who, because of age, did not participate in running EFA; 5) there was no continuity of personnel, location, assets, or general business organization; and 6) EFA expressly contracted that it had no legal obligation to pay PMW's debts.

In opposition to EFA's motion for summary judgment dismissing the complaint and in support of their motion for judgment on the complaint, plaintiffs contend that: a) Robert Blackburn's appointment as artistic director of RBPW is sufficient to establish continuity of ownership; b) PMW has ceased to exist and is, at most, a mere shell, shorn [*6] of its assets; c) EFA assumed many significant liabilities on behalf of PMW; d) PMW transferred its manager, Robert Blackburn, to EFA and two of PMW's directors, Deborah Cullen and Will Barnett, became members of RBPW's initial advisory board and at least three other members of that advisory board had previously been affiliated with PMW; e) RBPW acquired PMW's goodwill by adopting Robert

---

[2] The Underlying Action was referred to a referee who recommended that plaintiffs be awarded damages (and interest) in the amount of $663,876.90 and $101,118.83 in attorneys' fees and disbursements. That award was confirmed at a hearing on December 22, 2010, with interest thereon through the entry of judgment. After interests and costs were added, the Clerk of the Court entered judgment in the amount of $812,066.45 against PMW.

Case: 1:17-cv-03591 Document #: 236-2 Filed: 10/27/21 Page 66 of 74 PageID #:4308

Page 3 of 5

2014 N.Y. Misc. LEXIS 5879, *6; 2014 NY Slip Op 33487(U), **5

Blackburn's name; and f) RBPW acquired PMW's entire business operation without payment or consideration and it acquired all of its assets without payment or consideration.

In addition, plaintiffs argue that it would be inequitable to permit EFA to avoid payment of the judgment in the underlying action since they acquired PMW with full knowledge of plaintiff's pending litigation.

## [**6] DISCUSSION

### Summary Judgment

Summary judgment will be granted if it is clear that no triable issue of fact exists (*Alvarez v Prospect Hosp., 68 NY2d 320, 324, 501 N.E.2d 572, 508 N.Y.S.2d 923 [1986]*). The burden is on the moving party to make a prima facie showing of entitlement to summary judgment as a matter of law (*Zuckerman v City of New York, 49 NY2d 557, 562, 404 N.E.2d 718, 427 N.Y.S.2d 595 [1980]*; *Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067, 390 N.E.2d 298, 416 N.Y.S.2d 790 [1979]*). If a prima facie showing has been made, the burden shifts to the opposing party to produce evidentiary proof sufficient to establish the existence of a triable issue of fact (*Alvarez v Prospect Hosp., 68 NY2d at 324*; *Zuckerman v City of New York, 49 NY2d at 562*). Mere conclusions, [*7] unsubstantiated allegations or expressions of hope are insufficient to defeat a summary judgment motion (*Zuckerman v City of New York, 49 NY2d at 562*).

### Successor Liability

Ordinarily, "a corporation that purchases the assets of another corporation is not responsible for the [liabilities] the seller corporation" (*Kretzmer v Firesafe Prods. Corp., 24 AD3d 158, 158, 805 N.Y.S.2d 340 [1st Dept 2005]*; *Matter of New York City Asbestos Litig., 15 AD3d 254, 255, 789 N.Y.S.2d 484 [1st Dept 2005]*).

There are, however, four exceptions to this rule. A successor corporation may be held liable where: (1) the purchaser expressly or implicitly assumes the predecessor's liability; (2) there was a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is a mere continuation of the selling corporation; or (4) the transaction was entered into to defraud the creditors [**7] (*Schumacher v Richards*

*Shear Co., 59 NY2d 239, 245, 451 N.E.2d 195, 464 N.Y.S.2d 437 [1983]*).[3]

### De Facto Merger

As to the merger exception, a transaction structured as a purchase of assets may be deemed to fall within merger exception as a de facto merger if the following factors are present: "continuity of ownership; cessation of ordinary business and dissolution of the acquired corporation as soon as possible; assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business [*8] of the acquired corporation; and, continuity of management, personnel, physical location, assets and general business operation" (*Fitzgerald v Fahnestock & Co., 286 AD2d 573, 574, 730 N.Y.S.2d 70 [1st Dept 2001]*).

"Not all of these elements are necessary to find a defacto merger. Courts will look to whether the acquiring corporation was seeking to obtain for itself intangible assets such as good will, trademarks, patents, customer lists and the right to use the acquired corporation's name" (*id. at 574-575*).

