IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY BOIM, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DAVID BOIM, DECEASED, AND JOYCE BOIM, <br><br>　　　　Plaintiffs, <br><br>　　v. <br><br>AMERICAN MUSLIMS FOR PALESTINE, AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION, AND RAFEEQ JABER, <br><br>　　　　Defendants. | Civil No. 17-cv-03591 <br><br> **Hon. Sharon Johnson Coleman** |

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANT RAFEEQ JABER'S RULE 12(B)(6) MOTION TO DISMISS**

Daniel I. Schlessinger
Seth H. Corthell
JASZCZUK P.C.
30 South Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 442-0509
dschlessinger@jaszczuk.com
scorthell@jaszczuk.com

Of Counsel
Nathan Lewin (*pro hac vice*)
Alyza D. Lewin (*pro hac vice*)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, D.C. 20006
(202) 828-1000
nat@lewinlewin.com
alyza@lewinlewin.com

*Attorneys for Stanley Boim, Individually and as the Administrator of the Estate of David Boim, Deceased, and Joyce Boim*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii
I. INTRODUCTION ........................................................................................................ 1
II. FACTS ..................................................................................................................... 3
    A. For many years, Jaber headed IAP and pursuant to that role actively participated in promoting and fundraising for Hamas in the United States. ....... 3
    B. Magistrate Judge Arlander Keys found that IAP-and Jaber specifically- actively promoted Hamas and encouraged IAP constituents to donate to HLF, which then funneled the donations to Hamas. ........................................... 4
    C. Following the *Boim* Judgement, Jaber oversees the windup and conceals that IAP continued to operate disguised as AMP. ............................................. 6
III. LEGAL ARGUMENT .................................................................................................. 8
    A. Legal Standard ................................................................................................. 8
    B. Plaintiffs have adequately pleaded their alter ego/veil piercing claims against Jaber ................................................................................................... 8
        1. *Jaber's brief ignores the Seventh Circuit opinion reinstating this case and focuses on factors that are irrelevant in the context of a terrorism financing organization.* ............................................................................. 8
        2. *The Amended Complaint alleges that as the leader of IAP, Jaber promoted and encouraged constituents to donate to Hamas, misled the Boims during collections proceedings, and facilitated the IAP-AMP transition.* ............................................................................................. 9
    C. Plaintiffs have adequately pleaded fraudulent concealment. ......................... 11
        1. *The Boims sufficiently alleged that Jaber owed them a fiduciary duty as the leader of IAP, an insolvent judgment debtor.* ................................ 12
        2. *The Boims sufficiently alleged that Jaber concealed material facts during and after his 2005 deposition.* ....................................................... 12
        3. *Jaber's statute of limitations defense cannot be decided on the pleadings.* ................................................................................................ 14
IV. CONCLUSION ........................................................................................................ 15

## TABLE OF AUTHORITIES

### CASES

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................ 8

*Boim v. Am. Muslims for Palestine*, 9 F.4th 545 (7th Cir. 2021) ................................................ 8, 9

*Boim v. Holy Land Foundation*, 549 F.3d 685 (7th Cir. 2008) (*Boim III*) ........................... 1, 10, 11

*Boim v. QLI*, 340 F. Supp. 2d 885 (N.D. Ill. 2004) ................................................................ 3, 4, 5, 6, 10

*Bourbonnais v. Ameriprise Fin. Servs. Inc.*, 14-C-966, 2015 U.S. Dist. LEXIS 199204 (E.D. Wisc. Aug. 20, 2015) ................................................................................................................................. 13

*Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610 (7th Cir. 2014) ....................... 14

*Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 837 (7th Cir. 2010) ................................... 8, 15

*Fullerton v. Corelle Brands, LLC*, 18-cv-4152, 2019 U.S. Dist. LEXIS 168210 (N.D. Ill. September 30, 2019) ................................................................................................................................. 13

*Holy Land Found. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) ..................................................... 3

*Mullen v. GLV, Inc.*, 18-cv-1465, 2018 U.S. Dist. LEXIS 110302 (N.D. Ill. July 2, 2018) ........ 11

*Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152 (D.C. Cir. 2004) .................. 9

*Peetoom v. Swanson*, 778 N.E. 2d 291 (Ill. App. Ct. 2002) ......................................................... 10

