IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Boim, et al., | Case No. 1:17-cv-3591 |
| Plaintiffs, | |
| v. | District Judge Andrea R. Wood |
| American Muslims for Palestine, et al., | Magistrate Judge Heather K. McShain |
| Defendants. | |

**ANONYMOUS FORMER STUDENTS' MOTION TO INTERVENE**

NOW COME the proposed intervenors, Student A and Student B ("Intervenors"), through their attorneys, and move to intervene to prevent their names and other personal information being disclosed in discovery in this case, and in support of such motion state as follows:

**I.      Procedural Background and Introduction**

In this case, Plaintiffs allege that American Muslims for Palestine ("AMP") is an alter ego for Holy Land Foundation for Relief and Development, the American Muslim Society, and the Islamic Association for Palestine ("the Boim Organizations"), organizations against whom Plaintiffs had obtained a $156 million judgment. Dkt. 179 ¶¶ 2-3. On March 18, 2025, Defendants filed a motion for a protective order to allow them to redact the names and contact information of students identified in AMP's document production, specifically electronic mail messages between AMP and representatives of student organizations. Dkt. 546.

Intervenors are young professionals who recently graduated from law school and who were active in organizations that advocated for human rights in Palestine while in law school. Exhibit A,

1

Student A Decl. ¶¶ 12-14; Ex. B, Student B Decl. ¶¶ 2, 7-8. They have been the victims of doxxing and have been subjected to both harassment and workplace consequences for their advocacy for human rights in Palestine. They fear that having their names associated with this case could again subject them to doxxing, frivolous litigation and other forms of harassment. Ex. A ¶¶ 15, 19; Ex. B ¶¶ 7-10, 13.

As the attached declarations explain, Intervenors have no personal connection to AMP, the Boim Organizations, or Hamas, were under ten years of age at the time the Boims initiated their litigation against the Boim Organizations and still children at the time AMP was formed. Ex. A ¶¶ 2-3, 7, 16-18; Ex. B ¶¶ 2, 3, 5, 6; Dkt. 179, Am. Compl. ¶¶ 1, 2, 4. They are so far removed from this case that any possible relevance of their identities is greatly outweighed by the risk of harm of exposure.

Plaintiffs oppose any redaction, and counsel for Plaintiffs explained to Defendants that they intend to share the identity of students with "others knowledgeable about these matters who we do not employ" and with unnamed "government entities." Dkt. 535-3 pp. 2, 22. The movants seek to intervene in support of AMP's motion for a protective order and supply the Court with particular reasons for their desire for confidentiality. For the reasons detailed herein, Intervenors oppose AMP being forced to remove the redaction of their names and contact information, and oppose their names being provided to counsel for Plaintiffs.

## II.     Legal Standard for Intervention

According to Federal Rule of Civil Procedure 24, the Court may permit intervention to an individual who "(A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1).

In considering a motion to intervene to modify a protective order, courts consider "(1) whether the party opposing intervention has any substantial right at stake, and (2) whether the proposed

modification would 'tangibly prejudice' that right." *Griffith v. Univ. Hosp., L.L.C.*, 249 F.3d 658, 662 (7th Cir. 2001) (internal citations removed). "If tangible prejudice is established, the court must decide 'whether that injury outweighs the benefits" of the intervention sought. *Id.*

Individuals can be permitted to intervene when they do not have a stake in the claims asserted themselves, but rather an interest that is implicated by the causes of action at issue. *Lippert v. Ghosh*, No. 10-CV-4603, 2023 WL 3267977, at *3 (N.D. Ill. May 4, 2023) (Cox, J.); *Bond v. Utreras*, 585 F.3d 1061, 1070 (7th Cir. 2009) (explaining that intervention may be allowed even when the "interest" being asserted by such an intervenor is "not really a 'claim' or 'defense.' "). In such cases, the intervenor need not file a "pleading setting forth the claim or defense for which intervention is sought," as presumptively required by Rule 24(c). *Lippert*, 2023 WL 3267977 at *3.

