# -EXHIBIT 5-

# Supplemental Report of Paul Carroll

My name is Paul Carroll. I have spent more than 30 years as a professional in the United States non-profit sector working on issues of international security, US national security and foreign policy, humanitarian and peacebuilding issues, and as a philanthropic director with knowledge of US nonprofit structures and legal governance.

In particular, over the past four and a half years I led an organization, the Charity&Security Network, a community of roughly 200 organizations across the world that implemented humanitarian, peacebuilding and human rights programs. We provided legal analysis of developments in law and policy in the United States, United Nations and in other bodies like the Financial Action Task Force (FATF) and in some cases specific national laws that affected the ability of our members to operate.

<u>Law as a Weapon, Nonprofits as the Target</u>

In many cases such laws, while attempting to address international security issues such as terrorism, had additional impact on nongovernmental organizations (NGOs) that restricted their access to financial transactions, limited or eliminated their ability to operate, or restricted their ability to assemble and communicate. While sometimes these were viewed as "unintended consequences" there were many cases, and continue to be, where the veil of counterterrorism law is wielded by governments to suppress dissent and silence opposing voices. At the more extreme end of such tactics is the intentional use of litigation to limit a group's activities, restrict its finances, and ultimately end its existence.

The term of art for these tactics that weaponize legal tools to suppress policy or political views that one opposes is called *lawfare*. Lawfare in the international humanitarian, peacebuilding and human rights context has been the most active and mature in the Israeli-Palestinian context. There are numerous cases of lawfare in the United States where litigants engage in lawsuits targeting organizations that work to support programs in support of Palestinian civil society. In such lawfare cases, the aim of the plaintiff does not have to be a victory in the court, but rather to engage the defendant organization in a resource-intensive and long-term effort that essentially depletes their resources and prevents them from continuing their work.

Lawfare can take many forms, including litigation, regulatory complaints and pressure campaigns aimed at cutting off funding. Their claims are generally based on disinformation or misrepresentation of the facts. While they rarely prevail on the merits or succeed in forcing settlements on NGOs, the costs and chilling impacts of lawfare attacks further exacerbate the shrinking civic space problem. In the context of the ongoing Israel/Palestine conflict, over the last eight years or so lawfare has emerged as a tactic against human rights, humanitarian, and peacebuilding organizations (and those that support them). Lawfare attacks are particularly challenging for US NGOs since they need not be lodged by the government itself. Depending on the law being used, an individual or another non-profit may file suit.

The National and International Security Paradigm as an Enabling Factor

As a general point of fact, in the immediate time period after the attacks of 9/11, 2001, US national security policy and practice became centered around the core principle of counter-terrorism. With the evaporation of the Soviet Union in the mid-1990s, there was a period where a sole, identifiable "national threat" was elusive. The attacks of 9/11 provided one: terrorism.

Through sweeping legislation like the Patriot Act and its amendments, and Executive Orders, American citizens and civil society organizations relinquished - involuntarily -significant rights and liberties they had enjoyed for many years in service to the so-called Global War on Terror (GWOT). One of the outcomes of these fundamental changes in law and practice was the intense scrutiny and suppression of civil society organizations that were legally established and engaged in fully protected and legitimate activities but were nonetheless accused or otherwise labeled as "terrorist" due to their religious, ethnic or national affiliations or origins. Organizations with a Muslim or Islamic identity were particularly affected as Islamophobia swept the nation. As I wrote in a chapter for *Dissent, Protest, and Palestine-Israel: Restrictions on Civic Space During Violent Conflict*, edited by Carnegie Fellow Zaha Hassan and H.A. Hellyer and published in November 2024, "In the weeks after 9/11, several NPOs were investigated, had their assets frozen, and were completely shut down. Many of these cases were not based on sound evidence or thorough analysis and jurisprudence, and some of the associated trials were fraught with violations of due process." [1]

Formation of Non-profits: Plaintiffs' Witness Testimony and Defendants' Statements

In my review of the Plaintiff's expert witness statements I am struck by the lack of knowledge present with respect to how non-profit organizations are formed and operate in the United States. While their subject matter expertise on topical issues seems to be solid, and their informed perspectives and opinions are clear, there is a lack of direct experience and understanding of how and why 501c3 and 501c4 organizations - short-hand for the majority of civil society/non-profit organizations in the United States, including religious organizations like the Catholic Church - get established and operate.

