**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY BOIM, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DAVID BOIM, DECEASED, AND JOYCE BOIM, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 17-cv-03591 |
| v. | ) ) ) | **Hon. Andrea R. Wood** |
| AMERICAN MUSLIMS FOR PALESTINE, AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION AND RAFEEQ JABER, | ) ) ) ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**AGAINST DEFENDANT AMERICAN MUSLIMS FOR PALESTINE**

Daniel I. Schlessinger
Stephen J. Landes
Seth H. Corthell
Jaszczuk P.C.
311 South Wacker Dr., Suite 2150
Chicago, IL 60606
(312) 442-0401
dschlessinger@jaszczuk.com
slandes@jaszczuk.com
scorthell@jaszczuk.com

*Attorneys for Stanley Boim, Individually and*
*as the Administrator of the Estate of David*
*Boim, Deceased, and Joyce Boim*

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................ 1

II.    FACTUAL BACKGROUND ......................................................................................... 3

    A.     IAP IS ESTABLISHED AS HAMAS' PROPAGANDA AND FUNDRAISING ARM IN THE UNITED
STATES. ......................................................................................................................... 3

    B.     IAP WAS LED BY DEFENDANT RAFEEQ JABER, SUPPORTED BY THE MOSQUE FOUNDATION,
AND RELIED ON TRUSTED EMPLOYEES ABDELBASSET HAMAYEL AND OSAMA ABUIRSHAID. ....... 4

    C.     DAVID BOIM IS MURDERED BY HAMAS TERRORISTS; IAP IS FOUND CIVILLY LIABLE. ........... 6

    D.     FOLLOWING THE BOIM JUDGMENT, JABER CLAIMS IAP IS DEFUNCT. .................................. 6

    E.     THE HLF/IAP NETWORK ESTABLISHES THE "NEW" ENTITY KINDHEARTS. .......................... 7

    F.     IAP ACTIVISTS "TRANSITION" THE ORGANIZATION TO AMP. .......................................... 8

    G.     IAP LEADERS ARE BROUGHT IN TO LEAD DIRECTLY OUT OF "NECESSITY." .......................... 9

    H.     AMP CONTINUES FUNNELING MONEY TO HAMAS. ........................................................ 12

    I.     AMP CONTINUES IAP'S SYMBIOTIC RELATIONSHIP WITH THE MOSQUE FOUNDATION. ....... 14

    J.     AMP CONTINUES TO SPREAD HAMAS PROPAGANDA. ...................................................... 15

III.   STANDARD OF LAW ............................................................................................... 16

    A.     SUMMARY JUDGMENT STANDARD. ............................................................................... 16

    B.     SEVENTH CIRCUIT STANDARD FOR ALTER EGO. ............................................................ 17

IV.    LEGAL ARGUMENT ................................................................................................ 17

    A.     AMP WAS ESTABLISHED TO AVOID THE IAP JUDGMENT. ............................................... 18

    B.     AMP IS CONTROLLED BY FORMER IAP LEADERS AND SURROGATES. ................................ 19

    C.     AMP AND IAP OPERATE IN THE SAME MANNER. .......................................................... 20

    D.     AMP AND IAP SERVE THE SAME PURPOSE: TO ACT AS HAMAS' PROPAGANDA ARM IN THE
US. 21

V.     CONCLUSION .......................................................................................................... 21

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ........................................................ 19

*Boim v. Am. Muslims for Palestine*, 9 F.4th 545 (7th Cir. 2021)................................................. 20

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) ........................... 9, 16

*Boim v. Quranic Literacy Institute*, 340 F.Supp.2d 885,908 (N.D. Illinois 2004)................ passim

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)............................................................................ 19

*Matsushita* .................................................................................................................................... 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................................. 20

*Tolan v. Cotton*, 572 U.S. 650 (2014) ......................................................................................... 20

### STATUTES

18 U.S.C § 2333(a) ......................................................................................................................... 4

### RULES

FED. R. CIV. P. 25(c)........................................................................................................................ 4

FED. R. CIV. P. 56 .......................................................................................................................... 19

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Stanley and Joyce Boim (the "Boims") move for summary judgment on their alter-ego claim against Defendant Americans for Justice in Palestine Educational Foundation, doing business as American Muslims for Palestine ("AMP").

## I.    INTRODUCTION

This action seeks to enforce the judgment in *Stanley Boim, et al. v. Quranic Literacy Institute, et al.*, No. 00-cv-2905 (N.D. Ill.), under FED. R. CIV. P. 25(c) and 18 U.S.C § 2333(a), the Anti-Terrorism Act, as requested in the First Amended Complaint for declaratory relief (Dkt. 179). American Muslims for Palestine ("AMP") was founded by former leaders and surrogates of the judgment debtor Islamic Association for Palestine ("IAP")[1] as a disguised continuation of IAP, carrying forward its mission of promoting Hamas in the United States. AMP therefore cannot avoid IAP's liability for the death of an American teenager.