The concept of "de facto merger" is based on the idea "that a successor that effectively takes over a company in its entirety should carry the predecessor's liabilities as a concomitant to the benefits it derives from the good will purchased" (*Grant-Howard Assoc. v General Housewares Corp., 63 NY2d 291, 296, 472 N.E.2d 1, 482 N.Y.S.2d 225 [1984]*). As a result, courts analyze the factors in a flexible manner to determine whether, in substance, the successor's intent was to absorb and continue the operation of [**8] its predecessor (*Matter of AT&S Transp., LLC v Odyssey Logistics & Tech. Corp., 22 AD3d 750, 752, 803 N.Y.S.2d 118 [2d Dept 2005]*). However, continuity of ownership has been deemed essential to a de facto merger finding, as ownership continuity is the essence of a merger (*Matter of New York City Asbestos Litig, 15 AD3d at 258*; *Cargo Partner AG v Albatrans, Inc. 352 F.3d 41, 47 [2d Cir 2003]* [citing New York law]).

As discussed below, in this case there are questions of fact regarding whether, for the purposes of the de facto merger analysis, there was a continuity of ownership, dissolution of the [*9] selling corporation, and continuity of management. Accordingly, both motions seeking

---

[3] Plaintiffs rely solely on the merger and mere continuation exceptions for successor liability.

Case: 1:17-cv-03591 Document #: 236-2 Filed: 10/27/21 Page 67 of 74 PageID #:4309

Page 4 of 5

2014 N.Y. Misc. LEXIS 5879, *9; 2014 NY Slip Op 33487(U), **8

summary judgment on the de facto merger cause of action are denied.

a. Continuity of Ownership

The continuity of ownership prong of the de facto merger doctrine should be interpreted flexibly so that, even if a buyer does not pay for assets with buyer's stock, "other indicia of control over or continuing benefit from the sold assets might . . . be sufficient to satisfy the continuity of ownership factor" (*City of Syracuse v Loomis Armored US, LLC, 900 F Supp 2d 274, 289 [ND NY 2012]*[internal quotation marks and citation omitted]).

In *Rogers-Duell v Ying-Jen Chen (42 Misc 3d 1226[A], 992 N.Y.S.2d 160, 2014 NY Slip Op 50203[U], at *4 [Sup Ct, Albany County 2014])*, the court was faced with the questions of successor liability and continuity of ownership between two not-for-profit organizations. In that case, the court recognized that, because both entities were not-for-profits, they had no owners or shareholders. Therefore, it looked to other indicia of control instead of considering ownership, per se. That court turned its **[**9]** attention to the boards of trustees of both organizations to determine whether any pre-agreement trustees later served on the board of the successor corporation. In that case, none of the people who had been on the predecessor board were on the successor board and, although some overlap **[*10]** did occur, it only happened some months or years after the transfer agreement was signed.

In this case there is a question of fact about whether Robert Blackburn's appointment as artistic director of RBPW, with decision making and veto power over aspects of RBPW's operation, coupled with the fact that two of PMW's board members served on RBPW's initial advisory board and one of PMW's board members also served on EFA's board of directors, rises to the level of continuity of ownership.

b. Dissolution of PMW

In considering whether a dissolution occurred for the purposes of the de facto merger doctrine, it is irrelevant whether the predecessor company has been legally dissolved. Rather, the courts will determine whether the predecessor entity has closed and, for all intents and purposes ceased to exist. In *Fitzgerald v Fahnestock (286 AD2d at 575)*, the First Department stated that "[t]he IAS court erred in holding that there could be no de facto merger where the subsidiary is not legally dissolved. So long as the acquired corporation is shorn of its assets and has become, in essence, a shell, legal

dissolution is not necessary before a finding of a de facto merger will be made" (*see also Matter of New York City Asbestos Litig., 15 AD3d at 257*).

In this case, there **[*11]** is a question of fact regarding whether PMW was essentially dissolved after the transaction with EFA, even though it was allegedly represented by counsel in the Underlying **[**10]** Action and remains a registered not-for-profit corporation with the New York Department of State (see *id.*; *Buja v KCI Konecranes Intl. plc, 12 Misc 3d 859, 864, 815 N.Y.S.2d 412 [Sup Ct, Monroe County 2006]* [predecessor corporation continued in existence in a meaningful way where, after the purchase of assets, it was involved in litigation, had a default judgment filed against it and was represented in ongoing litigation]).

c. Continuity of Assets, Management and/or Business Operations between PMW and the RBPW.