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreens Co.*, 631 F.3d 436 (7th Cir. 2011) ................................................................................................................................. 13

*Richardson v. Southeastern Conf.*, No. 2492, 2020 U.S. Dist. LEXIS 55340 (N.D. Ill. Mar. 30, 2020) ... 13

*Technic Eng'g, Ltd. V. Basic Envirotech, Inc.*, 53 F. Supp. 2d 1007 (N.D. Ill. 1999) ................. 12

*United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834 (7th Cir. 2018) ............ 13

*United States v. Lewis*, 411 F.3d 838 (7th Cir. 2005) ................................................................. 15

*United States v. N. Trust Co.*, 372 F.3d 886 (7th Cir. 2004) ....................................................... 15

*Workforce Solutions v. Urban Servs. of Am.*, 997 N.E.3d 267 (Ill. Ct. App. 2012) .................... 12

### STATUTES

18 U.S.C. § 2333(d)(2) ................................................................................................................... 5

Defendant Rafeeq Jaber's motion to dismiss the Boims' alter ego/veil piercing and fraudulent concealment claims reads as if key elements of the Seventh Circuit's August 16, 2021 opinion (the "Opinion") reinstating this case are not controlling authority and are of no consequence to those causes of action. In truth, as the Opinion recognized, the "in depth" allegations of the Boims' First Amended Complaint ("FAC") are more than sufficient to withstand a Rule 12(b)(6) challenge. His motion should be promptly denied and the Boims should be allowed to finally proceed with their case.

## I. INTRODUCTION

For many years, Defendant Rafeeq Jaber ("Jaber") led the Islamic Association for Palestine ("IAP"). IAP was founded by future Hamas leaders and grew to encompass a network of organizations—including IAP's alter ego the American Muslim Society ("AMS"), which Jaber founded—that loosely operated as a single enterprise. It served as Hamas' propaganda and fundraising arm in the United States. Under Jaber's leadership, IAP published and distributed Hamas propaganda and deliberately funneled money to the terrorist organization through its financial conduit, the Holy Land Foundation ("HLF").[1] Although to the general public, Jaber was the head of a legitimate humanitarian organization dedicated to the cause of Palestine, he actively participated in IAP's nefarious activities to promote and support Hamas' campaign of violence against Jews.

IAP and Jaber's façade did not last. After Hamas terrorists murdered David Boim in 1996, David's estate and his parents (the "Boims") filed suit in 2000 under the federal Anti-Terrorism Act ("ATA") against, among others, IAP, AMS, and HLF in an attempt to hold

---

[1] *Boim v. Holy Land Foundation*, 549 F.3d 685, 701 (7th Cir. 2008) (hereinafter "*Boim III*") ("[T]he fact that the Foundation may not have known that Hamas was a terrorist organization (implausible as that is) would not exonerate the American Muslim Society, which did know and in giving money to the Foundation was deliberately funneling money to Hamas.")

1

accountable the individuals and entities in the United States that provided material support to Hamas (the "*Boim* Action"). The *Boim* Action exposed IAP and its leader Jaber for what they were: promoters and funders of Hamas and its hateful, violent agenda. It culminated with Magistrate Judge Arlander Keys granting summary judgment to the Boims and a jury assessing a $52 million judgment against IAP, AMS, HLF and other entities (the "*Boim* Judgment") that Magistrate Keys trebled to $156 million. Magistrate Keys' opinion included dozens of references to Jaber's direct involvement in IAP's efforts to promote and fund Hamas.

Following entry of the *Boim* Judgment, Jaber acted to render that judgment a dead letter and facilitated IAP's reemergence disguised as a new entity, American Muslims for Palestine ("AMP"). The Boims pursued enforcement proceedings against IAP, which was insolvent and uninterested in taking steps to satisfy any part of the *Boim* Judgment. Still at the helm of IAP during its "windup" and "dissolution," Jaber stifled the Boims' collection efforts by failing to monetize valuable IAP assets and concealing that former IAP leaders and surrogates were reforming the organization as AMP, filling high-level AMP positions, publishing IAP's newspaper under a new name, and utilizing IAP's other intangible assets and goodwill to continue raising money free of any liability for the *Boim* Judgment. Jaber was well aware of IAP's disguised continuance as AMP; he has been a frequent and prominent AMP surrogate from its inception, is involved in AMP's board-level decisions, and acts as its tax preparer.