The Court must consider whether the intervention will "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

### III. Legal Standards for Limiting Discovery

A. Standard for relevancy and protective orders

Discovery may be obtained about matters that are "relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Courts have "substantial latitude to fashion protective orders." *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 881 F.3d 550, 565 (7th Cir. 2018). The Court may issue a protective order to limit discovery that would result in annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c)(1)(A). Courts must limit the frequency or extent of discovery if they determine that the discovery sought a) "is unreasonably cumulative or duplicative, or can be obtained from some other

3

source that is more convenient, less burdensome, or less expensive" (Fed. R. Civ. P. 26(b)(2)(C)(i)) or b) "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action" (Fed. R. Civ. P. 26(b)(2)(C)(ii)).

To determine whether good cause for a protective order exists, the district court must balance "the harm to the party seeking the protective order and the importance of disclosure to the public." *Wiggins v. Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997) (Castillo, J.). In determining whether good cause exists, courts may consider, among other factors, "privacy interests, whether the information is important to public health and safety and whether the party benefiting from the confidentiality of the protective order is a public official." *Id.* Good cause depends on those and other factors according to the facts and circumstances in each specific case. *Id.*

Plaintiffs claim that the presumption of public access to court documents gives the public a right to unredacted student names. However, that presumption falls short of being a "right" or "legally protected interest." *Bond v. Utreras*, 585 F.3d 1061, 1066 (7th Cir. 2009). The presumption of a right to public access to documents can be overcome by factors such as "(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings." *In re Sealed Case*, 237 F.3d 657, 666 (D.C. Cir. 2001) (internal citation omitted).

B.  The right to privacy

The First Amendment protects the right to privacy in cases where it is "indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama*, 357 U.S. 449, 462 (1958); *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) ("[T]he right of association is a 'basic constitutional freedom, . . . that is 'closely allied to freedom of speech and a

4

right which, like free speech, lies at the foundation of a free society.'") (internal citations omitted).

To give substance to the freedom of association, individuals who associate or exchange ideas as part of an organization have an interest in the privacy of their membership files. *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 726 F.2d 1150, 1159 (7th Cir. 1984), *judgment rev'd on other grounds*, 470 U.S. 373 (1985); *NAACP v. Patterson*, 357 U.S. at 462 ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as the forms of governmental action in the cases above were thought likely to produce upon the particular constitutional rights there involved.") (refusing to allow the disclosure of NAACP members).

In short, in the First Amendment context, "[a]nonymity is a shield from the tyranny of the majority." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).

### IV. Israel's Politically-Motivated Arrests and Exclusion from the West Bank and Gaza

Students A and B each have family members in the occupied West Bank and/or Gaza. They describe fear of repercussions from the Israeli government if their names are associated with this case. Ex. A ¶ 21; Ex. B ¶¶ 10-12.

Their fears are grounded in Israel's documented history of politically-motivated arrest and exclusion of dissidents. Israel holds Palestinians in administrative detention, sometimes for years at a time, which means that it does not have to secure a conviction nor present any evidence to imprison Palestinians living in the West Bank and Gaza. As the U.S. State Department explains, "Israeli military law allowed the indefinite administrative detention without charge or trial of Palestinians from the West Bank or Gaza, whether they were detained or imprisoned within Israel, or within the West Bank or Gaza, for so-called security-related offenses."[1] The report continues:

---

[1] U.S. Department of State, *Israel, West Bank and Gaza: Israel, West Bank and Gaza*, available at https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/israel-west-bank-and-

> Significant human rights issues included credible reports of:
> . . .
> With respect to Israeli security forces in the Occupied Palestinian Territories: arbitrary or unlawful killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment; harsh and life-threatening prison or detention conditions; arbitrary arrest or detention; political prisoners or detainees; arbitrary or unlawful interference with privacy; punishment of family members for alleged offenses by a relative; serious abuses in a conflict, including widespread civilian deaths or harm, enforced disappearances or abductions, forcible transfers of civilian populations, torture, physical abuses, conflict-related sexual violence or punishment; serious restrictions on freedom of expression and media freedom, including violence or threats of violence against journalists, unjustified arrests or prosecutions of journalists, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental and civil society organizations; restrictions on freedom of movement and residence and on the right to leave the occupied territories; serious government restrictions on or harassment of domestic and international human rights organizations; and crimes involving violence or threats of violence targeting Palestinians.