Moreover, there is a lack of understanding of how often and how routine it is to have organizations with similar missions and goals formed, but are still distinct groups. One need only look at the broad

---

[1] One example of this can be found in the ruling against the Holy Land Foundation (HLF) in September 2001. Within weeks after the 9/11 attacks, HLF became a casualty of the Bush administration's so-called GlobalWar on Terror, and the largest major terrorist financing "victory" post-9/11. The case has been widely criticized. The trials were fraught with questionable and prejudicial admissions of evidence, including "secret evidence" that the defense was not able to review for "national security reasons." While the final ruling stands, the initial designation of HLF as a Specially Designated Global Terrorist (SDGT) and later conviction amid multiple issues of evidentiary procedures is emblematic of the challenges that face NGOs that may have even an indirect relationship to a particular religion, nationality or ethnicity.

variety of environmental groups, for example, with similar missions that exist. Their leadership lists are distinct, though may overlap to some extent; their funding sources are independent, but likewise may overlap; and their educational and advocacy themes may seem to be almost identical, though methods may diverge. David Brower, the iconic environmentalist who led the Sierra Club through record membership growth during the 1960s, was also kicked out by the board over differences of policy. He then founded Friends of the Earth which has become almost equally well-regarded in the environmental movement. No one would call them the same group.

I describe this simply to point out that the tradition of civil society in America is long and broad, and overlapping and reinforcing groups and efforts are to be expected. This does not necessarily equate to an alter ego.

A.      Plaintiffs' Witness' Gaps in Methods and Data

I reviewed the deposition transcripts and reports of the three witnesses designated by Plaintiffs in this matter, and present the gaps in methods and data that stood out to me in each below, in chronological order based on the dates of their deposition testimony.

1.      Lorenzo Vidino:

- He acknowledges that he is new to testifying about Hamas. All of his previous experience has been about ISIS and Al Qaeda; this case and AMP involve the United States non-profit network.. Vidino Deposition Transcript at p. 119
- He began his career in the U.S. at the Investigative Project and as the right hand to Steve Emerson; this shows bias and a lack of neutrality as a testifier, as that entity and individual have repeatedly targeted domestic non-profit organizations. Transcript pp. 13-15
- Dr. Vidino described being friendly with SPME's executive director, Asaf Romirowsky (had lunch with him and accepted job applicants from him), who signed the funding agreement with plaintiffs in this case to fund this litigation. This also shows bias and a lack of neutrality. Transcript pp. 137-39
- His published books center on the Muslim Brotherhood, Al Qaeda, and in Europe, not United States-based domestic non-profits. CV, p. 3
- The majority of his experience relates to extremism in the European Context. CV throughout, and specifically pp 5-8; Transcript pp. 92-106
- Dr. Vidino testified that he did not review co-founder Munjed Ahmad's deposition testimony, and does not know who he is. That signifies that he has not thoroughly reviewed the founding and initiation, or even ongoing operations, of AMP. Transcript pp. 124, 190-191
- The section of his report that discusses AMP contains only one cited source, to WikiLeaks - not known as a reliable or heavily researched data source. Report pp. 24-26
- His "methodology" relies heavily on presumptions, not identified facts. Transcript p. 143
- Dr. Vidino misidentified the only individual defendant in the lawsuit, and could not explain why. Transcript p. 201

2. Harel Chorev:

- Dr. Chorev relies extensively on Network Theory, and is the first and one of the very few applying Network Theory to historical contexts. That alone does not show errors, but he described learning it from YouTube as a primary source, which does not signify formal training or methods. Chorev Transcript pp. 18-20, Expert Report p. 3
- Dr. Chorev's book on Palestine relates to the 19th century, not present day United States nonprofit environments. Transcript p. 67
- Dr. Chorev's teaching experience focused entirely on the Middle East. Transcript pp. 18-24, CV p. 2
- Dr. Chorev also did not know who AMP's co-founder Munjed Ahmad is. Transcript p. 125
- Dr. Chorev, like Dr. Vidino, described personal connections to the funder of this litigation, Asaf Romirowsky, and also co-authored an article with him. Transcript p. 200
- Dr. Chorev's work involves very little, and almost zero, experience in the U.S. nonprofit context. Transcript pp. 68-70
- Dr. Chorev acknowledges he took many facts at face value as presented to him by the attorneys representing the plaintiffs in this case, without independently confirming or verifying those facts. Transcript pp. 107-15
- Dr. Chorev's witness report contains only four footnotes throughout; he does not otherwise source his conclusions and statements.
- Dr. Chorev acknowledged that his report contains erroneous, unrelated copy-paste information in error. Transcript p. 128
- Dr. Chorev's own social media posts, described and presented to him during his deposition, demonstrate bias against Palestinians that indicate he may not interpret information neutrally. Transcript p. 187-89

Arieh Spitzen:

- Mr. Spitzen admits he has no knowledge of the U.S. Muslim or non-profit landscape. Spitzen Deposition Transcript pp. 42, 102
- Mr. Spitzen also acknowledges he accepted representations made to him by the attorneys for plaintiffs in this case as true on their face, and did not independently research or verify them. Transcript p. 89; Addendum to retainer agreement provided by attorneys for plaintiffs.
- His report relies on social media posts which he attributes to AMP/AJP, that were not made by AMP/AJP, showing lack of diligence in the foundation for his report. Transcript pp. 95-97
- Mr. Spitzen provided extensive pages of reporting on the organization Baitulmaal, which is not a defendant in this lawsuit or the plaintiffs' earlier lawsuit. Report pp. 1-3 (first part); Transcript p. 55
- He did not know the facts surrounding AMP and its incorporation or operations in the United States. Transcript p. 10

B.      Testimony of AMP's Co-Founders and Related Public Documents

In my review of the depositions of Munjed Ahmad and Hatem Al Bazian regarding the establishment of American Muslims for Palestine (in 2006) and the AJP Educational Foundation (in 2009) I find the explanations about the motivations, descriptions of mission, and relationships between the founders to be typical for the origins of many nonprofit organizations in the United States.

SPECIFIC IDENTIFIED PASSAGES:

- Notes by Munjed Ahmad regarding the April 2006 pre-formation meeting show the concept, and even name of AMP, was still in formation and up for a vote at this point. Exhibit 64 to Deposition of Munjed Ahmad, Nov. 8, 2018.
- The testimony of witness Magdi Odeh who created the Yahoo bulletin board the plaintiffs reference, explains that AMP's early discussions revealed that "they didn't want that old guard, they didn't want anyone from IAP." Transcript deposition of Magdi Odeh on Jan. 9, 2024 at pp. 53, 60.
- This same testimony explains that this witness named that Yahoo bulletin board the "AMP transition" in Q4 2005 because it represented the efforts to "transition into a concept into an organization." Transcript deposition of Magdi Odeh on Jan. 9. 2024 at p. 85.
- That witness' involvement lessened significantly after that point, and he did not ultimately run or provide information to AMP as an entity, or later AJP.
- AMP's Articles of incorporation and related testimony of its co-founders Munjed Ahmad and Dr. Bazian show the following facts, verified by external objective documents and sources:
    - AMP incorporated as a California entity, not an Illinois entity like IAP or a Texas entity like HLF. Transcript deposition of Munjed Ahmad on Nov. 8, 2018 at p. 139.
        - This makes sense because that's the location of Dr. Bazian and his work
    - AMP incorporated in Q3 2006–roughly two years after the recognized end of IAP per the plaintiffs' complaint in this case, and years after the Department of Justice seized the funds of HLF. Transcript deposition of Munjed Ahmad on Feb. 1, 2024 at p. 32.
- Munjed Ahmad provided reasonable testimony that he organized the 2006 (first) AMP convention, the reason for selection of the venue used, and that the payment for that event came from the registration fees the attendees provided. I have not seen any information that contradicts this testimony. Transcript deposition of Munjed Ahmad on Nov. 8, 2018 at pp. 145, 152, 159-160, 203.
- The dates above do not align with any "overlap" of IAP conventions, three out of five of which took place over Christmas weekends and the last of which was Christmas 2001 (showing a five year gap). Transcript deposition of Rafeeq Jaber on Jan. 22, 2025 at pp. 231, 266, 268, 270.
- The fact that there were no conventions in 2008 or 2009 shows typical struggles of nonprofit organizations in their third and fourth years – initial bumps of interest, followed by a turning point on whether they will be able to sustain interest long-term. Current events in 2009, as

articulated in the depositions, help to explain AMP's resurgence, which has continued since then likely in notable part because of the ongoing involvement of the same people who created it. That consistency helps organizations thrive and promotes trust. Transcript deposition of Munjed Ahmad on Feb. 1, 2024 at pp. 21, 264.
- Osama Abuirshaid had no leadership or regular role with AMP until 2009 at the earliest—which as described above occurred many years after the acknowledged end of IAP's operations and any funding. See declaration of Osama Abuirshaid provided in litigation.
- Abdelbaset Hamayel was not involved regularly with AMP until 2009, per its co-founders' testimony – the depositions show no support for the allegation that he serves as anything more than a volunteer from 2009 to present date. See declaration of Abdelbaset Hamayel provided in litigation.
- AMP's nearly twenty-year domestic history of operations shows consistent domestic activities throughout, by design, and consistent with the statements publicly present on its website in its Statement of Principles –these differ from IAP publications listing its purpose and operations. See https://www.ampalestine.org/about-amp/anti-bigotry-statement; See https://www.ampalestine.org/about-amp/statement-principles.
- AMP's published anti-bigotry and antisemitism statements appear on its public website as core values, which also differs from IAP's publications and stated principles. See https://www.ampalestine.org/about-amp/anti-bigotry-statement.