In 1996, David Boim, the teenage son of plaintiffs Stanley and Joyce Boim, was fatally shot in the head by Hamas terrorists while waiting with classmates for a bus to Jerusalem. In their pursuit of justice, David's parents uncovered a network of individuals and entities in the United States dedicated to funding and promoting Hamas and its violent agenda. Years later, one of those entities—IAP—was found civilly liable for David's death under the Anti-Terrorism Act ("ATA") and ordered to pay $156 million in damages.

When it came time to collect the judgment, IAP—through its president, Rafeeq Jaber—claimed the organization was "defunct" and made little to no effort to pay. Behind the scenes,

---

[1] The Islamic Association for Palestine operated over the years under a variety of names including American Muslim Society. They were the same organization. *Boim v. Quranic Literacy Institute*, 340 F.Supp.2d 885,908 (N.D. Illinois 2004).

however, a network of IAP leaders and surrogates worked to evade the judgment and continue their efforts to promote and raise funds for Hamas in the United States through a "new" entity. They discussed this "transition" and the need to avoid any overt connections to IAP and its leaders. Nevertheless, shortly after the new entity's creation, core IAP figures—including Osama Abuirshaid, Abdelbasset Hamayel, and Rafeeq Jaber—were in control of it.

The "new" organization's operations mirror those of IAP. It established a chapter system in many of the same cities and sometimes headed by former IAP surrogates. Although AMP claimed to have been founded by a lawyer from Wisconsin and an academic in California, its center of gravity remained the same area of Chicago as IAP. For example, AMP holds its yearly convention in the Chicagoland area—just like IAP—and draws significant support from the nearby Mosque Foundation in Bridgeview. Other IAP assets, such as its Arabic-language newspaper, were not formally transferred to AMP but remained under the control of IAP leaders who later became associated with AMP, including its current executive director, Osama Abuirshaid.

AMP and IAP also share the same *raison d'être*: to serve as Hamas's propaganda and fundraising arm in the United States. Among AMP's earliest activities were organizing and speaking at a series of fundraising events around the country on behalf of an organization called Viva Palestina. The funds raised at these events—where AMP leaders served as organizers and speakers—went into the hands of Hamas leaders in Gaza, in clear violation of the Anti-Terrorism Act. AMP also fosters and funds Students for Justice in Palestine ("SJP") ██████████ ██████████████████████████ nd supports campaigns that disseminate Hamas talking points and antisemitism on campuses nationwide.

These facts, among others, demonstrate IAP's disguised continuance as AMP. The Boims are therefore entitled to summary judgment on their alter ego claim.

## II.     FACTUAL BACKGROUND

### A.  IAP IS ESTABLISHED AS HAMAS' PROPAGANDA AND FUNDRAISING ARM IN THE UNITED STATES.

In 1987, several Muslim Brotherhood–linked networks operating in Gaza and the surrounding area came together to form Hamas. (SOF 1) Hamas stands in contrast to the Palestinian Authority—the generally recognized representative of Palestinians—because it rejects secularism and opposes any compromise with Israel. (SOF 2)

From Hamas' formation onward, the Islamic Association for Palestine ("IAP") served as its propaganda arm in the United States, funneling money to the group through other Hamas-aligned not-for-profit entities, including the Holy Land Foundation for Relief and Development ("HLF"). *Boim v. Quranic Literacy Institute*, 340 F. Supp. 2d 885, 906–09 (N.D. Ill. 2004) ("the men discussed that 'their institutions, such as the Fund [HLF] and the Union [IAP] were established in the first place to provide assistance to the Movement [Hamas] . . .'"). Although several entities used some form of the name IAP, they effectively operated as a single organization. *Id.* at 908.

In 1993, IAP's then-leader Omar Ahmad attended a meeting in Philadelphia with other members and supporters of Hamas—including senior Hamas leaders sent from Gaza—to discuss strategies for opposing the Oslo Accords and a potential two-state solution. *Id.* at 908–09. Although Hamas had not yet been formally designated by the United States as a terrorist organization, the participants recognized the need to obscure their allegiance and, fearing surveillance, referred to Hamas only as "the Movement" or "Samah" (Hamas spelled backwards). *Id.* They were overheard. By the FBI. Participants agreed that IAP and HLF—

3

organizations the network had "established in the first place to provide assistance to the Movement [Hamas]"—should continue their "objectives and methods" of spreading Hamas's message and raising funds. *Id.*

Thereafter, HLF and IAP continued to work in tandem. IAP served as Hamas's mouthpiece. It held an annual convention in Rosemont, Illinois, featuring pro-Hamas speakers and notables; published the Arabic-language newspaper Al-Zaytounah; distributed pro-Hamas statements and editorials (including one advocating "martyrdom operations, meeting death with death, and killing jews [sic]"); garnered support for Hamas leader Abu Marzook who was being extradited from the United States; and solicited donations for HLF. *Boim*, 340 F. Supp. 2d at 910. IAP barely disguised its support for Hamas and refused even to condemn suicide bombings. *Id.* at 912 ("Indeed, Mr. Jaber testified that IAP takes no position on whether suicide bombings, also called 'martyrdom operations,' are right or wrong . . . .").