Here, there is also a question about whether there is a continuity of business operations because it is undisputed that there was a gap of over four years between PMW ceasing ordinary business operations and the commencement of EFA's RBPW program (Eustis aff, ¶¶ 6, 10, Cullen aff, ¶¶ 2, 10, 19). Moreover, although two former PMW directors were on RBPW's initial advisory board, only one of PMW's former directors, Will Barnett, was on EFA's board of directors in 2002. Whether two initial advisory board members and one overlapping member of the board of directors rises to the **[*12]** level of overlapping management is a question that cannot be decided on the papers before the court (Stephenson aff, ¶¶ 28, 29 and 32; Ezcurra affirmation, exhibit 14).

Accordingly, because there are questions of fact as to some of the essential indicia of de facto merger, both motions for summary judgment on the first cause of action alleging de facto merger are denied (*see MBIA Ins. Corp. v Countrywide Home Loans, Inc., 40 Misc 3d 643, 662, 667, 671, 965 N.Y.S.2d 284 [Sup Ct, NY County 2013]*)

"Mere Continuation"

 **[**11]** The branch of defendants' motion for summary judgment that seeks to dismiss the second cause of action based on the "mere continuation" doctrine is granted and plaintiffs' demand for judgment on that claim is denied.

Under the mere continuation doctrine, as opposed to de

Case: 1:17-cv-03591 Document #: 236-2 Filed: 10/27/21 Page 68 of 74 PageID #:4310

Page 5 of 5

2014 N.Y. Misc. LEXIS 5879, *12; 2014 NY Slip Op 33487(U), **11

facto merger, it is essential that the predecessor corporation ceases to exist.

In *Schumacher (59 NY2d at 245*), the Court of Appeals explained that "the [mere continuation] exception refers to corporate reorganization, . . . where only one corporation survives the transaction; the predecessor corporation **must** be extinguished" (emphasis added). "If the predecessor corporation continues to exist after the transaction, in however gossamer a form, the mere continuation exception is not applicable (*Diaz v South Bend Lathe Inc., 707 F Supp 97, 100 [ED NY 1989]* [citing *Schumacher*]; *Marenyi v Packard Press Corp., 1994 US Dist LEXIS 14190, *29-*30, 1994 WL 16000129 *9 [SD NY 1994])*.

Other factors considered **[*13]** to be indicative of the mere continuation exception are that the business of the successor is the same as the business of the predecessor, the business employs the same work force, and the successor has acquired the predecessor's location, management and goodwill (*see NTL Capital, LLC v Right Track Rec., LLC, 73 AD3d 410, 411, 901 N.Y.S.2d 4 [1st Dept 2010])*.

a. Predecessor corporation[4]

In this case, EFA has submitted evidence that demonstrates that PMW continues to exist, in **[**12]** however gossamer a form, as an active not-for-profit corporation as recorded by the New York Department of State (Clark affirmation, exhibit D). Accordingly, because PMW continues to exist, the RBPW program at EFA cannot be a mere continuation of PMW (*see Matter of Seventh Jud. Dist, Asbestos Litig., 6 Misc 3d 749, 751-752, 788 N.Y.S.2d 579 [Sup Ct, Ontario County 2005]; Colon v Multi-Pak Corp., 477 F Supp 2d 620, 627 [SD NY 2007]* [where predecessor continued to exist as a separate entity for five years after agreement mere continuation doctrine does not apply]).

Moreover, the evidence demonstrates that there was no continuity of personnel (Stephenson aff, ¶¶ 33, 34) or physical location between the two entities (Stephenson aff, ¶ 36). Indeed PMW had no employees **[*14]** and, it is undisputed that before the agreement, it did business in a building located at 19 West 24th Street in

Manhattan. EFA has been located at 323 West 39th Street in Manhattan since 1998.

Plaintiffs have failed to come forward with evidence to raise a material question of fact regarding PMW's continued existence or the lack of continuity of personnel or physical location. The fact that, after PMW was evicted in 2001, it rented storage space and stored some of its possessions at EFA, does not establish continuity of location because PMW was not conducting business operations at EFA during that time period (Ezcurra affirmation, Exhibit K at 42-43).

Accordingly, it is

ORDERED, that defendants The Elizabeth Foundation for the Arts and The Robert Blackburn Printmaking Workshop's motion for summary judgment to dismiss the complaint (motion sequence #002) is granted to the extent that the second cause of action alleging liability under a theory of continuation of the judgment debtor is dismissed; and it is further

ORDERED that defendants' motion for summary judgment is otherwise denied; and it is further

**[**13]** ORDERED that plaintiffs Michael Ring and Frank Ring's motion for summary judgment **[*15]** on the complaint (motion sequence #003) is denied; and it is further

ORDERED that the action shall continue as to the first cause of action and the parties are directed to proceed to mediation/trial forthwith.