As the Seventh Circuit noted in its Opinion, all of these facts are alleged "in depth" in the Boims' FAC; they are presumed true at this stage of the case[2] and together they easily satisfy the pleading requirements for the Boims' claims. Jaber's motion is unavailing as it completely

---

[2] It is notable that essentially none of these facts are in dispute; most of them were already adjudicated in the *Boim* Action. In any event, all of the allegations of the FAC must be taken as true in deciding the pending motion.

ignores the Seventh Circuit's instructions as to the appropriate alter ego/veil piercing factors in the context of "terrorism financing organizations" and the Boims' detailed allegations concerning Jaber's involvement in IAP, his concealment of information from the Boims to subvert the *Boim* Judgment, and his critical role in IAP's "transition" to AMP.

## II. FACTS

**A. For many years, Jaber headed IAP and pursuant to that role actively participated in promoting and fundraising for Hamas in the United States.**

Khalid Mishal, the future head of Hamas, directed the creation of IAP in Indiana in 1981 and later described it as one of the "first pillars of Hamas." (FAC ¶ 28) IAP expanded over the years to become an umbrella organization for a network of entities throughout the United States that raised funds and spread propaganda for Hamas. (FAC ¶¶ 29-32) Defendant Rafeeq Jaber founded one of the organizations within this network, AMS. Although Jaber started AMS as the Chicago chapter for IAP, he eventually incorporated it in 1993, and in 1996 AMS took over leadership of IAP and installed Jaber as president of the IAP umbrella organization. (FAC ¶ 32)

Another organization within this network, the Holy Land Foundation ("HLF"), served as the umbrella organization's direct financial conduit to Hamas in Gaza and the West Bank. (*Id.*) IAP—through various legal entities that were a part of the umbrella organization, such as AMS—encouraged the public to donate to the legal entity HLF and gave money itself. (*Id.*) *See also Boim v. Quranic Literacy Institute ("QLI")*, 340 F. Supp. 2d 885, 910 (N.D. Ill. 2004). HLF would then distribute the money to Hamas-controlled charities. *Holy Land Found. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (upholding the district court decision to designate HLF as a Specially Designated Terrorist).

Despite its nefarious activities, under Jaber's leadership, IAP, together with its alter ego AMS (hereinafter collectively referred to as "IAP"), was able to operate in the open because it

fronted as a "public-awareness, educational, political, social, and civic" organization. (FAC ¶ 33) In this respect, Jaber and IAP were very successful; by 2002, IAP claimed it was "the largest Muslim, Arab, and Palestinian American grassroots organization dedicated to the cause of Palestine . . ." (FAC ¶ 40) (internal quotation marks omitted) Its well-attended annual conventions were the most significant national gatherings of Islamic pro-Palestinian activists. (*Id.*) IAP had a regular roster of speakers who appeared at the annual conventions, "festivals," and meetings. (*Id.*) IAP's nationally circulated Arabic-language, pro-Hamas newspaper, *al Zaytouna*, connected IAP's community and supporters and was its mailing list. (*See* FAC ¶¶ 40, 66) But beneath this veneer, IAP, and Jaber specifically, provided moral and financial support to Hamas. *Boim v. QLI*, 340 F. Supp. 2d. at 910-12 (discussing IAP's financial contributions to Hamas as well as Rafeeq Jaber's support for Hamas' terrorist activities). (FAC ¶¶ 33-34) Indeed, Jaber himself admitted that at this time he was an active fundraiser for HLF, and that AMS had a fundraising contract with HLF. (FAC ¶ 114)

Under Jaber's leadership, IAP did not observe corporate formalities. (FAC ¶ 149) IAP and the other entities within the umbrella organization loosely operated as a single enterprise. (FAC ¶ 150) Jaber led a distinct, limited, and identifiable group of activists who were part of a self-perpetuating "board" that controlled the overarching enterprise. (FAC ¶ 85)

B. **Magistrate Judge Arlander Keys found that IAP—and Jaber specifically—actively promoted Hamas and encouraged IAP constituents to donate to HLF, which then funneled the donations to Hamas.**

In 1995, the United States officially designated Hamas as a Foreign Terrorist Organization in Executive Order 12947, a designation that remains in effect today. (FAC ¶ 21) The next year, two Hamas terrorists murdered David Boim in Bet El, near Jerusalem. (FAC ¶ 1) His grieving parents then initiated a lawsuit in the Northern District of Illinois in 2000 (the