*Id.* According to the Israeli human rights organization B'TSelem, at the end of December 2024, the Israel Prison Service (IPS) was holding 3,327 Palestinians in administrative detention.[2]

If Student A and Student B's identities are disclosed to third parties and "government entities" such as Israel or the United States in connection with a terrorism case, Students A and B could also be denied entry into the West Bank or Gaza for political reasons, which is what happened to Omar Shakir, Human Rights Watch's Israel and Palestine director.[3] Ex. B ¶ 13. The process for foreigners entering the West Bank is distinct from the process by which foreigners enter Israel.[4] As the Israeli report, "Procedure for Entry and Residence of Foreigners in the Judea and Samaria Area," explains, "a foreigner has no vested right to enter the [West Bank]. Applications from foreigners will be evaluated according to the discretion of the authorized office. Among the considerations taken into

---

gaza/west-bank-and-gaza/
[2] B'Tselem, Statistics on administrative detention in the Occupied Territories, March 3, 2025, *available at* https://www.btselem.org/administrative_detention/statistics
[3] Human Rights Watch, *West Bank: New Entry Rules Further Isolate Palestinians*, January 23, 2023, *available at* https://www.hrw.org/news/2023/01/23/west-bank-new-entry-rules-further-isolate-palestinians
[4] *Id.*

account are the foreigner's likelihood to endanger security, . . . and any other relevant considerations."[5]

Disclosure of Intervenors' names to third parties could endanger their freedom of movement and the safety of their families in the West Bank or Gaza.

### V. Intervenors' privacy interests far outweigh any interest Plaintiffs have in discovering their names.

A. Intervenors' identities are not relevant.

This Court described Plaintiffs' explanations for the relevancy of student organizations to this case as follows:

> Plaintiffs allege that SJP is a college campus-based organization that "spreads antisemitism on campuses across the nation. That's a quote from docket 386, page 4. And has recently "valorized" Hamas after the October 7th attacks in Israel. And plaintiffs also allege that SJP was founded by "current AMP leader Hateem Bazian." And that's spelled H-a-t-e-m B-a-z-i-a-n. And I'm quoting, again, from docket entry 386. Plaintiffs contend that IAP, one of the defendants in the underlying *Boim* litigation, actively promoted SJP events and solicited donations for SJP prior to IAP's dissolution, and that AMP has similarly promoted SJP events.
> And plaintiffs cite two examples of this, AMP's alleged facilitation in 2020 of the "first ever national convening of SJP chapters in the U.S." and "repeated references" on AMP's director or outreach's LinkedIn page to his work with SJP.

Dkt. 402 (Tr. of Proceedings, 4/15/24) at pp. 16-17.

This Court also noted that student organizational information was only relevant to the extent that the groups were engaged in coordination with AMP to promote the alleged illegal purpose. It explained, "assuming arguendo that SJP was actively promoting Hamas after the October 7th attacks, and assuming further that AMP was somehow assisting with that promotional activity, the

---

[5] Coordination of Government Activities in the Territories, Operations Department, *Procedure for Entry and Residence of Foreigners in the Judea and Samaria Area*, December 21, 2022, available at
https://www.gov.il/BlobFolder/policy/judeaentry2022/en/%D7%A0%D7%95%D7%94%D7%9C%20%D7%9B%D7%A0%D7%99%D7%A1%D7%AA%20%D7%96%D7%A8%D7%99%D7%9D%20%D7%91%D7%90%D7%A0%D7%92%D7%9C%D7%99%D7%AA-%20%D7%AA%D7%A8%D7%92%D7%95%D7%9D%20%D7%9E%D7%A2%D7%95%D7%93%D7%9B%D7%9F%20%D7%93%D7%A6%D7%9E%D7%91%D7%A8%202022%20(2).pdf

Court concludes that arguably makes the information that plaintiffs seek here relevant." *Id.* at p. 23.