For its part, HLF served as the financial conduit, directing funds raised by IAP to organizations that were "either known fronts for Hamas, known supporters of Hamas, or entities whose funding [was] known to benefit the Hamas agenda." *Id.* at 896. At one IAP conference in 1989, a veiled speaker identified as a Hamas terrorist "specifically thanks the Occupied Land Fund (the entity now known as HLF) for its support." *Id.*

For many years these entities worked in tandem to spread Hamas propaganda and raise funds for the organization, just as their leaders had envisioned.

**B. IAP WAS LED BY DEFENDANT RAFEEQ JABER, SUPPORTED BY THE MOSQUE FOUNDATION, AND RELIED ON TRUSTED EMPLOYEES ABDELBASSET HAMAYEL AND OSAMA ABUIRSHAID.**

IAP was led for years by Defendant Rafeeq Jaber, who ran its Chicago chapter (also known as the American Muslim Society ("AMS")). *Boim*, 340 F. Supp. 2d at 910. Jaber became

involved in IAP through the Mosque Foundation in Bridgeview, Illinois, which had a close relationship with IAP and frequently served as a staging ground for IAP activities. (*Id.*; SOF 3) The Mosque Foundation's Imam, Sheikh Jamal Said, maintained a presence at IAP events and advocated for the families of Palestinian "martyrs," directing community members to donate to their cause. *See Boim*, 340 F. Supp. 2d at 912. (SOF 4)

While Jaber led IAP, two of his most important employees were Abdelbasset Hamayel and Osama Abuirshaid. ████████████████████████████████████
████████████████████████████████████████ OF 5)

Hamayel was hired by IAP around 1997 as an office administrator. (SOF 6) Prior to immigrating to the United States from Ramallah, Hamayel was active in Al-Kutlah al-Islamiyah, a Hamas-affiliated student organization. (SOF 7; SOF 8) At IAP, Hamayel proved invaluable; he was responsible for action letters, newsletters, bulletins, and organizing events. (SOF 9) In a 2003 deposition, Rafeeq Jaber described Hamayel as "[t]he employee that works for us, the executive director, the secretary. He is everything." (SOF 10) By 2002, he had become the organization's Director and General Secretary. (SOF 11)

Abuirshaid was hired by IAP in 2000 as an Outreach Coordinator. (SOF 12) According to Abuirshaid, he initially came to the United States in the late 1990s as a reporter for a Jordanian newspaper led by a member of the Muslim Brotherhood. (SOF 13) At IAP, he leveraged his background in journalism, becoming editor-in-chief of IAP's widely distributed Arabic-language newspaper, *Al-Zaytounah*. (SOF 14) Documents produced by Mr. Jaber in following the Boim judgment indicate ████████████████████████████████████████
████ (SOF 15)

### C. DAVID BOIM IS MURDERED BY HAMAS TERRORISTS; IAP IS FOUND CIVILLY LIABLE.

On May 13, 1996, David Boim was shot in the head by Hamas terrorists while waiting for a bus to take him and several classmates to Jerusalem. *Boim*, 340 F. Supp. 2d at 889. One of the perpetrators killed himself in a subsequent multi-fatality suicide attack in downtown Jerusalem, the other was convicted and sentenced for his involvement. *Id.* The Boims then commenced a civil action in the United States under the Anti-Terrorism Act of 1992, naming as defendants the perpetrators, and several United States-based Hamas leaders and pro-Hamas not-for-profits—including IAP. *Id.*

That case exposed IAP as a part of a U.S.-based network of individuals and entities that actively supported and funded Hamas' terrorist agenda. *See generally Boim.* In the end, the question of whether IAP provided material support to Hamas was not a close one. Magistrate Judge Arlander Keys[2] granted the Boims motion for summary judgment on IAP's liability in 2004, noting the "abundance of evidence" demonstrating that IAP "desired to help Hamas' activities succeed, and, in fact, engaged in some act of helping those activities succeed." *Id.*, at 908. Following that ruling, a jury assessed damages of $52 million against IAP and other defendants jointly and severally, which Judge Keys trebled to $156 million pursuant to the statute. The ruling and verdict were eventually upheld by the Seventh Circuit in a seminal *en banc* opinion. *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 688 (7th Cir. 2008) (*en banc*).

### D. FOLLOWING THE BOIM JUDGMENT, JABER CLAIMS IAP IS DEFUNCT.

Following the *Boim* jury verdict on damages, the Boims attempted to collect the $156 million judgment. Through those efforts, the Boims were able to recover approximately $2.5

---

[2] The case was referred to and tried by Magistrate Judge Keys pursuant to the agreement of the parties.

million from the assets of HLF that were seized by the federal government. (SOF 16) The Boims were unable to locate any significant funds from IAP other than a used van and some trinkets from their gift shop. (*Id.*) As a part of their collection efforts, the Boims deposed IAP President Rafeeq Jaber in 2005, who testified that IAP was "financially defunct" at the time and was no longer operating. (SOF 18) ██████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ (SOF 19)