Dated: November 12, 2014

ENTER:

/s/ Joan M. Kenney

J.S.C.

**End of Document**

---

[4] The standard for dissolution of the predecessor corporation are different under the theories of de facto merger and mere continuation (*see, Schumacher (59 NY2d at 245* [mere continuation]) as compared to *Fitzgerald (286 AD2d at 575* [de facto merger]).

 Neutral
As of: October 27, 2021 2:58 PM Z

## *Simpson v. Saggezza, Inc.*

United States District Court for the Northern District of Illinois

August 8, 2018, Decided; August 8, 2018, Filed

Case No. 17-cv-04165

**Reporter**
2018 U.S. Dist. LEXIS 133740 *; 2018 WL 3753431

STEVEN SIMPSON, Plaintiff, v. SAGGEZZA, INC., ARVIND KAPUR, Individually, and SOCKALINGAM SUPPIAH, individually, Defendant.

**Subsequent History:** Motion denied by *Simpson v. Saggezza, Inc., 2018 U.S. Dist. LEXIS 161623 (N.D. Ill., Sept. 21, 2018)*

## Core Terms

bonus, counterclaim, retaliation, motion to dismiss, retaliatory, rights, terminated, parties, allegations, interview, mandated, promised, bonuses, installment payment, public policy, assurances, violations, employees, hired

**Counsel:** **[*1]** For Steven Simpson, Plaintiff, Counter Defendant: Alexis D Martin, Lorraine Teraldico Peeters, Madeline K. Engel, Alejandro Caffarelli, Caffarelli & Associates Ltd., Chicago, IL.

For Saggezza, Inc., Arvind Kapur, Sockalingam Suppiah, Defendants: Vivek Jayaram, LEAD ATTORNEY, Jayaram Law Group, Ltd., Chicago, IL; Brett Adam Manchel, Johanna R Hyman, Jayaram Law Group, Chicago, IL.

For Saggezza, Inc., Counter Claimant: Vivek Jayaram, LEAD ATTORNEY, Jayaram Law Group, Ltd., Chicago, IL; Brett Adam Manchel, Johanna R Hyman, Jayaram Law Group, Chicago, IL.

**Judges:** SHARON JOHNSON COLEMAN, United States District Judge.

**Opinion by:** SHARON JOHNSON COLEMAN

## Opinion

**MEMORANDUM AND ORDER**

Plaintiff, Steven Simpson brings this suit against Defendants Saggezza, Inc., ("Saggezza"), Arvind Kapur, and Sockalingam Suppiah, (collectively, "Defendants"), for various violations of the *Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115/1 et seq.* ("IWPCA"), when the Defendants failed to provide Simpson with his earned compensation per the agreement between the parties and then retaliated against him for requesting payment. The Defendants now move this Court to dismiss Plaintiff's First Amended Complaint for failure to state a claim pursuant to *Federal Rules of Civil Procedure 12(b)(6)*. For the reasons **[*2]** set forth below, this Court grants Defendants' Motion in part.

**Background**

The following facts are taken as true for the purpose of resolving this motion. Simpson, a Florida resident, worked for Saggezza from November 2014 through December 2016. Saggezza is an Illinois corporation, based in Chicago, that provides "global solutions" to financial institutions. Kapur is a co-founder and Chief Executive Officer of Saggezza. Suppiah was also a co-founder and the Chief Operating Officer of Saggezza. Both men were Simpson's bosses. They held hiring and firing authority as well as the power to determine the amount and allocation of compensation.

Prior to working at Saggezza, Simpson held positions as Executive Vice President at First Federal Bank in Florida and Chief Strategy Officer of City National Bank-Miami, earning over $300,000 per year in each role. The Defendants were aware of Simpson's professional experience and previous salaries when the company recruited him. On October 28, 2014, Kapur informed Simpson that the company had strong revenues of $40 million during a phone interview. After the conversation, Simpson agreed to travel to Chicago for an in-person interview. Both Kapur and Suppiah **[*3]** confirmed the

2018 U.S. Dist. LEXIS 133740, *3

financial health of Saggezza during the second interview. Kapur and Suppiah also mentioned that Saggezza had a five-million-dollar line of credit with Standard Bank and Trust of Hickory Hills, IL that only had a small line drawn on it.