4

"*Boim* Action"), under the civil liability provisions of the ATA, 18 U.S.C. § 2333(d)(2). IAP and HLF were two of the many entities from the umbrella organization named as defendants. (*Id.*)

While the *Boim* Action was ongoing, the Treasury officially named HLF as a terrorist organization and froze its assets. (FAC ¶ 58) HLF had claimed to be the largest Islamic charity in North America with the stated benign purpose of supporting "social welfare in Palestine," but Treasury officials determined that HLF's actual purpose was to subsidize a designated terrorist organization, namely Hamas. (FAC ¶¶ 27, 58)

Similarly, IAP claimed that it was merely an advocacy organization. (FAC ¶ 33) The *Boim* Action proved that this was also false, and when the *Boim* action began to shine a light on the true nature of IAP, it tried to exploit the doctrine of corporate separateness to avoid liability, arguing that the Boims had the wrong IAP. (FAC ¶ 47) While in charge, Jaber had shown almost no regard for any distinctions between the various legal entities that made up the IAP network, and thus there were a number of organizations using the IAP name. (*Id.*) Judge Keys acknowledged the hodgepodge of intertwined entities using the same name that Jaber oversaw and concluded that AMS, IAP, and all other network entities essentially functioned as one organization and thus could not "hide behind their ambiguous and amorphous corporate design." (FAC ¶¶ 47-48, 151)

In 2004, Judge Keys granted summary judgment to the Boims, finding IAP liable under the ATA for aiding and abetting David's murder by raising funds for and donating to HLF. (FAC ¶ 42) *See also QLI*, 340 F. Supp.2d, at 910-13. In his opinion, Judge Keys specifically noted "IAP and AMS . . contributed money, on a number of occasions, to HLF, and routinely and consistently encouraged people to donate money to HLF, and otherwise assisted in HLF's fundraising endeavors." *Id.*, at 910. Moreover, under Jaber's leadership, IAP's intent to aid

Hamas was apparent as it published and distributed materials praising Hamas' terrorist activities, including suicide bombings. *Id.*, at 912. The next month, a jury assessed damages of $52 million that were trebled to $156 million. (*Id.*) The Seventh Circuit, in its *en banc* review upheld Judge Key's ruling and the damage award.

C. **Following the *Boim* Judgment, Jaber oversees the windup and conceals that IAP continued to operate disguised as AMP.**

IAP had no interest in paying the judgment debt and instead dissolved without any effort to do so. (FAC ¶¶ 53-54) But the overarching IAP enterprise's illiquid assets—its know-how, deep following in the Islamic pro-Palestinian community, and committed leadership—made it advantageous to keep it alive disguised with a new name. (FAC ¶ 40) Jaber's efforts to facilitate and conceal this rebranding of IAP as a "new" entity were critical to this scheme.

Following the *Boim* Judgment, Jaber made almost no effort to satisfy the judgment beyond the $14,386 the Boims collected. (FAC ¶ 119) He did not take routine measures to be expected from the president of an insolvent entity such as declaring bankruptcy or informing other board members that the entity was liable for a massive $156 million judgment. (*Id.*) Nor did he attempt to monetize the assets of IAP to generate money to pay the judgment, such as its newspaper, *Al-Zaytouna*. (*Id.*) With respect to *Al-Zaytouna*, Jaber actually refused an offer from Abuirshaid to purchase the paper. (*Id.*) When the Boims deposed Jaber in March of 2005 pursuant to their citation to discover assets, Jaber concealed this fact, depriving the Boims of proceeds from the sale of a valuable asset. (FAC ¶ 54) Jaber also failed to disclose that IAP was continuing to operate by diverting its intangible assets and goodwill to a "new" organization that would later incorporate as AMP. (FAC ¶ 182) Because Jaber effectively concealed this information from the Boims during his deposition, and it was otherwise inaccessible to the

6

Boims due to the ongoing efforts of Jaber and his confederates to continue IAP's pro-Hamas mission without arousing suspicion, the Boims discontinued their collection efforts. (FAC ¶ 57)