The Court also recognized the privacy interests of third-party students. It explained, in ruling on Defendants' motion for a protective order,

> [T]he Court does grant the motion in part and orders that the donor records be designated as attorneys' eyes only. First, the Court is persuaded that there's good cause to shield these donor records from public disclosure for the reasons that are laid out in the, the declaration attached to the defense papers but also are attached to the defense motion, but also given the October 7th attacks and the ongoing public debate, which has frequently become newsworthy, and examples of that include, you know, cyber bullying, identification of students who have offered pro-Palestinian positions on college campuses.
> . . .
> And so for all of these reasons this Court finds that the AEO designation with respect to the donor records is appropriate given that there is a concern that disclosure of those records could lead to harassment of the identified individuals.
> However, I am not ruling with respect to designating the student grantee records as AE0. So that portion of the motion is denied without prejudice to renewal at a later date.

Dkt. 477 (Tr. of Proceedings, 10/17/24), pp. 19-21.

Plaintiffs elaborate on their reasons for seeking the identity of student organizers in their March 25, 2025 opposition to AMP's motion for a protective order. They write, "[E]vidence showing that Defendants spearhead and foster similar campaigns to support Hamas is undeniably relevant to the alter ego analysis. And the questions of how, where, when, and by whom are all necessary components of Plaintiffs' inquiry." Dkt. 551 p. 5. Plaintiffs report already having the 362 pages of documents demonstrating AMP's cooperation with student organizations, and do not claim any of those documents suggest the existence of projects related to Hamas, let alone participation in some kind of alter ego scheme. Dkt. 551 pp. 1-2. Nor do Plaintiffs present evidence that the student organizations at issue cooperated with IAP (again, Intervenors were young children at the time that organization was active). Plaintiffs insinuate that the absence of such evidence can be explained by the fact that Defendants have redacted "other material the substance of which we can only guess at." *Id.* at p. 2. Plaintiffs need not guess at the substance of that material, however, since counsel for

8

Defendants represent that they have redacted "the names and contact information of students identified in AMP's document production, and the contact information of any nonstudent third parties identified in the same production." Dkt. 546 at p. 1.

Intervenors are not aware of any information that would make their identities relevant to this case. The Seventh Circuit has offered guidance about factors that may be relevant to alter ego liability, namely "overlap in leadership, same organizational purpose, similarity of operations, and unlawful motive or intent to escape liability." *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 559 (7th Cir. 2021). "Organizational purpose" cannot be interpreted so broadly as to criminalize any assistance to an entire national group, or human rights advocacy. '

Intervenors specifically disclaim any suggestion that the particular student organizations with which they affiliated had any organizational connection to AMP, the Boim Organizations, or Hamas. Ex. A ¶¶ 16-18; Ex. B ¶¶ 2-5. Student B also explains that SJP branches in particular are not coordinated or organized at the national level; each university-based SJP group has its own leadership and separate organizational status, and there is no uniform ideology or mission other than the desire for justice in Palestine. If IAP provided grants to SJP chapters decades ago, that fact does not connect them to AMP grants to different student organizations in the 2020s.

Students A and B explain that the particular events they organized which AMP funded had nothing to do with Hamas; one was an informational trip to Palestine, and the other was an event about the legal implications of home demotions in a Jerusalem neighborhood. Ex. A ¶¶ 7, 18; Ex. B ¶ 3.

Nor do Intervenors have any connection to the alter ego allegations in this case or the events that sparked the lawsuit against the Boim Organizations. Student A was a baby when Boim was killed and Student B was not yet born. Ex. A ¶ 3; Ex. B ¶ 6. They were not even members of the organizations they describe in their declarations until after this case was filed. Ex. A ¶ 2; Ex. B ¶ 2.