### E. THE HLF/IAP NETWORK ESTABLISHES THE "NEW" ENTITY KINDHEARTS.

While both IAP and HLF were both deemed liable for David's murder and subject to the $156 million judgment, HLF faced criminal liability for its terror financing activities. In 2001, it was Specially Designated Terrorist by the Treasury Department and its assets were frozen— ███████████████████████████████████████████████████████████████ (SOF 20; SOF 21) HLF and five of its leaders were convicted in 2008 of various crimes relating to their funding of Hamas. (*Id.*) The leaders received long prison sentences. (*Id.*)

Nevertheless—and foreshadowing the events of this action—shortly after the government froze HLF's assets, a new organization immediately filled the void: Kindhearts. Like HLF, Kindhearts claimed to be a charitable organization focused on helping Palestinians in need. (SOF 23) Many of the alleged key personnel at Kindhearts had been associated with HLF, including Mohammed El-Mezain, who was one of the later convicted HLF leaders sent to prison in the HLF case. (SOF 24) Remarkably, IAP veterans Hamayel and Abuirshaid both landed at Kindhearts after IAP became "defunct." (SOF 25)

Kindhearts; existence was short-lived. In 2006 the Treasury Department froze Kindhearts assets and issued a statement that it believed Kindhearts was the "progeny" of HLF. (SOF 26)

### F. IAP ACTIVISTS "TRANSITION" THE ORGANIZATION TO AMP.

Kindhearts was not the only attempt to continue the mission of IAP and HLF. Shortly after IAP was found liable for David's murder, former IAP surrogates began discussing a plan to "transition" to a new organization to fill the "void" left by IAP. Enter Magdi Odeh and Hatem Bazian.

Magdi Odeh had been an IAP volunteer as far back as the late 90s, helping coordinate IAP events for Jaber and Hamayel and moderating a panel at the organization's 2000 convention. (SOF 27) Hatem Bazian cofounded Students for Justice in Palestine and had been a featured speaker at IAP events. (SOF 28) They both testified that AMP was conceived in 2005 in the same place IAP claims it became "defunct": Chicago, Illinois. Specifically, at an Islamic Society of North America meeting held at the Mosque Foundation's school. (SOF 29) Attendees recognized that IAP had left a "void" that needed to be filled. (*Id.*)

Following that meeting, Odeh created a Yahoo! Chat group titled "AMP Transition" in late 2005. (SOF 31) Early communications among Odeh, Bazian, and others demonstrate an awareness of the need to avoid any appearance that a new organization was connected to IAP, given IAP's outstanding financial obligations and the legal consequences associated with its prior conduct. To that end, they discussed avoiding association with "well know[n] [*sic*] IAP figures," including Sufian Nabhan, a former IAP board member and leader of its Detroit chapter. (SOF 31) Bazian acknowledged that "[i]t would not be prudent for [AMP organizers] to come back into the April meeting and only have the same cities and people represented." (SOF 32) In practice, however, AMP's early development included essential participation by former IAP personnel.

- Nabhan, despite earlier discussions about distancing from former IAP leaders, became ███████████████████████ organized events for the Detroit chapter (as he had done for IAP), and later served as an AMP board member. (SOF 33, SOF 34)

8

- Chapters were also established in New Jersey, Minnesota, and Milwaukee—each of which previously had IAP chapters—and the "new" AMP chapters in these cities were staffed by IAP loyalists Yousef Shahin, Hussien Al-Khatib, and Salah Sarsour. (SOF 35, SOF 36, SOF 37)

- And IAP veteran Odeh initially headed AMP's all-important Chicago Chapter, and helped organize its first two conventions. (SOF 40)

- Those conventions were not held in Berkeley, California where AMP was formally based and where Bazian lived. They occurred in Rosemont, Illinois where the IAP conventions took place every year. (SOF 41)

- The conventions featured speeches from IAP convention stalwarts, including Jaber and Abuirshaid. (SOF 42)

The message was clear: IAP was back in business, rebranded as AMP and taking full advantage of IAP's social capital and reputation.

## G. IAP LEADERS ARE BROUGHT IN TO LEAD DIRECTLY OUT OF "NECESSITY."

Odeh and Bazian successfully relaunched IAP as AMP, but, to thrive it was a "necessity" for the organization to bring in the old guard to lead the organization formally. Re-emerging from the shadows: Abuirshaid, Hamayel, and Jaber.

**Hamayel:** Since leaving IAP and then Kindhearts, Abdelbasset Hamayel was hired by Sheikh Jamal Said to serve as the Mosque Foundation's Community Center Director. (SOF 43) By no later than January 2009 he became AMP's "voluntary" and "temporary" Executive Director" stating himself that his critical role was to "help the organization start functioning." Hamayel has held that "voluntary" position for many years. (SOF 44) Hamayel's role at AMP is substantial and similar to the one he held at IAP where he was described by Jaber as

9

"everything." He coordinated major events, including the annual convention and fundraising dinner. (SOF 45) He still maintains key AMP information such as donor records. (*Id.*)