To assist with recruitment, Saggezza initially offered Simpson a base salary of $210,000 per year with a minimum annual bonus of $120,000. Kapur and Suppiah informed Simpson that Saggezza paid its leadership incentive bonuses as a matter of course, which typically brought their salaries up to between $330-350,000 per year. The offer also included 100,000 shares of stock in Saggezza's employee stock option program. Based on the representations made about the strength of the company, the job description, the potential assignments, and the compensation structure, Simpson agreed to accept employment. Saggezza hired Simpson as the Senior Vice President of Financial Institutions Solutions. In that role, he was expected to lead a new line of business that focused on providing advanced analytics solutions for banks and credit unions and was promised a competent staff to support these efforts.

After joining Saggezza, Simpson found discrepancies in [*4] information that Kapur and Suppiah provided. Saggezza released or lost a significant number of qualified employees, who were replaced with "cheaper," less experienced workers. With the employment shifts, Simpson was expected to assume several additional job duties outside of the scope of his originally agreed upon employment terms. Simpson learned that Saggezza's revenues were approximately $23.3 million, not $40 million. Simpson also discovered that the line of credit was fully drawn. Additionally, after Simpson's start, Saggezza introduced a new incentive structure that applied to all company leaders. Since this was different from what Simpson was presented during the interview, he addressed Kapur about his concerns. Kapur assured Simpson that the original agreement discussed during his recruitment would be honored, and Simpson continued his employment based on this information.

One of Simpson's major complaints was that he only received a bonus of $37,000 instead of the $120,000 he expected based on the Defendant's assurances. When approached about the $83,000 difference, Kapur and Suppiah told Simpson that Saggezza was experiencing financial troubles, but they could pay him $75,000 [*5] in three equal installments instead. Each payment would be made upon completing one of Simpson's five performance goals. Kapur also stated that he would

provide Simpson with an additional 150,000 shares of Saggezza common stock to bring his ownership of the company up to 1%. Simpson agreed to this payment plan and continued working for Saggezza. A few weeks later, Kapur told him that he would need to sign an onerous employment contract to receive the additional shares. Simpson refused to sign the contract.

Simpson informed Kapur that three of the proposed goals were outside of his control since they were tied to sales of products in a different department's purview and impossible to attain in the 2016 calendar year. Kapur promised Simpson that he would provide alternative goals, but he delayed in doing so. Kapur orally agreed that if the other department's products were not ready for implementation in March 2016 that he would adjust the goals by reducing sales targets and numbers. Despite several attempts to codify this agreement, Kapur refused to put it in writing. In the meantime, Simpson began working on the remaining two goals. Between March and April 2016, Simpson met one of the [*6] goals. Kapur then attempted to back out of the agreement, but Kapur needed additional time to pay the first installment payment. Simpson agreed that the Defendants could pay half of the installment amount in April and the other half in May 2016. The April payment was timely made, but May's payment was not. After repeated requests for payment, Simpson finally received the second half of the first installment payment.

The three remaining goals could not be completed because the underlying products were not ready for implementation and the Defendants could not provide reliable information about their expected completion dates. The Defendants denies that they failed to provide viable product information or alternative goals. Otherwise, Simpson met or exceeded the other agreed-upon expectations required for the payment of his 2015 bonus. The Defendants only paid him the initial $37,000 and one installment payment of $25,000. Kapur was continually elusive about when and whether Simpson would be paid when responding to Simpson's compensation complaints. Saggezza expressed frustration with Plaintiff's complaints about his not receiving his full bonus. In November 2016, an attorney hired by [*7] Simpson sent Saggezza a letter about Simpson's unpaid earned bonuses. After the letter, Simpson was invited to resign. Instead, Simpson continued his employment, even securing another large potential deal, which satisfied any remaining performance requirements for the payment of his 2015 bonus.

On December 28, 2016, Kapur held a meeting with Simpson to inform him that he would be terminated effective immediately. Kapur specifically referenced that he and Suppiah were upset about Simpson involving counsel and complaining about wage violations. No other cause or reasoning was provided for Simpson's termination.

Simpson filed his First Amended Complaint regarding the aforementioned issues for several violations of the Illinois Wage Payment and Collections Act on January 29, 2018. Saggezza now moves to dismiss the pleading in its entirety for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)*.

**Legal Standard**

To survive a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face and raising the right to relief above speculation. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. When reviewing a motion to dismiss, the Court must accept all well-pleaded factual allegations **[*8]** as true and draw all reasonable inferences in the plaintiff's favor. *Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)*; *Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 633 (7th Cir. 2007)*.