As a result, within a relatively short time, the IAP enterprise was up and running again disguised as a new entity, AMP,[3] without the burden or stigma of the *Boim* Judgment but operated by largely the same leadership, headquartered just down the street, and serving the same functions and purpose. (FAC ¶¶ 77-144) In December of 2005, AMP's early planners made it clear that their intent was to continue IAP as a new entity, AMP. (FAC ¶ 67-69) To effectuate this disguised continuance without raising suspicions, they agreed that AMP needed to keep IAP leaders at a distance. (*Id.*)

Nevertheless, IAP leaders, including Jaber, remained deeply involved in AMP. The organizational meeting of the "new" entity was held at a Muslim American Society ("MAS") event in Milwaukee in April 2006. (FAC ¶¶ 70-71) A panel discussion at the meeting included former IAP and future AMP leader Osama Abuirshaid, former IAP surrogate and future AMP President Hatem Bazian, and former IAP President Rafeeq Jaber. (*Id.*) At AMP's inaugural convention—held at the same time of year and in the same location as IAP's annual convention—Jaber was a featured speaker and has been a frequent and honored speaker at subsequent AMP events. (*E.g.*, FAC ¶¶ 91) In his public statements, Jaber himself has also drawn equivalence between IAP and AMP, claiming that "the Zionist organizations will be working against AMP and they closed IAP." (FAC ¶ 118) Jaber has also been involved in AMP's board-level business decisions, serves as its financial advisor and tax preparer, and in 2015 designated himself as a representative of AMP. (FAC ¶ 117)

---

[3] AMP was incorporated on July 28, 2006 in California. In 2009, AMP leaders incorporated Americans for Justice in Palestine, which later became AMP's operating entity and now does business as AMP. (FAC ¶ 61) Hereinafter, Americans for Justice in Palestine and AMP will be referred to collectively as AMP.

7

### III. LEGAL ARGUMENT

#### A. Legal Standard

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Detailed factual allegations are not required, "a viable pleading need only include a short and plain statement of the claim showing that the pleader is entitled to relief . . ." *Boim*, 9 F.4th at 556. At this stage, the complaint is construed in the light most favorable to the plaintiff, accepting all well-pleaded facts as true, and drawing all reasonable inferences in plaintiff's favor. *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 837 (7th Cir. 2010).

#### B. Plaintiffs have adequately pleaded their alter ego/veil piercing claims against Jaber

1. *Jaber's brief ignores the Seventh Circuit opinion reinstating this case and focuses on factors that are irrelevant in the context of a terrorism financing organization.*

On August 23, 2021, the Seventh Circuit reversed and remanded the dismissal of this action, finding that the Boims had sufficiently alleged alter ego to establish jurisdiction and were entitled to "proceed to adjudication on the merits." *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 559 (7th Cir. 2021). The Opinion recognized that the Boims' FAC is "comprehensive" and "explicitly incorporates … detailed factual allegations" that ". . . allege in depth the facts and events which, the Boims maintain, entitle them to damages under § 2333(a) from the new organization and Jaber as alter egos of the Islamic Association." *Id.*, at 556.

The Seventh Circuit also held that equitable doctrines such as alter ego are not rigid and that factors traditionally relevant to for-profit entities have little to no weight in the context of "terrorism financing organizations." *Id.*, at 559. This echoes the rationale of other courts that applied a flexible standard when considering entities that are nominally separate, but in actuality

8

are controlled by, or instruments of, terrorist organizations. *See, e.g., Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157 (D.C. Cir. 2004)

Jaber's brief completely ignores the Seventh Circuit's instructions. Instead of addressing Jaber's control of and participation in IAP's Hamas promotion and funding, his critical role in transitioning IAP to AMP by concealing material information from the Boims when they tried to collect the *Boim* Judgment and diverting IAP's critical assets to AMP while promptly taking the position of a prominent AMP surrogate and participant in high-level business decisions, Jaber stubbornly reverts to focusing on irrelevant factors such as whether he was transferring IAP assets to himself. As the Seventh Circuit explained, the transfer of tangible assets or diversion of IAP funds for personal use has little to no weight here because IAP did not "have customers, equipment, or owners in the traditional sense;" it did not exist to generate profits for owners or shareholders, it existed to spread the message of and funnel money to Hamas. *Boim*, 9 F.4th at 559.