9

Plaintiffs are therefore attempting to discover the identities of Intervenors and their former student colleagues even though they cannot cite to any evidence of illegal coordination with AMP. *Sirazi v. Panda Express, Inc.*, No. 08 C 2345, 2009 WL 4232693, at *3 (N.D. Ill. Nov. 24, 2009) ("without some reason to conclude that the pond might be stocked, one cannot demand to 'fish.' "); *Id.*, *citing Sirazi v. Panda Express, Inc.*, No. 08 C 2345, 2009 WL 4232693, at *3 (N.D. Ill. Nov. 24, 2009) (*citing United States v. Holland,* 445 F.2d 701, 793 (D.C.Cir.1971)) ("The trouble with absence of evidence is that it is consistent with *any* hypothesis.").

    B.  Intervenors' privacy interests are substantial and warrant continued redaction of the documents in AMP's production.

Although there appears to be no probative value to Plaintiff's discovery of Intervenor's identities, there is danger of prejudice to Intervenors' interests. There is information in the record indicating that Plaintiffs intend to share their identities with third parties. Counsel for Plaintiffs wrote, in the context of explaining why he wanted student names, "[W]e do not have the names of the students or others who are responsible for promoting Hamas. . . . [W]e continue to prepare our case and in that effort, we would like to discuss material in the documents with others knowledgeable about these matters who we do not employ." Dkt. 535-3 p. 2. He also wrote,

> We have received requests from government entities to share with them documents that AMP has produced to us. While these requests do not rise to the level of subpoenas or court orders as reference in paragraph 12 of the Confidentiality Order, these requests strike us as seeking material in the public interest that we should share in response to these requests, particularly given our view that these documents do not contain information that should be considered confidential.

*Id.* at p. 22.

The mere fact that Intervenors engaged in public advocacy does not mean they have waived their right to privacy, contrary to Plaintiffs' suggestion. Dkt. 551 p. 3. In their public advocacy, Intervenors had the power to choose where and how to speak, and to whom. They oppose having their identities disclosed in connection with a terrorism case to actors who pose a threat to their

10

reputations, their new careers, their freedom, and the safety of their family members. Their advocacy at issue is an informational trip to Palestine for law students and an educational event about legal issues surrounding Israeli home demolitions in a Palestinian neighborhood in Jerusalem. Ex. A ¶¶ 7-8; Ex. B ¶ 3. Such advocacy does not imply some sort of consent to being mired in a terrorism and alter ego lawsuit.

It is also inappropriate for AMP to be forced to disclose Intervenors' identities to counsel for the Plaintiffs absent a specific demonstration that their identities are likely to be relevant. As Student A explains, "I do not feel comfortable sharing my identity with counsel for the plaintiffs in this case, whom I view as pursuing bad-faith litigation aimed at silencing a respected educational organization merely because of its political orientation, and who has expressed an intent to share my information with 'government entities.' " Ex. A ¶ 20. Intervenors could easily become the defendants in frivolous litigation, merely because of their completely legitimate associations with AMP as student activists advocating for an oppressed people. Ex. A ¶ 19.

Since Plaintiffs have not presented evidence of particular students organizations which have coordinated with AMP for an illegal purpose, and Plaintiff's counsel cannot even determine if Intervenors promote Hamas in coordination with AMP without sharing their information with third parties, there is no possible case-related purpose to the disclosure of their identities, even on an "Attorney Eyes Only" basis. Intervenors respectfully ask that their privacy interests be respected.

WHEREFORE, Intervenors respectfully request:

1) That they be permitted to intervene for the limited purpose of providing information and argument relevant to Defendants' motion for a protective order; and
2) That this Court allow AMP to redact the names and contact information of former students from correspondence they produce.

Respectfully submitted,

Counsel for Proposed Intervenors

/s/ Rima Kapitan

Atty No. 6286541
Kapitan Gomaa Law, P.C.
P.O. Box 46503
Chicago, Illinois 60646
Phone: (312)566-9590
Fax: (312) 566-9591
rima@kapitangomaa.com