**Abuirshaid:** As noted above, Osama Abuirshaid worked at Kindhearts. Abuirshaid testified that Bazian and Salah Sarsour solicited him to come to work for AMP around 2006. (SOF 46) Abuirshaid refused to take a formal position because he feared it would endanger his pending naturalization application, but he immediately began speaking at AMP events. (SOF 48)

At that time, Abuirshaid had already restarted publication of IAP's newspaper, *Al-Zaytounah*, in January 2005—just two months after receiving his last *Al-Zaytounah* paycheck. (SOF 48) Abuirshaid named the "new" paper *El Meezan* and continued operating it while running AMP. (SOF 49) *El Meezan*'s website was virtually identical to *Al Zaytounah*'s and contained many of the same advertisers, including Kindhearts and Baitulmaal. (*Id.*) Abuirshaid eventually sold the newspaper in 2016, but kept it in the IAP family, transferring it to a company led by Sufian Nabhan. (SOF 50) Jaber was the primary distributor of *El Meezan* and subscribers included imprisoned HLF leaders Shukri Baker and Abdul-Rahman Odeh. (SOF 51)

In Bazian's own words, Abuirshaid was formally brought into the organization out of "necessity" as his stature in the community and talents made him a valuable spokesperson and fundraiser. (SOF 52) Since then, Abuirshaid has been a key leader of AMP and currently serves as the organization's Executive Director. (SOF 53)

**Jaber:** Rafeeq Jaber was brought onto the AMP board to serve as the organization's tax preparer. (SOF 54) That responsibility alone made him privy to and a part of board-level decisions for the organization. (*Id.*) But his involvement with AMP did not end there, he also acted as a public representative of AMP ███████████████████████████

████████████████████████████████████████████████████████

10

**Other former IAP loyalists:** They were not the only IAP loyalists involved in AMP. In addition to Mr. Nabhan, Hussien Al-Khatib and Yousef Shahin, former IAP chapter leaders in Minnesota and New Jersey, became AMP's board members. (SOF 36, SOF 37) Kifah Mustapha is a former Imam at the Bridgeview Mosque who was a board member for the IAP and went on to become a speaker at AMP events. (SOF 57)

In other instances, family members of former IAP leaders stepped in to prominent roles. For example, Salah Daoud was an IAP board member who eventually left the country, but his sister-in-law, Sana'a became an ███████████████████████████████ OF 58) Imad Sarsour was a prominent figure in IAP's Milwaukee Chapter and was listed as a board member on the IAP website. (SOF 38█████████████ Salah was one of AMP's ████████ and has been a member of the board for many years. (SOF 59) (AMP Donor Records) Salah and a third brother, Jamil, spent time in prison in Israel ███████████████████████████ ████████████████ (SOF 39) Other IAP leaders that did not become involved in AMP had often already left the country. (SOF 60) The chart below demonstrates the significant overlap between IAP and AMP.



## H. AMP CONTINUES FUNNELING MONEY TO HAMAS.

With IAP leaders firmly back in control, AMP restarted one of IAP most important tasks: funneling its constituent's financial support to Hamas. Under IAP, HLF and then Kindhearts served as the funnel. AMP slightly modified the strategy, relying on a coalition of pro-Hamas charities instead of one designated funnel.

One example is Viva Palestina. Viva Palestina was a pro-Hamas organization led by former British MP George Galloway. (SOF 61) Between 2009 and 2010, Mr. Galloway and Viva Palestina led several convoys to the Gaza Strip to provide, among other things, cash to Hamas leaders. (*Id.*) Upon reaching the Gaza Strip during one of those convoys, Mr. Galloway handed money directly to Hamas leader Ismail Haniya[3] and declared: "This is not charity. This is politics." (SOF 62)

---

[3] Haniya, together with other Hamas leaders, was indicted for violations of numerous sections of the Anti-Terrorism Act on February 1, 2024 by the US Department of Justice for their roles in perpetrating the October 7, 2023 attacks on Israel. https://www.justice.gov/archives/opa/media/1366141/dl

AMP was one of Mr. Galloway and Viva Palestina's critical patrons. AMP hosted and AMP leaders including Abuirshaid spoke at several events for Mr. Galloway at which he raised significant amounts of money which he handed over to Hamas. (SOF 63) An AMP draft press release proudly states:

> Most recently, AMP has endorsed and hosted several events for British MP George Galloway, who was in the United States raising funds for Viva Palestina and his second aid convoy to Gaza. AMP-sponsored fundraisers took place in Dallas, Texas; Kansas City, Milwaukee, Minneapolis and in New Jersey, where in one night Galloway raised more than $300,000. "AMP has the perspective to go out and do things," Galloway told the open house guests. "I would not have had the success I have had here if it weren't for AMP."

(*Id.*)

AMP's effort to promote Viva Palestina was not an outlier event. It offers other Hamas-aligned charities, including Baitulmaal, access to its loyal supporters to raise funds that would be funneled to Hamas. (SOF 64; SOF 65 ███████████████████████████ ████████████████████████ These efforts were a brazen violation of the legal standards under the Anti-Terrorism Act established by the Seventh Circuit just months before:

> Nor should donors to terrorism be able to escape liability because terrorist and their supporter launder donations through a chain of intermediate organizations. Donor A gives to innocent-appearing organization B which gives to innocent-appearing organization C which gives to Hamas. As long as A either knows or is reckless in failing to discover that donations to B end up with Hamas, A is liable.