**Discussion**

*Count I - Earned Bonus Owed*

The Saggezza Defendants contend that Simpson's claim to recover his bonus fails and must be dismissed because he does not allege facts indicating that he was entitled to an "earned bonus" or any additional compensation related to his contract. A motion to dismiss is reviewed in a light most favorable to the nonmoving party.

Simpson's complaint is brought under the IWPCA, which provides that "payments to separated employees . . . shall be defined as wages, salaries, earned commissions, [and] *earned bonuses* . . . owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." *820 ILCS 115/2* (emphasis added). Earned bonuses are defined as "compensation given in addition to the required

compensation for services performed." *Ill. Admin. Code tit. 56, § 300.500*; *820 Ill. Comp. Stat. 115/12*. IWPCA only covers bonuses that are unequivocally promised by the employer, while conditional or discretionary bonuses are not considered "earned." *Sutula-Johnson v. Office Depot, Inc., No. 17-1855, 893 F.3d 967, 2018 U.S. App. LEXIS 17179, at *14-15 (7th Cir. June 25, 2018)*. Employees have the right to receive only an earned bonus at the time of separation when the terms of the bonus are unequivocally promised by the employer, and the employee has satisfied **[*9]** the expectations set forth in the agreement between the parties. *Ill. Admin. Code tit. 56, § 300.500(a)*; *see McLaughlin v. Sternberg Lanterns, Inc., 395 Ill. App. 3d 536, 917 N.E.2d 1065, 1071, 335 Ill. Dec. 1 (Ill. App. Ct. 2009)*(explaining that unequivocal right to "earned bonus" under Illinois Administrative Code means employee has no right to it until she has performed the contract requirements.). The agreement need not be in writing to constitute a basis for a IWCPA claim. *See Osorio v. Tile Shop, LLC, No. 15 C 15, 2015 U.S. Dist. LEXIS 159748, at *6 (N.D. Ill. Nov. 27, 2015)*(Kennelly, J.)(finding that "under the IWPCA '[a]n "agreement" is broader than a contract and requires only a manifestation of mutual assent on the part of two or more persons; parties may enter into an "agreement" without the formalities and accompanying legal protections of a contract.'")(citing *Zabinsky v. Gelber Group, Inc., 347 Ill. App. 3d 243, 807 N.E.2d 666, 283 Ill. Dec. 61 (2004))*; *see e.g., Harris v. Cent. Garden & Pet Co., No. 09 C 2354, 2011 U.S. Dist. LEXIS 84098, at *27 (N.D. Ill. Aug. 1, 2011)*(Chang, J.)(recognizing an IWPCA claim based on an oral agreement).

Here, the initial bonus payment of $120,000 discussed during Simpson's recruitment does not appear, based on the facts alleged, to be tied to the accomplishment of any objective measures and cannot be considered "earned" per the definition. The subsequent installation payment structure agreed upon by both parties, however, was directly and unequivocally tied to the accomplishment of five definitive goals. Per the oral agreement, Saggezza agreed to give Simpson an installment payment of $25,000 **[*10]** for accomplishing each of the outlined goals up to $75,000. Although $75,000 is less than Simpson's initial demand that Saggezza pay the remaining $83,000 of the promised $120,000, Simpson did agree to the new bonus compensation plan. The facts alleged in the complaint show the requisite meeting of minds regarding the objective terms for the bonus. Further, the complaint alleges that Simpson satisfied the agreed-upon goals to create an entitlement to the agreed upon $75,000.

Count I sufficiently plead that there was an unfulfilled earned bonus associated with the installment payment plan agreed upon by all parties. Accordingly, Defendants' motion to dismiss Count I is denied.

*Count II and IV-Retaliation*

The Defendants move to dismiss Simpson's retaliation claim, Count II, because they contend that Simpson fails to allege that the retaliation was motivated by his request for compensation or the hiring of an attorney. They also contend that Simpson failed to demonstrate that his discharge was in contravention of a clearly mandated public policy under Illinois law and so, Count IV should be dismissed.

The IWPCA permits employees to recover if an employer discharges that employee because **[*11]** he "has made a complaint to his employer . . . that he or she has not been paid in accordance with the provisions of this Act." *820 ILCS 115/14(c)*.

Here, Simpson alleged in paragraph 69 of his First Amended Complaint that "[h]ad [Simpson] not complained about [Saggeza's] failure to fully compensate him per their agreement, and had [Simpson] not brought a lawyer in to assert his rights, [Saggeza] would not have terminated [Simpson]." The facts set forth above clearly state that there existed an agreement for an earned bonus for performance. Further, the facts alleged indicate that Simpson believed the driving force behind his termination was the repeated requests, alone and through counsel, for the compensation he was owed under the agreed payment plan. Accordingly, the Court finds that Simpson sufficiently plead a claim for retaliation under IWPCA and Defendants' motion to dismiss Count II is denied.