Therefore, the key factors with respect to Jaber are the control he exerted over IAP during the events that gave rise to the *Boim* Judgment, his actions during IAP's corporate "wind-up," and his efforts to facilitate IAP's evasion of the *Boim* Judgment as it purposefully disguised its continuance as AMP. As explained below, the Boims have sufficiently alleged all of these facts in their FAC.

2. *The Amended Complaint alleges that as the leader of IAP, Jaber promoted and encouraged constituents to donate to Hamas, misled the Boims during collections proceedings, and facilitated the IAP-AMP transition.*

The Boims allege that Jaber held high level positions at IAP, actively promoted and raised money for Hamas through IAP's conduit HLF pursuant to those positions, and was the leader of IAP when it "dissolved" in 2004 and 2005. (FAC ¶ 114) Furthermore, the FAC alleges—based on citations to the record in the original *Boim* Action—that under Jaber's

9

leadership, IAP failed to comply with any of the requirements for maintaining corporate separateness:

> In short, the record shows that at all times relevant to this action, there was a national organization serving as the Islamic Association for Palestine, and that IAP Texas and AMS either formally served as that organization, or were so intertwined and involved with that organization as to make any formal distinction meaningless. The defendants cannot now hide behind their ambiguous and amorphous corporate design. The Court finds that the defendants' "it wasn't us" arguments ring hollow.

(FAC ¶ 48 (quoting *Quranic Literacy Institute*, 340 F. Supp. at 908)) Judge Posner's *en banc* opinion reinstating the *Boim* Judgment agreed with this assessment. (*Id.* (quoting *Boim III*, 549 F.3d at 687-88 ("... the Islamic Association of Palestine-National, appears to be either an alter ego of the American Muslim Society or just an alternative name for it, and need not be discussed separately."))) After IAP "dissolved," Jaber oversaw the distribution of its assets to satisfy the *Boim* Judgment, and during and after the collection proceedings misled the Boims by representing that IAP was defunct and concealing that IAP was reorganizing and continuing to operate disguised as AMP. (FAC ¶¶ 116-119, 182) Jaber turned down Abuirshaid's offer to purchase *al Zaytouna*, which deprived the Boims of proceeds from the sale and allowed AMP to restart the publication at no cost under the name *al Meezan*. (FAC ¶ 66) He then immediately became an AMP surrogate and a featured speaker at AMP events, including speaking at its inaugural convention, visibly bringing with him the IAP stamp of credibility and approbation. (FAC ¶¶ 81 and 139) As time passed Jaber let his guard down further, drawing equivalence between IAP and AMP in public statements and participating in high-level board decisions. (FAC ¶¶ 117 and 118) Upholding corporate separateness between Jaber and IAP under these circumstances would perpetrate a fraud on the Boims. *Peetoom v. Swanson*, 778 N.E. 2d 291, 295 (Ill. App. Ct. 2002)

To the extent Jaber addresses any factors that would be relevant to the alter ego/veil piercing analysis, he simply ignores these "in-depth" allegations. For example, Jaber states that the alter ego/veil piercing allegations "rest solely on conclusory claims that [Jaber] 'participated directly in the conduct giving rise to the *Boim* Judgment'" (Dkt. 237-1, ("Jaber Motion,"), p. 12) This contention is particularly stunning given that the FAC references Magistrate Judge Keys" findings that under Jaber's leadership IAP fundraised for HLF, "desired to help Hamas' activities succeed" and published articles glorifying Hamas' terrorist tactics, including suicide bombings. (FAC ¶¶ 33-34). Moreover, Jaber himself admitted he was an active HLF fundraiser and that IAP's alter ego AMS had a fundraising contract with HLF. (FAC ¶ 114) Thus, under the *Boim III* standards, Jaber is culpable in David Boim's murder.

Accordingly, the Boims' FAC easily satisfies the pleading requirements of Rule 12(b)(6) as to their alter ego and veil piercing claims against Jaber.

## C. **Plaintiffs have adequately pleaded fraudulent concealment.**

Jaber's motion similarly downplays or outright ignores controlling precedent and the Boims' detailed allegations concerning their fraudulent concealment claim and likewise should be denied as to that claim.