*Boim v. Holy Land*, 549 F.3d at 701-02. This is exactly the system that AMP put into place.



[REDACTED]

(SOF 66) Salah Sarsour testified that the funds raised by AMP for Viva Palestina to be sent to Hamas were initially given to a "Christian charity." (*Id.*)

AMP cannot begin to even claim that they were not "reckless in failing to discover that the donations . . . end[ed] up with Hamas" assuming that they will even say they did not know. Hamas controlled Gaza at that time and that was where the money was being sent. AMP openly and blatantly did what the Seventh Circuit said they could not do: they sent money to Hamas through third parties – *i.e.*, they followed the IAP blueprint in service of their patron, Hamas.

I. **AMP CONTINUES IAP'S SYMBIOTIC RELATIONSHIP WITH THE MOSQUE FOUNDATION.**

Prior to its transformation into AMP, IAP and the Mosque Foundation had a close relationship. IAP president Jaber first became involved in IAP through the Mosque Foundation, where he was also the president of the board for several years. *See, e.g., Boim*, 340 F. Supp. 2d 885, 910.

[REDACTED] (SOF 67)

When IAP was restarted as AMP, that relationship continued. The earliest discussions about forming AMP took place at the Mosque Foundation's school in 2005. (SOF 29) [REDACTED]

[REDACTED]

[REDACTED]

(SOF 68)

### J. AMP CONTINUES TO SPREAD HAMAS PROPAGANDA.

Since coming into existence, AMP has filled the void left by IAP, spreading and

amplifying pro-Hamas talking points under the guise of educating the public on Palestine. To that

end. [REDACTED]

[REDACTED] SJP is a student organization co-founded by Hatem Bazian. (SOF

28) More recently, the organization has become known for its explicit pro-Hamas stance in the

wake of October 7, including promotional material that glorified Hamas fighters in the

immediate aftermath of the massacre. (SOF 69)

[REDACTED] SOF

70) Since IAP rebranded itself as AMP, it has increased its support for the once-fledgling student

organization [REDACTED] SOF 71)

AMP's website, newsletters, and social media often promote SJP events, congratulate chapters

on various accomplishments, or draw attention to chapters facing potential suspension or

punishments. (*Id.*). AMP also held a series of workshops titled the "Campus Activism Track" at

which AMP representatives discussed, *inter alia*, "how to start an SJP or other student activism

group on your campus." (*Id.*)

AMP's continuation of its close relationship with SJP also brought it a new leader to help

spread its message and solidify the AMP-SJP connection: Taher Herzallah. Mr. Herzallah was the

president of an SJP chapter at University of California Riverside. Prior to graduating, Mr.

Herzallah was hired by AMP in the summer of 2010 as its West Coast Regional Director and

National Campus Coordinator. (SOF 72) After being hired, Mr. Herzallah help organize "a

National SJP conference in October 2011." (SOF 73) In his role at AMP, Herzallah was a direct

15

contact for numerous SJP chapters across the country, ███████████████████ and
often traveling to SJP events to provide an AMP presence. (SOF 72)

Over the years, Herzallah has risen through the ranks of AMP and now serves as its
Director of Outreach and Grassroots Organizing. (*Id.*) Notably, Herzallah's standing with the
organization has not been materially jeopardized by his notable inflammatory statements,
including saying ████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

## III.    STANDARD OF LAW

### A.  SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate where "there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual
dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the
non-moving party, and it is material if it might affect the outcome of the suit under the governing
law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of showing the absence of a genuine dispute of
material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that showing is made, the
burden shifts to the non-movant to proffer specific facts demonstrating that a genuine issue exists
for trial. *Id.* at 324. The non-movant may not rest on mere allegations or denials in the pleadings;
instead, it must cite admissible evidence in the record. FED. R. CIV. P. 56(c)(1); *Anderson*, 477
U.S. at 256.

Unsubstantiated, conclusory, or self-serving denials do not create a genuine fact dispute;
"the mere existence of a scintilla of evidence" is insufficient. *Anderson*, 477 U.S. at 252. Courts
consistently hold that unsupported assertions, speculation, or denials lacking evidentiary support

16

cannot defeat summary judgment. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Celotex*, 477 U.S. at 324 (non-movant must "go beyond the pleadings" with competent evidence).

In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). But summary judgment should be granted when the record as a whole could not lead a rational trier of fact to find for the non-movant. *See, e.g., Matsushita*, 475 U.S. at 587.