Turning to Count IV, a successful claim for retaliatory termination under Illinois common law requires that the plaintiff show that he has been (1) terminated; (2) in retaliation for his action; and (3) that the discharge violates a clearly mandated public policy. *Geary v. Telular Corp., 341 Ill. App. 3d 694, 700-01, 275 Ill. Dec. 648, 653-54, 793 N.E.2d 128, 133-34 (2003)* (citing *Paris v. Cherry Payment Sys., 265 Ill. App. 3d 383, 384, 202 Ill. Dec. 705, 707, 638 N.E.2d 351, 353 (1994)).* "In order to constitute a clearly **[*12]** mandated public policy exception justifying application of the tort of retaliatory discharge, the matter 'must strike at the heart of a citizen's social rights, duties, and responsibilities.'" *Id.* (quoting *Palmateer v. Int'l Harvester Co., 85 Ill. 2d*

*124, 130, 52 Ill. Dec. 13, 15, 421 N.E.2d 876, 878 (1981)).* It is not enough to simply state a constitutional or statutory provision in a complaint to trigger a retaliatory discharge claim. *See McGrath v. CCC Info. Servs., 314 Ill. App. 3d 431, 440, 246 Ill. Dec. 856, 863, 731 N.E.2d 384, 391 (2000).*

Here, the allegations state that Simpson was terminated in response to his demand for payment of his earned bonus, satisfying the first two prongs. As for the third prong, that the discharge violates clearly mandated policy, Simpson relies on *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, to contend that the narrow application of the common law retaliation tort has been expanded to include IWPCA claims since the Act was amended. *No. 00 C 5755, 2001 U.S. Dist. LEXIS 18370 (N.D. Ill. Nov. 7, 2001)*(Lefkow, J.). The Court disagrees with Simpson's interpretation of *Ladegaard*. While the *Ladegaard* Court recognizes that IWPCA involves the rights of the public, the holding determined that the rights protected by the act cannot be abrogated by private agreement, as doing so would contravene the act's underlying public policy agenda. The Court did not, however, address whether the rights in IWPCA were the type contemplated **[*13]** under Illinois common law. The precedent is clear that compensation disputes raised under IWPCA are of a private, economic nature and do not implicate the social rights, duties, and responsibilities required for a retaliatory discharge tort. *McGrath, 314 Ill. App. 3d at 440.* Accordingly, Simpson cannot establish that his termination violated a mandated public policy of Illinois so, the common law retaliation claim must be dismissed with prejudice. *See O'Donnell v. Am. at Home Healthcare & Nursing Servs., No. 12 CV 6762, 2015 U.S. Dist. LEXIS 18585, at \*48 (N.D. Ill. Feb. 17, 2015)*(Shah, J.)("But the Illinois courts have made clear that an employer who discharges an employee for asserting his rights under the IWPCA has not contravened a 'clearly mandated' public policy such that an action for retaliatory discharge is permitted."). Defendants' motion as to Count IV is granted.

*Count III - Fraudulent Inducement*

Finally, the Defendants argue that Count III should be dismissed because Simpson did not plead that his reliance on the Kapur and Suppiah's representations was justified.

A successful fraudulent inducement claim under Illinois law requires a plaintiff to allege: (1) a false statement of material fact; (2) known or believed to be false by the

person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance [*14] on the truth of the statement; and (5) damage to the other party resulting from such reliance. *Integrated Genomics, Inc. v. Gerngross, 636 F.3d 853, 863 (7th Cir. 2011).* A person may justifiably rely on a representation of fact even if he could have ascertained that it was untrue upon making an investigation. *Field v. Mans, 516 U.S. 59, 70, 116 S. Ct. 437, 444, 133 L. Ed. 2d 351 (1995)*(citing *Restat 2d of Torts, § 540* (2nd 1979)). This is particularly true in situations where parties do not have equal knowledge or means of obtaining knowledge of the facts in question. *Sec. Ctr. v. Am. Tel. & Tel. Co., 94 C 6707, 1995 U.S. Dist. LEXIS 6540, at *19 (N.D. Ill. May 15, 1995)*(Coar, J.)(*Ryan v. Wersi Elec. GmbH & Co., 3 F.3d 174, 182 (7th Cir. 1993))*.