Pleading a claim for fraudulent concealment under Illinois law requires the general fraud elements plus allegations "that the defendant concealed a material fact when he was under a duty to disclose that fact to the plaintiff." *Mullen v. GLV, Inc.*, 18-cv-1465, 2018 U.S. Dist. LEXIS 110302 (N.D. Ill. July 2, 2018) As to the Boims' claim, Jaber argues that the FAC is defective in three respects: (1) it fails to allege Jaber had a sufficient duty to disclose material information to the Boims; (2) it does not allege the Boims' fraudulent concealment claim with sufficient particularity to satisfy Rule 9(b); and (3) the claim is untimely on the face of the pleadings. For the following reasons, each of these arguments is unavailing.

11

1. *The Boims sufficiently alleged that Jaber owed them a fiduciary duty as the leader of IAP, an insolvent judgment debtor.*

Jaber repeatedly argues that he had no duty to disclose material facts concerning IAP's ability to satisfy the *Boim* Judgment or that it was continuing to operate and raise funds disguised as AMP. (*E.g.*, Jaber Motion, at p. 10) Illinois law says otherwise. Indeed, under Illinois law, when an entity becomes insolvent, its officers' fiduciary duties extend to the entities' creditors. *Workforce Solutions v. Urban Servs. of Am.*, 997 N.E.2d 267, 284 (Ill. Ct. App. 2012) ("... [O]nce a corporation becomes insolvent, an officer's fiduciary duty extends to the creditors of the corporation . . ."); *Technic Eng'g, Ltd. V. Basic Envirotech, Inc.*, 53 F. Supp. 2d 1007, 1011 (N.D. Ill. 1999) (finding that a creditor can assert claims for breach of fiduciary duty against an insolvent debtor).

The Boims have alleged as much here. After the *Boim* Judgment, IAP was insolvent because its assets were insufficient to pay its debt to the Boims. (FAC ¶ 180) At that time, Jaber was an officer and director of IAP and oversaw the "windup" of its affairs. (*Id.*) Accordingly, from the moment Magistrate Keys entered the *Boim* Judgment, Jaber's fiduciary duties extended to the Boims because any of IAP's remaining assets were merely being "held in trust [by IAP] for the benefit of its creditor[]," the Boims. *See Workforce Solutions*, 997 N.E.2d at 284.

2. *The Boims sufficiently alleged that Jaber concealed material facts during and after his 2005 deposition.*

The Boims set forth the requisite who, what, when, where, and how to satisfy the strict Rule 9(b) test that Jaber contends should apply to the Boims' claim. Specifically, they allege that Jaber represented during his March 2005 deposition that IAP had no ability to pay the Boims, while concealing material facts about IAP's continuing operations and its assets that could have been used to pay down the *Boim* Judgment. (FAC ¶¶ 54, 119) For example, IAP owned *al Zaytouna*, a valuable, widely read Arabic-language newspaper; during his deposition Jaber

12

concealed that IAP retained it, despite receiving at least one purchase offer. (*Id.* ¶ 119) Furthermore, by 2006 at the latest, Jaber was a prominent AMP surrogate, yet continued to conceal that IAP had "transitioned" to AMP and was using IAP's intangible assets and goodwill to stage lucrative events free of any obligation to satisfy the *Boim* Judgment. (*Id.* ¶¶ 91, 182)

But whether the Boims meet the standard Jaber espouses is of no import because that standard does not apply to Boims' fraudulent concealment claim in this context. The Seventh Circuit has recognized the need to relax the Rule 9(b) standard when "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 841 (7th Cir. 2018) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreens Co.*, 631 F.3d 436, 442 (7th Cir. 2011)). This exception to Rule 9(b) is frequently applied to fraudulent concealment claims because the defendant in such cases is often concealing information that is not accessible to the plaintiff. *See also Fullerton v. Corelle Brands, LLC*, 2019 U.S. Dist. LEXIS 168210, at *27 (N.D. Ill. September 30, 2019) ("The standard to state a fraudulent omission claim under Rule 9(b) is more relaxed than the typical fraud claim."); *Bourbonnais v. Ameriprise Fin. Servs. Inc.*, 14-C-966, 2015 U.S. Dist. LEXIS 199204, at *12 (E.D. Wisc. Aug. 20, 2015) (finding that the particularity requirement applies differently to fraudulent concealment claims because ". . . there is no who, what, when, where or how.")