## B.  SEVENTH CIRCUIT STANDARD FOR ALTER EGO.

In its opinion reversing the initial dismissal of this matter, the Seventh Circuit emphasized that the alter-ego doctrine is flexible and context-specific, and must be applied in light of the factual realities of terrorism-financing organizations, not rigid corporate-law factors. *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 558–59 (7th Cir. 2021). To that end, the appellate court (and then this Court) expressly identified four factors as being probative to the alter ego question: (1) overlap in leadership; (2) similarity of organizational purpose; (3) similarity of operations; and (4) unlawful motive or intent to evade liability. *Id.*

## IV.   LEGAL ARGUMENT

After IAP was found liable for the murder of David Boim, the organization could no longer operate while being subject to the massive judgment. Recognizing this, after a "quiet period," IAP loyalists and leaders came together to form a "new" organization to fill the "void" IAP left. But the undisputed facts demonstrate the "new" organization was nothing more than a disguised continuance of IAP—no reasonable jury could find otherwise.

### A. AMP WAS ESTABLISHED TO AVOID THE IAP JUDGMENT.

The record demonstrates that AMP was not formed as a genuinely new organization but to fill the "void" left by IAP while evading IAP's liability for the murder of David Boim.

Following the judgment, IAP's president, Rafeeq Jaber, publicly declared the entity "defunct," yet the evidence reveals that IAP's loyalist, including Hatem Bazian, Magdi Odeh and Salah Sarsour almost immediately began orchestrating an effort to keep IAP alive by organizing a "transition" to AMP. Communications among these individuals, including discussions at the Mosque Foundation's school in Chicago and the Yahoo! "Transition" Group, show a deliberate effort to obscure the continuity between IAP and AMP, with explicit recognition of the need to avoid overt connections to IAP and its leadership. And despite Dr. Bazian and Mr. Odeh's attempts to cover their tracks, IAP leaders were involved with AMP from the very beginning.

And while Bazian and Odeh were working to rebrand IAP as AMP, other IAP leaders were still working to further the IAP cause. Abuirshaid and Hamayel and others put their skills and contacts to work at Kindhearts to replicate and continue the work of HLF.   Osama Abuirshaid restarted the IAP newspaper, *Al Zaytounah*, as *El Meezan*, with Rafeeq Jaber helping him with distribution. Eventually, all three of them were back with AMP in prominent roles.

As Dr. Lorenzo Vidino explains in his expert report, the creation of AMP fits a well-documented pattern among network organizations seeking to avoid legal consequences: "members of the network were planning the creation of a new organization that would replace IAP without giving the impression it did so." (Ex. A at 24). Dr. Harel Chorev further describes how such organizations maintain legitimacy and operational cover through formal structures, while their true objectives and activities remain concealed (Chorev Report, attached as Ex. OO, at 3). The evidence thus establishes that AMP's formation was a direct response to the *Boim*

18

judgment, designed to continue IAP's mission while shielding its assets and leadership from liability.

**B. AMP IS CONTROLLED BY FORMER IAP LEADERS AND SURROGATES.**

AMP's leadership structure at the time of the "transition" and well after was dominated by individuals who previously held key positions within IAP, confirming a substantial overlap in control and operational expertise. The summary judgment record identifies Rafeeq Jaber, Abdelbasset Hamayel, and Osama Abuirshaid as central figures in both organizations.

Hamayel, who joined IAP in 1997 and rose to become its Director and General Secretary, now serves as AMP's "volunteer" operations manager, overseeing major events and donor records. Abuirshaid, formerly IAP's Outreach Coordinator and editor of its Arabic-language newspaper, was recruited to AMP for his fundraising and propaganda skills. Jaber, who served as IAP's president, became AMP's tax preparer and financial advisor, participating in board-level decisions and representing AMP at community organizations. Other former IAP loyalists, such as Sufian Nabhan, Hussien Al-Khatib, and Yousef Shahin, have also held important positions at AMP chapters.

Dr. Chorev's expert analysis highlights the "continued presence of former IAP leaders in major roles within the purportedly 'new' AMP," noting that this continuity is a hallmark of "resilient network organizations" (Ex. OO at 10), in this case the response to having been found subject to a massive judgment. Dr. Vidino similarly observes that "AMP's substantial leadership overlap with IAP/AMS was built on the same infrastructure and 'played in the same sandbox' of personal contacts" (Ex. A at 24–25).

The overwhelming evidence of leadership continuity supports the conclusion that AMP is not a distinct entity, but the alter ego of IAP.

### C. AMP AND IAP OPERATE IN THE SAME MANNER.

The operational practices of AMP closely mirror those of IAP, further demonstrating that AMP is a disguised continuation of its predecessor.

AMP immediately established chapters in the same cities, often led by former IAP surrogates, and held annual conventions in the Chicagoland area featuring the same speakers and serving the same community. AMP continues to rely on the Mosque Foundation for event staging and access to its Zakat program, with records showing over $400,000 in pledged donations from the Foundation's Zakat program between 2010 and 2014. AMP's fundraising events, including those for Viva Palestina, Baitulmaal, and other pro-Hamas charities, replicate IAP's strategy of funneling money to Hamas through coalition partners.