Here, Simpson alleges that Kapur and Suppiah made several statements about the financial health of the company and the opportunities available to Simpson during the initial interview and negotiations stages. The facts presented in Count III are sufficient to proceed on a claim of fraudulent inducement. Kapur and Suppiah were in positions of authority that afforded them easy access to the information they presented. Additionally, in an interview context, it is reasonable that a candidate would presume company's assurances about its status are true. It is critical here that co-founders Kapur and Suppiah were the Chief Executive Officer and Chief Operating Officer of Saggezza, respectively, because they would have intimate knowledge about Saggezza. Given the circumstances and their [*15] roles, Simpson had no reason to question Kapur and Suppiah's representations at the time. Accordingly, it is reasonable to ascertain that Simpson could justifiably rely on Kapur and Suppiah's assurances to his detriment.

The Defendants' second point is that Simpson did not allege any false statements of material fact because the assurances were mere puffery that commonly occurs between a prospective employer and employee. For a statement to be actionable as fraudulent, it has to rely on a past or present fact. *Enter. Warehousing Sols., Inc. v. Capital One Servs., No. 01C 7725, 2002 U.S. Dist. LEXIS 4335, at *17 (N.D. Ill. Mar. 14, 2002)*(Darrah, J.). Expressions of opinions, expectations, or future contingent events do not qualify. *Id.*

These allegations are not puffery. They do not contain superlatives or grandiose language about the strength of the company. *Speakers of Sport, Inc. v. ProServ, Inc., 178 F.3d 862, 866 (7th Cir. 1999).* Kapur and Suppiah provided Simpson with precise, internal figures,

capturing the financial state of the company and informed Simpson's potential compensation package. The information came from knowledgeable sources and were based on historical data, not prospective predictions. *Enter. Warehousing Sols., 2002 U.S. Dist. LEXIS 4335, at *17* (finding that statements about previous performance and approval does not constitute "puffery"); *cf. Jada Toys, Inc. v. Chi. Imp., Inc., No. 07 C 699, 2008 U.S. Dist. LEXIS 29286, at *6 n.4 (N.D. Ill. Apr. 10, 2008)*(Brown, J.)("The court held that the allegedly false promise -- that the defendant [*16] would obtain millions of dollars of endorsements for a star baseball player -- was puffery because it involved something over which the defendant had no control."). There was no reason why Simpson would not have seriously relied on this insider information coming from credible sources.

As the Defendants have not challenged any other elements, the Court finds that all the elements have been properly alleged to support that Simpson relied on certain representations when he took the job, causing him financial and professional damage. Consequently, Defendants' motion to dismiss is denied as to Count III.

*Count V - Retaliatory Counterclaims*

The Defendants argue that Simpson's allegation of a "retaliatory counterclaim" claim is not legally cognizable under Illinois or federal law and must be dismissed.

Anti-retaliation rights are intended to prevent employers from "intimidating employees and discouraging them from enforcing their rights." *Beltran v. Brentwood N. Healthcare Ctr., LLC, 426 F. Supp. 2d 827, 833 (N.D. Ill. 2006)*(Grady, J.). Courts rarely find that conduct arising during the scope of existing litigation amounts to retaliation, especially the filing of a compulsory counterclaim, because at the point that the counterclaim would have been filed, the plaintiff has already [*17] asserted his rights; they will not incur significant additional expenses because they have presumably already hired counsel; and defendants must bring compulsory counterclaims or risk waiver. *Ergo v. Int'l Merch. Servs., 519 F. Supp. 2d 765, 783 (N.D. Ill. 2007)*(Leinenweber, J.)(citing *Steffes v. Stepan Co., 144 F.3d 1070, 1075 (7th Cir. 1998)).* Counterclaims are only considered retaliatory when they are baseless. *Id.*

Here, Defendant's counterclaim was brought in response to Simpson's complaint. However, the mere fact that Defendants filed a counterclaim in this case is

not sufficient to make out a claim for retaliation. *Beltran, 426 F. Supp. 2d at 834* (finding that since filing a counterclaim is different from initiating a lawsuit, filing a counterclaim, without more, is not an adverse action that can support a retaliation claim."). As the Court finds that the counterclaims are not frivolous and were done in the normal course of litigation, they cannot be deemed retaliatory under the law. Accordingly, Count V is dismissed without prejudice.

## Conclusion

For the above reasons, Defendants' Motion to Dismiss Plaintiff's Complaint is granted in part as to Counts IV and V and denied as to the remaining three counts.

IT IS SO ORDERED.

/s/ Sharon Johnson Coleman

ENTERED: SHARON JOHNSON COLEMAN

United States District Court Judge

Dated: 8/8/2018

---

**End of Document**