Consider the recent case applying this exception, *Richardson v. Southeastern Conf.*, in which the plaintiff, a former college football player, alleged that the NCAA had a duty to disclose to him information about the dangers of head injuries. No. 2492, 2020 U.S. Dist. LEXIS 55340 at *60 (N.D. Ill. Mar. 30, 2020). The plaintiff further alleged that the NCAA concealed those dangers while he was playing and "continued its course of fraudulent concealment by

13

failing to inform him that he had been exposed" to potentially long-term brain damage after he left school. *Id.*, 61-62. Medical literature and other facts that substantiated his claim were "uniquely in the possession of the NCAA" and inaccessible to the plaintiff. *Id.*, at 62.

Here, due to his position as the officer of an insolvent judgment debtor, Jaber was duty-bound to the Boims in their efforts to collect the *Boim* Judgment. In his position, Jaber had information concerning IAP's assets and operations, like the offer to purchase *al Zaytouna* or its transition to AMP, that was not accessible to the Boims. The Boims allege that Jaber concealed that information during his March 2005 deposition and continued his course of fraudulent concealment when he failed to inform them IAP was continuing to raise large amounts of money disguised as AMP. (*See, e.g.,* FAC ¶ 182) As to the second prong of the test, the Boims have alleged numerous facts that provide grounds for their suspicions. For example, Abuirshaid himself admitted that Jaber refused his offer to purchase *al Zaytouna* in 2004 (*see, e.g.,* FAC ¶ 119), Jaber was a prominent AMP surrogate from its inception (*see, e.g.,* FAC ¶ 80), and Jaber's own public statements show that he considers IAP and AMP to be the same entity (*see* FAC ¶ 118).

3. *Jaber's statute of limitations defense cannot be decided on the pleadings.*

Finally, Jaber's affirmative defense that the Boims' fraudulent concealment claim is untimely is not apparent from the face of the FAC and therefore the claim cannot be dismissed pursuant to Rule 12(b)(6).

Courts in this circuit rarely dismiss claims for noncompliance with the statute of limitations under Rule 12(b)(6). *See, e.g., Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014) ("When a defendant charges noncompliance with the statute of limitations, '[d]ismissal under Rule 12(b)(6) [is] irregular, for the statute of limitations is an

14

affirmative defense.'") (quoting *United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004)). Indeed, dismissals based on the statute of limitations, or any other affirmative defenses, are uncommon because "complaints need not anticipate and attempt to plead around defenses." *Id.*, at 613. As such, "a motion to dismiss based on failure to comply with the statute of limitations should be granted only where 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Id.*, at 613-14 (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)).

Jaber attempts to—but falls far short of—satisfying this standard by arguing that the Boims "knew, or reasonably should have known," that IAP was continuing to operate disguised as AMP as early as 2006. (Jaber Motion, at p. 18) Jaber's single conclusory statement obscures the factual complexity of his limitations defense. It disregards the pages of "in depth" allegations concerning the steps that Jaber and others were taking to conceal IAP's transition to AMP and assumes—without any basis in the FAC—that the Boims knew or should have known Jaber's deception the moment AMP incorporated. Under these circumstances, when the Boims knew or should have known that Jaber duped them is at the very least a contested issue and not apparent from the face of the pleadings. This conclusion is especially true in the context of Jaber's Rule 12(b)(6) motion, where all of the allegations must be construed in the Boims' favor. *Fednav Int'l Ltd.*, 624 F.3d at 837.

### IV.  CONCLUSION

For the aforementioned reasons, the Boims have sufficiently alleged alter ego/veil piercing and fraudulent concealment claims against Jaber and it is not even a close question. The Court should deny Jaber's motion to dismiss without delay.

November 17, 2021

Respectfully submitted,

*/s/ Seth H. Corthell*
Daniel I. Schlessinger
Seth H. Corthell
JASZCZUK P.C.
30 South Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 442-0509
dschlessinger@jaszczuk.com
scorthell@jaszczuk.com

*Attorneys for Stanley Boim, Individually and as the Administrator of the Estate of David Boim, Deceased, and Joyce Boim*

<u>Of Counsel</u>
Nathan Lewin (*pro hac vice*)
Alyza D. Lewin (*pro hac vice*)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, D.C. 20006
(202) 828-1000
nat@lewinlewin.com
alyza@lewinlewin.com

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed electronically using the Court's CM/ECF system and has been served to all parties via email through CM/ECF on this 17th day of November 2021.

                                                    */s/ Seth H. Corthell*