Dr. Chorev notes that AMP's first public event after its rebranding was its 2006 National Convention, held at the same location as previous IAP conventions and featuring the same speakers and focus, "reinforcing the seamless transition from IAP to AMP" (Ex. OO at 12). Dr. Vidino describes how AMP "teamed up with entities such as Viva Palestina, Baitulmaal, Zakat Foundation, Islamic Relief and United Muslim Relief that . . . have been publicly identified as sympathetic if not . . . directly providing support to Hamas." (Ex. A at 25). Arieh Spitzen's expert report further confirms that AMP "helped raise money for Hamas—both for its terrorist wing and for the civilian infrastructure that supports Hamas terrorism—when it extended its patronage to the Viva Palestina organization in its fundraising campaign in the USA that used the resources and staff of the AMP organization" (Ex. F at 4).

These facts establish that AMP's operational structure, fundraising activities, and relationship with the Mosque Foundation are indistinguishable from those of IAP.

### D. AMP AND IAP SERVE THE SAME PURPOSE: TO ACT AS HAMAS' PROPAGANDA ARM IN THE US.

Finally, the evidence shows that both AMP and IAP exist to promote Hamas's agenda in the United States, acting as its propaganda and fundraising arm and supporting affiliated organizations and campaigns.

IAP was established as Hamas's propaganda and fundraising arm, holding conventions, publishing pro-Hamas materials, and soliciting donations for Hamas-linked charities. AMP continued this mission, distributing an identical newspaper, organizing conventions that amplify Hamas talking points, and providing grants to SJP chapters nationwide. AMP's clearly illegal fundraising for Viva Palestina and Baitulmaal directly benefited Hamas's civilian and military infrastructure, as confirmed by expert analysis and public records. AMP's publications, social media, and events consistently promote Hamas's narrative.

Dr. Chorev concludes that AMP "fulfilled the same specific functions and roles: educating and indoctrinating Americans according to the Hamas/Muslim Brotherhood narrative, supporting SJP, and organizing the annual conference that played a key role in conveying Hamas' message to the community" (Ex. OO at 9). Dr. Vidino observes that AMP "carried on also IAP/AMS goal of raising funds for Hamas milieus" (Ex. A at 25), and Spitzen confirms that AMP's fundraising activities directly supported Hamas's infrastructure (Ex. F at 4).

The record thus demonstrates that AMP is not a new organization, but the alter ego of IAP, serving the same network, advancing the same goals, and employing the same methods.

## V.    CONCLUSION

Judge Scudder was very clear that the alter ego analysis "is not rigid and must account for the context in which the doctrine is being applied - here, to terrorism financing organizations."  Terrorism financing organizations do not simply put out job opening on

21

LinkedIn.  These organizations require individuals who have specific beliefs and, critically, can be trusted.

> . . . [t]he [Muslim Brotherhood] . . . in the West, where the number of MB activists is significantly smaller,  is composed of connections and collaborations established around a network of personal relationships. In the West, it is essentially a fairly small network of activists tied together by marriage, business ties, old friendships, and, most importantly, a common vision.

Ex. A p. 10.

This point is borne out by the Yahoo Chat.  On its face, the Chat was a clear recognition by the AMP "founders" that populating the "new" organization with IAP veterans would raise onerous financial and reputational challenges. They, understandably, did not want the presence of easily identifiable IAP leaders to increase the risk of becoming liable for IAP's enormous debt.  But if the "new" AMP was intent in demonstrating that it was not the alter-ego or successor of IAP why did it persist in continuing the latter's major activity, illegally raising money for Hamas, holding conventions in same place with the same speakers and allow it to be run by the same people? The reason is clear. They followed the Muslim Brotherhood playbook. They brought on the people they knew and trusted, people with specific experience and a common vision, to operate the "new" organization.  They hired the same people, sent money to the same terrorism group and conducted their affairs in the same way as the purportedly disavowed IAP.  It is clear from the Seventh Circuit's opinion that that AMP is indeed the alter ego of IAP and thereby liable.

As such, the undisputed record demonstrates that AMP is not a genuinely "new" entity, but rather is a disguised continuance of IAP, created and operated by the same core leadership to perpetuate the same mission, evade the Boim judgment, and continue serving as Hamas's propaganda and fundraising arm in the United States. The undisputed continuity in personnel,

operations, purpose, and financial practices between AMP and IAP leaves no other reasonable

conclusion and fully meets the legal standards set in this case by the Seventh Circuit and this

Court . Accordingly, Plaintiffs are entitled to summary judgment as a matter of law on their alter

ego claim, and the Court should hold AMP liable for the judgment previously entered against

IAP.

Date: December 5, 2025

Respectfully submitted,

/s/ Seth H. Corthell
Daniel I. Schlessinger
Stephen J. Landes
Seth H. Corthell
Jaszczuk P.C.
311 South Wacker Dr., Suite 2150
Chicago, IL 60606
(312) 442-0401
dschlessinger@jaszczuk.com
slandes@jaszczuk.com
scorthell@jaszczuk.com

*Attorneys for Stanley Boim, Individually and as the Administrator of the Estate of David Boim, Deceased, and Joyce Boim*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed

electronically using the Court's CM/ECF system and has been served to all parties via email

through CM/ECF on this 5th day of December 2025.


<u>*/s/ Seth H. Corthell*            </u>